# EXHIBIT A

1              UNITED STATES DISTRICT COURT

2             CENTRAL DISTRICT OF CALIFORNIA

3

4    ROSA NUNEZ, individually, ANTHONY        )
     NUNEZ, JR., individually and as          )
5    successor-in-interest to Decedent,       )
     Anthony Nunez and ANDREW NUNEZ,          )
6    individually,                            )
                                              )
7              Plaintiffs,                    )
                                              )
8              vs.                            ) Case No.
                                              ) 5:22-CV-01934-SSS-SPx
9    COUNTY OF SAN BERNARDINO, CITY OF        )
     HESPERIA, MICHAEL MARTINEZ, SABRINA      )
10   CERVANTES, JEREMY DEBERG, JONATHAN       )
     CAMPOS, and DOES 5-15, inclusive,        )
11                                            )
               Defendants.                    )
12   _____ )

13

14         REMOTE VIDEOCONFERENCE DEPOSITION OF

15                  MICHAEL MARTINEZ

16             MONDAY, FEBRUARY 12, 2024

17

18

19

20

21

22   Reported Stenographically By:

23   Jinna Grace Kim, CSR No. 14151

24   Job No.:  47724

25

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Michael Martinez on 02/12/2024

Page 2

1                    UNITED STATES DISTRICT COURT

2                    CENTRAL DISTRICT OF CALIFORNIA

3

4   ROSA NUNEZ, individually, ANTHONY      )
    NUNEZ, JR., individually and as        )
5   successor-in-interest to Decedent,     )
    Anthony Nunez and ANDREW NUNEZ,        )
6   individually,                          )
                                           )
7                  Plaintiffs,             )
                                           )
8          vs.                             ) Case No.
                                           ) 5:22-CV-01934-SSS-SPx
9   COUNTY OF SAN BERNARDINO, CITY OF      )
    HESPERIA, MICHAEL MARTINEZ, SABRINA    )
10  CERVANTES, JEREMY DEBERG, JONATHAN     )
    CAMPOS, and DOES 5-15, inclusive,      )
11                                         )
                   Defendants.             )
12  _____    )

13

14          The remote videoconference deposition of MICHAEL

15  MARTINEZ, taken on behalf of the Plaintiffs, beginning at

16  10:00 a.m., and ending at 1:37 p.m., on Monday, February 12,

17  2024, before Jinna Grace Kim, Certified Stenographic

18  Shorthand Reporter No. 14151.

19

20

21

22

23

24

25

**ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Michael Martinez on 02/12/2024**

Page 3

```
 1      APPEARANCES OF COUNSEL:


 2
        For the Plaintiffs:
 3
                LAW OFFICES OF DALE K. GALIPO
 4              BY:   DALE K. GALIPO, ESQ.
                BY:   MARCEL F. SINCICH, ESQ.
 5              BY:   BENJAMIN S. LEVINE, ESQ.
                21800 Burbank Boulevard, Suite 310
 6              Woodland Hills, California 91367
                Tel:  818-347-3333
 7              Fax:  818-347-4118
                E-mail:  dalekgalipo@yahoo.com
 8              E-mail:  msincich@galipolaw.com
                E-mail:  blevine@galipolaw.com
 9

10              CARRILLO LAW FIRM, LLP
                BY:   PEREZ, ESQ.
11              1499 Huntington Drive, Suite 402
                South Pasadena, California 91030
12              Tel:  626-799-9375
                Fax:  626-799-9380
13              E-mail:  mc@carrillofirm.com

14      For the Defendants:
15
                WESIERSKI & ZUREK, LLP
16              BY:   BRETT SMITH, ESQ.
                29 Orchard Road
17              Lake Forest, California 92630
                Tel:  949-756-0517
18              Fax:  949-756-0517
                E-mail:  bsmith@wzllp.com
19

20
        Also Present:  Mahadhi Corzano, Esq., Fujii Law Group
21

22

23

24

25
```

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Michael Martinez on 02/12/2024

