# EXHIBIT D

```
 1                UNITED STATES DISTRICT COURT

 2                CENTRAL DISTRICT OF CALIFORNIA

 3

 4    ROSA NUNEZ, individually, ANTHONY   )
      NUNEZ, JR., individually and as     )
 5    successor-in-interest to Decedent,  )
      Anthony Nunez and ANDREW NUNEZ,     )
 6    individually,                       )
                                          )
 7                  Plaintiffs,           )
                                          )
 8            vs.                         ) Case No.
                                          ) 5:22-CV-01934-SSS-SPx
 9    COUNTY OF SAN BERNARDINO, CITY OF   )
      HESPERIA, MICHAEL MARTINEZ, SABRINA )
10    CERVANTES, JEREMY DEBERG, JONATHAN  )
      CAMPOS, and DOES 5-15, inclusive,   )
11                                        )
                    Defendants.           )
12    _____)

13

14           REMOTE VIDEOCONFERENCE DEPOSITION OF

15                      JEREMY DEBERG

16                WEDNESDAY, FEBRUARY 21, 2024

17

18

19

20

21

22    Reported Stenographically By:

23    Jinna Grace Kim, CSR No. 14151

24    Job No.:  47727

25
```

```
 1                UNITED STATES DISTRICT COURT

 2                CENTRAL DISTRICT OF CALIFORNIA

 3

 4   ROSA NUNEZ, individually, ANTHONY   )
     NUNEZ, JR., individually and as     )
 5   successor-in-interest to Decedent,  )
     Anthony Nunez and ANDREW NUNEZ,     )
 6   individually,                       )
                                         )
 7                 Plaintiffs,           )
                                         )
 8                 vs.                   ) Case No.
                                         ) 5:22-CV-01934-SSS-SPx
 9   COUNTY OF SAN BERNARDINO, CITY OF   )
     HESPERIA, MICHAEL MARTINEZ, SABRINA )
10   CERVANTES, JEREMY DEBERG, JONATHAN  )
     CAMPOS, and DOES 5-15, inclusive,   )
11                                       )
                   Defendants.           )
12   _____)

13

14        The remote videoconference deposition of JEREMY

15   DEBERG, taken on behalf of the Plaintiffs, beginning at 10:03

16   a.m., and ending at 1:28 p.m., on Wednesday, February 21,

17   2024, before Jinna Grace Kim, Certified Stenographic

18   Shorthand Reporter No. 14151.

19

20

21

22

23

24

25
```

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Jeremy Deberg on 02/21/2024

Page 3

1  APPEARANCES OF COUNSEL:

2

   For the Plaintiffs:
3
            LAW OFFICES OF DALE K. GALIPO
4           BY:  DALE K. GALIPO, ESQ.
            BY:  BENJAMIN S. LEVINE, ESQ.
5           21800 Burbank Boulevard, Suite 310
            Woodland Hills, California 91367
6           Tel:  818-347-3333
            Fax:  818-347-4118
7           E-mail:  dalekgalipo@yahoo.com
            E-mail:  blevine@galipolaw.com
8

9           CARRILLO LAW FIRM, LLP
            BY:  DOMINIQUE BOUBION, ESQ.
10          1499 Huntington Drive, Suite 402
            South Pasadena, California 91030
11          Tel:  626-799-9375
            Fax:  626-799-9380
12          E-mail:  db@carrillofirm.com

13
   For the Defendants:
14
            WESIERSKI & ZUREK, LLP
15          BY:  BRETT SMITH, ESQ.
            29 Orchard Road
16          Lake Forest, California 92630
            Tel:  949-756-0517
17          Fax:  949-756-0517
            E-mail:  bsmith@wzllp.com
18

19 Also Present:  Mahadhi Corzano, Esq., Fujii Law Firm

20

21

22

23

24

25

1  your head at the time?
2      A.   Yes.  The microphone is at the top of my -- at the
3  "V" of my uniform affixed.
4      Q.   And you had it in that position during the incident
5  as well?
6      A.   Yes.  That's where I always keep it.
7      Q.   How did you first hear about this incident?
8      A.   I was on an unrelated -- excuse me -- call for
9  service, and I was driving towards the Hesperia Sheriff's
10 Station.  I was turning west on Main Street.  I was on the
11 east side of town, and our station is near the center of the
12 city.  So I was driving west on Main Street towards the
13 Hesperia Sheriff's Station when I heard a deputy broadcast
14 over the radio that they were out with a subject armed with a
15 chain, at which time I assisted on that call for service.
16     Q.   Did they give you a location that they were at?
17     A.   Yes.  It was on 9th Avenue south of Main Street.
18 I don't remember the exact address.
19     Q.   You did receive an address, though?
20     A.   Yes.
21     Q.   Did you then drive to that address?
22     A.   I did.
23     Q.   Approximately how long did it take you before you
24 got to the address after you began driving there?
25     A.   Without looking at my call history, I couldn't

