# EXHIBIT E

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Sabrina Cervantes on 02/22/2024

1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3

4   ROSA NUNEZ, individually, ANTHONY    )
    NUNEZ, JR., individually and as      )
5   successor-in-interest to Decedent,   )
    Anthony Nunez and ANDREW NUNEZ,      )
6   individually,                        )
                                         )
7            Plaintiffs,                 )
                                         )
8            vs.                         ) Case No.
                                         ) 5:22-CV-01934-SSS-SPx
9   COUNTY OF SAN BERNARDINO, CITY OF    )
    HESPERIA, MICHAEL MARTINEZ, SABRINA  )
10  CERVANTES, JEREMY DEBERG, JONATHAN   )
    CAMPOS, and DOES 5-15, inclusive,    )
11                                       )
             Defendants.                 )
12  _____)

13

14       REMOTE VIDEOCONFERENCE DEPOSITION OF

15            SABRINA CERVANTES

16        THURSDAY, FEBRUARY 22, 2024

17

18

19

20

21

22  Reported Stenographically By:

23  Jinna Grace Kim, CSR No. 14151

24  Job No.:  49297

25

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Sabrina Cervantes on 02/22/2024

Page 2

```
 1                    UNITED STATES DISTRICT COURT

 2                    CENTRAL DISTRICT OF CALIFORNIA

 3

 4    ROSA NUNEZ, individually, ANTHONY    )
      NUNEZ, JR., individually and as      )
 5    successor-in-interest to Decedent,   )
      Anthony Nunez and ANDREW NUNEZ,      )
 6    individually,                        )
                                           )
 7                    Plaintiffs,          )
                                           )
 8             vs.                         ) Case No.
                                           ) 5:22-CV-01934-SSS-SPx
 9    COUNTY OF SAN BERNARDINO, CITY OF    )
      HESPERIA, MICHAEL MARTINEZ, SABRINA  )
10    CERVANTES, JEREMY DEBERG, JONATHAN   )
      CAMPOS, and DOES 5-15, inclusive,    )
11                                         )
                      Defendants.          )
12    _____)

13

14             The remote videoconference deposition of SABRINA

15    CERVANTES, taken on behalf of the Plaintiffs, beginning at

16    11:30 a.m., and ending at 2:17 p.m., on Thursday, February

17    22, 2024, before Jinna Grace Kim, Certified Stenographic

18    Shorthand Reporter No. 14151.

19

20

21

22

23

24

25
```

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Sabrina Cervantes on 02/22/2024

```
                                                           Page 3
 1     APPEARANCES OF COUNSEL:


 2

       For the Plaintiffs:
 3

               LAW OFFICES OF DALE K. GALIPO
 4             BY:  DALE K. GALIPO, ESQ.
               BY:  BENJAMIN S. LEVINE, ESQ.
 5             21800 Burbank Boulevard, Suite 310
               Woodland Hills, California 91367
 6             Tel:  818-347-3333
               Fax:  818-347-4118
 7             E-mail:  dalekgalipo@yahoo.com
               E-mail:  blevine@galipolaw.com
 8

 9             CARRILLO LAW FIRM, LLP
               BY:  DOMINIQUE BOUBION, ESQ.
10             1499 Huntington Drive, Suite 402
               South Pasadena, California 91030
11             Tel:  626-799-9375
               Fax:  626-799-9380
12             E-mail:  db@carrillofirm.com

13     For the Defendants:
14
               WESIERSKI & ZUREK, LLP
15             BY:  BRETT SMITH, ESQ.
               29 Orchard Road
16             Lake Forest, California 92630
               Tel:  949-756-0517
17             Fax:  949-756-0517
               E-mail:  bsmith@wzllp.com
18

19     Also Present:  Mahadhi Corzano, Esq., Fujii Law Firm

20

21

22

23

24

25
```

**ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
Sabrina Cervantes on 02/22/2024

Page 24

1   A.   Prior to my arrival I don't believe so.

2        From what I remember, the suspect was inside of the

3   house and was talking to deputies through the front door.

4        So deputies had no visual of what the suspect looked

5   like at the time or if he had anything in his hands.

