1
**LAW OFFICES OF DALE K. GALIPO**
Dale K. Galipo (SBN 144074)
2
dalekgalipo@yahoo.com
Benjamin S. Levine (SBN 342060)
3
blevine@galipolaw.com
21800 Burbank Boulevard, Suite 310
4
Woodland Hills, California, 91367
Telephone: (818) 347-3333 / Facsimile: (818) 347-4118
5

6
LUIS A. CARRILLO (SBN 70398)
MICHAEL S. CARRILLO (SBN 258878)
7
DOMINIQUE L. BOUBION (SBN 336915)
**CARRILLO LAW FIRM, LLP**
8
1499 Huntington Drive, Suite 402
South Pasadena, California 91030
9
Tel: (626) 799-9375/ Fax: (626) 799-9380
10

11
Attorneys for Plaintiffs
ROSA NUÑEZ, ANTHONY NUÑEZ, JR., and ANDREW NUÑEZ
12

13
**UNITED STATES DISTRICT COURT FOR THE**
14
**CENTRAL DISTRICT OF CALIFORNIA**

15
ROSA NUÑEZ, individually;
16
ANTHONY NUÑEZ, JR., individually
and as successor-in-interest to Decedent,
17
Anthony Nuñez; and ANDREW
NUÑEZ, individually,
18

19
                    Plaintiffs,
20
          v.

21
COUNTY OF SAN BERNARDINO;
CITY OF HESPERIA; MICHAEL
22
MARTINEZ; SABRINA CERVANTES;
JEREMY DEBERG; JONATHAN
23
CAMPOS; and DOES 5 through 15,
inclusive,
24
                    Defendants.
25

26

27

28

Case No. 5:22-cv-01934-SSS-SP

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR SUMMARY ADJUDICATION; MEMORANDUM AND POINTS OF AUTHORITIES IN SUPPORT**

*[Filed concurrently with Plaintiffs' Separate Statement of Facts; Plaintiffs' Objections to Evidence; Declaration of Benjamin S. Levine and Exhibits thereto; Declaration of Scott A. DeFoe]*

Date:         May 31, 2024
Time:         2:00 p.m.
Courtroom: 2

# **<u>TABLE OF CONTENTS</u>**

**MEMORANDUM OF POINTS AND AUTHORITIES** .......................................1

I.      INTRODUCTION .................................................................................1

II.     STATEMENT OF FACTS.....................................................................2

    A.      Deputies Encounter Anthony Nuñez During Mental Health Crisis ......2

    B.      Deputies Fire Less-Lethal Weapons at Anthony ...............................3

    C.      Leadup to and Use of Deadly Force ...................................................4

    D.      Training and Deadly Force Principles .................................................6

III.    LEGAL STANDARD ............................................................................7

IV.     THE DEPUTIES ARE NOT ENTITLED TO QUALIFIED
        IMMUNITY ...........................................................................................8

    A.      The Deputies' Uses of Force Were Excessive and Unreasonable..........8

        1.      No Severe Crime Committed .......................................................9

        2.      No Immediate Threat of Death or Serious Bodily Harm .............9

        3.      No Forcible Resistance or Attempt to Flee ...............................12

        4.      No Warning Given; Other Less-Intrusive Options
                Available............................................................................12

        5.      Clear Indications of a Mental Health Crisis ..............................13

    B.      The Unconstitutionality of the Force Used Was Clearly
        Established ........................................................................................14

V.      THE DEPUTIES VIOLATED PLAINTIFF ROSA NUÑEZ'S
        FOURTEENTH AMENDMENT RIGHTS .....................................17

VI.     THE DEPUTIES VIOLATED THE BANE ACT .........................19

VII.    THE DEPUTIES COMMITTED BATTERY .................................19

VIII.   THE DEPUTIES WERE NEGLIGENT ........................................20

IX.     CONCLUSION ....................................................................................21

# TABLE OF AUTHORITIES

## Cases

*Alves v. Riverside County*,
 2023 WL 4104185 (C.D. Cal. May 19, 2023) ................................................24

*Anderson v. Liberty Lobby, Inc.*,
 477 U.S. 242 (1986) ................................................12

*Ashcroft v. al-Kidd*,
 563 U.S. 731, 741 (2011) ................................................18

*B.B. v. County of Los Angeles*,
 25 Cal. App. 5th 115 (2018) ................................................23

*Brosseau v. Haugen*,
 543 U.S. 194 (2004) ................................................18

*Bryan v. MacPherson*,
 630 F.3d 805 (9th Cir. 2010) ................................................16, 17

*Deorle v. Rutherford*,
 272 F.3d 1272 (9th Cir. 2001) ................................................passim

*Drummond v. City of Anaheim*,
 343 F.3d 1052 (9th Cir. 2003) ................................................19

*Estate of Aguirre v. County of Riverside*,
 29 F.4th 624 (9th Cir. 2022) ................................................14, 15, 19, 20

*Ewolski v. City of Brunswick*,
 287 F.3d 492 (6th Cir. 2002) ................................................22, 23

*Garcia v. City of Azusa*,
 2023 WL 9420513 (C.D. Cal. Dec. 1, 2023) ................................................24

*George v. Morris*,
 736 F.3d 829 (9th Cir. 2013) ................................................13

*Glenn v. Wash. Cnty.*,
 673 F.3d 864 (9th Cir. 2011) ................................................13

*Gonzalez v. City of Anaheim*,
 747 F.3d 789 (9th Cir. 2014) ................................................12

*Graham v. Connor*,
 490 U.S. 386 (1989) ................................................12, 13

*Hayes v. County of San Diego,*
    736 F.3d 1223 (9th Cir. 2013)......................................................14, 15, 21, 22

*Hope v. Pelzer,*
    536 U.S. 730 (2002) ..........................................................................18, 19, 21

*Kaur v. City of Lodi,*
    263 F. Supp. 3d 947 (E.D. Cal. 2017)......................................................13

*Kosakoff v. City of San Diego,*
    2010 WL 1759455 (S.D. Cal. Apr. 29, 2010) ..........................................22

*Krouse v. Graham,*
    19 Cal. 3d 59 (1977)................................................................................25

