**LAW OFFICES OF DALE K. GALIPO**
Dale K. Galipo (SBN 144074)
dalekgalipo@yahoo.com
Benjamin S. Levine (SBN 342060)
blevine@galipolaw.com
21800 Burbank Boulevard, Suite 310
Woodland Hills, California, 91367
Telephone: (818) 347-3333
Facsimile: (818) 347-4118

LUIS A. CARRILLO (SBN 70398)
MICHAEL S. CARRILLO (SBN 258878)
DOMINIQUE L. BOUBION (SBN 336915)
**CARRILLO LAW FIRM, LLP**
1499 Huntington Drive, Suite 402
South Pasadena, California 91030
Tel: (626) 799-9375
Fax: (626) 799-9380

Attorneys for Plaintiffs
ROSA NUÑEZ, ANTHONY NUÑEZ, JR., and ANDREW NUÑEZ

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROSA NUNEZ, individually; ANTHONY NUÑEZ, JR., individually and as successor-in-interest to Decedent, Anthony Nuñez; and ANDREW NUÑEZ, individually, <br><br> Plaintiffs, <br><br> v. <br><br> COUNTY OF SAN BERNARDINO; CITY OF HESPERIA; MICHAEL MARTINEZ; SABRINA CERVANTES; JEREMY DEBERG; JONATHAN CAMPOS; and DOES 5 through 15, inclusive, <br><br> Defendants. | Case No. 5:22-cv-01934-SSS-SP <br><br> **PLAINTIFFS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT AND ADDITIONAL UNDISPUTED MATERIAL FACTS** <br><br> *[Filed concurrently with Plaintiffs' Memorandum of Points and Authorities in Opposition to Defendants' Motion for Summary Judgment; Plaintiffs' Objections to Evidence; Declaration of Benjamin S. Levine and Exhibits thereto; Declaration of Scott A. DeFoe]* <br><br> Date:     May 31, 2024 <br> Time:     2:00 p.m. <br> Courtroom: 2 |

Pursuant to Local Rule 56-2 and the Court's July 26, 2023 Civil Standing Order, Plaintiffs respectfully submit this Statement of Genuine Disputes of Material Fact and Additional Undisputed Material Facts in support of their Opposition to Defendants' Rule 56 Motion for Summary Judgment.

DATED:  April 26, 2024            LAW OFFICES OF DALE K. GALIPO

By _/s/ Benjamin S. Levine_____
    Dale K. Galipo
    Benjamin S. Levine
    Attorneys for Plaintiff

## PLAINTIFFS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT IN RESPONSE TO DEFENDANTS' SEPARATE STATEMENT OF ALLEGEDLY UNDISPUTED MATERIAL FACTS AT DKT. 64

| Defendants' Allegedly Undisputed Fact and Evidence | Disputed/Undisputed Fact and Evidence |
|---|---|
| 1. On March 29, 2022 San Bernardino County Sheriffs' Deputies arrived at 8990 9th Avenue in the City of Hesperia, California after receiving a call from Noelia Benitez ("Benitez") wife of Andrew Nunez.<br><br>**EVIDENCE:**<br>Plaintiffs' Second Amended Complaint ("SAC") ¶ 26-27. | **Disputed** that the deputies who arrived at 8990 9th Avenue received any call from Ms. Benitez. Ms. Benitez spoke with a 911 operator, and certain details she provided were separately relayed to deputies by Sheriffs' Department dispatch.<br><br>Ex. F to Prescott Decl., Benitez Depo. 91:24-92:2; Ex. 5 to Levine Decl., LaFever Depo. 11:6-22. |
| 2. Ms. Benitez called 911 of her own accord after seeing Decedent Anthony Nunez ("Decedent") get into a physical altercation with his brother, Plaintiff Andrew Nunez.<br><br>**EVIDENCE:**<br>Deposition of Noelia Benitez ("Benitez Depo") 81:9-14, Deposition of Andrew Nunez ("Andrew Depo") Andrew Depo 59:14-60:15 | **Disputed** as to "altercation" to extent it implies Anthony Nuñez harmed or used appreciable force against Andrew Nuñez or anyone else. Ms. Benitez testified that Anthony "just pushed [Andrew] . . ., with his hands."<br><br>Ex. F to Prescott Decl., Benitez Depo. 81:2-3. |
| 3. Ms. Benitez called 911 because she thought 911 would be the fastest to respond.<br><br>**EVIDENCE:**<br>Benitez Depo 82:1-6 | **Disputed.**<br><br>In the cited portion of Ms. Benitez's testimony, she was asked why she called 911 rather than a mental health or mental crisis hotline, to which she responded that she did not know why and that she "wasn't thinking." She added that she "just though 911 was the fastest." She did not state that she believed 911 would |

| Defendants' Allegedly Undisputed Fact and Evidence | Disputed/Undisputed Fact and Evidence |
|---|---|
| | be fastest *to respond* and could just as likely have meant that 911 was the fastest phone number to dial.<br><br>Ex. F to Prescott Decl., Benitez Depo. 82:1-6.<br><br>**Further disputed** to extent it implies Ms. Benitez shared her rationale for dialing 911 rather than calling another number with the 911 operator during her call, which is not supported by the cited deposition testimony.<br><br>Ex. F to Prescott Decl., Benitez Depo. 82:1-6. |
| 4.  Ms. Benitez believed the confrontation between Andrew Nunez and Decedent was an emergency<br><br>**EVIDENCE:**<br>     Benitez Depo 82:16-22 | **Disputed** to extent it implies Ms. Benitez shared this belief with the 911 operator during her call, which is not supported by the cited deposition testimony.<br><br>Ex. F to Prescott Decl., Benitez Depo. 82:16:22. |
| 5.  Decedent was telling Ms. Benitez and Andrew Nunez "that he was God" at the time of his altercation with Andrew Nunez.<br><br>**EVIDENCE:**<br>     Benitez Depo 82:24-83:16 | **Disputed** to extent it implies Ms. Benitez shared this detail with the 911 operator during her call, which is not supported by the cited deposition testimony.<br><br>Ex. F to Prescott Decl., Benitez Depo. 82:24-83:16. |
| 6.  Ms. Benitez reported to 911 dispatchers that Decedent was on drugs because his eyes looked glossy.<br><br>**EVIDENCE:** | **Disputed** to extent it implies Ms. Benitez knew, rather than merely believed, Anthony Nuñez was "on drugs." Mr. Benitez's deposition testimony makes clear that she |

| Defendants' Allegedly Undisputed Fact and Evidence | Disputed/Undisputed Fact and Evidence |
|---|---|
| Benitez Depo 90:5-11. | "believe[d]" this was the case at the time based on Mr. Nuñez's eyes appearing "glossy."<br><br>Ex. F to Prescott Decl., Benitez Depo. 9:8-11.<br><br>**Further disputed** to extent it implies Ms. Benitez share the basis for her belief that Anthony was "on drugs" with the 911 operator during her call, which is not supported by the cited deposition testimony. |
| 7.  Ms. Benitez told 911 dispatchers that there were firearms in the home when she called regarding Decedent.<br><br>**EVIDENCE:**<br>Benitez Depo 90:12-17 | **Disputed** to extent it implies the defendant deputies did not receive updated information that no firearm was in the house or accessible to Anthony prior to any deputy's use of force against Anthony. While Deputies Martinez and Campos were speaking with Anthony at the front door, Andrew Nuñez, who had left the house and was with Sergeant LaFever at a "command post" three or four houses to the north of the Nuñez home, called Rosa  Nuñez , who owned the firearm deputies had received information might be on the premises. With LaFever listening, Rosa informed Andrew that there was no gun inside of the house and that the gun was inside of a locked vehicle on the property and that Anthony did not have a key to that vehicle. This information was broadcast to the deputies. |

| Defendants' Allegedly Undisputed Fact and Evidence | Disputed/Undisputed Fact and Evidence |
|---|---|
| | Ex. 5 to Levine Decl., LaFever Depo 30:12-31:2, 31:22-33:6, 35:17-25. |
| 8.  Ms. Benitez told 911 dispatchers that Decedent had not slept for several days because of the way he was acting when she made the 911 call.  **EVIDENCE:**     Benitez Depo 91:24-92:10 | **Disputed** to extent it implies Ms. Benitez shared the basis for her belief that Anthony had not slept with the 911 operator during her call, which is not supported by the cited deposition testimony.  Ex. F to Prescott Decl., Benitez Depo. 91:24-92:10. |
| 9.  Ms. Benitez remained on the line with 911 dispatchers rather than hanging up in case Decedent and Andrew Nunez got into another altercation  **EVIDENCE:**     Benitez Depo 93:10-94:6 | **Undisputed.** |
| 10. Decedent had a hallucination on the date of the incident immediately prior to engaging in a physical altercation with Andrew Nunez.  **EVIDENCE:**     Andrew Depo 98:24-99:9; Andrew Depo 105:17-24 | **Disputed.**  In the cited portions of Andrew Nuñez's deposition, Andrew testified that he thought Anthony Nuñez experienced a hallucination on the morning of the incident at issue in this case. Andrew did not testify that Anthony had, as a factual matter, actually experienced a hallucination.  Ex. C to Prescott Decl., Andrew Nuñez Depo. 98:24-99:9.  **Further disputed** to extent it implies this information was shared with the 911 operator during Ms. Benitez's call or was shared with deputies, neither of which is |

| Defendants' Allegedly Undisputed Fact and Evidence | Disputed/Undisputed Fact and Evidence |
|---|---|
| | supported by the cited deposition testimony. |
| 11. During the physical altercation between Andrew Nunez and Decedent, Decedent threatened Andrew Nunez with a metal chain and Decedent was holding the metal chain while he pushed Andrew Nunez.<br><br>**EVIDENCE:**<br>Andrew Depo 60:22-25; Benitez Depo 79:9-20; Deposition of Deputy Sabrina Cervantes ("Cervantes Depo") 25:24-26:2 | **<u>Disputed.</u>**<br><br>The cited portions of Andrew Nuñez and Ms. Benitez's depositions do not establish that Anthony Nuñez threatened Andrew with the chain leash. Andrew testified that Anthony merely "hit the floor with" the leash. The cited portion of Deputy Cervantes's deposition makes no reference to the chain leash. In any event, Deputy Cervantes was not present during and did not observe the alleged altercation.<br><br>Ex. C to Prescott Decl., Andrew Nuñez Depo. 60:22-25; Ex. F to Prescott Decl., Benitez Depo. 79:9-20; Ex. C to Prescott Decl., Cervantes Depo. 25:24-26:2; Ex. 4 to Levine Decl., Cervantes Depo. 20:23-21:6 (Cervantes responded to Nuñez home after other deputies were already there and were speaking with Anthony). |
| 12. Prior to arriving on scene, Deputies Michael Martinez, Jeremy Deberg, and Sabrina Cervantes, (the "Deputies") and Sergeant Corey LaFever ("LaFever") were informed of the presence of firearms at the premises.<br><br>**EVIDENCE:**<br>Cervantes Depo 24:6-14, Deposition of Michael Martinez ("Martinez | **<u>Disputed</u>** to extent it implies the deputies were informed that there were in fact firearms on the premises of the Nuñez home prior to arriving. Rather, dispatch advised deputies that it was possible there were firearms at the house.<br><br>Ex. A to Prescott Decl., Martinez Depo. 80:13-20. |

| Defendants' Allegedly Undisputed Fact and Evidence | Disputed/Undisputed Fact and Evidence |
|---|---|
| Depo") 80:13-20; Deposition of Corey LaFever ("LaFever Depo") 13:16-14:1 | **Further disputed** to extent it implies the deputies were informed prior to arriving that Anthony Nuñez had access to any firearms. Deputies did not receive information regarding whether or how Anthony might have access to any firearm.<br><br>Ex. B to Prescott Decl., LaFever Depo. 13:16-22.<br><br>**Further disputed** to extent it implies the defendant deputies did not receive updated information that no firearm was in the house or accessible to Anthony prior to any deputy's use of force against Anthony. While Deputies Martinez and Campos were speaking with Anthony at the front door, Andrew Nuñez , who had left the house and was with Sergeant LaFever at a "command post" three or four houses to the north of the Nuñez home, called Rosa Nuñez, who owned the firearm deputies had received information might be on the premises. With LaFever listening, Rosa informed Andrew that there was no gun inside of the house and that the gun was inside of a locked vehicle on the property and that Anthony did not have a key to that vehicle. This information was broadcast to the deputies.<br><br>Ex. 5 to Levine Decl., LaFever Depo 30:12-31:2, 31:22-33:6, 35:17-25. |

