**LAW OFFICES OF DALE K. GALIPO**
Dale K. Galipo (SBN 144074)
dalekgalipo@yahoo.com
Benjamin S. Levine (SBN 342060)
blevine@galipolaw.com
21800 Burbank Boulevard, Suite 310
Woodland Hills, California, 91367
Telephone: (818) 347-3333
Facsimile: (818) 347-4118

LUIS A. CARRILLO (SBN 70398)
MICHAEL S. CARRILLO (SBN 258878)
DOMINIQUE L. BOUBION (SBN 336915)
**CARRILLO LAW FIRM, LLP**
1499 Huntington Drive, Suite 402
South Pasadena, California 91030
Tel: (626) 799-9375
Fax: (626) 799-9380

Attorneys for Plaintiffs
ROSA NUÑEZ, ANTHONY NUÑEZ, JR., and ANDREW NUÑEZ

# UNITED STATES DISTRICT COURT FOR THE
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROSA NUÑEZ, individually; ANTHONY NUÑEZ, JR., individually and as successor-in-interest to Decedent, Anthony Nuñez; and ANDREW NUÑEZ, individually,<br><br>Plaintiffs,<br><br>v.<br><br>COUNTY OF SAN BERNARDINO; CITY OF HESPERIA; MICHAEL MARTINEZ; SABRINA CERVANTES; JEREMY DEBERG; JONATHAN CAMPOS; and DOES 5 through 15, inclusive,<br><br>Defendants. | Case No. 5:22-cv-01934-SSS-SP<br><br>**DECLARATION OF SCOTT A. DEFOE IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR SUMMARY ADJUDICATION**<br><br>*[Filed concurrently with Plaintiffs' Memorandum of Points and Authorities in Opposition to Defendants' Motion for Summary Judgment; Plaintiffs' Separate Statement of Facts; Plaintiffs' Objections to Evidence; Declaration of Benjamin S. Levine and Exhibits thereto]*<br><br>Date:     May 31, 2024<br>Time:    2:00 p.m.<br>Courtroom: 2 |

# DECLARATION OF SCOTT A. DEFOE

I, Scott A. DeFoe, declare as follows:

1. I am a police practices expert specializing in the procedures of police practices and proper police tactics, including proper procedures for the detention and arrest of individuals and the type and degree of force, if any, appropriate under different circumstances.

2. I am a competent adult and personally familiar with the facts contained herein and would and could competently testify thereto if called upon to do so.

3. My opinions are based in part on my training, professional experience, and education. I am a twenty-year veteran of the Los Angeles Police Department. I held supervisory positions for the last 14 years of my career. During my tenure with the LAPD, I received over 100 commendations, including the Medal of Valor, Purple Heart, and Police Star.

4. Before reaching my opinions in this case, I reviewed the following materials:

   a. Second Amended Complaint for Damages, Case No. 5:22-cv-01934-SSS-SPx.

   b. Photographs of Chain, (NUNEZ/SBD 001647-001656).

   c. Deposition Transcript and Exhibits of Corey LaFever taken on February 12, 2024.

   d. Deposition Transcript and Exhibits of Jeremy Deberg taken on February 21, 2024.

   e. Deposition Transcript and Exhibits of Sabrina Cervantes taken on February 22, 2024.

   f. Deposition Transcript and Exhibits of Michael Martinez taken on February 12, 2024.

   g. San Bernardino County Sheriff Department Deputy Sheriff Michael Martinez, Audio Belt Recording, (1:34:29).

  h. Transcribed Audio Belt Recording for San Bernardino County Sheriff Department Deputy Sheriff Michael Martinez, (NUNEZ/SBD 000204-000384).

  i. Scene Photographs, (NUNEZ/SBD 001081-001631).

  j. San Bernardino County Sheriff's Department Training Materials, (NUNEZ/SBD 001853-002036).

  k. San Bernardino County Sheriff's Department Manual, (NUNEZ/SBD 002038-002091).

  l. Transcribed Interview with Deputy Michael Martinez, DR No. 1922022324, (NUNEZ/SBD 000386-000482).

  m. Rough Deposition Transcript of Lucy Ramos taken on February 27, 2024.

  n. Rough Deposition Transcript of Jonathan Campos taken on March 18, 2024.

