Exhibit 1

1                    UNITED STATES DISTRICT COURT

2                    CENTRAL DISTRICT OF CALIFORNIA

3

4   ROSA NUNEZ, individually, ANTHONY      )
    NUNEZ, JR., individually and as        )
5   successor-in-interest to Decedent,     )
    Anthony Nunez and ANDREW NUNEZ,        )
6   individually,                          )
                                           )
7                Plaintiffs,               )
                                           )
8                vs.                       ) Case No.
                                           ) 5:22-CV-01934-SSS-SPx
9   COUNTY OF SAN BERNARDINO, CITY OF      )
    HESPERIA, MICHAEL MARTINEZ, SABRINA    )
10  CERVANTES, JEREMY DEBERG, JONATHAN     )
    CAMPOS, and DOES 5-15, inclusive,      )
11                                         )
                 Defendants.               )
12  _____    )

13

14          REMOTE VIDEOCONFERENCE DEPOSITION OF

15                    MICHAEL MARTINEZ

16              MONDAY, FEBRUARY 12, 2024

17

18

19

20

21

22  Reported Stenographically By:

23  Jinna Grace Kim, CSR No. 14151

24  Job No.:  47724

25

**ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Michael Martinez on 02/12/2024**

```
 1   time of your first shot?

 2      A.   To my recollection, yes.

 3      Q.   And how far were you from Mr. Nunez at the time of

 4   your first shot?

 5      A.   Approximately I would say 15 feet, 15 to 20 feet.

 6      Q.   And your second shot, where were you aiming?

 7      A.   The same, chest area.

 8      Q.   And what was the distance between you and Mr. Nunez

 9   at the time of your second shot?

10      A.   I would say a couple feet, closer from the initial

11   15 to 20 feet.

12      Q.   So approximately 14 to 19 feet?

13      A.   I would say so, yes.

14      Q.   And your third shot, where were you aiming at your

15   time of your third shot?

16      A.   His chest area, also, sir.

17      Q.   Was his chest area essentially presented to you at

18   the time of all of your shots?

19      A.   To my recollection, yes.

20      Q.   Was Mr. Nunez, for instance, turning at any point in

21   time during your shots?

22           MR. SMITH:  I'll object as to the form.

23           But go ahead, Deputy Martinez.

24           THE WITNESS:  Can you repeat the question more time,

25   sir.
```

**ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Michael Martinez on 02/12/2024**

Page 16

1    Q.    Was Mr. Nunez standing still at the time of your

2  first shot?

3    A.    I believe he was walking towards my direction.

4    Q.    And what about the second shot?

5    A.    Continued pacing towards me.

6    Q.    Was he essentially walking towards you?

7    A.    To my recollection, yes, sir.

8    Q.    How long after your third shot did Mr. Nunez

9  continue to walk towards you before he started falling to the

10  ground?

11    A.    I think after the third shot, he maybe took a couple

12  steps and then went to the ground.

13    Q.    How did Mr. Nunez fall to the ground, to your

14  knowledge?

15    A.    Kind of like hovered forward to the ground facing

16  belly first.

17    Q.    Is that kind of like if you have a broom stick and

18  the broom is touching the ground, and you kind of just let it

19  fall forward, it would just fall kind of forward onto the

20  ground; is that how he fell?

21          MR. SMITH:  I'll object as to form.

22          But go ahead, Deputy Martinez.

23          THE WITNESS:  Yeah.  That would be an example, would

24  be something like that, yes.

25  BY MR. SINCICH:

**ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Michael Martinez on 02/12/2024**

1   Q.   Okay.  I'm not sure if I asked, but did he fall

2   forward, backwards, to the side?

3        Which direction did he fall?

4   A.   Forward, sir.

5   Q.   And so forward means he would have fallen towards

6   you?

7   A.   That's correct.

8   Q.   How far was Mr. Nunez's head from where you were

9   standing after he fell to the ground?

10  A.   I would have to say approximately eight to ten feet,

11  probably about eight to ten feet.

12  Q.   That's your best estimate, eight to ten feet from

13  his head to where you were standing after he fell to the

14  ground?

15  A.   Yes, sir.

16  Q.   Prior to using deadly force, did you give a verbal

17  warning that deadly force was going to be used?

18  A.   No.

19  Q.   Within, say, the ten seconds prior to your first

20  shot, did you give any verbal commands to Mr. Nunez?

21  A.   Yes.  He was advised to put the chain down.

22  Q.   Who advised Mr. Nunez to put the chain down in that

23  ten-second period?

24  A.   I believe myself, along with other deputies who were

25  present during the incident.

**ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Michael Martinez on 02/12/2024**

Page 21

```
 1     A.   No, sir.
 2     Q.   Approximately how long did it take for you to fire
 3  all three of your shots?
 4     A.   Five seconds.
 5     Q.   Were your shots evenly spaced?
 6     A.   I would say so, yes.
 7     Q.   Were you attempting to assess in between shots?
 8     A.   Assess what, sir?
 9     Q.   Anything.  That was going to be my next question.
10          But if the answer's no, then I won't ask it.
11          I'll re-ask the question.
12          Did you do an assessment after you fired your first
13  shot?
14          MR. SMITH:  I'll object as to form.
15          But go ahead, Deputy Martinez.
16          THE WITNESS:  So after my first shot I just
17  proceeded forward.  So I continued to fire the other two
18  rounds, sir.
19  BY MR. SINCICH:
20     Q.   Did you feel like you had time to assess in between
21  your first and second shot?
22     A.   No.  During that time, like I said, he was
23  proceeding forward, so no.
24     Q.   So in between your first and second shot, you were
25  able to identify that the subject was still moving forward?
```

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Michael Martinez on 02/12/2024

Page 22

 1     A.   That's correct, sir.

 2     Q.   Did you observe anything else in that time period in

 3  between the first and second shot?

 4     A.   No, sir.

 5     Q.   When you fired your first shot, was Mr. Nunez

 6  holding the chain?

 7     A.   Yes, sir.

 8     Q.   And was he holding it in both hands or one hand?

 9     A.   His right hand.

10     Q.   Can you describe how he was holding the chain at the

11  time of your first shot?

12     A.   It was wrapped in his right hand while clenching a

13  fist.

14     Q.   Do you know how many times it was wrapped around his

15  right hand?

16     A.   I do not.

17     Q.   Was it approximately one or two times?

18     A.   It was enough for him to swing it up in the air and

19  maintain control of it.

20     Q.   Was he swinging the chain up in the air at the time

21  of your first shot?

22     A.   He swung it in my direction prior to my first shot,

23  yes.

24     Q.   At the time of your first shot, was he still

25  swinging the chain up in the air?

**ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Michael Martinez on 02/12/2024**

1    A.   No.

2    Q.   At the time of your first shot, he was holding the

3  chain with his right hand; correct?

4    A.   Yes, sir.

5    Q.   Where was his right hand relative of his body at the

6  time of your first shot?

7    A.   I would say up near his head or ear level above his

8  shoulder.

9    Q.   Can you demonstrate for me how he was holding the

10  chain?

11        MR. SMITH:  I'll object as to form.

12        But go ahead, Deputy Martinez, if you can.

13        THE WITNESS:  Sorry about that, Brett.

14        MR. SMITH:  It's okay.

15        THE WITNESS:  (Indicating).

16  BY MR. SINCICH:

17    Q.   So you have your hand approximately aligned with

18  your ears; is that correct?

19    A.   I would say somewhere in that vicinity, yes.

20    Q.   And your elbow is out to your right side?

21    A.   Correct.

22    Q.   And it's kind of making almost a acute triangle, if

23  I remember middle school correctly?

24    A.   I would say that.

25    Q.   Was Mr. Nunez, for instance, when he was walking

Page 24

1  forward towards you, did he keep his right foot back, or did

2  he just walk normally with his left foot forward, right foot

3  forward?

4      A.   I don't recall.

5      Q.   And when he had the chain at the time of your first

6  shot held in his right hand approximately by his right ear,

7  where was the rest of the chain at that time?

