Exhibit 2

**ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Jonathan Campos on 03/18/2024**

```
 1              UNITED STATES DISTRICT COURT

 2            CENTRAL DISTRICT OF CALIFORNIA

 3

 4

 5    ROSA NUNEZ, individually;        )
      ANTHONY NUNEZ, JR.,              )
 6    individually and as             ) Case No.
      successor-in-interest to        ) 5:22-cv-01934-SSS-SPx
 7    Decedent, Anthony Nunez; and,   )
      ANDREW NUNEZ, individually,      )
 8                                     )
              Plaintiffs,              )
 9                                     )
         vs.                           )
10                                     )
      COUNTY OF SAN BERNARDINO;        )
11    CITY OF HESPERIA; MICHAEL        )
      MARTINEZ; SABRINA CERVANTES;     )
12    JEREMY DEBERG; JONATHAN          )
      CAMPOS; and DOES 5 through       )
13    15, inclusive,                   )
                                       )
14            Defendants.              )
                                       )
15

16

17        REMOTE DEPOSITION OF JONATHAN CAMPOS

18             OAK HILLS, CALIFORNIA

19             MONDAY, MARCH 18, 2024

20

21

22

23   STENOGRAPHICALLY REPORTED BY:

24   Patricia L. Davis, RPR
     CSR No. 11521
25
```

Page 27

1    Q   Did you have any specific information regarding
2  what the possible weapons in the house were?
3    A   I believe --
4        MR. CORZANO:  Objection.  Broad as to time.
5        Go ahead.
6        THE WITNESS:  I believe -- sorry.
7  BY MR. LEVINE:
8    Q   I'll just clarify, too, that the question is
9  referring to the period of time prior to your arrival at
10  the location.
11    A   So I believe the dispatch informed there's a
12  possible gun at the house.
13    Q   Prior to arriving, did you hear any reference
14  to a suspect having a chain leash?
15    A   Not that I recall.
16    Q   Did you speak with any other deputies before
17  arriving at the scene --
18    A   No.
19    Q   -- about the call?
20    A   No.
21    Q   Prior to arriving at the location, did you
22  have -- had you ever heard the name Anthony Nunez
23  before?
24    A   No.
25    Q   Did you know at the time whether Anthony Nunez

**ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Jonathan Campos on 03/18/2024**

Page 28

1    had ever been convicted of any crimes?

2        A    I did not.

3        Q    Did you have any specific information that

4    Anthony Nunez was under the influence of drugs that day

5    prior to your arrival?

6        A    Yes.

7        Q    What specific information did you have in that

8    regard?

9        A    The fact that dispatch informed us that he had

10   been awake for days.

11       Q    Anything else?

12       A    That was it.

13       Q    Were you alone in your vehicle when you

14   traveled to the scene?

15       A    Yes.

16       Q    And upon arriving, did you park your vehicle

17   somewhere?

18       A    Yes.

19       Q    Where did you park?

20       A    Directly in front of the house outside the

21   perimeter chain-link fence.

22       Q    Would that be on 9th Avenue?

23       A    Yes.

24       Q    And then upon arriving and parking, did you get

25   out of your vehicle?

**ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Jonathan Campos on 03/18/2024**

Page 29

1      A    Yes.

2      Q    Were any other deputies already on the scene at

3   the time you exited your vehicle?

4      A    No.

5      Q    Did any other deputies arrive shortly after you

6   did?

7      A    Yes.  As I parked my vehicle, I could see

8   Michael Martinez's unit approaching from the north.

9   He's traveling south.  And so I saw him coming, but I

10  got there maybe 30 seconds before he did.

11     Q    Did you wait on the street for Deputy Martinez

12  to arrive before entering the property?

13     A    Yes.

14     Q    Prior to entering the property after Deputy

15  Martinez arrives, did you have any discussion with him

16  regarding what had occurred at the location so far?

17     A    Not so much as a discussion that what occurred,

18  but more like, hey, let's go find out what we have here.

19     Q    Did you have any discussion with him regarding

20  a tactical plan at that time?

21     A    No, at that moment we were just going to see

22  what we had.

23     Q    I think you've already told me about what

24  weapons and equipment you had on your person at the time

25  that you arrived.  Were there any additional weapons or

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Jonathan Campos on 03/18/2024

1   equipment that were in your vehicle?

2       A   Yes.  There's a Mini-14 rifle and a Remington

3   870 shotgun located in the front center console area, I

4   suppose, between the driver's seat and the front

5   passenger's seat, and then in the trunk I had a beanbag

6   shotgun.

7       Q   Was there any additional protective equipment

8   that can be held or worn on your body in the vehicle?

9       A   Yes, I had my riot shield helmet.  It's like a

10  big helmet.

11      Q   You had a shield and a helmet?

12      A   No, just the riot helmet, like a -- with the

13  face shield.

14      Q   Okay.  Did you also have a shield or just a

15  helmet just to clarify?

16      A   Just a helmet.

17      Q   Okay.  Did you at any point consider retrieving

18  the helmet from your vehicle during the incident?

19      A   No.

20      Q   At any point during the incident and before the

21  use of deadly force, did you access any other deputy's

22  vehicle at the scene?

23      A   I'm sorry, you're asking if I accessed any

24  other vehicles?

25      Q   Correct.

**ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Jonathan Campos on 03/18/2024**

Page 31

```
 1       A    No.

 2       Q    Did you ever become aware of any additional

 3   protective equipment being available in other deputies'

 4   vehicles at the scene?

 5       A    I suppose, yes.

 6       Q    What did you become aware of in that regard?

 7       A    Well, not that I became aware of, but I know

 8   that when my sergeant went on scene, the watch

 9   commander, in his vehicle he always carries a lot more

10   gear than everyone else does.

11            And I know the watch commander vehicle has a

12   shield, has a 40 millimeter, you know, beanbag less

13   lethal gun, and it has a pepper ball, like a paintball

14   pepper gun.

15       Q    What was the name of your watch commander who

16   you're referring to?

17       A    Sergeant Corey LaFever.

18       Q    And I think you mentioned earlier that you had

19   a taser on your Sam Browne belt that day; is that

20   correct?

21       A    Yes.

22       Q    Could you briefly describe how that taser

23   operates?

24       A    Yes, it's an X2 taser.  Essentially it almost

25   looks like a toy gun.  It's yellow and black in color.
```

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Jonathan Campos on 03/18/2024

Page 34

```
 1   believe -- I think it was her husband -- were inside the
 2   garage.
 3       Q    Was that window you mentioned facing the
 4   street?
 5       A    Yes.
 6       Q    And, likewise, was that window facing you as
 7   you approached from the driveway?
 8       A    That's correct.
 9       Q    What information did the reporting party
10   provide when you contacted her through the window?
11       A    Well, her husband kind of did all the speaking,
12   but he informed us that his brother hadn't slept in
13   days, acting crazy, and he had a chain and he was in the
14   front living room right inside the front door.
15            He just told us, He's over there.  Be careful,
16   he's got a chain.
17       Q    Did the reporting party or her husband tell you
18   that either of them had any injuries?
19       A    Not at that time, no.
20       Q    Did the reporting party or her husband provide
21   you with any additional details at that point about what
22   had occurred prompting the 911 call?
23       A    No.
24       Q    After speaking with the reporting party and her
25   husband, did you then go to the front door of the house?
```

Page 37

1          So if I had to describe the hallway, it was
2     like a T-intersection, you know.  I walk in the front
3     and you hit a wall and you can go right or left.  And he
4     was right there in that little T corridor.
5          Q    Approximately how far away from the front door
6     was he standing?
7          A    An estimate, about 16 feet.
8          Q    Approximately -- and I think you said there was
9     a sort of T-shaped intersection between the front
10    hallway and the corridor leading to different rooms.
11    Was there a wall at the end of that front hallway where
12    the two paths split off from it?
13         A    Yes.
14         Q    Approximately how far from the front door was
15    that wall?
16         A    I'd say about 16, 18 feet.
17         Q    So was Anthony then at or almost at the wall
18    there at the end of the hallway?
19         A    Yes.  He was in that little section area, yeah.
20         Q    Was Anthony -- what was Anthony wearing, could
21    you tell?
22         A    No shirt, black pants.  I want to say sandals,
23    but I really don't remember if he was wearing shoes or
24    sandals.  I can't remember.
25         Q    Was he wearing a hat?

