Exhibit 3

**ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
Jeremy Deberg on 02/21/2024

```
 1              UNITED STATES DISTRICT COURT

 2              CENTRAL DISTRICT OF CALIFORNIA

 3

 4   ROSA NUNEZ, individually, ANTHONY    )
     NUNEZ, JR., individually and as      )
 5   successor-in-interest to Decedent,   )
     Anthony Nunez and ANDREW NUNEZ,      )
 6   individually,                        )
                                          )
 7              Plaintiffs,               )
                                          )
 8              vs.                       ) Case No.
                                          ) 5:22-CV-01934-SSS-SPx
 9   COUNTY OF SAN BERNARDINO, CITY OF    )
     HESPERIA, MICHAEL MARTINEZ, SABRINA  )
10   CERVANTES, JEREMY DEBERG, JONATHAN   )
     CAMPOS, and DOES 5-15, inclusive,    )
11                                        )
                Defendants.               )
12   _____)

13

14        REMOTE VIDEOCONFERENCE DEPOSITION OF

15                  JEREMY DEBERG

16           WEDNESDAY, FEBRUARY 21, 2024

17

18

19

20

21

22   Reported Stenographically By:

23   Jinna Grace Kim, CSR No. 14151

24   Job No.:  47727

25
```

**ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
Jeremy Deberg on 02/21/2024

Page 20

1      Q.    So it would have been 7:00 to 7:00 then?

2      A.    Yes.

3      Q.    Do you recall how much sleep you had gotten in the

4    24 hours prior to this incident?

5      A.    Not off the top of my head.  I would have to refer

6    to my transcribed statement.

7      Q.    Were you in uniform on the day of the incident?

8      A.    Yes, I was.

9      Q.    Could you describe for me what in your recollection

10   your uniform included that day?

11     A.    A similar shirt to what you're seeing now, a tan

12   shirt, green pants.  On my tan shirt I had my metal badge

13   affixed to my left breast pocket.  There is a cloth American

14   flag to my right breast pocket or my right breast, my brass

15   name tag with J. Deberg engraved on the front, below the

16   American flag on both shoulders San Bernardino County

17   Sheriff's Department patches, and then wearing a full Sam

18   Browne duty belt to include OC spray, audio recorder, extra

19   magazines, a Glock 17 duty weapon, Taser, R-C-B, expandable

20   baton, my radio, and two pairs of handcuffs.

21     Q.    Was there anything on your Sam Browne belt that you

22   haven't just listed for me?

23     A.    I don't remember if I had a tourniquet on my Sam

24   Browne belt at the time or not.

25     Q.    Okay.  And were you wearing any body armor or any

**ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Jeremy Deberg on 02/21/2024**

Page 26

1          And so my question was, prior to arriving at the

2    location, did you receive any other information via any

3    medium besides the radio about what was going on?

4      A.   To my knowledge, no, or to my recollection, no.

5      Q.   Prior to that day had you ever met or had any

6    interaction with somebody -- well, let me try to ask that

7    again.

8          Do you now understand the individual who was

9    involved in this incident, his name to be Anthony Nunez?

10     A.   I believe that's his name, yes.

11     Q.   Had you ever met or had any interaction with him

12   before that date?

13     A.   To the best of my recollection, no, I have not.

14     Q.   When you were in your vehicle traveling to the

15   location, were you by yourself?

16     A.   Yes.

17     Q.   Do you recall approximately what time you arrived at

18   the location?

19     A.   I do not.

20     Q.   Do you recall where you parked your car upon

21   arriving?

22     A.   Yes.  I parked my marked patrol vehicle on the west

23   dirt shoulder of 9th Avenue north of the incident location.

24     Q.   Would that also have been across the street from the

25   incident location?

**ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Jeremy Deberg on 02/21/2024**

1     A.    No, the same side of the street.

2           The residence was on the west side of the street.

3     Q.    Okay.  And what did you -- did you then get out of

4     the vehicle upon arriving?

5     A.    Yes.  I arrived on-scene at the same time as

6     Sergeant La Fever, and his patrol vehicle was parked right in

7     front of mine.  Upon exiting my patrol vehicle, I asked him

8     if I should get the 40-millimeter less-lethal launcher, and

9     he said that was a good idea, at which time I retrieved it

10    from his patrol vehicle.

