Exhibit 4

```
 1                  UNITED STATES DISTRICT COURT

 2                  CENTRAL DISTRICT OF CALIFORNIA

 3

 4   ROSA NUNEZ, individually, ANTHONY     )
     NUNEZ, JR., individually and as       )
 5   successor-in-interest to Decedent,    )
     Anthony Nunez and ANDREW NUNEZ,       )
 6   individually,                         )
                                           )
 7                  Plaintiffs,            )
                                           )
 8                  vs.                    ) Case No.
                                           ) 5:22-CV-01934-SSS-SPx
 9   COUNTY OF SAN BERNARDINO, CITY OF     )
     HESPERIA, MICHAEL MARTINEZ, SABRINA   )
10   CERVANTES, JEREMY DEBERG, JONATHAN    )
     CAMPOS, and DOES 5-15, inclusive,     )
11                                         )
                    Defendants.            )
12   _____)

13

14          REMOTE VIDEOCONFERENCE DEPOSITION OF

15                    SABRINA CERVANTES

16              THURSDAY, FEBRUARY 22, 2024

17

18

19

20

21

22   Reported Stenographically By:

23   Jinna Grace Kim, CSR No. 14151

24   Job No.:  49297

25
```

**ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Sabrina Cervantes on 02/22/2024**

Page 18

```
 1      A.    I don't recall exactly, sir.

 2      Q.    Were you in a uniform on the day of the incident?

 3      A.    Yes, sir.

 4      Q.    And did you have a Sam Browne belt on you on the day

 5   of the incident?

 6      A.    Yes, sir.

 7      Q.    Do you recall what tools and equipment were on your

 8   Sam Browne belt that day?

 9      A.    I do recall.

10      Q.    Could you tell me what was on that belt.

11      A.    Yes, sir.  I had pepper spray, I had my duty gun, a

12   set of handcuffs, my radio, my RCB, my unit keys, and I

13   believe that was it.

14      Q.    Did you have a Taser?

15      A.    Yes, yes, sir.

16      Q.    Were you wearing a ballistic vest of any kind?

17      A.    Yes, sir.

18      Q.    Could you describe that.

19      A.    Ballistic vest that would be from the department we

20   wear underneath our Class A uniform shirts, has velcro, and

21   covers pretty much your torso and your back.

22      Q.    Is it considered to be bulletproof or what type of

23   protection is it intended to provide?

24            MR. SMITH:  I'll object to the form of the question.

25            But go ahead, Sabrina.
```

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Sabrina Cervantes on 02/22/2024

Page 20

1      Q.    Have you listened to it anytime since?

2      A.    No, sir.

3      Q.    Have you listened to any audio from any belt

4  recording of the incident at any time since your recorded

5  interview?

6      A.    No, sir.

7      Q.    Were you wearing a police radio during this

8  incident?

9      A.    Yes, sir.

10     Q.    Did you have any kind of microphone closer to your

11  face like on your lapel or anywhere like that?

12     A.    No, sir.  I just had my earpiece.

13     Q.    Does the earpiece allow you to talk into it without

14  having to do anything with your hands?

15     A.    I just have to push on the little lapel mic, I

16  guess.

17     Q.    Did you make any communications over your police

18  radio during this incident?

19     A.    Yes, sir.

20     Q.    Were you called to the scene of this incident,

21  personally?

22     A.    No, sir.

23     Q.    How did you hear about the call that led you to go

24  to the scene of this incident?

25     A.    My partner aired over the radio that the suspect was

**ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Sabrina Cervantes on 02/22/2024**

Page 21

1   refusing to cooperate with deputies, and dispatch put out a

2   Code 33B which means no extra radio traffic is able to go

3   through in and out of that same channel due to obviously

4   emergency.

5          So when that happened, then that's when I decided

6   that my partners needed backup.

7      Q.   When you used the term partner, do you mean that --

8   are you referring to a deputy who you're specifically

9   assigned to work together with, or do you just -- are you

10  using the term more generally to refer to another sheriff

11  deputy from your department?

12     A.   No.  I was on shift with that -- with that deputy on

13  the day of the incident.

14     Q.   Is any deputy who is on the same shift as you

15  someone who you would consider your partner in the way that

16  you're using the term now?

17     A.   Yes, sir.

18     Q.   Approximately how many partners did you have that

19  day?

20          MR. SMITH:  I'll object to the form of the question.

21          But go ahead, Sabrina.

22          THE WITNESS:  I believe out on the field, five

23  deputies.

24  BY MR. LEVINE:

25     Q.   Okay.  So was there any other information that you

**ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Sabrina Cervantes on 02/22/2024**

 1    A.   Prior to my arrival I don't believe so.

 2         From what I remember, the suspect was inside of the

 3    house and was talking to deputies through the front door.

 4         So deputies had no visual of what the suspect looked

 5    like at the time or if he had anything in his hands.

 6    **Q.   Prior to arriving did you have any information about**

 7    **there being a firearm or a potential firearm at the**

 8    **location?**

 9    A.   That is correct, sir.

10    **Q.   What information did you receive?**

11    A.   From what I recall, the mother of the suspect stated

12    that there was a weapon in the house, a firearm in the house,

13    and nobody in the house knew where the weapon was at

14    exactly.

15    **Q.   And then when you arrived did you park your car**

16    **somewhere?**

17    A.   Yes, sir.

18    **Q.   Was there anybody traveling in that vehicle with**

19    **you?**

20    A.   No, sir.

21    **Q.   Where did you park?**

22    A.   I parked about two houses down from the residence.

23    **Q.   Was that on the same side of the street as the**

24    **residence?**

25    A.   That's correct.

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Sabrina Cervantes on 02/22/2024

Page 27

1   where there was a wall.

