# Exhibit 5

```
 1                UNITED STATES DISTRICT COURT

 2                CENTRAL DISTRICT OF CALIFORNIA

 3

 4   ROSA NUNEZ, individually, ANTHONY    )
     NUNEZ, JR., individually and as      )
 5   successor-in-interest to Decedent,   )
     Anthony Nunez and ANDREW NUNEZ,      )
 6   individually,                        )
                                          )
 7              Plaintiffs,               )
                                          )
 8              vs.                       ) Case No.
                                          ) 5:22-CV-01934-SSS-SPx
 9   COUNTY OF SAN BERNARDINO, CITY OF    )
     HESPERIA, MICHAEL MARTINEZ, SABRINA  )
10   CERVANTES, JEREMY DEBERG, JONATHAN   )
     CAMPOS, and DOES 5-15, inclusive,    )
11                                        )
                Defendants.               )
12   _____)

13

14         REMOTE VIDEOCONFERENCE DEPOSITION OF

15                    COREY LA FEVER

16              MONDAY, FEBRUARY 12, 2024

17

18

19

20

21

22   Reported Stenographically By:

23   Jinna Grace Kim, CSR No. 14151

24   Job No.:  47724

25
```

1  before.

2           And then at about probably about 7:30 we were

3  finished with briefing normally between 15 and 30 minutes is

4  what we do for briefing.  At the conclusion of that, I

5  reviewed reports and other administrative duties.

6      Q.   And at some point did -- well, how did you initially

7  learn about this call?

8      A.   There was a radio call that was -- that I was

9  advised of by radio that there was a domestic disturbance at

10 the location in question on 9th Street.  I knew that two

11 deputies were in route to that call for service.

12     Q.   And that radio information that you heard about the

13 call, would that have been from dispatch?

14     A.   Yes.

15     Q.   What was -- what information do you recall having

16 received from that initial dispatch call?

17     A.   I recall the reporting party advise that he was in

18 an altercation with his brother and was asking for police

19 assistance to the location because he was -- I don't remember

20 if he used the word out of control or what, but because of

21 the disturbance at the incident location and being able to

22 needing assistance, to help with the incident.

23     Q.   And your understanding is that the reporting party

24 was the brother who was calling about the subject in this

25 case?

1  Q.  Would that have been 9th Avenue?

2  A.  Yes.

3  Q.  And do you recall whether you parked your vehicle
4  along the street directly in front of the address where the
5  call was about?

6  A.  It would have been to the northeast of the property.
7      I don't recall how far away, but it was definitely
8  not immediately in front of it.

9  Q.  Do you recall approximately how many houses to the
10 north you parked?

11 A.  I believe I parked mine just to the -- just to the
12 one house north of the incident location in front of that
13 residence.

14 Q.  And I think you said that there was already another
15 police vehicle -- or excuse me -- Sheriff's vehicle parked in
16 front of where you parked?

17 A.  Yes.  It could have been two, Deputy Campos and
18 Deputy Martinez.  I don't recall where there is exactly,
19 where but I recall being behind theirs.

20 Q.  What did you observe -- did you then get out of your
21 vehicle once you arrived?

22 A.  Yes.

23 Q.  What did you observe upon exiting your vehicle?

24 A.  I observed Deputy Campos and Deputy Martinez out in
25 front of the residence just to the east of the entryway.

| | | |
|---|---|---|
| 1 | Q. | And was that the first location on the property that |
| 2 | you breached after entering the driveway? | |
| 3 | A. | Yes. |
| 4 | Q. | What were you able to observe from that northeast |
| 5 | corner? | |
| 6 | A. | I observed the Deputies Martinez and Campos again |
| 7 | facing the front of the residence, facing to the west and | |
| 8 | communicating with someone.  It wasn't until later I was able | |
| 9 | to determine that that was the subject Andrew -- I'm sorry -- | |
| 10 | Anthony. | |
| 11 | | And there was two adults inside the window just to |
| 12 | the north of where they were, later identified as a bedroom | |
| 13 | where we were able to make contact the deputies. | |
| 14 | | Deputy Deberg, Deputy Cervantes and I were able to |
| 15 | see, and I made contact with the two later identified as | |
| 16 | Andrew and his wife inside that -- through the window. | |
| 17 | Q. | So to your knowledge, have you ever encountered |
| 18 | Anthony Nunez before? | |
| 19 | A. | No. |
| 20 | Q. | Did you have any information about any criminal |
| 21 | history of his? | |
| 22 | A. | There might have been information that came over the |
| 23 | radio, but I don't recall that. | |
| 24 | Q. | Did you at that point have any information regarding |
| 25 | any crime that he was believed to have committed? | |

Page 28

1   point?

