# Exhibit 7

```
 1                  UNITED STATES DISTRICT COURT

 2                 CENTRAL DISTRICT OF CALIFORNIA

 3

 4   ROSA NUNEZ, individually, ANTHONY    )
     NUNEZ, JR., individually and as      )
 5   successor-in-interest to Decedent,   )
     Anthony Nunez and ANDREW NUNEZ,      )
 6   individually,                        )
                                          )
 7              Plaintiffs,               )
                                          )
 8              vs.                       ) Case No.
                                          ) 5:22-CV-01934-SSS-SPx
 9   COUNTY OF SAN BERNARDINO, CITY OF    )
     HESPERIA, MICHAEL MARTINEZ, SABRINA  )
10   CERVANTES, JEREMY DEBERG, JONATHAN   )
     CAMPOS, and DOES 5-15, inclusive,    )
11                                        )
                Defendants.               )
12   _____)

13

14           REMOTE VIDEOCONFERENCE DEPOSITION OF

15                      EDWARD T. FLOSI

16                   MONDAY, APRIL 1, 2024

17

18

19

20

21

22

23   Reported Stenographically By:

24   Jinna Grace Kim, CSR No. 14151

25   Job No.:  58794
```

1    Q.   I take it in cases that you have went to trial on
2    and testified in the officer-involved shooting cases that the
3    use of deadly force was reasonable, in majority of those
4    cases there were an expert retained by the plaintiff who had
5    a differing opinion than you?
6    A.   That's common, yes.
7    Q.   Let's talk just a little bit about some of the
8    standards that apply to the use of deadly force.
9         I know you and I have talked about some of them in
10   the past.  Obviously, deadly force is the highest level of
11   force that an officers can use against someone else?
12   A.   Deadly force is the most intrusive level, yes.
13   Q.   And is the expectation that if officers are shooting
14   center mass, that it's likely to cause death or serious
15   bodily injury?
16   A.   Yes.  Application of deadly force is likely to cause
17   of death or serious bodily injury.
18   Q.   And the reverence for human life is at least a
19   concept that's discussed in relation to the use of deadly
20   force?
21   A.   Yes.  Reverence for all life involved including the
22   deputies in this case.
23   Q.   But the reverence for human life, obviously,
24   includes the suspect; correct?
25   A.   Yes.  Everybody, as I said.

Page 10

1   Q.   Are officers trained that they should give a verbal
2   warning when feasible before using deadly force?
3   A.   If it's feasible, some sort of warning is given.
4   Q.   Is there training to give a verbal warning when
5   feasible when using certain non-lethal forces?
6   A.   Yes.  If feasible, officers are trained to give some
7   sort of warning.
8   Q.   Are officers generally trained that subjective fear
9   alone is insufficient to use deadly force?
10  A.   Officers are trained that the facts and
11  circumstances that they rely upon should be objective facts
12  and circumstances.
13  Q.   And so it has to be objectively reasonable; is that
14  fair?
15  A.   Yes.  The standard is the belief must be objectively
16  reasonable.
17  Q.   Is a fear of future harm alone enough to use deadly
18  force based on the training?
19  A.   If you could be a little more specific about future
20  fear, give me a range, maybe.
21  Q.   Sure.  Are you aware that at some point Penal Code
22  Section 835 was revised?
23  A.   Yes.
24  Q.   If you know, did some of the revisions make it into
25  the updated POST Learning Domains?

Page 13

1    A.   I see that, yes.

2    Q.   And then in the next paragraph, you say officers are
3  trained that imminent means a threat of death or serious
4  injury is "imminent," when based upon the totality of the
5  circumstances a reasonable officer in same situation would
6  believe that a person has the present ability, opportunity,
7  and apparent intent to immediately cause death or serious
8  bodily injury to the peace officer or another person.

9       Do you see that sentence?

10   A.   I do.

11   Q.   Just so that I understand it correctly, this is both
12  in the POST Learning Domain and also part of the revised
13  Penal Code Section 835?

