# EXHIBIT 2

## On-Scene Consulting

March 29, 2024

Mr. Dale K. Galipo, Esq.
The Law Offices of Dale K. Galipo
21800 Burbank Boulevard, Suite 310
Woodland Hills, California 91367

### Federal Rules of Civil Procedure 26 (a) (2) (B) Supplemental Report

**ROSA NUNEZ, individually; ANTHONY NUNEZ, JR., individually and as successor-in-interest to Decedent, Anthony Nunez; and, ANDREW NUNEZ, individually, Plaintiffs,**

**vs.**

**COUNTY OF SAN BERNARDINO, CITY OF HESPERIA; MICHAEL MARTINEZ; SABRINA CERVANTES; JEREMY DEBERG; JONATHAN CAMPOS; and DOES 5-15, inclusive,**
<u>**Case No. 5:22-CV-01934-SSS-SPx.**</u>


Dear Mr. Galipo,

Thank you for retaining me to analyze and render opinions regarding the March 29, 2022, Deputy-Involved Shooting incident at 8990 Ninth Avenue, Hesperia, California 92345, that involved San Bernardino County Sheriff's Department, Deputy Sheriff Michael Martinez, <u>Employee No. F6915</u>, that resulted in the death of Anthony Nunez. Pursuant to the requirements of Rule 26, I have reviewed documents, photographs, San Bernardino County Sheriff's Department documents, Transcriptions of Digitally Recorded Depositions, and other material (<u>as listed under Materials Reviewed</u>) provided to me thus far regarding this case.  Please be advised that if additional documents related to this matter are provided, it may be necessary to write a supplemental report in order to refine or express additional opinions.


Scott A. DeFoe
Principal
On-Scene Consulting, LLC

## On-Scene Consulting ───────────

**Materials Reviewed:**

1. Second Amended Complaint for Damages, <u>Case No. 5:22-CV-01934-SSS-SPx</u>.

2. Photographs of Chain, (<u>NUNEZ/SBD 001647-001656</u>).

3. Deposition Transcript and Exhibits of Corey LaFever taken on February 12, 2024.

4. Deposition Transcript and Exhibits of Jeremy Deberg taken on February 21, 2024.

5. Deposition Transcript and Exhibits of Sabrina Cervantes taken on February 22, 2024.

6. Deposition Transcript and Exhibits of Michael Martinez taken on February 12, 2024.

7. San Bernardino County Sheriff Department Deputy Sheriff Michael Martinez, Audio Belt Recording, (<u>1:34:29</u>).

8. Transcribed Audio Belt Recording for San Bernardino County Sheriff Department Deputy Sheriff Michael Martinez, (<u>NUNEZ/SBD 000204-000384</u>).

9. Scene Photographs, (<u>NUNEZ/SBD 001081-001631</u>).

10. San Bernardino County Sheriff's Department Training Materials, (<u>NUNEZ/SBD 001853-002036</u>).

11. San Bernardino County Sheriff's Department Manual, (<u>NUNEZ/SBD 002038-002091</u>).

12. Transcribed Interview with Deputy Michael Martinez, <u>DR No. 1922022324</u>, (<u>NUNEZ/SBD 000386-000482</u>).

13. Rough Deposition Transcript of Lucy Ramos taken on February 27, 2024.

**California POST Basic Learning Domains as Follows:**
1. #1: "Leadership, Professionalism and Ethics."
2. #2: "Criminal Justice System."
3. #3: "Policing in the Community."

## On-Scene Consulting ──────────────

4.  #20: "Use of Force."
5.  #21: "Patrol Techniques."
6.  #23: "Crimes in Progress."
7.  #33: "Arrest and Control."
8.  #34: "First Aid, CPR, and AED."
9.  #35: "Firearms/Chemical Agents."
10. #37: "People with Disabilities."

### Additional Materials Reviewed

1.  Rough Deposition Transcript of Jonathan Campos taken on March 18, 2024.

2.  Rough Deposition Transcript of Luz Elena Ramos taken on February 27, 2024.

### Summary

The following statement summaries represent documents/statements that were used in part during my review but are in no way meant to be exhaustive. The documents listed in the <u>Materials Reviewed Section</u> of this report represent the full library of documents reviewed thus far and used as a basis for my opinions.

### Factual Summary

On March 29, 2022, deputies for the San Bernardino County Sheriff's Department responded to a call at 8990 Ninth Avenue in Hesperia, California. Dispatch advised that the caller reported the suspect male had pushed the suspect's brother, may be under the influence, and had not slept in multiple days, and that there possibly was a gun in the residence.

Deputies Jonathan Campos and Michael Martinez arrived at the residence at the same time. They approached the house and contacted a male, Andrew Nuñez, who was in a bedroom inside the residence. When the deputies knocked on the front door (<u>on the east side of the residence</u>), they heard something knock on the door from the inside, and heard a man speaking, possibly to himself. They then went back to the bedroom window to ask Andrew to open the front door for them, which he did before returning to his bedroom.

Through the open front door, the deputies saw Anthony Nuñez standing several feet inside. Anthony was wearing black pants with no shirt and was holding a chain dog leash, just over 7 feet in length, in his right hand, wrapped around his hand multiple times. Deputy Campos drew his taser and held it at low-ready. Deputies Martinez and Campos

## On-Scene Consulting ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

began speaking with Anthony and directing him to drop the chain and come outside so that they could talk. Campos agreed he would holster his taser if Anthony dropped the chain, and Anthony dropped the chain onto his foot. When Campos did not holster his taser, Anthony picked the chain up again. Martinez radioed a request that the next available deputy respond with a less-lethal beanbag shotgun.

The deputies spoke with Anthony, with Anthony standing inside the doorway and the deputies standing at the front porch, for approximately an hour. Anthony's mood rose and fell over the course of the conversation, and he spoke at length to the deputies about various subjects including religion, how he was a king and needed to be obeyed, and his plan to run for and be elected President, as well as how he loved and respected the deputies.

During this time, Deputy Zane and Sergeant Corey LaFever arrived at the house. These deputies remained on the north side of the residence, out of Anthony's view. Deputies Jeremy Deberg and Sabrina Cervantes also arrived and armed themselves with a 40 millimeter round launcher and a beanbag shotgun, respectively, before taking positions near the front door of the house out of Anthony's view. LaFever joined Campos and Martinez by the front door for a short time to speak to Anthony, who soon became irritated with LaFever, who returned to the north side of the property.

Concerned about Anthony and a possible gun in the house, LaFever called for additional deputies and directed deputies to evacuate Anthony's family members from two bedrooms in the house through the bedroom windows. LaFever then established a command post at a nearby intersection and directed deputies to establish a perimeter, evacuate neighbors, and close off the block. The fire department was also summoned to stage nearby. LaFever briefly interviewed Andrew at the command post, during which time Andrew spoke via telephone to Rosa Nuñez (his and Anthony's mother), who was the owner of the reported firearm. Rosa lived at the house but was away for the day. Rosa advised Andrew and LaFever that days earlier, she had moved the gun out of the house and into a vehicle that was parked outside and locked, for which only she had the key. This information was relayed to the deputies.

As Martinez and Campos continued to speak to Anthony, Anthony eventually became aware that his family members were no longer inside the house. Anthony began asking the deputies for his family and quickly became more agitated. Anthony demanded that his family be returned. According to deputies, Anthony soon stepped out of the house and walked toward the south end of the yard, away from the deputies, and began swinging the chain leash over his head like a lasso. Two sedan vehicles were parked parallel to each other in front of the front porch at an angle, facing southwest toward the house. Deputies

## On-Scene Consulting

Deberg and Cervantes stepped out from near the front of the house and joined Campos and Martinez, who moved behind (*i.e.*, to the east of) the two parked cars.

Deputies ordered Anthony to drop the chain and get on the ground. According to deputies, while standing in the southern or southeastern portion of the yard and swinging the chain, Anthony turned to face the deputies. Anthony was at least 20-25 feet away from the deputies at this time, likely further. Cervantes called out "less lethal" and attempted to fire her beanbag launcher, but it did not fire; she testified it jammed. Deberg fired his 40-millimeter launcher at Anthony four times while Anthony was still in the southern portion of the yard, walking around that portion of the yard but not approaching deputies. According to the deputies, these 40-millimeter rounds struck Anthony. Campos then fired his taser.

