# Exhibit 1

```
 1                  UNITED STATES DISTRICT COURT

 2                 CENTRAL DISTRICT OF CALIFORNIA

 3

 4   ROSA NUNEZ, individually, ANTHONY      )
     NUNEZ, JR., individually and as        )
 5   successor-in-interest to Decedent,     )
     Anthony Nunez and ANDREW NUNEZ,        )
 6   individually,                          )
                                            )
 7                 Plaintiffs,              )
                                            )
 8                 vs.                      ) Case No.
                                            ) 5:22-CV-01934-SSS-SPx
 9   COUNTY OF SAN BERNARDINO, CITY OF      )
     HESPERIA, MICHAEL MARTINEZ, SABRINA    )
10   CERVANTES, JEREMY DEBERG, JONATHAN     )
     CAMPOS, and DOES 5-15, inclusive,      )
11                                          )
                   Defendants.              )
12   _____)

13

14          REMOTE VIDEOCONFERENCE DEPOSITION OF

15                     MICHAEL MARTINEZ

16                MONDAY, FEBRUARY 12, 2024

17

18

19

20

21

22   Reported Stenographically By:

23   Jinna Grace Kim, CSR No. 14151

24   Job No.:  47724

25
```

Page 80

```
 1    plan to you?
 2        A.   No, sir.  I was engaging with Anthony.
 3        Q.   And when you say Anthony, you mean the decedent,
 4    Anthony Nunez?
 5        A.   The suspect, yes.
 6        Q.   I want to ask you about some of the information you
 7    knew about Anthony Nunez during the incident.
 8             At some point in time during the day, you got a call
 9    that you responded to; is that correct?
10        A.   Yes, sir.
11        Q.   Was it essentially a call from dispatch?
12        A.   Yes, sir.
13        Q.   What information did you have from dispatch about
14    the incident?
15        A.   That there was a female calling, female caller
16    stating that her brother-in-law was beating up her husband.
17        Q.   Anything else?
18        A.   The call also stated that he was possibly under the
19    influence.  There was possibly guns registered to the mom at
20    the house.
21        Q.   Did you ever see a gun at any point in time inside
22    the house?
23        A.   I never went in the house, sir.
24        Q.   Did you ever look inside the house?
25        A.   No, sir.
```

Page 82

1  shirt at the time; is that fair?

2       A.   Yes, sir.

3       Q.   And when you had this information that he was

4  possibly under the influence, did the call say possibly under

5  the influence of what?

6       A.   I don't recall.  I don't believe it did say what.

7       Q.   So to your understanding, it could have been drugs

8  or it could have been alcohol?

9       A.   Initially, yeah.

10      Q.   Did you ever learn anything else about whether or

11 not he was possibly under the influence of either drugs or

12 alcohol?

13      A.   In route to the call, sir?

14      Q.   Is that when you learned some new information?

15      A.   No, sir.  Are you asking any other information in

16 route to the call; is that what you're asking?

17      Q.   What I'm wondering is, if at any point in time

18 during the incident prior to the use of deadly force, did you

19 learn any specific information as to whether or not he was

20 under the influence of either drugs or alcohol?

21      A.   Based on my training and experience, it appeared

22 that he was under influence of some kind of controlled

23 substance.

24      Q.   But no one ever told you whether or not he used

25 drugs or whether or not he used alcohol?

Page 85

```
 1   kicked anybody?
 2       A.   No, sir.
 3       Q.   Did Mr. Nunez ever punch or kick any deputy?
 4       A.   No, sir.
 5       Q.   Did Mr. Nunez ever attempt to punch or kick any
 6   deputy?
 7       A.   No, sir.
 8       Q.   Did Mr. Nunez ever grab any deputy?
 9       A.   No, sir.
10       Q.   Did Mr. Nunez ever attempt to grab any deputy?
11       A.   No, sir.
12       Q.   Did Mr. Nunez ever harm or injure any deputy?
13       A.   Did you say attempt or harm?
14       Q.   Did he ever harm or injure any deputy?
15       A.   No, sir.
16       Q.   Did you ever see Mr. Nunez use drugs?
17       A.   No, sir.
18       Q.   Did you ever see any drug paraphernalia on
19   Mr. Nunez's body prior to your use of deadly force?
20       A.   No, sir.
21       Q.   Did you see any kind of drug paraphernalia anywhere
22   around Mr. Nunez at any point in time prior to your use of
23   deadly force?
24       A.   No, sir.
25       Q.   And you said that you saw certain signs or symptoms
```

Page 89

```
 1     A.   Yes, sir.
 2     Q.   But you didn't know if he had any of that?
 3     A.   No, sir.
 4     Q.   Did you ever see his eyes dilated?
 5     A.   I couldn't tell from the distance that we were at,
 6   sir.
 7     Q.   Did you ever see him like foaming at the mouth or
 8   anything like that?
 9     A.   I don't believe so.
10     Q.   Earlier, you gave me the reasons why you used deadly
11   force.
12          Do you recall that?
13     A.   Yes, sir.
14     Q.   Is it fair to say that you didn't use deadly force
15   because you thought he used drugs that day?
16     A.   I did not use deadly force because I thought he used
17   drugs?
18     Q.   Correct.
19     A.   Correct.
20     Q.   Did you know anything about whether or not he had a
21   history of using drugs?
22     A.   I did not, sir.
23     Q.   Did you know anything about whether he had a
24   criminal history?
25     A.   I did not, sir.
```

Page 90

```
 1      Q.   Did you know whether or not he had ever been
 2   arrested before?
 3      A.   No, sir.
 4      Q.   Did you know whether or not he had ever been
 5   affiliated with a gang?
 6      A.   No, sir.
 7      Q.   Did you know anything about his personal or family
 8   history?
 9      A.   No, sir.
10      Q.   Had you ever met Mr. Nunez prior to the day of the
11   incident?
12      A.   No, sir.
13      Q.   What about anybody that lived in the house?
14      A.   I don't believe so, sir.
15      Q.   Had you ever responded to that house on a call prior
16   to this incident?
17      A.   No, sir.
18      Q.   Okay.  Prior to use of deadly force, did you ever
19   hear Mr. Nunez verbally threaten any civilians?
20      A.   I don't believe so, sir.
21      Q.   What about any of his family members?
22      A.   I don't believe so, sir.
23      Q.   Did you ever see Mr. Nunez try to go into a room
24   where one of his family members were before he had went
25   outside?
```