# Exhibit B

```
 1                 UNITED STATES DISTRICT COURT

 2                CENTRAL DISTRICT OF CALIFORNIA

 3

 4   ROSA NUNEZ, individually, ANTHONY      )
     NUNEZ, JR., individually and as        )
 5   successor-in-interest to Decedent,     )
     Anthony Nunez and ANDREW NUNEZ,        )
 6   individually,                          )
                                            )
 7                  Plaintiffs,             )
                                            )
 8                  vs.                     ) Case No.
                                            ) 5:22-CV-01934-SSS-SPx
 9   COUNTY OF SAN BERNARDINO, CITY OF      )
     HESPERIA, MICHAEL MARTINEZ, SABRINA    )
10   CERVANTES, JEREMY DEBERG, JONATHAN     )
     CAMPOS, and DOES 5-15, inclusive,      )
11                                          )
                    Defendants.             )
12   _____)

13

14            REMOTE VIDEOCONFERENCE DEPOSITION OF

15                       JEREMY DEBERG

16                 WEDNESDAY, FEBRUARY 21, 2024

17

18

19

20

21

22   Reported Stenographically By:

23   Jinna Grace Kim, CSR No. 14151

24   Job No.:  47727

25
```

1  located towards the north portion of the property.
2      Q.   Was -- did Sergeant La Fever walk on to the property
3  with you?
4      A.   Within close proximity.  I don't remember if he was
5  directly next to me or in close proximity that same time.
6      Q.   Were there any other deputies who were nearby who
7  were entering the property with you or within a few seconds
8  of you?
9      A.   I don't recall when other deputies arrived.
10     Q.   Where on the property did you go to first after
11 entering via the driveway?
12     A.   I went towards the front door, but I stayed in north
13 of the front door so as not to escalate anything, escalate
14 the situation by adding more deputies present while Deputy
15 Campos and Martinez were engaged with Mr. Nunez.
16     Q.   Was there a particular position that you took north
17 of the front door at that time?
18     A.   During the incident I took multiple positions north
19 of the front door.  Some to include just north of the front
20 door and others were northeast of the front door behind a
21 vehicle that was parked in front of the front door.
22     Q.   One moment here.  All right.
23          I'm going to share my screen here.
24          Okay.  I'm sharing my screen.
25          Do you see an image on your phone?

Page 42

```
 1   BY MR. LEVINE:
 2        Q.   I think before our break he were talking about a
 3   little bit about your positioning during the period directly
 4   after you came on to the property, and I think you were
 5   telling me a bit about how that included positioning near a
 6   red vehicle that was parked there.
 7             Were -- was there another vehicle parked directly
 8   next to that red vehicle at the time?
 9        A.   Yes.  It was a dark sedan.
10        Q.   And then were there additional vehicles further to
11   the north parked somewhere along the driveway?
12        A.   I believe there was, yes.
13        Q.   While you were standing in the positions north of
14   the front door that you told me about just before the break,
15   what was your understanding as to what was happening between
16   Anthony Nunez and any deputies that may have been at or near
17   the front porch area of the house?
18        A.   Deputy Campos and Deputy Martinez were at the front
19   porch area of the residence, and it appeared they were trying
20   to negotiate with Mr. Nunez to drop the chain and exit the
21   residence so that we can speak to him while he was not
22   armed.
23        Q.   Prior to Anthony Nunez exiting -- excuse me -- the
24   residence, did you see him at any point?
25        A.   No.  I did not see Mr. Nunez until he exited the
```

