# Exhibit E

```
 1                UNITED STATES DISTRICT COURT

 2               CENTRAL DISTRICT OF CALIFORNIA

 3

 4   ROSA NUNEZ, individually, ANTHONY    )
     NUNEZ, JR., individually and as      )
 5   successor-in-interest to Decedent,   )
     Anthony Nunez and ANDREW NUNEZ,      )
 6   individually,                        )
                                          )
 7                  Plaintiffs,           )
                                          )
 8                  vs.                   ) Case No.
                                          ) 5:22-CV-01934-SSS-SPx
 9   COUNTY OF SAN BERNARDINO, CITY OF    )
     HESPERIA, MICHAEL MARTINEZ, SABRINA  )
10   CERVANTES, JEREMY DEBERG, JONATHAN   )
     CAMPOS, and DOES 5-15, inclusive,    )
11                                        )
                    Defendants.           )
12   _____)

13

14          REMOTE VIDEOCONFERENCE DEPOSITION OF

15                    MICHAEL MARTINEZ

16                MONDAY, FEBRUARY 12, 2024

17

18

19

20

21

22   Reported Stenographically By:

23   Jinna Grace Kim, CSR No. 14151

24   Job No.:  47724

25
```

Page 87

```
 1      Q.   Okay.  Based on your training and experience, do
 2   people who are under influence of alcohol also sweat?
 3      A.   Yes, sir.
 4      Q.   Do people under the influence of alcohol also have
 5   rapid speech based on your training?
 6      A.   It's possible.
 7      Q.   And you said he was not making sense?
 8      A.   That's correct.
 9      Q.   Is it also possible that people are under the
10   influence of alcohol have speech patterns that don't make
11   sense?
12      A.   Yes, sir.
13      Q.   Did you also have information that Mr. Nunez had not
14   slept in almost three days?
15           MR. SMITH:  I'll object to the form of the question.
16           Go ahead, Deputy Martinez.
17           THE WITNESS:  I believe in initial information it
18   did say that he had been up.  I don't remember the exact time
19   frame, but yes, that he had been up, I believe.
20   BY MR. SINCICH:
21      Q.   Do you have any kind of training or experience on
22   what could happen to a person when they don't get sleep for
23   several days?
24      A.   Yes, sir.
25      Q.   What is the training and experience, to your
```

1  knowledge?
2      A.   Become delusional, see and hear things that are not
3  there, things of that nature.
4      Q.   Is it fair to say that when a person is up for
5  several days without sleeping, they kind of exhibit signs of
6  mental illness?
7           MR. SMITH:   I'm going to object to the form of the
8  question.
9           But go ahead, Deputy.
10          THE WITNESS:   It's possible, sir.
11 BY MR. SINCICH:
12     Q.   Is it possible that the reason why he had rapid
13 speech and was not making sense was because he was up for
14 several days without sleeping?
15     A.   It's possible, sir.
16     Q.   And when you say movements with his head, what did
17 you mean by that?
18     A.   Just like a weird tick, like a back and forth like
19 kind of a sway or not a normal head movement if that makes
20 sense.
21     Q.   Did you know whether or not he had ever been
22 diagnosed with Tourette's or anything like that?
23     A.   No, sir.
24     Q.   Based on your training and experience, do you
25 understand that sometime people have ticks?

Page 92

```
 1            But go ahead, Deputy Martinez.
 2            THE WITNESS:  Do something as far as what, sir?
 3   BY MR. SINCICH:
 4       Q.   If you have any training on whether there is certain
 5   tactics or techniques or procedures you're supposed to employ
 6   when interacting with a person who you suspect could
 7   potentially have a mental illness or a mental health
 8   crisis?
 9       A.   Yes, sir.
10       Q.   And what is that training?
11       A.   Communication, try to gain rapport.
12       Q.   Were you essentially trained to try to de-escalate
13   the situation as opposed to escalating it?
14       A.   Yes, sir.
15       Q.   Are deputies trained to use communication to
16   effectively a subject into custody without resorting to
17   deadly force?
18       A.   Yes, sir.
19       Q.   Are deputies trained to utilize less-lethal methods
20   prior to utilizing deadly force?
21       A.   Yes, sir.
22       Q.   Is it your training that you should exhaust all of
23   your less intrusive options prior to escalating to deadly
24   force?
25       A.   Depending on the situation, sir.
```