Christopher P. Wesierski [Bar No. 086736]
 cwesierski@wzllp.com
Michelle R. Prescott [Bar No. 262638]
 mprescott@wzllp.com
Brett A. Smith [Bar No. 322707]
 bsmith@wzllp.com
WESIERSKI & ZUREK LLP
29 Orchard Road
Lake Forest, California 92630
Telephone: (949) 975-1000
Facsimile: (949) 756-0517

Attorneys for Defendants, COUNTY OF SAN BERNARDINO, CITY OF HESPERIA MICHAEL MARTINEZ, SABRINA CERVANTES and JEREMY DEBERG

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| ROSA NUNEZ, individually and as successor-in-interest to Decedent, Anthony Nunez; ANTHONY NUNEZ, JR., individually and as successor-in-interest to Decedent, Anthony Nunez; and, ANDREW NUNEZ, individually, <br><br> Plaintiffs, <br><br> vs. <br><br> COUNTY OF SAN BERNARDINO; CITY OF HESPERIA; MICHAEL MARTINEZ; SABRINA CERVANTES; JEREMY DEBERG; JONATHAN CAMPOS; and DOES 5 through 15, inclusive, <br><br> Defendants. | Case No. 5:22-cv-1934-SSS(SPx) <br><br> **DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION IN LIMINE NO. 1; DECLARATION OF MICHELLE R. PRESCOTT** <br><br> Trial Date:   09/23/2024 |

Defendants COUNTY OF SAN BERNARDINO, CITY OF HESPERIA, MICHAEL MARTINEZ, SABRINA CERVANTES, and JEREMY DEBERG ("Defendants") hereby submit their Opposition to Plaintiffs ROSA NUNEZ, ANTHONY NUNEZ, JR. and ANDREW NUNEZ's ("Plaintiffs") Motion in Limine No. 1 "to exclude information unknown to deputies at the time of use of force" (the "Motion"). Defendant JONATHAN CAMPOS ("Campos") was previously dismissed by Plaintiff. As such, Campos will not be not joining in this Opposition.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. INTRODUCTION

This matter concerns an officer involved fatal shooting that took place on March 29, 2022. On the date of the incident, Anthony Nunez ("Mr. Nunez" or the "Decedent"), physically assaulted his brother Andrew Nunez while armed with a metal chain which prompted Andrew Nunez's wife, Noelia Benitez, to call 911 and seek help from Defendants. The plaintiffs in this matter are the Decedents' mother Rosa Nunez, son Anthony Nunez Jr. and brother Andrew Nunez (collectively "Plaintiffs").

Plaintiff's Motion in Limine No. 1 seeks to exclude: (1) any information concerning Decedent's criminal history and related proceedings including Decedent's prior arrest for assaulting an officer as a result of an altercation between Decedent and another family member that is not a party to this action, (2) any information regarding drug use by Decedent other than that which was known by the Defendant Deputies on the date of the incident, (3) any information that Decedent suffered from hallucinations, and (4) any information that Decedent had an alleged romantic relationship or interest in his underage niece, Brenda Lopez. ("The Evidence")

Plaintiffs contend that evidence of Decedent's prior criminal past is irrelevant, unduly prejudicial, impermissible character evidence, and hearsay.

The Evidence, however, has been put at issue by the Plaintiffs themselves with their claims for interference with familial relationship, negligence, and negligent

infliction of emotional distress.

## II. EVIDENCE OF DECEDENT'S HABITUAL DRUG USE IS ADMISSIBLE UNDER FRE 406, AND SHOULD NOT BE EXCLUDED

"Evidence of a person's habit or an organization's routine practice may be admitted to prove that on a particular occasion the person or organization acted in accordance with the habit or routine practice. The court may admit this evidence regardless of whether it is corroborated or whether there was an eyewitness." (Rule 406, F.R.Evid.)

"In an action for wrongful death the moral habits of the deceased, such as habitual intemperance, gambling or lack of thrift, have a bearing on the value of his life to his wife and family (Citation), for his habits of sobriety and economy are reflected in his earning capacity and monetary value to his family." (*McDonald v. Price*, 80 Cal.App.2d 150, 153 (1947).) Further, "moral indiscretions [are] relevant to show the value of [the Decedent's] companionship. . . there is authority for the proposition that plaintiff, by seeking damages for pecuniary loss resulting by reason of her husband's death, tenders an issue as to the relationship between deceased and herself." (*Carr v. Pacific Tel. Co.*, 26 Cal.App.3d 537, 545 (1972).)