Page 11

```
 1      A.    Yes.

 2      Q.    Okay.  And do you recall the location of the

 3   incident?

 4      A.    An address off 8th Avenue in the City of Hesperia.

 5      Q.    Okay.  Is this a residential neighborhood?

 6      A.    Yes.

 7      Q.    A single family home, essentially?

 8      A.    Correct.

 9      Q.    Did you use force during the incident?

10      A.    What force are you speaking of?

11            There's different types of force.

12      Q.    Right.  That might have been my next question.

13            First, I'm trying to lay a foundation.

14            Did you use any kind of force during the incident?

15      A.    Yes, sir.

16      Q.    And what kind of force did you use?

17      A.    Lethal force.

18      Q.    Okay.  Did you use any other kind of force besides

19   lethal force?

20      A.    I don't believe so.

21      Q.    And when you say you used lethal force, does that

22   mean that you used your pistol to shoot rounds at the

23   subject, Mr. Nunez?

24      A.    My duty weapon, yes.

25      Q.    How many rounds did you fire during the incident?
```

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Michael Martinez on 02/12/2024

Page 12

1        A.   I believe it was three.

2        Q.   Did any other officers use deadly force during the
3   incident?

4        A.   No, sir.

5        Q.   How many other law enforcement officers were
6   on-scene at the time of the use of deadly force?

7             MR. SMITH:  I'll object as to form.

8             But go ahead, Deputy Martinez.

9             THE WITNESS:  To my knowledge, deputies I had seen
10  was approximately seven, but I know there was a lot of other
11  stuff going on behind the scene.  So I couldn't give you an
12  exact number or how many officers were there.

13  BY MR. SINCICH:

14       Q.   Okay.  Do you know how many officers were in the
15  front yard of the residence at the time of the shots?

16       A.   I would say approximately five or six.

17       Q.   And for each of the three shots that you fired, did
18  you intentionally press the trigger each time?

19       A.   Yes.

20       Q.   Did you intend for each of your shots to strike
21  Mr. Nunez?

22       A.   Yes.

23       Q.   Was it your understanding at the time of the
24  incident that shooting a person with your duty weapon could
25  cause death or serious bodily injury?

**ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
Michael Martinez on 02/12/2024

Page 15

```
 1   BY MR. SINCICH:

 2       Q.   Was the subject turning at all during your shot?

 3       A.   I don't believe so.

 4       Q.   Was Mr. Nunez on his feet during the time of all of

 5   your shots?

 6       A.   Yes, sir.

 7       Q.   Was Mr. Nunez ever falling to the ground during any

 8   of your shots?

 9       A.   I believe after the third shot he began to fall

10   forward.

11       Q.   How long after the third shot did he begin to fall

12   forward?

13       A.   I would say within seconds.

14       Q.   When you say within seconds, approximately how many

15   seconds are you referring to?

16       A.   Five to ten seconds.

17       Q.   Was Mr. Nunez moving at all during the five to ten

18   seconds after your third shot?

19       A.   Just his motion to the ground.

20       Q.   What was the distance between you and Mr. Nunez at

21   the time of your third shot?

22       A.   I would say ten feet.

23       Q.   Was Mr. Nunez standing still at the time of your

24   third shot?

25       A.   No.  He was proceeding towards me.
```

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Michael Martinez on 02/12/2024

Page 16

1    Q.    Was Mr. Nunez standing still at the time of your

2    first shot?

3    A.    I believe he was walking towards my direction.

4    Q.    And what about the second shot?

5    A.    Continued pacing towards me.

6    Q.    Was he essentially walking towards you?

7    A.    To my recollection, yes, sir.

8    Q.    How long after your third shot did Mr. Nunez

9    continue to walk towards you before he started falling to the

10   ground?

11   A.    I think after the third shot, he maybe took a couple

12   steps and then went to the ground.

13   Q.    How did Mr. Nunez fall to the ground, to your

14   knowledge?

15   A.    Kind of like hovered forward to the ground facing

16   belly first.