1   estimate.
2   Q.   Do you think -- in your estimation do you think it
3   would be shorter on longer than ten minutes?
4   A.   If I had to estimate, I would say at or less than
5   ten minutes.
6   Q.   Okay.
7   A.   But again, I can't specify exactly without looking
8   at the call history.
9   Q.   During the time up until your arrival at the address
10  that you received, what information did you receive over the
11  radio about what was going on?
12  A.   I don't recall what the radio transmissions were.
13  Q.   But I think you mentioned just now that you had been
14  advised that there was somebody with a chain?
15  A.   Yes.  That's what the initial broadcast that I heard
16  was, but after that between that broadcast and me arriving
17  on-scene I have no recall what radio transmissions there
18  were.
19  Q.   Prior to -- do you recall prior to your arriving
20  on-scene receiving information, any information about a
21  particular suspect or subject that deputies were engaging
22  with?
23  A.   I'm sorry.  I don't understand the question.
24  Q.   Did you have an understanding that there was a
25  particular individual that the deputies were engaged with at

1   A.   No, the same side of the street.

2        The residence was on the west side of the street.

3   Q.   Okay. And what did you -- did you then get out of
4   the vehicle upon arriving?

5   A.   Yes. I arrived on-scene at the same time as
6   Sergeant La Fever, and his patrol vehicle was parked right in
7   front of mine. Upon exiting my patrol vehicle, I asked him
8   if I should get the 40-millimeter less-lethal launcher, and
9   he said that was a good idea, at which time I retrieved it
10  from his patrol vehicle.

11  Q.   Upon getting out of the your vehicle after parking,
12  did you see anybody else from that position besides Sergeant
13  La Fever?

14  A.   No.

15  Q.   Besides Sergeant La Fever, did you speak with any
16  other deputies upon arriving at the scene before you --
17  before going to the property?

18  A.   I don't believe so.

19  Q.   What prompted you to ask Sergeant La Fever whether
20  you should retrieve the 40-millimeter launcher?

21  A.   I thought it would be a good idea to have various
22  options of less-lethal, or it would be a good idea for
23  multiple less-lethal options to be present in case they were
24  warranted.

25  Q.   I think you said multiple less-lethal options there.

Page 31

```
 1   had asked Sergeant La Fever about the 40-millimeter launcher
 2   and that he had said that yes, you should retrieve the
 3   40-millimeter launcher; is that correct?
 4       A.   Yes.
 5       Q.   And you retrieved that from his vehicle?
 6       A.   Yes.  It was in the trunk area of his patrol
 7   vehicle.
 8       Q.   Was it in some sort of case?
 9       A.   Yes.  It was in the hard plastic pelican case.
10       Q.   Was it loaded already?
11       A.   No, it was not.
12       Q.   Did you load it?
13       A.   I did.
14       Q.   How many rounds does it carry?
15       A.   It carries four in a cylinder style drum magazine.
16       Q.   Did you load it with four rounds?
17       A.   I did.
18       Q.   Is there some type of chamber that allows it to
19   carry an additional round, or is the total number of rounds
20   it can carry at a time four?
21       A.   The total it can carry is four.
22       Q.   Did you obtain any additional rounds to carry on
23   your person besides the four that you loaded into the
24   launcher?
25       A.   I did not.
```

1  to change my position at all, and I believe he told me I was
2  in a good position in my general area where I had been posted
3  up, but I don't recall any other conversations.
4      Q.  Were you communicating with other deputies during
5  that time via a radio?
6      A.  Yes.  Some of the more important things that I heard
7  with the conversation between Deputy Campos, Deputy Martinez,
8  mr. Nunez I would broadcast such as if they said he dropped
9  the chain, I would broadcast on the radio that he dropped the
10 chain.  If they said he picked it up, I would broadcast that
11 he picked it up.
12         I do believe or there was one time when Mr. Nunez
13 said he was going to make us kill him, and I did broadcast
14 that just so that everyone was aware of his possible
15 intentions.
16     Q.  At the time of that last statement that you just
17 mentioned, was Anthony still inside the house?
18     A.  Yes.  And that was shortly before he exited the
19 house.
20     Q.  At some point did Deputy Campos join you at or near
21 the portion that you had taken to the north of the front door
22 of the house?
23     A.  Yes.  I don't recall when she arrived on-scene, but
24 she had retrieved a less-lethal bean bag shotgun.
25     Q.  And where was she generally positioned relative to

```
 1   closet deputy to Anthony at that time?
 2       A.   It's very possible.
 3       Q.   Did your first round appear to strike Anthony?
 4       A.   It did strike him in the abdomen area.
 5       Q.   And what effect if any did that appear to have?
 6       A.   None.  He had zero reaction to it.
 7       Q.   And he didn't say anything in response to being
 8   shot?
 9       A.   He didn't say anything.  He didn't flinch.
10            His muscles didn't change.  As far as I could tell,
11   it was the same as a fly landing on him.
12       Q.   Could you see any kind of mark on his body on the
13   part of his abdomen that the round struck after it struck
14   him?
15       A.   I don't recall seeing any marks.
16       Q.   Did you then fire another round at Anthony?
17       A.   Yes.  And he was in a very similar position as the
18   first where he was when I fired the first round, and the
19   second round struck him in the abdomen area as well.
20       Q.   Had he begun walking between the first and second
21   rounds, or did he stay in the same place?
22       A.   He was in the same general place.
23            He never stood -- during the whole incident he never
24   stood completely still while outside the residence.  He was
25   constantly moving his feet.  So he never stayed in one
```