6   Q.   Prior to arriving did you have any information about

7   there being a firearm or a potential firearm at the

8   location?

9   A.   That is correct, sir.

10  Q.   What information did you receive?

11  A.   From what I recall, the mother of the suspect stated

12  that there was a weapon in the house, a firearm in the house,

13  and nobody in the house knew where the weapon was at

14  exactly.

15  Q.   And then when you arrived did you park your car

16  somewhere?

17  A.   Yes, sir.

18  Q.   Was there anybody traveling in that vehicle with

19  you?

20  A.   No, sir.

21  Q.   Where did you park?

22  A.   I parked about two houses down from the residence.

23  Q.   Was that on the same side of the street as the

24  residence?

25  A.   That's correct.

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Sabrina Cervantes on 02/22/2024

Page 25

1   Q.   And when he say two houses down, two houses down in

2   which direction?

3   A.   I believe it was north.

4   Q.   Do you now know the name of the suspect who deputies

5   were engaged with there to be Anthony Nunez?

6   A.   Yes, sir.

7   Q.   Prior to that day had you ever met or had any

8   interaction with Anthony Nunez?

9   A.   No, sir.

10   Q.   Prior to your arrival at the location, did you have

11   any information regarding Anthony Nunez having ever been

12   convicted of any crimes?

13   A.   No, sir.

14   Q.   Prior to arriving at the location, did you have any

15   specific information that Anthony Nunez had used any drugs at

16   any point?

17   A.   Yes, sir.

18   Q.   What specific information did you have regarding

19   that?

20   A.   I believe that the family said that he was under the

21   influence of a controlled substance.  I'm not too sure

22   exactly what substance he was on, but that he had not slept

23   in five days, four days.

24        The family became scared of him, and the day the

25   reason why we got called there to the date of the incident

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Sabrina Cervantes on 02/22/2024

Page 26

1  was because Anthony had, I believe, choked his brother and

2  held him against the wall.

3      Q.   After parking your car a couple houses to the north

4  of the location, did you get out of the car?

5      A.   Yes, sir.

6      Q.   And did you see any other Sheriff's vehicles on the

7  street when you got out?

8      A.   Yes, sir.

9      Q.   How many?

10     A.   I believe there was two, sir.

11     Q.   And what was your understanding at that time as to

12  how many other Sheriff's deputies were already at the

13  location?

14     A.   Based off the MDC and the radio traffic, I knew

15  there was two deputies already on the scene.

16     Q.   Was your impression at the time that the two deputy

17  vehicles you saw were the -- that it was one for each of the

18  two deputies that were already there?

19     A.   Yes, sir.

20     Q.   Upon getting out of your vehicle, did you see any

21  deputies from where you were standing?

22     A.   Yes, sir.

23     Q.   And where were they located?

24     A.   They were located in the front of the residence kind

25  of facing the front door, but like more to towards the right

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Sabrina Cervantes on 02/22/2024

Page 27

1   where there was a wall.

2       Q.   And what was the first thing that you did after

3   getting out of your vehicle?

4       A.   I got out of my vehicle, I went to the back of the

5   vehicle in the trunk, I retrieved the less-lethal shotgun, I

6   opened and made sure that the shotgun was clear and didn't

7   have any live ammunition or less-lethal rounds inside.

8            And I placed the less-lethal rounds inside of the

9   shotgun and went to assist my two deputies that were

10  on-scene.

11       Q.   Besides the equipment that you already told me about

12  that was on your belt and as well as that less-lethal

13  shotgun, did you have any other weapon systems or protective

14  equipment that was in your vehicle?

15       A.   As in like less-lethal or lethal?

16       Q.   Anything.

17       A.   I do have the shotgun and the mini --

18       Q.   What was the last thing you said?

19            You broke up a little bit.

20       A.   The mini 14 rifle.

21       Q.   Are there any other less-lethal weapons that were in

22  the vehicle?

23       A.   No, sir.

24       Q.   Were there any other lethal weapons that were in the

25  vehicle?