*Lake Nacimiento Ranch Co. v. San Luis Obispo County,*
    841 F.2d 872 (9th Cir. 1987)...................................................................12

*Moreland v. Las Vegas Metro. Police Dept.,*
    159 F.3d 365 (9th Cir. 1998)...................................................................22

*S.R. Nehad v. Browder,*
    929 F.3d 1125 (9th Cir. 2019)...........................................................13, 17

*Nelson v. City of Davis,*
    685 F.3d 867 (9th Cir. 2012)...................................................................17

*Newmaker v. City of Fortuna,*
    842 F.3d 1108 (9th Cir. 2016).................................................................12

*Ochoa v. County of Kern,*
    2024 WL 1133577 (9th Cir. Mar. 15, 2024) ...........................................13

*Orn v. City of Tacoma,*
    949 F.3d 1167 (9th Cir. 2020).................................................................18

*Porter v. Osborn,*
    546 F.3d 1131 (9th Cir. 2008).................................................................22

*Ra v. Superior Court,*
    154 Cal. App. 4th 142 (2007)..................................................................25

*Reese v. County of Sacramento,*
    888 F.3d 1030 (9th Cir. 2018).................................................................23

*Reyes v. City of Santa Ana,*
    832 F. App'x 487 (9th Cir. 2020).............................................................24

*Rios v. City of Los Angeles*,
    2022 WL 17219086 (C.D. Cal. Aug. 25, 2022)............................................24

*Rivas-Villegas v. Cortesluna*,
    595 U.S. 1 (2021) ............................................................................19

*Santos v. Gates*,
    287 F.3d 846 (9th Cir. 2002) ........................................................12

*Scott v. Henrich*,
    39 F.3d 912 (9th Cir. 1994) ..........................................................12

*Smith v. City of Hemet*,
    394 F.3d 689 (9th Cir. 2005) ........................................................13

*Tabares v. City of Huntington Beach*,
    988 F.3d 1119 (9th Cir. 2021) ......................................................24

*Tan Lam v. City of Los Banos*,
    976 F.3d 986 (9th Cir. 2020) ........................................................14

*Tennessee v. Garner*,
    471 U.S. 1(1985) ..........................................................................17

*Vos v. City of Newport Beach*,
    892 F.3d 1024 (9th Cir. 2018) ......................................................12

*White v. Pauly*,
    580 U.S. 73 (2017) ........................................................................18

*Wilks v. Hom*,
    2 Cal. App. 4th 1264 (1992)..........................................................25

*Willis v. City of Fresno*,
    520 F. App'x 590 (9th Cir. 2013)............................................22, 23

*Yount v. City of Sacramento*,
    43 Cal. 4th 885 (2004)..................................................................24

*Zion v. County of Orange*,
    874 F.3d 1072 (9th Cir. 2017)..................................................15, 23

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

Summary judgment should be denied. Viewing the facts and drawing all permissible inferences in Plaintiffs' favor, there is substantial evidence that deputies Michael Martinez, Jeremy Deberg, and Sabrina Cervantes violated Anthony Nuñez's and Plaintiffs' constitutional rights and state law in using deadly and less-lethal force against Anthony. Nor are the deputies entitled to qualified immunity: The unlawfulness of Martinez's use of deadly force was obvious, including based on his own training, and precedent also provided clear notice that each deputy's force was unconstitutional. Additional evidence supports Plaintiffs' state law claims, including the deputies' negligent pre-shooting tactics and conduct.

Viewed in Plaintiffs' favor, the evidence shows as follows: Deputies encountered Anthony holding a leash, amidst a mental health crisis, and had no information anyone was injured. They asked Anthony to come outside, and he eventually did. Anthony never swung the leash around him or toward any deputy as if to strike them. As Anthony stood still, Deberg and Cervantes began firing less-lethal weapons at him, without warning, from 30-35 feet away. Anthony then walked toward the front of a parked car. While Anthony was in front of that car, walking, not facing or moving toward any deputy, and not swinging the leash, Martinez began firing three shots, without warning, from 20 feet away by the rear of that car. Martinez could have used it or an adjacent car as cover but chose not to. Anthony came no closer than 17-18 feet during the course of the shots, and by the third, was already falling to the ground. Anthony died of his injuries. Plaintiffs' expert opined that Martinez's use of deadly force was inappropriate and contrary to police standards and training.

Many material facts are disputed. Resolving those disputes in Plaintiffs' favor, as the Court must here, Anthony posed no immediate threat of death or

serious bodily injury when Martinez used deadly force, and no immediate threat when less-lethal force was used, making each deputy's force excessive. Because deputies had fair notice this was the case, qualified immunity must be denied. Martinez's use of deadly force also violated the Fourteenth Amendment and the Bane Act, and amounted to battery and demonstrated negligence. For each of these reasons, as discussed below, summary judgment should be denied.[1]

## II.   STATEMENT OF FACTS

### A. Deputies Encounter Anthony Nuñez During Mental Health Crisis

On March 29, 2022, San Bernardino Sheriff's Department ("SBSD") deputies were dispatched to Anthony Nuñez's family home after Anthony reportedly pushed his brother, Plaintiff Andrew Nuñez, and had reportedly not slept. [Pls.' Resp. Defs.' Facts ("PRF") 1-2, 8.] Deputies Michael Martinez and Jonathan Campos arrived first and spoke to Andrew through a window. [PRF-16; Pls.' Add'l Facts ("PF") 1.] Andrew told them he was okay, Anthony had only "shoved" him, and Anthony was acting "crazy." [Id.] Martinez and Campos walked to the front door, which Andrew opened from inside before returning to his room. [PF-2.] Anthony was approximately 16 feet inside opposite a closed screen door, holding a thin chain-linked dog leash. [PF-3.] The leash had a short handle, was just over seven feet, and consisted only of chain links no more than one inch in length and half an inch in diameter, with no buckle or other object at the end. [PF-4.] Anthony held the leash wrapped approximately two times around his hand, reducing its effective length. [PF-5.]