| Defendants' Allegedly Undisputed Fact and Evidence | Disputed/Undisputed Fact and Evidence |
|---|---|
| 13. Prior to arriving on scene, Deputy Martinez and Deputy Cervantes were aware that Decedent was possibly the influence of a controlled substance.<br><br>**EVIDENCE:**<br>Cervantes Depo 25:14-23; Martinez Depo 80:17-20 | **Disputed** to extent "controlled substance" implies deputies had information indicating Anthony Nuñez was under the influence of illegal drugs prior to arriving. Deputy Martinez testified that he received information from dispatch that the 911 caller's brother-in-law was "possibly under the influence," that Martinez did not receive information regarding what the brother-in-law was under the influence of, and that Martinez understood that this could have meant the brother-in-law was under the influence of alcohol.<br><br>Ex. A to Prescott Decl., Martinez Depo. 80:17-20; Ex. 1 to Levine Decl., Martinez Depo. 82:3-9. |
| 14. Deberg believed Decedent was under the influence of a controlled substance at the time of the incident<br><br>**EVIDENCE:**<br>Deposition of Jeremy Deberg ("Deberg Depo") 106:21-107:17 | **Disputed** to extent it implies Deputy Deberg believed the signs and symptoms he observed Anthony Nuñez exhibit actually were, or could only be, indicative of Anthony being under the influence of a controlled substance. Although Deputy Deberg testified that Anthony's "irrational" statements, including "calling someone a devil," led Deberg to believe Anthony may have been under the influence of a controlled substance, Deberg further testified that this was just one of multiple possible explanations for Anthony's statements, and that the possibility that Anthony was experiencing a mental health crisis |

| Defendants' Allegedly Undisputed Fact and Evidence | Disputed/Undisputed Fact and Evidence |
|---|---|
| | was "definitely" also a possible explanation for Anthony's statements. Deputy Deberg also testified he never heard Anthony say Anthony had used any controlled substance.<br><br>Ex. 3 to Levine Decl., Deberg Depo. 106:21-107:6, 107:14-108:11. |
| 15. When Deputy Martinez arrived on scene, he began attempting to de-escalate with Decedent.<br><br>**EVIDENCE:**<br>Declaration of Michael Martinez ("Martinez Decl." ¶ 9, Exh. A | **Disputed** to extent it implies any de-escalation efforts Deputy Martinez made were competent or adequate. Martinez's alleged de-escalation efforts were wholly inadequate, and Martinez committed key errors a reasonable deputy would not have committed, thereby escalating the situation rather than de-escalating.<br><br>DeFoe Decl., ¶ 19-20. |
| 16. Deputies Deberg and Cervantes arrived on scene shortly after Deputy Martinez and Deputy Campos.<br><br>**EVIDENCE:**<br>Cervantes Depo 26:3-27:1; Deberg Depo 23:7-24:8 | **Undisputed.** |
| 17. While attempting to de-escalate, the Deputies attempted to get Decedent to exit the home and come outside in order to separate him from the firearms that were on the property.<br><br>**EVIDENCE:**<br>Martinez Decl. ¶ 9-10, Exh. A; Cervantes Depo 33:11-22; LaFever Depo 24:4-22 | **Disputed** to extent it implies any de-escalation efforts Deputy Martinez made were competent or adequate. Martinez's alleged de-escalation efforts were wholly inadequate, and Martinez committed key errors a reasonable deputy would not have committed, thereby escalating the situation rather than de-escalating.<br><br>DeFoe Decl., ¶ 19-20. |

| Defendants' Allegedly Undisputed Fact and Evidence | Disputed/Undisputed Fact and Evidence |
|---|---|
| | **Further disputed** to extent it implies deputies had information Anthony had access to any firearm or that they did not receive information that no firearm was in the house or accessible to Anthony prior to any deputy's use of force against Anthony. While Deputies Martinez and Campos were speaking with Anthony at the front door, Andrew Nuñez, who had left the house and was with Sergeant LaFever at a "command post" three or four houses to the north of the Nuñez home, called Rosa Nuñez, who owned the firearm deputies had received information might be on the premises. With LaFever listening, Rosa informed Andrew that there was no gun inside of the house and that the gun was inside of a locked vehicle on the property and that Anthony did not have a key to that vehicle. This information was broadcast to the deputies.<br><br>Ex. 5 to Levine Decl., LaFever Depo 30:12-31:2, 31:22-33:6, 35:17-25. |
| 18. The deputies were unable to confirm that the gun was not accessible until after the incident had concluded<br><br>**EVIDENCE:**<br>LaFever Depo 33:7-15 | **Disputed.**<br><br>Prior to any deputy's use of force against Anthony, deputies received reliable information that no gun was accessible to Anthony. While Deputies Martinez and Campos were speaking with Anthony at the front door, Andrew Nuñez, who had left |

| Defendants' Allegedly Undisputed Fact and Evidence | Disputed/Undisputed Fact and Evidence |
|---|---|
| | the house and was with Sergeant LaFever at a "command post" three or four houses to the north of the Nuñez home, called Rosa Nuñez, who owned the firearm deputies had received information might be on the premises. With LaFever listening, Rosa informed Andrew that there was no gun inside of the house and that the gun was inside of a locked vehicle on the property and that Anthony did not have a key to that vehicle. This information was broadcast to the deputies.<br><br>Ex. 5 to Levine Decl., LaFever Depo 30:12-31:2, 31:22-33:6, 35:17-25. |
| 19. Upon arrival, Deputy Cervantes retrieved her less-lethal shotgun from her vehicle and took cover behind a short wall approximately five feet away from Deputies Martinez and Campos in order to allow Martinez and Campos to continue to attempt to de-escalate with Decedent<br><br>**EVIDENCE:**<br>Cervantes Depo 27:2-10, 33:16-22 35:1-12 | **Disputed** to extent it implies any de-escalation efforts Deputy Martinez made were competent or adequate. Martinez's alleged de-escalation efforts were wholly inadequate, and Martinez committed key errors a reasonable deputy would not have committed, thereby escalating the situation rather than de-escalating.<br><br>DeFoe Decl., ¶ 19-20.<br><br>**Otherwise undisputed** except to clarify that there was no "short wall" near the front porch area where Deputies Martinez and Campos were speaking with Anthony. The wall referenced by Cervantes was the full-height western wall of the house. |

| Defendants' Allegedly Undisputed Fact and Evidence | Disputed/Undisputed Fact and Evidence |
|---|---|
| | Ex. 4 to Levine Decl., Cervantes Depo 56:8-57:2 & Ex. 1. |
| 20. Upon arrival, Deputy Deberg retrieved the 40-millimiter ("40mm") launcher at the direction of Sergeant La Fever from Sergeant La Fever's trunk<br><br>**EVIDENCE:**<br>Deberg Depo 27:3-10; 31:5-9 | **<u>Undisputed.</u>** |
| 21. While on scene, Deputy Deberg broadcast a statement to the deputies that Decedent told Deputies Martinez and Campos that they would need to kill Decedent so everyone on scene was aware of Decedent's possible intentions<br><br>**EVIDENCE:**<br>Deberg Depo 48:4-15 | **<u>Disputed</u>** to extent it implies Anthony did not immediately recant this statement and that it was the only information the deputies had available in order to ascertain whether Anthony was serious or that this statement was credible. Immediately after making this statement, Anthony clarified that he did not intend to confront deputies or create a violent situation, stating "I'm not like that. I'm not like that," and pleading with the deputies to return his family members, who Anthony had just learned had been taken from the house.<br><br>Ex. 9 to Levine Decl., Belt Recording Transcript 155:13-20, 156:1-16. |
| 22. Shortly after arriving, Sergeant LaFever encountered Andrew Nunez and Noelia Benitez and made initial contact with them.<br><br>**EVIDENCE:**<br>LaFever Decl. ¶ 10 | **<u>Undisputed.</u>** |

| Defendants' Allegedly Undisputed Fact and Evidence | Disputed/Undisputed Fact and Evidence |
|---|---|
| 23.During this contact, Andrew Nunez informed LaFever that Decedent was likely under the influence of narcotics.<br><br>**EVIDENCE:**<br>　　LaFever Decl. ¶ 10 | **<u>Disputed</u>** to extent it implies Andrew Nuñez actually knew whether Anthony was under the influence of narcotics. Andrew testified that on the date of the incident, he only "suspected" that Anthony was "on drugs."<br><br>Ex. 8 to Levine Decl., Andrew Nuñez Depo. 134:9-19. |
| 24.While Decedent was speaking with Deputy Martinez he made repeated threats to harm Deputy Martinez and told Martinez he wanted to commit "suicide by cop"<br><br>**EVIDENCE:**<br>　　Martinez Decl. ¶ 10, 13-14, Exh. A | **<u>Disputed.</u>**<br><br>One statement Anthony made that Deputy Martinez may here be referring to was in the context of a hypothetical scenario in which Anthony was a king and police attempted to disempower Anthony by involving the FBI. Other statements were framed as a warnings to the deputies not to approach and that Anthony would defend himself if deputies "put hands on" him and attempted to kill him or otherwise attempted to harm him. Anthony also clarified that he was "not that kind of person," that he "would never do that" because he was "a good man" and "love[d] God." When Anthony made a statement that he was "gonna fight," he immediately clarified that he meant he would "fight … to be in [elected] office." Other statements were immediately recanted, such as when Anthony clarified that he did not intend to confront deputies or create a violent situation, stating |

| Defendants' Allegedly Undisputed Fact and Evidence | Disputed/Undisputed Fact and Evidence |
|---|---|
| | "I'm not like that. I'm not like that," and pleading with the deputies to return his family members, who Anthony had just learned had been taken from the house.<br><br>Ex. 9 to Levine Decl., Belt Recording Transcript 34:27-35:20, 60:18-61:27, 102:17-103:5, 117:6-10, 155:13-20, 156:1-16.<br><br>Anthony also never said "suicide by cop."<br><br>*See* Martinez Decl., Ex. A. |
| 25. After over an hour of communication with Decedent, Deputy Martinez was able to get Decedent to leave the home.<br><br>**EVIDENCE:**<br>Martinez Decl. ¶ 12 | **Undisputed.** |
| 26. The Deputies continued attempting to de-escalate with Decedent prior to the incident, including making multiple requests that Decedent drop the chain he was holding.<br><br>**EVIDENCE:**<br>Martinez Decl. ¶ 10, 12, Exh. A, | **Disputed** to extent it implies any de-escalation efforts Deputy Martinez made were competent or adequate. Martinez's alleged de-escalation efforts were wholly inadequate, and Martinez committed key errors a reasonable deputy would not have committed, thereby escalating the situation rather than de-escalating.<br><br>DeFoe Decl., ¶ 20. |
| 27. Decedent remained aggressive the entire time the Deputies were trying to verbally de-escalate with him.<br><br>**EVIDENCE:** | **Disputed.**<br><br>Anthony was respectful and even warm toward the deputies at times throughout their conversation with |

| Defendants' Allegedly Undisputed Fact and Evidence | Disputed/Undisputed Fact and Evidence |
|---|---|
| Cervantes Depo 44:8-20 | him. During their conversation, Anthony said he loved the deputies, that he wanted them to love him, that he just wanted to have a conversation with them, that they were "awesome," that he apologized to them, that they do a lot to help the world, that they were professional, and that they were his brothers. Anthony also put down the leash he was holding for a time, which Deputy Martinez viewed as an act of compliance.<br><br>Ex. 9 to Levine Decl., Belt Recording Transcript 7:5-13, 7:24, 10:26-27, 23:2-11, 28:11, 38:24, 45:27, 48:5, 50:8; Ex. 2 to Levine Decl., Campos Depo. 44:5-9; Ex. 1 to Levine Decl., Martinez Depo. 109:25-110:2, 110:13-14.<br><br>**Further disputed** to extent it implies any de-escalation efforts Deputy Martinez made were competent or adequate. Martinez's alleged de-escalation efforts were wholly inadequate, and Martinez committed key errors a reasonable deputy would not have committed, thereby escalating the situation rather than de-escalating.<br><br>DeFoe Decl., ¶ 19-20. |
| 28. In the ten seconds prior to firing at Decedent, Deputy Martinez and the other deputies continued to order Decedent to drop the chain. | **Disputed** to extent it implies that multiple deputies issuing commands was proper or an adequate de-escalation technique. Deputies are |

| Defendants' Allegedly Undisputed Fact and Evidence | Disputed/Undisputed Fact and Evidence |
|---|---|
| **EVIDENCE:**<br>    Martinez Depo 17:19-25 | trained that where multiple deputies are trying to gain compliance from a subject, only one deputy should issue commands. Deputies are also trained that multiple deputies giving commands to a subject can cause confusion and can create additional tension and escalate the situation.<br><br>Ex. 2 to Levine Decl., Campos Depo. 118:19-21, 119:7-25; Ex. 3 to Levine Decl., Deberg Depo. 103:3-7; DeFoe Decl. ¶ 20. |
| 29. Immediately prior to the lethal force encounter Deputy Cervantes fired two less lethal rounds from her less lethal shotgun at the direction of Deputy Martinez.<br><br>**EVIDENCE:**<br>    Cervantes Depo 60:12-15, 20-25 | **Disputed** that both of the beanbag shotgun rounds Deputy Cervantes fired were fired "[i]mmediately" before Deputy Martinez used lethal force. Deputy Cervantes fired the first beanbag shotgun round before Deputy Deberg fired four rounds from his 40 millimeter round launcher and before Deputy Campos discharged his taser. According to Deputy Cervantes, three or more minutes passed between the time she fired her first beanbag round and the time she fired her second beanbag round.<br><br>Cervantes Depo 60:12-19, 63:12-64:3, 68:16-25, 75:17-76:11. |
| 30. Prior to firing the first less-lethal shotgun round, Deputy Cervantes called out "less-lethal, less-lethal" as required by Department policy<br><br>**EVIDENCE:**<br>    Cervantes Depo 64:4-8 | **Disputed** that Deputy Cervantes saying "less-lethal" was pursuant to department policy. The cited portion of Cervantes's deposition testimony makes no reference to department policy. Cervantes stating only "less-lethal, less-lethal" was not an |