**Police Officer Standards and Training On Deadly Force:**

5. At the time of the shooting of Mr. Nuñez on March 29, 2022, police officer standards and training on the use of deadly force included that:

  a. Deadly force is the highest level of force.

  b. When feasible, a warning should be given before using deadly force, as well as less-lethal force.

  c. Deadly force can only be used on the basis of an "objectively reasonable" belief that the suspect poses an immediate threat of death or serious bodily injury. In other words, a subjective fear is not enough, a fear of future harm is not enough, and an objectively reasonable belief that the suspect poses a threat of harm less than death or serious bodily injury is not enough.

  d. A suspect's failure to comply with officer commands alone is an insufficient basis for the use of deadly force.

e. A suspect holding a weapon or potential weapon alone is an insufficient basis for the use of deadly force.

f. Deadly force can only be used in an "immediate defense of life" situation; in other words, in defense of immediate or imminent death or serious bodily injury.

g. The decision to use deadly force must be guided by the reverence for human life.

h. An officer must justify every shot he or she fires.

i. An overreaction in using deadly force is excessive force.

j. When officers fire less-lethal weapons at a suspect, it may prompt the suspect to move away from officers.

**The Use of Lethal Force Was Inappropriate and Contrary to Police Officer Standards and Training:**

6. Under the facts of this case, it would not have been appropriate for Sheriff's Deputy Martinez to shoot Mr. Nuñez simply because Mr. Nuñez was holding a chain leash when Mr. Nuñez not swinging it and gave no indication, he was about to swing it toward anyone, and when Mr. Nuñez was walking and not facing or moving toward deputies.

7. The presence of a chain leash or similar object that could be used as an impact weapon is an insufficient basis for the use of deadly force. In this case, it would not have been appropriate for the Deputies to have shot Mr. Nuñez simply on the basis that he had the leash handle in his hand because having a chain in his hand alone would be insufficient basis for use of deadly force.

8. Additionally, it would not have been appropriate for the Deputies to shoot Mr. Nuñez on the basis that he was running away from the Deputies. Police officers are trained that they can only shoot a fleeing felon where (1) the officer has information that the suspect has committed an atrocious felony involving the infliction of injury or death, AND (2) the suspect poses an immediate threat of death

or serious bodily injury. None of those factors were present in the incident involving Mr. Nuñez. Most fundamentally, Mr. Nuñez was not running away at the time Deputy Martinez fired. Mr. Nuñez also had not committed any felony that inflicted injury on anyone.

9. Police officers and sheriff's deputies are trained that they can only use deadly force in an immediate defense of life situation, in other words, when there is an immediate or imminent threat of death or serious bodily injury. There was no immediate defense of life situation when Deputy Martinez fired his three lethal shots at Mr. Nuñez. Deputy Martinez knew there was no person in Mr. Nuñez's immediate vicinity when Deputy Martinez fired his shots, there was no serious crime in progress, Mr. Nuñez did not swing or take action as though about to swing the chain leash immediately prior to or during the shots, Mr. Nuñez had not swung the chain in a manner indicating he was attempting to strike or injure anyone with it, Mr. Nuñez was merely walking and not facing or approaching Deputy Martinez immediately before or during the first two shots, Mr. Nuñez was as far as 20 feet from Deputy Martinez at the time of the first shot, no civilians were nearby and all occupants of the Nuñez home had been brought away from the premises, Mr. Nuñez's arm came progressively further down with each shot and was extended downward to his thigh by the third shot, and Mr. Nuñez had already begun falling by the third shot or sooner.

10. Deputy Martinez did not issue any verbal warning to Mr. Nuñez that he was going to use lethal force despite it being feasible to do so. At the time Deputy Martinez began to fire, Mr. Nuñez was as far as 20 feet from Deputy Martinez and was not facing Deputy Martinez or moving in his direction. Additionally, Deputy Martinez had the ability to gain additional time, if necessary, by maneuvering around either of the two parked cars, which would have provided cover and could have increased his distance from Mr. Nuñez, or by tactically repositioning to a location further from Mr. Nuñez. Additionally, Deputy Martinez failed to assess the

1 effectiveness of the use of less-lethal force that directly preceded his own use of
2 lethal force or attempt to do so, despite having received training that Deputies
3 should assess the effectiveness of less-lethal force that has been used against a
4 subject before using additional force where feasible.