8      A.   Dangling down if that makes sense, just like hanging

9  from the legs portion that was left, hanging down.

10      Q.   Was it touching the ground?

11      A.   I don't recall if it was touching the ground.

12      Q.   Do you recall where approximately it went down to on

13  his body?

14      A.   I do not, sir.

15      Q.   Was it essentially just hanging straight down from

16  his hand?

17      A.   From his clenched fist, yes.

18      Q.   At the time of the second shot, did he still have

19  the chain in his hand?

20      A.   Yes, he did.

21      Q.   Was it in a different position at all?

22      A.   I believe it was still in the same position.

23      Q.   Was there any change in the way he was holding the

24  chain in between the first and second shot?

25      A.   No, sir.

**ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Michael Martinez on 02/12/2024**

Page 25

```
 1      Q.   In the ten seconds before the first shot, did

 2   Mr. Nunez verbally threaten you or any of the other

 3   deputies?

 4      A.   No.  He was yelling lots of obscenities.

 5           I don't -- I don't specifically know if it was any

 6   threats made ten seconds before the shot.

 7      Q.   What about in between the first and second shot?

 8      A.   No.

 9      Q.   Five seconds prior to your first shot, did you hear

10   Mr. Nunez say anything?

11      A.   I don't recall if he had said anything five seconds

12   before the first shot.

13      Q.   What about in between your first and second shot,

14   did he say anything?

15      A.   No.

16      Q.   And there was no change in the way he was holding

17   the chain in between the first and the second shot?

18      A.   No, sir.

19      Q.   Was there any change in -- strike that.

20           Was there any change in how he was holding the chain

21   in between the second and third shot?

22      A.   No, sir.

23      Q.   Were you stationary at the time of your first

24   shot?

25      A.   Yes, sir.
```

**ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Michael Martinez on 02/12/2024**

1    Q.   Were you stationary at the time of your third

2    shot?

3    A.   I don't recall if I had taken a step back.

4         To my recollection, I don't recall if I had taken

5    one or two steps back or not or stayed stationary.

6    Q.   Is it possible that you took one or two steps

7    backwards prior to firing your third shot?

8    A.   Being the fact that he had proceeded forward towards

9    me, I would say yes due to the length of the chain.

10    Q.   Were you still potentially moving backward at the

11    time of your third shot, or had you taken the one or two

12    steps and then stopped?

13    A.   I could have taken one or two steps and maybe

14    stopped, but I'm not a 100 percent on that.

15    Q.   What I'm wondering is if you were moving while you

16    were shooting.

17    A.   No.

18    Q.   Prior to firing your first shot, did you move your

19    position at all?

20    A.   Yes.

21    Q.   How did you move prior to firing your first shot,

22    say, in the first five seconds prior to firing your first

23    shot, where did you move?

24    A.   I followed Anthony who was running north in front of

25    the vehicles in front of the residence -- not following, I

**ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Michael Martinez on 02/12/2024**

Page 27

1   turned in his direction as he was running north.

2           So initially, he started south and he began north,

3   and I turned my body north.

4      Q.   So you kind of just rotated your body in the same

5   position?

6      A.   In his direction, correct.

7      Q.   And you were east of his position at that time?

8      A.   Yes, sir.

9      Q.   Now, you mentioned running just a moment ago.

10          Is it your testimony that Mr. Nunez ran at any point

11  in time during this incident?

12     A.   Yeah.  Either like a pacing or quicker than a walk,

13  I would say or faster than a walk.

14     Q.   But at the time of your shots, you said he was

15  walking; is that correct?

16     A.   Yes, sir.

17     Q.   Immediately prior to at the time of your shots, was

18  Mr. Nunez running at you or any other officers?

19     A.   One more time, sir?

20     Q.   Immediately prior to and at the time of your shots,

21  was Mr. Nunez running at you or any other deputies?

22     A.   Yes.  Swung the chain towards my direction.

23     Q.   My question's a little bit different.

24          At the time immediately prior and during your shots,

25  had Mr. Nunez run towards you or any of the other deputies?

**ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Michael Martinez on 02/12/2024**

Page 28

```
 1     A.   No.  He walked.

 2     Q.   So he wasn't lunging at you or any of the other

 3  deputies?

 4          MR. SMITH:  I'll object as to form.

 5          But go ahead, Deputy Martinez.

 6          THE WITNESS:  Not with his -- not with his body.

 7  BY MR. SINCICH:

 8     Q.   I want to back up a little bit.

 9          Do you have prior law enforcement experience?

10          MR. SMITH:  I'll object as to form.

11          Go ahead, Deputy Martinez, if you understand.

12          THE WITNESS:  Meaning what, sir?

13          I don't understand.

14  BY MR. SINCICH:

15     Q.   Yeah.  I think your attorney made a good objection

16  there.

17          Let me just say ask a couple of foundational

18  questions.

19          Who do you currently work for?

20     A.   San Bernardino County Sheriff's Department.

21     Q.   And is that who you worked for at the time of the

22  incident?

23     A.   Yes.

24     Q.   What was your rank at that time?

25     A.   Deputy Sheriff assigned to patrol.
```

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Michael Martinez on 02/12/2024

Page 35

 1      Q.   If I understand your testimony correctly, did you

 2   use deadly force because you felt like the less-lethal force

 3   was not working to gain compliance?

 4      A.   Yes.  And for the fact of the weapon he had in his

 5   right hand.

 6      Q.   Is there any other reason why you used deadly force

 7   besides the less-lethal was ineffective to gain compliance

 8   and that he had the chain in his right hand?

 9      A.   And to stop the threat.

10      Q.   And what was the threat?

11      A.   The suspect possibly harming myself or my partners

12   with the metal chain or citizens, the residents next door on

13   each side of the house.

14      Q.   Do you know where your partners were standing at the

15   time of your use of deadly force?

16      A.   To the south of me, sir.

17      Q.   So basically to your left?

18      A.   Yes.

19      Q.   And at the time of your use of deadly force,

20   Mr. Nunez was essentially to your west?

21      A.   Yes, sir.

22      Q.   And Mr. Nunez was walking towards you as you

23   testified before; correct?

24      A.   Yes, sir.

25      Q.   Is it fair to say he wasn't walking towards your

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Michael Martinez on 02/12/2024

Page 38

1      Q.   Can you give me an estimate?

2           Was it a matter of minutes?

3           The incident was an hour and a half; correct?

4      A.   Yes, sir.

5      Q.   So was it within five minutes, or was it an hour

6   earlier?

7      A.   I would say within five, ten minutes after he came

8   outside.

9      Q.   Is it fair to say that you hadn't seen any civilians

10  within five to ten minutes prior to the  its shots?

11     A.   Yeah.  I believe so.

12     Q.   At the time of your use of deadly force, was

13  Mr. Nunez walking towards any civilians?

14     A.   No, sir.

15     Q.   Is it fair to say that at the time of your use of

16  deadly force, Mr. Nunez was not trying to harm or injure any

17  of the civilians?

18     A.   Sir, are we just speaking specifically civilians?

19     Q.   Yes, the civilians.

20     A.   That's right.

21     Q.   Okay.  One of the reasons why you that said that you

22  used deadly force was to protect civilians.

23          Do you recall that?

24     A.   Yes, sir.

25     Q.   Do you feel that there was any civilians at the time

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Michael Martinez on 02/12/2024

Page 39

```
 1    of your shots that were immediately in danger based of

 2    Mr. Nunez's actions?

 3        A.   It could have been immediately in danger if he would

 4    have jumped the fence and went to a neighboring residence.

 5        Q.   Did Mr. Nunez jump any fence during the incident?

 6        A.   No, sir.

 7        Q.   Did Mr. Nunez ever attempt to jump any fence?

 8        A.   No, sir.

 9        Q.   Did Mr. Nunez ever walk close enough to touch a

10    fence?

11             MR. SMITH:  I'll object as to the form.

12             But go ahead, Deputy Martinez.

13             THE WITNESS:  He wasn't near the fence when he

14    initially came outside.

15    BY MR. SINCICH:

16        Q.   How close was he to the fence based off your

17    recollection?

18        A.   10, 15 feet approximately.

19        Q.   And when he was 10 or 15 feet away from the fence,

20    was the civilian there at that south fence at that same

21    time?

22        A.   I don't believe I saw them at that time, no.

23        Q.   And he still had the chain in his hand at that

24    point; right?

25        A.   That's correct, sir.
```

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Michael Martinez on 02/12/2024

Page 40

1    Q.  And then he actually moved away from the fence, he

2  walked to the north?