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Jonathan Campos on 03/18/2024

Page 38

 1      A   I don't recall.

 2      Q   Was he holding anything in either of his hands

 3   when you first saw him in the doorway?

 4      A   Yes.

 5      Q   What was he holding?

 6      A   He was holding a chain.

 7      Q   Could you describe the chain?

 8      A   Yes.  It was a pretty decent size chain.  I'd

 9   say each link was maybe about an inch and a half to

10   2 inches.  And he had it wrapped around -- it looked

11   like it may have had a handle, I don't recall.  But he

12   had it balled up in his right fist and it looked like he

13   had it wrapped around his hand maybe twice.

14          And it was dangled all the way to the floor, so

15   if I had to estimate the length of the chain, I'd say

16   between 6 and 8 feet, maybe a little longer.

17      Q   Did he appear to have a gun on his person?

18      A   No.

19      Q   He wasn't holding a gun in his hands, for

20   example?

21      A   No.

22      Q   Did you at any point while speaking with

23   Anthony observe any kind of bulge in his waistband that

24   you believed indicated he might have a gun in his

25   waistband?

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Jonathan Campos on 03/18/2024

Page 39

```
 1      A   No.

 2      Q   Did you ever learn that Anthony had a gun on

 3   his person?

 4      A   I searched him out after the incident concluded

 5   and I didn't find a gun on him.

 6      Q   Did you and Deputy Martinez begin speaking with

 7   Anthony at the front door while he stood toward the end

 8   of the hallway there?

 9      A   Yes.

10      Q   Upon seeing him standing in the hallway holding

11   the chain, did you draw a weapon of any kind?

12      A   Yes.

13      Q   What weapon did you draw?

14      A   My taser.

15      Q   At that time did Deputy Martinez draw a weapon?

16      A   Yes.

17      Q   What weapon did he draw?

18      A   His duty weapon.  I don't know if he has a

19   Glock 21 or 19, but he drew his weapon.

20      Q   Was there any discussion between you and Deputy

21   Martinez who would be the lethal officer and who would

22   have less lethal?

23      A   No, it just kind of happened instinctively.

24      Q   And while you were holding your taser and

25   Deputy Martinez was holding his duty weapon, did you
```

### ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
#### Jonathan Campos on 03/18/2024

Page 44

```
 1   Anthony that he was the watch commander, he was in
 2   charge, so to speak.  And I think LaFever asked him if
 3   there was anything we could do for him to, you know,
 4   drop the chain and come out peacefully.
 5           From what I can recall, Anthony liked LaFever
 6   and they kind of had, like, a positive, I guess,
 7   conversation, but then it kind of turned where Anthony
 8   went hot and cold and just told LaFever that he didn't
 9   like him at the end.
10           And LaFever ended up kind of stopped talking to
11   him and I -- I was right behind LaFever and I ended up
12   swapping spots with LaFever and I took the position
13   right next to Michael again and Michael and myself just
14   continued to talk to Anthony.
15      Q   At some point during the conversation you and
16   Deputy Martinez were having with Anthony, did Anthony
17   exit the house through the front door?
18      A   Yes.
19      Q   Approximately how long after you first
20   encountered Anthony at the front door did he come
21   outside?
22      A   Well over an hour.  I'd say maybe an hour, 15
23   to -- an hour and 15 minutes.
24      Q   I think you mentioned a moment ago that during
25   your conversation with Anthony, Anthony was hot and
```

**ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
Jonathan Campos on 03/18/2024

Page 45

1   cold?  Was that the term that you used?

2        A   Yes.

3        Q   I think you might have said up and down as

4   well?

5        A   Yes.

6        Q   Could you describe what you mean by that?

7        A   Well, there were moments we felt like we were

8   connecting with him so that he was kind of, you know,

9   agreeing with us and he was no longer screaming or he

10  kind of stopped taking that bladed stance.  And he was,

11  you know, not angry, so to speak.

12        And so we were listening to him tell us his

13  story about wanting to fix the country, he wanted to run

14  for president, and all the things wrong with the

15  country.

16        And then out of nowhere, he'd kind of just turn

17  and say, you know, F you, or whatever, yell at us, and

18  he'd be angry again.

19        So he was very unpredictable.  His behavior was

20  up and down, angry and nice, angry and nice.

21        Q   Prior to exiting the house, did Anthony ever

22  make any reference to being king or maybe that he would

23  in the future be a king?

24        A   Yes.

25        Q   Prior to him exiting the house, did Anthony

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Jonathan Campos on 03/18/2024

Page 46

1    ever discuss any religious subjects with you and Deputy

2    Martinez?

3        A    Yes.

4        Q    Could you give an example of what religious

5    subjects he was discussing with you?

6        A    I believe he prayed.  He said a prayer to God

7    and said that he was going to fight till death.

8             And I think he said something to the effect of,

9    Please, God, accept my soul because I'm going to make

10   these men kill me, something like that.

11       Q    Prior to Anthony exiting the house, did you

12   ever consider that Anthony might be having some kind of

13   mental health episode or mental health crisis?

14       A    No, it didn't cross my mind.

15       Q    When you were at the police academy, did you

16   receive any kind of training identifying subjects who

17   may be experiencing mental health crises?

18            MR. SMITH:  I'll object to the form of the

19   question really quick, Jonathan.

20            Go ahead and answer.

21            THE WITNESS:  Yes, I received a 32-hour crisis

22   intervention team course.

23   BY MR. LEVINE:

24       Q    When Anthony came outside of the house

25   approximately an hour and 15 minutes after you first

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Jonathan Campos on 03/18/2024

Page 47

1   encountered him at the front doorway, was he still

2   holding the chain?

3       A   Yes.

4       Q   At any point prior to Anthony coming outside of

5   the house with the chain, did you receive information

6   including via radio that there was, in fact, no gun

7   inside of the house?

8       A   I received information that there was possibly

9   a gun in the house.

10      Q   Subsequent to receiving information that there

11  was possibly a gun in the house, did you ever receive

12  any kind of update or additional information regarding

13  that possible gun?

14      A   Yes.  I believe after my partners -- I'm not

15  sure who -- someone had spoken to the reporting party

16  and the husband, I believe they relayed there might be a

17  handgun registered to the owner of the house in the

18  corner bedroom.  Or I heard that through radio traffic.

19      Q   After that, did you ever hear via radio any

20  information that there was not a gun inside the house

21  after all or that the gun that was believed to have been

22  inside the house was, in fact, outside of the house

23  somewhere?

24          MR. CORZANO:  Objection.  Compound.

25          Go ahead, Jonathan.

**ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Jonathan Campos on 03/18/2024**

Page 48

1          THE WITNESS:  I think I found out there was no

2    gun found after everything was said and done, like, the

3    following day.

4    BY MR. LEVINE:

5          Q    When Anthony came outside of the house, was

6    your impression -- had your impression of whether he was

7    armed with a handgun changed?

8          A    No, because I never actually saw a bulge to

9    begin with or any, like, imprinting around his

10   waistband.  So I never believed he had a gun.  I was

11   more focused on the chain, if anything.

12         Q    You never saw Anthony arm himself with a

13   firearm?

14         A    No.  My only concern was that if there was a

15   gun, it was in the corner bedroom and that he would run

16   and beat us to it.

17         MR. LEVINE:  I see we're at one minute shy of

18   11:30.  Would now be a good time to take a short break?

19         MR. SMITH:  Yeah.  I think we can go off the

20   record.

21         MR. LEVINE:  Let's go off the record then.

22         (Break taken from 11:30 a.m. to 11:37 a.m.)

23         MR. LEVINE:  Let's go back on the record.

24   BY MR. LEVINE:

25         Q    At some point before Anthony came outside the

**ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Jonathan Campos on 03/18/2024**

1      A   Yes, a sliding glass window.

2      Q   At some point before Anthony exited the house

3  did you become aware that all of the other occupants of

4  the house had been evacuated?

5      A   Yes, I -- I'm not sure again who, but somebody

6  stated, Hey, all the family members are out of the

7  house.

8      Q   So just to clarify then, at the time Anthony

9  came out from the house, was your understanding that he

10  was the only one inside the house?