11    Q.    Upon getting out of the your vehicle after parking,

12    did you see anybody else from that position besides Sergeant

13    La Fever?

14    A.    No.

15    Q.    Besides Sergeant La Fever, did you speak with any

16    other deputies upon arriving at the scene before you --

17    before going to the property?

18    A.    I don't believe so.

19    Q.    What prompted you to ask Sergeant La Fever whether

20    you should retrieve the 40-millimeter launcher?

21    A.    I thought it would be a good idea to have various

22    options of less-lethal, or it would be a good idea for

23    multiple less-lethal options to be present in case they were

24    warranted.

25    Q.    I think you said multiple less-lethal options there.

**ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Jeremy Deberg on 02/21/2024**

Page 29

1    Q.   And where are each of those kept in your vehicle?

2    A.   The patrol rifle and 12-gauge shotgun are kept in

3    the driver area under the driver seat and in locked and

4    secured gun rack, and the bean bag, the 12-gauge bean bag

5    less-lethal shotgun is kept in the trunk area of the patrol

6    vehicles and the gun rack.

7    Q.   Do you normally keep a 40-millimeter round launcher

8    in your patrol vehicle?

9    A.   No.  It's -- our station is assigned I believe one,

10   and it's kept in the watch commander's vehicle.

11   Q.   How about protective equipment, would there have

12   been any other kind of protective equipment besides what was

13   already on your body in your vehicle that day?

14   A.   Can you be more specific what you're asking about?

15   Q.   Any -- it could include any additional kinds of body

16   armor, a helmet, a shield, anything that -- any tools that

17   you would have had that could have been used the for personal

18   protection that are not typically considered to be weapons.

19   A.   I carry a ballistic helmet in the trunk of my

20   vehicle and a rifle rated plate carrier for additional body

21   armor.

22   Q.   Could you describe what each of those is?

23   A.   The plate carrier is a load bearing vest style plate

24   carrier, and it has ceramic hard plates inside the carrier.

25   It's designed to stop high-power or high velocity rifle

**ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
Jeremy Deberg on 02/21/2024

Page 45

```
 1   the residence and when to exit the residence through the

 2   window.

 3       Q.   The person who you were speaking to who was holding

 4   the phone, did they have any visible injuries that you could

 5   see?

 6       A.   I don't recall seeing any injuries, but again, I was

 7   not looking for injuries.

 8       Q.   Did you see any of the other residents besides

 9   Anthony in person after they had exited the house?

10       A.   I may have seen other residents in my peripheral,

11   but I did not directly contact any other residents and was

12   not in close proximity to any other residents --

13       Q.   I'm sorry for talking at the same time as you there.

14            Did you happen to observe any visible injuries on

15   any of those other residents at any point?

16       A.   I wasn't close enough to see any injuries on any

17   other residents.

18       Q.   While you were standing in a position to the north

19   of the front door of the house near the red car that we

20   discussed earlier, how much approximately of the discussion

21   between Deputies Martinez and Campos and Anthony Nunez could

22   you hear?

23            MR. SMITH:  I'll object to the form of the question.

24            Sorry to step on your answer there, Deputy.

25            THE WITNESS:  That's okay.  I could hear parts of
```

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Jeremy Deberg on 02/21/2024

Page 53

1    A.   Yes.  Near the point of the green where it comes to

2  a point at the dirt.

3    Q.   Okay.  And so when you said that that was the

4  approximate direction that Anthony headed in after exiting

5  the house, was that the -- was that the southern most point

6  that he reached while walking in that direction?

7    A.   That general area, yes.  I don't -- like I said, I

8  can't remember exactly his exact location, but it's that

9  general area.

10    Q.   Okay.  And then when Anthony moved into that area,

11  did you remain in approximately the same location that you

12  had been in?

13    A.   I moved further east to be more in the open dirt

14  area, east of the rear of the vehicles.

15    Q.   Did you move to the south at all during that time or

16  just to the east?

17    A.   Just to the east.  I stayed pretty lateral.

18    Q.   And then did you observe -- how about Deputy

19  Martinez and Campos, did you observe them move anywhere at

20  the time that Anthony came out of the house and then moved to

21  the south or southwest towards the southern portion of the

22  yard?

23    A.   I don't recall their movements.

24         I was focused on Mr. Nunez.

25    Q.   How about Deputy Campos, did you see her move to a

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Jeremy Deberg on 02/21/2024

1   different location?