2       Q.   And what was the first thing that you did after

3   getting out of your vehicle?

4       A.   I got out of my vehicle, I went to the back of the

5   vehicle in the trunk, I retrieved the less-lethal shotgun, I

6   opened and made sure that the shotgun was clear and didn't

7   have any live ammunition or less-lethal rounds inside.

8            And I placed the less-lethal rounds inside of the

9   shotgun and went to assist my two deputies that were

10  on-scene.

11      Q.   Besides the equipment that you already told me about

12  that was on your belt and as well as that less-lethal

13  shotgun, did you have any other weapon systems or protective

14  equipment that was in your vehicle?

15      A.   As in like less-lethal or lethal?

16      Q.   Anything.

17      A.   I do have the shotgun and the mini --

18      Q.   What was the last thing you said?

19           You broke up a little bit.

20      A.   The mini 14 rifle.

21      Q.   Are there any other less-lethal weapons that were in

22  the vehicle?

23      A.   No, sir.

24      Q.   Were there any other lethal weapons that were in the

25  vehicle?

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Sabrina Cervantes on 02/22/2024

1      A.   No, sir.

2      Q.   Was there any other protective equipment of any kind

3   that was in the vehicle?

4      A.   No, sir.

5      Q.   For example, did you have a helmet in the vehicle?

6      A.   Yes, sir.  I had my department-issued that was in

7   any tac bag.

8      Q.   Any other protective equipment along those lines

9   that was in the vehicle?

10     A.   My -- I had my leather vest.  That's -- I forget

11  what it's called, that we use during, obviously, if there was

12  like an active shooter.

13     Q.   Is that sometimes called a plate carrier?

14     A.   Yeah, plate carrier.

15     Q.   Was there any kind of like riot shield or anything

16  like that that was in your vehicle?

17     A.   I believe I had that inside my vehicle, sir.

18     Q.   So I think you mentioned a moment ago that after

19  getting the less-lethal shotgun, you approached the

20  residence; is that correct?

21     A.   Yes, sir.

22     Q.   And where on the property did you walk to?

23     A.   I walked -- I don't know how to explain the house.

24          So when I walked to the front of the house I was not

25  right in front of the front door.  I was more to the -- if

**ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Sabrina Cervantes on 02/22/2024**

Page 30

1    A.   They were positioned right in front of the -- not

2   right in front of the door, but where the walkway begins to

3   walk to the front door.  They were at the beginning of the

4   walkway.

5    **Q.   Was there some kind of a porch area in front of the**

6   **front door?**

7    A.   I don't recall.

8    **Q.   When you grabbed the less-lethal shotgun, what**

9   **prompted you to grab that?**

10   A.   My partner over the radio had advised that the next

11  deputy that were to be on-scene to grab the less-lethal

12  shotgun due to the suspect being uncooperative.

13   **Q.   Have you ever used that -- had you ever used any**

14  **less-lethal shotgun before?**

15   A.   Just during training, sir.

16   **Q.   So you had never used it in the field?**

17   A.   No, sir.

18   **Q.   At the time you retrieved that less-lethal shotgun,**

19  **what information did you have about what other less-lethal**

20  **weapon systems the two deputies who were speaking to Anthony**

21  **had with them?**

22   A.   Obviously, they had their Taser.  So I know they had

23  the Taser and the RCB, we should have that on our belt all

24  the time, but no other weapon that I knew of.

25   **Q.   Do you also have pepper spray or OC spray on your**

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Sabrina Cervantes on 02/22/2024

1   belt all the time?

2       A.    Yes, sir.

3       Q.    And when I say you, I mean not just you personally,

4   but Sheriff's deputies at your department?

5       A.    Yes, sir.

6       Q.    At any point prior to going on to the property, did

7   you go over to any of the other deputy's vehicles?

8       A.    No, sir.

9       Q.    Could you describe for me the less-lethal shotgun

10  that you had?

11      A.    It's -- it has a black barrel, the butt part is

12  yellow, and has -- I don't forget the -- where you put the

13  less-lethal rounds, the little bag that's called in the back

14  of it.  That's where all the less-lethal rounds go inside.

15            That's pretty much it.

16      Q.    And how is the -- that less-lethal shotgun loaded?

17      A.    We got to pull the -- I forget the bottom part, what

18  it's called.  It's not the barrel, but it's like the kind of

19  like the shotgun.  You just pull that lever forward.

20            You open it.  You make sure that there is no live

21  rounds or less-lethal rounds inside.  You have to make sure

22  it's clear and empty.  And then you put in your less-lethal

23  rounds, sir.

24      Q.    And is that component where you load the less-lethal

25  shotgun, is that on top of the weapon, or on the -- what side

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Sabrina Cervantes on 02/22/2024

1      A.   He did not speak to the occupants until they were

2   able to get out of the residence.

3      Q.   Was there any -- some other deputy who was speaking

4   to any of the other occupants regarding a plan to get them

5   out of the residence?

6      A.   I don't recall, sir.

7      Q.   Do you at some point assist in efforts to get any of

8   the other occupants out of the residence?

9      A.   No, sir.

10     Q.   Did you see any of the other occupants at any point

11  prior to the use of lethal force during the incident?

12     A.   Yes, sir.

13     Q.   Who did you see?

14     A.   I saw the Anthony's brother, Anthony's

15  sister-in-law, and I saw the two nieces.