2   A.   If I remember correctly, they were just to the north

3   of the doorway out of sight from Anthony, but available to

4   assist Deputy Martinez and Campos and had visual of them.

5   Q.   So when you walked away from Anthony and towards the

6   window where Andrew was, you would have walked past Deputies

7   Cervantes and Deberg?

8   A.   Yes.

9   Q.   Do you say anything to them or did they say anything

10  to you when you walked past them?

11  A.   Not that I recall, specifically.

12  Q.   And when -- at the time you went back to the window

13  where Anthony was, did you then develop a plan to get Andrew

14  and his wife out of the house?

15  A.   Yes.  I was to get Andrew, his wife, and their

16  daughter, as well as some other family on the opposite side

17  of the residence.

18  Q.   And what deputies did you formulate that plan

19  with?

20  A.   Deputy Zane [phonetic] as well as eventually

21  Detective Schrader [phonetic] came to the incident location,

22  and he assisted with that evacuation as well.

23  Q.   Did you assign certain deputies to handle the room

24  that was on other side of the house while other deputies

25  handled the room that had Andrew in it --

1   A.   We were able to get Andrew and his wife and daughter
2   out, the young child, out of the -- that initial room, and
3   then work on getting the other two out of the other portion
4   of the residence.  And that was once we got Andrew and his
5   wife out, we were able to formulate a plan, and Deputy Zane
6   as well as Detective Schrader were assigned to assist in
7   getting the remaining occupants out of the residence.
8   Q.   Did you join them in getting the remaining occupants
9   out of the residence?
10  A.   No.  I asked them to take care of that so I could
11  start taking care of some other things that were happening.
12  Q.   What were -- what other things that were happening
13  did you attend to immediately after delegating this plan to
14  those deputies?
15  A.   I was also in the process of delegating -- getting
16  our Special Enforcement Division involved who have more
17  expertise in dealing with and utilizing -- and they're also
18  known as SWAT operators utilizing different operations and
19  tactics to assist us by getting Anthony out of the residence
20  and provide a better security for handling the firearms.
21       So I contacted the lieutenant of the Special
22  Enforcement Division, Lieutenant Smith, and requested their
23  assistance in the incident.
24  Q.   I think in your explanation there, you referenced
25  better security and handling the firearms.

1         If I heard that correctly, could you explain what
2    you meant by that?
3         A.   Our Special Enforcement Division has expertise in
4    entering homes in higher risk situations and being able to
5    deal with barricaded subjects.  They have more specialty
6    training in being able to do that.
7              And because Anthony refused to come out of the house
8    and we knew there was a handgun in the residence, we knew
9    that escalated the situation and wanted to make sure that
10   we had the best tactics possible to deal with the situation
11   and training and experience I guess.  Not just the tactics.
12        Q.   At some point did you establish a command post near
13   the location where the house was?
14        A.   Yes.
15        Q.   And approximately where was that command post
16   located?
17        A.   It was approximately 100 to 200 yards northeast of
18   the incident location along 9th Avenue, but about 200 or so
19   yards north of the location.
20        Q.   Was that at or near the next intersection to the
21   north on 9th Avenue?
22        A.   Yes.  It was closer to Saltan [phonetic] Avenue, I
23   believe.
24        Q.   Do you have an approximation as to how many houses
25   or in between the subject location and where you established

Page 31

1  this command post?
2     A.   Approximately three or four houses.
3     Q.   From where -- from the command post could you see
4  what was happening in the -- between Deputies Martinez and
5  Campos and Andrew -- excuse me -- Anthony Nunez at the front
6  of the subject property?
7     A.   Not through -- not at the doorway area, but I could
8  see the front of the property by the fence towards closest to
9  9th Avenue if that makes sense.
10    Q.   Were there any trees or other visual obstructions
11 between you and any part of the front yard at the subject
12 property from where you were standing at the command post?
13    A.   There was vehicles and fences.  I don't recall any
14 trees, but clearly, the vehicles from the arriving deputies
15 would have been in that view.
16    Q.   Approximately how long were you at that command post
17 location for once you arrived there?
18    A.   I would say -- I would roughly say 20 to 30 minutes.
19       Time and situations like that kind of run away.
20       So it's hard to track specifics.
21       Sorry to say that.
22    Q.   Did any of the residents of the household such as
23 Andrew or his wife join you at the location at the command
24 post?
25    A.   Yes.  Andrew did.