14   A.   I don't know if that exact wording is in the code,
15  but you I know that the definition is included in the code
16  now.

17   Q.   So am I understanding this correctly, that for there
18  to be imminent, there that's to be the present ability,
19  opportunity, and apparent intent to immediately cause death
20  or serious bodily injury?

21   A.   That a reasonable officer would believe based on
22  their knowledge and perception that there is that present
23  ability, opportunity, and apparent intent.

24   Q.   So a reasonable officer would have to believe all
25  three exist, in other words, in the conjunctive?

Page 14

```
 1    A.   That's the way I read it.
 2    Q.   Okay.  I guess just for discussion purposes, if a
 3  reasonable officer would not believe that all three existed,
 4  then applying this standard, the use of deadly force would be
 5  inappropriate; is that fair?
 6    A.   If a reasonable officer did not have this belief
 7  based on the facts and circumstances known or perceived to
 8  them, then it could not rise to the level of a deadly force
 9  response.
10    Q.   And the belief would have to be a reasonable belief,
11  also; correct?
12    A.   Yes.  It's a reasonable belief based on the facts
13  and circumstances known or perceived at the time.
14    Q.   So if hypothetically in a given case, the fact
15  finder found it was not a reasonable belief, then that would
16  go against the notion of the deadly force being appropriate;
17  is that generally a fair statement?
18    A.   If that was the perception of the independent fact
19  finder, then that would be the their belief.
20    Q.   And then the next sentence, an imminent harm is not
21  merely a fear of future harm no matter how great the fear and
22  no matter how great the likelihood of the harm, but is one
23  that from appearances must be instantly confronted and
24  addressed.
25         Do you see where I'm reading from?
```

1    A.   I do.

2    Q.   And again, that is also part of the Learning
3    Domain?

4    A.   It is.

5    Q.   And so are officers trained that a fear of future
6    harm, no matter how great the fear and no matter how great
7    the likelihood of the harm is not enough?

8    A.   That's the language in the Learning Domain.
9         It doesn't define for me how far in the future.
10        Is it days in the future, or is it upcoming in the
11   next few moment future.

12   Q.   Okay.  All right.
13        Have you seen shooting cases before either on video
14   or maybe cases that you reviewed where you believe the
15   officer overreacted in using deadly force?

16   A.   I don't know if overreacted is the right word, but
17   I have reviewed some cases where my opinion was that I could
18   not defend the officers' deadly force response because I did
19   not believe it was objectively reasonable.

20   Q.   Can officers like other human beings overreact on
21   occasion?

22   A.   I'm sure as any human person could overreact,
23   officers are capable of it as well.

24   Q.   Is there training with respect to controlling your
25   fear, controlling your anger, things of that nature?

Page 16

1   A.   Absolutely.

2   Q.   Is there training with respect to not overreacting
3   to a situation?

4   A.   I don't remember overreaction training.
5        There is specifically some training in Learning
6   Domain 20 about managing fear and anger.

7   Q.   In many of the cases that you work on and review
8   statements of officers, witnesses, have you noted that
9   sometimes the facts of the cases are disputed?

10  A.   Oftentimes, facts are disputed based on different
11  people's perception and angle of view of the event.

12  Q.   And as a police practice expert having testified on
13  multiple occasions in jury trials, is it your understanding
14  that a jury ultimately decides the disputed facts?

15  A.   They make their own decision, yes.

16  Q.   And with respect to whether the use of deadly force
17  is reasonable or not, excessive or not, it's your
18  understanding that the jury also makes that decision?