Anthony then walked back north/northwest, toward the front porch, closer to the deputies but not in their direction (they remained near the rear of the parked cars). The deputies' accounts are somewhat inconsistent, but some claimed Anthony continued to swing the chain over his head during this time and/or flick it forward in a whipping motion. According to Cervantes, Cervantes then fired a beanbag round at Anthony while he was near the porch, and Anthony then began approaching the deputies through the gap in the two parked cars. According to Deberg, Anthony had already begun approaching the deputies when the taser and beanbag round were fired. Some deputies called out "less lethal, less lethal" to one another before firing, and Deberg said "40, 40," but no deputy issued a warning to Anthony that less-lethal force would be used against him if he did not comply.

The belt recording of the incident makes clear that immediately after Cervantes fired the beanbag round, Martinez fired 3 shots at Anthony from his handgun over a span of approximately 2 seconds. The 3 shots were evenly spaced. According to the deputies, Anthony was approximately 15-20 feet away from Martinez when Martinez began firing and continued to advance a short distance closer to Martinez during the shots. During his deposition, Martinez testified that at the time of all three shots, Anthony was holding the chain in his right hand with his right hand raised by his ear but was not swinging or moving the chain and was not pulling his arm back or winding up as if to swing the chain forward. Martinez further testified that Anthony's torso and shoulders were facing and squared toward Martinez at the time of the shots (other deputies similarly testified), and that Martinez took a few steps backward during the shots. Martinez did not issue any verbal warning he would shoot. In his interview, Martinez stated that he reassessed the claimed threat between shots, but during his deposition stated he did not have time to do so. Martinez claims he fired because he believed Anthony posed an immediate threat of

## On-Scene Consulting

death or serious bodily injury to Martinez or the other officers by virtue of the chain leash Anthony held.

The deposition of a next-door neighbor and witness, Lucy Ramos, was taken on Feb. 27, and Ramos contradicts much of the deputies' testimony regarding Anthony's conduct immediately before and during the shooting. Ramos testified that she was sitting in a parked car on her property watching Anthony and the deputies up until the time of the use of lethal force. She testified that immediately before and at the time of the shooting, Anthony held the chain at about stomach-level, and that she had at times seen him gesturing forward with it when deputies approached him, as though to warn them not to approach, but she never saw him attempt to strike any deputy with it, swing or spin it over his head, or swing it forward. She further testified that she never saw Anthony run toward, walk quickly toward, or walk at all toward at any deputy immediately prior to the use of lethal force. She further testified that Anthony never appeared to be attempting to injure any deputy and it never appeared that any deputy was about to be killed or seriously injured by him.

According to Martinez, at the time of the shots, Martinez was standing between the areas behind the rear ends of the two parked vehicles. During his deposition, Martinez acknowledged that he had room to maneuver either to the left (around the rear of the left car) or to the right (around the rear of the right car) to gain cover and distance from Anthony but did not do either.

Anthony fell to the ground somewhere between the two parked vehicles and Martinez kicked the chain away. Campos handcuffed Anthony. When the paramedics arrived, they dragged Anthony's body several feet to the east, out of the space in between the two cars and into the open, so that they would have more room to work on him.

**Opinions:**

Note: None of my opinions are intended to usurp the province of the jury and are not stated as ultimate issues. I hold the opinions below a reasonable degree of professional certainty. The basis and reasons for my opinions are premised upon my education, training and experience in law enforcement, my knowledge of law enforcement standards, analysis and study; my familiarity with generally accepted police practices and the professional and academic literature in the field; my review of relevant actions, policies and procedures; and my understanding of the facts of this case based on my review of the comprehensive materials listed on Page 2 of this report. My opinions and testimony regarding police procedure are relevant topics concerning issues of which lay

**On-Scene Consulting** ———————————————————————

jurors are unaware or frequently have misconceptions.  My testimony on these topics is relevant and would assist a jury in understanding the evidence presented to them.

### Opinion Number 1

It is my opinion based on my review of the facts and testimony in this matter, a reasonable Deputy Sheriff would have initially determined Mr. Anthony Nunez was mentally ill or experiencing a mental crisis.  It is my opinion the Defendants, failed to initially determine Mr. Anthony Nunez was mentally ill, experiencing a mental crisis, and/or potentially under the influence of a controlled substance.

Throughout the United States and in California, law enforcement agencies have recognized and trained their officers in multiple ways to safely interact with subjects such as Mr. Anthony Nunez who are suffering from a mental illness or experiencing a mental crisis.  The objective is to avoid unnecessary injury and or death.  The underlying principle is reverence for human life.  These correct and reasonable methods are recognizing cues and other indicators in order to make appropriate decisions regarding intervention strategies; time to assess the situation; calm the situation; request additional resources and equipment; provide reassurance that the Deputies officers are there to help; give the person time to calm down; move slowly; eliminate emergency lights and reduce environmental distractions.  These correct and reasonable methods are well known and proven effective for the safety and welfare of both Peace Officers and the public.

In addition, law enforcement officers are taught that they should attempt to de-escalate and utilize proper defusing techniques throughout an incident.  There was no rush.  Mr. Anthony Nunez was outside of his residence and all family members had been relocated by the San Bernardino County Sheriff's Office.  There was no crime in progress and Mr. Anthony Nunez was only potentially in violation on 242 PC-Misdemeanor Battery for allegedly "pushing" his brother Andrew Nunez, who was not injured as a result of the alleged pushing incident.

In addition, I base my opinion on California Police Officer Standards and Training (POST), Learning Domain No. 20-Chapter 2: Force Options, Communication, 2-11: Effective communication may enable a peace officer to gain cooperation and voluntary compliance in stressful situations.

The vast majority of law enforcement responsibilities involve effective communication.  Communication involves both command presence and words resulting in improved safety.  Effective communication can:

## On-Scene Consulting

- Provide skills that reduce the likelihood of physical confrontation.
- Result in a reduction of injuries.
- Render more effective public service and improves community relations.
- Decrease public complaints and internal affairs investigations.
- Decrease civil liability.
- Lessen personal and professional stress.

In addition, the Defendants <u>failed</u> to comply with <u>San Bernardino County Sheriff's Department, 3.606.10 De-Escalation, (NUNEZ/SBD-002052-2053)</u>: Gaining voluntary compliance enhances officer and public safety, helps officers to defuse a situation, mitigates unintended consequences, and establishes law enforcement legitimacy and community trust. Safety members shall use de-escalation techniques, crisis intervention tactics and other alternatives to force, as per their training, when feasible. Alternatives to force are not required by a member when the member reasonably believes that immediate action must be taken to prevent injury to themselves, another member or the public.

It is necessary for members to utilize crisis intervention tactics when applicable to a situation. If a member, based on their training and experience, determines a subject might be experiencing a crisis, the member shall consider crisis intervention tactics as an available means of de-escalation.

<u>De-escalation Techniques may include</u>:

1. Creating distance and a buffer zone between the officer and the subject.

2. Establishing an effective line of communication with the subject, considering factors such as mental illness, possible intoxication, and potential medical or physical conditions.

3. Considering other available resources, including specialized units, psychiatric emergency response team clinicians and negotiators.

In addition, I base my opinion on my twenty-eight years of law enforcement experience where I responded to thousands of calls for service and have effectively utilized defusing techniques, de-escalation techniques, verbal strategies, and active listening skills to reduce the potential for violence and bring the emotional level of the incident to a manageable level.

In addition, I base my opinion on my twenty-eight-year law enforcement career and specifically during my assignment as a Sergeant II+1 at Los Angeles Police Department Special Weapons and Tactics (<u>SWAT</u>) where I supervised hundreds of SWAT incidents that involved the use of the SWAT's Crisis Negotiation Team.