1  the residence and when to exit the residence through the
2  window.
3       Q.   The person who you were speaking to who was holding
4  the phone, did they have any visible injuries that you could
5  see?
6       A.   I don't recall seeing any injuries, but again, I was
7  not looking for injuries.
8       Q.   Did you see any of the other residents besides
9  Anthony in person after they had exited the house?
10      A.   I may have seen other residents in my peripheral,
11 but I did not directly contact any other residents and was
12 not in close proximity to any other residents --
13      Q.   I'm sorry for talking at the same time as you there.
14           Did you happen to observe any visible injuries on
15 any of those other residents at any point?
16      A.   I wasn't close enough to see any injuries on any
17 other residents.
18      Q.   While you were standing in a position to the north
19 of the front door of the house near the red car that we
20 discussed earlier, how much approximately of the discussion
21 between Deputies Martinez and Campos and Anthony Nunez could
22 you hear?
23           MR. SMITH:  I'll object to the form of the question.
24           Sorry to step on your answer there, Deputy.
25           THE WITNESS:  That's okay.  I could hear parts of

Page 46

1    it, but not the conversation in entirety.  When Mr. Nunez
2    would get loud, I could hear certain things he was saying,
3    but when he would talk quieter, I couldn't hear what he was
4    saying.
5    BY MR. LEVINE:
6        Q.   Was your understanding that those two deputies were
7    outside of the house on or near the porch and that Anthony
8    was inside of the house?
9        A.   That's my understanding, yes.
10       Q.   Did that make it harder to hear Anthony than it was
11   to hear the two deputies?
12            MR. SMITH:  I'll object to the form of the question.
13            But go ahead, Deputy.
14            THE WITNESS:  Strictly based on distance, yes.
15            Mr. Nunez was further from me than Deputy Martinez
16   and Deputy Campos.
17   BY MR. LEVINE:
18       Q.   So were you during that period hearing more of what
19   the two deputies were saying than you were hearing what
20   Anthony was saying?
21       A.   That's a safe assumption.
22       Q.   Is that your recollection, though?
23            I don't want you to assume.
24       A.   Well, I mean I can't -- I don't know what the
25   entirety of the conversation was.

Page 107

1  he had used drugs or that I heard from him?
2      Q.   Anything like that.
3      A.   Based on his behavior and the -- what I heard him
4  say inside the residence, I believe there was a high
5  probability he was under the influence of a controlled
6  substance.
7      Q.   What were the things that he said from inside the
8  residence that made you believe he might be under the
9  influence?
10     A.   I remember him calling someone a devil, he's going
11 to make us kill him.  I mean, all very irrational thoughts
12 which I've seen numerous times with paranoia due to drug
13 use.
14     Q.   Did you ever hear him say that he had used drugs?
15     A.   No.  But at the same time very few people that used
16 drugs will openly admit they used drugs or under the
17 influence of drugs based on my training and experience.
18     Q.   When -- I think you mentioned a moment ago that you
19 heard him make a statement while he was inside about devils
20 and things like that.
21          Did I hear you correctly?
22     A.   Yes.
23     Q.   Did you consider that when you heard that, that it
24 may be an indication that Anthony was experiencing some kind
25 of mental health crisis?

Page 108

1    A.   It was a possibility.  Could also be a drug induced
2  paranoia.  But until the situation's under control and calm,
3  we can't get a mental health professional in there to
4  evaluate him.
5    Q.   I understand that.  I'm just asking about what went
6  through your mind and what you considered at the time based
7  on the information you had.
8         So it sounds like, correct me if I'm wrong, you're
9  saying that you considered that that was one of multiple
10 possibilities that might explain the things he was saying?
11   A.   Yes.  It was definitely a theory.
12   Q.   Okay.  All right.
13        Would it be all right with you if I did not ask you
14 anymore questions today?
15   A.   Okay.
16        MR. LEVINE:  Brett or Mahadhi, do you guys have any
17 questions you would like to ask before we finish?
18        MR. SMITH:  I have a couple.
19        Mahadhi, if you have some as well?
20        MR. CORZANO:  No.
21        MR. SMITH:  Okay.  I just have a couple short ones.
22                        EXAMINATION
23 BY MR. SMITH:
24   Q.   So you mentioned earlier that you were part of the
25 kind of the Marijuana Task Force.  And so am I correct in