The Decedent's habits of sobriety and moral indiscretions, are relevant to his companionship value to his family. The fact that the Decedent had a history of drug use and a habit of regularly using methamphetamine is relevant to his habit for sobriety and his likely condition at the time of his encounter with Defendants and his previous physical assault of Plaintiff Andrew Nunez. This evidence goes directly to Plaintiffs' claim for damages concerning their allegations arising out of their familial relationship with Decedent as any such relationship must be evaluated in light of Decedent's frequent, days-long, habitual drug binges. As such, it is both relevant and admissible.

## III. THE EVIDENCE IS RELEVANT TO THE NEGLIGENCE CLAIMS AND AFFIRMATIVE DEFENSES

WESIERSKI & ZUREK LLP
LAWYERS
29 ORCHARD ROAD
LAKE FOREST, CALIFORNIA 92630
(949) 975-1000

3
I2176498-2 SBD-0015

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION IN LIMINE NO. 1

Defendants should be allowed to introduce evidence of Decedent's other arrests and criminal history (convictions, incarcerations, and probation) as they are relevant to Plaintiffs" claims for negligence damages.

In *Green v. Baca*, 226 F.R.D. 624, 658 (C.D. Cal. 2005), the court held that the plaintiff's prison time and length thereof were relevant to the jury's consideration of damages. (*See also Peraza v. Delameter*, 722 F.2d 1455, 1457 (9th Cir. 1984) (holding that the trial court properly admitted evidence of plaintiff's subsequent encounters with the police as relevant to plaintiff's claim that he suffered injury to head, body and psyche as a result of the arrest at issue). The *Green* court held that the plaintiff's contention that such evidence will be unduly prejudicial can be properly addressed by giving an appropriate limiting instruction to the jury. (*Id.*)

It must be assumed that the jury will follow the instructions given to it by the Court. (*See United States v. Nelson*, 137 F.3d 1094, 1107 (9th Cir. 1998) ["[T]he district court gave detailed limiting instructions in order to curtail any unfair prejudice that [a party] might suffer. This court can presume that the jury followed these instructions."].) In addition, the challenged evidence is independently admissible for numerous other purposes, as discussed herein.

As provided above, in his deposition, Plaintiff Andrew Nunez testified he knew (1) Decedent was afraid of the police (55:21-23), (2) that he made a fake call to the police including mimicking putting his phone to his ear on the date of the incident prior to Ms. Benitez calling the police officers to gain Decedent's compliance (107:21-108:4), (3) that he knew at the time he pantomimed the call that Decedent was afraid of the police and that was the reason he pretended to call the police (108:2-7), (4) that "anytime the Decedent and him would get into an argument he would threaten him with calling the police to get on the Decedent's nerves and to gain his compliance (108-12-24), (5) that he continued to threaten to call the police on Decedent after his prior arrest because he knew the prior arrest made Decedent afraid of police officers (109:4-6, 12-13) and (6) that he was intentionally trying to antagonize the decedent

by purposefully ignoring Decedent's question concerning whether the police had been called. (See Declaration of Michelle R. Prescott ("Prescott Decl.") ¶ 3, Exh. A.)

All of this conduct goes directly to the heart of Mr. Nunez's negligence and negligent infliction of emotional distress claims because all of this intentional conduct over a period of years by Mr. Nunez was a contributing factor to the alleged negligence. Had Mr. Nunez not intentionally or negligently used the threat of calling the police to intentionally antagonize Decedent and try to gain his compliance during previous physical and/or verbal altercations, Decedent may have reacted differently to being faced by the officers, Instead, Decedent had been threatened for years by Plaintiffs that they would call the police and when finally faced with the reality of the police actually arriving Decedent had years of negligent manipulation by Plaintiffs at the forefront of his mind.

As such, evidence of the negligent weaponization of the police by Plaintiffs and the fear arising from Decedent's prior arrest for assaulting an officer are highly relevant to claims concerning the alleged "familial" relationship between Decedent and Plaintiffs. At a minimum, evidence of Plaintiff's other arrests and criminal history is relevant to the negligence and negligent infliction of emotional distress claims as discussed above.

Contrary to Plaintiff's contentions, the Ninth Circuit has not held that information unknown to police officers can *never* be admissible. In fact, under *Graham*, evidence of facts unknown to a police officer is admissible "in assessing the credibility of an officer's account of the circumstances that prompted the use of force." (*Graham v. Connor*, 490 U.S. 386, 399 n.12 (1989).)