17   Q.    Is that kind of like if you have a broom stick and

18   the broom is touching the ground, and you kind of just let it

19   fall forward, it would just fall kind of forward onto the

20   ground; is that how he fell?

21        MR. SMITH:  I'll object as to form.

22        But go ahead, Deputy Martinez.

23        THE WITNESS:  Yeah.  That would be an example, would

24   be something like that, yes.

25   BY MR. SINCICH:

**ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
Michael Martinez on 02/12/2024

Page 17

1    Q.    Okay.  I'm not sure if I asked, but did he fall

2    forward, backwards, to the side?

3          Which direction did he fall?

4    A.    Forward, sir.

5    Q.    And so forward means he would have fallen towards

6    you?

7    A.    That's correct.

8    Q.    How far was Mr. Nunez's head from where you were

9    standing after he fell to the ground?

10   A.    I would have to say approximately eight to ten feet,

11   probably about eight to ten feet.

12   Q.    That's your best estimate, eight to ten feet from

13   his head to where you were standing after he fell to the

14   ground?

15   A.    Yes, sir.

16   Q.    Prior to using deadly force, did you give a verbal

17   warning that deadly force was going to be used?

18   A.    No.

19   Q.    Within, say, the ten seconds prior to your first

20   shot, did you give any verbal commands to Mr. Nunez?

21   A.    Yes.  He was advised to put the chain down.

22   Q.    Who advised Mr. Nunez to put the chain down in that

23   ten-second period?

24   A.    I believe myself, along with other deputies who were

25   present during the incident.

**ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
Michael Martinez on 02/12/2024

Page 22

 1      A.   That's correct, sir.

 2      Q.   Did you observe anything else in that time period in

 3   between the first and second shot?

 4      A.   No, sir.

 5      Q.   When you fired your first shot, was Mr. Nunez

 6   holding the chain?

 7      A.   Yes, sir.

 8      Q.   And was he holding it in both hands or one hand?

 9      A.   His right hand.

10      Q.   Can you describe how he was holding the chain at the

11   time of your first shot?

12      A.   It was wrapped in his right hand while clenching a

13   fist.

14      Q.   Do you know how many times it was wrapped around his

15   right hand?

16      A.   I do not.

17      Q.   Was it approximately one or two times?

18      A.   It was enough for him to swing it up in the air and

19   maintain control of it.

20      Q.   Was he swinging the chain up in the air at the time

21   of your first shot?

22      A.   He swung it in my direction prior to my first shot,

23   yes.

24      Q.   At the time of your first shot, was he still

25   swinging the chain up in the air?

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Michael Martinez on 02/12/2024

Page 23

```
1      A.   No.

2      Q.   At the time of your first shot, he was holding the

3    chain with his right hand; correct?

4      A.   Yes, sir.

5      Q.   Where was his right hand relative of his body at the

6    time of your first shot?

7      A.   I would say up near his head or ear level above his

8    shoulder.

9      Q.   Can you demonstrate for me how he was holding the

10   chain?

11          MR. SMITH:  I'll object as to form.

12          But go ahead, Deputy Martinez, if you can.

13          THE WITNESS:  Sorry about that, Brett.

14          MR. SMITH:  It's okay.

15          THE WITNESS:  (Indicating).

16   BY MR. SINCICH:

17     Q.   So you have your hand approximately aligned with

18   your ears; is that correct?

19     A.   I would say somewhere in that vicinity, yes.

20     Q.   And your elbow is out to your right side?

21     A.   Correct.

22     Q.   And it's kind of making almost a acute triangle, if

23   I remember middle school correctly?

24     A.   I would say that.

25     Q.   Was Mr. Nunez, for instance, when he was walking
```

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Michael Martinez on 02/12/2024