Page 66

1   shot striking him in the abdomen area.
2       Q.   And was he still swinging the chain over his head
3   throughout the period that you were firing these four rounds
4   at him?
5       A.   Yes.  He never stopped swinging the chain above his
6   head, and he had the same reaction to all four shots which
7   was no reaction.
8       Q.   So just to kind of summarize here, and you know, I
9   want to make sure we're on the same page, so please correct
10  me if I'm wrong.
11          Your testimony is that Anthony was standing more or
12  less at the location of that point in the grass we saw on the
13  photo earlier at the time of your first and second shots.
14          And then he headed approximately to the east, and
15  while he was heading towards the east and the east fence
16  along the property, you fired the third shot, and then after
17  the third shot, he turned around and started heading
18  approximately to the west again, reached a position that was
19  further west than the position he had been in for shot one
20  and two.
21          And at that position you fired your fourth shot at
22  him; is that all generally correct?
23      A.   Yes.  In that general area, yes.
24      Q.   Okay.  Prior to firing any of these shots, did you
25  verbally warn Anthony that you were going to use the

1   40-millimeter against him?
2   A.   Yes.  I verbally said, "40, 40" to indicate to
3   Mr. Nunez and my partner that I'm going to deploy the
4   40-millimeter launcher.
5   Q.   Was it your understanding at the time that a
6   civilian without police training would understand the meaning
7   of "40, 40?"
8   A.   I don't know what the average civilian would
9   interpret that as.
10  Q.   I think, and again, correct me if I'm wrong.
11       I think you mentioned that at the time of your first
12  40-millimeter round that you fired, Anthony was approximately
13  35 feet away from you.
14       Do I have that correctly?
15  A.   I believe so.
16  Q.   At any point between your first and fourth shot, did
17  Anthony come any closer to you than approximately 35 feet?
18  A.   I believe when he was walking back to the west after
19  the third shot, he was not walking directly west.  He was
20  walking slightly north and west to walk in a closer direction
21  towards my direction --
22  Q.   What -- I'm sorry.  I thought you were finished.
23       I apologize.  What would you estimate was the
24  closest distance Anthony was to you during any of your four
25  shots?

1  Q.  Okay.  Did Anthony continue moving or begin moving
2  in a new direction after your fourth shot?
3  A.  Yeah.  Within moments he sprinted north along the
4  front of the house and in between that area between the dark
5  sedan and the red sedan in front of the front door.
6  Q.  And that was directly after your fourth shot was
7  fired?
8  A.  Within seconds, yeah.
9  Q.  Okay.  And so you're saying that he moved north
10 along the front area of the house to approximately where the
11 dirt was budding the porch, and then from there he moved into
12 the gap between the two vehicles that were parked there; is
13 that what you're saying?
14 A.  Yes.  He sprinted into the gap in between the two
15 vehicles still swinging the chain above his head the whole
16 time.
17 Q.  Okay.  And did he then proceed further through the
18 gap between those two cars to the -- I guess it would have
19 been to the east or to the northeast?
20 A.  Yes.  Those general directions.
21 Q.  And then what was the next type of weapon that was
22 deployed against Anthony?
23 A.  I know Deputy Cervantes deployed the less-lethal
24 bean bag shotgun.  I don't recall how many bean bag rounds
25 she deployed or where she was when she deployed it.

```
 1   danger to the public like a fleeing felon rule, then you
 2   could use deadly force on a fleeing felon such as a murder
 3   suspect running into a shopping center, a highly populated
 4   shopping center.
 5        Q.   Did you believe that the fleeing felon rule applied
 6   in this case at the time that Deputy Martinez fired his
 7   weapon?
 8        A.   No.
 9        Q.   So putting aside the fleeing felon rule that you
10   just mentioned, and assuming that the fleeing felon rule does
11   not apply in the given situation, is it your understanding
12   then that based on your training, deadly force can only be
13   used to defend against an imminent threat or immediate threat
14   of death or serious bodily injury?
15             MR. SMITH:   I'll object to the form of the question.
16             But go ahead, Jeremy.
17             THE WITNESS:   Yes.  To yourself or someone else.
18   BY MR. LEVINE:
19        Q.   Were you trained that deputies are responsible for
20   justifying every shot when using deadly force?
21        A.   Yes.  We are responsible for each time we pull the
22   trigger.
23        Q.   Were you trained that deputies should attempt to
24   assess the impact of or effect of the use of deadly force
25   after each shot?
```