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Sabrina Cervantes on 02/22/2024

Page 33

1      Q.    How many rounds can be loaded into a less-lethal

2    shotgun at a time?

3      A.    One set of time.

4      Q.    What is the maximum rounds that a less-lethal can

5    carry when it's fully loaded?

6      A.    I believe four.  Well, you have the one in the

7    chamber.  So I believe you have four or five.

8      Q.    And how many rounds did you load the less-lethal

9    shotgun with on the date of the incident?

10     A.    I believe there was four.  I don't recall.

11     Q.    And when you approached the residence, I think you

12    mentioned that the two deputies, and that would be Deputy

13    Martinez and Deputy Campos were standing sort of outside of

14    the front door area; is that correct?

15     A.    Yes.

16     Q.    And what did they appear to be doing at that time?

17     A.    They were trying to basically de-escalate the

18    situation.  They were trying to have a conversation with

19    Anthony.  They were basically trying to have a conversation

20    with him trying to calm him down.

21          I didn't see Anthony, but I heard his voice, and he

22    was very hostile.

23     Q.    Could you clearly hear everything that the two

24    deputies and Anthony were saying during that conversation?

25     A.    I could clearly hear the deputies.

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Sabrina Cervantes on 02/22/2024

Page 35

1   Q.   At the time that you arrived and took that position

2   behind the wall near the other two deputies, had you received

3   any instructions or directions from any other deputies or

4   supervisors regarding what you should do?

5   A.   The only -- from what I recall, Deputy Martinez had

6   basically hand-gestured me to like stay where the wall was

7   at, and I guess it was more because he didn't want Anthony to

8   get more aggravated if he saw additional deputies at the

9   location.

10   Q.   Was that why you took the position behind the wall

11   that you mentioned?

12   A.   That's correct, sir.

13   Q.   And had you had any conversations or discussions

14   with any deputies or supervisors about the incident up until

15   that point including over the radio?

16   A.   I believe so, sir.

17   Q.   And what conversation or discussion had you had?

18   A.   Just with Deputy Martinez telling me that stand by

19   the wall.  I don't recall having another conversation with

20   another deputy.

21   Q.   I think you mentioned hand gesture that you

22   interpreted and indicting that you should stay behind the

23   wall.

24        Did you have any verbal conversation with him?

25   A.   No.  Because he was still trying to talk to Anthony

**ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
Sabrina Cervantes on 02/22/2024

Page 44

1    ask you.

2              For the periods of that, you know, time of a little

3    over an hour where you were situated behind the wall that you

4    mentioned near the two Deputies Martinez and Campos, could

5    you, how much of their conversation with Anthony could you

6    hear?

7         A.   I heard pretty most, sir.

8         Q.   And what did Anthony's demeanor appear to be during

9    that conversation from what you could hear?

10        A.   He was very --

11        Q.   You broke up.

12        A.   Just by the tone of his voice, he was very

13   aggravated.

14        Q.   Okay.  Did he sound consistently aggravated

15   throughout the conversation that you heard?

16        A.   Yes, sir.

17        Q.   So there were not periods where he was more calm and

18   other periods where he was aggravated?

19              Or he was aggravated the whole time?

20        A.   He was -- from what I can hear, yes, sir.

21        Q.   And I think you mentioned before the break, but at

22   the time Anthony came outside you were still positioned in

23   that place behind that wall; is that correct?

24        A.   Yes.  I believe the first time he -- I don't think

25   he came outside of the house yes.  I believe he just opened

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Sabrina Cervantes on 02/22/2024

Page 59

1    vehicle, did the other deputies who you were with also

2    move?

3         A.    Yes.

4         Q.    And where did those deputies move to at that time?

5         A.    We all moved towards the back of the Charger, sir.

6         Q.    So at the time Anthony reached that southern most

7    point, you and the four other deputies were all approximately

8    standing at the rear of that gray Dodge Charger?

9         A.    Yes.

10        Q.    Upon reaching that southern most point that you

11   pointed out in the last image, what did Anthony do next?