The deputies told Anthony to drop the leash and to step outside. [PF-6.] Campos drew his Taser and Martinez drew his firearm. [PF-7.] Soon after, Anthony

---

[1] Plaintiffs hereby voluntarily dismiss their claims for Denial of Medical Care under the Fourth Amendment (Count 2) and for Municipal Liability (Counts 4 and 5). (*See* Dkt. 45.)

put the leash down for a period of time, which Martinez viewed as an act of compliance. [PF-8.] The deputies and Anthony began a conversation, during which Anthony said he would be calm; said he loved them, that he wanted them to love him, that he just wanted to have a conversation, that they were "awesome," that they were professional, and that they were his brothers; spoke about the devil, hell, God, Jesus, sinners, the end of the world, Joe Biden, Congress, the FBI, chemicals, pollution, the Illuminati, capitalism, technology, national borders, and diseases; said he was or would become president or king; and said he was crazy. [PF-9.] Anthony told the deputies he wanted to tell them a story and would then come outside. [PF-10.]

Anthony was at times happy and other times was agitated. [PF-11.] Based on deputies' training, symptoms they observed—including agitation, erratic speech, and discussion of unusual subjects—were potential symptoms of a mental health crisis. [PF-12.] Campos and Deberg believed Anthony may have been experiencing a mental health crisis. [PF-13.] Due to Anthony's speech and behavior, any reasonable deputy would have considered the same. [PF-14.]

**B. Deputies Fire Less-Lethal Weapons at Anthony**

Additional deputies arrived during the conversation, including Jeremy Deberg and Sabrina Cervantes, who retrieved a 40 millimeter ("40mm") round launcher and a beanbag shotgun, respectively. [PF-15.] Deberg took the launcher from Sgt. Corey LaFever's vehicle, which along with Cervantes's vehicle also contained a ballistic shield, and multiple deputies had riot helmets in their vehicles parked outside. [PF-16.] LaFever told deputies to have Anthony's family, including Andrew, exit the home, and the deputies were told everyone other than Anthony had left the house. [PF-17-18.] During the conversation, deputies called for assistance from the SBSD's Special Enforcement Division ("SED"), which has expertise and training in assisting with individuals who are experiencing mental health crises and may pose a risk of harm, and SED advised they would come. [PF-19.]

Anthony became aware his family had left and he came outside holding the leash. [PF-20.] Martinez and Campos stepped away from the front porch, and Martinez moved toward the rear of a red Honda Civic parked in front of the house just north of and parallel to a parked grey Dodge Charger; both vehicles faced the house. [PF-21.] Deberg and Cervantes took positions by Martinez near the rear of the vehicles, with Campos to their east. [PF-22.] Anthony walked south into the front yard, away from the deputies, stopped, and faced them from 30-35 feet away. [PF-23.] Cervantes fired a beanbag round, without warning that she would fire if he did not comply. [PF-24.] Within five seconds, while Anthony remained in the same part of the yard 35 feet away, Deberg began firing four 40mm impact rounds, without warning he would fire if Anthony did not comply. [PF-25.] Five seconds after, Campos fired his Taser, which did not connect with Anthony. [PF-26.]

While Anthony stood in the southern portion of the yard and deputies fired less-lethal weapons at him, Anthony held the leash downward. [PF-27.] Anthony did not swing it around him or overhead, and he only moved it forward to warn officers away from him when they approached, while also backing away. [*Id.*]

## C. Leadup to and Use of Deadly Force

Anthony began walking northwest, toward the front door, telling deputies to "get away." [PF-28.] Martinez had moved just east of (behind) the gap between the rears of the parked cars, with Cervantes to his south. [PF-29.] As Anthony neared the porch, Cervantes fired another beanbag round, without warning, prompting him to move north, toward the gap between the front of the parked Dodge and the eastern wall of the house. [PF-30.]

While Anthony was walking in front of the Dodge's right-front bumper, facing north, Martinez fired his first gunshot at Anthony from Anthony's east while Anthony was up to 20 feet away, with at least a portion of the Dodge between them. [PF-31-32.] Immediately after, as Anthony walked in front of the gap between the two cars, still facing north, Martinez fired again while Anthony was up 19 feet

away. [PF-33.] Anthony then turned toward Martinez, who took one or two steps back, and while Anthony was next to the front passenger-side wheel of the Dodge and was falling to the ground, Martinez fired a third shot at Anthony from up to 17-18 feet away. [PF-34.]

Anthony did not run or lunge toward any deputy immediately before or during any of Martinez's gunshots. [PF-35.] Martinez did not issue a verbal warning he was going to shoot before firing any shots and did not reassess the purported threat Anthony posed between shots. [PF-36.] Immediately prior to and during Martinez's first shot, Anthony was holding the leash no higher than just above shoulder-level, with the leash hanging downward. [PF-37.] Anthony's arm came further down between Martinez's first and second shot and, by Martinez's third shot, was fully extended downward holding the leash at thigh-level, with the leash dragging on the ground. [PF-38-39.] Immediately before and during Martinez's shots, Anthony was not swinging the leash and did not pull his arm back as though preparing to swing the leash forward. [PF-40.] By Martinez's third shot or earlier, Anthony was already falling to the ground. [PF-41.]

Immediately before and while firing, Martinez had the ability to maneuver around the rear of the Dodge, which would have kept it between him and Anthony, but he did not. [PF-42.] He also had the ability to maneuver around the rear of the Honda, which would have put it between him and Anthony and would have increased their distance, but he did not, violating his training. [PF-43.] The deputies never discussed a tactical plan or what to do if Anthony came outside with the leash. [PF-44.] No deputy ever retrieved a ballistic shield or riot helmet from patrol vehicles, or called for their retrieval, despite knowing it was available, even though it would have protected them had Anthony swung the leash toward deputies. [PF-45.] Although each deputy was carrying pepper spray, no deputy attempted to use it, and Cervantes never considered using it. [PF-46.]

After Anthony came outside, no deputy believed he had any potential weapon besides the leash. [PF-47.] Anthony never swung the leash around him, raised it overhead, struck or attempted to strike any deputy, reached for any deputy's weapon, or injured anyone. [PF-48-49.] Deputies could not recall him making any verbal threats after coming outside or in the leadup to Martinez's shots. [PF-50-51.] Deputies had no information that Anthony had any criminal history. [PF-52.] Immediately before and during Martinez's shots, deputies did not see any civilians nearby and did not believe any civilian was in immediate danger. [PF-53-54.] Plaintiffs' expert has opined that Martinez's use of deadly force was inappropriate and violated law enforcement standards and training. [PF-55.] Anthony did not attempt to flee, and Plaintiffs' expert and Deberg agreed deputies could not shoot Anthony as a "fleeing felon." [PF-56.]