| Defendants' Allegedly Undisputed Fact and Evidence | Disputed/Undisputed Fact and Evidence |
|---|---|
| | adequate or clear warning that a weapon would be used against Anthony if he did not immediately comply with commands. Further, Defense expert Edward Flosi testified that Cervantes did not issue any verbal warning that she was going to fire her beanbag shotgun, even though deputies are trained to give a verbal warning before using less-lethal force when feasible.<br><br>Ex. E to Prescott Decl., Cervantes Depo. 64:4-8; DeFoe Decl., ¶ 11; Ex. 7 to Levine Decl., Flosi Depo. 10:4-7, 47:7-12. |
| 31. One less lethal shotgun round struck Decedent in the chest area<br><br>**EVIDENCE:**<br>Cervantes Depo 60:16. | **Disputed** that only one of Deputy Cervantes's beanbag shotgun rounds struck Anthony. Both rounds struck him.<br><br>Ex. E. to Prescott Decl., Cervantes Depo. 60:16, 77:2-9. |
| 32. At the time Deputy Cervantes fired her first less-lethal round Decedent was standing five or six feet away from her<br><br>**EVIDENCE:**<br>Cervantes Depo 64:22-25 | **Disputed.**<br><br>When Deputy Cervantes fired her first beanbag shotgun round, Anthony was approximately 30-35 feet from Cervantes.<br><br>Ex. 3 to Levine Decl., Deberg Depo. 53:25-54:8 (when Anthony was standing in the southern portion of the yard, Deputy Cervantes was standing close to Deputy Deberg), 58:23-59:18 (when Anthony stopped in the southern portion of the yard and turned to face deputies, |

| Defendants' Allegedly Undisputed Fact and Evidence | Disputed/Undisputed Fact and Evidence |
|---|---|
| | Cervantes attempted her first shot with the beanbag shotgun), 60:13-16 (when Cervantes attempted her first shot with the beanbag shotgun, Anthony was 30 feet from Deberg), 62:23-63:1 (when Deberg fired his first 40 millimeter round at Anthony, Anthony was standing in the same part of the yard as when Cervantes had attempted her first beanbag shotgun round), 63:17-19 (when Deberg fired his first 40 millimeter round at Anthony, Anthony was approximately 35 feet from Deberg); Ex. 1 to Levine Decl., Martinez Depo. 117:2-11 (when Anthony stopped in southern portion of yard, Anthony was approximately 30 feet from nearest deputy). |
| 33. Deputy Cervantes observed Decedent swing the metal chain and striking with the chain in her direction approximately five or six feet away from her.<br><br>**EVIDENCE:**<br>Cervantes Depo 59:10-60:11 | **Disputed.**<br><br>Eyewitness Lucy Ramos testified that she observed the entire encounter between Anthony and the deputies from the time Anthony exited the house until Martinez fired, and that she never saw Anthony swing the leash around him or over his head, swing the leash forward as though to strike any deputy with it, or attempt to strike any deputy with the leash.<br><br>Ex. 6 to Levine Decl., Ramos Depo. 45:11-22, 46:13-25, 54:21-24, 59:17-22, 59:23-60:10, 67:10-14, 85:3-10, 88:18-20, 90:4-7, 91:10-13. |

| Defendants' Allegedly Undisputed Fact and Evidence | Disputed/Undisputed Fact and Evidence |
|---|---|
| | **Further disputed** that Anthony was approximately five or six feet away from Deputy Cervantes during the period described in the cited portion of Cervantes's deposition. Cervantes testified that during that period, Cervantes was standing near the rear of a gray Dodge Charger parked in front of the house, and Anthony was standing in the southern portion of the yard in the shade, as depicted in Exhibit 2 to Cervantes's deposition transcript, past a patch of grass that jutted out into a dirt area.<br><br>Ex. 4 to Levine Decl., Cervantes Depo. 57:9-60:11 & Ex. 2. |
| 34. After firing her first less-lethal round, Cervantes' shotgun had a malfunction and she was required to clear the malfunction.<br><br>**EVIDENCE:**<br>Cervantes Depo 61:1-6 | **Disputed** as to "was required to clear the malfunction." The cited portion of Deputy Cervantes's deposition testimony does not establish that she had no option other than to clear the claimed malfunction, as opposed to switching to one of the alternate less-lethal options she carried on her belt or utilizing another tactic. During the incident, Cervantes had pepper spray, a baton, and a taser on her belt.<br><br>Ex. 4 to Levine Decl., Cervantes Depo. 18:7-15. |
| 35. The second less lethal shotgun round fired by Cervantes struck Decedent in the torso area<br><br>**EVIDENCE:** | **Undisputed.** |

-19-

| Defendants' Allegedly Undisputed Fact and Evidence | Disputed/Undisputed Fact and Evidence |
|---|---|
| Cervantes Depo 77:2-9 | |
| 36. Cervantes was in essentially the same position when she fired both less lethal rounds<br><br>**EVIDENCE:**<br>Cervantes Depo 77:19-25 | **<u>Undisputed.</u>** |
| 37. At the time Deputy Cervantes fired her second less-lethal round Decedent was still five to six feet from her<br><br>**EVIDENCE:**<br>Cervantes Depo 78:10-13 | **<u>Disputed.</u>**<br><br>When Deputy Cervantes fired the second beanbag shotgun round, Anthony was near the driver's-side front fender of the parked grey Dodge Charger, and Cervantes was near the rear of the passenger side of the Charger, such that Anthony was directly opposite the Charger from Cervantes. Deputy Martinez estimated that the length of the parked vehicles was as much as 20 feet.<br><br>Ex. 2 to Levine Decl., Campos Depo. 84:24-85:12; Ex. 1 to Levine Decl., Martinez Depo. 60:17-21. |
| 38. At the time Deputy Cervantes fired her first less-lethal round, she believed Decedent was close enough to strike her or the other deputies with the chain and cause death or serious bodily harm.<br><br>**EVIDENCE:**<br>Cervantes Depo 78:19-79:22 | **<u>Disputed</u>** to extent it implies this claimed belief was reasonable. At the time Deputy Cervantes fired her first beanbag shotgun round, Anthony was no closer to her than approximately 30 feet. The chain leash Anthony held was just over seven feet in length; however, because Anthony was holding the leash with the leash wrapped around his hand once or twice, the effective length of the chain was as short as six feet. Further, Anthony was not |

| Defendants' Allegedly Undisputed Fact and Evidence | Disputed/Undisputed Fact and Evidence |
|---|---|
| | swinging the leash at the time Cervantes fired her first beanbag shotgun round. Additionally, eyewitness Lucy Ramos testified that she observed the entire encounter between Anthony and the deputies from the time Anthony exited the house until Martinez fired, and that she never saw Anthony swing the leash around him or over his head, swing the leash forward as though to strike any deputy with it, or attempt to strike any deputy with the leash.<br><br>Ex. 3 to Levine Decl., Deberg Depo. 53:25-54:8 (when Anthony was standing in the southern portion of the yard, Deputy Cervantes was standing close to Deputy Deberg), 58:23-59:18 (when Anthony stopped in the southern portion of the yard and turned to face deputies, Cervantes attempted her first shot with the beanbag shotgun), 60:13-16 (when Cervantes attempted her first shot with the beanbag shotgun, Anthony was 30 feet from Deberg), 62:23-63:1 (when Deberg fired his first 40 millimeter round at Anthony, Anthony was standing in the same part of the yard as when Cervantes had attempted her first beanbag shotgun round), 63:17-19 (when Deberg fired his first 40 millimeter round at Anthony, Anthony was approximately 35 feet from Deberg); Ex. 1 to Levine Decl., Martinez |

-21-

| Defendants' Allegedly Undisputed Fact and Evidence | Disputed/Undisputed Fact and Evidence |
|---|---|
| | Depo. 117:2-11 (when Anthony stopped in southern portion of yard, Anthony was approximately 30 feet from nearest deputy), 117:22-118:4 (when Anthony stopped in southern portion of yard, no deputy was in range of being struck by the chain leash), 125:6-20; Ex. 2 to Levine Decl., Campos Depo. 73:10-13; Ex. 6 to Levine Decl., Ramos Depo. 45:11-22, 46:13-25, 54:21-24, 59:17-22, 59:23-60:10, 67:10-14, 85:3-10, 88:18-20, 89:10-18, 90:4-7, 91:10-13. |
| 39. At the time Deputy Cervantes fired her second less-lethal round she believed Decedent was posing an immediate threat of death or serious bodily harm because he was still swinging the chain and was close enough to strike her<br><br>**EVIDENCE:**<br>Cervantes Depo 81:15-82:8 | **<u>Disputed.</u>**<br><br>Anthony was not swinging the chain leash at the time Deputy Cervantes fired the second beanbag shotgun round. Deputy Martinez fired his first lethal round within 1-2 seconds after Cervantes fired her second beanbag shotgun round, and Martinez testified that at the time he fired and for the approximately 5-10 seconds immediately beforehand, Anthony was not swinging the chain. Additionally, eyewitness Lucy Ramos testified that she observed the entire encounter between Anthony and the deputies from the time Anthony exited the house until Martinez fired, and that she never saw Anthony swing the leash around him or over his head, swing the leash forward as though to strike any deputy with it, or attempt to strike any deputy with the leash, |

| Defendants' Allegedly Undisputed Fact and Evidence | Disputed/Undisputed Fact and Evidence |
|---|---|
| | and it never appeared that any deputy was about to be killed or seriously injured by Anthony. Subjective fear is insufficient to justify the use of deadly force.<br><br>Ex. 1 to Levine Decl., Martinez Depo. 22:24-23:1, 63:18-21; Ex. 3 to Levine Decl., Deberg Depo. 77:17-78:8, 78:16-22; Ex. 6 to Levine Decl., Ramos Depo. 45:11-22, 46:13-25, 54:21-24, 59:17-22, 59:23-60:10, 67:10-14, 85:3-10, 88:18-20, 89:10-18, 90:4-7, 90:24-91:13; DeFoe Decl. ¶ 5(c), 9, 14(b).<br><br>**Further disputed** that Anthony was close enough to strike Cervantes with the leash at the time she fired the second beanbag shotgun round. When Deputy Cervantes fired the second beanbag shotgun round, Anthony was near the driver's-side front fender of the parked grey Dodge Charger, and Cervantes was near the rear of the passenger side of the Charger, such that Anthony was directly opposite the Charger from Cervantes. Deputy Martinez estimated that the length of the parked vehicles was as much as 20 feet.<br><br>Ex. 2 to Levine Decl., Campos Depo. 84:24-85:12; Ex. 1 to Levine Decl., Martinez Depo. 60:17-21. |

| Defendants' Allegedly Undisputed Fact and Evidence | Disputed/Undisputed Fact and Evidence |
|---|---|
| 40. Prior to the lethal force encounter, Deberg used the 40mm launcher and fired four 40mm rounds at Decedent<br><br>**EVIDENCE:**<br>Deberg Decl. ¶ 14. | **Undisputed.** |
| 41. Prior to firing the 40mm launcher Deberg verbally called "40, 40" to indicate to Decedent and the Deputies that the 40mm launcher was being deployed as required by Department policy<br><br>**EVIDENCE:**<br>Deberg Depo 66:24-67:4 | **Disputed** that Deputy Deberg saying "40, 40" warned Anthony that Deberg was going to fire the 40 millimeter launcher at Anthony, or that this purported warning was conditioned on Anthony not complying with commands. Deberg testified that he did not know what an average civilian would understand "40, 40" to mean. Deberg stating only "40, 40" was not an adequate or clear warning that a weapon would be used against Anthony if he did not immediately comply with commands. Defense expert Edward Flosi also testified that Deberg did not issue any verbal warning that he was going to fire the 40 millimeter launcher, even though deputies are trained to give a verbal warning before using less-lethal force when feasible.<br><br>Ex. 3 to Levine Decl., Deberg Depo. 67:5-9; DeFoe Decl., ¶ 11; Ex. 7 to Levine Decl., Flosi Depo. 10:4-7, 47:7-12.<br><br>**Further disputed** in that the cited portion of Deberg's deposition testimony makes no reference to department policy. |