5   11. Deputies Cervantes and Deberg did not issue adequate or proper verbal
6 warnings to Mr. Nuñez that they were going to use less-lethal force against him
7 prior to using such force, despite it being feasible to do so, and Deputy Cervantes
8 did not issue any warning prior to firing her second beanbag shotgun round. A
9 proper verbal warning clearly communicates to the subject that the deputy is about
10 to use a particular type of force against the subject unless the subject immediately
11 complies with deputies' commands. Neither Deputy Cervantes stating "less lethal,
12 less lethal" nor Deputy Deberg stating "40, 40" were sufficient to make a subject
13 aware that the speaking deputy was preparing to use a weapon against the subject, or
14 that use of the weapon could be averted through the subject's immediate
15 compliance.

16   12. In this case, the Defendant Deputies had cover available to them at all
17 relevant times.

   a. According to Deputy Martinez, Deputy Martinez was positioned to the east (rear) of two parked vehicles while Mr. Nuñez was west (in front) of the southernmost vehicle facing north, and Deputy Martinez had the ability to maneuver around either vehicle and put the vehicle between himself and Mr. Nuñez.

   b. Deputies Cervantes, Deberg, and Campos were all to the south of Deputy Martinez, such that the southernmost vehicle was between them and Mr. Nuñez.

   c. Deputies Cervantes and Campos each had riot helmets in their patrol vehicles, and there was a ballistic shield in Sergeant LaFever's vehicle. According to Deputy Campos, every deputy present would have known

there was a ballistic shield in Sergeant LaFever's vehicle.

13. Deputy Martinez fired shots at Mr. Nuñez's rear and right side and fired at least one shot at Mr. Nuñez as he was already falling to the ground.

    a. According to Deputy Campos, Deputy Martinez fired his first two shots at Mr. Nuñez while Mr. Nuñez was facing north.

    b. According to Deputy Martinez, Deputy Martinez fired all of his shots at Mr. Nuñez from a position to Mr. Nuñez's east.

    c. According to the coroner autopsy report, three of the four gunshot wounds to Mr. Nuñez had back-to-front trajectories, and all four had right-to-left trajectories.

14. From the standpoint of police practices and basic police training, Defendant Deputy Martinez's uses of deadly force were contrary to Peace Officer Standards and Training ("POST"), improper, and inappropriate, including (but not limited to) for the following reasons:

    a. **Deputy Martinez Could Not Shoot Mr. Nuñez for Holding a Chain Leash**. Under the facts of this case, Deputy Martinez could not permissibly shoot at Mr. Nuñez simply because Mr. Nuñez was holding a chain leash.

    b. There was **No Immediate Defense of Life Situation** as explained above. At the time of the shooting, Mr. Nuñez posed no immediate threat of death or serious bodily injury to any person.

    c. **Deputy Martinez Could Not Shoot Mr. Nuñez based on Flight** because Mr. Nuñez was not fleeing, and for the reasons explained above.

    d. **No crime involving the infliction of serious injury or death.** The deputies, including the Defendant Deputies, were not responding to a serious crime in this case. The deputies had no information that Mr. Nuñez had injured anyone and no information that Mr. Nuñez had

   attempted to injure anyone with the chain leash. According to a percipient witness, even when Mr. Nuñez came outside while holding the chain leash, he never swung it toward anyone in a manner indicating he was attempting to strike them.

 e. **No immediate verbal threats**. Deputy Campos testified that he could not recall hearing Mr. Nuñez verbally threaten to harm anyone at any point after exiting the house.