3    A.  Yes, sir.

4    Q.  Okay.  So is it fair to say that at the time of your

5  use of deadly force, there was no civilian in immediate

6  danger of death or serious bodily injury?

7    A.  No.  Just deputy, sir.

8    Q.  Okay.  And what deputies do you believe were in

9  immediate danger of death or serious bodily injury at the

10  time of your use of deadly force?

11    A.  Myself.

12    Q.  Any other deputies?

13    A.  And the couple deputies that were standing to my --

14  to the south of me which would have been to my left.

15    And then also, like I said, I didn't look back to

16  see if any deputies were behind me.

17    Q.  Is it fair to say that you didn't use deadly force

18  during this incident to protect deputies that you didn't know

19  where they were?

20    MR. SMITH:  I'll object as to form.

21    But go ahead, Deputy Martinez.

22    THE WITNESS:  Can you repeat that question one more

23  time?

24  BY MR. SINCICH:

25    Q.  Sure.  As to the deputies that you didn't know where

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Michael Martinez on 02/12/2024

Page 41

 1  they were at, is it fair to say that you were not using

 2  deadly force to protect them?

 3      A.   Yes, that's fair to say.

 4      Q.   And the partners that were to the south of you, what

 5  partners were they?

 6      A.   I don't recall.

 7      Q.   How close was the closest partner to you to your

 8  left at the time of your use of deadly force?

 9      A.   Right next to me.  So about a foot, maybe, or

10  less.

11      Q.   Was it so close that if you kind of moved your elbow

12  out to your left, you would be able to touch the shoulder of

13  that deputy?  Or were they further?

14      A.   Approximately that.  I would say maybe between the

15  hand length to the left or closer.  I don't recall.

16           I can't recall a 100 percent.

17      Q.   So you said approximately like one arm length away

18  from you to your left?

19      A.   If not closer, yeah.

20      Q.   And then how far to the left of that deputy was the

21  second partner deputy that was to your south?

22      A.   I would say about the same.

23      Q.   And were they essentially directly to your south, or

24  were they more east or west than your position?

25      A.   I would say directly towards the south.

**ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Michael Martinez on 02/12/2024**

Page 46

1    Q.   So essentially, he would have to swing the chain and

2    the chain would have to hit the deputy in the head?

3    A.   Yes.

4    Q.   Other than fear that there was a possibility that if

5    he swung the chain and if the chain hit a deputy in the head,

6    they could potentially get knocked out, was there any other

7    fear that you had related to the chain at the time of your

8    use of deadly force?

9    A.   Just the great bodily injury he could have caused to

10   myself and my partners.

11   Q.   What great bodily injury were you concerned with?

12   A.   Being struck with the chain in any form, sir.

13   Q.   I understand that he was holding some kind of handle

14   on one end of the chain; is that fair?

15   A.   Yes.

16   Q.   What was on the other end of the chain?

17   A.   I believe it was just metal, sir.

18   Q.   There wasn't like a ball or a blade or anything like

19   that?

20   A.   Not to my recollection.

21   Q.   Have you ever seen somebody die from being hit with

22   the chain?

23   A.   Trying to recall a lot of situations I've been in

24   work.  To my knowledge, I can't recall one at this time.

25   Q.   Is there a situations that you recall based on your

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Michael Martinez on 02/12/2024

Page 54

```
 1   BY MR. SINCICH:

 2        Q.   That's correct.

 3        A.   I don't believe so.

 4        Q.   What about a gun in their waistband or pocket?

 5        A.   Yes, sir.

 6        Q.   Approximately how many occasions?

 7        A.   One to three, guessing.

 8        Q.   And you didn't use deadly force in those one or

 9   three different situations?

10        A.   The weapon was concealed.

11        Q.   So you didn't know that they had a gun at the

12   time?

13        A.   That's correct, sir.

14        Q.   Had you ever been in a situation where you saw a

15   subject with a bat or a pipe in their hand?

16        A.   I believe I have.  I just couldn't recall the exact

17   incident or time.

18        Q.   Do you know approximately how many times you've seen

19   a subject with a bat or a pipe in their hand?

20        A.   Five to ten times, sir.

21        Q.   Is it fair to say that you didn't use deadly force

22   against them in those five to ten different occasions?

23        A.   Yes.

24        Q.   Based on your training and policies, is it fair to

25   say that you can only use deadly force if the subject
```

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Michael Martinez on 02/12/2024

Page 55

1  presents an immediate threat of death or serious bodily

2  injury?

3      A.   Yes, sir.

4      Q.   Okay.

5           MR. SINCICH:  It's about 11:19.

6           We've been going just over an hour.  I couldn't

7  remember what time we started.

8           I know it was a little bit later.

9           But is now a good time to take a break?

10          MR. SMITH:  It is for me.

11          I'll defer to you, Deputy Martinez.

12          MR. SINCICH:  I want to make sure Ms. Kim gets a

13 break.  Why don't we take ten minutes.

14          (Recess taken.)

15 BY MR. SINCICH:

16     Q.   Deputy Martinez, we left off at a little bit of a

17 little history line of questions, but I want to ask you a

18 couple questions going back to at the time of force.

19          You had mentioned that and demonstrated that

20 Mr. Nunez's arm was out to his side when he was holding the

21 chain when you fired.

22          Do you recall that?

23     A.   I wouldn't say side, sir.  Above his shoulder.

24     Q.   Right.  His hand was above his shoulder; correct?

25     A.   Correct, sir.

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Michael Martinez on 02/12/2024

Page 58

```
 1   position as if to wind up to swing the chain?

 2       A.   Yeah.  I don't recall if he was winding up his arm,

 3   but I just recall it was near his ear or near his ear above

 4   the shoulder.

 5       Q.   And what about in between the second and third shot,

 6   did you see his right arm go back almost behind his body

 7   winding up as though to swing the chain?

 8       A.   I don't recall.  I just know it was above his

 9   shoulder near his ear area.

10       Q.   Is it fair to say to the best of your recollection,

11   he held his right arm and hand with the chain steady by his

12   ear during all of the shots?

13       A.   Like I said, I don't recall exactly, but I would say

14   no.  I don't recall.

15       Q.   I'm not sure if I understand your response.

16            To the best of your recollection, is it fair to say

17   that Mr. Nunez's hand and arm remained in the same position

18   out to his -- arm out to his side, hand clenching the chain

19   up by his right ear?

20       A.   Yes.  But at the same time I don't recall if he had

21   moved it back towards a winding position like you had stated.

22            So I'm going to say I don't recall if he had stayed

23   in that exact same position during that whole time.

24       Q.   Is it fair to say that if you don't recall that

25   occurring, that you didn't use deadly force because he moved
```

**ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Michael Martinez on 02/12/2024**

Page 59

```
 1  his arm backwards?

 2          MR. SMITH:  I'll object as to the form.

 3          But go ahead, Deputy Martinez.

 4          THE WITNESS:  Can you repeat that one more time,

 5  sir?

 6  BY MR. SINCICH:

 7     Q.   Is it fair to say that because you don't recall it

 8  ever occurring, is fair to say that you didn't use deadly

 9  force because he moved his arm backwards as if to wind up to

10  swing the chain?

11          MR. SMITH:  I'll restate my objections again.

12          But go ahead, Deputy.

13          THE WITNESS:  Like I said, I don't initially

14  recall -- I don't recall if he had wind up his arm or not.

15  BY MR. SINCICH:

16     Q.   Right.  And my question is a little different.

17          Is it fair to say that you didn't use deadly force

18  because his arm was moving as if to wind up to swing the

19  chain?

20     A.   Yes.  Yes, sir.

21     Q.   Right.  I'm sorry.

22          I was just looking at my notes.

23     A.   Okay.

24     Q.   At some point in time you had mentioned that he was

25  walking north.
```

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Michael Martinez on 02/12/2024

Page 60

1           Do you recall that?

2      A.   Yes, sir.

3      Q.   Generally speaking, and I want to get into more

4  detail in a minute, but generally speaking, he exited the

5  house and walked south towards the open area where the dirt

6  is?