11      A   Yes.  Anthony knew that as well.  It aggravated

12  him.

13      Q   How did Anthony become aware that nobody else

14  was in the house with him?

15      A   He kind of took a sidestep toward the living

16  room and kind of peeked down the hallway, and then he

17  did the same with the opposite direction.  And I think

18  he even called for one of his family members and

19  received no answer, and at that point I think he

20  realized the house was evacuated.

21      Q   Just a moment here.  I'm going to show a photo.

22  One moment.  Let me pull it up.

23          I am sharing my screen.  Can you see an image

24  on the screen?

25      A   Yes.

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Jonathan Campos on 03/18/2024

Page 54

1      Q    At the time Anthony came outside the house from

2   the front door, were you and Deputy Martinez still

3   standing on that concrete front porch that we discussed

4   a moment ago?

5      A    Yes.

6      Q    Did you move away from the concrete front porch

7   to give Anthony space as he exited the house?

8      A    Yes.  So he moved toward us rather quickly, so

9   both myself and Michael backpedaled.  I went between

10  both of those vehicles that you saw in the pictures in

11  the middle.

12         I'm not sure what direction Michael went, but I

13  believe he went back toward the driveway.  But I know

14  when I backpedaled, I was in between those vehicles.

15     Q    I'm going to share my screen again, and this is

16  the first image I showed, which has already been marked

17  as Exhibit A.

18         Are you able to identify the position that you

19  took after backing away from Anthony through the

20  vehicles as Anthony was coming outside?

21     A    Yes.  So from what I recall, when he came

22  outside, he actually slammed the door behind him, like

23  closing that as an option to go back inside, you know.

24  And he stood at the front -- I would say right in the

25  front of that white patio chair swinging the chain over

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Jonathan Campos on 03/18/2024

Page 55

1  his head almost similar to swinging a lasso.

2          And I backpedaled right through the center of

3  those vehicles and took a position of cover, I suppose,

4  behind the left rear taillight of the Dodge Charger.

5      Q   So you backed away from Anthony through the gap

6  between the vehicles and then went around the rear of

7  the gray Dodge Charger that's visible on the left-hand

8  side of this image and stood near the left taillight of

9  that Charger; is that correct?

10     A   Yes.

11     Q   Do you know where Deputy Martinez went at that

12  time?

13     A   Not to be exact, but I believe he went on the

14  right side of that Honda Civic.

15     Q   When you say he went on the right side of the

16  Honda Civic, do you mean that he went -- he backed away

17  along the right side or that he stopped at a position

18  along the right side of the Honda Civic?

19     A   I believe he stopped somewhere along that side

20  because, from what I recall, Deputy Cervantes was

21  standing with the less lethal somewhere behind the Honda

22  Civic as well.  So he positioned himself next to her

23  somewhere.

24     Q   Okay.  Was Deputy Deberg also somewhere in the

25  front yard when Anthony came outside of the house?

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Jonathan Campos on 03/18/2024

Page 56

```
 1      A   Yes.

 2      Q   Do you recall where Deputy Deberg was standing

 3   when Anthony came outside?

 4      A   I really don't recall.  I just know he was

 5   somewhere behind those vehicles.

 6      Q   Do you, for example, know whether he was to

 7   your left which would be, I think, to the south or to

 8   your right, which I believe would have been more towards

 9   the north?

10      A   I'm going to go with to my right toward the

11   north.

12      Q   Was he standing in between you and -- well,

13   I'll scratch that question.

14          When Anthony came outside, did he remain

15   standing in front of the house or did he move in some

16   other direction after exiting?

17      A   He stayed there for a matter of maybe ten

18   seconds kind of looked at all of us, you know, one at a

19   time.  And he saw, I believe, an opening to his right

20   and he just took off running toward his right, which is

21   like an open little area on the front south end of his

22   front yard.

23          And then he positioned himself over there,

24   like, you know, in the center of that little dirt area

25   between the Charger and the chain-link fence.
```

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Jonathan Campos on 03/18/2024

Page 57

1    Q   When you say he positioned himself in the dirt

2  area, do you mean he stopped running at some point in

3  that dirt area?

4    A   Yes.

5    Q   When he stopped running in that dirt area, did

6  he come to a stop and stand in that space?

7    A   Yes.  He stood there, but he was still swinging

8  the chain over his head like a lasso.

9    Q   And when you say he was swinging the chain over

10  his head like a lasso, do you mean that he was holding

11  it over the top of his head and swinging it sort of

12  around from side to side horizontally?

13    A   Correct.

14    Q   Was he doing -- was he swinging the chain like

15  a lasso consistently from the time he exited the house

16  through the time he stopped running in that dirt area to

17  the south?

18    A   I would say so, yes.

19    Q   One moment.  I'm going to share my screen

20  again.

21        Can you see this image on my screen?

22    A   Yes.

23    Q   Does this image show the area that Anthony

24  moved to after exiting the house?

25    A   Yes.

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Jonathan Campos on 03/18/2024

Page 60

```
 1   portion of the yard?

 2       A    That looks about right to me.

 3            MR. LEVINE:  All right.  So I'm going to mark

 4   the unaltered version of this image as Exhibit C.  And

 5   for the record, I will note that this is the image Bates

 6   stamped SBD 1146.

 7            (Deposition Exhibit C marked for

 8            identification.)

 9            MR. LEVINE:  And then I will also mark the

10   edited version of this same image that includes the

11   green circle as Exhibit D.

12            (Deposition Exhibit D marked for

13            identification.)

14   BY MR. LEVINE:

15       Q    When Anthony reached that position that you

16   identified just a moment ago with the green circle in

17   that image, were you still standing approximately to the

18   rear of the left taillight of the gray Dodge Charger

19   that was parked in the front yard?

20       A    No.

21       Q    I'm sorry, did you say no?

22       A    Yes, I said no.

23       Q    Had you moved to a different position by the

24   time Anthony reached that location?

25       A    Yes.
```

**ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
Jonathan Campos on 03/18/2024

Page 61

1     Q   Where had you moved to by that point?

2     A   So as he moved, so did I.  If you pull out that

3   original picture, Exhibit A, in the back you'll see a

4   tree.  It looks like juniper bush or tree.  I ran around

5   that tree and I was positioned in between that bush/tree

6   and the chain-link gate in the front yard.

7     Q   One moment.  I'm going to share my screen

8   again.

9         Can you see this image?

10    A   Yes.

11    Q   Are you able to see in this image the position

12  that you were just describing that you took after

13  Anthony moved to the southern portion of the yard?

14    A   Yes.

15    Q   Could you describe for me where in the context

16  of this image you moved to at that time?

17    A   Yes.  So the sheriff's unit right there to the

18  right, that's my vehicle.  Just to the left of that

19  you'll see a chain-link gate, and to the left of that

20  you see that tree.  I was in between the chain-link and

21  the tree.  To the right more, where your mouse is.  Yes.

22    Q   I'm going to zoom in a little further.

23        Can you see the tree and the chain-link fence

24  and the police vehicle in this zoomed-in image?

25    A   Yes.

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Jonathan Campos on 03/18/2024

Page 63

1          (Deposition Exhibit F marked for

2          identification.)

3          MR. LEVINE:  One moment.  I'm sharing this same

4    image again without the circle.

5    BY MR. LEVINE:

6      Q   At the time that you took the position near the

7    chain-link fence between the chain-link fence and the

8    tree while Anthony was standing in the southern portion

9    of the yard, do you know where Deputy Martinez was

10   standing?

11     A   I want to say somewhere on the right side of

12   the Honda Civic still.

13     Q   Okay.  You say you want to say.  Is that

14   because you knew he was there at the time or could you

15   just clarify that?

16     A   I just knew all of my partners were to my right

17   and only one was to my left on the outside of the

18   chain-link gate.  But I know Michael was somewhere

19   either between those vehicles or somewhere on my right

20   side.

21     Q   Was it your understanding at the time that

22   Anthony was in the southern portion of the yard that we

23   discussed a moment ago, that the other deputies who were

24   on the property -- specifically Deputies Martinez,

25   Cervantes, and Deberg -- were somewhere between the tree

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Jonathan Campos on 03/18/2024

Page 64

1    and the parked vehicles that are shown on the left-hand

2    side of this image?