2      A.   She was in relative close proximity to me I believe

3   for the most part she was to my right.

4      Q.   **When you moved to the east out into the open after**

5   **or at the time that Anthony moved towards the south, did she**

6   **also move to the east with you?**

7      A.   Yes.  I believe she stayed predominantly to my

8   right.

9      Q.   **So during this time would it be fair to say she**

10  **essentially followed you or tracked your movement?**

11     A.   I can't speak to her exact movements.

12     Q.   **I just mean based on your own recollection.**

13     A.   The times I did see her, she was predominately to my

14  right, yes.

15     Q.   **By the time Anthony came outside of the house, had**

16  **you seen any injuries on anybody at the scene?**

17          MR. SMITH:  I'll object to the form of the question.

18          But go ahead, Deputy.

19          THE WITNESS:  I believe I answered that already.

20          I -- besides the female who was on the phone with

21  the other two females in the southern room, I never got close

22  enough to any of the other occupants to see injuries, and

23  when I was close enough to the one female, I wasn't looking

24  for injuries.  I was predominantly focused on the front door

25  and giving her orders on how to get the people out of the

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Jeremy Deberg on 02/21/2024

Page 58

1    before or after that click that you heard?

2        A.    I believe she said, "Bean bag, bean bag," which

3    indicates she's about to deploy a bean bag shotgun, a

4    less-lethal bean bag shotgun.

5        Q.    Did you hear her say anything to the effect of "Put

6    down the chain or I'll shoot you with the bean bag shotgun?"

7        A.    I don't recall.  I know multiple deputies were

8    giving him orders to drop the chain.

9        Q.    Do you recall approximately how much time passed

10   from the point you observed Anthony begin swinging the chain

11   over his head while he was standing in the southern portion

12   of the front yard and the time that you heard that click that

13   you just mentioned?

14       A.    I would estimate a minute or less.

15       Q.    There is a fairly decent range of time that could be

16   within a minuet or less.

17           Do you know if it was more or less than 30

18   seconds?

19       A.    I don't know.

20       Q.    Do you know it if was more or less that ten

21   seconds?

22       A.    I believe it was more.

23       Q.    So you think it was somewhere between ten and 60

24   seconds between the time Anthony began swinging the chain

25   over his head while standing in the southern portion of the

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Jeremy Deberg on 02/21/2024

Page 59

 1  yard and the time you heard Deputy Cervantes' weapon click;

 2  is that correct?

 3          MR. SMITH:  I'll object to the form of the question.

 4          But go ahead, Deputy.

 5          THE WITNESS:  Well, I would like to clarify.

 6          He began swinging the chain before he or as he was

 7  walking, not once he got to the stopping point.

 8          And once he got to that point, I described in the

 9  photograph where the green comes to a point at the dirt, he

10  did stop to face the deputies, and he was facing deputies

11  when swinging the chain over his head, and that's when Deputy

12  Cervantes attempted to deploy the bean bag shotgun.

13  BY MR. LEVINE:

14      Q.  So you're saying that he reached -- he was walking

15  to the south or southeast, reached a point approximately near

16  the tip of the grass where you described, and then turned

17  around to face deputies once he reached that point?

18      A.  Yes.

19      Q.  I'm just going to stop sharing this for right now.

20          When you heard the click that you mentioned, what

21  was your understanding of what had happened?

22      A.  Can you be more specific?

23      Q.  Yes.  When you heard the click from Deputy

24  Cervantes' weapon, was your understanding that the weapon had

25  fired successfully?

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Jeremy Deberg on 02/21/2024

Page 60

1    A.   No.  It did not fire.

2    Q.   Okay.  Do you --

3    A.   The click was -- the click was the firing pin being

4  deployed or activated inside the shotgun, but a round did not

5  go off which could be either there wasn't a round in the

6  chamber, or there was a faulty primer strike, or somehow the

7  round did not go off.

8    Q.   Was Anthony continuously swinging the chain over his

9  head from the time he was walking to the south or southeast

10  until the time Deputy Cervantes attempted to fire that

11  weapon?

12    A.   Yes.

13    Q.   At the time that you heard that click sound from

14  Deputy Cervantes' weapon, how -- approximately how far away

15  was Anthony from you?