16     Q.   Where were they when you saw them?

17     A.   Initially I saw when the brother and the

18  sister-in-law come out of the window, and they were seated on

19  the chair right outside of the window.

20          That was right before we were able to move them to a

21  safe location.  And two nieces I initially saw them when I

22  became aware that they were inside the house.  They were

23  standing in their bedroom, and you could see them through the

24  window through the curtains moving.

25     Q.   When you saw Anthony's brother and sister-in-law

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Sabrina Cervantes on 02/22/2024

Page 39

 1  outside of the window that they came through, how far away

 2  from you were they?

 3      A.  Six feet, seven feet.

 4      Q.  Could you observe any visible injuries on either of

 5  them at that time?

 6      A.  No, sir.  I was not close enough to see.

 7      Q.  And then when the -- when you saw the two girls who

 8  you mentioned on the other side of the house, was that

 9  because you had changed your position to go over there?

10      A.  Well, I just walked a little bit more towards the

11  street, and I had a visual of the two nieces.

12      Q.  Where were you standing when you had that visual of

13  the two nieces?

14      A.  Beginning of the driveway, sir.

15      Q.  When you say the beginning, you mean like the point

16  where it connects to the street?

17      A.  To the street, yes, sir.

18      Q.  And where were those two nieces at the time you saw

19  them from the beginning of the driveway?

20      A.  Inside their bedroom.

21      Q.  Approximately how far away from you were they at

22  that time?

23      A.  Quite a few feet, a long driveway where their window

24  was at was in front of the house.  If you're facing the front

25  door, it's going to be to the south of the front door.

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Sabrina Cervantes on 02/22/2024

Page 40

1      Q.   That's okay.  I can move on to my next question.

2           Could you see any visible injuries on them at any

3   point when you saw them prior to the use of lethal force

4   during the incident?

5      A.   No, sir.

6      Q.   Where were you positioned after -- well, let me go

7   back.

8           At some point did you develop an understanding that

9   all of the occupants of the house besides Anthony had exited

10  the house?

11     A.   That's correct.

12     Q.   And approximately how long after you arrived did you

13  form that understanding?

14     A.   Well, I was already on-scene.

15          I was on-scene, and they were still inside the

16  residence at the time.

17     Q.   So from the time you got to the scene to the time

18  you understood that they were all out of the residence,

19  approximately how long was that?

20     A.   I don't remember, sir.

21     Q.   Could you give me any kind of estimate?

22     A.   I believe 35, 45 minutes.

23     Q.   At any point prior to the use of lethal force during

24  this incident, did you observe any visible injuries on any of

25  the other occupants of the house?

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Sabrina Cervantes on 02/22/2024

1    A.    No, sir.

2    Q.    At the time that you first understood that all of

3  the occupants of the house were no longer in the house

4  besides Anthony, where were you positioned?

5    A.    So behind the wall, sir.

6    Q.    I think you mentioned that at some point you walked

7  out towards the edge of the driveway where you got a view of

8  two girls.

9        Did you then go back to the same position behind the

10 wall that you had been in previously?

11   A.    Yes, sir.

12   Q.    And did you -- I'll take that back.

13        At some point did Anthony come outside of the

14 house?

15   A.    Yes, sir.

16   Q.    Were you still in that same position behind the wall

17 when Anthony came outside of the house?

18   A.    Yes, sir.

19   Q.    Besides going to the front of the driveway where you

20 got the view of the two girls, had you at any point prior to

21 Anthony exiting the house changed your position from that

22 general area behind the wall where you had been?

23   A.    Yes, sir.  Well, we were trying to get the nieces

24 out of the house.  I don't recall which deputy I went with,

25 but we went to towards the back of the house because we had

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Sabrina Cervantes on 02/22/2024

Page 45

1  the door, and that is when Deputy Campos and Martinez both

2  saw that he had a chain in his hand.

3          And at that point I saw I believe it was Deputy

4  Campos.  I'm not sure if it was Deputy Campos or Martinez

5  pulled out the -- pulled out the Taser.

6          And that's when I came from behind the wall to join

7  them at that time.

8      Q.  And at that point when Deputy Campos pulled out the

9  Taser and you walked over to join them, was that the over an

10 hour into the time that you were on the scene?

11     A.  I believe so.  It might have been a little longer.

12         I honestly believe that we were -- they were talking

13 to him for like about two hours, sir.

14     Q.  And up until that point I think you mentioned that

15 it was at that point that the door was opened.

16         Did I understand you correctly?

17     A.  Yes.  I believe he opened the door.

18         He -- I didn't see the chain in his hand initially

19 when he the opened the door.  I was still behind the wall,

20 obviously.  As soon as I went to go join Deputy Campos and

21 Deputy Martinez, Anthony shut the door right away.

22     Q.  So for the period of about an hour or a little more

23 prior to the door opening, was it your understanding that

24 Deputies Martinez and Campos were speaking with Anthony

25 through a closed door?

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Sabrina Cervantes on 02/22/2024

Page 46

1    A.    It was I believe it was a screen door.

2         So you're obviously able to like communicate through

3    the door.  So I believe Anthony had obviously better visual

4    of Deputy Campos and Martinez.  Deputy Campos and Martinez I

5    believe they -- I can't speak for them, but through the

6    screen door you can't see any -- any movement that Anthony

7    was doing inside the residence.

8    **Q.    And then so was there some point when Anthony**

9    **actually came outside and stepped out of the front door**

10   **outside of the house?**

11   A.    Yes, sir.

12   **Q.    Is that the same point you were just describing, or**

13   **did that come later?**

14   A.    I believe that because he opened the door.

15        I don't believe -- I believe maybe like two or three

16   more times after that, and would shut it, and then he did

17   come out at one point, sir.