1   Q.   And was he there continually with you for the entire
2   time you were at the command post?
3   A.   No.
4   Q.   Approximately how long was he there at the command
5   post with you for?
6   A.   He was only with me for a few minutes.
7        He was definitely with other deputies or personnel,
8   but he was with me just for a few minutes while I asked him
9   to provide information about the residents.
10  Q.   Did at any point while you were at the command post
11  receive any additional information about the firearm you
12  believed was inside the residence?
13  A.   Yes.  Andrew received a phone call from his mother
14  who was the owner of the handgun and advised that the handgun
15  at some point prior to date or that date's incident had been
16  moved from the residence into a vehicle on the premises out
17  front.
18  Q.   And was it your understanding that the handgun was,
19  in fact, locked inside of that vehicle out front?
20  A.   That was our understanding.
21  Q.   Did you receive information that Anthony did not
22  have access to the key to that vehicle?
23  A.   Nobody had access to that vehicle, to the best of
24  our knowledge, with keys.
25  Q.   Was this updated information regarding the location

Page 33

1  of the firearm relayed in some manner to the deputies who
2  were at the property?
3      A.  I believe so.  I believe I advised dispatch over the
4  radio of the information.  Whether it was me or somebody
5  else, but I believe that was -- that information was
6  provided.
7      Q.  So your understanding is that at around that time
8  Deputies Campos and Martinez would have been updated to the
9  fact that there was not a gun inside the house; is that
10 correct?
11     A.  They were updated that the -- about the information
12 that the gun was possibly moved, but there was no
13 confirmation that that gun was, in fact, not accessible at,
14 you know, we were able -- unable to confirm that specific
15 detail.
16         MR. SMITH:  And I'll interpose my objection that the
17 form of the question, and it's been answered.
18         So go ahead --
19         THE WITNESS:  Sorry about that.
20         MR. SMITH:  That's okay.
21 BY MR. LEVINE:
22     Q.  Did you at some point -- sorry.
23         Hang on.  Scratch that.
24         At the time that you formulated a plan to evacuate
25 the other residents of the household besides Anthony, did you

Page 35

1  did you direct deputies to begin evacuating residents
2  surrounding the subject property?
3      A.   Yes.
4      Q.   And approximately how long after your arrival on the
5  scene did you give that direction?
6      A.   It would be estimated, you know, 15 minutes, 20
7  minutes, maybe.
8      Q.   Did you ever receive information from any of the
9  deputies that the houses surrounding the subject location
10 had, in fact, been evacuated?
11     A.   I believe they were getting updates.
12          I don't remember specifically -- I don't remember
13 the specific details, but they were getting updates.
14     Q.   So you don't recall receiving any confirmation that
15 that task had been completed, for example?
16     A.   I believe it was still ongoing.
17     Q.   While you were at the command post for the
18 approximately 20 to 30 minutes that you mentioned before,
19 what was your understanding of what was taking place between
20 Anthony and Deputies Martinez and Campos?
21     A.   They continued to give him directions to come out of
22 the residence, to separate himself from that chain as well as
23 to drop the chain he had picked it up throughout the
24 interaction they had with him, and remove himself away from
25 the residence.

Page 42

1  that there was access to the firearms as discussed earlier or
2  the firearm.
3      Q.   Was Anthony shirtless?
4      A.   Yes.
5      Q.   Could -- did -- could you tell if there was any --
6  anything in his waistband from the time that you were talking
7  to him by the door?
8           Did you see any bulge or anything like that?
9      A.   I didn't notice any bulge.
10     Q.   You didn't have any information that Anthony was in
11 possession of a knife?
12     A.   Not that I recall.
13     Q.   You didn't have any information that Anthony was in
14 possession of a club or any other type of blunt object?
15     A.   No.
16     Q.   I think you mentioned earlier that when you were
17 speaking with Anthony by the door, that the chain was sort of
18 coiled up by his foot on the ground; is that correct?
19     A.   If I remember correctly, yes.
20     Q.   Could you -- were you able to get an approximate
21 sense of how wide the chain was?
22     A.   Not that I recall, not that I specific remember.
23     Q.   Could -- were you able to get an impression of the
24 approximate weight of the chain as you observed it there
25 coiled up?

Page 57

1 time of the shooting?

2    A. Yes.

3    Q. Okay. And so I think you mentioned a moment ago

4 that your recollection was that at the time of Deputy

5 Martinez's gunshots, you were somewhere maybe ten or so feet

6 away to the rear of the red vehicle; is that accurate?

7    A. Yes.

8    Q. Does this image capture what you -- the position

9 that you recall -- I'll scoot it over a little bit --

10 standing in at the time of Martinez's first gunshot?