19  A.   They -- unless it's a deadly force case, of course,
20  then they will make that decision on their own.

21  Q.   In term of tactics, obviously, officers have
22  training with respect to tactics?

23  A.   Yes.

24  Q.   And I take it the goal in any situation, if they
25  can, is to safely take the person into custody?

Page 28

```
1     A.   Toward the west.
2     Q.   So the house from the street is which direction, if
3  you know?
4     A.   From the street, west.
5     Q.   And so when Mr. Nunez was moving in between the
6  vehicles, would he have been traveling in a east direction?
7     A.   If my directions are correct, yes, he would have
8  been moving east if he was coming between the vehicles.
9     Q.   And what is your understanding as to where Deputy
10 Cervantes was in relation to the vehicles when she deployed
11 the bean bag?
12    A.   I think she was at least very close to Deputy
13 Martinez at the time.
14    Q.   And what do you base that on?
15         Just reviewing the materials?
16    A.   My recollection of the event and how all four
17 deputies were very close to the rear end of the gray car if
18 the front was pointed towards the home.
19    Q.   And when you say all four deputies, that would
20 include DeBerg, Campos, Cervantes, and Martinez?
21    A.   Yes.
22    Q.   Based on your review, did Deputy Martinez give any
23 verbal warning that he was going to use deadly force?
24    A.   There was as far as I remember, no specific full
25 deadly force warning given.
```

1    Q.   Were there any warning that the less-lethal was
2    going to be deployed, any warnings given to Mr. Nunez
3    regarding the 40-millimeter, the Taser, or the bean bag
4    round?
5    A.   Specific to the use, I believe there was a previous
6    warning about the Taser device, but when Mr. Nunez came out
7    in to the yard, I don't believe there was a specific warning
8    about the use of different force options.
9    Q.   Now, in part of your review, you looked at the
10   deposition of Deputy Martinez?
11   A.   I would have to go and look at my list.
12   Q.   Take a moment and do that if you can.
13   A.   Yes.  Michael Martinez is in the list of
14   depositions.
15   Q.   And would it be fair to say since he was the
16   shooting officer, that would be at least one of the important
17   documents you would want to review, his deposition?
18   A.   I think there are plenty of important documents, but
19   it would have been included in the documents that I wanted to
20   review.
21   Q.   I'm assuming you charge per hour for your review of
22   the materials?
23   A.   I do.
24   Q.   And when you go through a deposition like Deputy
25   Martinez's deposition, do you take notes, do you underline,

Page 34

1   he moved back as Mr. Nunez was approaching, and as he came
2   out of the home as well.
3          But I don't know if he moved during the sequencing
4   of the shooting?
5      Q.   And assuming the cars were parked faced-in, in other
6   words, the front closer to the house, what is your
7   understanding as to where Deputy Martinez was relative to the
8   two vehicle when he fired his shots?
9      A.   He would have been closer to the passenger side
10  taillight assembly of the gray car.
11     Q.   And the gray car as you're looking from the street
12  to the house, would be on the left?
13     A.   Yes.
14     Q.   Do you know approximately what the length of those,
15  that type of vehicle is?  Is it like 15 to 20 feet, somewhere
16  in that range?
17     A.   Probably.
18     Q.   Is there a concept of tactical repositioning that's
19  taught in the training?
20     A.   Yes.  Tactical repositioning or redeployment is
21  something that is taught in training.
22     Q.   So, for example, if an officer decides he wants to
23  take cover or create distance, this is something depending on
24  the facts, obviously, that an officer could consider as an
25  option?

Case 5:22-cv-01934-SSS-SP   Document 72-11   Filed 04/26/24   Page 12 of 15   Page ID #:1340
ROSA NUNEZ, ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Edward T. Flosi on 04/01/2024