## On-Scene Consulting

Lastly, I base my opinion on my twenty-eight- year law enforcement career where, as a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

### Opinion Number 2

It is my opinion the Defendants <u>failed</u> to request the San Bernardino County Sheriff's Department Mental Health Crisis Intervention Team, (<u>CIT</u>) to respond and aid the involved Defendants with the incident involving Mr. Anthony Nunez.   In addition, it is my opinion, the San Bernardino County Sheriff's Department failed to properly train the involved Defendants in Crisis Intervention Techniques.    Crisis Intervention Team (<u>CIT</u>) Officers are specially trained to respond to incidents involving individuals who are mentally ill, experiencing a mental crisis an or under the influence of a controlled substance.

Many law enforcement agencies throughout the United States that have provided Crisis Intervention Training (<u>CIT</u>) to their police officers and or have formed a Crisis Intervention Team(<u>s</u>) that typically <u>follow the below listed recommended guidelines</u>:

- Whenever possible, a uniformed CIT Officer(<u>s</u>) should respond to any call involving a mentally ill individual that pose a danger to self or others.
- Upon receiving a call involving a mentally ill person, who poses a danger to themselves or others, Communications (<u>Dispatch</u>) will follow the standard dispatch protocol and request a CIT Officer(<u>s</u>) to respond.

Crisis Intervention curriculum teaches officers skills such as de-escalation, (e.g., <u>talking slowly, having more patience, asking subject questions, recognizing the signs and symptoms of mental illness</u>), how to provide mental health referrals/resources, and about the voluntary treatment options.  By increasing understanding by officers of mental illness and improving the response to mental health calls will reduce the need for the use of force, decrease injuries and deaths to officers and people in a mental health crisis, reduce the stigma of mental illness and increase access and engagement in services for people with mental illness.

In addition, the Defendants <u>failed</u> to comply with San Bernardino County Sheriff's Department, 3.180 Mental Health Crisis Intervention Team, (NUNEZ/SBD-002046-2047): The Department has established the Crisis Intervention Team, (CIT) program to ensure that mental health-related calls for service are handled safely and effectively, with compassion and understanding. Members who have completed CIT training are a useful resource to supplement traditional law enforcement response to mental health crisis: identifying alternate resources that may be used, suggesting effective options to booking

## On-Scene Consulting

at a jail facility, and assisting in the attempt to restore the person to a pre-crisis level. CIT-trained personnel have specific training to deal with persons experiencing mental health crisis, and therefore their expertise should be utilized when available.  Patrol Divisions should work toward the goal of having at least one deputy trained in mental health intervention on duty at all times.

In addition, I base my opinion on my law enforcement experience with the Los Angeles Police Department (LAPD) while assigned to: Patrol, Vice, Special Problems Unit, Detectives, and Special Weapons and Tactics (SWAT) to include being the Supervisor-in-Charge of LAPD SWAT's Crisis Negotiation Team.  In addition, the utilization of a mental health professional at the onset of an incident such as this incident can be an invaluable tool.  The Los Angeles Police Department Mental Evaluation Unit (MEU) responds to thousands of similar incidents on an annual basis and supports uniformed personnel by providing valuable insight and information.  I also base my opinion on my twenty-eight-year law enforcement career where I have utilized the services of LAPD's Mental Evaluation Unit on hundreds of incidents to effectively resolve situations involving mentally ill subjects.

Lastly, I base my opinion on my twenty-eight- year law enforcement career whereas a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

### Opinion Number 3

It is my opinion, based on my review of the videos, facts and testimony, the Defendants failed to formulate a safe tactical plan and failed to discuss and implement reasonable tactical contingencies to include tactically retreating to create Time and Distance until the arrival of San Bernardino County Sheriff's Department Mental Health Crisis Intervention Team.

There was not a crime in progress.  There was no rush.  Deputy Sheriffs are taught, or should be taught, Time and Distance.

In addition, the Defendants should have been aware that Mr. Anthony Nunez was mentally ill, experiencing a mental crisis, and/or potentially under the influence of a controlled substance.

Deputy Sheriffs must approach every contact with officer safety in mind.  Complacency, overconfidence, poor planning, or inappropriate positioning can leave Deputy Sheriffs vulnerable to attack.

## On-Scene Consulting ────────────

The tactical plan that should have outlined verbal skills (defusing and de-escalation techniques) and Less Lethal Force options such as: empty hands, physical strength and compliance techniques, soft or hard hand techniques, the Taser Conducted Energy Weapon, (CEW), with an effective range of 7-15 feet and maximum range of 21-25 feet, Ballistic Shield, K9, Pepper Ball Launcher with a maximum effective range of 60 feet, 40mm with a maximum effective range of approximately 100 feet, ASP/ baton, Oleoresin Capsicum "OC" spray with an effective range of 2-15 feet, Chemical Munitions, Baton or the deployment of the 870 Remington 12-Gauge Shotgun with a Drag Stabilized 12-Gauge Bean Bag Round. The Drag Stabilized 12-Gauge Round is a translucent 12 Gauge shell loaded with a 40-Gram tear shaped bag made from a cotton and ballistic material blend and filled with #9 shot. The design utilizes four stabilizing tails and smokeless powder as the propellant. The round has a velocity of 270 feet per second (FPS) with a maximum effective range of 75 feet.

The Taser is a Conducted Energy Weapon, (CEW), as defined by the manufacturer, Axon. It is a handheld, battery operated tool which uses controlled electrical current designed to disrupt a person's sensory and motor nervous system by means of deploying electrical energy sufficient to cause temporary uncontrolled muscle contractions, or Neuro Muscular Incapacitation, ("NMI"). As a result, the electrical energy can override the person's voluntary motor responses for a brief duration. The use of Taser CEW deployment resulting in NMI may provide a brief opportunity during which physical restraint procedures can be initiated whenever practical.

In addition, I base my opinion on California Police Officer Standards and Training (POST), Learning Domain No. 21-Chapter 1: Basic Concepts of Law Enforcement Patrol, 1-21:

**Inappropriate Attitude:**
- Careless or complacent.
- Overconfident.
- Too aggressive.

**Poor or No Planning:**
- Rushing into the situation without any plan of action.
- Failure to establish plan of action prior to engaging the suspect.
- Not considering alternative actions.

## On-Scene Consulting

In addition, the <u>Defendants failed to comply with San Bernardino Sheriff's Department
Training, "What is a Tactical Plan?</u> (<u>NUNEZ/SBD-001860</u>): A plan is an intention or
decision about what one is going to do. Tactical plans must cover what deputies need to
achieve as a team during a call for service or event. A plan needs to be made based on
the situation and environment. Each deputy has the responsibility for the implementation
of the tactical plan.

As set forth in <u>POST Learning Domain 22</u>, "Officers are trained to work together and
function as a team. In order to ensure officer safety and to ensure an appropriate
outcome, the primary officers and cover officers must effectively communicate with one
another. Appropriate communication involves advising the primary officer of any critical
occurrences or safety issues."

In addition, I base my opinion on <u>California Commission on Peace Officers Standards
and Training, Student Materials, Learning Domain, No. 21-Chapter 1: Basic Concepts of
Law Enforcement Patrol,1-22:</u> The element of officer safety refers to the practical
application of tactically sound procedures to perform law enforcement activities in a safe
and effective manner to include the utilization of available resources. Some of the
available resources in this situation can include calling for backup officers, waiting for
and deploying backup officers; remaining in a position of advantage, cover, and
concealment; issuing commands and verbalization from a position of cover; using less-
than-lethal and other tactics that officers are trained to use in these situations.

<u>In addition, I base my opinion on the following facts and testimony in this matter:</u>

- According to Deputy Sheriff Michael Martinez, Sergeant LaFever was in charge
  of creating a tactical plan and he never communicated a tactical plan to Martinez,
  (<u>Deposition Transcript of Michael Martinez, Pages 79-80</u>).
- According to Deputy John Campos, there was no discussion what to do if Mr.
  Anthony Nunez came out of the house and does not recall if Sergeant LaFever said
  what to do if Mr. Nunez came out of the house with a chain in his hand,
  (<u>Deposition Transcript of John Campos, Pages 110-111</u>).
- According to Deputy John Campos, he believes a ballistic shield could block a
  chain being swung and supposes the use of deadly force could have been averted
  had Deputy Martinez or if a different Deputy had been holding a ballistic shield,
  (<u>Deposition Transcript of John Campos, Page 117</u>).