Consistent with this *Graham* principle, the Ninth Circuit has held that where the material facts are disputed, as they are here, facts unknown to the officers at the point of the use of force can be admissible. (*Boyd v. City & County of San Francisco*, 576 F.3d 938, 944 (9th Cir. 2009) (holding that evidence that decedent was on drugs was relevant and admissible in an excessive force case because it made assertions that

5

decedent was acting erratically more probable); *T.D.W. v. Riverside County*, 2010 U.S. Dist. LEXIS 35821, 2010 WL 1006618, at *4 (C.D. Cal. Mar. 11, 2010) (holding that evidence of decedent's intoxication was properly admitted at trial "because this evidence was probative of decedent's conduct, particularly when defendants contended that decedent's erratic behavior immediately preceding and at the time of the shooting led to their use of force").)

Here, the parties dispute Decedent's behavior prior to the use of force which is directly impacted by his prior arrest and the threats made by Plaintiffs to call the police to gain Decedent's compliance. The parties also dispute the existence and extent of any familial relationship between Decedent and the parties and the extent to which the contributory negligence of Mr. Nunez repeatedly threatening Decedent with calling the police and pretending to call the police of the date of the incident were contributing factors that would partially or completely defeat the pending negligence and negligent of infliction of emotional distress claims. Such evidence will assist the jury in resolving the factual disputes and in determining credibility. It also should be allowed under FRE 403. While there may be some prejudice, it is not unfair prejudice that will have an "undue tendency to suggest [a] decision on an improper basis." On the contrary, if this evidence is excluded, Defendants will be severely prejudiced as the jury's decision will not be based on all the relevant, material facts, and the Defendants will be deprived of a fair trial.

### IV. THE EVIDENCE IS ADMISSIBLE UNDER FRE 404(B), AND SHOULD NOT BE EXCLUDED

As a general rule, evidence of a prior crime or other bad act "is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." (Fed. R. Evid. 404(b)(1).) However, such evidence may be admissible "for another purpose, such as proving motive." (Fed. R. Evid. 404(b)(2).)

As one court explained, "[t]he 'laundry list' of admissible purposes for

evidence of prior bad acts is not exhaustive. It is sufficient only that there be *some* non-propensity purpose for its admission." (*United States v. Lynn*, 856 F.2d 430, 435 n.11 (1st Cir. 1988) [citation omitted].)

Defendants are not seeking to introduce such evidence to prove character, which is not allowed under FRE 404. FRE 404(b) allows the use of character evidence for purposes other than acting in conformity therewith. Such evidence can be used to show motive, opportunity, intent, preparation, plan, knowledge, trustworthiness or other permissible purposes. In addition, FRE 608 permits cross-examination on a witness's character for truthfulness.

If Plaintiffs misrepresent Decedent's character and his prior criminal history, history of drug use and alleged inappropriate relationship with his niece and attempt to portray him as a person who is a law-abiding citizen, then Defendants should be allowed to impeach Plaintiffs with Decedent's criminal history and history of drug use. (*See also United States v. Cook*, 608 F.2d 1175, 1187 (9th Cir. 1979).) If Plaintiffs take the stand and Defendants are not permitted to offer truthful and complete facts and/or impeach him, the jury would likely be left with a false impression about Decedent's trustworthiness and the relationship between Plaintiffs and Decedents put directly at issue by Plaintiffs' claims. While Defendants are not seeking to introduce every one of Decedent's prior convictions, his overall criminal history bears upon their claimed damages.

A similar situation was addressed in *United States v. Cook*, 608 F.2d 1175, 1187 (9th Cir. 1979), wherein the court upheld a district court's ruling allowing into evidence the defendant's prior robbery convictions because the district court had reason to believe that the defendant would take the stand and misrepresent his character to the jury. In those circumstances, the court held that the defendant's prior criminal record would "give the jury a more comprehensive view of the trustworthiness of the defendant as a witness." (*Id.* at 1187. See also *United States v. Bagley*, 772 F.2d 482 (9th Cir. 1985), *United States v. Mehrmanesh*, 682 F.2d 1303,

1309 (9th Cir. 1982) [in prosecution for drug offense court upheld ruling allowing introduction of prior narcotics conviction because defendant intended to take the stand and deny any involvement in narcotics trafficking].)