Page 24

```
 1    forward towards you, did he keep his right foot back, or did

 2    he just walk normally with his left foot forward, right foot

 3    forward?

 4        A.   I don't recall.

 5        Q.   And when he had the chain at the time of your first

 6    shot held in his right hand approximately by his right ear,

 7    where was the rest of the chain at that time?

 8        A.   Dangling down if that makes sense, just like hanging

 9    from the legs portion that was left, hanging down.

10        Q.   Was it touching the ground?

11        A.   I don't recall if it was touching the ground.

12        Q.   Do you recall where approximately it went down to on

13    his body?

14        A.   I do not, sir.

15        Q.   Was it essentially just hanging straight down from

16    his hand?

17        A.   From his clenched fist, yes.

18        Q.   At the time of the second shot, did he still have

19    the chain in his hand?

20        A.   Yes, he did.

21        Q.   Was it in a different position at all?

22        A.   I believe it was still in the same position.

23        Q.   Was there any change in the way he was holding the

24    chain in between the first and second shot?

25        A.   No, sir.
```

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Michael Martinez on 02/12/2024

Page 25

```
 1      Q.    In the ten seconds before the first shot, did

 2  Mr. Nunez verbally threaten you or any of the other

 3  deputies?

 4      A.    No.  He was yelling lots of obscenities.

 5            I don't -- I don't specifically know if it was any

 6  threats made ten seconds before the shot.

 7      Q.    What about in between the first and second shot?

 8      A.    No.

 9      Q.    Five seconds prior to your first shot, did you hear

10  Mr. Nunez say anything?

11      A.    I don't recall if he had said anything five seconds

12  before the first shot.

13      Q.    What about in between your first and second shot,

14  did he say anything?

15      A.    No.

16      Q.    And there was no change in the way he was holding

17  the chain in between the first and the second shot?

18      A.    No, sir.

19      Q.    Was there change in -- strike that.

20            Was there any change in how he was holding the chain

21  in between the second and third shot?

22      A.    No, sir.

23      Q.    Were you stationary at the time of your first

24  shot?

25      A.    Yes, sir.
```

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Michael Martinez on 02/12/2024

Page 34

```
 1      A.   Those are the three that I recall.

 2      Q.   Was Sergeant LeFever in the front yard, do you

 3  recall that?

 4      A.   Yeah.  But not at that time.

 5      Q.   Okay.  He had gone elsewhere at the time of the

 6  shots?

 7      A.   I believe so.

 8      Q.   Where did you believe Sergeant LeFever went at the

 9  time of the shots?

10      A.   To the command post that was being set up.

11      Q.   Do you have any military experience?

12      A.   No, sir.

13      Q.   At the academy did you essentially study the POST

14  Learning Domains?

15      A.   Yes, sir.

16      Q.   Is it your understanding that deputies in San

17  Bernardino are required to know and follow their training and

18  their policies?

19      A.   Yes, sir.

20      Q.   Okay.  In this particular incident why did you use

21  deadly force?

22      A.   Based on my training and experience after we didn't

23  gain compliance after the 40-millimeter, there was no other

24  less-lethal force options that would gain compliance at that

25  point.
```

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Michael Martinez on 02/12/2024

Page 35

1       Q.    If I understand your testimony correctly, did you

2    use deadly force because you felt like the less-lethal force

3    was not working to gain compliance?

4       A.    Yes.  And for the fact of the weapon he had in his

5    right hand.

6       Q.    Is there any other reason why you used deadly force

7    besides the less-lethal was ineffective to gain compliance

8    and that he had the chain in his right hand?

9       A.    And to stop the threat.

10      Q.    And what was the threat?

11      A.    The suspect possibly harming myself or my partners

12   with the metal chain or citizens, the residents next door on

13   each side of the house.

14      Q.    Do you know where your partners were standing at the

15   time of your use of deadly force?

16      A.    To the south of me, sir.

17      Q.    So basically to your left?

18      A.    Yes.

19      Q.    And at the time of your use of deadly force,

20   Mr. Nunez was essentially to your west?

21      A.    Yes, sir.

22      Q.    And Mr. Nunez was walking towards you as you

23   testified before; correct?

24      A.    Yes, sir.

25      Q.    Is it fair to say he wasn't walking towards your

**ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
Michael Martinez on 02/12/2024

Page 45

1      Q.    Did you receive any training from your department

2    that a chain can knock a deputy out?