1  there that I'm just not thinking about at the top of my
2  head.
3      Q.   Would those weapons include a knife?
4           MR. SMITH:  I'll object to the form.
5           But go ahead, Jeremy.
6           THE WITNESS:  Again, it's a very generic question
7  and I'm not going to answer a generic question with a
8  specific answer.
9  BY MR. LEVINE:
10     Q.   Were you also trained on the use of less-lethal
11 force including the 40-millimeter?
12     A.   Yes.
13     Q.   Were you trained that when using less-lethal impact
14 devices, you should allow time for those devices to take
15 effect or have an impact before using further force on a
16 subject?
17     A.   Generally, when reasonable and practical, yes.
18     Q.   According to your training what is the intended
19 effect of a 40-millimeter round launcher?
20     A.   To gain compliance from a subject.
21     Q.   Is it considered a pain compliance weapon?
22     A.   I believe so.
23     Q.   And essentially, is the idea there that the reason a
24 subject would become compliant after being shot with a
25 40-millimeter round is that they don't want to be hurt

```
 1   anymore?
 2       A.   I believe that's a good assumption.
 3       Q.   According to your training, under what circumstances
 4   is it appropriate for a deputy to fire a 40-millimeter round
 5   at an individual?
 6            MR. SMITH:  I'll object to the form.
 7            But go ahead, Jeremy.
 8            THE WITNESS:  I'm sorry.  Can you restate the
 9   question?
10   BY MR. LEVINE:
11       Q.   Sure.  According to your training, under what
12   circumstance is it appropriate for a deputy to fire a
13   40-millimeter round at an individual?
14       A.   When there is a threat of bodily injury, active
15   resistance.
16       Q.   Is any threat of bodily injury sufficient to justify
17   the use of a 40-millimeter round according to your
18   training?
19       A.   I would have to look up the specific policy.
20       Q.   According to your training, is it your understanding
21   that if a -- if you were witnessing a subject about to slap
22   another civilian across the face with their bare hand, that
23   that threat of force would justify your use of the
24   40-millimeter launcher against the person who is about to
25   slap the other person?
```

```
 1      A.   I believe when he was still inside the residence
 2   before he exited, he said he was going to kill someone.
 3           But I don't know who directly he was speaking to.
 4           That's when Deputy Campos and Deputy Martinez were
 5   engaged with him.
 6      Q.   At any point after Anthony exited the house, did you
 7   hear him make verbal threats that appeared to be directed
 8   toward a specific deputy?
 9      A.   Not that I recall.
10      Q.   Okay.  At any point at the time Deputy Martinez
11   fired his shots, did you have any specific information about
12   any criminal history that Anthony had?
13      A.   No.  At that time I did not even know his name.
14      Q.   Okay.  At the time that Deputy Martinez fired any of
15   his shots, did you have any information that Anthony had
16   injured anybody that day?
17           MR. SMITH:  I'll object to the form of the question.
18           But go ahead, Deputy.
19           THE WITNESS:  I don't recall.
20   BY MR. LEVINE:
21      Q.   At the time that Deputy Martinez fired any of his
22   shots, did you have any specific information that Anthony had
23   used any drugs that day or was on drugs at the time of the
24   incident?
25      A.   Did I have specific knowledge like someone told me
```

```
 1   he had used drugs or that I heard from him?
 2       Q.   Anything like that.
 3       A.   Based on his behavior and the -- what I heard him
 4   say inside the residence, I believe there was a high
 5   probability he was under the influence of a controlled
 6   substance.
 7       Q.   What were the things that he said from inside the
 8   residence that made you believe he might be under the
 9   influence?
10       A.   I remember him calling someone a devil, he's going
11   to make us kill him.  I mean, all very irrational thoughts
12   which I've seen numerous times with paranoia due to drug
13   use.
14       Q.   Did you ever hear him say that he had used drugs?
15       A.   No.  But at the same time very few people that used
16   drugs will openly admit they used drugs or under the
17   influence of drugs based on my training and experience.
18       Q.   When -- I think you mentioned a moment ago that you
19   heard him make a statement while he was inside about devils
20   and things like that.
21            Did I hear you correctly?
22       A.   Yes.
23       Q.   Did you consider that when you heard that, that it
24   may be an indication that Anthony was experiencing some kind
25   of mental health crisis?
```