12        A.    At that point he started swinging the chain at this

13   point.  He wasn't standing still.  He was kind of pacing like

14   back and forth.  That's the reason why he tried to like close

15   distance a little bit because he kept like moving back,

16   moving forward, he was a little bit all over the place, but

17   in the same area.

18             That's when he started swinging the chain link, the

19   chain that he had.  And then at that point that's when he

20   started striking in our direction, the chain, he started

21   basically like trying to hit us with the chain, and

22   obviously, in our direction.

23        Q.    And when you say he was swinging it in your

24   direction, that was from that position approximately by the

25   edge of the shade in the southern portion of the yard?

```
1      A.    Correct.
2      Q.    When he started doing that, approximately how far
3   away was he from you?
4      A.    Like about five feet, maybe, sir, six feet.
5      Q.    You were standing five or six feet away from him
6   when he was at that southern portion of the yard that you
7   just pointed out by the shade?
8      A.    Approximately.  Yes, sir.
9      Q.    And that was while you were standing at the rear of
10  the gray Dodge Charger?
11     A.    Yes, sir.
12     Q.    Okay.  Was -- at some point did you attempt to fire
13  your less-lethal shotgun?
14     A.    Yes, sir.  Deputy Martinez advised "less-lethal,
15  less-lethal," and I deployed one round.
16           I believe it hit Anthony in the chest area.
17     Q.    And at the time that -- and that was -- was that the
18  first time you attempted to fire your less-lethal shotgun?
19     A.    Yes.
20     Q.    Okay.  Was that the only round that you fired with
21  your less-lethal shotgun that day?
22     A.    No, sir.
23     Q.    How many rounds in total did you fire with your
24  less-lethal shotgun that day?
25     A.    I believe two, sir.
```

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Sabrina Cervantes on 02/22/2024

Page 61

1    Q.    Okay.  And both of those were -- were both of those

2    fired successfully?

3    A.    After the first -- after I deployed the first one, I

4    had got a malfunction in the less-lethal shotgun, and then I

5    was able to clear it afterwards, and then after that that's

6    when I shot the second round.

7    Q.    So you, just to clarify, you shot, you pointed the

8    less-lethal shotgun at Anthony, you fired, it shot a round at

9    him, and then there was a malfunction, and you cleared the

10   malfunction, and then you fired a second shot at Anthony?

11   A.    Not at that point.  I fired the second shot when

12   Anthony closed the distance after.  So I didn't shoot the

13   second round until my partners deployed their less-lethal.

14          And all the other less-lethal that was deployed was

15   ineffective.

16   Q.    The first round that you mentioned that you fired at

17   Anthony, did that -- I think you might have said already, but

18   did that appear to strike him?

19   A.    Yes, sir.  I believe it did.

20   Q.    Where on his body did it appear to strike him?

21   A.    I believe the -- his chest area, sir.

22   Q.    And at the time you fired that first round from your

23   less-lethal shotgun, was he still standing in that southern

24   portion of the yard near the shade that you identified in

25   that image that I showed you?

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Sabrina Cervantes on 02/22/2024

Page 64

1    Q.   Do -- could you give me an estimate as to how much

2    time passed?

3    A.   I don't -- maybe two seconds, three seconds.

4    Q.   When you fired your first less-lethal shotgun round

5    at Anthony, before you did that did you give him any verbal

6    warning that you were going to shoot the less-lethal shotgun

7    at him?

8    A.   Yes.  I believe I said, less-lethal, less-lethal.

9    Q.   But did you specifically say -- did you say anything

10   to the effect of, you know, put down the chain or I'll shoot

11   you with the less-lethal shotgun?

12   A.   I don't recall.  I did tell him -- I remember

13   telling him maybe multiple times to put the chain down.

14   Q.   Do you recall ever connecting that specifically to

15   the fact that you would use force against him if he did not

16   put the chain down?

17   A.   I don't recall --

18        MR. SMITH:  I'll object to the form of the question.

19        But go ahead, Sabrina.  You've already answered.

20        THE WITNESS:  I don't recall, sir.

21   BY MR. LEVINE:

22   Q.   And I think you said that at the time you fired that

23   first less-lethal round, Anthony was standing five or six

24   feet away from you?