After Martinez's shots, Anthony took about two steps forward before falling forward to the ground, with his head pointed east toward Martinez and as far as ten feet from Martinez. [PF-57-59.] Anthony died from his gunshot wounds. [PF-60.] An autopsy revealed four gunshot wounds from Martinez's three shots: Wounds "A," to the back of Anthony's upper right arm, with a trajectory of back-to-front, right-to-left, and upward; "B," near Anthony's right armpit, with a trajectory of back-to-front and right-to-left; "C," to the rear of the right side of Anthony's torso, with a right-to-left trajectory; and "D," to Anthony's right torso, with a trajectory of front-to-back, right-to-left, and downward. [PF-61.] Within four minutes after Martinez fired, SED personnel began arriving. [PF-62.]

**D. Training and Deadly Force Principles**

SBSD deputies receive extensive training in tactics, use of cover, and deadly force. [PF-63.] They are trained to identify potential mental illness or mental health crises, and to use special techniques to attempt to de-escalate with these individual. [PF-64.] Deputies are trained commands should be given clearly, by one deputy, to avoid raising tension. [PF-65.] They are trained to maneuver or "tactically

reposition" away from subjects holding a blunt/impact weapon when possible, including using cover, to gain time and protection. [PF-66-67.] They are trained, when feasible, to exhaust less-lethal force options before using deadly force, and to assess their effectiveness before using more force. [PF-68.] Deputies are trained that pepper spray burns and obscures subjects' vision and causes them to immediately stop and rub their eyes. [PF-69.]

Deputies are trained to issue verbal warnings before using lethal and less-lethal weapons when feasible. [PF-70.] They are trained that deadly force is the highest level of force they can use and is only permissible when a subject poses an immediate or imminent threat of death or serious bodily injury. [PF-71-72.] They are trained such a threat is "imminent" when a reasonable deputy would believe a subject has the present ability, opportunity, *and* apparent intent to immediately cause death or serious bodily injury. [PF-73.] They are further trained that fear of *future* harm is insufficient, no matter how great the fear or likelihood of harm. [PF-74.] They are trained any belief in the necessity of deadly force must be based on objective factors and not subjective fear, and are trained to control their fear. [PF-75-76.] They are trained they are responsible for justifying every gunshot fired and to reassess any threat a subject poses between shots. [PF-77-78.]

### III.   <u>LEGAL STANDARD</u>

At summary judgment, the Court must view the evidence and draw all reasonable inferences in the light most favorable to the nonmovant. *Lake Nacimiento Ranch Co. v. San Luis Obispo Cnty.*, 841 F.2d 872, 875 (9th Cir. 1987). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge ...." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "Because [the excessive force inquiry] nearly always requires a jury to sift through disputed factual contentions," summary judgment "in excessive force cases should be granted sparingly." *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002). "Deadly force cases

pose a particularly difficult problem because the officer defendant[s]" are often among "the only surviving eyewitness[es]." *Gonzalez v. City of Anaheim*, 747 F.3d 789, 794-95 (9th Cir. 2014) (en banc) (alteration adopted). Courts "must carefully examine all the evidence in the record." *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994); *see Newmaker v. City of Fortuna*, 842 F.3d 1108, 1116 (9th Cir. 2016).

## IV.   THE DEPUTIES ARE NOT ENTITLED TO QUALIFIED IMMUNITY

### A. The Deputies' Uses of Force Were Excessive and Unreasonable

Fourth Amendment claims for excessive force are judged by "whether the officers' actions [we]re 'objectionably reasonable' in light of the facts and circumstances confronting them." *Graham v. Connor*, 490 U.S. 386, 397 (1989). The "nature and quality of the intrusion" is weighed against the "countervailing governmental interests at stake." *Id.* at 396. Government interest factors include "(1) the severity of the crime," "(2) whether the suspect poses an immediate threat" to anyone, "and (3) whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* Additional factors include (4) "whether proper warnings were given" and "the availability of less intrusive" options to effectuate arrest, and (5) "whether the suspect has exhibited signs of mental illness." *Vos v. City of Newport Beach*, 892 F.3d 1024, 1033-34 & n.9 (9th Cir. 2018); *see S.R. Nehad v. Browder*, 929 F.3d 1125, 1137-38 (9th Cir. 2019). "Only information known to the officer at the time the conduct occurred is relevant." *Id.* at 1132.

"The intrusiveness of … deadly force is unmatched." *Graham*, 490 U.S. at 397. "A beanbag shotgun is a twelve-gauge shotgun loaded with 'beanbag' rounds, …. which can kill a person if it strikes his head or the left side of his chest at a range of under fifty feet." *Glenn v. Wash. Cnty.*, 673 F.3d 864, 872 (9th Cir. 2011) (cleaned up); *see Deorle v. Rutherford*, 272 F.3d 1272, 1280 (9th Cir. 2001). A "40mm launcher [i]s capable of inflicting … serious injury." *Ochoa v. Cnty. of Kern*, 2024 WL 1133577, at *1 (9th Cir. Mar. 15, 2024). Because both weapons

represent a high degree of force, only "a strong governmental interest" can justify their use. *Id.*; *Deorle*, 272 F.3d at 1280.

### 1. No Severe Crime Committed

Although domestic disturbances can pose danger, this is less so "where (i) the domestic dispute terminated before the officers arrived and (ii) the alleged abuser is no longer in the presence of or close proximity to the victim." *Kaur v. City of Lodi*, 263 F. Supp. 3d 947, 966 (E.D. Cal. 2017) (collecting cases). The alleged disturbance, during which Anthony reportedly pushed Andrew, ended well deputies arrived, when Andrew was uninjured and separated from Anthony. Accordingly, the alleged push during a domestic dispute weighs against the reasonableness of the deputies' force. *See George v. Morris*, 736 F.3d 829, 839 (9th Cir. 2013); *Smith v. City of Hemet*, 394 F.3d 689 (9th Cir. 2005), 702-03; *Nehad*, 929 F.3d at 1136.