| Defendants' Allegedly Undisputed Fact and Evidence | Disputed/Undisputed Fact and Evidence |
|---|---|
| | Ex. D to Prescott Decl., Deberg Depo 66:24-67:4. |
| 42. When Deputy Deberg fired on Decedent, he was still armed with the chain and was charging directly at Deputies Martinez and Cervantes<br><br>**EVIDENCE:**<br>Deberg Decl. ¶ 18 | **<u>Disputed.</u>**<br><br>When Deputy Deberg fired all four of his 40 millimeter rounds at Anthony, Anthony remained in same general position in the southern portion of the front yard that he had been in since before Deputy Cervantes fired her first beanbag shotgun round and he was not running toward any deputy. This statement from Deberg's declaration also <u>directly contradicts</u> his own deposition testimony, in which he testified that Anthony remained stationary in the same position for approximately 15-20 seconds prior to and during Deberg's first and second shots from the 40 millimeter launcher; that Anthony started walking east toward the street, not facing Deberg, at the time of Deberg's third shot from the 40 millimeter launcher; and that Anthony was walking west at the time of Deberg's fourth shot from the 40 millimeter launcher and was located in the approximate position he had been in during Deberg's first two shots from the 40 millimeter launcher.<br><br>Ex. 2 to Levine Decl., Campos Depo. 57:1-7, 71:10-22, 73:3-9, 74:20-75:2; Ex. 3 to Levine Decl., |

| Defendants' Allegedly Undisputed Fact and Evidence | Disputed/Undisputed Fact and Evidence |
|---|---|
| | Deberg Depo. 62:18-63:1, 64:16-29, 65:3-11, 65:21-66:1. |
| 43. Decedent did not react to the first 40mm round striking him<br><br>**EVIDENCE:**<br>Deberg Depo 64:3-11 | **<u>Disputed</u>** to extent it implies any reaction by Anthony to being struck by the 40 millimeter round would necessarily have been visible or perceptible to Deputy Deberg. In the cited portion of Deberg's deposition testimony, Deberg was asked what effect the round "appear[ed] to have," and Deberg testified that his impressions regarding Anthony's reaction were based on what Deberg "could tell."<br><br>Ex. D to Prescott Decl., Deberg Depo. 64:5-11. |
| 44. Decedent did not stop swinging the chain while being shot with the four 40mm rounds and he did not react to any of the shots hitting him<br><br>**EVIDENCE:**<br>Deberg Depo 66:2-7 | **<u>Disputed.</u>**<br><br>Anthony was not swinging the chain leash at the time Deputy Deberg fired at Anthony with the 40 millimeter launcher. Additionally, eyewitness Lucy Ramos testified that she observed the entire encounter between Anthony and the deputies from the time Anthony exited the house until Martinez fired, and that she never saw Anthony swing the leash around him or over his head, swing the leash forward as though to strike any deputy with it, or attempt to strike any deputy with the leash.<br><br>Ex. 2 to Levine Decl., Campos Depo. 73:3-9; Ex. 6 to Levine Decl., Ramos Depo. 45:11-22, 46:13-25, |

| Defendants' Allegedly Undisputed Fact and Evidence | Disputed/Undisputed Fact and Evidence |
|---|---|
| | 54:21-24, 59:17-22, 59:23-60:10, 67:10-14, 85:3-10, 88:18-20, 89:10-18, 90:4-7, 91:10-13.<br><br>**Further disputed** to extent it implies any reaction by Anthony to being struck by the 40 millimeter rounds would necessarily have been visible or perceptible to Deputy Deberg. Deberg testified that his impressions regarding Anthony's reaction to being struck were based on what Deberg "could tell."<br><br>Ex. D to Prescott Decl., Deberg Depo. 64:5-11. |
| 45. Within moments of being struck with the fourth 40mm round, Decedent sprinted north along the front of the house and in between that area between the dark sedan and the red sedan parked on the driveway while swinging the chain over his head<br><br>**EVIDENCE:**<br>Deberg Depo 74:1-16 | **Disputed.**<br><br>Deputy Campos fired his taser at Anthony before Anthony began moving northwest toward the front of the grey Dodge Charger parked in front of the house. Deputy Cervantes testified that after Campos used the taser, Anthony began "walking" toward the front of the Charger over the course of approximately three minutes. When Anthony then began passing in front of the Charger, he was walking. Deputy Martinez fired his first gunshot at Anthony while Anthony was still passing in front of the Charger, and Martinez testified that immediately prior to Martinez's first shot, Anthony was running, not walking. |

| Defendants' Allegedly Undisputed Fact and Evidence | Disputed/Undisputed Fact and Evidence |
|---|---|
| | Ex. 2 to Levine Decl., Campos Depo. 75:7-17, 83:21-84:11, 90:5-8; Ex. 4 to Levine Decl., Cervantes Depo. 75:12-23; Ex. 1 to Levine Decl., Martinez Depo. 27:10-16, 27:24-28:1.<br><br>**Further disputed** that Anthony was swinging the chain over his head during the referenced period. Eyewitness Lucy Ramos testified that she observed the entire encounter between Anthony and the deputies from the time Anthony exited the house until Martinez fired, and that she never saw Anthony swing the leash around him or over his head, swing the leash forward as though to strike any deputy with it, or attempt to strike any deputy with the leash.<br><br>Ex. 6 to Levine Decl., Ramos Depo. 45:11-22, 46:13-25, 54:21-24, 59:17-22, 59:23-60:10, 67:10-14, 85:3-10, 88:18-20, 89:10-18, 90:4-7, 91:10-13. |
| 46. Deputy Martinez used lethal force on Decedent after less-lethal force was ineffective to stop the threat of Decedent who was still armed with the chain and could have possibly harmed Deputy Martinez or the other Deputies.<br><br>**EVIDENCE:**<br>Martinez Depo 35:1-13 | **Disputed** to extent "the threat of Decedent" or "could have possibly harmed Deputy Martinez or the other Deputies" imply Anthony posed an imminent or immediate threat of death or serious bodily injury to Deputy Martinez or anyone else at the time Martinez used lethal force. At the time Martinez fired, Anthony did not pose such a threat to anyone. |

| Defendants' Allegedly Undisputed Fact and Evidence | Disputed/Undisputed Fact and Evidence |
|---|---|
| | DeFoe Decl. ¶ 6-7, 9, 13-14; Ex. 6 to Levine Decl., Ramos Depo. 90:24-91:8. |
| 47. Deputy Martinez believed the chain was approximately ten (10) feet in length at the time of the lethal force encounter.<br><br>**EVIDENCE:**<br>Martinez Depo 48:17-48:1 | **Disputed** to extent it implies Deputy Martinez's claimed impression of the length of the leash was accurate or reasonable. In his deposition, Martinez acknowledged that the leash was just over seven feet in length and was wrapped once or twice around Anthony's hand, such that its effective length would have been as short as six feet.<br><br>Ex. 1 to Levine Decl., Martinez Depo. 125:8-20.<br><br>Six feet is sufficiently shorter than ten feet as to make Martinez's claimed belief that the leash was ten feet long an unreasonable mistake of fact. |
| 48. Deputy Martinez fired three shots at Decedent during the lethal force encounter.<br><br>**EVIDENCE:**<br>Martinez Depo 11:25-12:1 | **Undisputed.** |
| 49. Decedent was proceeding toward Deputy Martinez at the time all three shots were fired.<br><br>**EVIDENCE:**<br>Martinez Depo 15:23-16:7 | **Disputed.**<br><br>At the time Deputy Martinez fired his first two gunshots from a position to the east of Anthony, Anthony was facing and walking north, *i.e.,* not toward Martinez. Additionally, by the time of Martinez's third shot or earlier, |

| Defendants' Allegedly Undisputed Fact and Evidence | Disputed/Undisputed Fact and Evidence |
|---|---|
| | Anthony was already falling to the ground.<br><br>Ex. 1 to Levine Decl., Martinez Depo. 26:21-27:8, 27:14-16; Ex. 2 to Levine Decl., Campos Depo. 91:14-19, 92:18-20, 95:22-96:4; Ex. 6 to Levine Decl., Ramos Depo. 87:4-11. |
| 50. Deputy Martinez did not believe he could take cover behind the vehicles on the driveway because of the length of chain in Decedent's hands and Decedent previously swinging the chains at the vehicles.<br><br>**EVIDENCE:**<br>Martinez Depo 105:20-106:10 | **Disputed** to extent it implies this claimed belief was reasonable. In his deposition, Deputy Martinez acknowledged that the leash was just over seven feet in length and was wrapped once or twice around Anthony's hand, such that its effective length would have been as short as six feet. This was short enough for either of the vehicles, which Martinez estimated to be as long as 20 feet in length, to provide cover. Martinez could have used either vehicle as cover, or tactically repositioned to a location further away, but did not do so.<br><br>Ex. 1 to Levine Decl., Martinez Depo. 60:17-21, 125:8-20; DeFoe Decl. ¶ 10.<br><br>**Further disputed** that Anthony had previously swung the chain leash at any vehicle. Eyewitness Lucy Ramos testified that she observed the entire encounter between Anthony and the deputies from the time Anthony exited the house until Martinez fired, that Anthony kept the leash down, and that she never |

| Defendants' Allegedly Undisputed Fact and Evidence | Disputed/Undisputed Fact and Evidence |
|---|---|
| | saw Anthony swing the leash around him or over his head.<br><br>Ex. 6 to Levine Decl., Ramos Depo. 45:11-22, 46:13-25, 54:21-24, 59:17-22, 59:23-60:10, 88:18-20. |
| 51. Because Decedent was rapidly approaching Deputy Martinez while armed with a chain at the time of the lethal force encounter Deputy Martinez was unable to measure the exact distance between himself and Decedent at the time of the lethal force encounter.<br><br>**EVIDENCE:**<br>Martinez Decl. ¶ 19 | **Disputed** to extent it implies Deputy Martinez was not able to form an impression of the distance between himself and Anthony at the time Martinez fired at Anthony. During Martinez's deposition, Martinez estimated that Anthony was as far as 20 feet away when Martinez began firing.<br><br>Ex. 1 to Levine Decl., Martinez Depo. 14:3-5.<br><br>**Further disputed** that Anthony was "rapidly approaching Deputy Martinez" at the time Martinez fired or immediately beforehand. Deputy Campos testified that at the time of Martinez's first and second shots, Anthony was moving and facing north. At the time, Martinez was to Anthony's east. Eyewitness Lucy Ramos also testified that she observed the entire encounter between Anthony and the deputies from the time Anthony exited the house until Martinez fired, and that immediately before Martinez fired, she did not observe Anthony run, walk quickly, or walk at all toward deputies. |

| Defendants' Allegedly Undisputed Fact and Evidence | Disputed/Undisputed Fact and Evidence |
|---|---|
| | Ex. 2 to Levine Decl., Campos Depo. 91:14-19, 92:18-20; Ex. 1 to Levine Decl., Martinez Depo. 26:21-27:8, 27:14-16; Ex. 6 to Levine Decl., Ramos Depo. 45:11-22, 46:13-25, 54:21-24, 85:3-10. |
| 52. At the time of the lethal force encounter, Deputy Martinez believed the distance between himself and Decedent was no more than 15-20 feet and that Decedent closed to within 5-6 feet of him before Decedent fell to the ground.<br><br>**EVIDENCE:**<br>Martinez Decl. ¶ 19 | **Disputed** that Deputy Martinez perceived that Anthony was 5-6 feet away from Martinez before Anthony fell to the ground or that such a perception would have been reasonable. Deputy Martinez testified that after he fired his third shot at Anthony, Anthony took a couple of steps forward and then fell directly forward to the ground, toward Martinez, and that after Anthony fell, Anthony's head was as far as 10 feet from where Martinez was standing. Because Anthony's height was 5'11", for his head to have landed 10 feet from Martinez after Anthony fell forward, Anthony would have been approximately 16 feet from Martinez before he fell. Further, because Martinez testified that Anthony took a couple of steps toward Martinez after Martinez fired his third shot, Anthony would have been further than 16 feet from Martinez at the time of Martinez's third shot, approximately 17-18 feet away. At the time Martinez began to fire, Anthony was in front of a parked car, and Martinez was behind it. |

| Defendants' Allegedly Undisputed Fact and Evidence | Disputed/Undisputed Fact and Evidence |
|---|---|
| | Ex. 1 to Levine Decl., Martinez Depo. 16:8-17:11; Ex. 2 to Levine Decl., Campos Depo. 90:5-8; Ex. 4 to Levine Decl., Cervantes Depo. 82:25-83:18; Ex. 12 to Levine Decl., Autopsy Report, p.1. |
| 53. At the time of Deputy Martinez's first shot, Decedent was holding the chain wrapped around his right hand and at approximately ear level with the remainder of the chain dangling<br><br>**EVIDENCE:**<br>Martinez Depo 22:10-19, 23:2-8, 24:5-9, 25:15-17 | <u>**Undisputed**</u> except to extent it implies that Anthony was about to or was preparing to swing the chain at the time of Deputy Martinez's first shot. Martinez testified that Anthony was not swinging the leash at the time of Martinez's first shot and that the length of the chain was dangling straight down, which indicates that Anthony was not moving the chain at all at that time. Martinez also testified that he could not recall seeing Anthony pull or wind his arm back as though he was preparing to swing the chain forward immediately prior to or during Martinez's shots, and that Martinez did not base his decision to shoot on having perceived any such winding-back movement.<br><br>Ex. 1 to Levine Decl., Martinez Depo. 22:24-23:1, 24:5-17, 58:16-21, 59:17-20. |
| 54. Deputy Martinez believed Decedent was going to try and strike him with the chain at the time of his first shot.<br><br>**EVIDENCE:**<br>Martinez Depo 43:5-15 | <u>**Disputed**</u> to extent it implies this claimed belief was reasonable. Martinez testified that Anthony was not swinging the leash at the time of Martinez's first shot and that the length of the chain was dangling straight down, which indicates that Anthony was not moving the chain |