 f. **Officers Must Justify Every Shot.** Police officers must justify every shot they fire. Force is unreasonable when the type, degree, and duration of the force employed was not necessary or appropriate. In this case, each of the three shots were inappropriate and unjustified. Deputy Martinez overreacted, and an overreaction in using deadly force is excessive force. Deputy Martinez fired at least one shot at Mr. Nuñez as he was going to the ground.

 g. **Other reasonable alternative measures available**. Police officers and sheriff's deputies are trained that they can only use deadly force in a "last resort" situation. Shooting was not a "last resort" in this case. Other reasonable alternative measures were available, including giving a warning that the Deputies were prepared to use deadly force and utilizing pepper/OC spray and/or tasers in an appropriate manner so as not to escalate the situation, if that were necessary.

 h. **No verbal warning regarding deadly force**. Police officers and sheriff's deputies are trained to give a verbal warning that deadly force will be used when feasible. All Defendant Deputies failed to issue a verbal warning prior to using less-lethal and deadly force, even though it would have been feasible to do so under the circumstances they confronted.

 i. **Subjective fear is insufficient to justify a use of deadly force**. Basic

police training requires that any use of deadly force must be based on an "objective" rather than "subjective" "reasonable necessity" of action to "imminent danger." Fear of a potential future threat is insufficient to justify use of deadly force, no matter how great the fear and no matter how great the likelihood of harm. In this case, the record does not support any objectively reasonable explanation that Mr. Nuñez posed an immediate threat of death or serious bodily injury at the time that any of the shots were fired. It was unreasonable to believe that Mr. Nuñez could have immediately reached the Deputies and struck them with the chain, which was wrapped around Mr. Nuñez's hand and had an effective length of approximately six feet, before Deputy Martinez could have fired when Deputy Martinez already had his gun aimed at Mr. Nuñez and was as far as 20 feet away. Mr. Nuñez was shot while he was not facing or moving in the direction of any deputy.

j. **No reverence for human life**. Police officers and sheriff's deputies are trained that they must show a reverence for human life. Deputy Martinez showed no reverence for human life when he fired three rounds at Mr. Nuñez striking him from the side and from the rear, while Mr. Nuñez was not facing or moving in the direction of any deputy, without issuing a verbal warning that deadly force would be used.

k. **Tueller drill training and "21-foot rule" not applicable**. According to Deputy Martinez, Deputy Martinez believed use of deadly force was appropriate against Mr. Nuñez from a distance of 20 feet based on the Tueller drill. Through the Tueller drill, police officers and sheriff's deputies are trained that they may lack sufficient time to draw their weapon, take aim at a subject, and fire when a subject armed with a knife is running toward them at full speed from 21 feet away. At the time Deputy Martinez fired from as far as 20 feet away, Mr. Nuñez was

walking, Mr. Nuñez was not facing or moving in the direction of any deputy, and Deputy Martinez already had his weapon drawn and aimed at Mr. Nuñez.  Mr. Nuñez also did not have a knife.  The Tueller drill training did not apply under these circumstances.

**Pre-Shooting Negligent Tactics**

15. The Defendant Deputies failed to employ appropriate situational awareness and appropriate tactics in this incident. Deputy Martinez began firing at Mr. Nuñez immediately after Deputy Cervantes fired a beanbag shotgun round at Mr. Nuñez, meaning Deputy Martinez failed to adequately assess the effect the beanbag round had on Mr. Nuñez before firing and failed to properly assess whether a threat of imminent death or serious bodily injury was actually present when he shot.

16. Additionally, the Defendant Deputies failed to discuss or formulate any tactical plan regarding how they would respond if Mr. Nuñez exited the house while holding the chain leash.  The Defendant Deputies had asked Mr. Nuñez to exit the house and therefore should have anticipated he might do so.  A tactical plan would have increased the likelihood of gaining compliance and reduced the likelihood any need for use of deadly force would arise, including by enabling Defendant Deputies to designate a single Deputy who would maintain dialogue with Mr. Nuñez, and enabling Defendant Deputies to identify and prepare to utilize available cover and protective equipment.  A tactical plan also could have afforded more time for the Sheriff's Department's Special Enforcement Division, which was en route, to arrive.