7      A.   Yes, sir.

8      Q.   And that's when he was 15 feet from that south

9  fence?

10     A.   Yes, sir.

11     Q.   And then he walked north almost in a same direction

12 back towards the front door?

13     A.   Yes, sir.

14     Q.   And then at some point he must have turned to his

15 right in the direction to the east where you were?

16     A.   Yes, sir.

17     Q.   How far was Mr. Nunez from you at the moment he

18 first turned to his right facing you?

19     A.   I would say a compact car length.

20     Q.   What is your best estimate as to that distance?

21     A.   15, 20 feet.

22     Q.   How long after he turned towards you did you fire

23 first shot?

24     A.   I believe it was right after he cleared the vehicle

25 and began to walk towards me.

Page 63

1    Q.   But you didn't fire?

2    A.   Until he started walking towards me, no.

3    Q.   Right.  And I'm just speaking of a very specific

4  time when he first took a step in your direction which would

5  have been something about five or ten seconds before your

6  first shot; is that correct?

7    A.   Yes.

8    Q.   Okay.  So when he first took a step in your

9  direction, where was the chain at that point in time?

10   A.   Above his shoulder by his ear.

11   Q.   In the same position as when you did fire?

12   A.   Right.  The only difference was he was closer to

13  me.

14   Q.   So his arm and hand position didn't change from the

15  five to ten seconds before your first shot all the way up

16  until your third shot; is that true?

17   A.   Can you repeat it one more time?

18   Q.   His hand position, his right hand and arm position,

19  didn't change from the five to ten seconds before your first

20  shot all the way up until your third shot; is that fair?

21   A.   Yes, sir.

22   Q.   Okay.  And you said the only thing that did change

23  is his proximity to you?

24   A.   Yes, sir.

25   Q.   So when he first turned and faced in your direction

**ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Michael Martinez on 02/12/2024**

Page 72

```
 1            THE WITNESS:  Yes, sir.

 2   BY MR. SINCICH:

 3       Q.   You were in uniform at the time of the incident?

 4       A.   Yes, sir.

 5       Q.   And did you have a like a Sam Browne belt on?

 6       A.   That's correct, sir.

 7       Q.   What kind of tools and equipment did you have on

 8   your belt?

 9       A.   Do you want me to name everything, sir?

10       Q.   Yes, please.

11       A.   Okay.  My duty weapon, audio recorder, pepper spray,

12   two sets of handcuffs, RCB, Taser, and my set of keys, and

13   two magazines of extra magazines.

14       Q.   And how did you load your magazines into your

15   weapon?

16            What was your load-up?

17       A.   13, plus one, sir.

18       Q.   Does that mean your magazine had 13 rounds, and

19   there was one round in the chamber?

20       A.   That's correct.

21       Q.   So if you fired three rounds, then there would be

22   essentially one round still in the chamber and ten rounds in

23   the magazine?

24       A.   That's correct, sir.

25       Q.   And were you firing -- what type of weapon were you
```

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Michael Martinez on 02/12/2024

Page 74

1      Q.   Had you ever been pepper-sprayed before in

2  training?

3      A.   Yes, sir.

4      Q.   Is it fair to say that pepper spray can be

5  debilitating?

6      A.   Yes, sir.

7      Q.   It causes the person to not be able to see?

8      A.   Yes, sir.

9      Q.   It's hard to breathe?

10     A.   Yes, sir.

11     Q.   Is it fair to say that typically when people are

12  pepper-sprayed, they have an immediate reaction of just

13  stopping and starting to rub their eyes?

14          MR. SMITH:  I'll object as to the form.

15          Go ahead, Deputy Martinez.

16          THE WITNESS:  Yes, sir.

17  BY MR. SINCICH:

18     Q.   And you said you had belt recorder on?

19     A.   Yes, sir.

20     Q.   And your belt recorder essentially recorded the

21  audio of the entire incident?

22     A.   Yes, sir.

23     Q.   At the time of the incident did San Bernardino have

24  body cameras available to deputies?

25     A.   No, sir.

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Michael Martinez on 02/12/2024

Page 79

1      A.   Yes, sir.

2      Q.   What kind of sights did you have on your weapon?

3      A.   Just the regular sights that come with the weapon.

4      Q.   Are those otherwise known as iron sights?

5      A.   Yes, sir.

6      Q.   So you didn't have like a red dot sight attachment

7   on top of your pistol?

8      A.   No, sir.

9      Q.   Did you have, for instance, a laser that sometimes

10  attach at the bottom of a receiver?

11     A.   No, sir.

12     Q.   Do your iron sights have, for instance, the glowing

13  green dots that are sometimes referred to as night sights?

14     A.   Yes, sir.

15     Q.   Do those help you shoot more accurately?

16     A.   At night, yes.

17     Q.   Do you utilize those during the day?

18     A.   I utilize the iron sights, sir.

19     Q.   Who is your immediate supervisor on the scene of the

20  incident?

21     A.   Sergeant LeFever.

22     Q.   Was Sergeant LeFever in charge of creating a

23  tactical plan?

24     A.   Yes, sir.

25     Q.   Did Sergeant LeFever ever communicate a tactical

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Michael Martinez on 02/12/2024

Page 80

1   plan to you?

2       A.   No, sir.  I was engaging with Anthony.

3       Q.   And when you say Anthony, you mean the decedent,

4   Anthony Nunez?

5       A.   The suspect, yes.

6       Q.   I want to ask you about some of the information you

7   knew about Anthony Nunez during the incident.

8            At some point in time during the day, you got a call

9   that you responded to; is that correct?

10      A.   Yes, sir.

11      Q.   Was it essentially a call from dispatch?

12      A.   Yes, sir.

13      Q.   What information did you have from dispatch about

14   the incident?

15      A.   That there was a female calling, female caller

16   stating that her brother-in-law was beating up her husband.

17      Q.   Anything else?

18      A.   The call also stated that he was possibly under the

19   influence.  There was possibly guns registered to the mom at

20   the house.

21      Q.   Did you ever see a gun at any point in time inside

22   the house?

23      A.   I never went in the house, sir.

24      Q.   Did you ever look inside the house?

25      A.   No, sir.

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Michael Martinez on 02/12/2024

Page 81

1    Q.   At some point in time when you first got there,

2    Mr. Nunez was inside the house; correct?

3    A.   The front doorway.

4    Q.   Right.  He was inside the house?

5    A.   Yes, sir.

6    Q.   And you were looking at him inside the house?

7    A.   That's correct, sir.

8    Q.   Did you see any gun inside the house at that time?

9    A.   From the immediate location where he was at, there

10   was only -- I couldn't see anything.

11        There was just a wall behind him.

12   Q.   Is it fair to say that you never saw a gun inside

13   the house?

14   A.   Yes.

15   Q.   Did you ever see any knives anywhere around

16   Mr. Nunez at any point in time during the incident?

17   A.   No, sir.

18   Q.   Did you ever see any guns anywhere around Mr. Nunez

19   at any point in time during the incident?

20   A.   No, sir.

21   Q.   Did you ever see any kind of bulge or anything that

22   you thought might look like a weapon inside Mr. Nunez's

23   pockets or waistband?

24   A.   No, sir.

25   Q.   It's my understanding that he was not wearing a

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Michael Martinez on 02/12/2024

Page 82

1  shirt at the time; is that fair?

2      A.  Yes, sir.

3      Q.  And when you had this information that he was

4  possibly under the influence, did the call say possibly under

5  the influence of what?

6      A.  I don't recall.  I don't believe it did say what.

7      Q.  So to your understanding, it could have been drugs

8  or it could have been alcohol?

9      A.  Initially, yeah.

10     Q.  Did you ever learn anything else about whether or

11 not he was possibly under the influence of either drugs or

12 alcohol?

13     A.  In route to the call, sir?

14     Q.  Is that when you learned some new information?

15     A.  No, sir.  Are you asking any other information in

16 route to the call; is that what you're asking?

17     Q.  What I'm wondering is, if at any point in time

18 during the incident prior to the use of deadly force, did you

19 learn any specific information as to whether or not he was

20 under the influence of either drugs or alcohol?

21     A.  Based on my training and experience, it appeared

22 that he was under influence of some kind of controlled

23 substance.

24     Q.  But no one ever told you whether or not he used

25 drugs or whether or not he used alcohol?

**ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Michael Martinez on 02/12/2024**

Page 83

```
1      A.   Yeah.  I don't recall if the call specifically said

2   drugs or alcohol.

3      Q.   Okay.

4      A.   It may have and may not have.

5           I would have to look at it.

6      Q.   Okay.  Did you ever have any information that the

7   decedent's brother was injured in any way prior to your use

8   of deadly force?

9      A.   No, sir.

10     Q.   And you met the brother at one point when you first

11  arrived; is that fair?

12     A.   Yes, sir.

13     Q.   And at that point in time he spoke with you?

14     A.   Briefly, yes.

15     Q.   You asked him if he was okay?

16     A.   Yes, sir.

17     Q.   He said he was?

18     A.   Yes, sir.

19     Q.   Did he mention that he was hurt or injured at all?

20     A.   I believe I just recall I asked him if he was okay.

21          I didn't get any further details.

22     Q.   Did you ask him if he, for instance, used drugs that

23  day?

24     A.   No.  I don't believe I did, sir.

25     Q.   Did you ask him if he beat him up?
```

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Michael Martinez on 02/12/2024

Page 84

1       A.   I don't believe so, sir.

2       Q.   When you saw the brother he was in the window;

3   correct?

4       A.   Yes, sir.

5       Q.   When you first saw him?

6       A.   Yes, sir.

7       Q.   And when you first saw him, did he appear to be

8   bleeding or injured?

9       A.   I didn't see any bleeding, sir.

10      Q.   Is it fair to say prior to your use of deadly force,

11  you had no information that Mr. Nunez ever physically harmed

12  anybody?

13           MR. SMITH:  I'm going to object to the form of the

14  question.

15           But go ahead, Deputy Martinez.

16           THE WITNESS:  Only the information I was provided

17  prior to arriving on-scene, sir.

18  BY MR. SINCICH:

19      Q.   Right.  But you were there also for about an hour

20  and a half before you used deadly force; right?

21      A.   Yes, sir.

22      Q.   And so during that time frame did you ever learn

23  that Mr. Nunez ever physically harmed anybody?

24      A.   No, sir.

25      Q.   Did you ever learn that Mr. Nunez ever punched or

**ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Michael Martinez on 02/12/2024**

Page 85

1    kicked anybody?

2        A.    No, sir.

3        Q.    Did Mr. Nunez ever punch or kick any deputy?

4        A.    No, sir.

5        Q.    Did Mr. Nunez ever attempt to punch or kick any

6    deputy?

7        A.    No, sir.

8        Q.    Did Mr. Nunez ever grab any deputy?

9        A.    No, sir.

10       Q.    Did Mr. Nunez ever attempt to grab any deputy?

11       A.    No, sir.

12       Q.    Did Mr. Nunez ever harm or injure any deputy?

13       A.    Did you say attempt or harm?

14       Q.    Did he ever harm or injure any deputy?

15       A.    No, sir.

16       Q.    Did you ever see Mr. Nunez use drugs?

17       A.    No, sir.

18       Q.    Did you ever see any drug paraphernalia on

19   Mr. Nunez's body prior to your use of deadly force?

20       A.    No, sir.

21       Q.    Did you see any kind of drug paraphernalia anywhere

22   around Mr. Nunez at any point in time prior to your use of

23   deadly force?

24       A.    No, sir.

25       Q.    And you said that you saw certain signs or symptoms

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Michael Martinez on 02/12/2024

Page 87

1      Q.   Okay.  Based on your training and experience, do

2   people who are under influence of alcohol also sweat?

3      A.   Yes, sir.

4      Q.   Do people under the influence of alcohol also have

5   rapid speech based on your training?

6      A.   It's possible.

7      Q.   And you said he was not making sense?

8      A.   That's correct.

9      Q.   Is it also possible that people are under the

10   influence of alcohol have speech patterns that don't make

11   sense?

12      A.   Yes, sir.

13      Q.   Did you also have information that Mr. Nunez had not

14   slept in almost three days?

15           MR. SMITH:  I'll object to the form of the question.

16           Go ahead, Deputy Martinez.

17           THE WITNESS:  I believe in initial information it

18   did say that he had been up.  I don't remember the exact time

19   frame, but yes, that he had been up, I believe.

20   BY MR. SINCICH:

21      Q.   Do you have any kind of training or experience on

22   what could happen to a person when they don't get sleep for

23   several days?

24      A.   Yes, sir.

25      Q.   What is the training and experience, to your

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Michael Martinez on 02/12/2024

Page 88

 1   knowledge?

 2       A.   Become delusional, see and hear things that are not

 3   there, things of that nature.

 4       Q.   Is it fair to say that when a person is up for

 5   several days without sleeping, they kind of exhibit signs of

 6   mental illness?

 7            MR. SMITH:   I'm going to object to the form of the

 8   question.

 9            But go ahead, Deputy.

10            THE WITNESS:   It's possible, sir.

11   BY MR. SINCICH:

12       Q.   Is it possible that the reason why he had rapid

13   speech and was not making sense was because he was up for

14   several days without sleeping?

15       A.   It's possible, sir.

16       Q.   And when you say movements with his head, what did

17   you mean by that?

18       A.   Just like a weird tick, like a back and forth like

19   kind of a sway or not a normal head movement if that makes

20   sense.

21       Q.   Did you know whether or not he had ever been

22   diagnosed with Tourette's or anything like that?

23       A.   No, sir.

24       Q.   Based on your training and experience, do you

25   understand that sometime people have ticks?

**ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Michael Martinez on 02/12/2024**

Page 89

```
 1      A.   Yes, sir.

 2      Q.   But you didn't know if he had any of that?

 3      A.   No, sir.

 4      Q.   Did you ever see his eyes dilated?

 5      A.   I couldn't tell from the distance that we were at,

 6  sir.

 7      Q.   Did you ever see him like foaming at the mouth or

 8  anything like that?

 9      A.   I don't believe so.

10      Q.   Earlier, you gave me the reasons why you used deadly

11  force.

12           Do you recall that?

13      A.   Yes, sir.

14      Q.   Is it fair to say that you didn't use deadly force

15  because you thought he used drugs that day?

16      A.   I did not use deadly force because I thought he used

17  drugs?

18      Q.   Correct.

19      A.   Correct.

20      Q.   Did you know anything about whether or not he had a

21  history of using drugs?

22      A.   I did not, sir.

23      Q.   Did you know anything about whether he had a

24  criminal history?

25      A.   I did not, sir.
```

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Michael Martinez on 02/12/2024

Page 90

1     Q.   Did you know whether or not he had ever been

2  arrested before?

3     A.   No, sir.

4     Q.   Did you know whether or not he had ever been

5  affiliated with a gang?

6     A.   No, sir.

7     Q.   Did you know anything about his personal or family

8  history?

9     A.   No, sir.

10     Q.   Had you ever met Mr. Nunez prior to the day of the

11  incident?

12     A.   No, sir.

13     Q.   What about anybody that lived in the house?

14     A.   I don't believe so, sir.

15     Q.   Had you ever responded to that house on a call prior

16  to this incident?

17     A.   No, sir.

18     Q.   Okay.  Prior to use of deadly force, did you ever

19  hear Mr. Nunez verbally threaten any civilians?

20     A.   I don't believe so, sir.

21     Q.   What about any of his family members?

22     A.   I don't believe so, sir.

23     Q.   Did you ever see Mr. Nunez try to go into a room

24  where one of his family members were before he had went

25  outside?

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Michael Martinez on 02/12/2024

Page 92

```
 1            But go ahead, Deputy Martinez.

 2            THE WITNESS:  Do something as far as what, sir?

 3   BY MR. SINCICH:

 4       Q.   If you have any training on whether there is certain

 5   tactics or techniques or procedures you're supposed to employ

 6   when interacting with a person who you suspect could

 7   potentially have a mental illness or a mental health

 8   crisis?

 9       A.   Yes, sir.

10       Q.   And what is that training?

11       A.   Communication, try to gain rapport.

12       Q.   Were you essentially trained to try to de-escalate

13   the situation as opposed to escalating it?

14       A.   Yes, sir.

15       Q.   Are deputies trained to use communication to

16   effectively a subject into custody without resorting to

17   deadly force?

18       A.   Yes, sir.

19       Q.   Are deputies trained to utilize less-lethal methods

20   prior to utilizing deadly force?

21       A.   Yes, sir.

22       Q.   Is it your training that you should exhaust all of

23   your less intrusive options prior to escalating to deadly

24   force?

25       A.   Depending on the situation, sir.
```

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Michael Martinez on 02/12/2024

Page 93

1    Q.   If feasible?

2    A.   Correct.  Yes, sir.

3    Q.   Is it your training that you should give a verbal

4    warning prior to using deadly force when feasible?

5    A.   Yes, sir.

6    Q.   Is it part of the training that you should give an

7    opportunity for the subject to comply with a warning after a

8    warning is given?

9    A.   Yes, sir.

10   Q.   Are you trained that deputies should give commands

11   prior to using deadly force?

12   A.   Yes, sir.

13   Q.   And trained to allow time for the subject an

14   opportunity to comply with those commands?

15   A.   Depending on the situation, sir.

16   Q.   Right.  When feasible?

17   A.   Yes, sir.

18   Q.   And does that apply to all types of force, the

19   warnings and the commands, even non-lethal force?

20   A.   Depending on the situation, sir.

21   Q.   So the training that an officer should give commands

22   and warnings, does that also apply to less-lethal force?

23   A.   Yes, sir.

24   Q.   Did you receive training that deadly force is the

25   highest level of force an officer can use?

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Michael Martinez on 02/12/2024

Page 94

1      A.   Yes, sir.

2      Q.   That it should only be used in limited

3  circumstances?

4      A.   Yes, sir.

5      Q.   And I think we covered it, but there has to be an

6  immediate threat of death or serious bodily injury?

7      A.   Yes, sir.

8      Q.   And kind of the flip of that is that if there is not

9  an immediate threat of death or serious bodily injury,

10  according to the training, officers should not use deadly

11  force?

12      A.   Depending on the situation, sir.

13      Q.   Is there ever a situation based on your training

14  where the subject is not an immediate threat of death or

15  serious bodily injury where it's okay to use deadly force?

16      A.   Not worded like that, no, sir.

17      Q.   So is it fair to say that if the subject is not an

18  immediate threat of death of death or serious bodily injury,

19  it would be a violation of training and policy, at least, to

20  use deadly force?

21      A.   Yes, sir.

22      Q.   Does the department give deputies training in

23  reverence for human life?

24          MR. SMITH:  I'm going to object to the form of the

25  question.

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Michael Martinez on 02/12/2024

Page 97

1    Q.   So maybe another word that can be used is like

2  having respect for human life.

3    A.   Yes.  We have training on that, sir.

4    Q.   Is part of the training to respect human life, does

5  that go back to some of the training where you should utilize

6  less-lethal force and de-escalation instead of deadly

7  force?

8    A.   Yes, sir.

9    Q.   And do you have training that essentially you have

10  the ability to maneuver prior to using deadly force?

11    A.   Maneuver as far as how, sir?

12    Q.   Some people call it moving off the "X."

13         Have you ever heard of that?

14    A.   No, sir.

15    Q.   Do you have any training that deputies can shoot and

16  move at the same time?

17    A.   Yes, sir.

18    Q.   And part of that training is so that you can gain

19  distance from the subject; right?

20    A.   Yes, sir.

21    Q.   Do you have any training that deputies, when the

22  space is available, that they should maneuver to gain

23  distance instead of using deadly force?

24    A.   Yes, sir.

25    Q.   Do you have training that tactical maneuvering is

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Michael Martinez on 02/12/2024

Page 98

1   not a retreat?

2       A.   Yes, sir.

3       Q.   And I think some people call it tactical

4   repositioning?

5       A.   Yes, sir.

6       Q.   Can you describe what tactical repositioning is, to

7   your knowledge?

8       A.   So if you're open and you have something you can

9   barricade or a tree or something that you can get cover, you

10  would move to that position.

11      Q.   You would move to those positions of cover as

12  opposed to using deadly force?

13      A.   Depending on the situation, sir.

14      Q.   So --

15      A.   You have to give me a detailed situation to where

16  how I would respond to moving to cover.

17           It all depends on the situation, sir.

18      Q.   I'm just wondering what your training is with regard

19  to tactical reposition.

20      A.   It depends.  Every situations is different, sir.

21      Q.   Is that what they tell you at training; is that

22  every situation's different?

23      A.   Specifically, every situation can be different.

24      Q.   Sure.  What do they tell you in training as to what

25  tactical repositioning is?

**ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Michael Martinez on 02/12/2024**

```
 1   question.

 2            Sorry to interrupt.  Go ahead, Deputy.

 3            THE WITNESS:  Depending on the situation, sir.

 4   BY MR. SINCICH:

 5       Q.   So if the situation is one in which the deputy had

 6   space to maneuver to tactically reposition?

 7       A.   Depending on the situation, sir.

 8       Q.   Say it again?

 9       A.   Depending on the situation.

10       Q.   What does it depend on?

11       A.   The situation, sir.

12       Q.   What about the situation is dependent, what facts?

13       A.   The circumstance of the call or whatever the case

14   may be.

15       Q.   What if we had all the same information as what is

16   related to this call, would it be consistent with department

17   training for a deputy to reposition to create distance

18   between the deputy and the subject?

19            MR. SMITH:  I'll object to the form of the question.

20            But go ahead, Deputy Martinez.

21            THE WITNESS:  Yes, sir.

22   BY MR. SINCICH:

23       Q.   Had you ever heard of the training equation that

24   distance plus cover equals time?

25       A.   Specifically worded that way, not sure.
```

**ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Michael Martinez on 02/12/2024**

Page 101

1          But yeah, in training there's -- it had been

2   taught.

3     Q.   Something to the effect that distance plus cover

4   equals time?

5     A.   Yes, sir.

6     Q.   And that when you have time, you have more

7   options?

8     A.   Yes, sir.

9     Q.   During this incident was there anything that you

10  could have achieved cover with?

11    A.   Based on the circumstance, I don't believe so,

12  sir.

13    Q.   Well, for instance, earlier you gave an example of a

14  tree.

15         Do you recall that example you gave?

16    A.   Yes.

17    Q.   And you used deadly force in the front yard;

18  right?

19    A.   Yes, sir.

20    Q.   Was there any trees anywhere around you at the time

21  you used deadly force?

22    A.   I don't believe so, sir.

23    Q.   Were there any vehicles around you at the time you

24  use deadly force?

25    A.   In front of me, yes, sir.

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Michael Martinez on 02/12/2024

Page 103

1   towards you, he was walking along the north side of the

2   vehicles to his east or to the east?

3       A.   Yes, sir.

4       Q.   And so it's your recollection that you were five

5   feet to the north of the vehicle?

6       A.   Approximately.  I believe so.

7       Q.   And how many feet east were you of that vehicle when

8   you fired your first shot?

9       A.   Maybe a foot or two, I believe, to my best

10  recollection.

11      Q.   And at the time that you fired your first shot, you

12  said Mr. Nunez was to the north of the vehicle?

13      A.   Yes, sir.

14      Q.   Was he east or west to the vehicle's front bumper?

15      A.   I believe east, sir.

16      Q.   How far east from the front bumper was Mr. Nunez

17  when you fired your first shot?

18      A.   I belive 15 feet approximately, I believe.

19      Q.   He was 15 feet east of the vehicle's front bumper?

20      A.   I'm sorry, no, no.  I'm sorry.  A couple feet.

21      Q.   When you say a couple, what do you mean?

22      A.   Two feet, approximately.

23      Q.   So he was approximately near the front right tire of

24  that vehicle?

25      A.   To my recollection somewhere right there, yes.

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Michael Martinez on 02/12/2024

Page 105

1   shot in relation to that vehicle?

2        A.    I believe at the passenger side front door.

3        Q.    And what about the third shot?

4        A.    Just a little bit in front of that or a little bit

5   more east of that.

6        Q.    How much distance did Mr. Nunez cover in between his

7   first and second shot?

8        A.    I don't know.  I don't recall, sir.

9        Q.    Can you give me an approximate distance?

10       A.    One or two feet.

11       Q.    And then how many feet did Mr. Nunez cover between

12   the second and the third shot?

13       A.    Another one or two feet, I believe.

14       Q.    And then you said I believe earlier that he moved an

15   additional some distance after the third shot before he fell

16   to the ground?

17       A.    Yes, sir.

18       Q.    Do you recall that distance?

19       A.    I do not.

20       Q.    Okay.  Was it possible for you to maneuver to the

21   south while Mr. Nunez was on the north side of the vehicle?

22       A.    Yes, it was possible.

23       Q.    And if you maneuvered to the south prior to using

24   deadly force, is it fair to say that the vehicle would have

25   given you cover?

**ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Michael Martinez on 02/12/2024**

Page 107

```
 1              MR. SINCICH:  What about you, Jinna, is that okay?

 2              COURT REPORTER:  Yes.  Five minutes is fine.

 3              (Recess taken.)

 4   BY MR. SINCICH:

 5      Q.   All right.  Deputy Martinez, do you understand

 6   you're still under oath?

 7      A.   Yes, sir.

 8      Q.   So we covered the information that you had prior to

 9   you got on-scene.

10              And the first thing that you did when you walked

11   past the driveway is you saw the brother?

12      A.   In the house, yes, sir.

13      Q.   And you didn't have -- you had a conversation with

14   him for a brief time?

15      A.   Yes, sir.

16      Q.   Is it fair to say that you didn't learn anything new

17   about Mr. Nunez in that conversation?

18      A.   Yes, sir --

19              MR. SMITH:  I'll object to the form of the question.

20              But go ahead.  Sorry to interrupt.

21              THE WITNESS:  Sorry about that, Brett.

22   BY MR. SINCICH:

23      Q.   Essentially, you're at the front and knocked?

24      A.   Yes, sir.

25      Q.   And then no one answered the door; correct?
```

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Michael Martinez on 02/12/2024

1     A.   No, sir.

2     Q.   So then you went back to the brother's window?

3     A.   Yes, sir.

4     Q.   Did you ask the brother to open the door?

5     A.   Yes, sir.

6     Q.   At the time that you asked the brother to open the

7  door, did you understand that Mr. Nunez was in the area

8  behind the closed front door?

9     A.   No, sir.

10     Q.   You heard a person talking to themselves; right?

11     A.   I heard some kind of knocking or something hit

12  the -- from the interior of the front door.

13     Q.   And then Deputy Campos said that he thought somebody

14  was talking to themselves behind the front door?

15     A.   Yes.  I believe so.

16     Q.   Did you believe that that was potentially Mr. Nunez,

17  the subject of the call?

18     A.   I had no idea at that time, sir.

19     Q.   Did that go through your mind, that that could have

20  been the decedent, Mr. Nunez?

21     A.   Possibly.

22     Q.   And then you asked his brother to go open the door;

23  right?

24     A.   I don't recall if I said if you could open the door

25  or if he was okay with opening the door.

**ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Michael Martinez on 02/12/2024**

Page 109

```
 1            I don't verbatim recall how I asked him, but I did

 2   ask him to open the front door.

 3       Q.   Is it fair to say the brother felt comfortable

 4   enough to go open the front door despite Mr. Nunez being over

 5   there?

 6       A.   Yes, sir.

 7       Q.   And then after his brother opened the door, did you

 8   ask the brother to step outside?

 9       A.   No.  He immediately went back to the north side.

10            I believe the bedroom that I initially contacted him

11   at or his -- I believe his wife was at.

12       Q.   And at some point in time all of the people inside

13   the house were evacuated; right?

14       A.   To my knowledge, that was all through radio

15   communication that I was advised of that.

16       Q.   How long after the brother first opened the front

17   door to the time that all of the people inside the house were

18   evacuated?

19       A.   I'm not -- I'm not sure, sir.  I don't know.

20       Q.   Approximately how long?

21       A.   I don't even have an approximate for you, sir.

22       Q.   At some point in time did you want Mr. Nunez to drop

23   the chain?

24       A.   Yes, sir.

25       Q.   And when he was inside that front door area, did
```

**ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Michael Martinez on 02/12/2024**

1    Mr. Nunez at one point put the chain down?

2        A.   He laid it on top of his right shoe, yes.

3        Q.   After he laid it down on his right shoe, did he

4    stand back up?

5        A.   He just leaned forward.  It wasn't even really a the

6    bend knee type put it down.

7             Does that make sense?

8        Q.   Right.  He just kind of dropped it on the right

9    foot?

10       A.   Yes.

11       Q.   His hands were empty?

12       A.   Yes, sir.

13       Q.   Did you see that as an act of compliance?

14       A.   Yes.

15       Q.   And during the time that he was inside the house,

16   you wanted to actually get him outside the house; right?

17       A.   Yes, sir.

18       Q.   Why did you want him out of the house?

19       A.   Like I said, behind initially where he was standing

20   at, I didn't know what was to the left, just the right of

21   him.  I didn't know if there could have been another weapon,

22   or I was blinded to the north and east and side -- I'm

23   sorry -- north and south side of the entrance of the

24   location.

25       Q.   When he put the chain down when he was still inside

**ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Michael Martinez on 02/12/2024**

Page 115

```
 1      Q.   And when he went outside did you view that as an act

 2   of compliance?

 3      A.   No, sir, because he still had the chain in his

 4   hand.

 5      Q.   What about -- did you give him commands to go

 6   outside?

 7      A.   The first command was to drop the chain and then go

 8   outside.

 9      Q.   Right.  But you wanted him to come outside; right?

10      A.   Yes, sir.

11      Q.   And so when he went outside, was that at least

12   partial compliance with your commands?

13           MR. SMITH:  I'm going to object to the form of the

14   question.

15           Go ahead, Deputy Martinez.

16           THE WITNESS:  Yes, sir.

17   BY MR. SINCICH:

18      Q.   When he first came outside, is that when you were

19   about 15 feet away from the front door to the east?

20      A.   Yes.  I believe so, sir.

21      Q.   When he came outside did he run, attack, or lunge at

22   any of the deputies?

23      A.   He went towards the south side of the residence in

24   front of the two vehicles that were parked east of the front

25   door.
```

**ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Michael Martinez on 02/12/2024**

 1    A.   East.

 2    Q.   So after Mr. Nunez walked away from the deputies,

 3  did he stop at some point?

 4    A.   Yeah.  He stopped and helicoptered the chain over

 5  his head.

 6    Q.   And how far was he when he helicoptered the chain

 7  over his head?

 8    A.   Away from the deputies, myself?

 9         Who are we talking about?

10    Q.   Away from the closest deputy.

11    A.   30 feet, probably.

12    Q.   And you didn't use deadly force at that time;

13  correct?

14    A.   No, sir.

15    Q.   Is it fair to say that because he was 30 feet away,

16  even though he was helicoptering the chain over his head, he

17  wasn't about to harm or kill anybody?

18    A.   No.  I can't say that, sir.  I can't say that he

19  wasn't going to hurt anybody, no.

20    Q.   Did he, in fact, hurt anybody?

21    A.   No.

22    Q.   When he was swinging the chain over his head, was

23  any deputy in range of being hit by that chain, if we assume

24  it's ten feet based off of your estimate?

25    A.   Nobody was struck, sir.

**ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Michael Martinez on 02/12/2024**

Page 118

1    Q.   But was anybody even within range of being struck?

2         MR. SMITH:  I'll object to the form of the question.

3         But go ahead, Deputy.

4         THE WITNESS:  No, sir.

5   BY MR. SINCICH:

6    Q.   So for instance, if the chain is only ten feet

7   long --

8    A.   And that's an estimate, sir.  I don't know what the

9   exact measurement of the chain was.

10   Q.   Right.  I'll pull up an image and I think we have

11  the exact measurement.

12        But is it fair to say that if the chain is ten feet

13  long, and you're over ten feet away from Mr. Nunez, then you

14  were not going to be hit by the chain if swung at you?

15        MR. SMITH:  I'll object to the form of the question.

16        But go ahead, Deputy.

17        THE WITNESS:  Standing still I would say yes.

18        That being said, given the opportunity to walk

19  forward or sudden movement.

20  BY MR. SINCICH:

21   Q.   Right.  So if you and Mr. Nunez were standing still,

22  and he was over ten feet away swinging the chain, is it fair

23  to say that over ten feet away, you wouldn't be struck by the

24  chain?

25   A.   Standing still, yes.

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Michael Martinez on 02/12/2024

Page 122

1   approximately 30 feet from the deputy swinging the chain?

2      A.   I would say another 20 to 30 minutes, sir.

3           Swinging the chain, or just outside?  I'm sorry.

4      Q.   When he was swinging the chain, how long was he

5   swinging the chain?

6      A.   I don't recall.

7      Q.   Was it a matter of minutes or seconds?

8      A.   I don't recall, sir.

9      Q.   Okay.  How long was he in the area where he was

10  swinging the chain prior to walking back north towards the

11  front door of the residence?

12     A.   Approximately I believe 20 to 30 minutes.

13     Q.   And in that 20 to 30 minutes time frame, was it your

14  understanding that deputies had evacuated civilians from the

15  neighboring homes?

16     A.   I believe I did hear it via the radio

17  communication.

18     Q.   And it's your understanding that there was other

19  deputies around that were helping to cordon off the area?

20     A.   I believe so, sir.

21     Q.   Okay.  And then after that 20 or 30 minutes, he

22  started walking north up towards the front door of the

23  house?

24     A.   Yes, sir.

25     Q.   Did you change position as he started walking

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Michael Martinez on 02/12/2024

Page 125

1          (Exhibit 2 was marked for identification.)

2    BY MR. SINCICH:

3      Q.   Do you recognize this to be the tail end of the

4    chain?

5      A.   I had never seen it that close, sir.

6      Q.   Okay.  I'll represent to you that this was produced

7    to us as images of the chain produced in discovery.

8           Do you see how the tape measure essentially is

9    showing how long the chain is down to the end?

10     A.   Yes, sir.

11     Q.   If this is accurate, is it fair to say that with the

12   chain extended all the way out, it's approximately seven feet

13   and three inches?

14     A.   Yes, sir.

15     Q.   Is it fair to say that if he is holding the chain,

16   and he has the chain wrapped around his hand either one or

17   two times, that the chain would be a little less than seven

18   feet, maybe even only six feet in terms of the amount of

19   length left after it's wrapped around his hand?

20     A.   Yes, sir.

21          MR. SMITH:  I'll interpose my objection to the form

22   of the question.

23          But go ahead.  You've already answered.

24          MR. SINCICH:  And those would be Exhibit 1 and 2,

25   those two images of the chain.

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Michael Martinez on 02/12/2024

Page 128

1    Q.   Okay.  Something around this area is where -- is

2  where he was when he swung the chain and hit the car?

3    A.   I believe so.

4    Q.   Okay.  I'm going to mark this as -- I'll mark this

5  as 3 -- well, I'll just mark it as 4.

6         (Exhibit 4 was marked for identification.)

7         MR. SMITH:  Just for clarification, three would be

8  the untouched image, the --

9         MR. SINCICH:  -- right --

10        MR. SMITH:  -- 36.  I think I saw it on there.

11        MR. SINCICH:  The Bates number for this one is 1136.

12        MR. SMITH:  And then 4 would be with the circle

13  affixed --

14        MR. SINCICH:  4 would with the circle affixed.

15        MR. SMITH:  Okay.  Thank you.

16  BY MR. SINCICH:

17    Q.   And what area of the car did he strike -- strike

18  that.

19        Which car did he strike with the chain?

20    A.   I don't recall if it was the gray or the red car.

21        I don't -- I'm not sure.

22    Q.   Where were you standing at the time that he struck

23  that you heard the chain strike the car?

24    A.   I was following him south.  So I was standing on the

25  other side of the gray and the red car on the east side.

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Michael Martinez on 02/12/2024

Page 130

1       Q.    That's what I'm wondering.  How about I ask that.

2             Is that Mr. Nunez's blood that's near the front

3    passenger door?

4             MR. SMITH:  I'll object to the form of the question.

5             But go ahead, Deputy Martinez.

6             THE WITNESS:  I believe so.

7    BY MR. SINCICH:

8       Q.   Is it fair to say that because you're aiming at his

9    upper thoracic area, that's where your shots generally

10   speaking would have impacted him?

11      A.   Yes.

12      Q.   So his feet would have been closer to where the

13   concrete is, the direction of the concrete if that's where

14   his blood was, and then his head would have been more to the

15   east?

16      A.   I'm sorry.  If what, sir?

17      Q.   If this is his blood, when he was down on the ground

18   when he first fell down to the ground, would his feet be more

19   to the west in the direction of where the concrete is?

20      A.   Yes.

21      Q.   I'll mark this as 7, 1219, that's the Bates number.

22           (Exhibit 7 was marked for identification.)

23   BY MR. SINCICH:

24      Q.   Is this the front of the house?

25      A.   I believe so.

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Michael Martinez on 02/12/2024

Page 139

1   and make it green.  I'm going to take the second shot and

2   make it blue.

3            Is this accurate approximations of where you were

4   standing at the time of your three shots?

5       A.   I believe so, yes.  That's an estimate, yes.

6       Q.   So that's going to be Exhibit 11 with the marked

7   circles.

8            (Exhibit 11 was marked for identification.)

9   BY MR. SINCICH:

10      Q.   I'm going to mark as Exhibit 12 what is 1218 Bates

11  number.

12           (Exhibit 12 was marked for identification.)

13  BY MR. SINCICH:

14      Q.   In this image can you tell where Mr. Nunez was when

15  you fired your first shot?

16      A.   By the concrete back there.

17      Q.   And you were standing as you described before in

18  between the two shadows, but east of the bumper kind of where

19  his feet were?

20      A.   Approximately, yes, sir.

21      Q.   And where were the other officers when you were in

22  that position?  You said to your south; right?

23           To your left?

24      A.   Yes.

25      Q.   Was it possible, for instance, was there anything

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Michael Martinez on 02/12/2024

Page 140

1  blocking you from maneuvering to the south around the gray

2  vehicle prior to your first shot?

3      A.   I don't believe so, sir.

4      Q.   Was it an option to move to the north around the red

5  vehicle prior to your first shot?

6      A.   I believe it may have been an option.

7      Q.   And if you move directly to your south while

8  Mr. Nunez was over by the concrete, would that have put the

9  vehicle in between you and Mr. Nunez?

10     A.   Yes.

11     Q.   And would that have increased the distance between

12 you and Mr. Nunez?

13     A.   I don't know if it would have increased the

14 distance.  I'm not sure.

15     Q.   If you moved directly to your south while he was

16 over by the concrete?

17     A.   Yes.

18     Q.   And if you maneuvered to your north, would that then

19 put the red vehicle in between you and Mr. Nunez?

20     A.   Yes.

21     Q.   And would that also increase the distance between

22 you and Mr. Nunez?

23     A.   Yes.

24     Q.   I'm going to mark as Exhibit 13 what is Bates number

25 1419.