3        A    Correct.

4            MR. LEVINE:  And just for the record, the image

5    that's on the screen is the one marked as Exhibit E.

6    BY MR. LEVINE:

7        Q    By the time Anthony came outside, had you

8    witnessed him strike anybody?

9        A    No.  The only -- no.

10       Q    By the time Anthony came outside, had you

11   witnessed any injuries on anybody that you were able to

12   observe?

13       A    No.

14       Q    When Anthony was moving from the front door

15   area to the southern portion of the yard as we discussed

16   a moment ago, did you observe any of Deputies Martinez,

17   Cervantes, or Deberg change their locations?

18       A    Yes, they moved as I moved.

19       Q    Could you describe what you mean?

20       A    So when Anthony ran to his right, our left, I

21   was worried that he was going to come around and come

22   straight at me and that's why I ran around that tree.

23           And I remember seeing Deberg and Cervantes to

24   my right taking kind of my position behind the Charger

25   bumper, in that general area.

**ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Jonathan Campos on 03/18/2024**

Page 68

1      Q    How did you become aware that Deputy Cervantes

2    had a malfunction with the less lethal shotgun?

3      A    She tried -- she pulled the trigger, I believe.

4    I didn't hear it click, but I heard her rack the shotgun

5    and she tried to pull it again.  And she's looking at

6    her gun -- I looked to my right, and I saw her looking

7    at her gun trying to fix it.

8      Q    So that attempted deployment did not

9    successfully fire then?

10     A    Correct.

11     Q    Prior to that attempted deployment, did you

12   hear Deputy Cervantes warn Anthony that she was going to

13   use the beanbag shotgun against him?

14     A    I don't recall.  I just remember she announced,

15   Beanbag.

16     Q    At the time of that attempting deployment of

17   the beanbag shotgun, approximately how far was Anthony

18   from Deputy Cervantes?

19     A    25 feet maybe.  Between 20 and 25.

20     Q    Did it appear to you that the distance between

21   you and Anthony was approximately the same as the

22   distance between Deputy Cervantes and Anthony at that

23   time?

24     A    No.

25     Q    Were you closer to Anthony or was Deputy

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Jonathan Campos on 03/18/2024

Page 71

1    that?

2        A    Yes, Deputy Deberg.

3        Q    What weapons system did Deputy Deberg use

4    against Anthony?

5        A    It was the less lethal 40-millimeter launcher.

6        Q    Approximately how long after Deputy Cervantes

7    attempted to fire the less lethal shotgun did Deputy

8    Deberg first fire the 40-millimeter launcher?

9        A    Four, maybe five seconds.

10       Q    Was Anthony standing in approximately the same

11   position as he was when Deputy Cervantes attempted the

12   less lethal shotgun when Deputy Deberg first fired the

13   40 millimeter?

14       A    Yes, he was right next to Cervantes.

15       Q    Deputy Deberg was right next to Cervantes?

16       A    Yes.

17       Q    And I guess just to clarify, my question was

18   about Anthony's location.  Had Anthony changed locations

19   between the time Deputy Cervantes first attempted the

20   less lethal shotgun and the time Deputy Deberg first

21   fired the 40-millimeter launcher?

22       A    My apologies.  He maintained the same position.

23       Q    How many times did Deputy Deberg fire the

24   40-millimeter launcher at Anthony?

25       A    I believe four.

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Jonathan Campos on 03/18/2024

Page 73

1    a less lethal weapon?

2         A    Correct.

3         Q    At the time Deputy Deberg fired his first

4    40-millimeter round at Anthony, what was Anthony doing

5    with the chain, if anything?

6         A    At that point I think he stopped swinging it.

7    I think he kind of stood there in kind of, like, a

8    bladed stance, and he kind of just, I guess, braced for

9    the use of the 40 mill.

10        Q    Was Anthony swinging the chain at the time

11   Deputy Cervantes first attempted to use the less lethal

12   shotgun against Anthony?

13        A    No.

14        Q    He had already stopped swinging the chain by

15   that time?

16        A    I believe so, yes.

17        Q    Do you recall approximately how much time

18   passed between the time Anthony stopped swinging the

19   chain and the time Deputy Cervantes first attempted to

20   fire the less lethal shotgun at him?

21        A    Maybe a matter of four or five seconds.

22        Q    And then after Deputy Cervantes attempted to

23   fire the less lethal shotgun, Anthony was holding the

24   chain in the same position until Deputy Deberg fired his

25   first 40-millimeter round?

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Jonathan Campos on 03/18/2024

Page 74

1     A   Correct.

2     Q   Did Deputy Deberg's first 40-millimeter round

3   appear to strike Anthony?

4     A   Yes.

5     Q   As far as you could tell, did all four of

6   Deputy Deberg's 40-millimeter rounds appear to strike

7   Anthony?

8     A   I want to say three out of the four.  I think

9   he might have missed one.  But I remember seeing three

10  solid hits on Anthony's torso.

11    Q   Did you see one of the 40-millimeter rounds

12  miss Anthony?

13    A   I'm just not sure if they all connected, like

14  they all impacted Anthony.

15    Q   So just to clarify it sounds like you're saying

16  you saw three of the four strike Anthony, and the fourth

17  one may or may not have struck him, but if it did, you

18  didn't see it strike him?

19    A   Correct.

20    Q   Did Anthony remain in the same position over

21  the course of Deputy Deberg's four 40-millimeter rounds

22  that he fired?

23    A   Yes.

24    Q   So the distance between Anthony and Deputy

25  Deberg remained approximately the same for all four

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Jonathan Campos on 03/18/2024

Page 75

```
 1   rounds that Deputy Deberg fired?

 2       A   Correct.

 3       Q   Was the fourth 40-millimeter round that Deputy

 4   Deberg fired the last less lethal weapon that Deputy

 5   Deberg used against Anthony that day?

 6       A   Yes.

 7       Q   After Deputy Deberg fired the four

 8   40-millimeter rounds at Anthony, did another deputy

 9   attempt another less lethal weapon system against

10   Anthony?

11       A   Yes, I did.

12       Q   What less lethal weapon did you deploy?

13       A   My taser.

14       Q   Approximately how long after Deputy Deberg's

15   fourth and final 40-millimeter round did you fire your

16   taser at Anthony?

17       A   Within seconds.  Maybe five at most, I think.

18       Q   At the time you fired your taser at Anthony,

19   was Anthony standing in approximately the same position

20   as he was during Deputy Deberg's 40-millimeter rounds?

21       A   No.

22       Q   Where was Anthony at the time you fired your

23   taser?

24       A   He was charging at me, running at me with the

25   chain in hand, like, swinging it.
```

**ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Jonathan Campos on 03/18/2024**

Page 77

1     **Q  When you fired your taser at Anthony, did the**

2  **prongs strike Anthony?**

3     A  I believe one of them may have got lodged into

4  his pants, but the other one did not.

5     **Q  It did not get lodged in his pants or it did**

6  **not contact Anthony?**

7     A  It did not contact Anthony.

8     **Q  Did you see the other dart miss Anthony?**

9     A  Well, they're really small and it's a pretty

10  fast projectile, so I can't really see the darts, so to

11  speak.  But I could tell because my taser began arcing

12  and I can hear it popping.  And when you hear that, you

13  know you didn't get a successful connection or current.

14     **Q  You're saying that you heard a popping sound**

15  **from your taser that indicated to you that there was no**

16  **successful current?**

17     A  Correct.  There was no successful penetration

18  of both darts.

19     **Q  Does a taser make a different sound when there**

20  **is a successful penetration of both darts?**

21     A  Yes, it's quiet.

22     **Q  So the fact that you heard a louder sound was**

23  **an indication to you that there had not been a**

24  **successful penetration of both darts?**

25     A  Correct.

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Jonathan Campos on 03/18/2024

Page 83

1   approaching you and through the time he -- through the

2   time you fired the taser at him and he changed

3   directions?

4       A   Yes.

5       Q   I'm going to show an image on my screen.

6           Can you see the image I'm sharing?

7       A   Yes.

8       Q   This is the image that was previously marked as

9   Exhibit E.  I think you mentioned -- and please correct

10  me if I'm wrong -- before the break that Anthony moved

11  approximately 3 feet in your direction from where he had

12  previously been standing prior to you deploying the

13  taser at him.  And then after you deployed the taser,

14  Anthony stopped moving towards you and began moving in a

15  different direction; is that accurate?

16      A   Yes.

17      Q   And at the time you deployed the taser, were

18  you still in the position you previously identified

19  between the chain-link fence and the tree?

20      A   Yes.

21      Q   When Anthony changed direction after you fired

22  your taser at him, which direction did he move in?

23      A   West back toward the house.

24      Q   Was it more or less directly west, straight in

25  the direction of the house?

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Jonathan Campos on 03/18/2024

Page 84

1        A    I suppose it was kind of like a diagonal

2    direction.  Like, he didn't run straight toward the

3    house.  He kind of ran toward the front of the Charger.

4        **Q    Would you say it was more in a northwesterly**

5    **direction?**

6        A    That sounds more accurate, yes.

7        **Q    Okay.  And then did -- as he was moving in that**

8    **direction, did Anthony reach the front porch?**

9        A    I don't know if he actually made it to the

10   porch, but he definitely made it to the front of the

11   Charger, that area.

12       **Q    When Anthony reached the front of the Charger,**

13   **was the Charger between you and Anthony?**

14       A    Yes.  At that moment I was the farthest deputy

15   from Anthony.

16       **Q    At the time Anthony reached the -- well, I'll**

17   **take that back.**

18            **I think before the break you were describing**

19   **the shot or shots that Deputy Cervantes fired out of her**

20   **less lethal shotgun after you used the taser.  And I**

21   **think you testified that you heard her fire at least one**

22   **shot, possibly as many as three; is that accurate?**

23       A    Yes.

24       **Q    When Deputy Cervantes fired the first of those**

25   **shots that you heard, where was Anthony standing?**

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Jonathan Campos on 03/18/2024

Page 85

1      A   He wasn't standing.  He was running, like, full

2   motion.  I'd say the front driver's side quarter panel

3   of the front fender, I'm sorry, of the Dodge Charger, he

4   was in that area.

5      Q   And where was Deputy Cervantes at that time?

6      A   She was near the rear passenger side of the

7   Charger.  If I can recall correctly, she was, yeah, in

8   between the vehicles.

9      Q   So would it be accurate to say that at the time

10  of her first shot, Anthony was more or less directly

11  opposite the Charger from Deputy Cervantes?

12     A   Yes.

13     Q   While Anthony was moving northwest toward the

14  front of the Dodge Charger, including during the time

15  that Deputy Martinez fired that first successful less

16  lethal round, was Anthony swinging the chain over his

17  head?

18     A   Yes.

19     Q   And I think you mentioned that there was a --

20  that there was very little time between the one or more

21  less lethal rounds that Deputy Cervantes fired and the

22  first gunshot fired by Deputy Martinez; is that

23  accurate?

24     A   Yes.

25     Q   How many gunshots did Deputy Martinez fire?

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Jonathan Campos on 03/18/2024

Page 86

1        A    I believe three, but I'm not certain.

2        Q    So in the seconds before -- I'll take that

3    back.

4             So is your testimony that you believe Deputy

5    Cervantes fired as many as three less lethal rounds and

6    Deputy Martinez fired three lethal rounds as well?

7        A    Yes.

8        Q    Approximately how much time passed between

9    Deputy Martinez's first and last lethal rounds that he

10    fired?

11        A    I'll estimate four to five seconds.

12        Q    Were the three shots that he fired evenly

13    spaced?

14        A    I don't recall.  I don't believe so though.

15        Q    Do you believe there was a longer gap between

16    the first and second shots or the second and third

17    shots?

18        A    I want to say second and third.

19        Q    At the time Deputy Martinez fired his three

20    gunshots, were you standing in the same position you had

21    been in when you fired your taser?

22        A    No.

23        Q    Where were you standing at the time Deputy

24    Martinez fired his gunshots?

25        A    I began to run around that tree again.  I was

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Jonathan Campos on 03/18/2024

Page 90

1          (Simultaneous speaking.)

2          (Reporter clarification.)

3          MR. LEVINE:  Sure.  I'll re-ask the question.

4    BY MR. LEVINE:

5      Q   At the time of Deputy Martinez's first gunshot,

6    was Anthony located in front of the passenger side

7    portion of the front bumper of the Dodge Charger?

8      A   Yes.

9      Q   And at that time was Anthony swinging the chain

10   over his head?

11     A   Yes.

12     Q   Still like a lasso?

13     A   Yes.

14     Q   When you saw Anthony swing the chain while he

15   was outside prior to the gunshots, was it always in that

16   lasso-type movement?

17     A   No, because when he ran at me, he was kind of,

18   like -- he kind of had it in the front of him.  But when

19   he ran toward the front of the Charger, it was over his

20   head -- definitely over his head swinging.

21     Q   Did you hear Deputy Martinez give a verbal

22   warning to Anthony that he was going to shoot before he

23   shot?

24     A   No, I don't recall hearing anything.

25     Q   And at that time that Deputy Martinez fired his

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Jonathan Campos on 03/18/2024

Page 91

1    first shot, was Anthony swinging the chain over his

2    head?

3        A    Yes.

4        Q    From what you could tell of where Deputy

5    Martinez was located at the time of the first shot, did

6    it appear that Anthony was facing directly toward Deputy

7    Martinez at the time of that first shot?

8        A    Again, I don't remember where Michael Martinez

9    was at.  I just know that he was running in the

10   direction of, I'd say, toward more Sabrina.  Like, I

11   didn't know if he was going to go straight or turn right

12   in between the vehicles.  But he was definitely in that

13   area when I heard the first shot.

14       Q    What direction was Anthony facing at the time

15   of the first shot?

16       A    I'd say the driveway.  He was facing north.

17       Q    So at the time of the first shot, Anthony

18   was -- was he moving north and also facing north?

19       A    Yes.

20       Q    So from your perspective, at the time of the

21   first shot, Anthony could have been either about to

22   continue moving north or could have made a right turn to

23   go in between the two vehicles?

24       A    Yes, that's correct.

25       Q    At the time of the -- approximately how long

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Jonathan Campos on 03/18/2024

Page 92

1   passed between the first and second gunshot?

2        A    I want to say the first two were back to back

3   and the third one was delayed.  So I'm going to guess a

4   second.

5        Q    Okay.  And just to clarify, I don't want you to

6   guess.  An estimate is a bit different from a guess, you

7   know, based on what you perceived at the time.  A guess

8   would be more speculative.

9             So just to clarify, when you say that you

10  believe there was about a one-second space between the

11  first and second gunshots, are you guessing or is that

12  an estimate?

13       A    It's an estimate.

14       Q    At the time of the second gunshot, where was

15  Anthony?

16       A    In between both of the front bumpers of the

17  Honda and the Charger.

18       Q    What direction was Anthony facing at the time

19  of the second gunshot?

20       A    I'd say the same direction.

21       Q    And at the time of the second gunshot, was

22  Anthony still holding the chain?

23       A    Yes.

24       Q    Was Anthony still swinging the chain overhead

25  at the time of the second gunshot?

**ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
Jonathan Campos on 03/18/2024

Page 93

1      A   I don't believe so.  I think I recall seeing

2  him kind of bringing it down, like his arm kind of

3  flinching.

4      Q   So between the first and second gunshots, you

5  saw Anthony's arm come down with the chain?

6      A   Like he flinched or he kind of like --

7  obviously, he got shot, so his arm came down a little

8  bit.

9      Q   Immediately prior to the first gunshot when you

10  said Anthony was swinging the chain over his head, how

11  high above his head was his hand, approximately, that

12  was holding the chain?

13      A   Between half a foot and a foot.

14      Q   And at the time of the second gunshot, where

15  vertically relative to Anthony's head was his hand that

16  was holding the chain?

17      A   Shoulder length.

18      Q   So at about shoulder level is where his hand

19  was?

20      A   I'd say that sounds about right, yes.

21      Q   Was his hand extended forward or to the side?

22  Or how would you characterize the way he was holding his

23  hand at the time of the second gunshot?

24      A   Lowered like -- like his elbow came in tucked

25  in.

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Jonathan Campos on 03/18/2024

Page 94

1     Q    So I think you just demonstrated, but for the

2   court reporter who's typing this down, it looked like

3   you showed your elbow down sort of by your rib cage with

4   your fist extended upwards toward approximately shoulder

5   height; is that accurate?

6     A    Yes.

7     Q    Did -- scratch that.

8          At the time of the third gunshot, where was

9   Anthony?

10    A    I'd say at the wheel wells of -- the front

11  wheel wells of the Charger and the Honda Civic, like the

12  front passenger wheel of the Charger and the front

13  driver's side of the Honda Civic.

14    Q    Which direction was Anthony facing at the time

15  of the third gunshot?

16    A    Probably facing, like, east.

17    Q    So between the second and third gunshots, did

18  Anthony turn in between the two parked vehicles to face

19  through the gap between the two parked vehicles?

20    A    Yes.

21    Q    After the third gunshot, did Anthony go to the

22  ground?

23    A    Yes.

24    Q    Did Anthony go to the ground immediately after

25  the third gunshot?

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Jonathan Campos on 03/18/2024

Page 95

1      A    Yes.

2      Q    Which direction did Anthony fall in?

3      A    I want to say he was facing east.  Like, his

4    head was lying toward -- yeah, east.

5      Q    So would it be accurate to say he fell forward

6    in the direction he was moving?

7      A    Yes, but I think he actually -- yes, that

8    sounds about right.  He kind of, like, landed on his

9    side.

10     Q    Did you see Anthony, did you see his body while

11    he was landing?

12     A    Yes.

13     Q    And you saw him land on his side?

14     A    Yes.

15     Q    Which side?  Was it his right side or his left

16    side?

17     A    I want to say his left side.

18     Q    What was Anthony -- how was Anthony holding the

19    chain during the third gunshot?

20     A    I mean, it was just being held in his hand.  He

21    just, you know, kind of gripped it with his fingers.

22     Q    Well, during the second gunshot, I think you

23    told me Anthony was holding the chain at approximately

24    shoulder level with his elbow down near his rib cage.

25    How would you compare the way Anthony was holding the

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Jonathan Campos on 03/18/2024

Page 96

1   chain at the third gunshot to that?

2       A    At that moment, I mean, he had already been

3   shot.  So, I mean, he was almost -- it looked like he

4   was collapsing and his arm was full -- fully extended.

5       Q    Where was Anthony's hand that he was holding

6   the chain with at the time of the third gunshot?

7       A    Fully extended.  So, I mean, I would estimate

8   past his hips, you know, somewhere around his thigh

9   area.

10      Q    So when you say fully extended, it was extended

11  downward?

12      A    Yes, that's correct.

13      Q    Could you see the chain if the chain was, for

14  example, dragging on the ground by that point?

15      A    Yes, that's a good way to put it.

16      Q    The chain was dragging on the ground?

17      A    Yes.

18      Q    At any point prior to the second or third

19  gunshots, did you hear Deputy Martinez warn Anthony that

20  he was going to shoot?

21      A    No, I don't recall.

22      Q    Did you hear Anthony say anything immediately

23  prior to any of these three gunshots?

24      A    No.

25      Q    What was the last thing you heard Anthony say?

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Jonathan Campos on 03/18/2024

Page 97

```
 1      A   I want to say it was the prayer before he came

 2   outside.  That's the only thing I can remember right

 3   now.  I don't remember him really saying anything while

 4   he was outside.

 5      Q   While Anthony was outside of the house, did you

 6   hear him make any verbal threats to anyone?

 7      A   Not that I recall.

 8      Q   Did Anthony ever make any verbal threats that

 9   were directed to you specifically?

10          MR. CORZANO:  Objection.  Broad as to time.

11          But go ahead.

12          THE WITNESS:  Directed to me in the beginning

13   when he had first saw me unholster my taser, I recall

14   him telling me something to the effect of, You're going

15   to need a lot more than that taser to stop me.

16   BY MR. LEVINE:

17      Q   One moment.

18          What happened next after Anthony fell after

19   being shot?

20      A   Like I said, initially I was the farthest one

21   from Anthony.  So Sabrina and Deberg were, I think, off

22   to my right on the passenger side of the Honda.  So I

23   had unholstered my duty weapon, my Glock 21, and I took

24   point.

25          I ran up to Anthony first.  I saw his hand was
```

**ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
Jonathan Campos on 03/18/2024

Page 98

1    still holding the chain, so I kicked the chain back with

2    my foot and pulled the chain away from him.  I placed

3    him in handcuffs to the rear.  I rolled him back onto

4    his back and assessed him, tried to give him any medical

5    attention I could at that point to him.

6        Q    And at some point did paramedics arrive?

7        A    Yes.

8        Q    Approximately how long after Anthony fell did

9    paramedics arrive to Anthony?

10       A    One minute.

11       Q    At any time before Martinez fired his final

12   gunshot, did you ever observe Anthony reach for or

13   attempt to grab a deputy's weapon?

14       A    No.

15       Q    At any time -- excuse me.

16            At the time Deputy Martinez fired any of his

17   shots, did you observe any civilians nearby besides

18   Anthony?

19       A    Yes.

20       Q    Who did you observe?

21       A    The neighbors.

22       Q    Were those the neighbors to the north or the

23   south or the east or the west?

24       A    Directly to the south.

25       Q    And that was at the time Deputy Martinez fired

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Jonathan Campos on 03/18/2024

Page 104

1    incident?

2         A    I didn't believe it would be an effective use

3    of force using that because I think, if anything, he

4    might just become more upset.

5         **Q    Does OC spray have the capacity to blind a**

6    **suspect when successfully used against them?**

7              MR. SMITH:  I'll object that that requires

8    expert testimony.

9              But go ahead, Jonathan, if you know.

10             THE WITNESS:  I mean, it burns.  And when I was

11   OC'd in the academy, I'm not going to say it blinded me

12   but definitely obscured my vision.

13   BY MR. LEVINE:

14        **Q    At any time prior to Deputy Martinez's uses of**

15   **lethal force, was there any discussion between you and**

16   **any other deputies or that you overheard between other**

17   **deputies regarding a tactical plan for what deputies**

18   **would do if Anthony came outside of the house with the**

19   **chain?**

20        A    So as far as the discussion, no, but I believe

21   Michael and my plan, if any, was to get him out of the

22   house.  That way we can eliminate the possibility of him

23   going to that back bedroom to get a possible gun.

24             And also once he was outside the house, I knew

25   that my partner Sabrina and Deberg had less lethal, so

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Jonathan Campos on 03/18/2024

Page 105

1   if he came outside the house, I was hoping they would,

2   you know, deploy their less lethal and that would cause

3   Anthony to drop the chain and drop to the ground.  But

4   that didn't happen.

5       Q   When you spoke with Sergeant LaFever either in

6   person, near the doorway, or via radio, did you share

7   with him that it was your goal to get Anthony to come

8   outside of the house?

9       A   I believe I did, yes.

10      Q   And did Sergeant LaFever ever say anything to

11  you about what you or other deputies should do if

12  Anthony did come out of the house and had the chain in

13  his hand?

14      A   I don't recall him saying anything to that

15  effect, no.

16      Q   Did you ever hear any deputy saying anything

17  about what any deputy should do if Anthony came out of

18  the house with the chain in his hand?

19      A   No.

20      Q   Did you ever discuss with any other deputy the

21  possibility of utilizing personal protective equipment

22  to protect yourselves against the chain?

23          MR. SMITH:  I'll take a moment to object to the

24  form of the question.

25          But go ahead, Jonathan.  I'm sorry to

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Jonathan Campos on 03/18/2024

Page 106

 1  interrupt.

 2        THE WITNESS:  Are you referring to our riot

 3  shield helmets?

 4  BY MR. LEVINE:

 5     Q   It could include any type of protective gear

 6  that deputies would have had access to at the time, yes,

 7  including the riot shield helmets or I believe you

 8  mentioned that Sergeant LaFever had a shield in the

 9  vehicle, any of those types of equipment.

10     A   We never spoke about it, but it would have

11  been -- yeah, it would have been useful to have one of

12  those.

13     Q   Is that because one or more of those types of

14  equipment in your view could have been effective in

15  defending against a chain?

16     A   It's possible, yes.

17     Q   Do you believe that the riot shield helmet

18  would be effective in defending against a chain if the

19  chain were swung, for example, toward a deputy's head?

20        MR. SMITH:  Sorry, Jonathan.  I'll object to

21  the form of the question.  Calls for a legal -- expert

22  opinion rather.

23        Go ahead, Jonathan.  I'm sorry.

24        THE WITNESS:  Just to clarify, you're asking if

25  I had a helmet on, would that protect my head?

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Jonathan Campos on 03/18/2024

Page 107

 1   BY MR. LEVINE:

 2       Q   I'm asking based on your impressions at the

 3   time of the incident, do you believe that a helmet could

 4   have protected your head from a chain being swung at

 5   it --

 6           MR. CORZANO:  I'm going to object.  Calls for

 7   expert opinion.  Also, incomplete hypothetical.

 8           But go ahead if you know how to answer,

 9   Jonathan.

10           THE WITNESS:  If the question is if I was

11   wearing a helmet with my face shield, would it protect

12   me from a chain?  Most definitely, yes.

13   BY MR. LEVINE:

14       Q   Did you receive training either at the academy

15   or through the department after becoming a deputy

16   regarding the use and purposes of riot shield helmets?

17       A   Yes.

18       Q   What, generally, were you trained that is the

19   type of protection or purpose provided by a riot shield

20   helmet?

21       A   Well, the training I received in the academy

22   was -- I believe it was an eight-hour block of mobile

23   field force.  It's just beginner stuff, but in how to

24   put on your helmet, form a line -- a scrimmage line, and

25   essentially just hold the line in case of a riot, you

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Jonathan Campos on 03/18/2024

Page 108

1   know.

2       Q   And what training did you receive with respect

3   to how the helmet is intended to protect a deputy who is

4   wearing it from potential threats?

5       A   In the case of a riot -- I'll use that as an

6   example -- it's called a riot helmet.  If bricks, rocks,

7   bottles, anything are thrown at us, if it hits our heads

8   it will cause great bodily injury.

9           But if we're in a helmet along with -- it has a

10  clear face shield, you know, then that will definitely

11  protect us from getting directly hit.

12      Q   So based on that training you've described, is

13  it your belief that the riot shield helmet could provide

14  protection for a deputy from a chain being swung at the

15  deputy's head?

16          MR. CORZANO:  I'm going to object it calls for

17  a legal opinion, incomplete hypothetical, and asked and

18  answered.

19          But go ahead, Jon.

20          THE WITNESS:  Yes.

21  BY MR. LEVINE:

22      Q   Did you receive training, whether in the

23  academy or subsequently, on the use of shields?

24      A   Yes.

25      Q   According to your training that you received on

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Jonathan Campos on 03/18/2024

Page 109

1  shields, what is their intended use and purpose?

2      A    Well, depends on what kind of shield you're

3  talking of.  Ballistic or the riot shield?

4      Q    What was the type of shield that you were aware

5  was in the vehicle of Sergeant LaFever on the day of the

6  incident?

7      A    Ballistic.

8      Q    All right.  According to the training that you

9  received in the academy and subsequently, what was the

10  use and intended purpose of a ballistic shield?

11      A    They gave us scenarios on one was building

12  searches, you know, whoever has the shield can take

13  point and take in -- you know, when that first door gets

14  blown, the person with the shield goes in first and how

15  to utilize it when clearing buildings.

16          The second one was what if you're dealing --

17  there was one where we dealt with a barricaded subject.

18  How to approach, you know, someone barricaded in a house

19  or in a vehicle and how to use your shield along with

20  your police unit to position yourself in a position of

21  advantage, so to speak.

22      Q    In your understanding, is a ballistic shield

23  bulletproof?

24      A    Yes.

25      Q    Did you ever receive any kind of training

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Jonathan Campos on 03/18/2024

Page 110

1  regarding the capacity of a ballistic shield to block

2  blunt or edged weapons?

3      A   You mean like a baseball bat?

4      **Q   Like a baseball bat or a knife or a stick or a**

5  **pole or anything like that.**

6      A   Well --

7          MR. CORZANO:  Objection.  I'm going to object

8  on compound.

9          But go ahead, Jonathan.

10         THE WITNESS:  I mean, if the ballistic shield

11  can block bullets, then it could block, I think, a pipe

12  or a baseball bat.

13  BY MR. LEVINE:

14     **Q   Were you trained that a ballistic shield could**

15  **be used to block weapons other than bullets?**

16     A   I wouldn't necessarily say trained, but, I

17  mean, I believe that's more like common sense.

18     **Q   Based on the training you received regarding**

19  **shields and any experience you had using shields,**

20  **specifically ball shields, is it your belief that a**

21  **ballistic shield could be effective in blocking a chain**

22  **being swung at you?**

23         MR. CORZANO:  I'm going to object.  Incomplete

24  hypothetical and calls for an expert opinion.

25         Go ahead, Jonathan.

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Jonathan Campos on 03/18/2024

Page 111

```
 1              THE WITNESS:  Yes.

 2   BY MR. LEVINE:

 3       Q    Do you believe that under the circumstances

 4   leading up to the use of deadly force in this case as

 5   you observed them, had Deputy Martinez or a different

 6   deputy been holding a ballistic shield, that the use of

 7   the ballistic shield could have averted any need to use

 8   lethal force against Anthony?

 9              (Simultaneous speaking.)

10              MR. LEVINE:  Go ahead, Mahadhi.

11              MR. CORZANO:  Same objections.  Incomplete

12   hypothetical.  Calls for expert opinion.

13              Go ahead, Jonathan.

14              THE WITNESS:  My apologies.  Could you repeat

15   the question.

16              MR. LEVINE:  Ms. Davis, are you able to read

17   that last question back just so it's verbatim?

18              MR. CORZANO:  I'm just going to assert the same

19   objections so that way Jonathan can get the whole

20   question.

21              (Record read as follows:

22              "QUESTION:  Do you believe that under the

23              circumstances leading up to the use of deadly

24              force in this case as you observed them, had

25              Deputy Martinez or a different deputy been
```

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Jonathan Campos on 03/18/2024

Page 112

```
 1              holding a ballistic shield, that the use of the
 2              ballistic shield could have averted any need to
 3              use lethal force against Anthony?")
 4          THE WITNESS:  I suppose so.
 5   BY MR. LEVINE:
 6      Q   Could you explain how that would be in your
 7   estimation?
 8      A   I mean, if I had a shield -- which they're
 9   pretty large.  There's ones that are, I believe, 8-feet
10   long, some that are 6-feet long.  But if I had a shield
11   blocking my entire body, including my head, that's going
12   to provide protection to me.
13      Q   Did you ever access Sergeant LaFever's vehicle
14   on the date of the incident?
15      A   No, I don't even know where he parked at.
16      Q   I think you mentioned -- please correct me if
17   I'm wrong, but I believe you mentioned earlier that you
18   were aware that there was a ballistic shield in Sergeant
19   LaFever's vehicle; is that correct?
20          MR. CORZANO:  I'm going to object.  Misstates
21   the witness's testimony.
22          But go ahead, Jonathan.
23          THE WITNESS:  Anyone who's a watch commander,
24   whether it be a corporal acting as a Paul 60, or anyone
25   driving the watch commander vehicle has access to all of
```

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Jonathan Campos on 03/18/2024

Page 113

1    the extra gear that the watch commander's vehicle

2    carries.

3    BY MR. LEVINE:

4         Q   So were you aware that there was a ballistic

5    shield in Sergeant LaFever's vehicle because Sergeant

6    LaFever was the watch commander?

7         A   Correct.

8         Q   Did you receive some type of training or

9    instruction with the San Bernardino County Sheriff's

10   Department that a ballistic shield is included among the

11   kinds of equipment carried in a watch commander's

12   vehicle?

13        A   Not that I received training, just with my

14   experience there's always a shield, and like I said

15   earlier, there's extra nonlethal gear in there.

16        Q   Based on your experience with the San

17   Bernardino County Sheriff's Department, is it your

18   understanding that any deputy would have been aware that

19   a ballistic shield is carried in the watch commander

20   vehicle?

21             MR. CORZANO:  I'm going to object.  Calls for

22   speculation.

23             But go ahead, Jon.

24             THE WITNESS:  I would believe so.

25   BY MR. LEVINE:

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Jonathan Campos on 03/18/2024

Page 114

1      Q   Did you ever hear Sergeant LaFever suggest or

2   direct to any deputies that a deputy retrieve a

3   ballistic shield from his vehicle?

4      A   No, not that I recall.

5      Q   Did you ever hear any deputy call for a

6   ballistic shield?

7      A   No.

8      Q   Did you ever consider prior to the use of

9   lethal force by Deputy Martinez retrieving or calling

10  for the ballistic shield from Sergeant LaFever's

11  vehicle?

12     A   No.

13     Q   After you joined the sheriff's department, did

14  you receive additional training beyond what you had

15  received in the academy?

16     A   Yes.

17     Q   Did you have a field training officer for some

18  amount of time after joining the sheriff's department?

19     A   Yes.

20     Q   How long did you have a field training officer

21  for?

22     A   Full length of my field training.

23     Q   And how long was that?

24     A   Twelve weeks.

25     Q   Between the training that you received in the

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Jonathan Campos on 03/18/2024

Page 115

1   academy and any training that you received subsequently

2   through the San Bernardino County Sheriff's Department,

3   did you receive training on the use of deadly force?

4       A   Yes.

5       Q   Based on your training, is deadly force the

6   highest level of force that an officer can use?

7       A   Yes.

8       Q   Were you trained that deadly force should only

9   be used to defend against an imminent or immediate

10  threat of death or serious bodily injury?

11      A   Yes.

12      Q   Were you trained that deputies are responsible

13  for justifying each shot fired when using deadly force?

14      A   Could you repeat the question.

15      Q   Were you trained that deputies are responsible

16  for justifying each shot that they fired when using

17  deadly force?

18      A   Yes.

19      Q   Were you trained that deputies should as best

20  as they can attempt to reassess any threat posed by a

21  subject between shots that they fire?

22      A   Yes.

23      Q   Were you trained that before using deadly force

24  a warning should be given where feasible?

25      A   When feasible, yes.

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Jonathan Campos on 03/18/2024

Page 117

1        A    Yes.

2        Q    And would that include training on the use of a

3    taser?

4        A    Yes.

5        Q    Were you trained that when using less lethal

6    weapons, deputies should allow time for the less lethal

7    weapon to take effect when feasible?

8        A    When feasible, yes.

9        Q    Were you trained that deputies should assess

10   the situation during and immediately after the use of

11   less lethal weapons to determine whether the less lethal

12   weapon was effective?

13       A    Yes.

14       Q    Were you trained that where a less lethal

15   weapon is attempted against a subject and is not

16   effective, using that same less lethal weapon a second

17   time can be effective against the subject?

18            MR. CORZANO:  Objection.  Incomplete

19   hypothetical.  Calls for expert opinion.

20            Go ahead, Jonathan.

21            THE WITNESS:  I suppose it's possible.  But was

22   I trained that way?  No.

23   BY MR. LEVINE:

24       Q    And between your time at the academy and any

25   additional training you received subsequent to your time

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Jonathan Campos on 03/18/2024

Page 118

1    in the academy, did you receive training on tactics?

2        A    Yes.

3        Q    Did that training on tactics include training

4    on cover and concealment?

5        A    Yes.

6        Q    Were you trained that when dealing with a

7    subject who is armed with a blunt or edged weapon, that

8    deputies should, when feasible, use cover and

9    concealment to create distance between them and the

10   subject?

11       A    Yes.

12       Q    And were you also trained that using cover and

13   concealment can serve as protection against a weapon

14   that a subject is holding?

15       A    Depending on the weapon, but yes.

16       Q    Did you receive training on communicating with

17   armed suspects or subjects?

18       A    Yes.

19       Q    Did that training include that only one deputy

20   should give commands to the subject or suspect?

21       A    Yes.

22       Q    Is part of the reason for that training to

23   ensure that the subject has not received conflicting

24   commands?

25       A    Yes.  I mean, you don't want to cause

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Jonathan Campos on 03/18/2024

Page 119

1  confusion, but as long as all the deputies are giving

2  the same command.

3     Q   Is part of the reason for that training also to

4  ensure that the subject can clearly hear the deputy who

5  is giving commands?

6     A   Yes.

7     Q   Were you trained that multiple officers giving

8  commands to a subject runs the risk of escalating the

9  situation?

10       MR. CORZANO:  I'm going to object.  Calls for

11  expert opinion.

12       Go ahead, Jonathan.

13       THE WITNESS:  Like I said, it can cause

14  confusion.

15  BY MR. LEVINE:

16     Q   I guess my question was just a little bit

17  different.  You say that it can cause confusion.  I

18  guess what I'm asking more is according to your

19  training, could that confusion result in creating more

20  tension in the situation or escalating things with the

21  subject?

22       MR. CORZANO:  I'm going to object.  Calls for

23  expert opinion.  Incomplete hypothetical.

24       Go ahead, Jon.

25       THE WITNESS:  Yes.

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Jonathan Campos on 03/18/2024

Page 126

```
 1      A   Well, he displayed symptomology of being under

 2   the influence of a controlled substance such as his

 3   nonsensical statements, his pupils being very dilated,

 4   his eyelid flutter, things like that.

 5      Q   Any other physical indications that you

 6   observed that, let's say, kind of dovetailed with those

 7   observations?

 8           (Simultaneous speaking.)

 9           (Reporter clarification.)

10           MR. LEVINE:  I'll just quickly object that it

11   calls for speculation.

12           But you can answer.

13           THE WITNESS:  He was very agitated.  His being

14   angry one moment, being happy and cool with us the next.

15   Kind of sidestepped a lot.  Couldn't stay still.

16   Wouldn't remain still.  He was very unpredictable.

17   BY MR. SMITH:

18      Q   Very unpredictable.  Okay.

19           Did you see him with any other physical

20   indications, like instruments of drug use on his person,

21   at any time?

22      A   I don't recall if I found any paraphernalia in

23   his pocket, but I want to say we might have found some

24   paraphernalia in his pocket.

25      Q   Okay.  Did you observe a white coating on his
```

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Jonathan Campos on 03/18/2024

```
 1                        -o0o-

 2              FURTHER EXAMINATION BY MR. LEVINE

 3       Q   There was a question a moment ago about any

 4   drug paraphernalia that was found at the scene or on

 5   Anthony's person.  Do you recall that?

 6       A   Yes.

 7       Q   And I think you testified that you believe you

 8   may have found some type of drug paraphernalia on

 9   Anthony's person?

10       A   Yes.

11       Q   Did you find any drug paraphernalia at the

12   location, including on Anthony's person, at any time

13   prior to the use of deadly force during the incident?

14       A   No.

15       Q   And I think there was a question about whether

16   Anthony had any white substance on his tongue or around

17   his mouth.  Do you recall that?

18       A   Yes.

19       Q   What specifically did you observe in that

20   regard?

21       A   The white coating around his mouth.

22       Q   When did you observe that?

23       A   While speaking with him in the doorway.

24       Q   And I think you testified that, you know, among

25   the reasons why you thought Anthony might be under the
```

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Jonathan Campos on 03/18/2024

Page 130

1   influence was that he was agitated and erratic and sort

2   of up and down.  Do I have that correctly?

3       A   Yes.

4       Q   Based on your training, are those also

5   potential symptoms or indicators of somebody

6   indicating -- excuse me, of somebody experiencing a

7   mental health crisis or episode?

8       A   Yes.

9       Q   Did you at any point during this incident

10  consider that Anthony may be experiencing some type of

11  meant health crisis?

12      A   No.

13          MR. LEVINE:  Those are all my questions.

14          Thank you.

15          MR. SMITH:  So barring you needing orders for

16  transcripts, I think we can go off the record.

17          THE REPORTER:  Let me ask on the record first,

18  Mr. Corzano, would you like to order a certified copy of

19  this transcript?

20          MR. CORZANO:  Yes, please.

21          THE REPORTER:  Electronic okay?

22          MR. CORZANO:  Yes.

23          THE REPORTER:  And, Mr. Smith, same question?

24          MR. SMITH:  Yeah, and I believe expedited as

25  well.