16    A.   I would estimate about 30 feet.

17    Q.   And at the time you heard that click sound, who was

18  the closest deputy to Anthony?

19    A.   I don't recall.

20    Q.   Do you recall at that time whether there was a

21  deputy who was closer to Anthony than you were?

22    A.   I don't recall.  I was focused on Mr. Nunez, and I'm

23  not positive of where the other deputy positions were.

24        When Deputy Cervantes attempted to deploy the

25  less-lethal bean bag, I yelled out multiple times, "Backdrop,

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Jeremy Deberg on 02/21/2024

Page 62

1   the bean bag shotgun, what was the next less-lethal weapon

2   system that was deployed or that was attempted to be deployed

3   by a deputy that you recall?

4       A.   I deployed the 40-millimeter launcher striking

5   Mr. Nunez in the abdomen area.

6       Q.   And when you deployed that 40-millimeter launcher

7   for the first time, was that after the civilian you had

8   mentioned had gotten in their car and driven their car out of

9   sight?

10      A.   Yes.  I waited until I had a clear backdrop in case

11  the round missed Mr. Nunez.  It would not accidentally strike

12  a civilian.

13      Q.   Approximately how much time passed between the time

14  you heard the click from Deputy Cervantes' bean bag shotgun

15  and the time you fired your first round from the

16  40-millimeter launcher?

17      A.   I would estimate 15 to 20 seconds.

18      Q.   During that 15 to 20 seconds did Anthony move to a

19  different location than he had been?

20      A.   No.  He stayed stationary still facing deputies and

21  still swinging the chain above his head with enough force to

22  make the chain howl in the wind.

23      Q.   Was he still standing approximately at the area of

24  that point in the grass in the photograph we looked at

25  earlier?

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Jeremy Deberg on 02/21/2024

Page 63

1       A.    That general area, yes.

2       Q.    At the -- and had he continued to swing the chain

3   over his head continuously during the period between the

4   clicking sound from Deputy Cervantes' weapon and the time you

5   fired your first round of the 40-millimeter?

6       A.    Yes.

7       Q.    Was Anthony saying anything during that period?

8       A.    I don't recall.  I know myself and other deputies

9   were giving him orders to drop the chain and he was not

10  complying in dropping the chain and continue to swing it a

11  very aggressive manner above his head.

12      Q.    When you fired your first round from the

13  40-millimeter, where were you standing?

14      A.    In the same general area in the middle of the dirt

15  area east of the two parked vehicles in front of the front

16  doors.

17      Q.    And at the time you fired that first round,

18  approximately how far away from Anthony were you?

19      A.    I would estimate approximately 35 feet or so.

20      Q.    Do you recall whether there was a deputy who was

21  closer to Anthony than you were at the time you fired your

22  first round?

23      A.    At that time I don't know where the other deputies'

24  positions were.

25      Q.    So as far as you were aware, you could have been the

**ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
Jeremy Deberg on 02/21/2024

1    closet deputy to Anthony at that time?

2        A.    It's very possible.

3        Q.    Did your first round appear to strike Anthony?

4        A.    It did strike him in the abdomen area.

5        Q.    And what effect if any did that appear to have?

6        A.    None.  He had zero reaction to it.

7        Q.    And he didn't say anything in response to being

8    shot?

9        A.    He didn't say anything.  He didn't flinch.

10            His muscles didn't change.  As far as I could tell,

11   it was the same as a fly landing on him.

12       Q.    Could you see any kind of mark on his body on the

13   part of his abdomen that the round struck after it struck

14   him?

15       A.    I don't recall seeing any marks.

16       Q.    Did you then fire another round at Anthony?

17       A.    Yes.  And he was in a very similar position as the

18   first where he was when I fired the first round, and the

19   second round struck him in the abdomen area as well.

20       Q.    Had he begun walking between the first and second

21   rounds, or did he stay in the same place?

22       A.    He was in the same general place.

23            He never stood -- during the whole incident he never

24   stood completely still while outside the residence.  He was

25   constantly moving his feet.  So he never stayed in one

Page 65

1   specific spot, but the first and second rounds hit him while

2   he was in the same general area of each other.

3       Q.   Okay.  And then did you fire a third round at

4   Anthony?

5       A.   Yes.  Mr. Nunez began walking east towards 9th

6   Avenue, and I fired a third round towards or at Mr. Nunez

7   striking him in the abdomen area, also.

8       Q.   What side of his body or the front or the back was

9   facing you at the time you fired that third shot?

10      A.   I believe he was slightly bladed or angled.

11           So it would have been his front and left side.

12      Q.   Did the -- I can't remember if I asked.

13           Did the second shot appear to strike him?

14      A.   All four shots that I fired struck Mr. Nunez.

15      Q.   And approximately how much time passed between the

16  first and second shot that you fired?

17      A.   I would estimate less than ten seconds.

18      Q.   And then how much time approximately passed between

19  the second and third shot that you fired?

20           I would estimate about the same.

21      Q.   And then did you fire a fourth shot?

22      A.   Yes.  After the third shot struck Mr. Nunez, he

23  began walking west back towards the house, and he was just

24  slightly west of where he was standing when the first and

25  second shot hit him, and that's where I deployed the fourth

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Jeremy Deberg on 02/21/2024

Page 66

1   shot striking him in the abdomen area.

2       Q.   And was he still swinging the chain over his head

3   throughout the period that you were firing these four rounds

4   at him?

5       A.   Yes.  He never stopped swinging the chain above his

6   head, and he had the same reaction to all four shots which

7   was no reaction.

8       Q.   So just to kind of summarize here, and you know, I

9   want to make sure we're on the same page, so please correct

10  me if I'm wrong.

11          Your testimony is that Anthony was standing more or

12  less at the location of that point in the grass we saw on the

13  photo earlier at the time of your first and second shots.

14          And then he headed approximately to the east, and

15  while he was heading towards the east and the east fence

16  along the property, you fired the third shot, and then after

17  the third shot, he turned around and started heading

18  approximately to the west again, reached a position that was

19  further west than the position he had been in for shot one

20  and two.

21          And at that position you fired your fourth shot at

22  him; is that all generally correct?

23      A.   Yes.  In that general area, yes.

24      Q.   Okay.  Prior to firing any of these shots, did you

25  verbally warn Anthony that you were going to use the

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Jeremy Deberg on 02/21/2024

Page 67

1   40-millimeter against him?

2      A.   Yes.  I verbally said, "40, 40" to indicate to

3   Mr. Nunez and my partner that I'm going to deploy the

4   40-millimeter launcher.

5      Q.   Was it your understanding at the time that a

6   civilian without police training would understand the meaning

7   of "40, 40?"

8      A.   I don't know what the average civilian would

9   interpret that as.

10      Q.   I think, and again, correct me if I'm wrong.

11         I think you mentioned that at the time of your first

12   40-millimeter round that you fired, Anthony was approximately

13   35 feet away from you.

14         Do I have that correctly?

15      A.   I believe so.

16      Q.   At any point between your first and fourth shot, did

17   Anthony come any closer to you than approximately 35 feet?

18      A.   I believe when he was walking back to the west after

19   the third shot, he was not walking directly west.  He was

20   walking slightly north and west to walk in a closer direction

21   towards my direction --

22      Q.   What -- I'm sorry.  I thought you were finished.

23         I apologize.  What would you estimate was the

24   closest distance Anthony was to you during any of your four

25   shots?

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Jeremy Deberg on 02/21/2024

Page 77

1     Q.   And you did not see a Taser being deployed at any

2  point prior to Deputy Cervantes firing that latter bean bag

3  round at Anthony?

4     A.   No.  I was not aware of the Taser deployment, the

5  attempted Taser deployment until after I was back at the

6  Hesperia Sheriff's Station after the incident.

7     Q.   So prior to Deputy Cervantes using that bean bag,

8  round, you never heard any deputies yell, for example,

9  Taser?

10    A.   No.  I don't recall hearing that.

11    Q.   And you never saw any wires from a Taser you know

12  spanning the distance between any deputy and Anthony at any

13  point?

14    A.   No.  Again, before I was back at the Hesperia

15  Sheriff's Station, I was unaware that a Taser had been

16  deployed or attempted to be deployed.

17    Q.   And then after Deputy Cervantes fired that bean bag

18  round at Anthony, was -- did an officer then use lethal force

19  against Anthony?

20    A.   Yes.  Deputy Martinez did.

21    Q.   What is your understanding as to when Deputy

22  Martinez used lethal force against Anthony relative to Deputy

23  Cervantes' use of the bean bag round?

24    A.   My understanding is it was afterwards.

25    Q.   And approximately how long afterward was it?

**ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
*Jeremy Deberg on 02/21/2024*

1    A.   Immediate.

2    Q.   **Was it less than five seconds after?**

3    A.   Yes.

4    Q.   **Was it less than one second after?**

5    A.   I can't speculate to more or less than one second.

6    Q.   **But would it be safe to say it was within one or two**

7    **seconds of the bean bag round?**

8    A.   I would say that's safe to say.

9    Q.   **Could you hear a distinct pause between the bean bag**

10   **round and Deputy Martinez's first gunshot?**

11        MR. SMITH:  I'll object to the form of the question.

12        But go ahead, Deputy.

13        MR. LEVINE:  I'll ask the question in a different

14   way.

15   BY MR. LEVINE:

16   Q.   **Did Deputy Cervantes' bean bag shot from her bean**

17   **bag shotgun, did that appear to be more or less simultaneous**

18   **with Deputy Martinez's first gunshot, or could you tell that**

19   **there was a gap in between that?**

20   A.   I could not distinguish the difference between the

21   bean bag shotgun round being fired and Deputy Martinez's duty

22   weapon being fired.

23   Q.   **How many times did you hear Deputy Martinez fire his**

24   **duty weapon?**

25   A.   I believe it was three.

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Jeremy Deberg on 02/21/2024

Page 88

1  pointed it at Mr. Nunez while he was secured with handcuffs,

2  and then we summoned paramedics who were already running into

3  the scene from the command post north of the incident

4  location at which time they provided medical treatment and

5  life-saving measures.

6      Q.   Did you personally put handcuffs on Anthony, or was

7  it a different deputy?

8      A.   It was a different deputy.  I was the cover

9  deputy.

10     Q.   And then did you personally summon the paramedics,

11  or was that a different deputy as well?

12     A.   I don't recall who summoned the paramedics.

13          I did not.  I was as soon as he was secured with

14  handcuffs, I began running to my patrol unit to get the

15  trauma medical kit, and at the time I got to my patrol unit,

16  the paramedics ran past me into the scene to provide

17  life-saving measures.

18     Q.   At any time before Deputy Martinez fired his third

19  and final shot at Anthony, did you ever observe Anthony reach

20  for or attempt to grab any deputy's weapon?

21     A.   I don't believe so.

22     Q.   At the time that Deputy Martinez fired any of his

23  shots, did you observe any civilians nearby besides Anthony

24  including at any of the adjacent properties?

25     A.   No.  I don't recall seeing any civilians after the

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Jeremy Deberg on 02/21/2024

Page 89

1   civilian disappeared earlier prior to my deployment of the

2   40-millimeter launcher.

3        Q.   Were you holding onto the 40-millimeter launcher for

4   the full time between your fourth shot from the 40-millimeter

5   and the last shot that Deputy Martinez fired?

6        A.   Yes.

7        Q.   And I think you said you drew your duty weapon after

8   Deputy Martinez had finished firing; is that correct?

9        A.   Yes.

10       Q.   At the time that Deputy Martinez fired any of his

11  shots, did Anthony appear to you to pose an immediate threat

12  of death or serious bodily injury to Deputy Martinez or to

13  anyone else who was present at the house?

14       A.   Yes.  At the time that he was charging in the

15  northeast direction between the two vehicles, I did believe

16  he posed an imminent threat to all the deputies on the scene

17  at the scene because that chain can lacerate and maim a

18  person if it hits you and with the extended range of the

19  chain and Mr. Nunez being on a full sprint, he can cover a

20  lot of ground very quickly.

21            And I believe there chain would cause great bodily

22  injury or death if someone was hit with it in their head,

23  neck, chest.

24       Q.   Could you explain just a little bit for me what is

25  your understanding as to how being struck by the chain that

**ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Jeremy Deberg on 02/21/2024**

Page 93

1          THE WITNESS:  I could not tell you if I have or not.

2          I've heard of a lot of officers getting maimed and

3   mauled and disfigured in the line of duty and also killed in

4   the like of duty, but to the exact weapons used or means

5   used, I couldn't specify.

6   BY MR. LEVINE:

7     Q.   I just have a few questions next about your some of

8   your training.

9          So first of all, I think you mentioned at the

10  beginning or earlier in the deposition that you spent some

11  time at the Sheriff's Academy.

12         Did you receive training while you were in the

13  academy?

14    A.   Yes.

15    Q.   And then have you received additional training

16  during the time you have been with the Sheriff's Department

17  since completing the academy?

18    A.   Yes.  We have annual trainings.

19    Q.   And has your training during your time with the

20  Sheriff's Department included field training?

21    A.   What do you mean field training?

22    Q.   Was there a period following your completion of the

23  academy where you were assigned a field training officer?

24    A.   Yes.  While I was assigned to patrol.

25    Q.   How long did you have a field training officer

Page 94

```
 1   assigned to you for?

 2       A.   I believe it was just over three months.

 3       Q.   Has the training that you received between the

 4   academy and the training that you have gone while being a

 5   sheriff's deputy, has that included training on use of deadly

 6   force?

 7       A.   Yes.

 8       Q.   Based on the training on deadly force that you've

 9   received, is deadly force considered the highest level of

10   force an officer can use?

11       A.   Yes.

12       Q.   Based on your training that you received, is it your

13   understanding that deadly force can only be used to defend

14   against immediate or imminent threat of death or serious

15   bodily injury?

16       A.   I'm sorry.  You broke up a little.

17            Can you restate that?

18       Q.   According to the training that you received on

19   deadly force, is it your understanding that deadly force

20   should only be used to defend against an imminent threat or

21   immediate threat of death or serious bodily injury?

22       A.   That's part of it, yes.

23       Q.   Is there more to it than that that you can

24   explain?

25       A.   Certain circumstances if you could articulate the
```

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Jeremy Deberg on 02/21/2024

Page 95

1  danger to the public like a fleeing felon rule, then you

2  could use deadly force on a fleeing felon such as a murder

3  suspect running into a shopping center, a highly populated

4  shopping center.

5      Q.   Did you believe that the fleeing felon rule applied

6  in this case at the time that Deputy Martinez fired his

7  weapon?

8      A.   No.

9      Q.   So putting aside the fleeing felon rule that you

10  just mentioned, and assuming that the fleeing felon rule does

11  not apply in the given situation, is it your understanding

12  then that based on your training, deadly force can only be

13  used to defend against an imminent threat or immediate threat

14  of death or serious bodily injury?

15          MR. SMITH:  I'll object to the form of the question.

16          But go ahead, Jeremy.

17          THE WITNESS:  Yes.  To yourself or someone else.

18  BY MR. LEVINE:

19      Q.   Were you trained that deputies are responsible for

20  justifying every shot when using deadly force?

21      A.   Yes.  We are responsible for each time we pull the

22  trigger.

23      Q.   Were you trained that deputies should attempt to

24  assess the impact of or effect of the use of deadly force

25  after each shot?

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Jeremy Deberg on 02/21/2024

Page 97

```
 1   BY MR. LEVINE:

 2        Q.   Were you trained that before using deadly force, a

 3   warning should be given when feasible?

 4        A.   When feasible, yes, or practical.

 5        Q.   Were you trained that where a warning is given

 6   before using deadly force, the subject should be given an

 7   opportunity to comply with that warning before deadly force

 8   it used if feasible?

 9        A.   If feasible or practical, yes.

10             I don't believe that's the case here.

11        Q.   Were you trained that it is justifiable to be use

12   deadly force against somebody just for holding a gun in their

13   hand?

14        A.   You're going to have to be more specific.

15             It's a very broad question.

16        Q.   Were you trained that the mere fact that somebody is

17   holding a gun in their hand by itself is sufficient to

18   justify the use of deadly force against that person?

19        A.   Again, that's very broad.  Where is the gun pointed,

20   how is he holding it, what is his demeanor?

21             I'll answer.  I'll need a specific situation.

22        Q.   Just let me try to re-ask it.

23             Were you trained that it's justifiable to use deadly

24   force against somebody who is just because they are holding a

25   gun in their hand regardless of which direction the gun is
```

**ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Jeremy Deberg on 02/21/2024**

1          You have to curb your communications to how the

2   subject is reacting to the communications.

3      **Q.   Were you trained that when there are multiple**

4   **deputies working to gain compliance from a non-compliant**

5   **subject, that only one of those deputies should be the one**

6   **issuing commands?**

7      A.   Ideally.  But sometimes circumstances don't allow

8   that.

9      **Q.   Were you trained that when multiple deputies who are**

10  **attempting to gain compliance from a subject are giving**

11  **commands to that subject, that there is a risk of confusing**

12  **the subject or of escalating the situation?**

13      MR. SMITH:  I'll object to the form of the question.

14      But go ahead, Deputy.

15      THE WITNESS:  If deputies on-scene are giving

16  conflicting commands, then yes, it can confuse someone.

17      I don't see how multiple deputies giving the same

18  commands would confuse anyone, being told the same thing from

19  multiple different people.

20      As far as escalating, I can't speak to whether it

21  would escalate or not based on multiple people giving the

22  same commands.

23  BY MR. LEVINE:

24      **Q.   Did you receive any kind of training in the use of**

25  **cover and concealment during situations when confronting a**

**ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Jeremy Deberg on 02/21/2024**

Page 106

1      A.   I believe when he was still inside the residence

2   before he exited, he said he was going to kill someone.

3           But I don't know who directly he was speaking to.

4           That's when Deputy Campos and Deputy Martinez were

5   engaged with him.

6      Q.   At any point after Anthony exited the house, did you

7   hear him make verbal threats that appeared to be directed

8   toward a specific deputy?

9      A.   Not that I recall.

10      Q.   Okay.  At any point at the time Deputy Martinez

11   fired his shots, did you have any specific information about

12   any criminal history that Anthony had?

13      A.   No.  At that time I did not even know his name.

14      Q.   Okay.  At the time that Deputy Martinez fired any of

15   his shots, did you have any information that Anthony had

16   injured anybody that day?

17           MR. SMITH:  I'll object to the form of the question.

18           But go ahead, Deputy.

19           THE WITNESS:  I don't recall.

20   BY MR. LEVINE:

21      Q.   At the time that Deputy Martinez fired any of his

22   shots, did you have any specific information that Anthony had

23   used any drugs that day or was on drugs at the time of the

24   incident?

25      A.   Did I have specific knowledge like someone told me

**ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
Jeremy Deberg on 02/21/2024

 1  he had used drugs or that I heard from him?

 2      Q.    Anything like that.

 3      A.    Based on his behavior and the -- what I heard him

 4  say inside the residence, I believe there was a high

 5  probability he was under the influence of a controlled

 6  substance.

 7      Q.    What were the things that he said from inside the

 8  residence that made you believe he might be under the

 9  influence?

10      A.    I remember him calling someone a devil, he's going

11  to make us kill him.  I mean, all very irrational thoughts

12  which I've seen numerous times with paranoia due to drug

13  use.

14      Q.    Did you ever hear him say that he had used drugs?

15      A.    No.  But at the same time very few people that used

16  drugs will openly admit they used drugs or under the

17  influence of drugs based on my training and experience.

18      Q.    When -- I think you mentioned a moment ago that you

19  heard him make a statement while he was inside about devils

20  and things like that.

21            Did I hear you correctly?

22      A.    Yes.

23      Q.    Did you consider that when you heard that, that it

24  may be an indication that Anthony was experiencing some kind

25  of mental health crisis?

**ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
Jeremy Deberg on 02/21/2024

Page 108

1      A.   It was a possibility.  Could also be a drug induced

2   paranoia.  But until the situation's under control and calm,

3   we can't get a mental health professional in there to

4   evaluate him.

5      Q.   I understand that.  I'm just asking about what went

6   through your mind and what you considered at the time based

7   on the information you had.

8           So it sounds like, correct me if I'm wrong, you're

9   saying that you considered that that was one of multiple

10  possibilities that might explain the things he was saying?

11     A.   Yes.  It was definitely a theory.

12     Q.   Okay.  All right.

13          Would it be all right with you if I did not ask you

14  anymore questions today?

15     A.   Okay.

16          MR. LEVINE:  Brett or Mahadhi, do you guys have any

17  questions you would like to ask before we finish?

18          MR. SMITH:  I have a couple.

19          Mahadhi, if you have some as well?

20          MR. CORZANO:  No.

21          MR. SMITH:  Okay.  I just have a couple short ones.

22                            EXAMINATION

23  BY MR. SMITH:

24     Q.   So you mentioned earlier that you were part of the

25  kind of the Marijuana Task Force.  And so am I correct in