18   **Q.    Approximately how long had passed from the time he**

19   **arrived until the time he came out of the house?**

20   A.    Like I said, sir, I believe it was over an hour.

21   **Q.    Okay.  And when he came out of the house, could you**

22   **see him from where you were standing behind the wall?**

23   A.    At that point I was not standing behind the wall,

24   sir.  At that point I was standing next to Deputy Campos and

25   Deputy Martinez.

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Sabrina Cervantes on 02/22/2024

Page 48

1   door, but stayed still kind of close to the front door.

2        So yeah.  He stepped out of the house during that

3   time, but didn't walk towards us at that time yet.

4   **Q.   After stepping outside and standing in place there,**

5   **did he ever go back inside of the house after that?**

6   A.   Yes.

7   **Q.   Okay.**

8   A.   At one point we did air that he was coming out of

9   the house and we thought he was going to cooperate during

10  that time, and then he just went back inside again.

11  **Q.   So I want you to think about the last time that he**

12  **came outside of the house when he did not go back in the**

13  **house after that point.**

14       **Do you have that time in your mind?**

15  A.   I do, sir.

16  **Q.   Okay.  So when Anthony came out of the house that**

17  **intal time, did he remain in place after stepping outside, or**

18  **did he walk somewhere that time?**

19  A.   No, sir.  He walked out towards the walkway of where

20  we were standing.  Obviously, we stepped back to create

21  distance between Anthony and ourselves.

22       And then there was two I believe there was two

23  vehicles parked in the front of the walkway, and then like

24  the front yard was full of dirt, and there was two cars that

25  were marked there.

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Sabrina Cervantes on 02/22/2024

Page 49

1          Anthony walked towards more going towards south of

2    the house.  So I don't know how to explain it.  I have it in

3    my head -- basically, he went around the first car.

4          So now we're out.  All of us are out in the open.

5    Q.    So Anthony came outside of the house and then walked

6    around the car, and then began moving to the south from

7    there?

8    A.    Yes, sir.

9    Q.    What color was the car that he walked around?

10   A.    I don't recall, sir.

11   Q.    Do you recall whether it was a dark-colored car?

12   A.    I believe I want to say maybe a dark blue or like a

13   black.

14   Q.    Okay.  Do you recall whether it was a red car?

15   A.    I -- honestly, sir, I do not recall the color of the

16   vehicle.

17   Q.    When Anthony came outside and went around that car

18   and then began moving south, where did you move to?

19   A.    So I stayed behind I want to say it was a Honda, an

20   older Honda maybe an Acura basically the first car.

21          I stayed behind there by the trunk area.

22   Q.    When you say the first car, do you mean was that the

23   car that was further to the north or further to the south?

24   A.    Further to the south.

25   Q.    And how about Deputy Martinez and Campos, when

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Sabrina Cervantes on 02/22/2024

Page 53

1     Q.   What had you witnessed him do in that regard?

2     A.   At that point he had the chain link wrapped around

3  his arm, and he still had a leeway with it, and was basically

4  whipping it around like around his body.

5          I mean it was a pretty big chain.  So he was doing

6  it in the sense of like for us to like get away from him.

7     Q.   And that was before he came outside the final

8  time?

9     A.   That was when he came out the final time.

10    Q.   But so before -- by the time he came out the final

11 time, had you witnessed him attempt to strike anybody?

12    A.   No, sir.

13    Q.   By the time Anthony came outside the final time, had

14 you seen any visible injuries on anybody at the scene?

15    A.   No, sir.

16    Q.   And I think you mentioned a moment ago that after

17 Anthony came outside the final time, he went around that car

18 and then began moving to the south; is that correct?

19    A.   Correct.

20    Q.   When he was moving to the south, was he moving into

21 some portion of the yard that had grass or dirt on it?

22    A.   Dirt, sir.

23    Q.   Approximately how far to the south of the front door

24 did he go at that time?

25    A.   Probably about eight or nine feet.

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Sabrina Cervantes on 02/22/2024

Page 55

1      Q.   Which vehicle was that?

2      A.   The red one, sir.

3      Q.   Okay.  So would that be the vehicle on the

4   right-hand side of the image?

5      A.   Correct.

6      Q.   And then I think you mentioned earlier that when

7   Anthony came outside, he walked around one of the vehicles

8   before moving further south?

9      A.   Correct.

10     Q.   Do you see that vehicle that he walked around in

11  this image?

12     A.   Yes.  It's going to be that gray Honda.

13     Q.   Did you mean that when Anthony came outside the door

14  the final time, he walked through the gap between these two

15  vehicles in this image, and then around the rear of the gray

16  vehicle before moving south from there?

17     A.   I don't -- I don't believe so.

18          I think he just went straight around the Dodge to go

19  to the south.

20     Q.   So when you say around, you mean he came outside and

21  then he went south past the front end of the gray vehicle

22  there?

23     A.   Yes.

24     Q.   Okay.  And then the -- I think you mentioned that he

25  continued south after that; is that correct?

**ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Sabrina Cervantes on 02/22/2024**

Page 56

```
 1    A.   Correct.

 2    Q.   Did he at some point stop moving south?

 3    A.   Yes.

 4    Q.   Does this image show the point where he stopped

 5   moving south?

 6    A.   No.  It was a little bit more south towards the

 7   left, there was like another photograph out.

 8    Q.   Just for now I will for the record state that this

 9   is County Bates-stamped image 1218, and I'll go ahead and

10   introduce this as Exhibit 1.

11         (Exhibit 1 was marked for identification.)

12   BY MR. LEVINE:

13    Q.   Sorry.  I'm just putting the same image back up one

14   more time.

15         When you mentioned that before Anthony came outside,

16   you were standing behind a wall.

17         Is the position where you were standing shown in

18   this image?

19    A.   Yes.

20    Q.   Could you identify that position for me based on the

21   image?

22    A.   Yes.  It's going to be right adjacent to the red

23   Honda.  So it's going to be that wall between the where you

24   could see the front door and the window on the right side.

25    Q.   So you're standing sort of near the wall that's
```

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Sabrina Cervantes on 02/22/2024

1    between those two parts of the house?

2        A.   Correct.

3        Q.   All right.  One moment.

4             Okay.  I'm sharing my screen again.

5             Here is a new image.  Does this image appear to show

6    the southern portion of the front yard where the incident

7    took place?

8        A.   Yes.

9        Q.   Does this image show the area where Anthony was

10   walking south that we were just discussing?

11       A.   Yes.

12       Q.   Does it show the point where he stopped walking

13   south?

14       A.   Yes.

15       Q.   Could you identify for me on this image

16   approximately where he was when he stopped moving south?

17       A.   I believe we were where the shade begins.

18       Q.   Can you see my cursor on your screen?

19       A.   Yeah.

20       Q.   Is my cursor --

21       A.   A little bit -- yeah.  So if you move up more going

22   towards like where that tree is, go up more, and go to the

23   left, a little bit more to the left, like about right

24   there.

25       Q.   Okay.  So you're referring to the portion part of

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Sabrina Cervantes on 02/22/2024

Page 58

1   the shade that appears to be near the a fence line at the

2   southern end of the yard just up on the image from where

3   there appears to be a sort of angled portion of grass

4   sticking out into the dirt; is that correct?

5        A.   Correct.

6        Q.   So just up from the point of that grass where the

7   shadow begins, is that approximately where Anthony was when

8   he stopped moving south?

9        A.   Yes.

10        Q.   All right.  And then just for the record, I will

11   identify that this is the County's produced image Bates 1146,

12   and I'll introduce this as Exhibit 2.

13            (Exhibit 2 was marked for identification.)

14   BY MR. LEVINE:

15        Q.   When Anthony reached that southern most point near

16   the edge of the shade that you just pointed out for me, were

17   you still standing behind that red Honda?

18        A.   I believe I moved -- well, we all moved a little bit

19   towards now behind of the Charger.

20            Now at this point we're behind the Charger.

21        Q.   So while Anthony was moving south towards that shade

22   area you identified on the previous image, you moved a little

23   further south as well to the rear of the gray vehicle?

24        A.   Yes.

25        Q.   And at the time you moved to the rear of the gray

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Sabrina Cervantes on 02/22/2024

Page 59

1   vehicle, did the other deputies who you were with also

2   move?

3       A.   Yes.

4       Q.   And where did those deputies move to at that time?

5       A.   We all moved towards the back of the Charger, sir.

6       Q.   So at the time Anthony reached that southern most

7   point, you and the four other deputies were all approximately

8   standing at the rear of that gray Dodge Charger?

9       A.   Yes.

10      Q.   Upon reaching that southern most point that you

11  pointed out in the last image, what did Anthony do next?

12      A.   At that point he started swinging the chain at this

13  point.  He wasn't standing still.  He was kind of pacing like

14  back and forth.  That's the reason why he tried to like close

15  distance a little bit because he kept like moving back,

16  moving forward, he was a little bit all over the place, but

17  in the same area.

18           That's when he started swinging the chain link, the

19  chain that he had.  And then at that point that's when he

20  started striking in our direction, the chain, he started

21  basically like trying to hit us with the chain, and

22  obviously, in our direction.

23      Q.   And when you say he was swinging it in your

24  direction, that was from that position approximately by the

25  edge of the shade in the southern portion of the yard?

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Sabrina Cervantes on 02/22/2024

Page 60

1      A.   Correct.

2      Q.   When he started doing that, approximately how far

3   away was he from you?

4      A.   Like about five feet, maybe, sir, six feet.

5      Q.   You were standing five or six feet away from him

6   when he was at that southern portion of the yard that you

7   just pointed out by the shade?

8      A.   Approximately.  Yes, sir.

9      Q.   And that was while you were standing at the rear of

10   the gray Dodge Charger?

11      A.   Yes, sir.

12      Q.   Okay.  Was -- at some point did you attempt to fire

13   your less-lethal shotgun?

14      A.   Yes, sir.  Deputy Martinez advised "less-lethal,

15   less-lethal," and I deployed one round.

16           I believe it hit Anthony in the chest area.

17      Q.   And at the time that -- and that was -- was that the

18   first time you attempted to fire your less-lethal shotgun?

19      A.   Yes.

20      Q.   Okay.  Was that the only round that you fired with

21   your less-lethal shotgun that day?

22      A.   No, sir.

23      Q.   How many rounds in total did you fire with your

24   less-lethal shotgun that day?

25      A.   I believe two, sir.

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Sabrina Cervantes on 02/22/2024

Page 63

```
 1              THE WITNESS:  I don't recall, sir.

 2   BY MR. LEVINE:

 3       Q.   So do you recall whether there were any less-lethal

 4   weapons that were used by any of the other deputies before

 5   you fired that first less-lethal shotgun round?

 6       A.   I don't believe if it was before or after.

 7       Q.   Okay.  And what do you recall -- was the next --

 8   well, was there -- was there another less-lethal weapon that

 9   a deputy used against Anthony after you fired that first

10   less-lethal round?

11       A.   Yes.

12       Q.   What -- and do you recall what the next less-lethal

13   weapon that was used against Anthony was?

14       A.   I believe it was the 40, the less-lethal, the 40,

15   that's what we call it.

16       Q.   And would that be a 40-millimeter round launcher?

17       A.   Yes, sir.

18       Q.   Which deputy had the 40?

19       A.   I believe it was Deputy Deberg.

20       Q.   Do you recall approximately how long it was between

21   the time you fired your first less-lethal shotgun round and

22   the time Deputy Deberg fired his first 40-millimeter round?

23       A.   I believe it was right after, sir, because I did

24   voice that I had a malfunction, and then that's when Deputy

25   Deberg deployed the 40.
```

Page 64

1     Q.   Do -- could you give me an estimate as to how much

2  time passed?

3     A.   I don't -- maybe two seconds, three seconds.

4     Q.   When you fired your first less-lethal shotgun round

5  at Anthony, before you did that did you give him any verbal

6  warning that you were going to shoot the less-lethal shotgun

7  at him?

8     A.   Yes.  I believe I said, less-lethal, less-lethal.

9     Q.   But did you specifically say -- did you say anything

10  to the effect of, you know, put down the chain or I'll shoot

11  you with the less-lethal shotgun?

12     A.   I don't recall.  I did tell him -- I remember

13  telling him maybe multiple times to put the chain down.

14     Q.   Do you recall ever connecting that specifically to

15  the fact that you would use force against him if he did not

16  put the chain down?

17     A.   I don't recall --

18          MR. SMITH:  I'll object to the form of the question.

19          But go ahead, Sabrina.  You've already answered.

20          THE WITNESS:  I don't recall, sir.

21  BY MR. LEVINE:

22     Q.   And I think you said that at the time you fired that

23  first less-lethal round, Anthony was standing five or six

24  feet away from you?

25     A.   Yes.

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Sabrina Cervantes on 02/22/2024

Page 68

1   struck Anthony?

2       A.   I don't recall.  I don't recall.

3            Well, the only thing I do remember is when Deputy

4   Deberg did deploy all four of them, I don't remember which

5   deputy aired it, but he was saying that it was ineffective.

6   So I don't know if it was ineffective because Anthony --

7   obviously, Anthony didn't go down at the time.

8            I don't know if it was missed or if they just didn't

9   affect him.

10      Q.   Okay.  So your understanding -- was it your

11  understanding after those four 40-millimeter rounds were

12  fired, that possibly all of them had missed Anthony?

13      A.   I don't want to say missed, but I mean some of them

14  could have hit him and ineffective.

15           Like I said, I don't recall.

16      Q.   After -- after Deputy Deberg fired his fourth

17  40-millimeter round, was there another less-lethal weapon

18  that was used after that?

19      A.   Yes, sir.

20      Q.   And what was the next less-lethal weapon that a

21  deputy used after Deputy Deberg's fourth 40-millimeter

22  round?

23      A.   I believe it was the Taser, sir.

24      Q.   Which deputy used the Taser?

25      A.   I believe it was Deputy Campos.

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Sabrina Cervantes on 02/22/2024

Page 74

1  as you had been standing at when Deputy Deberg fired his

2  40-millimeter rounds?

3      A.   Yes.

4      Q.   Did you hear Deputy Campos give any kind of verbal

5  warning to Anthony before deploying his Taser?

6      A.   I don't recall.

7      Q.   Do you recall hearing Deputy Campos say anything to

8  Anthony in let's say the ten seconds prior to ploying his

9  Taser?

10      A.   I believe he said, "Taser, Taser, Taser."

11      Q.   Based on your training would saying, "Taser, Taser,

12  Taser" be considered an adequate verbal warning to give to a

13  subject before deploying a Taser against them?

14      A.   Yes --

15          MR. SMITH:  I'll object to the form of the question.

16          But go ahead, Sabrina.  You've already answered.

17  BY MR. LEVINE:

18      Q.   After Deputy Campos deployed the Taser, were there

19  any other less-lethal weapons that any deputies used against

20  Anthony?

21      A.   No, sir.

22      Q.   Did you ever fire your less-lethal shotgun a second

23  time?

24      A.   Yes, sir.

25      Q.   When was -- was that before or after Deputy Campos

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Sabrina Cervantes on 02/22/2024

Page 75

1   fired the Taser?

2       A.   After, sir.

3       Q.   Approximately how long after?

4       A.   Approximately maybe three minutes, sir.

5       Q.   Okay.

6            MR. LEVINE:  Would now be a good time for another

7   quick break?

8            MR. SMITH:  Yeah.

9            (Recess taken.)

10           BY MR. LEVINE:  Back on the record.

11  BY MR. LEVINE:

12      Q.   I think right before we took our last break, you

13  said that it was approximately three minutes between the time

14  that Deputy Campos fired the Taser and your second time

15  firing the less-lethal shotgun; is that correct?

16      A.   Yes.

17      Q.   During those three minutes did Anthony remain more

18  or less in the same location that he had been at the time

19  Deputy Campos fired the Taser?

20           MR. SMITH:  I'll object to the form of the question.

21           But go ahead, Sabrina.

22           THE WITNESS:  No, sir.  Anthony started walking

23  towards the front of the Charger at the time.

24  BY MR. LEVINE:

25      Q.   At the time that you fired your second less-lethal

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Sabrina Cervantes on 02/22/2024

Page 76

1  round at Anthony, where was Anthony standing?

2     A.   Now he was standing in between -- well, still in the

3  front, but between the Charger and the red Honda in the

4  front.

5     Q.   Was he in front of those cars in the area like --

6     A.   In the front, but in between, if that makes sense.

7     Q.   Right.  So he -- so wasn't directly between the two

8  cars, but he was in front of the area directly between the

9  two cars.

10          Is that -- do I have that right?

11    A.   Correct.

12    Q.   And prior to firing that second less-lethal shotgun

13  round, did you give any kind of verbal warning to Anthony

14  that you were going to fire?

15    A.   I don't recall.  I do remember giving him commands

16  to drop the chain.

17    Q.   But don't recall whether you told him you were

18  going to fire the less-lethal shotgun at him?

19    A.   No.

20    Q.   That second time you fired the less-lethal shotgun

21  at Anthony, was that the last time you fired the less-lethal

22  shotgun?

23    A.   Yes.

24    Q.   Did that second less-lethal shotgun round appear to

25  strike Anthony?

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Sabrina Cervantes on 02/22/2024

Page 81

```
 1   death or serious bodily harm to you or to the other

 2   deputies?

 3       A.   Yes.

 4       Q.   And could you explain that.

 5       A.   After I shot the second round, and I believed that

 6   aggravated him because that's when he said, "Fuck you,

 7   bitch," and he started closing distance, meaning, he started

 8   running -- at that point he started running towards me.

 9       Q.   But before you fired your second less-lethal shotgun

10   round, he was not running towards you; correct?

11       A.   No.

12       Q.   No, I'm not correct?

13            Or no, he was not running towards you?

14       A.   No, he was not running towards me.

15       Q.   So when I say at the time you fired the second round

16   at him, what did he appear to be pose an immediate threat of

17   death or serious bodily injury, I guess I'm referring to

18   immediately before you fired, like at the time you fired

19   before he started running towards you, at that time was he --

20   did he appear to be an immediate threat of death or serious

21   bodily injury to you or the other deputies?

22       A.   I would say yes because he was still swinging the

23   chain around.

24       Q.   Did you believe that you were within striking

25   distance of the chain at that time?
```

**ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Sabrina Cervantes on 02/22/2024**

Page 82

1      A.   If he could have hit me, yes, sir.

2      Q.   Could you explain what you mean by if he could have

3   hit you?

4      A.   Because during that time he wasn't directly swinging

5   it at me.  Like I said, he was swinging it around.  So he

6   could have -- if he would have struck it -- he would have

7   basically lunged towards my direction with the chain, yes, it

8   would have hit me.

9      Q.   Is there a reason why -- well, at any point did you

10  draw your duty weapon?

11     A.   No, sir.

12     Q.   Is there a reason why at the time that you believed

13  he posed an immediate threat of death or serious bodily harm

14  to you or the other deputies, that you did not draw your duty

15  weapon and fire?

16     A.   It happened so fast.  I didn't think that he was

17  going to run towards my direction.  So because of the how

18  fast he started running towards me, it just -- I didn't think

19  to grab my -- or you know unholster my duty belt and point it

20  in his direction.

21     Q.   Prior to him starting to run towards you, is there a

22  reason why you did not draw your duty weapon and fire?

23     A.   No, sir.  I believe I still had a few rounds in my

24  less-lethal.

25     Q.   At the time that Anthony started to move towards

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Sabrina Cervantes on 02/22/2024

Page 83

1   you, were you still standing between the rear or behind and

2   between the two vehicles?

3       A.   Yes.

4       Q.   At that time where was Deputy Martinez standing, if

5   you recall?

6       A.   He was standing to my right.

7       Q.   Would that have put him behind the red vehicle?

8       A.   A little bit more towards, yes.

9       Q.   Was he still sort of in the space behind the gap

10  between the two vehicles, or was he more directly behind the

11  red vehicle at that time?

12      A.   More towards the red vehicle.

13      Q.   And so was he standing behind the trunk of the red

14  vehicle at that time?

15      A.   I believe so, sir.

16      Q.   Would it maybe have been the left part of the trunk

17  or the part of the trunk that's more on the driver side?

18      A.   More part of the trunk on the driver side.

19      Q.   And then did Deputy Martinez fire his duty weapon at

20  some point?

21      A.   Yes, sir.

22      Q.   Do you recall how many times he fired his duty

23  weapon?

24      A.   I don't recall, sir.

25      Q.   Do you have an estimate as to how many times you

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Sabrina Cervantes on 02/22/2024

Page 89

1  fired, and I believe it was Deputy Campos who rendered aid

2  right away.

3       Q.   What kind of aid did he render, if you know?

4       A.   I don't remember, sir.

5       Q.   Do you recall if somebody handcuffed Anthony?

6       A.   I don't recall.

7       Q.   Did you handcuff Anthony?

8       A.   No --

9            MR. SMITH:  I'll object to the form of the question.

10 BY MR. LEVINE:

11       Q.   Did you provide any medical aid to Anthony

12 personally?

13       A.   No, sir.

14       Q.   Did you at any point summon paramedics to come after

15 Anthony had been shot?

16       A.   Yes, sir.  They were already on-scene.

17       Q.   So you didn't have to summon them yourself; they

18 were -- they just came without you doing anything?

19       A.   Yes, sir.

20       Q.   At any time before Deputy Martinez fired his final

21 shot at Anthony, did you ever observe Anthony reach for or

22 attempt to reach for a deputy's weapon?

23       A.   I don't recall, sir.

24       Q.   At the time Deputy Martinez fired any of his shots

25 at Anthony, did you observe any civilians nearby other than

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Sabrina Cervantes on 02/22/2024

Page 90

1   Anthony?

2       A.   I don't believe so.

3       Q.   And I think mentioned earlier that -- well, was your

4   impression at the time of the shooting, that the chain

5   Anthony had was capable of causing death to somebody as a

6   result of swinging it at them?

7           MR. SMITH:  I'll object to the form of the question.

8           THE WITNESS:  I don't understand the question.

9   BY MR. LEVINE:

10      Q.   Did you based on having seen the chain while Anthony

11  was holding it at any time prior to Deputy Martinez firing

12  his duty weapon, did you have the impression that if Anthony

13  swung the chain at any of the deputies, and the chain struck

14  them, that that could kill the deputy who was struck?

15      A.   Yes.

16      Q.   What was your understanding of how that chain would

17  cause death to somebody as a result of hitting them when it

18  was swung at them?

19          MR. SMITH:  I'll object to the form of the question.

20          Sorry to interrupt, but go ahead.

21          THE WITNESS:  Hitting deputy in the wrong spot,

22  whether -- I mean, obviously, in the face.

23  BY MR. LEVINE:

24      Q.   Where do you think the chain could have struck

25  somebody in the face that would have killed them?

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Sabrina Cervantes on 02/22/2024

1        MR. SMITH:  Once again, I'll object to the form of

2    the question.

3    BY MR. LEVINE:

4        Q.   I didn't hear your answer.

5        A.   Maybe somewhere on the temple.

6        Q.   Prior to this incident had you ever heard of any law

7    enforcement officers being struck by a chain that a suspect

8    was holding before?

9        A.   No, sir.

10       Q.   At any time during this incident did you consider

11   using your OC spray?

12       A.   No, sir.

13       Q.   Was there a reason why you did not consider using

14   your OC spray?

15       A.   Yes, sir.  The distance between Anthony and I, it

16   was too much of too much of a distance.  My pepper spray

17   would have been ineffective.  It could have gone into my

18   partner's eyes which that would create a officer safety

19   issue, or it could have gone into my eyes which would have

20   caused officer safety issue.

21       Q.   Was it windy that day?

22       A.   I don't recall, sir.

23       Q.   What is the -- based on your training, what is the

24   effective range of OC spray on a subject?

25       A.   I believe maybe about a foot or two feet.

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Sabrina Cervantes on 02/22/2024

Page 92

1      Q.   So does that mean that if you're more than two feet

2   away from the subject, the spray may be ineffective?

3      A.   Could have been, yes, sir.

4      Q.   So when you said that he was too far away, do you

5   mean that because he was approximately -- well, let's say at

6   the time that you used your less-lethal, I think you

7   testified that you were five to six feet away from him.

8          Would you not have used your OC spray at that time

9   because he was too far at five to six feet away?

10     A.   Yes, sir.

11     Q.   Did you consider using your Taser at anytime during

12  this incident?

13     A.   No, sir.

14     Q.   And was there a reason why you did not consider

15  that?

16     A.   Because I was instructed to use less-lethal shotgun,

17  sir.

18     Q.   At any point during this incident, did you consider

19  that Anthony might be having a mental health crisis of some

20  kind?

21     A.   Could be, sir.

22     Q.   But do recall whether you considered that at the

23  time?

24     A.   No, sir.

25     Q.   At any time before the shooting -- at any time

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Sabrina Cervantes on 02/22/2024

Page 93

1   before Deputy Martinez fired his duty weapon, was there any

2   discussion of a tactical plan regarding what you or the other

3   deputies would do if Anthony came outside with the chain?

4        A.   No, sir.

5        Q.   Was there any discussion at any point of using

6   personal protective equipment like the helmet that you

7   mentioned you had?

8        A.   No, sir.

9        Q.   Did you ever have consider retrieving your helmet at

10  any point as a tool to protect you from the chain?

11       A.   No, sir.

12       Q.   Was there a reason why you did not consider that?

13       A.   Just -- I didn't think about it at the time, sir.

14       Q.   Between your time at the Sheriff's Academy and also

15  while working as a Sheriff's deputy have you received

16  training on the use of deadly force?

17       A.   Yes, sir.

18       Q.   Based on your training, is deadly force considered

19  the highest level of force an officer can use?

20       A.   Yes, sir.

21       Q.   Based on your training, is it your understanding

22  that deadly force should only be used to defend against an

23  imminent threat or immediate threat of death or serious

24  bodily injury?

25       A.   Yes, sir.

ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Sabrina Cervantes on 02/22/2024

Page 94

1      Q.   Were you trained that deputies are responsible to

2    justify each shot they fire when using deadly force?

3      A.   Yes, sir.

4      Q.   Were you trained that when using deadly force,

5    deputies should attempt to assess the effectiveness of each

6    shot between shots?

7      A.   Yes, sir.

8      Q.   Were you trained that before using deadly force, a

9    warning should be given, if feasible?

10     A.   Yes, sir.

11     Q.   Did you receive training on the use of less-lethal

12   force as well?

13     A.   Yes, sir.

14     Q.   And would that include training on the use of

15   less-lethal shotgun?

16     A.   Yes, sir.

17     Q.   Were you trained that you should give -- the

18   deputies should give a warning before using less-lethal

19   weapons?

20     A.   Yes, sir.

21     Q.   According to your training, what is the intended

22   effect of a bean bag shotgun?

23     A.   To basically stop the threat.

24     Q.   According to your training, is there a minimum

25   distance you should have between you and an individual before





EXHIBIT 2

CervantesS 2/22/24

Huseby.com