11    A. Yes. I believe I was towards the back right of the

12 red car shadow somewhere right in there.

13    Q. If I to draw a circle, would that approximately be

14 where you were standing?

15    A. I would say approximately.

16    Q. And by the way, I'll mark the unaltered photo, and

17 this is 1218. I think we're on Exhibit 3.

18      (Exhibit 3 was marked for identification.)

19      MR. SMITH: Yeah.

20      MR. LEVINE: Okay. So that would be 3.

21      I'll hold off on 4 for right now.

22 BY MR. LEVINE:

23    Q. So the red circle there is approximately your

24 position at the time of the initial gunshot.

25      And then how about Deputy Martinez?

Page 58

1           I realize that this photo shows a -- the body of
2   Andrew on the ground.
3           But ignoring that for right now, could you -- could
4   you let me know where approximately where Deputy Martinez was
5   standing at the time of the first gunshot?
6       A.  Yes.  Just for clarification, that's the body of
7   Anthony, not Andrew.  And then he would -- I would say that
8   Martinez was standing approximately just to the I'll say just
9   to the east a little bit further than Anthony's foot.
10          So if you move your cursor up a little bit --
11      Q.  So I'll draw a circle, and you can let me know where
12  to move the circle.
13      A.  Uh-huh.
14      Q.  Is this circle pretty much accurate?
15      A.  I'm having a hard time seeing that blue.
16          I would say it's a little bit further towards the
17  house.
18      Q.  Okay.  How about that?
19      A.  I would go a little more.
20      Q.  More.  Okay.
21      A.  And a little bit more.  I would just he was in
22  between the two vehicles.
23      Q.  How's that?
24      A.  I think that's probably pretty accurate.
25          It's hard to tell with the image, but yeah.

Page 60

1   was continuing to move forward between the first and third
2   gunshots?
3           Do I have that correct?
4      A.   Correct, yes.  That's correct.  I don't recall.
5      Q.   And you also testified if I recall correctly, that
6   your recollection was that Deputy Martinez was moving
7   backwards away from Anthony by some amount in the span
8   between the first and third shots?
9      A.   I believe he was continuously moving back,
10  correct.
11     Q.   Do you have a recollection as to whether during the
12  time between the first and third shots, that Deputy Martinez
13  was gaining distance away from Anthony?
14     A.   I don't recall.
15     Q.   Do you recall if at -- let me just back up there.
16          Based on the image that we have here, and I will go
17  head and mark this as Exhibit4.
18          (Exhibit 4 was marked for identification.)
19  BY MR. LEVINE:
20     Q.   Is it your recollection that based on where Deputy
21  Martinez was standing, that he -- that the -- this gray
22  vehicle and the image was immediately to his left at the time
23  of the -- based on where he was positioned as marked by the
24  blue circle?
25     A.   I believe so.

Page 64

1  BY MR. LEVINE:
2      Q.  Okay.  My understanding is we've essentially reached
3  the end of your time that you're available for today,
4  Sergeant La Fever; is that correct?
5      A.  Yes.  If it's brief I might have a few more minutes
6  if it's something that you think we can get through.
7      Q.  Maybe just one or two more brief questions and I
8  won't go much longer at all.
9          You've received training at some point in your
10 career?
11     A.  Yes.
12     Q.  The Sheriff's Department provides more or less
13 regular training to its deputies; is that correct?
14     A.  Yes.
15     Q.  Does it provide training to deputies on tactical
16 repositioning?
17     A.  Yes.
18     Q.  What briefly in your understanding is tactical
19 repositioning?
20     A.  Tactical repositioning, although, I don't know that
21 I've heard those specific phrases would be to reposition
22 yourself in a situation that provides the best tactical
23 advantage to be away from a particular threat of violence.
24     Q.  Are deputies at the San Bernardino County Sheriff's
25 Department trained that they should when possible and when

Page 65

1  they could do so without increasing the threat to their
2  physical safely or to the physical safety of others,
3  tactically reposition in order to create space between
4  themselves and a subject who is armed?
5      A.  Yes.
6      Q.  With an impact weapon?
7      A.  Yes.
8      Q.  I'll go ahead and leave it there.
9          Thank you very much for your time, Sergeant La
10 Fever.
11         MR. LEVINE:  I don't know if Mr. Smith, if you have
12 any follow-up question.
13         MR. SMITH:  I don't, but thank you for offering.
14         MR. LEVINE:  Mr. Corzano?
15         MR. CORZANO:  I don't.  Thank you.
16         (Deposition proceeding concluded at 4:01 p.m.)
17                         *  *  *
18
19
20
21
22
23
24
25