Page 35

1    A.   If they're aware and that is an available and
2  tactically sound option, then officers can move.
3    Q.   Would you agree based on your review of the
4  materials, that Mr. Nunez was not swinging the chain during
5  the shots?
6    A.   During the actual shots, I don't recall if he was
7  actually swinging the chain, but he had swung the chain
8  according to the deputies immediately prior to the shots.
9    Q.   Do you recall Deputy Martinez testifying in
10 deposition that the chain was in the same position during the
11 shots, and that Mr. Nunez had not -- was not swinging the
12 chain during the shots?
13   A.   I don't recall that testimony, but that's my
14 understanding.
15   Q.   And in terms of the gait, Deputy Martinez describes
16 Mr. Nunez was walking?
17   A.   Quickly.
18   Q.   Would you agree that Deputy Martinez indicated that
19 Mr. Nunez was not running or lunging towards any deputies
20 immediately prior to or during the shots?
21   A.   I don't recall any testimony about Mr. Nunez running
22 or running or lunging at the time, only that he was
23 aggressing quickly towards the deputies.
24   Q.   Do you recall Deputy Martinez indicating that he
25 didn't recall Mr. Nunez like winding up as if he was about to

Page 36

1  swing the chain before the first shot?

2      A.  No.  I remember there was some testimony or

3  statements that Mr. Nunez had swung the chain in a fashion

4  towards the deputies and then started moving towards the

5  deputies prior to the shots being fired.

6      Q.  Would it be correct that at least based on the

7  statements of the deputies including Deputy Martinez, that

8  the deputies did not observe a firearm on Mr. Nunez at the

9  time of the shots?

10     A.  I don't think there is any testimony or statements

11  by any of the deputies that Mr. Nunez ever was in physical

12  possession of a firearm.

13     Q.  Would you also agree that none of them observed him

14  with, for example, a knife immediately before or during the

15  shots?

16     A.  No.  We can probably shorten this up.

17         I think the only weapon that any of the deputies

18  ever testified to or stated that Mr. Nunez had was the

19  chain.

20     Q.  And prior to the shooting did Deputy Martinez have

21  any specific information that Mr. Nunez had physically

22  injured anyone with the chain?

23     A.  With the chain, no.

24     Q.  Okay.

25         MR. GALIPO:  We've been going about an hour.

1  apologize -- but indicated that Mr. Nunez was like swinging
2  the chain or swinging it at someone or something like that?
3      A.  Yes.  At different times the deputies talked about
4  Mr. Nunez swinging it.  One deputy described it as like a
5  lasso type of fashion, and one time it was described as
6  swinging towards like almost a whip type of fashion.
7      Q.  I think you've already told me that based on your
8  review of the materials, Mr. Nunez did not strike any deputy
9  with the chain; is that fair?
10     A.  I don't recall of any evidence that any of the
11 deputies were actually struck by the chain.
12     Q.  And to your knowledge, did any of the deputies
13 sustain any type of physical injury related to this
14 incident?
15     A.  I don't recall any injuries reported.
16     Q.  So the swinging of the chain, do you know how close
17 the closest deputy was to him when this alleged swinging took
18 place?
19     A.  It would have been within the length of the car, the
20 gray car as he and then moved towards the deputies after
21 swinging it towards the deputies.
22     Q.  So from 15 to 20 feet away?
23     A.  Yes.  And then moving towards the deputies after
24 swinging it.
25     Q.  So are you saying it's your understanding that

Page 47

1  to a mental health facility.
2      Q.   Well, who was recommending a psychologist?
3           Was that the deputies or someone else?
4      A.   I don't recall the entire portion of the
5  conversation, but I do have a footnote to that quote that it
6  was on Martinez's belt-worn audio.
7      Q.   So Page 34 of your report, looking at Line 18, you
8  indicate that there was not a full verbal warning prior to
9  the discharge of the projectile impact weapons or the Taser
10 device.
11          Do you see that?
12     A.   I do.
13     Q.   And then on Lines 23 and 24, you talk about officers
14 are trained they should give some warning prior to a force
15 response where feasible?
16     A.   Yes.
17     Q.   What is the benefit of that, why does the training
18 say, if you know, when feasible, give the suspect a warning
19 before using force against them?
20     A.   If it's feasible to do so, it gives the subject if
21 they're able to comprehend the warning, a opportunity to stop
22 what they're doing to mitigate the chances of the officers,
23 the deputies in this case, having to respond with force.
24     Q.   And with respect to deadly force, what is the
25 importantance of giving a warning when feasible based on the