## On-Scene Consulting ───────────────

- According to Deputy John Campos, he believes Sergeant LaFever's vehicle contained a ballistic shield and he did not hear Sergeant LaFever request a Deputy to get the ballistic shield, (Deposition Transcript of John Campos, Pages 119-120).

In addition, I base my opinion on my twenty-eight years of law enforcement experience where I responded to thousands of calls for service and have effectively utilized defusing techniques, de-escalation techniques, verbal strategies, and active listening skills to reduce the potential for violence and bring the emotional level of the incident to a manageable level.

In addition, I base my opinion on I base my opinion on my twenty-eight-year law enforcement career and specifically during my assignment as a Sergeant II+1 at Los Angeles Police Department Special Weapons and Tactics (SWAT) where I supervised hundreds of SWAT incidents that involved the use of the SWAT's Crisis Negotiation Team.

In addition, I base my opinion as a former Long Range Impact Device Instructor, (40MM/37MM/Remington 870 Bean Bag Shotgun), during my tenure as a Los Angeles Police Department Sergeant II+1 at Metropolitan Division K9 Platoon and as a Sergeant II+1 assigned to Metropolitan Division Special Weapons and Tactics, (SWAT).

Lastly, I base my opinion on my twenty-eight- year law enforcement career where, as a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

### Opinion Number 4

It is my opinion, based on my review of the videos, facts and testimony, the Defendants failed to designate a Contact and Cover Officers, (Deputies) and failed to utilize available cover prior to deployment of both Less Lethal and Lethal Force that resulted in the unnecessary death of Mr. Anthony Nunez.  There was no rush.  There was no crime in progress and the Nunez residence located at 8990 Ninth Avenue, Hesperia, California 92345, had been evacuated and the neighboring residences were evacuated.

In addition, based on my review of the transcribed Audio Belt Recording for San Bernardino County Sheriff Department Deputy Sheriff Michael Martinez, (NUNEZ/SBD 000204-000384), there were numerous Deputies that were engaged in dialogue during the incident, which is contrary to training especially if a subject is mentally ill, experiencing a mental crisis an or under the influence of a controlled substance.

## On-Scene Consulting ─────────────────────

In addition, I base my opinion on <u>California Police Officer Standards and Training (POST), Learning Domain No. 23-Crimes in Progress, Chapter 2: Basic Tactical Considerations, Tactical Approach</u>: Peace officers should always be aware of surrounding objects or areas that may be utilized for cover or concealment.

<u>Cover</u>:
- Anything that may stop or deflect an opponent's bullets.
- Should be used when involved in an armed encounter if possible.
- The type of cover will depend on the type of weapon.

**Examples of Cover:**
- Cement block or brick walls.
- Buildings.
- Portion of the vehicle with the engine block.
- Trees.

According to Deputy Sheriff Michael Martinez, just before he first shot, he could have maneuvered to the south or north, which would have put either of the two parked vehicles between him and Mr. Nunez, at least one of which would have increased the distance between them, but he did not do so, (<u>Deposition Transcript of Michael Martinez, Page 139-140</u>).

As set forth in <u>POST Learning Domain 22</u>, "Officers are trained to work together and function as a team.  In order to ensure officer safety and to ensure an appropriate outcome, the primary officers and cover officers must effectively communicate with one another.  Appropriate communication involves advising the primary officer of any critical occurrences or safety issues."

In addition, I base my opinion on <u>California Commission on Peace Officers Standards and Training, Student Materials, Learning Domain, No. 21-Chapter 1: Basic Concepts of Law Enforcement Patrol,1-22:</u>  The element of officer safety refers to the practical application of tactically sound procedures to perform law enforcement activities in a safe and effective manner to include the utilization of available resources.  Some of the available resources in this situation can include calling for backup officers, waiting for and deploying backup officers; remaining in a position of advantage, cover, and concealment; issuing commands and verbalization from a position of cover; using less-than-lethal and other tactics that officers are trained to use in these situations.

## On-Scene Consulting   ———————————————

In addition, I base my opinion on my twenty-eight years of law enforcement experience where I responded to thousands of calls for service and have effectively utilized defusing techniques, de-escalation techniques, verbal strategies, and active listening skills to reduce the potential for violence and bring the emotional level of the incident to a manageable level.

In addition, I base my opinion on I base my opinion on my twenty-eight-year law enforcement career and specifically during my assignment as a Sergeant II+1 at Los Angeles Police Department Special Weapons and Tactics (SWAT) where I supervised hundreds of SWAT incidents that involved the use of the SWAT's Crisis Negotiation Team.

In addition, I base my opinion as a former Long Range Impact Device Instructor, (40MM/37MM/Remington 870 Bean Bag Shotgun), during my tenure as a Los Angeles Police Department Sergeant II+1 at Metropolitan Division K9 Platoon and as a Sergeant II+1 assigned to Metropolitan Division Special Weapons and Tactics, (SWAT).

Lastly, I base my opinion on my twenty-eight- year law enforcement career where, as a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

### **Opinion Number 5**

It is my opinion based on my review of the facts and testimony in this matter, San Bernardino County Sheriff's Department Deputy Sheriff Jeremy DeBerg, failed to provide Mr. Anthony Nunez with a verbal warning and a reasonable opportunity to comply prior to deploying his 40 MM Tactical Launcher and striking Mr. Anthony Nunez in the chest/torso with Blunt Impact Projectile(s), (BIP's).

In addition, Deputy Sheriff Jeremy DeBerg failed to comply with San Bernardino County Sheriff's Department, 3.628.10, Less Lethal Weapons Systems: Preparation for Use, (NUNEZ/SBD-002072-002073): Generally, a verbal announcement of the intended use of the less lethal shotgun or less lethal launcher shall be given prior to discharge. This announcement serves to provide other safety members and individuals with the warning that a less lethal shotgun or less lethal launcher may be deployed.

In addition, I base my opinion on my twenty-eight years of law enforcement experience where I responded to thousands of calls for service and have effectively utilized defusing techniques, de-escalation techniques, verbal strategies, and active listening skills to reduce the potential for violence and bring the emotional level of the incident to a manageable level.

## On-Scene Consulting

In addition, I base my opinion on I base my opinion on my twenty-eight-year law enforcement career and specifically during my assignment as a Sergeant II+1 at Los Angeles Police Department Special Weapons and Tactics (SWAT) where I supervised hundreds of SWAT incidents that involved the use of the SWAT's Crisis Negotiation Team.  In In addition, I base my opinion as a former Long Range Impact Device Instructor, (40MM/37MM/Remington 870 Bean Bage Shotgun), during my tenure as a Los Angeles Police Department Sergeant II+1 at Metropolitan Division K9 Platoon and as a Sergeant II+1 assigned to Metropolitan Division Special Weapons and Tactics, (SWAT).

Lastly, I base my opinion on my twenty-eight- year law enforcement career where, as a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

### Opinion Number 6

It is my opinion based on my review of the facts and testimony in this matter, San Bernardino County Sheriff's Department Deputy Sheriff Sabrina Cervantes, failed to provide Mr. Anthony Nunez with a verbal warning and a reasonable opportunity to comply prior to deploying her Remington 870 Bean Bag Shotgun at Mr. Anthony Nunez.

In addition, Deputy Sheriff Sabrina Cervantes failed to comply with San Bernardino County Sheriff's Department, 3.628.10, Less Lethal Weapons Systems: Preparation for Use, (NUNEZ/SBD-002072-002073): Generally, a verbal announcement of the intended use of the less lethal shotgun or less lethal launcher shall be given prior to discharge. This announcement serves to provide other safety members and individuals with the warning that a less lethal shotgun or less lethal launcher may be deployed.

In addition, I base my opinion on my twenty-eight years of law enforcement experience where I responded to thousands of calls for service and have effectively utilized defusing techniques, de-escalation techniques, verbal strategies, and active listening skills to reduce the potential for violence and bring the emotional level of the incident to a manageable level.

In addition, I base my opinion on I base my opinion on my twenty-eight-year law enforcement career and specifically during my assignment as a Sergeant II+1 at Los Angeles Police Department Special Weapons and Tactics (SWAT) where I supervised hundreds of SWAT incidents that involved the use of the SWAT's Crisis Negotiation Team.  In In addition, I base my opinion as a former Long Range Impact Device Instructor, (40MM/37MM/Remington 870 Bean Bage Shotgun), during my tenure as a Los Angeles Police Department Sergeant II+1 at Metropolitan Division K9 Platoon and

## On-Scene Consulting —————————————————————

as a Sergeant II+1 assigned to Metropolitan Division Special Weapons and Tactics, (SWAT).

Lastly, I base my opinion on my twenty-eight- year law enforcement career where, as a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

### **Opinion Number 7**

It is my opinion based on my review of the facts and testimony in this matter, San Bernardino County Sheriff's Department Deputy Sheriff Jonathan Campos, failed to provide Mr. Anthony Nunez with a verbal warning and a reasonable opportunity to comply prior to deploying his Taser, Electronic Control Device, (ECD) at Mr. Anthony Nunez.

In addition, Deputy Sheriff Jonathan Campos failed to comply with San Bernardino County Sheriff's Department, 3.630.25, Taser: Verbal Warning, (NUNEZ/SBD-002078): Generally, a verbal announcement of the intended use of the Taser shall be given prior to the application of the Taser.  This announcement serves to:

- Provide the individual with a reasonable opportunity to comply with the deputy's direction.
- Provide other safety members and individuals with a warning that a Taser may be deployed.

In addition, I base my opinion on the following facts and testimony:

- According to Deputy Jonathan Campos, he did not give Mr. Anthony Nunez a warning that he was going to fire his Taser, (Deposition Transcript of Jonathan Campos, Page 82).

In addition, I base my opinion on my twenty-eight years of law enforcement experience where I responded to thousands of calls for service and have effectively utilized defusing techniques, de-escalation techniques, verbal strategies, and active listening skills to reduce the potential for violence and bring the emotional level of the incident to a manageable level.

In addition, I base my opinion on I base my opinion on my twenty-eight-year law enforcement career and specifically during my assignment as a Sergeant II+1 at Los Angeles Police Department Special Weapons and Tactics (SWAT) where I supervised hundreds of SWAT incidents that involved the use of the SWAT's Crisis Negotiation Team.  In In addition, I base my opinion as a former Long Range Impact Device

## On-Scene Consulting   ———————————————

Instructor, (40MM/37MM/Remington 870 Bean Bage Shotgun), during my tenure as a
Los Angeles Police Department Sergeant II+1 at Metropolitan Division K9 Platoon and
as a Sergeant II+1 assigned to Metropolitan Division Special Weapons and Tactics,
(SWAT).

Lastly, I base my opinion on my twenty-eight- year law enforcement career where, as a
Supervisor, I have investigated over 100 Use of Force Incidents as well as being
personally involved in the use of lethal and less than lethal force incidents.

### Opinion Number 8

It is my opinion that a reasonable Deputy Sheriff acting consistent with standard police
practices and outlined in the California Commission on Peace Officers Standards and
Training, Student Materials, Learning Domain, No. 20, Use of Force, Version 3.3, Pages
3-4, would have given a verbal warning to Mr. Anthony Nunez that he was going to fire
his service weapon.  The Supreme Court applied the reasonableness test set forth in the
Fourth Amendment (Tennessee v. Garner), "*some warning be given prior to the use of
deadly force where feasible…*"  Based upon my review of the facts in this matter, San
Bernardino County Sheriff's Department Deputy Sheriff Michael Martinez, Employee
No. F6915, did not give a verbal warning to Mr. Athony Nunez and give Mr. Anthony
Nunez a reasonable opportunity to comply prior to firing his Glock, Model 21, .45
caliber, semi-automatic pistol three times unnecessarily killing Mr. Anthony Nunez.

In addition, I base my opinion on the following facts and testimony in this matter:

- The Audio Belt Recording of San Bernardino County Sheriff Department Deputy
  Sheriff Michael Martinez does not capture any verbal warning to Mr. Anthony
  Nunez that Lethal Force would be used, (San Bernardino County Sheriff
  Department Deputy Sheriff Michael Martinez, Audio Belt Recording).
- According to SBSD Sergeant Corey LaFever, he doesn't recall if he heard Deputy
  Martinez give a verbal warning to Anthony that he would shoot before he shot,
  (Deposition Transcript of Corey LaFever, Page 52).
- According to Deputy Sheriff Jeremy Deberg, he doesn't recall if Deputy Martinez
  gave a verbal warning at all prior to firing his three shots, (Deposition Transcript
  of Jeremy Deberg, Page 87).
- According to Deputy Sheriff Michael Martinez, he did not give a verbal warning
  that deadly force was going to be used, (Deposition Transcript of Michael
  Martinez, Page 17).

## On-Scene Consulting ─────────────────────────

- According to Deputy Jonathan Camos, he did not hear Deputy Michael Martinez give a warning before firing his semi-automatic pistol, (<u>Deposition Transcript of Jonathan Campos, Page 95</u>).

In addition, I base my opinion on my twenty-eight years of law enforcement experience where I responded to thousands of calls for service and have effectively utilized defusing techniques, de-escalation techniques, verbal strategies, and active listening skills to reduce the potential for violence and bring the emotional level of the incident to a manageable level.

In addition, I base my opinion on I base my opinion on my twenty-eight-year law enforcement career and specifically during my assignment as a Sergeant II+1 at Los Angeles Police Department Special Weapons and Tactics (<u>SWAT</u>) where I supervised hundreds of SWAT incidents that involved the use of the SWAT's Crisis Negotiation Team.

Lastly, I base my opinion on my twenty-eight- year law enforcement career where, as a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

### **Opinion Number 9**

It is my opinion based on my review of the facts and testimony in this matter, a reasonable Deputy Sheriff acting consistent with standard police practices would <u>not</u> have used lethal force in this situation. It is my opinion based on my review of the facts and testimony in this matter, the use of lethal force by Department Deputy Sheriff Michael Martinez, <u>Employee No. F6915</u>, was unreasonable, inappropriate and unnecessary, when he fired his Glock, Model 21, .45 caliber, semi-automatic pistol three times, unnecessarily killing Mr. Anthony Nunez.

### <u>Considerations Regarding the Use of Deadly Force</u>

The use of deadly force is the most serious decision a peace officer may ever have to make.  Such a decision should be guided by ***the reverence for human life*** and used only when other means of control are unreasonable or have been exhausted.  Reverence for life is the foundation on which deadly force rests.  Deadly force is always the last resort used in the direst of circumstances.  The authority to use deadly force is an awesome responsibility given to police officers by the people who expect them to exercise that authority judiciously.  In the law enforcement/community partnership, peace officers are

## On-Scene Consulting

expected to be self-disciplined, accountable, and in turn, the community is expected to support its peace officers.

Officers are trained at the POST Basic academy that the use of force must meet an *"Objectively Reasonable"* standard. The following quote from POST typifies the training (emphasis added): *"A reasonable officer* is defined as an officer with similar training, experience, and background in a similar set of circumstances, who will react in a similar manner."(Learning Domain #20; "Introduction to the Use of Force, " pages 1-4).

Further, POST teaches in the basic curriculum regarding the legislative and community expectations regarding their powers of arrest and use of force by POST certified police officers:

"The criminal justice system gives law enforcement two extraordinary powers:"
1. The power of arrest and
2. The power to use deadly force.
"The authority to do so does not come from the rule of an authoritarian dictator. Rather it comes from the will and consent of the people who *put their trust in law enforcement to use that power with the utmost care and restraint.* This is why it is important to emphasize that peace officers do with the utmost care and restraint, *not confer "police powers" on themselves.* These powers come to the criminal justice system from the people they serve. (Learning Domain #2: "Criminal Justice System," page s 1-4, Emphasis added).

Additionally, an entire chapter in POST Learning Domain #20 is devoted to the "Consequences of Unreasonable Force."

**"Unreasonable force** occurs when the type, degree and duration of force employed was not necessary or appropriate." Also, POST specifies that there are a number of key factors that can affect which force option is approved and appropriate under the concept of the "totality of the circumstances." (Learning Domain #20 "Use of Force," Chapter 2).

POST training specifies that the use of force under the "totality of the circumstances" be only justified on the basis of an "objectively reasonable" standard. In other words, per the POST requirements, officers are not justified in any use of force based upon "subjective" fear. The requirements are taught in detail throughout the POST Basic Curriculum (as required by law).

## On-Scene Consulting ─────────────────────

The POST standard of "Reasonable Fear" is defined as: *A controlled and legitimate fear or mechanism that is necessary for officer safety based on actually perceived circumstances.* POST defines "Unreasonable Fear" as: *Generated in the officer's mind with no direct correlation to facts and situations.* (Learning Domain #20, Chapter 5, Emphasis added). Officers are also taught that POST requires that any use of deadly force must be based on an "objective" rather than "subjective" "reasonable necessity" of action to "imminent danger." (Learning Domain #20, Chapter 3).

A great deal of emphasis is placed on tried and proved tactics at the POST Basic Academy with the strong message in almost every germane training domain that incompetent tactics will invariably lead to unnecessary injury and/or death.

In addition, it is my opinion that Deputy Sheriff Michael Martinez violated San Bernardino County Sheriff's Department Policy 3.6.08, The Use of Lethal Force:

The use of lethal force is justified in the following circumstances:
- A safety member may use lethal force to protect himself or others from what he reasonably believes to be an immediate threat of death or serious bodily injury, **(Does not apply to the facts in this matter).**
- A safety member may us lethal force to accomplish the arrest or prevent escape of a suspected felon, when the member has probable cause to believe that the suspect poses a significant threat of death or serious bodily injury to the deputy or others, **(Does not apply to the facts in this matter. Mr. Anthony Nunez was suspected of allegedly committing a misdemeanor, 242 PC-Battery,).**

In addition, I base my opinion on the following facts and testimony in this matter:

- According to SBSD Sergeant Corey LaFever, at some point while he was at the Command Post, he learned that Andrew had received a phone call from his mother who was the owner of the handgun and advised that the handgun at some point prior to the date of this incident was moved from the residence into a vehicle on the premises out front. LaFever stated that he learned that nobody had access to that vehicle, (Deposition Transcript of Corey LaFever, Page 32).
- According to SBSD Sergeant Corey LaFever, Deputies Campos and Martinez were updated that the gun was possibly moved, (Deposition Transcript of Corey LaFever, Page 33).

## On-Scene Consulting ────────────────

- According to Deputy Sheriff Jeremy Deberg, he doesn't recall if he heard that Anthony had hurt anyone before Deputy Martinez fired his weapon, (Deposition Transcript of Jeremy Deberg, Page 87).
- According to Deputy Sheriff Michael Martinez, he doesn't recall if he heard any of the officers say, "Get down on the ground, stop moving," (Deposition Transcript of Michael Martinez, Page 19).
- According to Deputy Sheriff Michael Martinez, after he fired his first shot, Mr. Nunez still had the chain wrapped in his right hand while clenching a fist but *was not swinging the chain up in the air,* (Deposition Transcript of Michael Martinez, Page 17).
- According to Deputy Sheriff Michael Martinez, at the time he used deadly force, there were no civilians in immediate danger of death or serious bodily injury, (Deposition Transcript of Michael Martinez, Page 17).
- According to Deputy Sheriff Michael Martinez, Mr. Nunez **was not** swinging the chain at the time he first shot, (Deposition Transcript of Michael Martinez, Page 22-23, 43).
- According to Deputy Sheriff Michael Martinez, at the time he first shot, Mr. Nunez was holding the chain at ear level, with the chain dangling down, (Deposition Transcript of Michael Martinez, Page 24).
- According to Deputy Sheriff Michael Martinez, he confirms that he used deadly force because Less Lethal force was ineffective to gain compliance, (Deposition Transcript of Michael Martinez, Page 42).
- According to Deputy Sheriff Michael Martinez, he could not recall Mr. Nunez winding his right arm back as if to swing the chain forward just before he first shot, and he did not base his decision to shoot on any winding back motion by Mr. Nunez, (Deposition Transcript of Michael Martinez, Page 57-59).
- According to Deputy Sheriff Michael Martinez, he never saw Mr. Nunez near any guns at any point during the incident, (Deposition Transcript of Michael Martinez, Page 81).
- According to Deputy Sheriff Michael Martinez, he never saw Mr. Nunez ever try to punch or kick a Deputy, (Deposition Transcript of Michael Martinez, Page 85).
- According to Deputy Sheriff Michael Martinez, prior to this incident, he never responded to the Nunez residence for any calls for service, (Deposition Transcript of Michael Martinez, Page 90).
- According to Deputy Sheriff Michael Martinez, he has been trained in tactical repositioning and when the space is available, they should maneuver to gain distance instead of using deadly force, (Deposition Transcript of Michael Martinez, Page 97).

## On-Scene Consulting ———————————————————

- According to Deputy Sheriff Michael Martinez, just before he first shot, he could have maneuvered to the south or north, which would have put either of the two parked vehicles between him and Mr. Nunez, at least one of which would have increased the distance between them, but he did not do so, (Deposition Transcript of Michael Martinez, Page 139-140).
- According to witness Lucy Ramos, Ramos never saw Mr. Nunez swing the chain around him, or over his head, (Deposition Transcript (Rough) of Lucy Ramos, Page 59, 88).
- According to witness Lucy Ramos, Ramos never saw Mr. Nunez attempt to strike deputies with the chain, (Deposition Transcript (Rough) of Lucy Ramos, Page 59, 89).
- According to witness Lucy Ramos, immediately before the use of deadly force, Ramos did not see Mr. Nunez walk toward, walk quickly toward, or run toward deputies, (Deposition Transcript (Rough) of Lucy Ramos, Page 88).
- According to Deputy Jonathan Campos, he did not know if Mr. Anthony Nunez had been convicted of crimes in the past, (Deposition Transcript of Jonathan Campos, Page 27).
- According to Deputy Jonathan Campos, upon arrival at the incident, he heard from the Nunez' family that nobody was injured prior to his arrival, (Deposition Transcript of Jonathan Campos, Page 34).
- According to Deputy Jonathan Campos, Mr. Anthony Nunez wasn't holding a gun in his hand and didn't observe any kind of bulge in his waistband that made him believe that he had a gun in his waistband.  Campos searched Mr. Nunez after the incident and he didn't have a gun on him, (Deposition Transcript of Jonathan Campos, Pages 38-39).
- According to Deputy Jonathan Campos, he never believed that Mr. Anthony Nunez had a gun and he never saw Mr. Nunez arm himself with a firearm, (Deposition Transcript of Jonathan Campos, Page 43).
- According to Deputy Jonathan Campos, he did not witness Mr. Anthony Nunez strike anyone and did not witness any injuries to anybody, (Deposition Transcript of Jonathan Campos, Page 66).
- According to Deputy Jonathan Campos, Mr. Anthony Nunez' arm came down after the first shot by Deputy Martinez and his arm was not raised at the time of the second shot and by the third shot by Deputy Martinez, Mr. Nunez was holding the chain all the way down by his thigh, (Deposition Transcript of Jonathan Campos, Pages 97-101).

## On-Scene Consulting

In addition, I base my opinion on my twenty-eight years of law enforcement experience where I responded to thousands of calls for service and have effectively utilized defusing techniques, de-escalation techniques, verbal strategies, and active listening skills to reduce the potential for violence and bring the emotional level of the incident to a manageable level.

In addition, I base my opinion on I base my opinion on my twenty-eight-year law enforcement career and specifically during my assignment as a Sergeant II+1 at Los Angeles Police Department Special Weapons and Tactics (SWAT) where I supervised hundreds of SWAT incidents that involved the use of the SWAT's Crisis Negotiation Team.

Lastly, I base my opinion on my twenty-eight- year law enforcement career where, as a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

### **Opinion Number 10**

It is my opinion that there was a gross lack of situational awareness and fundamental tactical errors in this incident, as outlined in Opinions 1-9 in this Report.  It is also my opinion that there was a failure by the San Bernardino County Sheriff's Department to properly train the Defendant Deputy Sheriff's on following subject matters: Proper Response and Interaction with the Mentally Ill, Working as a Team, Verbal Strategies, Active Listening Skills, Crisis Intervention Training, Defusing and De-Escalation Techniques, Tactical Plan, Command and Control, Use of Cover and Contact Officers, Use of Cover and Concealment, Situational Awareness, the use of Less Lethal Force and the use of Lethal/Deadly Force.

It is my opinion the San Bernardino County Sheriff's Department failed to determine through their investigation and review process that there was a failure to effectively de-escalate the situation and that the Less Lethal Force and the Lethal Force used in this matter was inappropriate, unnecessary, and unreasonable, based on the totality of the circumstances.

It is also my opinion that there was a departure of from POST Standards, Use of Force and Use of Deadly Force Training. In addition, I base my opinion on the California Supreme Court opinion in Hayes v. County of San Diego, 2013 Cal LEXIS 6652.  In Hayes, the California Supreme Court found that, under California negligence law, an officer's pre-shooting conduct leading up to a deadly use of force may affect whether a

## On-Scene Consulting ────────────────

use of force is ultimately reasonable and therefore may be considered in the analysis of any use of deadly force.

Lastly, I base my opinion on my twenty-eight- year law enforcement career whereas a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

## **Opinion Number 11**

It is my opinion It is my opinion San Bernardino County Sheriff's Department Deputy Sheriff Michael Martinez, <u>Employee No. F6915,</u> use of lethal force violated Peace Officer Standards and Training and caused the unnecessary death of Mr. Anthony Nunez, including but not limited to for the following reasons:

- Deputy Sheriffs are trained that deadly force is the highest level of force a Police Officer can use.
- This was not an immediate Defense of Life situation.
- Deputy Sheriffs are trained that deadly force can only be used as a last resort.
- Deputy Sheriffs are trained that deadly force can only be used in the direst of circumstances.
- Deputy Sheriffs are trained that deadly force is likely to cause great bodily injury or death.
- Deputy Sheriffs are trained that they must show a reverence for human life.
- There were other reasonable measures available.
- All other reasonable measures were not exhausted.
- A verbal warning should be given, when feasible, that deadly force will be used. Here, no warning was given, even though it would have been feasible to do so.
- Deputy Sheriffs are trained that they are responsible for justifying every shot.
- Subjective Fear is insufficient to justify using deadly force.
- Deputy Sheriffs are trained that an overreaction in using deadly force is excessive force.

I base my opinion on my twenty-eight- year law enforcement career whereas a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

## **My Qualifications for Reviewing this Case:**

My opinions are based on my education, training, and experience. Upon my graduation in June 1988 from Northeastern University in Boston with a Bachelor's Degree in

## On-Scene Consulting

Criminal Justice, I was hired as Criminal Investigator/Special Agent, GS-1811. Upon completion of Criminal Investigator/Basic Agent School at the Federal Law Enforcement Training Center (FLETC), 6-Month academy, I was assigned to the Organized Crime Drug Task Force where I functioned as an agent and undercover operative. The investigations focused on targeting criminal organizations that were involved in large scale drug smuggling and money laundering operations.

I was assigned to the Office of the Special Agent In-Charge, in San Francisco from August 1988 until I joined the Los Angeles Police Department in November of 1989. While in the academy, I was selected by the staff to be my Recruit Class Leader. Upon my graduation from the LAPD Academy, I was assigned to 77th Division. In addition to being assigned to 77th Division, I was assigned to Northeast Division (Patrol), Northeast Division (Special Projects Unit-SPU), Northeast Division C.R.A.S.H (Gang Detail). I was selected to be transferred to Operations Central Bureau C.R.A.S.H., where I was assigned to a plain clothes detail targeting specific gangs throughout Operations Central Bureau.

I was selected to be a Police Officer III at Wilshire Area Vice where I functioned as an undercover operative targeting prostitution, gambling, bookmaking, and other Vice related offenses. While working Wilshire Vice, I was ambushed and received two gunshot wounds. I received the Purple Heart in 2010. Upon return from my injuries, I attended mandated Field Training Officer School and was assigned as a Field Training Officer (FTO) at Wilshire Division. I trained recruits upon their graduation from the Los Angeles Police Academy in tactics, use of force, report writing, vehicle stops, calls for service, court testimony, emergency procedures, pursuit policy, accident investigations, perimeters, Department policies and procedures, and effective communication skills. While assigned as a Field Training Officer, I was involved in an In-Policy Lethal Use of Force incident.

I was promoted to the rank of Detective and attended the LAPD Detective School. Upon completion of LAPD Detective School, I was assigned to Wilshire Area Narcotics, Field Enforcement Section, where I functioned in an undercover capacity.

I was promoted to the rank of Sergeant I and assigned to Hollenbeck Division. Prior to my assignment, I attended the mandated LAPD Supervisor School. In conjunction with LAPD Supervisor School, I was selected to attend the West Point Leadership Academy Supervisor Training. The training focused on team building, leadership, and decision making. While assigned to Hollenbeck Division, I conducted roll call training on a daily

## On-Scene Consulting ――――――――――――――――――――――――

basis on numerous subject matters to include Use of Force Options (<u>Non-Lethal and Lethal</u>), Tactics, Calls for Service, Calls for Service involving the Mentally Ill, Vehicle Pursuit Policy, LAPD Policies and Procedures, Use of Force Policy, Updated Legal Bulletins, Training Directives, and other Standardized Roll Call Training.  I directly supervised Police Officers and provided supervisory oversight during calls for service, tactical situations, perimeter tactics, containment and control issues and use of force incidents.  I conducted audits, personnel investigations, Standard Based Assessments (<u>Ratings/Evaluations</u>), Use of Force Investigations, Administrative Projects, and prepared commendations for Police Officer's field performance.  While assigned to Hollenbeck Division, I was selected as the Officer-In-Charge of Hollenbeck Division's Special Enforcement Group, (<u>SEG</u>).  I directly supervised (<u>14</u>) Police Officers and Detectives assigned to the Unit.  SEG worked in conjunction with Hollenbeck Detectives and specifically targeted career criminals in Hollenbeck Division.  I provided ongoing mandated Department Training as well tactical, firearms, less than lethal force, lethal force and search warrant tactics training to Police Officers and Detectives.  SEG prepared and served numerous search warrants.  I provided search warrant tactical briefing and de-briefing of each warrant at the conclusion of the of the search warrant service.  I completed audits, administrative projects, Use of Force Investigations, personnel complaints, and other administrative duties as deemed necessary by the Area Commanding Officer.

During this time, I was assigned to Internal Affairs Division (<u>IAD</u>), Headquarters Section.  I investigated personnel complaints that exceeded the scope for a geographical Division.  At the conclusion of my assignment to IAD, I was selected to Management Services Division, Special Projects, Office of the Chief of Police.  I completed numerous in-depth staff projects for review by the Chief of Police.  In addition, I conducted research and edited the 2000 LAPD Department Manual.

Also, during this time, I earned my Master's Degree in Public Administration from California State University, Long Beach.

I was selected as a Sergeant II at 77th Division Vice.  I directly supervised (<u>10</u>) undercover Vice Officers and four uniformed Police Officers.  I provided all facets of training to the Police Officers assigned to Vice to include Use of Force Policy, Legal Updates, Department Directives, Training Bulletins, Standardized Roll Call Training, Tactics Training, Undercover Operations Training, Surveillance Training, and any other training deemed necessary by the Area Commanding Officer.  I conducted audits,

## On-Scene Consulting ————————————————————

personnel investigations, administrative projects, Use of Force Investigations, and special projects.

During this time, I was selected by the Chief of Police to be loaned to the Rampart Corruption Task Force. I conducted Use of Force audits and Internal Affairs Audits on Specialized Units in Central Bureau and South Bureau.

In 2000, I was selected to Metropolitan Division K9 Platoon as a Sergeant II+1. I directly supervised (16) K9 Handlers. Metropolitan Division K9 conducted K9 searches for the entire Department covering all Patrol Divisions and Specialized Units. I provided all facets of training to the K9 Officers to include K9 Operations, tactics, search warrant services, Mobile Field Force Options, Less than Lethal Force Options, Lethal Force Options, Department Directives, Training Bulletins, and other training dictated by the Officer-in-Charge and Commanding Officer. In addition, I taught K9 Operations at LAPD In-Service Training, Watch Commander School, Sergeant School, Field Training Officer (FTO) School and Detective School. While assigned to K9, I investigated and completed K9 contacts (bite investigations), personnel complaints, and Use of Force Investigations. In addition, I directed and was directly involved in Use of Force incidents. I received the LAPD Medal of Valor and LAPD Police Star for two lethal use of force incidents while assigned to K9.

In 2005, I was selected as a Sergeant II+1 in Special Weapons and Tactics (SWAT). I directly supervised (60) SWAT Officers. I conducted and facilitated all facets of SWAT training to include Weapons Training (.45 caliber, MP-5, M-4, Benelli Shotgun, Remington 870 Bean Bag Shotgun, .40mm, 37mm, X-26 Taser) on a monthly basis. In addition, I facilitated and conducted training in the following training Cadres: Breacher (Explosive), Crisis Negotiation-Mental Health, MEU, SMART, Suicide Prevention, Counter-Terrorism Cadre, Climbing, Hostage Rescue, Sniper Training, Air Support Training (Fast Rope, Aerial Platform Shooting). I directly supervised SWAT missions and High-Risk Search Warrant Services to include all facets (preparation, briefing, deployment, de-briefing). I was the Supervisor-in-Charge of the Crisis Negotiation Team, (CNT). I provided on-going Crisis Negotiation Training, mental health training, Tactical de-briefs of SWAT incidents, 40-hour POST Certified CNT School, and suicide prevention training. I worked in conjunction with the mental health community to provide and facilitate training with LAPD SMART, LAPD Mental Evaluation Unit (MEU), Behavioral Science Services Section (BSS), and Didi Hirsch Suicide Prevention Training. In addition, I assisted the West Point Military Academy with the development of their crisis negotiation curriculum.

## On-Scene Consulting ⸺⸺⸺⸺⸺⸺⸺

During this time, I was selected as the LAPD SWAT representative to respond to Mumbai India with LAPD Counterterrorism and Las Vegas Metropolitan Division Police Department Counterterrorism following the terrorist attack in November 2008.  I taught use of force, tactics, and SWAT deployment to 250 Mumbai Special Tactical Police Officers.  Upon my return, I assisted with the development of Multi-Assault, Counter-Terrorism Action Capabilities, (MACTAC).

In June 2010, I retired from the Los Angeles Police Department with over 20 years of service to pursue an opportunity in the private sector. I held supervisory positions for the last 14 years of my career.  During my tenure with the LAPD, I received over 100 Commendations including: The Medal of Valor, Purple Heart, and the Police Star.

From June 2010 through April 2013, I was the Vice President of Security Operations at Caruso Affiliated in Los Angeles, CA.  My responsibilities included identifying and conducting Risk and Vulnerability Assessments for all Caruso Affiliated Developments, projected developments/investments, and residences.  I utilized strategic-level analysis from the intelligence community, law enforcement and the private sector.  I identified and monitored potential or actual incidents among critical infrastructure domains and all personal and professional interests of Caruso Affiliated.  I mitigated expected threats.  I utilized preplanned, coordinated actions in response to infrastructure warnings or incidents.  I responded to hostilities.  I identified and eliminated the cause, or source, of an infrastructure event by the utilization of emergency response measures to include on-site security personnel, local law enforcement, medical and fire rescue, and relevant investigative agencies.  I conducted all facets of security training for the company and employees.  I formulated Business Continuity and CEO Succession Plans for the company and all affiliated business interests.  I conducted ongoing audits and internal investigations.

From June 2013 to June 2014, I was hired as a Deputy Sheriff at the Riverside Sheriff's Department where I conducted all facets of patrol service to include calls for service, self-initiated field activity, arrests, citations, and court testimony. In addition, during my tenure with the Riverside County Sheriff's Department, I was assigned to Robert Presley Detention Center (RPDC).  I processed and monitored inmate population from initial intake, housing, court, transportation, and release. I conducted searches of inmate population as well as the facility on an ongoing basis. I utilized my experience as a gang officer, Detective and Sergeant with LAPD to conduct interviews and interrogations of prisoners regarding a myriad of investigations. I provided information to Gang Detail. I functioned as a mentor

## On-Scene Consulting ─────────────────────────

to newly appointed Deputy Sheriffs as well as Supervisors. I attended and certified in RSO Supplemental Jail Operations Core Course prior to deployment at RPDC. I attended on-going training to include Use of Force (Lethal and Non-Lethal), Crisis Negotiation Training, Active Listening Skills Training, Report Writing, Response and Deployment to Critical Incidents and Proper Protocols and Procedures when responding to a medical incident or suicide.

From June 2014 to March 2016, I was the Director of Security at Universal Protection Service where I supervised 84 Security Professionals at the City National Plaza. I conducted and facilitated all Bureau of Security and Investigative Services (BSIS) training to Security Professionals. I ensured all Security Professionals were compliant with BSIS security training and licensing. I conducted the following training to Security Professionals and Tenants on an ongoing basis: Fire Life Safety, Evacuation Drills, Active Shooter, Workplace Violence, Security Procedures and Protocols, Responding to Incidents Involving the Mentally Ill, Hazardous Materials and Internal Theft. I conducted ongoing Risk and Vulnerability Assessments of the City National Plaza to include security staffing and deployment, Closed Circuit Television (CCTV), Crime Prevention through Environmental Design (CPTED) and protocols to respond and mitigate threats. I developed Security and Fire Life Safety Manuals for Security Professionals and Tenants. I coordinated all security efforts to ensure safety at Special Events. I conducted internal investigations and worked in conjunction with the Los Angeles Police Department (LAPD) and the Los Angeles Fire Department (LAFD) on an ongoing basis.

From March 2016 to September 2017, I was the Director of Security at L&R Group of Companies. I conducted Risk and Vulnerability (RAV) Assessments for all L&R Group of Companies developments and projected developments throughout the United States. I conducted and/or facilitated all Bureau of Security and Investigative Services (BSIS) training to Security Professionals. I ensured all Security Professionals were compliant with BSIS security training and licensing. I conducted the following training to Security Professionals and Tenants on an ongoing basis: Fire Life Safety, Evacuation Drills, Active Shooter, Workplace Violence, Security Procedures and Protocols, Responding to Incidents Involving the Mentally Ill, Hazardous Materials and Internal Theft. I conducted ongoing Risk and Vulnerability Assessments to include security staffing and deployment, Closed Circuit Television (CCTV), Crime Prevention through Environmental Design (CPTED), and protocols to respond and mitigate threats. I developed Security and Fire Life Safety Manuals for Security Professionals and Tenants. I coordinated all security efforts to ensure safety at Special Events. I conducted internal investigations and worked

## On-Scene Consulting ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

in conjunction with the Los Angeles Police Department (LAPD) and the Los Angeles
Fire Department (LAFD) on an ongoing basis as well as respective law enforcement
agencies throughout the United States on security matters.

In 2020, I received my Master of Legal Studies from Pepperdine Caruso School of Law.

Attached are my curriculum vitae, listing of testimony and fee schedule.

Scott A. DeFoe