      Here, Plaintiffs are attempting to hide Decedent's prior arrests, convictions, incarcerations, and/or probation, despite the clear relevance of those matters. The information Plaintiffs now seek to exclude, including Decedent's criminal history of assaulting a police officer, is directly relevant to the contributory negligence of Plaintiffs which goes to the heart of their claims. Plaintiffs testified at deposition that they regularly used Decedent's well-known fear of police and threats to call the police to antagonize him and fain his compliance. Clearly this history of weaponizing law enforcement had a direct bearing on Decedent's actions on the date of the incident. Defendants should be allowed to use Decedent's other arrests and convictions to impeach Plaintiffs and to attack their credibility concerning their allegations about their "familial relationship" with Decedent. The probative value of these convictions on Plaintiffs' veracity about their subsequent abuse of the police to threaten Decedent into compliance and the impact these threats had on Decedent on the date of the incident certainly outweigh any prejudice their introduction might have on Plaintiffs.

## V. CONCLUSION

      Based on the foregoing, Plaintiff's Motion in Limine No. 1 should be denied.

DATED:  August 9, 2024        WESIERSKI & ZUREK LLP

By: *Christopher P. Wesierski*
CHRISTOPHER P. WESIERSKI
MICHELLE R. PRESCOTT
Attorneys for Defendants, COUNTY OF SAN BERNARDINO, CITY OF HESPERIA MICHAEL MARTINEZ, SABRINA CERVANTES and JEREMY DEBERG

# DECLARATION OF MICHELLE R. PRESCOTT

I, Michelle R. Prescott, declare:

1. I am an attorney at law licensed to practice before all the courts of the State of California and am a senior partner with Wesierski & Zurek LLP, counsel of record for Defendants .

2. The following facts are within my own personal knowledge, except as to those matters stated to be on information and belief, which I believe to be true. If called as a witness, I could and would competently testify to these facts.

3. Attached hereto as **Exhibit "A"** are true and correct pages from the Deposition Transcript of Andrew Nunez taken in this matter on February 15, 2024, in this matter.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on this 9th day of August, 2024, at Lake Forest, California.

*/s/ Michelle Prescott*

Michelle R. Prescott

# EXHIBIT "A"

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| ROSA NUNEZ, INDIVIDUALLY AND AS ) <br> SUCCESSOR IN INTEREST TO DECEDENT) <br> ANTHONY NUNEZ; ANTHONY NUNEZ, ) <br> JR., INDIVIDUALLY AND AS ) <br> SUCCESSOR IN INTEREST TO ) <br> DECEDENT, ANTHONY NUNEZ; AND ) <br> ANDREW NUNEZ, INDIVIDUALLY, ) <br> ) <br> PLAINTIFFS, ) <br> ) <br> VS. ) <br> ) <br> COUNTY OF SAN BERNARDINO; CITY OF) <br> HESPERIA; AND DOES 1 THROUGH 15, ) <br> INCLUSIVE, ) <br> ) <br> DEFENDANTS. ) <br> _____) | CASE NO.: <br> 5:22-cv-1934-SSS(SPx) <br><br> VENUE: SBC |

DEPOSITION OF Andrew Nunez

TAKEN ON Thursday, February 15, 2024

REPORTED BY:  ALICE J. WILBUR, COURT REPORTER

CSR NO. 9538



**PLATINUM REPORTERS & INTERPRETERS**
Certified Shorthand Reporters
Post Office Box 6070 - San Pedro, California 90734-6070 - (310) 241-1450

1

DEPOSITION OF ANDREW NUNEZ

```
 1     A    No, I don't.
 2     Q    Okay.  And do you know if Anthony ended up
 3  spending anytime in jail for that?
 4     A    Yes, they took him to jail.  And the cops
 5  beat him up really bad in there, because what he told
 6  me when he came home is that when they were making
 7  him change into their uniform he didn't change fast
 8  enough and when they told him to hurry up he told
 9  them that he's moving as fast as he can.
10          And he said that the officers winked at each
11  other, each other and they all beat him up really
12  bad.  He even had to get stitches.  They had to take
13  him to the hospital.
14     Q    Okay.
15     A    He was --
16     Q    Did you see the stitches that he received?
17     A    Yes, I did.
18     Q    Okay.  Where were the stitches?
19     A    I believe it was on his arm.
20     Q    Okay.
21     A    And then he had black eyes and stuff.  Yeah,
22  he was afraid of the police.  After that he didn't
23  want to go back to jail.
24     Q    Okay.  And I'm sorry.  Which arm did he have
25  the stitches in?
```

55



```
 1           MS. BOUBION:  Objection.  Lack of foundation.
 2   Lacks foundation, calls for speculation, vague and
 3   ambiguous and it's argumentative.  Go ahead.
 4           THE WITNESS:  No, at that moment I didn't
 5   think that he was having a medical emergency.
 6           MS. PRESCOTT:  Okay.  Did you think he was
 7   under the influence of methamphetamine?
 8           MS. BOUBION:  I'm just going to object to the
 9   extent that it lacks foundation and calls for
10   speculation.  Go ahead, Andrew.
11           THE WITNESS:  I think that I did think that
12   he was.
13   BY MS. PRESCOTT:
14      Q   Okay.  Andrew pretended to call the police
15   and told Anthony the police were on their way to the
16   house.  Did you tell the officers that?
17      A   Yeah, I believe I did tell the officers that
18   I had did that.  I made like a fake call because he
19   didn't want to let me shut my door, so once I did
20   that he went to his room and he let me shut my door.
21      Q   So is it true that you told Anthony that you
22   were going to call the police?
23      A   Yeah, I told Anthony that I was and I acted
24   like I called the police and I acted.  In fact I even
25   put the phone to my ear like if I was speaking to
```



```
 1   somebody from 911, but I didn't.
 2       Q   Okay.  And you knew at this time that your
 3   brother was afraid of the police when you made that
 4   threat; correct?
 5       A   Yeah, that's what I was using it for because
 6   I knew he was afraid of them because they had beat
 7   him up.
 8       Q   Okay.
 9           MS. BOUBION:  I'll just object to the use of
10   the word threat, but go ahead.
11   BY MS. PRESCOTT:
12       Q   Okay.  Had you ever told Anthony before that
13   you would call the police and to try and control his
14   behavior?
15       A   Well --
16           MS. BOUBION:  Objection.  I'm sorry.
17           THE WITNESS:  One time.  I'm sorry.
18           MS. BOUBION:  Okay.
19           THE WITNESS:  I'm sorry.  Any time that me
20   and my brother would get in an argument or whatever
21   like we didn't agree on anything or he don't stop
22   then I would scare him.  I would do that that's, that
23   was my little thing to kind of get on his nerves to
24   kind of get him to leave me alone, you know.
25           MS. BOUBION:  Wait.
```



DEPOSITION OF ANDREW NUNEZ

```
 1              MS. PRESCOTT:  Okay.
 2              MS. BOUBION:  I'm sorry.
 3     BY MS. PRESCOTT:
 4         Q    And after his incident with Marty where he
 5     became afraid of the police did you continue to use
 6     the police, say you were going to call the police?
 7         A    Well, that's why -- Okay.  Go ahead.  I'm
 8     sorry.
 9              MS. BOUBION:  Objection.  I'm just going to
10     object to the extent that it assumes facts not in
11     evidence, but go ahead, Andrew.
12              THE WITNESS:  That's why it was because of
13     that incident that I would say that stuff.
14     BY MS. PRESCOTT:
15         Q    Okay.  Andrew called Benitez and told her
16     Anthony was hallucinating.  Do you remember you
17     calling your wife and saying that?
18         A    Yes.
19              MS. BOUBION:  Hold on.  I'm just going to
20     object to the extent that it misstates the record and
21     it's compound.  Okay.  Go ahead.
22              THE WITNESS:  Yes, I remember calling my wife
23     and telling her that I think that Anthony was
24     hallucinating because he thinks that my mom and my
25     brother were dead.
```



State of California )
County of Los Angeles )

The undersigned Certified Shorthand Reporter CSR 9538, a court reporter in and for the State of California, does hereby certify:

That any witness(s) named in the foregoing proceeding was(were), before and/or during the commencement of proceeding, duly sworn or affirmed to testify the truth, the whole truth, and nothing but the truth;

That said proceeding was stenographically (or otherwise) reported by me and thereafter transcribed into typewriting under my direction.

The undersigned Certified Shorthand Reporter further certifies to be neither counsel for nor related to any party to said action nor in any way interested in the outcome thereof.

IN WITNESS WHEREOF, I have hereunto subscribed my name February 21, 2024.

*Alice Joanne Wilbur*
Certified Shorthand Reporter