3          MR. SMITH:  I'm going to object to the form of the

4    question.

5          But go ahead, Deputy Martinez.

6          THE WITNESS:  Can you repeat the question again,

7    sir?

8    BY MR. SINCICH:

9      Q.    Did you receive any training from your department

10   that a chain can knock a deputy out?

11     A.    No, sir.

12     Q.    In your mind, what would have to happen for the

13   chain to knock the deputy out?

14         MR. SMITH:  I'll object to the form of the question.

15         But go ahead, Deputy Martinez.

16         THE WITNESS:  Can you repeat the question again,

17   sir?

18   BY MR. SINCICH:

19     Q.    In your mind, at the time of your use the deadly

20   force, what would have to happen in order for the chain to

21   knock a deputy out?

22         MR. SMITH:  I'll restate my objections.

23         THE WITNESS:  I would have to be struck with the

24   chain, sir.

25   BY MR. SINCICH:

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Michael Martinez on 02/12/2024

Page 46

1    Q.    So essentially, he would have to swing the chain and

2    the chain would have to hit the deputy in the head?

3    A.    Yes.

4    Q.    Other than fear that there was a possibility that if

5    he swung the chain and if the chain hit a deputy in the head,

6    they could potentially get knocked out, was there any other

7    fear that you had related to the chain at the time of your

8    use of deadly force?

9    A.    Just the great bodily injury he could have caused to

10   myself and my partners.

11   Q.    What great bodily injury were you concerned with?

12   A.    Being struck with the chain in any form, sir.

13   Q.    I understand that he was holding some kind of handle

14   on one end of the chain; is that fair?

15   A.    Yes.

16   Q.    What was on the other end of the chain?

17   A.    I believe it was just metal, sir.

18   Q.    There wasn't like a ball or a blade or anything like

19   that?

20   A.    Not to my recollection.

21   Q.    Have you ever seen somebody die from being hit with

22   the chain?

23   A.    Trying to recall a lot of situations I've been in

24   work.  To my knowledge, I can't recall one at this time.

25   Q.    Is there a situations that you recall based on your

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Michael Martinez on 02/12/2024

Page 54

```
 1   BY MR. SINCICH:

 2        Q.   That's correct.

 3        A.   I don't believe so.

 4        Q.   What about a gun in their waistband or pocket?

 5        A.   Yes, sir.

 6        Q.   Approximately how many occasions?

 7        A.   One to three, guessing.

 8        Q.   And you didn't use deadly force in those one or

 9   three different situations?

10        A.   The weapon was concealed.

11        Q.   So you didn't know that they had a gun at the

12   time?

13        A.   That's correct, sir.

14        Q.   Had you ever been in a situation where you saw a

15   subject with a bat or a pipe in their hand?

16        A.   I believe I have.  I just couldn't recall the exact

17   incident or time.

18        Q.   Do you know approximately how many times you've seen

19   a subject with a bat or a pipe in their hand?

20        A.   Five to ten times, sir.

21        Q.   Is it fair to say that you didn't use deadly force

22   against them in those five to ten different occasions?

23        A.   Yes.

24        Q.   Based on your training and policies, is it fair to

25   say that you can only use deadly force if the subject
```

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Michael Martinez on 02/12/2024

Page 55

1    presents an immediate threat of death or serious bodily

2    injury?

3        A.   Yes, sir.

4        Q.   Okay.

5             MR. SINCICH:  It's about 11:19.

6             We've been going just over an hour.  I couldn't

7    remember what time we started.

8             I know it was a little bit later.

9             But is now a good time to take a break?

10            MR. SMITH:  It is for me.

11            I'll defer to you, Deputy Martinez.

12            MR. SINCICH:  I want to make sure Ms. Kim gets a

13   break.  Why don't we take ten minutes.

14            (Recess taken.)

15   BY MR. SINCICH:

16       Q.   Deputy Martinez, we left off at a little bit of a

17   little history line of questions, but I want to ask you a

18   couple questions going back to at the time of force.

19            You had mentioned that and demonstrated that

20   Mr. Nunez's arm was out to his side when he was holding the

21   chain when you fired.

22            Do you recall that?

23       A.   I wouldn't say side, sir.  Above his shoulder.

24       Q.   Right.  His hand was above his shoulder; correct?

25       A.   Correct, sir.

**ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
Michael Martinez on 02/12/2024

Page 64

1    and first took his first step towards you, what was the

2    distance between you and Mr. Nunez?

3        A.    Like I said, I don't recall.

4              I did give you an estimate earlier; right?

5        Q.    You might have.

6              Can you refresh my recollection?

7        A.    I would say about 20 feet.

8        Q.    This is when he first turned towards you and started

9    moving towards you?

10       A.    Yes, sir.

11       Q.    And at 20 feet because of his distance, you felt

12    like he wasn't an immediate threat of death or serious bodily

13    injury?

14       A.    No.  I believed he was.

15       Q.    Even at 20 feet you felt like he was an imminent

16    threat of death or serious bodily injury?

17       A.    Due to my training and experience, yes, sir.

18       Q.    Why didn't you shoot him at that time?

19             MR. SMITH:  I'm going to object to the form of the

20    question.

21             Go ahead, Deputy Martinez.

22             THE WITNESS:  We were still trying to gain

23    compliance, sir.

24    BY MR. SINCICH:

25       Q.    How were you trying to gain compliance?

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Michael Martinez on 02/12/2024

Page 65

1      A.   Tell him to drop the chain.

2      Q.   Did you feel like you still had time to attempt

3   less-lethal options such as verbal communication when he was

4   20 feet away?

5      A.   Can you repeat the question, sir?

6      Q.   Did you feel like because of his distance being 20

7   feet away, you still had the availability of other less

8   intrusive resources to utilize instead of using deadly force

9   to try to gain compliance?

10     A.   No, sir.

11     Q.   Maybe I don't understand your testimony then.

12          It sounds like you said at 20 feet away, you were

13   still trying to gain compliance.

14     A.   Yes, sir.

15     Q.   So did you feel like you had time and distance

16   enough to gain compliance?

17     A.   Not when he started walking towards me, sir.

18     Q.   All right.  I just want to make sure I understand

19   your testimony correctly.

20          What was the distance between you and Mr. Nunez at

21   the them time of your first shot?

22     A.   I believe it was about 15 feet, approximately.

23     Q.   Okay.  And so when he was 20 feet away, are you

24   saying even at 20 feet he was still a threat that you felt

25   sufficient to use deadly force?

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Michael Martinez on 02/12/2024

1      A.    Due to my training and experience, yes, sir.

2      Q.    What in your training and experience led you to

3   believe that a man with a chain 20 feet away was an immediate

4   threat of death or serious bodily injury?

5      A.    Training that we conduct regarding the Tueller

6   drill, sir.

7      Q.    Let me start with experience.

8            Do you have any experience with a man with a chain

9   20 feet away could cause death or serious bodily injury?

10     A.    No.

11     Q.    So you have training then; is that what you're

12  saying?

13           You relied on your training, not your experience?

14     A.    It's -- I believe it's experience and training,

15  sir.

16     Q.    Sure.  And I guess training is part of your

17  experience.

18           But when I say experience, I meant experience

19  outside of the training environment.

20           Do you understand that?

21     A.    Yes, sir.

22     Q.    And the training that you had, you said it was part

23  of the Tueller drill?

24     A.    Yes, sir.

25     Q.    And how many times have you seen or participated in

**ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
Michael Martinez on 02/12/2024

Page 67

1    an exercise where the Tueller drill was utilized?

2        A.    Quite a few same, sir.

3        Q.    When you say quite a few, what do you mean?

4        A.    A 100, over a 100, sir.

5        Q.    And the over 100 times where in training the Tueller

6    drill was utilized, did anybody ever have a chain in their

7    hand?

8        A.    I don't recall specifically if a -- I'm sorry -- if

9    a chain was used during those trainings.

10        Q.    Is it possible that in those over 100 occurrences

11    where you trained at the Tueller drill, is it possible that

12    on no occasions was there a chain involved in the subject's

13    hands?

14        A.    It's possible.

15        Q.    Generally speaking, the Tueller drill is utilized

16    when the subject has a knife; is that fair?

17        A.    Or a weapon of some sort.

18        Q.    Right.  The Tueller drill, I believe, started with

19    the subject with a knife, though.

20              Do you understand that?

21        A.    I would agree with that, yes.

22        Q.    And during the drills, typically, there is an

23    officer who has their weapon system holstered?

24        A.    Are you asking me a question?

25        Q.    Yes.

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Michael Martinez on 02/12/2024

Page 80

1    plan to you?

2         A.   No, sir.  I was engaging with Anthony.

3         Q.   And when you say Anthony, you mean the decedent,

4    Anthony Nunez?

5         A.   The suspect, yes.

6         Q.   I want to ask you about some of the information you

7    knew about Anthony Nunez during the incident.

8              At some point in time during the day, you got a call

9    that you responded to; is that correct?

10        A.   Yes, sir.

11        Q.   Was it essentially a call from dispatch?

12        A.   Yes, sir.

13        Q.   What information did you have from dispatch about

14   the incident?

15        A.   That there was a female calling, female caller

16   stating that her brother-in-law was beating up her husband.

17        Q.   Anything else?

18        A.   The call also stated that he was possibly under the

19   influence.  There was possibly guns registered to the mom at

20   the house.

21        Q.   Did you ever see a gun at any point in time inside

22   the house?

23        A.   I never went in the house, sir.

24        Q.   Did you ever look inside the house?

25        A.   No, sir.

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Michael Martinez on 02/12/2024

Page 105

1    shot in relation to that vehicle?

2        A.    I believe at the passenger side front door.

3        Q.    And what about the third shot?

4        A.    Just a little bit in front of that or a little bit

5    more east of that.

6        Q.    How much distance did Mr. Nunez cover in between his

7    first and second shot?

8        A.    I don't know.  I don't recall, sir.

9        Q.    Can you give me an approximate distance?

10       A.    One or two feet.

11       Q.    And then how many feet did Mr. Nunez cover between

12   the second and the third shot?

13       A.    Another one or two feet, I believe.

14       Q.    And then you said I believe earlier that he moved an

15   additional some distance after the third shot before he fell

16   to the ground?

17       A.    Yes, sir.

18       Q.    Do you recall that distance?

19       A.    I do not.

20       Q.    Okay.  Was it possible for you to maneuver to the

21   south while Mr. Nunez was on the north side of the vehicle?

22       A.    Yes, it was possible.

23       Q.    And if you maneuvered to the south prior to using

24   deadly force, is it fair to say that the vehicle would have

25   given you cover?

**ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Michael Martinez on 02/12/2024**

Page 106

1    A.   Not necessarily because the length of the chain that

2    he had swung right before he was on the north side, he had

3    swung the chain towards the vehicles.

4         So with the chain, no, it wouldn't have given me

5    cover.

6    Q.   **Where was Mr. Nunez located when he swung the chain**

7    **at the vehicle?**

8    A.   I believe there was two vehicles, and he was at the

9    second vehicle, the furthest vehicle south.

10        He had swing the chain towards the vehicles.

11   Q.   I think it might be easier if I pull up a photograph

12   in a minute here.  Before I get there, let me just ask you

13   quickly we covered some of the information that you knew

14   before arriving on-scene; correct?

15   A.   Yes, sir.

16   Q.   Is there any other information that you learned

17   prior to arriving on-scene?

18   A.   Without looking at the call history, to my

19   recollection, I don't believe so.

20   Q.   All right.

21        MR. SINCICH:  This might be a another good time to

22   take a break.

23        Can we just do five minuses this time?

24        Is that okay with everybody?

25        MR. SMITH:  Yeah.  That's perfectly fine with me.