25   A.   Yes.

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Sabrina Cervantes on 02/22/2024

Page 77

1    A.    I believe so, sir.

2    Q.    Could you tell approximately where on his body it

3    appeared to strike him?

4    A.    Somewhere on the torso area.

5    Q.    Would you say above his waist?

6    A.    Yes, sir.

7    Q.    Which way was Anthony facing at the time that you

8    fired your second less-lethal shotgun round at him?

9    A.    He was facing towards my direction.

10    Q.    And where were you standing at the time?

11    A.    At the end of the Charger and the red Honda.

12          So we were basically facing each other because I was

13    behind the both cars, but in between just like how Anthony

14    was in the front.

15    Q.    And I think you had said that for the previous

16    less-lethal deployment, you were standing near the rear of

17    the gray Charger; is that correct?

18    A.    Correct.

19    Q.    So were you essentially in the same position between

20    the first time you fired the less-lethal shotgun and the

21    second time you fired the less-lethal shotgun?

22    A.    Correct.  But I was more now between both cars.

23    Q.    So you had moved just a little closer to the red

24    car?

25    A.    Yes.

**ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
Sabrina Cervantes on 02/22/2024

Page 78

1    Q.    Did the second less-lethal shotgun round that you

2    fired at Anthony appear to have any affect on Anthony?

3    A.    No, sir.

4    Q.    Was Anthony saying anything to you at the time or

5    immediately before you fired your second less-lethal shotgun

6    round at Anthony?

7    A.    After I had told Anthony to put the chain down, he

8    did say I believe something among the line of, like, excuse

9    my profanity, but "Fuck you, bitch."

10   Q.    At the time you fired your second less-lethal

11   shotgun round at Anthony, approximately how far away was

12   Anthony from you?

13   A.    So between the car length, about like six feet.

14   Q.    At the time that you fired your first less-lethal

15   shotgun round at Anthony, did Anthony appear to pose an

16   immediate threat of death or serious bodily harm to you or

17   any of the other deputies?

18   A.    Yes, sir.

19   Q.    Could you explain how he appeared to pose an

20   immediate threat of death or serious bodily harm at the time

21   you fired your first less-lethal shotgun round?

22        MR. SMITH:  So if I can clarify something really

23   quick, Ben.

24        Is this when he's in the yard?  Is this when

25   Anthony's in the yard, or is this when he's near to the cars?

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Sabrina Cervantes on 02/22/2024

Page 79

1        MR. LEVINE:  It was at the time that she described

2    earlier when she fired her first of two less-lethal shotgun

3    rounds which I think, yes, I think she said that that was in

4    the yard, but was I don't want to testify for her.

5        MR. SMITH:  Go ahead, Sabrina.

6        THE WITNESS:  That's when he did the whipping, like,

7    trying to hit us with the chain.

8    BY MR. LEVINE:

9        Q.   And what led you to believe that him swing the chain

10   like that posed an immediate threat of death or serious

11   bodily harm to you or the other deputies?

12       A.   He could have easily hit us in our face where we

13   could lose vision or hit us you know somewhere on the head,

14   the temple, and obviously, we would be unable to perform our

15   duties.

16       Q.   At the time that you -- at the first time that you

17   fired your less-lethal shotgun at Anthony, were you close

18   enough to him that you believed the chain could have struck

19   you when he was swinging it based on where the two of you

20   were standing?

21       A.   Where we were standing I believe so just because of

22   how long of a leeway the chain he had on the chain.

23       Q.   So when you said that he was swinging it in your

24   direction at that time earlier, do you think that the --

25   well, were you struck by the chain at that time?

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Sabrina Cervantes on 02/22/2024

Page 81

1   death or serious bodily harm to you or to the other

2   deputies?

3        A.   Yes.

4        Q.   And could you explain that.

5        A.   After I shot the second round, and I believed that

6   aggravated him because that's when he said, "Fuck you,

7   bitch," and he started closing distance, meaning, he started

8   running -- at that point he started running towards me.

9        Q.   But before you fired your second less-lethal shotgun

10   round, he was not running towards you; correct?

11       A.   No.

12       Q.   No, I'm not correct?

13            Or no, he was not running towards you?

14       A.   No, he was not running towards me.

15       Q.   So when I say at the time you fired the second round

16   at him, what did he appear to be pose an immediate threat of

17   death or serious bodily injury, I guess I'm referring to

18   immediately before you fired, like at the time you fired

19   before he started running towards you, at that time was he --

20   did he appear to be an immediate threat of death or serious

21   bodily injury to you or the other deputies?

22       A.   I would say yes because he was still swinging the

23   chain around.

24       Q.   Did you believe that you were within striking

25   distance of the chain at that time?

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Sabrina Cervantes on 02/22/2024

Page 82

1      A.    If he could have hit me, yes, sir.

2      Q.    **Could you explain what you mean by if he could have**

3   **hit you?**

4      A.    **Because during that time he wasn't directly swinging**

5   **it at me.  Like I said, he was swinging it around.  So he**

6   **could have -- if he would have struck it -- he would have**

7   **basically lunged towards my direction with the chain, yes, it**

8   **would have hit me.**

9      Q.    Is there a reason why -- well, at any point did you

10  draw your duty weapon?

11     A.    No, sir.

12     Q.    **Is there a reason why at the time that you believed**

13  **he posed an immediate threat of death or serious bodily harm**

14  **to you or the other deputies, that you did not draw your duty**

15  **weapon and fire?**

16     A.    It happened so fast.  I didn't think that he was

17  going to run towards my direction.  So because of the how

18  fast he started running towards me, it just -- I didn't think

19  to grab my -- or you know unholster my duty belt and point it

20  in his direction.

21     Q.    **Prior to him starting to run towards you, is there a**

22  **reason why you did not draw your duty weapon and fire?**

23     A.    No, sir.  I believe I still had a few rounds in my

24  less-lethal.

25     Q.    **At the time that Anthony started to move towards**

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Sabrina Cervantes on 02/22/2024

Page 93

1    before Deputy Martinez fired his duty weapon, was there any

2    discussion of a tactical plan regarding what you or the other

3    deputies would do if Anthony came outside with the chain?

4        A.   No, sir.

5        Q.   Was there any discussion at any point of using

6    personal protective equipment like the helmet that you

7    mentioned you had?

8        A.   No, sir.

9        Q.   Did you ever have consider retrieving your helmet at

10   any point as a tool to protect you from the chain?

11       A.   No, sir.

12       Q.   Was there a reason why you did not consider that?

13       A.   Just -- I didn't think about it at the time, sir.

14       Q.   Between your time at the Sheriff's Academy and also

15   while working as a Sheriff's deputy have you received

16   training on the use of deadly force?

17       A.   Yes, sir.

18       Q.   Based on your training, is deadly force considered

19   the highest level of force an officer can use?

20       A.   Yes, sir.

21       Q.   Based on your training, is it your understanding

22   that deadly force should only be used to defend against an

23   imminent threat or immediate threat of death or serious

24   bodily injury?

25       A.   Yes, sir.

**ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
Sabrina Cervantes on 02/22/2024

Page 94

```
1       Q.    Were you trained that deputies are responsible to

2   justify each shot they fire when using deadly force?

3       A.    Yes, sir.

4       Q.    Were you trained that when using deadly force,

5   deputies should attempt to assess the effectiveness of each

6   shot between shots?

7       A.    Yes, sir.

8       Q.    Were you trained that before using deadly force, a

9   warning should be given, if feasible?

10      A.    Yes, sir.

11      Q.    Did you receive training on the use of less-lethal

12  force as well?

13      A.    Yes, sir.

14      Q.    And would that include training on the use of

15  less-lethal shotgun?

16      A.    Yes, sir.

17      Q.    Were you trained that you should give -- the

18  deputies should give a warning before using less-lethal

19  weapons?

20      A.    Yes, sir.

21      Q.    According to your training, what is the intended

22  effect of a bean bag shotgun?

23      A.    To basically stop the threat.

24      Q.    According to your training, is there a minimum

25  distance you should have between you and an individual before
```