### 2. No Immediate Threat of Death or Serious Bodily Harm

A deputy's use of deadly force is reasonable only if he has probable cause to believe a suspect poses an immediate threat of death or serious bodily harm to the deputy or others. *Gonzalez*, 747 F.3d at 793; *Morris*, 736 F.3d at 838. A "statement by an officer that he fears for his safety or the safety of others is not enough; there must be objective factors to justify such a concern." *Deorle*, 272 F.3d at 1281. "The mere fact that a suspect possesses a weapon" alone does not justify deadly force. *Hayes v. County of San Diego*, 736 F.3d 1223, 1233 (9th Cir. 2013). The circumstances must be such that a reasonable officer would believe the suspect would immediately use the weapon to inflict death or serious bodily harm if deadly force were not used. *See Estate of Aguirre v. County of Riverside*, 29 F.4th 624, 628 (9th Cir. 2022) (deadly force not justified where, on plaintiffs' facts, subject holding "bat-like object was not facing officer, "coming 'on the attack,'" or approaching bystanders); *Morris*, 736 F.3d at 838 (deadly force not justified where, on plaintiffs' facts, subject armed with gun did not turn and point gun at deputies); *Hayes*, 736 F.3d at 1234 (deadly force not justified where subject was holding knife while

walking, but "not charging," toward deputies). Even where a suspect injures an officer with a weapon—which did not occur here—use of subsequent force is unreasonable if the suspect no longer poses an immediate threat. *Tan Lam v. City of Los Banos*, 976 F.3d 986, 1002 (9th Cir. 2020) (collecting cases).

Viewed in Plaintiffs' favor, the circumstances Martinez faced were: Anthony was 20 feet away, with part of a car between them, and was not facing or moving toward any deputy. He was walking, not running. He was not swinging the leash or preparing to, and the leash was dangling down. He had never swung the leash around him or overhead and never attempted to strike any deputy, with the leash or otherwise. Seconds before Martinez fired, Anthony told deputies to "get away," indicating no intent of approaching. Only the deputies and Anthony were on the property; no civilians were near. The deputies significantly outnumbered Anthony. When Martinez fired his second shot, Anthony was 19 feet away and was not facing Martinez or moving in his direction. His arm had come partway down, and otherwise there was no change in how he held the leash. When Martinez fired his third shot, Anthony was 17-18 feet away and was falling down. Multiple bullet wounds had back-to-front trajectories, and all had right-to-left trajectories, showing that during some of the shots, Anthony's back was at least partially turned, and that he was not directly facing Martinez for any shots.[2]

A reasonable deputy would have understood Anthony posed no immediate threat of death or serious bodily harm to anyone. When Martinez fired, nothing about Anthony's movement or the way he held the leash indicated he would

---

[2] A wound to Anthony's chest—the only wound with a partial front-to-back trajectory—also had a downward trajectory, indicating that Anthony's torso was canted forward toward Martinez at the time. *See Tan Lam*, 976 F.3d at 1000 ("[B]ullet trajectory evidence showing that the second shot entered [decedent]'s body at a 'pretty steep,' 'downward trajectory' was consistent with [decedent] not having been upright when the fatal shot was fired.") This is consistent with Anthony falling during the final shot, which two witnesses testified they saw.

immediately rush and strike deputies. *See Morris*, 736 F.3d at 839 (no immediate threat where subject armed with gun had not begun to aim it at deputies). Even if he were to swing the leash, the usable portion was approximately six feet, and he was not close enough to strike anyone. To have struck any deputy with the leash, Anthony would have had to turn to face them, begin to approach, cover at least 14 feet, *and* swing; Martinez, whose gun was drawn and aimed at Anthony, could have stopped Anthony had any of those events occurred. A reasonable jury could easily find Anthony posed no immediate threat given the distance between him and deputies and the lack of movement with the leash. *See Aguirre*, 29 F.4th at 628 (no immediate threat where subject was 15 feet away, not facing or approaching officer); *Vos*, 892 F.3d 1024, 1029-30, 1032-33 (no immediate threat where subject was within 20 feet of officers and charged toward them with apparent pair of scissors overhead, where officers had available cover and outnumbered him); *Hayes*, 736 F.3d at 1234 (no immediate threat where subject was 6-8 feet away walking toward deputies, holding knife). That Anthony was already falling to the ground by Martinez's third shot even more clearly shows he posed no immediate threat. *See Zion v. Cnty. of Orange*, 874 F.3d 1072, 1075-76 (9th Cir. 2017) (where subject fell to ground after initial shots, he "was not in a position where he could easily harm anyone or flee" and posed no "immediate threat").

A jury could also find Anthony posed no immediate threat when Cervantes and Deberg used less-lethal force. When Deberg fired and Cervantes first fired, Anthony was 30-35 feet away, standing still, and not swinging the leash around him or overhead. When Cervantes fired again, Anthony was walking, not facing or moving toward her, on the opposite end of a parked car. He therefore posed no immediate threat. *See Deorle*, 272 F.3d at 1285; *Bryan v. MacPherson*, 630 F.3d 805, 826-27 (9th Cir. 2010).

### 3.  No Forcible Resistance or Attempt to Flee

"'Resistance' …. runs the gamut from the purely passive protestor who simply refuses to stand, to the individual who is physically assaulting the officer." *Id.* at 830. Courts must "evaluate the nature of any resistance in light of the actual facts of the case." *Id.* Anthony never used any force, or visibly attempted to use any force, against the deputies to resist. He at times complied with commands, including by dropping the leash, and by coming outside. The Ninth Circuit has recognized that even where an individual "continually ignored" commands to show his hands and remain outside of his home and "physically resisted" officers for a time, his level of resistance "provided little support for a use of significant force." *Id.* (quoting *Smith*, 394 F.3d at 703). It has likewise found that an individual's erratic behavior and "failure to comply with" orders was "a far cry from actively struggling with an officer" and did not support use of significant force. *Id.* Likewise, Anthony never attempted to flee or return inside to evade deputies.

### 4.  No Warning Given; Other Less-Intrusive Options Available

"Before using deadly force, law enforcement must, 'where feasible,' issue a warning." *Aguirre*, 29 F. 4th at 628 (quoting *Tennessee v. Garner*, 471 U.S. 1, 11-12 (1985)). Failure to give a warning before using less-lethal force "is a factor to be considered" in assessing reasonableness. *Deorle*, 272 F.3d at 1024. The statement should "warn[ ] that the use of force [is] imminent" unless the subject complies. *Bryan*, 630 F.3d at 831. It was feasible for each deputy to warn Anthony force would be used unless he complied; none did. When Cervantes and Deberg fired, Anthony stood 30-35 feet away, not swinging the leash around him or attempting to strike deputies. There was little urgency, making a warning feasible. Stating "less-lethal" and "40" was vague and did not communicate that force was conditioned on noncompliance. A warning was feasible when Martinez began firing at Anthony from 20 feet away, with Anthony not facing Martinez, moving in his direction, or swinging the leash.

Deputies also must "consider what other tactics if any were available" to effect an arrest, including "less intrusive methods." *Bryan*, 630 F.3d at 831 & n.15 (cleaned up); *see Nehad*, 929 F.3d at 1135. The deputies failed to discuss any tactical plan for what to do if Anthony came outside, as he had been asked to do, while holding the leash, or to call for available protective equipment. They failed to consider using pepper spray. Had deputies considered these reasonable, less intrusive alternatives, their uses of force may not have occurred. *See Nelson v. City of Davis*, 685 F.3d 867, 882 (9th Cir. 2012).[3]

### 5. Clear Indications of a Mental Health Crisis

Where someone exhibits "indications of mental illness" a reasonable officer would recognize, "the government's interest in using deadly force [i]s diminished." *Vos*, 892 F.3d at 1034; *see Glenn*, 673 F.3d at 875; *Deorle*, 272 F.3d at 1282-83. Anthony's speech wide-ranging, erratic speech addressing a host of religious and conspiratorial themes would have led any reasonable officer to believe Anthony was experiencing a mental health crisis. Although Defendants insinuate statements by Anthony suggesting that the deputies should kill him should have been taken at face value (Mot. at 14), "when an emotionally disturbed individual is 'acting out' and inviting officers to use deadly force to subdue him, the governmental interest in using such force is diminished by the fact that the officers are confronted, not with a person who has committed a serious crime against others, but with a mentally ill individual." *Deorle*, 272 F.3d at 1283. Because none of the reasonableness factors support the deputies' use of force, a reasonable jury could conclude that each

---

[3] Whether deputies violate their training when using force is also relevant to whether the force is excessive. *Drummond v. City of Anaheim*, 343 F.3d 1052, 1059 (9th Cir. 2003). Martinez violated his training by not tactically repositioning, utilizing available cover, or evaluating the effectiveness of Cervantes's second beanbag round before shooting.

1   defendant deputy's use of force, and Martinez's use of deadly force in particular,

2   was excessive and unreasonable.[4]

3   **B. The Unconstitutionality of the Force Used Was Clearly Established**

4       Qualified immunity does not apply where an official's conduct "violate[s]

5   clearly established … constitutional rights of which a reasonable person would have

6   known." *White v. Pauly*, 580 U.S. 73, 78-79 (2017). The touchstone of the "clearly

7   established" inquiry is whether "officers [had] fair notice of the illegality of their

8   conduct" at the time. *Orn v. City of Tacoma*, 949 F.3d 1167, 1178 (9th Cir. 2020);

9   *see Brosseau v. Haugen*, 543 U.S. 194, 198 (2004); *Hope v. Pelzer*, 536 U.S. 730,

10  739-40 (2002). Although this ordinarily requires "cases relevant to the situation

11  [officers] confronted," *Brosseau*, 543 U.S. at 200, it does "not require a case directly

12  on point," *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011); *see Hope*, 536 U.S. at 740

13  (qualified immunity should be denied even "despite notable factual distinctions

14  between the precedents relied on and the [instant case], so long as the prior

15  decisions gave reasonable warning that the conduct then at issue violated

16  constitutional rights"). In an "obvious case," however, even the more general

17  standards set forth in *Graham* and *Garner* can "clearly establish" the

18  unconstitutionality of official conduct "even without a body of relevant case law."

19  *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 6 (2021) (quoting *Brousseau*, 543 U.S. at

20  199). Training on use of force can also put deputies on notice that force is

21  unreasonable. *Drummond v. City of Anaheim*, 343 F.3d 1052, 1062 (9th Cir. 2003).

22      Viewing the facts in the light most favorable to Plaintiffs, this is an "obvious

23  case." At the time Martinez began firing without warning, Anthony was not facing

24  or walking toward Martinez or any other deputy, was 20 feet away, and was not

25

26  _____

27  [4] Although Defendants' motion references "the fleeing felon doctrine," they
    make no argument it applies (Mot. at 20-22.) It does not, as Plaintiffs' expert and
28  Deberg agreed, and Anthony was not fleeing.

swinging the leash. He had just told deputies to "get away" from him, showing he was not about to approach. By the time Martinez fired his third shot, Anthony was falling and the leash was all the way down. Under these circumstances, shooting Anthony dead was patently unreasonable, such that *Graham*'s prohibition on objectively unreasonable force, 490 U.S. at 397, as well as *Garner*'s rule forbidding use of deadly force against individuals who pose no immediate threat, 471 U.S. at 11, each were sufficient to "giv[e] fair and clear warning" and "apply with obvious clarity to the specific conduct" here. *Hope*, 536 U.S. at 741; *see Aguirre*, 29 F.4th at 626-29 (use of deadly force without warning against subject who was within 15 feet away, was not facing or approaching deputy, and was holding bat-like object pointed down was obviously unconstitutional). The same is true of Martinez's training that deadly force may only be used against an individual who has the present ability, opportunity, and apparent intent to inflict death or serious bodily injury. *See Drummond*, 343 F.3d at 1062.

Ninth Circuit precedent also made clear that use of deadly force under these circumstances was unconstitutional. In *Aguirre*, a sheriff's deputy responded to reports that an individual "was destroying property with a bat-like object, and had threatened a woman with a baby." 29 F.4th at 626. The deputy arrived, drew his gun, confronted the man, and "motioned for [the man] to back away and demanded that he drop the stick." *Id.* The man "did not drop it, and by some accounts verbally refused to do so." *Id.* The deputy attempted to pepper-spray the man, which was ineffective. *Id.* The deputy then "pointed his gun at [the man] and again ordered him to drop the stick, but [he] did not comply." *Id.* When the man then either "advanced quickly toward [the deputy] with at least one weapon raised" or "stood still, holding a single stick pointed down," the deputy, without issuing a warning, "shot [the man] six times from no more than fifteen feet away." *Id.* Although the deputy contended the man "stood facing him during all six shots, [ ] the coroner's report found [the man] died from two shots to his back." *Id.* at 626-27. "The bullet paths suggested"

that for at least those shots, the man "had turned *away* from the officer and was falling to the ground." *See id.* There was also no evidence "suggest[ing] [the man] was threatening bystanders or advancing toward them when he was killed." *Id.* at 628. The Ninth Circuit concluded that although "the suspected crime … was severe," the man was not "attempting to flee or evade arrest," and "key disputed fact[s]"—including "whether [the man] was facing the officer and coming 'on the attack'" or was "turned away from the officer," and the manner in which he "was holding [the] bat-like object when he was shot"—precluded summary judgment because if resolved in plaintiffs' favor, they would show that at the time of the shots, the man "presented no threat at all to the officer—or anyone else." *Id.* Accordingly, the court held that, construing the evidence in plaintiffs' favor, the use of deadly force was unreasonable. *Id.* at 628-29.

  *Aguirre*, which was decided prior to the incident in this case, clearly established that firing multiple shots without warning, from 20 feet away, at an individual who was not moving toward deputies, had his back at least partially turned, was holding a potential impact weapon but was not moving or swinging it, and against whom less-lethal weapons had already been used constituted excessive and unreasonable force under the Fourth Amendment. Indeed, certain facts in this case, viewed in the light most favorable to Plaintiffs, show that Anthony posed even less of an immediate threat than was posed in *Aguirre*: There, the man was several feet nearer to the shooting deputy at the time of the shots than Anthony was to Martinez, and in *Aguirre* there was no indication that any obstacles were between the man and the deputy or that the deputy had access to cover, whereas here the parked Honda was at least partially between Anthony and Martinez, and Martinez had the ability to use either of two parked cars for cover. Altogether, the material similarities between *Aguirre* and this case are more than sufficient to have clearly established the law, and any minor distinctions do not show otherwise. *See al-Kidd*, 563 U.S. at 741; *Hope*, 536 U.S. at 740.

*Aguirre* itself held that the unconstitutionality of the shooting in that case was "obvious," and that the law also was clearly established by *Hayes*, 736 F.3d 1223, and *Morris*, 736 F.3d 829. 29 F.4th at 629-30. These conclusions, and those decisions, further show the law here was clearly established. *See Hayes*, 736 F.3d at 1227-28, 1233-35 (deadly force excessive where deputy fired, without warning, from 6-8 feet at man holding large knife pointed tip-down where evidence did not "clearly establish that [he] was threatening the deputies with the knife" and where man was not attempting to evade deputies); *Morris*, 736 F.3d at 832-33, 838-39 & n.10 (deadly force excessive where deputies fired at man who emerged from home holding pistol pointed down, even where warning was issued). Additional decisions further show the law was clearly established. *See Vos*, 892 F.3d at 1028-34 (deadly force excessive where officers fired, without warning, from within 20 feet at man running out of store toward officers with what officers believed were scissors raised overhead, where man had not complied with orders to "[d]rop the weapon," where less-lethal weapon had been used but other available less-lethal options were not, where officers knew man had cut store employee with scissors, and where man had exhibited indications of mental illness).

Because, viewing the facts in the light most favorable to plaintiffs, Martinez's use of deadly force was unlawful and its unconstitutionality was clearly established, qualified immunity must be denied.[5]

## V.   THE DEPUTIES VIOLATED PLAINTIFF ROSA NUÑEZ'S FOURTEENTH AMENDMENT RIGHTS

Official action violates due process when it "shocks the conscience." *Hayes*, 736 F.3d at 1230. "Where actual deliberation is practical" before using force, only

---

[5] The unlawfulness of Deberg and Cervantes's less-lethal force was also clearly established. *See Bryan*, 630 F.3d at 823-32; *Deorle*, 272 F.3d at 1279-85; *Smith*, 394 F.3d at 700-04.

"deliberate indifference" must be shown. *Id.* In situations "that escalate so quickly that the officer must make a snap judgment" with no time to deliberate, plaintiffs must show he acted "with a purpose to harm unrelated to legitimate law enforcement objectives." *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008). "Deliberate indifference" applies where officers are able to evaluate the threat a suspect poses, *see Willis v. City of Fresno*, 520 F. App'x 590, 592 (9th Cir. 2013); *Kaur*, 263 F. Supp. 3d at 972 (deliberate indifference standard applied to suspect who at time of shooting "was neither dangerous nor currently in flight"); *Kosakoff v. City of San Diego*, 2010 WL 1759455, at *11-12 (S.D. Cal. Apr. 29, 2010), or where officers use force following a standoff with time to create a tactical plan, *Ewolski v. City of Brunswick*, 287 F.3d 492, 511 (6th Cir. 2002). "Purpose to harm" applies where unforeseen changes in circumstance, or clear, immediate threats to life allow only split seconds to make decisions. *E.g.*, *Hayes*, 736 F.3d at 1230 (officer's decision to use deadly force was "sudden" and "snap judgment based on the unexpected appearance of a knife in [decedent's] hand"); *Moreland v. Las Vegas Metro. Police Dept.*, 159 F.3d 365, 372 (9th Cir. 1998) (officers arriving at bar encountered "gunfight in progress threaten[ing] the lives of the 50 to 100 people").

Here, actual deliberation was practical, and Martinez's shooting reflects deliberate indifference to Anthony's rights. When Martinez began firing, Anthony was 20 feet away, not facing Martinez or moving toward him, and not swinging the leash. There was no need for a "snap judgment." *See Willis*, 520 F. App'x at 592. Martinez could have tactically repositioned and taken cover for protection and additional time to attempt alternate means to arrest Anthony, but elected not to. He fired after an hour-long conversation with Anthony, during which a tactical plan could have been formulated, when deputies knew SED was en route. *See Ewolski*, 287 F.3d at 511. Even under the purpose to harm standard, summary judgment must still be denied given Martinez continued to fire when Anthony was already falling

down and posed no threat. *See Zion*, 874 F.3d at 1077 (standard satisfied where officer continued firing after decedent was shot and rendered harmless).

## VI.   THE DEPUTIES VIOLATED THE BANE ACT

Under the Bane Act, beyond showing a civil rights violation, plaintiffs must only show the defendant acted with specific intent to violate a decedent's civil rights. *See B.B. v. Cnty. of Los Angeles*, 25 Cal. App. 5th 115, 129-33 (2018), *rev'd on other grounds*, 10 Cal. 5th 1 (2020); *Reese v. Cnty. of Sacramento*, 888 F.3d 1030, 1040 (9th Cir. 2018). A "reckless disregard for a person's constitutional rights is evidence of specific intent to deprive that person of those rights." *Reese*, 888 F.3d at 1045. Here, the deputies violated Anthony's right to be free from excessive force and, viewing the facts in Plaintiffs' favor, demonstrated reckless disregard. There was no immediate threat when Martinez fired, shown by Anthony's distance, actions, and position—including falling during the third shot—and Martinez's lack of warning or attempt to use cover. Deberg and Cervantes fired less-lethal weapons without warning from up to 35 feet away when Anthony was not approaching or swinging the leash around himself or overhead. There was no imminent threat when any force was used, showing the deputies "at least recklessly disregarded whether" the force was "more than necessary under the circumstances." *Rios v. City of Los Angeles*, 2:21-cv-05341-RGK-MAA, 2022 WL 17219086, at *4 (C.D. Cal. Aug. 25, 2022); *see Garcia v. City of Azusa*, CV 22-3457-MWF (JPRx), 2023 WL 9420513, at *8 (C.D. Cal. Dec. 1, 2023).

## VII.   THE DEPUTIES COMMITTED BATTERY

Battery claims against officers are analyzed under the Fourth Amendment reasonableness standard. *Reyes v. City of Santa Ana*, 832 F. App'x 487, 491 (9th Cir. 2020) (citing *Yount v. City of Sacramento*, 43 Cal. 4th 885, 902 (2004)). As discussed above, viewing the facts in Plaintiffs' favor, Deberg and Cervantes used unreasonable force when they fired less-lethal rounds at Anthony without proper warning from up to 35 feet away, while Anthony was stationary and not swinging

the leash. Martinez used unreasonable force when he fired three shots at Anthony from distances of 17-20 feet away without warning, while Anthony was not swinging or preparing to swing the leash, not facing or moving toward Martinez or other deputies during the first two shots, and already falling down by the third. Summary judgment must be denied on Plaintiffs' battery claim.

## VIII. <u>THE DEPUTIES WERE NEGLIGENT</u>

California negligence law is "broader than federal Fourth Amendment law." *Tabares v. City of Huntington Beach*, 988 F.3d 1119, 1125 (9th Cir. 2021); *Alves v. Riverside County*, EDCV 19-2083 JGB (SHKx), 2023 WL 4104185, at *13-14 (C.D. Cal. May 19, 2023). While California law considers Fourth Amendment factors when assessing an officer's conduct when force is used, it also encompasses preceding tactics and decisions, which "can render [officer] behavior unreasonable …, even if [ ] use of deadly force at the moment of the shooting might be reasonable in isolation." *Tabares*, 988 F.3d at 1125-26.

Even though the deputies' uses of force were unreasonable under Fourth Amendment, their preceding tactics and conduct further show they were negligent. Martinez repeatedly asked Anthony to come outside, but none of the deputies discussed a tactical plan for what do if Anthony came outside with the leash. After Anthony came outside, numerous deputies issued commands, despite training that this can raise tension and escalate the situation. Before shooting, Martinez failed to use cover or tactically reposition, even though it was feasible and would have been consistent with training. Deputies failed to call for retrieval of protective equipment, including a shield, even though any deputy would have known such equipment was available. For these reasons and those addressed regarding Plaintiffs' Fourth Amendment claim, the facts show the deputies were negligent.

Regarding Andrew Nuñez's NIED claim, it is sufficient that he "sensorially perceive[d]" deputies' use of force and was contemporaneously aware it was injuring a close relative, his brother. *See Wilks v. Hom*, 2 Cal. App. 4th 1264, 1271

(1992). Before the shooting, Andrew was concerned deputies would hurt Anthony. [PF-79.] Andrew knew armed deputies were confronting Anthony when he heard three popping sounds. [PF-80.] Given his awareness of this confrontation and concern Anthony would be harmed, when Andrew heard these sounds, he immediately understood Anthony had been shot. [PF-81.] This is sufficient. *See id.*; *Krouse v. Graham*, 19 Cal. 3d 59, 65-66 (1977). *Ra v. Superior Court*, 154 Cal. App. 4th 142 (2007), is not to the contrary. There, the plaintiff heard a bang from a direction she believed her husband was in, but had no idea what the noise was, and thus had no "reasonable certainty" he was injured. *Id.* at 144, 152-53. Andrew knew armed deputies were confronting his brother and, when he heard gunshots, immediately understood Anthony had been shot. These circumstances are much nearer to those in *Wilks*, 2 Cal. App. 4th at 1267, 1273.

## IX. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request the Court deny Defendants' Motion in its entirety.


DATED: April 26, 2024          LAW OFFICES OF DALE K. GALIPO



                               By_____/s/ Benjamin S. Levine_____
                                   Dale K. Galipo
                                   Benjamin S. Levine
                                   Attorneys for Plaintiffs

## CERTIFICATION OF COMPLIANCE WITH WORD LIMIT (L.R. 11-6.1)

The undersigned, counsel of record for Plaintiffs Rosa Nuñez, Anthony Nuñez, Jr., and Andrew Nuñez, certifies that this brief contains **6,982** words, which complies with the word limit of L.R. 11-6.1.

DATED:  April 26, 2024                    LAW OFFICES OF DALE K. GALIPO

By_____/s/ Benjamin S. Levine_____
Dale K. Galipo
Benjamin S. Levine
Attorneys for Plaintiffs