| Defendants' Allegedly Undisputed Fact and Evidence | Disputed/Undisputed Fact and Evidence |
|---|---|
| | at all at that time. Martinez also testified that he could not recall seeing Anthony pull or wind his arm back as though he was preparing to swing the chain forward immediately prior to or during Martinez's shots, and that Martinez did not base his decision to shoot on having perceived any such winding-back movement. Eyewitness Lucy Ramos also testified that she observed the entire encounter between Anthony and the deputies from the time Anthony exited the house until Martinez fired, and that she never saw Anthony swing the leash around him or over his head, swing the leash forward as though to strike any deputy with it, or attempt to strike any deputy with the leash. Ramos also testified that immediately before Martinez fired, she did not observe Anthony run, walk quickly, or walk at all toward deputies. Ramos's testimony shows that any claimed belief by Martinez that Anthony was about to attempt to strike Martinez with the leash was unreasonable. Deputies are trained that subjective fear and fear of future harm are insufficient to justify use of deadly force. They are trained that deadly force can only be used in "immediate defense of life," *i.e.*, to protect against an immediate threat of death or serious bodily injury, which were not present here. |

| Defendants' Allegedly Undisputed Fact and Evidence | Disputed/Undisputed Fact and Evidence |
|---|---|
| | Ex. 1 to Levine Decl., Martinez Depo. 22:24-23:1, 24:5-17, 58:16-21, 59:17-20; Ex. 6 to Levine Decl., Ramos Depo. 45:11-22, 46:13-25, 54:21-24, 59:17-22, 59:23-60:10, 67:10-14, 85:3-10, 88:18-20, 89:10-18, 90:4-7, 91:10-13; DeFoe Decl. ¶¶ 5(f), 9, 14(i). |
| 55. At the time of Deputy Martinez's second shot Decedent was holding the chain in the same manner as during the first shot.<br><br>**EVIDENCE:**<br>Martinez Depo 24:18-25 | **Disputed.**<br><br>Deputy Campos testified that between Deputy Martinez's first and second shots, Anthony's arm flinched and his hand dropped down to approximately shoulder-level.<br><br>Ex. 2 to Levine Decl., Campos Depo. 92:24-93:8, 93:14-20. |
| 56. At the time of Deputy Martinez's third shot Decedent was holding the chain in the same manner as during the prior shots.<br><br>**EVIDENCE:**<br>Martinez Depo 25:20-22 | **Disputed.**<br><br>Deputy Campos testified that by the time of Deputy Martinez's third shot, Anthony appeared to be collapsing, and his arm was fully extended downward with his hand around thigh-level, with the chain dragging on the ground. Eyewitness Lucy Ramos also testified that during at least one of Martinez's shots, Anthony was already falling down, which means the manner in which he was holding the leash would necessarily have changed.<br><br>Ex. 2 to Levine Decl., Campos Depo. 95:22-96:17; Ex. 6 to Levine Decl., Ramos Depo. 87:4-11. |

| Defendants' Allegedly Undisputed Fact and Evidence | Disputed/Undisputed Fact and Evidence |
|---|---|
| 57. Deputy Martinez was concerned that Decedent could use the chain to inflict great bodily injury to himself or his partners at the time of the lethal force encounter.<br><br>**EVIDENCE:**<br>Martinez Depo 46:4-12 | **Disputed** to extent it implies Deputy Martinez reasonably believed Anthony posed an imminent threat of death or serious bodily injury to Martinez or other deputies at the time or immediately before Martinez fired. Anthony posed no such threat. Deputies are trained that subjective fear, or fear of future harm, are insufficient to justify the use of deadly force.<br><br>DeFoe Decl. ¶ 6-7, 9, 13-14. |
| 58. After Deputy Martinez finished firing, Decedent then took a few more steps forward before falling to the ground.<br><br>**EVIDENCE:**<br>Martinez Depo 16:8-12. | **Undisputed**, but Plaintiffs would clarify that Anthony was approximately 17-18 feet away when Martinez finished firing.<br><br>*See* Plaintiffs' Additional Undisputed Fact 34. |
| 59. After Decedent fell to the ground, the deputies on scene began rendering aid to Decedent.<br><br>**EVIDENCE:**<br>LaFever Decl. ¶ 13 | **Undisputed.** |
| 60. Once the lethal force encounter had concluded and there was no imminent danger to medical personnel, San Bernardino Fire medical personnel already staged near the incident scene responded and continued to render aid to Decedent<br><br>**EVIDENCE:**<br>LaFever Decl. ¶ 14 | **Disputed** to extent it implies there was imminent danger to anyone at any point prior to Deputy Martinez's final gunshot. Anthony did not pose an imminent or immediate threat of death or serious bodily injury to anyone at the time Martinez fired or immediately beforehand.<br><br>DeFoe Decl. ¶ 6-7, 9, 13; Ex. 6 to Levine Decl., Ramos Depo. 90:24-91:8. |

| Defendants' Allegedly Undisputed Fact and Evidence | Disputed/Undisputed Fact and Evidence |
|---|---|
| 61. Medical personnel had been staged outside the danger zone at the scene at the direction of LaFever prior to the lethal force encounter in light of the presence of civilians inside the home and Decedent's refusal to vacate the home or drop the chain.<br><br>**EVIDENCE:**<br>   LaFever Decl. ¶ 11-12 | **Disputed** to extent it implies any civilians were inside the home by the time Anthony came outside. All other occupants of the home had left the home before Anthony came outside, a fact of which deputies were aware.<br><br>Ex. 2 to Levine Decl., Campos Depo. 50:2-7. |
| 62. Special Enforcement Division ("SED") officers were staged just outside the danger zone at the scene at the direction of LaFever prior to the lethal force encounter in light of the presence of civilians inside the home and Decedent's refusal to vacate the home or drop the chain.<br><br>**EVIDENCE:**<br>   LaFever Decl. ¶ 11-12 | **Disputed.**<br><br>The cited portion of Sergeant LaFever's declaration do not support the proposition for which they are cited. In the cited paragraphs, LaFever does not state that SED officers were staged near the scene; rather, he states that he called for backup from SED, and that he requested that paramedics stage nearby.<br><br>LaFever Decl. ¶ 11-12.<br><br>**Further disputed** to extent it implies any civilians were inside the home by the time Anthony came outside. All other occupants of the home had left the home before Anthony came outside, a fact of which deputies were aware.<br><br>Ex. 2 to Levine Decl., Campos Depo. 50:2-7. |
| 63. At the time of the lethal force encounter, Andrew Nunez was three houses away from the incident area. | **Undisputed.** |

| Defendants' Allegedly Undisputed Fact and Evidence | Disputed/Undisputed Fact and Evidence |
|---|---|
| **EVIDENCE:**<br>Andrew Depo 202:6-22 | |
| 64. The houses are on large properties that are estimated to be acres in size.<br><br>**EVIDENCE:**<br>Benitez Depo 108:16-25 | **Undisputed**, except to note that "large" is subjective and was not part of the cited portion of Ms. Benitez's deposition testimony. |
| 65. In his expert report, Plaintiff's expert Scott DeFoe admits "The belt recording of the incident makes clear that immediately after Cervantes fired the beanbag round, Martinez fired 3 shots at Anthony from his handgun over a span of approximately 2 seconds."<br><br>**EVIDENCE:**<br>DeFoe Rebuttal Report at Page 5 of 31 | **Disputed** to extent "the beanbag round" implies Deputy Cervantes fired only one beanbag round. She fired two.<br><br>Ex. 4 to Levine Decl., Cervantes Depo. 74:22-24. |
| 66. The deputies on scene had a legitimate law enforcement purpose and reasonable suspicion to contact and detain Decedent<br><br>**EVIDENCE:**<br>Declaration of Edward T. Flosi ("Flosi Decl.") ¶ 15 | **Disputed** to extent it implies the deputies had any legitimate purpose in using force against Anthony. Anthony was 30-35 feet away from deputies when Cervantes and Deberg fired less-lethal weapons at him, and Anthony was not swinging the leash overhead, around him, or as if to strike deputies. Anthony was 20 feet away from Martinez and was not swinging the leash when Martinez fired.<br><br>*See* Plaintiffs' Additional Undisputed Facts 23-25, 27, 31. |
| 67. The deputies on scene used pre-force tactics that were appropriate and consistent with current law enforcement training and practices | **Disputed.**<br><br>The deputies, including Deputies Martinez, Deberg, and Cervantes, |

| Defendants' Allegedly Undisputed Fact and Evidence | Disputed/Undisputed Fact and Evidence |
|---|---|
| **EVIDENCE:**<br>    Flosi Decl. ¶ 15 | committed numerous tactical errors in ways that were inconsistent with then-existing law enforcement training and practices, including by failing to properly assess the effectiveness of less-lethal weapons, failing to formulate or discuss any tactical plan for what deputies would do if Anthony came outside while holding the leash, failing to tactically reposition and utilize available cover, failing to retrieve or request retrieval of available protective equipment including a ballistic shield, failing to adequately account for indicators that Anthony was experiencing a mental health crisis, failing to designate a single deputy to speak with Anthony, and failing to issue proper commands and warnings. In making these tactical errors, the deputies increased tension with Anthony and escalated the situation.<br><br>DeFoe Decl. ¶ 15-22. |
| 68. The deputies on scene did not have independent or object evidence to support a belief that Decedent's actions were caused by a mental health issue<br><br>**EVIDENCE:**<br>    Flosi Decl. ¶ 15 | **<u>Disputed.</u>**<br><br>Multiple deputies acknowledged in their deposition testimony that the possibility of Anthony experiencing a mental health crisis or being mentally ill was one possible explanation they considered for Anthony's speech and behavior. Based on the things Anthony was saying, the deputies should have considered that he was experiencing |

| Defendants' Allegedly Undisputed Fact and Evidence | Disputed/Undisputed Fact and Evidence |
|---|---|
| | a mental health crisis or was mentally ill.<br><br>Ex. 2 to Levine Decl., Campos Depo. 129:24-130:8; Ex. 3 to Levine Decl., Deberg Depo. 107:18-108:11; DeFoe Decl. ¶ 19. |
| 69. The deputies on scene had a legitimate law enforcement purpose to arrest Decedent<br><br>**EVIDENCE:**<br>Flosi Decl. ¶ 15 | **Disputed** to extent it implies the deputies had any legitimate purpose in using force against Anthony. Anthony was 30-35 feet away from deputies when Cervantes and Deberg fired less-lethal weapons at him, and Anthony was not swinging the leash overhead, around him, or as if to strike deputies. Anthony was 20 feet away from Martinez and was not swinging the leash when Martinez fired.<br><br>*See* Plaintiffs' Additional Undisputed Facts 23-25, 27, 31. |
| 70. The deputies on scene properly attempted to de-escalate the incident prior to responding with deadly force<br><br>**EVIDENCE:**<br>Flosi Decl. ¶ 15 | **Disputed.**<br><br>Martinez's alleged de-escalation efforts were wholly inadequate, and Martinez committed key errors a reasonable deputy would not have committed, thereby escalating the situation rather than de-escalating.<br><br>DeFoe Decl., ¶ 20. |
| 71. The deputies on scene used less-lethal intermediate force responses that were reasonable to overcome the resistance of Nunez, to effect the arrest of Nunez, and to prevent an immediate and credible threat | **Disputed.**<br><br>Anthony was not resisting deputies and did not pose an immediate threat to anyone when Deputies Cervantes and Deberg fired less-lethal weapons |

| Defendants' Allegedly Undisputed Fact and Evidence | Disputed/Undisputed Fact and Evidence |
|---|---|
| **EVIDENCE:**<br>　　Flosi Decl. ¶ 15 | at Anthony while he was standing in the southern portion of the front yard 30 feet away from the closest deputy. At that time, he was standing, not swinging the leash, and not approaching deputies.<br><br>Ex. 1 to Levine Decl., Martinez Depo. 117:2-11; Ex. 2 to Levine Decl., Campos Depo. 57:1-7, 71:10-22, 73:3-9, 74:20-75:2; Ex. 3 to Levine Decl., Deberg Depo. 58:23-59:18, 60:13-16, 62:18-63:1, 63:17-19, 64:16-29, 65:3-11, 65:21-66:1; Ex. 6 to Levine Decl., Ramos Depo. 59:17-22, 59:23-60:10, 67:10-14, 85:3-10, 90:4-7.<br><br>Anthony likewise was not resisting deputies and did not pose an immediate threat to anyone when Cervantes fired her second beanbag round while Anthony was walking toward the front porch, away from the deputies, and not swinging the leash around him or over his head, and not attempting to strike deputies with the leash.<br><br>Ex. 4 to Levine Decl., Cervantes Depo. 75:12-23; Ex. 1 to Levine Decl., Martinez Depo. 27:10-16, 27:24-28:1; Ex. 6 to Levine Decl., Ramos Depo. 59:17-22, 88:18-24, 89:3-8, 89:10-18, 90:4-7. |
| 72. The deputies on scene used an appropriate deadly force to prevent a perceived imminent and credible threat | **Disputed.** |

| Defendants' Allegedly Undisputed Fact and Evidence | Disputed/Undisputed Fact and Evidence |
|---|---|
| of serious bodily injury or death when non-deadly intermediate force responses were not successful.<br><br>**EVIDENCE:**<br>Flosi Decl. ¶ 15 | Based on the circumstances the deputies faced, Anthony did not pose an imminent threat of death or serious bodily injury to anyone at the time or immediately before deadly force was used. At the time Martinez began firing, Anthony was 20 feet away, not facing Martinez or moving in his direction, walking, in front of the car, and not swinging the leash.<br><br>DeFoe Decl., ¶ 6-9, 13-14; Ex. 6 to Levine Decl., Ramos Depo. 90:24-91:8. *See* Plaintiffs' Additional Undisputed Facts 31, 35, 40, 48. |
| 73. The deadly force response by Deputy Martinez was appropriate and reasonable to prevent a perceived imminent and credible threat of serious bodily injury or death<br><br>**EVIDENCE:**<br>Flosi Decl. ¶ 20 | **Disputed.**<br><br>Based on the circumstances the deputies faced, Anthony did not pose an imminent threat of death or serious bodily injury to anyone at the time or immediately before deadly force was used. At the time Martinez began firing, Anthony was 20 feet away, not facing Martinez or moving in his direction, walking, in front of the car, and not swinging the leash.<br><br>DeFoe Decl., ¶ 6-9, 13-14; Ex. 6 to Levine Decl., Ramos Depo. 90:24-91:8. *See* Plaintiffs' Additional Undisputed Facts 31, 35, 40, 48. |
| 74. The deadly force response was appropriate and consistent with current law enforcement training standards in consideration of the "totality of | **Disputed.**<br><br>Based on the circumstances the deputies faced, Anthony did not |

| Defendants' Allegedly Undisputed Fact and Evidence | Disputed/Undisputed Fact and Evidence |
|---|---|
| circumstances" presented to Deputy Martinez at the moment force was used.<br><br>**EVIDENCE:**<br>Flosi Decl. ¶ 20 | pose an imminent threat of death or serious bodily injury to anyone at the time or immediately before deadly force was used. At the time Martinez began firing, Anthony was 20 feet away, not facing Martinez or moving in his direction, walking, in front of the car, and not swinging the leash. Martinez was trained that lethal or deadly force may be used only be used against a subject who presents an immediate threat of death or serious bodily injury.<br><br>DeFoe Decl., ¶ 5-9, 13-14; Ex. 6 to Levine Decl., Ramos Depo. 90:24-91:8; Ex. A to Prescott Decl., Martinez Depo. 54:24-55:3. *See* Plaintiffs' Additional Undisputed Facts 31, 35, 40, 48. |
| 75. The San Bernardino Sheriff's Department is a POST certified law enforcement agency.<br><br>**EVIDENCE:**<br>Flosi Decl. ¶ 10 | **<u>Undisputed.</u>** |
| 76. The Department's training records are audited by POST to ensure that minimum training standards are met.<br><br>**EVIDENCE:**<br>Flosi Decl. ¶ 11 | **<u>Undisputed.</u>** |
| 77. The training programs of the San Bernardino County Sheriff's Department are appropriate and consistent with POST training.<br><br>**EVIDENCE:** | **<u>Undisputed.</u>** |

| Defendants' Allegedly Undisputed Fact and Evidence | Disputed/Undisputed Fact and Evidence |
|---|---|
| Flosi Decl. ¶ 12-13 | |
| 78. Deputy Martinez was trained that lethal force may be used if there are no other options to gain compliance of an armed suspect who presents a threat of harming the deputies or civilians that may be in the area<br><br>**EVIDENCE:**<br>Martinez Depo 34:16-35:13 | **Disputed.**<br><br>The cited portion of Deputy Martinez's deposition testimony, which primarily does not refer to Martinez's training, does not support the proposition for which it is cited. Martinez was trained that lethal or deadly force may be used only be used against a subject who presents an immediate threat of death or serious bodily injury.<br><br>Ex. A to Prescott Decl., Martinez Depo. 54:24-55:3. |
| 79. Deputy Martinez was trained that he can use deadly force only if the subject presents an immediate threat of death or serious bodily injury.<br><br>**EVIDENCE:**<br>Martinez Depo 54:24-55:3 | **Undisputed.** |
| 80. Deputy Martinez believed Decedent posed an imminent threat of severe bodily injury or death when he was within 20 feet of Deputy Martinez and began advancing toward Deputy Martinez<br><br>**EVIDENCE:**<br>Martinez Depo 64:15-17, 65:11-17, | **Disputed** to extent it implies Anthony was advancing toward Deputy Martinez at the time Martinez began to fire at Anthony. At the time of Martinez's first and second shots, Martinez was to Anthony's east, while Anthony was facing and moving north.<br><br>Ex. 1 to Levine Decl., Martinez Depo. 26:21-27:8, 27:14-16; Ex. 2 to Levine Decl., Campos Depo. 91:14-19, 92:18-20. |

| Defendants' Allegedly Undisputed Fact and Evidence | Disputed/Undisputed Fact and Evidence |
|---|---|
| | **Further disputed** to extent it implies this claimed belief by Martinez was reasonable. Based on the circumstances the deputies faced, Anthony did not pose an imminent threat of death or serious bodily injury to anyone at the time or immediately before deadly force was used. Deputies are trained that subjective fear and fear of future harm are insufficient to justify use of deadly force. They are trained that deadly force can only be used in "immediate defense of life," *i.e.*, to protect against an immediate threat of death or serious bodily injury, which were not present here.

DeFoe Decl., ¶ 5(f), 6-9, 13-14; Ex. 6 to Levine Decl., Ramos Depo. 90:24-91:8. |
| 81. Deputy Martinez based his belief on prior training he received regarding armed suspects closing distance with officers known as the *Tueller* drill.

**EVIDENCE:**
Martinez Depo 65:23-66:6 | **Disputed** to extent it implies the Tueller drill and associated training was applicable under these circumstances. Deputies trained via the Tueller drill are taught that a suspect armed with a knife who is sprinting directly towards a deputy from 21 feet away can reach the deputy before the deputy can draw their firearm, take aim, and fire. When Martinez fired, although Anthony was approximately 20 feet away, Anthony was not facing Martinez or moving in his direction, and Martinez already had his gun drawn and aimed at Anthony, |

| Defendants' Allegedly Undisputed Fact and Evidence | Disputed/Undisputed Fact and Evidence |
|---|---|
| | making the Tueller drill inapplicable.<br><br>DeFoe Decl., ¶ 14(k).<br><br>**Further disputed** to extent it implies this claimed belief by Martinez was reasonable. Based on the circumstances the deputies faced, Anthony did not pose an imminent threat of death or serious bodily injury to anyone at the time or immediately before deadly force was used.<br><br>DeFoe Decl., ¶ 6-9, 13-14; Ex. 6 to Levine Decl., Ramos Depo. 90:24-91:8. |
| 82. Deputy Martinez participated in the *Tueller* drill over 100 times.<br><br>**EVIDENCE:**<br>  Martinez Depo 66:25-67:4 | **Disputed** to extent it implies the Tueller drill and associated training was applicable under these circumstances. Deputies trained via the Tueller drill are taught that a suspect armed with a knife who is sprinting directly towards a deputy from 21 feet away can reach the deputy before the deputy can draw their firearm, take aim, and fire. When Martinez fired, although Anthony was approximately 20 feet away, Anthony was not facing Martinez or moving in his direction, and Martinez already had his gun drawn and aimed at Anthony, making the Tueller drill inapplicable.<br><br>DeFoe Decl. ¶ 14(k). |

| Defendants' Allegedly Undisputed Fact and Evidence | Disputed/Undisputed Fact and Evidence |
|---|---|
| 83. Deputy Cervantes was trained that deadly force should only be used to defend against an imminent threat or immediate threat of death or serious bodily injury.<br><br>**EVIDENCE:**<br>Cervantes Depo 93:21-25 | **Undisputed.** |
| 84. Deputy Cervantes was trained on the use of the less-lethal shotgun and understood that its effect was to stop threats faced by the deputies.<br><br>**EVIDENCE:**<br>Cervantes Depo 94:11-23 | **Undisputed.** |
| 85. Deputy Deberg was trained that deadly force can only be used to defend against an imminent threat or immediate threat of death or serious bodily injury.<br><br>**EVIDENCE:**<br>Deberg Depo 95:9-17 | **Undisputed.** |
| 86. Deputy Deberg was trained on the use of less-lethal force including the 40mm launcher and was trained that it is appropriate to deploy it when there is a threat of bodily injury or active resistance<br><br>**EVIDENCE:**<br>Deberg Depo 99:10-12; 100:11-15 | **Undisputed.** |

//

//

## PLAINTIFFS' ADDITIONAL UNDISPUTED FACTS

| | Plaintiffs' Undisputed Fact | Evidence |
|---|---|---|
| 1. | When Deputies Martinez and Campos arrived, they spoke to Andrew Nuñez through Andrew's bedroom window, and Andrew told the deputies he was okay, that Anthony had only "shoved" him, and that Anthony was acting "crazy." | Ex. 1 to Levine Decl., Martinez Depo. 83:10-21, 84:2-6; Ex. 9 to Levine Decl., Belt Recording Transcript, 1:9-19. |
| 2. | Martinez and Campos walked to the front door, which Andrew opened from the inside before returning to his room. | Ex. 1 to Levine Decl., Martinez Depo. 107:23-108:5, 108:22-109:11. |
| 3. | Anthony was standing approximately 16 feet inside the house opposite a closed screen door and held a thin chain-linked dog leash. | Ex. 2 to Levine Decl., Campos Depo. 37:5-7, 38:2-6; Ex. 4 to Levine Decl., Cervantes Depo. 45:22-46:3; Ex. 6 to Levine Decl., Ramos Depo. 51:19-23, 53:11-15; Ex. 8 to Levine Decl., Andrew Nuñez Depo., 60:16-22. |
| 4. | The leash had a short handle, was just over seven feet long, and consisted only of chain links no more than one inch in length and approximately half an inch in diameter, with no clip, buckle, or other object attached to the end of the leash. | Ex. 1 to Levine Decl., Martinez Depo. 46:13-20; Ex. 10 to Levine Decl., Photographs of Leash. |
| 5. | Anthony held the leash in his right hand, with the leash wrapped approximately two times around his hand, reducing the leash's effective length. | Ex. 2 to Levine Decl., Campos Depo. 38:7-13; Ex. 1 to Levine Decl., Martinez Depo. 125:15-20. |
| 6. | From outside the doorway, Martinez and Campos told Anthony to drop the leash and to step outside. | Ex. 1 to Levine Decl., Martinez Depo. 115:5-8. |

| | Plaintiffs' Undisputed Fact | Evidence |
|---|---|---|
| 7. | Campos drew his Taser and Martinez drew his firearm. | Ex. 2 to Levine Decl., Campos Depo. 39:10-19. |
| 8. | Soon after Martinez and Campos began speaking to Anthony, Anthony put the leash down for a period of time, which Martinez viewed as an act of compliance. | Ex. 1 to Levine Decl., Martinez Depo. 109:22-110:14. |
| 9. | The deputies and Anthony began a conversation, during which Anthony said he would be calm; said he loved the deputies, that he wanted them to love him, that he just wanted to have a conversation with them, that they were "awesome," that they do a lot to help the world, that they were professional, and that they were his brothers; spoke about the devil, Satan, hell, God, Jesus, sinners, judgment, the end of the world, Joe Biden, Congress, the FBI, chemicals, pollution, the Illuminati, capitalism, technology, national borders, and contagious diseases; said he was or would become president or king; and said he was crazy. | Ex. 9 to Levine Decl., Belt Recording Transcript, 4:1-2, 6:1-2, 7:5-13, 7:24, 10:25-11:6, 12:4, 12:27-13:2, 14:5, 16:1, 16:8-9, 20:3-4, 22:4, 23:2-11, 26:11-13, 27:5-8, 29:4-21, 30:19-31:18, 32:20-21, 34:6-12, 36:17-37:4, 38:24, 39:12-13, 41:2-43:21, 45:27, 47:7-18, 50:8; Ex. 2 to Levine Decl., Campos Depo. 45:12-46:3. |
| 10. | Anthony told the deputies he wanted to tell them a story and that when he was done, he would come outside. | Ex. 9 to Levine Decl., Belt Recording Transcript, 13:25-26. |
| 11. | During their conversation, Anthony was at times happy and appeared to accept the officers' presence, and at other times became agitated. | Ex. 2 to Levine Decl., Campos Depo. 126:13-14, 129:24-130:3. |
| 12. | Based on the deputies' training, some or all of the symptoms the deputies observed — including Anthony appearing agitated, speaking erratically, | Ex. 2 to Levine Decl., Campos Depo. 129:24-130:8; Ex. 3 to Levine Decl., Deberg Depo. 107:18-108:11. |

| | | Plaintiffs' Undisputed Fact | Evidence |
|---|---|---|---|
| | | and the unusual subjects about which he spoke — were potential symptoms of a mental health crisis. | |
| | 13. | Campos and Deberg believed it was possible that Anthony was in fact experiencing a mental health crisis. | Ex. 2 to Levine Decl., Campos Depo. 129:24-130:8; Ex. 3 to Levine Decl., Deberg Depo. 107:18-108:11. |
| | 14. | Based on Anthony's speech and behavior, any reasonable deputy would have considered that Anthony may have been mentally ill or experiencing a mental health crisis. | DeFoe Decl., ¶ 19. |
| | 15. | Additional SBSD deputies arrived during the conversation, including Sgt. Corey LaFever, Jeremy Deberg, and Sabrina Cervantes. Deberg and Cervantes retrieved a 40 millimeter round launcher and a beanbag shotgun, respectively. | Ex. 3 to Levine Decl., Deberg Depo. 27:3-10; Ex. 4 to Levine Decl., Cervantes Depo. 27:2-10; Ex. 5 to Levine Decl., LaFever Depo. 15:20-25. |
| | 16. | Deberg retrieved the launcher from LaFever's vehicle, which along with Cervantes's vehicle also contained a ballistic shield, and multiple deputies had riot helmets in their vehicles parked outside the house. | Ex. 3 to Levine Decl., Deberg Depo. 26:20-27:10, 29:11-20; Ex. 2 to Levine Decl., Campos Depo. 28:16-23, 30:7-13, 31:2-17; Ex. 4 to Levine Decl., Cervantes Depo. 24:21-25, 28:5-7, 28:15-17; Ex. 5 to Levine Decl., LaFever Depo. 15:3-19. |
| | 17. | LaFever directed deputies to have several members of Anthony's family, including Andrew and Noelia, exit the home through windows to avoid Anthony noticing his family was being brought away from the house. | Ex. 5 to Levine Decl., LaFever Depo. 28:12-29:11. |
| | 18. | While the conversation was still taking place, the deputies were made aware | Ex. 2 to Levine Decl., Campos Depo. 50:2-7; Ex. 4 to Levine |

| | **Plaintiffs' Undisputed Fact** | **Evidence** |
|---|---|---|
| | that everyone other than Anthony had been removed from the house. | Decl., Cervantes Depo. 40:8-11. |
| 19. | During the conversation, deputies called for assistance from the SBSD's Special Enforcement Division ("SED"), which has expertise and training in assisting with individuals who are experiencing mental health crises and may pose a risk of harm to others, and SED personnel advised they would come. | Ex. 5 to Levine Decl., LaFever Depo. 29:12-30:11; DeFoe Decl. ¶ 22. |
| 20. | Later in the conversation, Anthony became aware his family was no longer in the house, causing him to become agitated, and he came outside while holding the leash. | Ex. 2 to Levine Decl., Campos Depo. 46:24-47:3, 50:8-20. |
| 21. | As Anthony walked out, Martinez and Campos stepped away from the front porch, and Martinez moved toward the rear of a red Honda Civic, which was parked in front of the house just north of and parallel to a parked grey Dodge Charger; both vehicles were facing the house. | Ex. 2 to Levine Decl., Campos Depo. 54:6-14, 55:11-23; Ex. 4 to Levine Decl., Cervantes Depo at Ex. 1 (depicting position of Honda and Dodge at time of incident). |
| 22. | Deberg and Cervantes took positions by Martinez near the rear of the vehicles, with Campos to their east. | Ex. 2 to Levine Decl., Campos Depo. 55:15-56:5, 60:15-61:6, 63:21-64:3; Ex. 3 to Levine Decl., Deberg Depo. 53:10-14, 53:25-54:8; Ex. 4 to Levine Decl., Cervantes Depo. 49:17-21. |
| 23. | Upon exiting, Anthony walked south into the southern portion of the house's front yard, away from the deputies, stopped, and faced the deputies from approximately 30-35 feet away. At this | Ex. 2 to Levine Decl., Campos Depo. 56:14-22, 57:1-7; Ex. 3 to Levine Decl., Deberg Depo. 59:14-18, 62:18-63:1, 63:17-19; Ex. 4 to Levine Decl., Cervantes Depo. 48:16-49:8, |

| | Plaintiffs' Undisputed Fact | Evidence |
|---|---|---|
| | time, Anthony was no closer than approximately 30 feet from the nearest deputy to him. | 55:13-56:1; Ex. 1 to Levine Decl., Martinez Depo. 117:2-11. |
| 24. | When Anthony continued to hold the leash, Cervantes fired a beanbag round at him, without verbally warning him that she would fire if he did not comply. | Ex. 2 to Levine Decl., Campos Depo. 68:11-15; Ex. 4 to Levine Decl., Cervantes Depo. 60:5-16, 64:4-20; Ex. 7 to Levine Decl., Flosi Depo. 29:1-8, 47:7-12. |
| 25. | Within five seconds, while Anthony was still in the same part of the yard and approximately 35 feet from Deberg, Deberg began firing four 40 millimeter impact rounds at Anthony, also without warning Anthony that he would fire if Anthony did not comply. | Ex. 2 to Levine Decl., Campos Depo. 72:15-19, 73:10-74:1, 74:20-75:2; Ex. 3 to Levine Decl., Deberg Depo. 62:23-63:1, 63:17-19, 64:16-29, 66:24-67:9; Ex. 7 to Levine Decl., Flosi Depo. 29:1-8, 47:7-12. |
| 26. | Approximately five seconds after Deberg's final shot, Campos fired his Taser, which did not fully connect with Anthony. | Ex. 2 to Levine Decl., Campos Depo. 75:12-17, 77:1-13. |
| 27. | While Anthony was standing in the southern portion of the front yard and deputies fired less-lethal weapons at him, Anthony was holding the leash downward. Anthony did not swing the leash around him or overhead, and he only moved the leash forward to warn officers away from him when they approached him, while also backing away from them. | Ex. 6 to Levine Decl., Ramos Depo. 54:21-56:22, 59:17-22, 88:18-24, 89:3-8. |
| 28. | After Campos's use of the Taser, Anthony began walking northwest, back toward the house's front door. Anthony told deputies to "get away." | Ex. 1 to Levine Decl., Martinez Depo. 122:9-24; Ex. 2 to Levine Decl., Campos Depo. 83:21-84:6; Ex. 4 to Levine Decl., Cervantes Depo. |

-52-

| | Plaintiffs' Undisputed Fact | Evidence |
|---|---|---|
| | | 75:17-23; Ex. 9 to Levine Decl., Belt Recording Transcript 175:6. |
| 29. | By this time, Martinez had moved just east of (*i.e.*, behind) the gap between the rear portions of the parked Dodge and Honda, with Cervantes just to Martinez's south. | Ex. 1 to Levine Decl., Martinez Depo. 35:14-16, 41:7-10, 103:7-10, 128:22-25; Ex. 4 to Levine Decl., Cervantes Depo. 77:7-14; Ex. 5 to Levine Decl., LaFever Depo. 57:3-58:25, 60:16-18 & Ex. 4. |
| 30. | As Anthony neared the porch, Cervantes fired a second beanbag round at Anthony, again without warning, which aggravated Anthony and prompted him to change direction and begin moving north, toward the space between the front of the parked Dodge and the eastern wall of the house. | Ex. 2 to Levine Decl., Campos Depo. 84:24-85:8, 91:14-19; Ex. 4 to Levine Decl., Cervantes Depo. 76:12-19, 81:5-8. |
| 31. | While Anthony was walking in front of the passenger-side portion of the Dodge's front bumper, and still facing north, Martinez fired the first of three gunshots at Anthony from Martinez's position to Anthony's east while Anthony was as far as 20 feet from Martinez. | Ex. 2 to Levine Decl., Campos Depo. 90:5-8, 91:14-19; Ex. 1 to Levine Decl., Martinez Depo. 14:3-5, 27:7-8. |
| 32. | Based on Anthony and Martinez's respective positions at the time, at least a portion of the Dodge was between them. | Ex. 2 to Levine Decl., Campos Depo. 90:5-8, 91:14-19; Ex. 1 to Levine Decl., Martinez Depo. 14:3-5, 27:7-8; Ex. 5 to Levine Decl., LaFever Depo. 57:3-58:25, 60:16-18 & Ex. 4. |
| 33. | Immediately thereafter, while Anthony was walking in front of the gap between the two cars, and still facing north, Martinez fired a second shot at Anthony | Ex. 2 to Levine Decl., Campos Depo. 92:14-20; Ex. 1 to Levine Decl., Martinez Depo. 14:8-13. |

| | Plaintiffs' Undisputed Fact | Evidence |
|---|---|---|
| | while Anthony was as far as 19 feet from Martinez. | |
| 34. | After Martinez's second shot, Anthony turned toward Martinez, who took one or two steps backward, and while Anthony was next to the front passenger-side wheel of the Dodge and was falling to the ground, Martinez fired a third shot at Anthony while Anthony was as far as 17-18 feet from Martinez. | Martinez testified that after his third shot, Anthony took a couple of steps toward Martinez, then fell forward toward Martinez, and landed with his head as far as 10 feet from where Martinez stood. Anthony's height was 5'11". If it is assumed that Anthony moved approximately 1-2 feet forward in the steps he took after the third shot, Anthony's distance at the time of the third shot would have been approximately 17-18 feet.<br><br>Ex. 2 to Levine Decl., Campos Depo. 94:8-20, 95:22-96:4; Ex. 6 to Levine Decl., Ramos Depo. 87:4-11; Ex. 1 to Levine Decl., Martinez Depo. 16:8-17:11 (after third shot, Anthony took a couple of steps forward, then fell forward toward Martinez; after he landed, his head was as far as 10 feet from Martinez), 26:6-9; Ex. 12 to Levine Decl., Autopsy Report, p.1 (showing Anthony's height as 5'11"). |
| 35. | At no point immediately prior to or during any of Martinez's gunshots did Anthony run or lunge toward any deputy. | Ex. 1 to Levine Decl., Martinez Depo. 15:23-16:7, 27:24-28:6; Ex. 6 to Levine Decl., Ramos Depo. 89:10-18. |
| 36. | Martinez did not issue a verbal warning that he was going to shoot before firing | Ex. 1 to Levine Decl., Martinez Depo. 17:16-18, |

| | Plaintiffs' Undisputed Fact | Evidence |
|---|---|---|
| | any of his shots and did not reassess the purported threat Anthony posed between shots. | 21:7-18; Ex. 7 to Levine Decl., Flosi Depo. 28:22-25. |
| 37. | Immediately prior to and during Martinez's first shot, Anthony was holding the leash no higher than just above shoulder-level, with the length of the leash hanging downward. | Ex. 1 to Levine Decl., Martinez Depo. 23:2-8, 24:5-9, 24:15-17. |
| 38. | Between Martinez's first and second shot, Anthony's arm came further down. | Ex. 2 to Levine Decl., Campos Depo. 93:4-8. |
| 39. | By the time of Martinez's third shot, Anthony's arm was fully extended downward and was holding the leash at approximately thigh-level, with the leash dragging on the ground. | Ex. 2 to Levine Decl., Campos Depo. 95:22-96:17. |
| 40. | Immediately prior to and during Martinez's shots, Anthony was not swinging the leash and did not pull his right arm back as though he was preparing to swing the leash forward. | Ex. 1 to Levine Decl., Martinez Depo. 22:24-23:1, 24:15-25, 25:16-22, 58:16-21, 59:17-20. |
| 41. | During at least one of Martinez's shots, Anthony was already falling to the ground. | Ex. 2 to Levine Decl., Campos Depo. 95:22-96:4; Ex. 6 to Levine Decl., Ramos Depo. 87:4-11. |
| 42. | Immediately before and at the time Martinez fired his shots, Martinez had the ability to maneuver to the south, around the rear of the Dodge, which would have kept the Dodge between him and Anthony, but Martinez did not do so. | Ex. 1 to Levine Decl., Martinez Depo. 105:20-22, 139:25-140:10; DeFoe Decl. ¶ 17. |
| 43. | Martinez also had the ability to maneuver to the north at that time, around the rear of the Honda, which | Ex. 1 to Levine Decl., Martinez Depo. 100:23-101:8, 140:18-23; DeFoe Decl. ¶ 17. |

| | Plaintiffs' Undisputed Fact | Evidence |
|---|---|---|
| | would have put the Honda between him and Anthony and would have increased the distance between them, but Martinez did not do so, even though doing so would have been consistent with his training. | |
| 44. | At no point prior to the use of lethal force did the deputies discuss a tactical plan, including any plan for what they would do if Anthony came outside with the leash. | Ex. 1 to Levine Decl., Martinez Depo. 79:25-80:2; Ex. 2 to Levine Decl., Campos Depo. 29:14-22, 104:14-22, 105:16-19; Ex. 4 to Levine Decl., Cervantes Depo. 92:25-93:4. |
| 45. | During the encounter with Anthony, no deputy ever retrieved a ballistic shield or riot helmet from patrol vehicles, or called for such equipment to be retrieved, even though any deputy would have known a ballistic shield was available and multiple deputies had helmets in their vehicles, and even though such equipment would have provided protection from the leash had Anthony swung it toward deputies. | Ex. 2 to Levine Decl., Campos Depo. 30:7-13, 31:2-17, 105:20-106:16, 107:2-12, 108:12-20, 109:25-112:12, 113:16-24, 114:5-7; Ex. 3 to Levine Decl., Deberg Depo. 29:11-20; Ex. 4 to Levine Decl., Cervantes Depo. 28:5-7, 28:15-17, 93:5-11; DeFoe Decl. ¶ 18. |
| 46. | Although each deputy was carrying pepper spray, no deputy attempted to use it, and Cervantes never considered using it. | Ex. 1 to Levine Decl., Martinez Depo. 72:7-12; Ex. 3 to Levine Decl., Deberg Depo. 20:9-20; Ex. 4 to Levine Decl., Cervantes Depo. 18:7-15, 30:25-31:5, 91:10-12; DeFoe Decl. ¶ 14(g). |
| 47. | After Anthony came outside, no deputy believed Anthony was carrying any potential weapon besides the leash. | Ex. 7 to Levine Decl., Flosi Depo. 36:6-19; Ex. 1 to Levine Decl., Martinez Depo. 81:18-24; Ex. 2 to Levine Decl., Campos Depo. 38:17-39:1, |

| | **Plaintiffs' Undisputed Fact** | **Evidence** |
|---|---|---|
| | | 48:5-10; Ex. 5 to Levine Decl., LaFever Depo. 42:3-9. |
| 48. | Anthony never swung the leash around him, raised the leash above his head, swung the leash forward as though attempting to strike any deputy with the leash, or otherwise struck or attempted to strike any deputy with the leash. | Ex. 6 to Levine Decl., Ramos Depo. 54:21-24, 59:17-22, 88:18-24, 89:3-8, 90:4-7, 91:10-13. |
| 49. | Anthony also never punched or kicked any deputy or attempted to do so, reached for any deputy's weapon, or harmed or injured anyone. | Ex. 1 to Levine Decl., Martinez Depo. 83:6-9, 85:3-15; Ex. 2 to Levine Decl., Campos Depo. 34:17-19, 64:7-13, 98:11-14; Ex. 3 to Levine Decl., Deberg Depo. 45:3-17, 88:18-21, 106:14-19; Ex. 4 to Levine Decl., Cervantes Depo. 38:25-39:6, 40:2-5, 40:23-41:1, 53:13-15; Ex. 7 to Levine Decl., Flosi Depo. 40:12-15. |
| 50. | Deputies could not recall Anthony making any verbal threats to anyone after exiting the house. | Ex. 2 to Levine Decl., Campos Depo. 97:5-7. |
| 51. | Martinez could not recall Anthony verbally threatening any deputies in the ten seconds before Martinez's first shot or thereafter. | Ex. 1 to Levine Decl., Martinez Depo. 25:1-15. |
| 52. | Deputies did not have information that Anthony had any criminal history. | Ex. 1 to Levine Decl., Martinez Depo. 89:23-90:3; Ex. 2 to Levine Decl., Campos Depo. 27:25-28:2; Ex. 3 to Levine Decl., Deberg Depo. 106:10-13; Ex. 5 to Levine Decl., LaFever Depo. 18:20-23. |
| 53. | Immediately before and during Martinez's shots, deputies did not see any civilians nearby besides Anthony. | Ex. 1 to Levine Decl., Martinez Depo. 38:9-20; Ex. 3 to Levine Decl., Deberg Depo. |

| | | **Plaintiffs' Undisputed Fact** | **Evidence** |
|---|---|---|---|
| | | | 88:22-89:2; Ex. 4 to Levine Decl., Cervantes Depo. 89:24-90:2. |
| | 54. | Martinez did not believe any civilian was in immediate danger of being killed or seriously injured by Anthony. | Ex. 1 to Levine Decl., Martinez Depo. 40:4-7. |
| | 55. | Plaintiffs' police practices expert has opined that, under these circumstances, Martinez's use of deadly force was inappropriate and violated law enforcement standards and training. | DeFoe Decl. ¶ 6-10, 13-14 |
| | 56. | Anthony did not indicate he was attempting to flee, and Plaintiffs' expert and Deberg agreed that deputies could not shoot Anthony as a "fleeing felon." | Ex. 1 to Levine Decl., Martinez Depo. 38:25-39:18; Ex. 3 to Levine Decl., Deberg Depo. 94:23-95:8; DeFoe Decl. ¶ 8. |
| | 57. | After Martinez's shots, Anthony took approximately two steps forward before falling forward to the ground. | Ex. 1 to Levine Decl., Martinez Depo. 16:8-12. |
| | 58. | Anthony fell with his head pointed east toward Martinez and his feet pointed west toward the house. | Ex. 3 to Levine Decl., Deberg Depo. 85:25-86:4; Ex. 1 to Levine Decl., Martinez Depo. 17:3-7, 130:12-20. |
| | 59. | Upon falling, Anthony's head was as far as ten feet from where Martinez stood. | Ex. 1 to Levine Decl., Martinez Depo. 17:8-11. |
| | 60. | Anthony died from his gunshot wounds. | Ex. 12 to Levine Decl., Autopsy Report, p.6. |
| | 61. | An autopsy conducted after the shooting revealed four gunshot wounds from Martinez's three shots: Wound "A," to the back of Anthony's right arm below the shoulder, with an exit wound near his right armpit and a trajectory of back-to-front, right-to-left, and upward; wound "B," near Anthony's right | Ex. 12 to Levine Decl., Autopsy Report, p.2-3. |

| | | Plaintiffs' Undisputed Fact | Evidence |
|---|---|---|---|
| | | armpit, with a trajectory of back-to-front and right-to-left; wound "C," to the rear portion of the right side of Anthony's torso, with a right-to-left trajectory; and wound "D," to Anthony's right torso, with a trajectory of front-to-back, right-to-left, and downward. | |
| | 62. | Within four minutes after Martinez fired, SED personnel began arriving to the house. | DeFoe Decl. ¶ 22. |
| | 63. | SBSD deputies receive extensive training, including in tactics, use of cover, and use of force and deadly force, before beginning patrol duties, and continue this training throughout their time with the SBSD. | Ex. 1 to Levine Decl., Martinez Depo. 92:4-93:2, 97:15-98:10; Ex. 3 to Levine Decl., Deberg Depo. 93:9-94:7. |
| | 64. | Deputies are trained to identify symptoms indicating an individual may be suffering from a mental illness or mental health crisis, and, when encountering such individuals, to attempt to de-escalate by reassuring the individual that the deputies are there to help; requesting additional resources; slowing down, in part to allow the requested resources to arrive; and assisting in calming the individual. | Ex. 1 to Levine Decl., Martinez Depo. 87:21-88:10, 92:4-14; Ex. 2 to Levine Decl., Campos Depo. 46:15-22, 129:24-130:8; Ex. 3 to Levine Decl., Deberg Depo. 107:18-108:4; DeFoe Decl. ¶ 19. |
| | 65. | Deputies are trained that commands should be given clearly and by a single deputy, as multiple deputies giving commands can cause confusion and escalate the situation by raising tension. | Ex. 2 to Levine Decl., Campos Depo. 118:19-21, 119:3-25; Ex. 3 to Levine Decl., Deberg Depo. 103:3-7; DeFoe Decl., ¶ 21. |
| | 66. | Deputies are trained that when space is available, they should maneuver or | Ex. 1 to Levine Decl., Martinez Depo. 97:25-98:10, |

| | Plaintiffs' Undisputed Fact | Evidence |
|---|---|---|
| | "tactically reposition" away from subjects who are holding a blunt or impact weapon, including by using cover or concealment. | 100:15-21; Ex. 5 to Levine Decl., LaFever Depo. 64:24-65:7; Ex. 7 to Levine Decl., Flosi Depo. 34:18-35:2; DeFoe Decl. ¶ 17. |
| 67. | Deputies are trained that by increasing distance and/or taking cover under such circumstances, they gain more time to address potential threats posed by the subject before resorting to deadly force, and that cover can also protect them from a weapon the subject is holding. | Ex. 1 to Levine Decl., Martinez Depo. 100:15-101:8; Ex. 7 to Levine Decl., Flosi Depo. 34:18-35:2; DeFoe Decl. ¶ 17. |
| 68. | Deputies are also trained, when feasible, to exhaust all less-lethal force options before resorting to deadly force, and to allow time for less-lethal weapons to take effect and assess their effectiveness before using additional force. | Ex. 1 to Levine Decl., Martinez Depo. 92:19-93:2; Ex. 2 to Levine Decl., Campos Depo. 117:9-13; DeFoe Decl. ¶¶ 10, 14(g). |
| 69. | Among less-lethal options, deputies are trained that pepper spray burns and obscures subjects' vision and typically causes subjects to immediately stop and rub their eyes. | Ex. 1 to Levine Decl., Martinez Depo. 74:11-16; Ex. 2 to Levine Decl., Campos Depo. 104:5-12. |
| 70. | Deputies are further trained to issue verbal warnings before using lethal and less-lethal weapons when feasible. | Ex. 1 to Levine Decl., Martinez Depo. 93:3-5; Ex. 2 to Levine Decl., Campos Depo. 115:23-25; Ex. 3 to Levine Decl., Deberg Depo. 97:2-4; Ex. 4 to Levine Decl., Cervantes Depo. 94:8-10, 94:17-20; Ex. 7 to Levine Decl., Flosi Depo. 10:1-7. |
| 71. | Deputies are trained that deadly force is the highest level of force an officer can use. | Ex. 1 to Levine Decl., Martinez Depo. 93:24-94:1; Ex. 2 to Levine Decl., Campos |

| | Plaintiffs' Undisputed Fact | Evidence |
|---|---|---|
| | | Depo. 115:5-7; Ex. 7 to Levine Decl., Flosi Depo. 9:10-12. |
| 72. | Deputies are trained that use of deadly force is only permissible when a subject poses an immediate or imminent threat of death or serious bodily injury to deputies or others. | Ex. 1 to Levine Decl., Martinez Depo. 54:24-55:3; Ex. 2 to Levine Decl., Campos Depo. 115:8-11; Ex. 3 to Levine Decl., Cervantes Depo. 93:21-25. |
| 73. | Deputies are trained that a threat of death or serious bodily injury is "imminent" when, based on the totality of the circumstances, a reasonable officer would believe a subject has the present ability, opportunity, and apparent intent to immediately cause death or serious bodily injury, and that if any of these factors are not present, deadly force is not permissible. | Ex. 7 to Levine Decl., Flosi Depo. 13:2-14:9. |
| 74. | Deputies are trained that fear of future harm is insufficient to justify use of deadly force, no matter how great the fear or the likelihood of the harm. | Ex. 7 to Levine Decl., Flosi Depo. 14:20-15:8. |
| 75. | Deputies are trained that any belief in the necessity of use of deadly force, to be permissible, must be based on objective factors and not subjective fear. | Ex. 7 to Levine Decl., Flosi Depo. 10:8-16. |
| 76. | Deputies are trained to control their fear under pressure. | Ex. 7 to Levine Decl., Flosi Depo. 15:24-16:6. |
| 77. | Deputies are trained that they are responsible for justifying every shot fired when using deadly force. | Ex. 2 to Levine Decl., Campos Depo. 115:15-18; Ex. 3 to Levine Decl., Deberg Depo. 95:19-22; Ex. 4 to Levine Decl., Cervantes Depo. 94:1-3. |
| 78. | Deputies are trained to reassess any threat posed by a subject between shots. | Ex. 2 to Levine Decl., Campos Depo. 115:19-22; Ex. 4 to |

| | | Plaintiffs' Undisputed Fact | Evidence |
|---|---|---|---|
| | | | Levine Decl., Cervantes Depo. 94:4-7. |
| | 79. | Before Anthony was shot, Andrew Nuñez was concerned that the deputies were going to hurt Anthony. | Ex. 8 to Levine Decl., Andrew Nuñez Depo. 177:9-15. |
| | 80. | While Andrew was three houses up the block from the Nuñez home, and was aware armed deputies were confronting Anthony, he heard at least three popping sounds. | Ex. 8 to Levine Decl., Andrew Nuñez Depo. 180:22-182:5. |
| | 81. | When Andrew heard at least three popping sounds, he immediately understood that they were gunshots and that Anthony had been shot. | Ex. 8 to Levine Decl., Andrew Nuñez Depo. 182:3-183:2. |

DATED:  April 26, 2024                    LAW OFFICES OF DALE K. GALIPO


                                          By  /s/ Benjamin S. Levine
                                              Dale K. Galipo
                                              Benjamin S. Levine
                                              Attorneys for Plaintiffs