17. Additionally, Deputy Martinez failed to appropriately tactically reposition and utilize available cover by moving around the rear of either of the two parked vehicles he stood behind before resorting to deadly force, when tactically repositioning in this manner would have put one of the vehicles between himself and Mr. Nuñez and may have increased his distance from Mr. Nuñez.  According to Deputy Martinez, he could have moved around the rear of either vehicle at the time

he began to fire but did not do so, even though doing so would have been consistent with his training. Deputies are trained that when space is available and when they can do so without increasing danger to themselves or others, they should tactically reposition in order to increase the distance between themselves and subjects they have reason to believe pose a threat of harm, including subjects who are or may be armed with an impact weapon, and in order to take cover. Deputies are trained that by doing so, they both can afford themselves more time to address the situation and can afford themselves protection from an impact weapon.

18. Additionally, the Defendant Deputies failed to retrieve or request retrieval of available protective equipment, including riot helmets and a ballistic shield. According to deputy testimony, any of Defendant Deputies would have known this equipment was available in the Watch Commander's vehicle, and a Watch Commander was present at the scene with his vehicle at the time of the incident. Had this equipment been utilized, the Defendant Deputies could have used the ballistic shield as additional cover and would have gained additional protection in the event Mr. Nuñez had attempted to strike them with the chain leash.

19. Additionally, the Defendant Deputies failed to respond appropriately, given that they observed Mr. Nuñez engage in behavior and speech indicating Mr. Nuñez may have been experiencing a mental health crisis or was mentally ill. The Defendant Deputies should have, and failed to, appropriately consider that Mr. Nuñez was experiencing a mental health crisis or was mentally ill. Deputies who are engaged with a subject who may be suffering from a mental illness or mental health crisis are trained to attempt to de-escalate by reassuring the individual that the Deputies are there to help, by requesting additional resources, by slowing down, in part to allow the requested resources to arrive, and by assisting in calming the subject.

20. Additionally, Deputies Martinez and Campos failed to designate one Deputy to engage in dialogue with Mr. Nuñez while Mr. Nuñez was inside the house

and instead alternated, with one Deputy stepping back while the other engaged with Mr. Nuñez, preventing either Deputy from building rapport and establishing authority with Mr. Nuñez.  Deputies Martinez and Campos also made misrepresentations and false statements to Mr. Nuñez while Mr. Nuñez was inside the house, including by telling him that he would not be arrested, preventing the Deputies from building trust with Mr. Nuñez as would have been necessary to de-escalate.  By misleading Mr. Nuñez in ways, he was able to perceive, Deputies Martinez and Campos escalated the situation rather than de-escalated.

21. Additionally, Defendant Deputies failed to properly issue commands to Mr. Nuñez in that they failed to ensure a single deputy was issuing commands at any time.  Deputies are trained that multiple deputies issuing commands to a subject can cause confusion and can create additional tension and thereby escalate the situation, reducing the likelihood of gaining compliance from the subject without the need to resort to use of force.

22. Additionally, once Mr. Nuñez exited the house, Defendant Deputies failed to utilize proper tactics in order to afford themselves additional time.  Defendant Deputies were aware that the Sheriff's Department's Special Enforcement Division was en route.  The Special Enforcement Division, like similar SWAT-type divisions common to many law enforcement agencies, had expertise and training in assisting with individuals experiencing mental health crises and who may pose a risk of harm to others.  Creating additional time, including by engaging in further dialogue with Mr. Nuñez, delaying the initial use of less-lethal weapons until a time when Mr. Nuñez was approaching the Deputies or was closer than 30 feet away, and utilizing available cover and concealment, would have increased the likelihood that Special Enforcement Division personnel would have arrived and assisted in resolving the situation before deadly force was used.  Post-incident reports show that Special Enforcement Division personnel began to arrive within approximately four minutes after Deputy Martinez used deadly force.

1  I declare under penalty of perjury of the laws of the United States of
2  America, that the foregoing is true and correct.  Executed on April 25, 2024, at
3  Huntington Beach, California.

<u>Scott A. DeFoe</u>

-12-    Case No. 5:22-cv-01934-SSS-SP
DECLARATION OF SCOTT A. DEFOE IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT