**LAW OFFICES OF DALE K. GALIPO**
Dale K. Galipo (SBN 144074)
dalekgalipo@yahoo.com
Benjamin S. Levine (SBN 342060)
blevine@galipolaw.com
21800 Burbank Boulevard, Suite 310
Woodland Hills, California, 91367
Tel: (818) 347-3333 / Fax: (818) 347-4118

LUIS A. CARRILLO (SBN 70398)
MICHAEL S. CARRILLO (SBN 258878)
DOMINIQUE L. BOUBION (SBN 336915)
**CARRILLO LAW FIRM, LLP**
1499 Huntington Drive, Suite 402
South Pasadena, California 91030
Tel: (626) 799-9375/ Fax: (626) 799-9380

Attorneys for Plaintiffs
ROSA NUÑEZ, ANTHONY NUÑEZ, JR., and ANDREW NUÑEZ

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROSA NUÑEZ, individually; ANTHONY NUÑEZ, JR., individually and as successor-in-interest to Decedent, Anthony Nuñez; and ANDREW NUÑEZ, individually, <br><br> Plaintiffs, <br><br> v. <br><br> COUNTY OF SAN BERNARDINO; CITY OF HESPERIA; MICHAEL MARTINEZ; SABRINA CERVANTES; JEREMY DEBERG; JONATHAN CAMPOS; and DOES 5 through 15, inclusive, <br><br> Defendants. | Case No. 5:22-cv-01934-SSS-SP <br><br> *Hon. Sunshine S. Sykes* <br><br> **PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR NEW TRIAL PURSUANT TO F.R.C.P. 59; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT** <br><br> [*Declaration of Benjamin S. Levine and exhibits thereto; and Proposed Order filed concurrently herewith*] <br><br> Date:  July 11, 2025 <br> Time:  2:00 p.m. <br> Crtrm: 2 |

**TO ALL PARTIES AND TO THEIR COUNSEL OF RECORD:**

   **PLEASE TAKE NOTICE THAT** on July 11, 2025, at 2:00 p.m., or as soon thereafter as the matter may be heard, in Courtroom 2 of the above entitled Court located at 3470 Twelfth Street, Riverside, California 92501, Plaintiffs will move this Court for an order granting a new trial in this matter.

   This Motion is made pursuant to Rule 59 of the Federal Rules of Civil Procedure and upon the following grounds:

   1. The jury's verdict is against the clear weight of the evidence, which overwhelmingly demonstrated that Defendant Martinez's use of deadly force was excessive, unreasonable, and negligent because Anthony Nuñez did not pose an immediate threat of death or serious bodily harm;

   2. Sergeant Corey LaFever, who was one of only two defense witnesses and was qualified by counsel as a quasi-expert on police practices, gave false testimony regarding material issues, and his false testimony was elicited by counsel;

   3. Counsel made several improper and prejudicial statements during closing argument regarding details that were not in evidence, bearing on material issues; and

   4. Individually and cumulatively, the foregoing errors denied Plaintiffs a fair trial.

   This motion is made following the conference of counsel pursuant to L.R. 7-3 which took place on May 30, 2025. The conference followed written correspondence between counsel, including correspondence from Plaintiffs' counsel outlining the grounds for the anticipated motion. Benjamin S. Levine attended the conference on behalf of Plaintiffs and Abe G. Salen attended on behalf of Defendants. The conference lasted 34 minutes and was held telephonically. During the conference, counsel discussed the issue of Plaintiffs seeking a new trial on all of

the grounds identified in this Notice; however, no agreement could be reached, so Plaintiffs now file the instant motion.

DATED: June 9, 2025                    LAW OFFICES OF DALE K. GALIPO


                                       By   /s/ Benjamin S. Levine
                                          Dale K. Galipo
                                          Benjamin S. Levine
                                          Attorneys for Plaintiffs

# **<u>TABLE OF CONTENTS</u>**

MEMORANDUM OF POINTS AND AUTHORITIES ............................................ 1

I.      INTRODUCTION ................................................................................... 1

II.     LEGAL STANDARD............................................................................. 2

III.    ARGUMENT........................................................................................ 4

    *A.* The Verdict Is Against the Clear Weight of the Evidence......................... 4

    *B.* The Verdict Is Based on False and Perjurious Evidence ......................... 11

    *C.* Allowing the Verdict to Stand Would Work a Miscarriage of Justice .... 17

        1.     Counsel Referenced Details Not in Evidence to Undermine
Plaintiffs' Case and Improperly Influence the Jury ............................... 17

        2.     Cumulatively, All the Foregoing Issues Warrant a New Trial...... 21

IV.    CONCLUSION..................................................................................... 22

# <u>TABLE OF AUTHORITES</u>

**Cases**

*Allied Chem. Corp. v. Daiflon, Inc.*,
    449 U.S. 33 (1980) ................................................................................ 3

*Bahra v. County of San Bernardino*,
    No. EDCV 16-1756-JGB-(SPx), 2022 WL 6653533 (C.D. Cal. Sept. 7, 2022)
    .............................................................................................................. 3, 4

*Beck v. Haik*,
    377 F.3d 624 (6th Cir. 2004) ............................................................... 21

*Briscoe v. LaHue*,
    460 U.S. 325 (1983) ....................................................................... 16, 17

*Cervantes v. County of Los Angeles*,
    CV12-09889-DDP-MRW, 2015 WL 5163031 (C.D. Cal. Sept. 3, 2015) ...... 10

*Cf. Hardwick v. County of Orange*,
    844 F.3d 1112 (9th Cir. 2017) ............................................................. 12

*City of Cleveland v. Peter Kiewit Sons' Co.*,
    624 F.2d 749 (6th Cir. 1980) ............................................................... 17

*Claiborne v. Blauser*,
    934 F.3d 885 (9th Cir. 2019) ................................................................. 3

*Clapper v. Am. Realty Investors, Inc.*,
    95 F.4th 309 (5th Cir. 2024) ........................................................... 17, 18

*Cleveland Demo. Co., Inc. v. Azcon Scrap Corp.*,
    827 F.2d 984 (4th Cir. 1987) ............................................................... 15

*De Saracho v. Custom Food Mach., Inc.*,
    206 F.3d 874 (9th Cir. 2000) ...................................................... 3, 18, 21

*Dees v. County of San Diego*,
    960 F.3d 1145 (9th Cir. 2020) .......................................................... 4, 22

*Demjanjuk v. Petrovsky*,
    10 F.3d 338 (6th Cir. 1993) ................................................................. 15

*Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd.*,
    762 F.3d 829 (9th Cir. 2014) ........................................................ passim

*Gibson v. Total Car Franchising Corp.*,
    223 F.R.D. 265 (M.D.N.C. 2004) ....................................................... 15

*Giglio v. United States*,
    405 U.S. 150 (1972) ............................................................................. 12

*Gonzales v. City of San Jose*,
    901 F.2d 758 (9th Cir. 1990) ............................................................... 21

*Gordon Mailloux Enters., Inc. v. Firemen's Ins. Co. of Newark,*
    366 F.2d 740 (9th Cir. 1966) ................................................................21

*Hayes v. Brown,*
    399 F.3d 972 (9th Cir. 2005) ...............................................11, 12, 16

*Hesselbein v. Beckham,*
    168 F.Supp.3d 1252 (E.D. Cal. 2016) ................................................18

*Hilborn v. Metro. Grp. Prop. & Cas. Ins. Co.,*
    306 F.R.D. 651 (D. Idaho 2015) ...........................................................9

*Hung Lam v. City of San Jose,*
    869 F.3d 1077 (9th Cir. 2017) ..............................................................4

*Hunter v. Thomas,*
    173 F.2d 810 (10th Cir. 1949) ............................................................15

*Jerden v. Amstutz,*
    430 F.3d 1231 (9th Cir. 2005) ............................................................21

*Kode v. Carlson,*
    596 F.3d 608 (9th Cir. 2010) ................................................................4

*Landeros v. Schafer,*
    2024 WL 1693356 (9th Cir. Apr. 19, 2024) ...............................11, 16

*Landes Constr. Co. v. Royal Bank of Can.,*
    833 F.2d 1365 (9th Cir. 1987) ..............................................................4

*Lennox v. City of Sacramento,*
    2024 WL 3845378, (E.D. Cal. Aug. 16, 2024) ..................................10

*Levitant v. City of N.Y. Human Res. Admin.,*
    914 F.Supp.2d 281 (E.D.N.Y. 2012) ..................................................21

*Mehling v. Schield,*
    253 Cal.App.2d 55 (1967) ..................................................................10

*Mejia v. Cook County,*
    650 F.3d 631 (7th Cir. 2011) ................................................................9

*Moist Cold Refrigerator Co. v. Lou Johnson Co.,*
    249 F.2d 246 (9th Cir. 1957) ............................................................4, 5

*Molski v. M.J. Cable, Inc.,*
    481 F.3d 724 (9th Cir. 2007) .......................................................passim

*Montgomery Ward & Co. v. Duncan,*
    311 U.S. 243 (1940) .............................................................................3

*Mooney v. Holohan,*
    294 U.S. 103 (1935) ...........................................................................12

*Morris v. W. Hayden Estates First Addition Homeowners Assoc., Inc.*,
    104 F.4th 1128 (9th Cir. 2024)........................................................................10

*Murphy v. City of Long Beach*,
    914 F.2d 183 (9th Cir. 1990)...........................................................................4

*Roy v. Volkswagen of Am., Inc.*,
    896 F.2d 1174 (9th Cir. 1990).........................................................................4

*Sagicor Life Ins. Co. v. Jang*,
    EDCV 19-2028-JGB-KK, 2022 WL 17328237 (C.D. Cal. Oct. 27, 2022)......9

*Shimko v. Guenther*,
    505 F.3d 987 (9th Cir. 2007)...........................................................................2

*Smith v. Union Oil Co.*,
    241 Cal.App.2d 338 (1966)..............................................................................9

*Stamps v. United States*,
    406 F.2d 925 (9th Cir. 1969)..........................................................................21

*Traylor v. Pickering*,
    324 F.2d 655 (5th Cir. 1963)..........................................................................16

*United States v. 4.0 Acres of Land*,
    175 F.3d 1133 (9th Cir. 1999).........................................................................3

*United States v. Bagley*,
    473 U.S. 667 (1985)................................................................................11, 12

*United States v. Houston*,
    648 F.3d 806 (9th Cir. 2011)..........................................................................16

*United States v. Simpson*,
    2021 WL 1986026 (N.D. Cal. May 18, 2021..................................................12

*White v. Pence*,
    961 F.2d 776 (8th Cir. 1992)...........................................................................4

**Statutes**
28 U.S.C. § 84(c)(1) ...........................................................................................17

**Rules**
Fed. R. Civ. P. 59.......................................................................................passim

## <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

## I.    INTRODUCTION

A new trial should be granted. Due to the jury's failure to properly apply the evidence to its instructions, a senior County official's perjured testimony regarding key details, and defense counsel's introduction of prejudicial details not in evidence during closing, Plaintiffs were denied a fair trial, resulting in an unsupportable defense verdict.

That verdict went against the clear weight of the evidence. The jury was instructed that, for Plaintiffs' Battery and Negligence claims, it must find for Plaintiffs if it determined Martinez did not reasonably believe Anthony Nuñez "ha[d] the present ability, opportunity, and apparent intent to immediately cause death or serious bodily injury" at the moment Martinez fired, such that Martinez had no choice but to "instantly confront[]" him with deadly force, and that even legitimate fear of future harm was insufficient. The weight of evidence, including all objective evidence, showed that Martinez fired when Anthony was opposite a car from him, not facing or moving toward deputies, and not swinging a chain, satisfying the instructions' requirements. The jury also evidently disregarded the additional requirement that Martinez make reasonable tactical repositioning efforts, which he easily could have done but did not. Additional evidence, including Martinez's failure to issue any verbal warning, further proved he violated the Fourth Amendment and the Bane Act.

The verdict also was obtained through false and perjurious testimony by Sergeant Corey LaFever, elicited and endorsed by counsel. LaFever testified to critical issues, claiming he was feet away from Martinez during the shooting and, crucially, that Anthony was charging between two cars toward Martinez, whipping the chain, when Martinez fired. LaFever's belt recording, however, indisputably shows LaFever was far away when the shots were fired and arrived at the house well after. Counsel elicited further false testimony wherein LaFever claimed he paused

his recorder and had been honest, and sought to validate LaFever's claims through illegitimate explanations for the contradictory evidence during closing. Although any perjury soils a trial's integrity, LaFever's was particularly significant where he was presented as a seasoned Sheriff's leader, one of only two defense witnesses, and his false testimony significantly supported Defendants regarding the central issue of the case.

The verdict was further tainted by improper comments during Defendants' closing, during which counsel put forward important, prejudicial details not in evidence. This included a representation that a key witness, deputy Jonathan Campos—whose testimony largely supported Plaintiffs, showing Anthony posed no immediate threat because he was in front of the cars and not facing deputies, and carrying the appearance of credibility given his role—was far away when Martinez fired so was untrustworthy. Counsel also represented that Anthony choked his brother and was high on amphetamines, violating the Court's evidentiary rulings, to improperly try to legitimize Anthony's killing.

Individually, each of these renders the verdict untrustworthy and warrants a new trial. Taken together—when, even with these problems, the jury deadlocked 4-4 and deliberated over three days, evincing the prejudice caused—the illegitimacy of the verdict is unmistakable. Because Plaintiffs were denied a fair trial, the Court should order a new one.

## II.    LEGAL STANDARD

Under F.R.C.P. 59, a new trial may be granted (1) "if the verdict is contrary to the clear weight of the evidence," (2) the verdict "is based upon false or perjurious evidence," or (3) "to prevent a miscarriage of justice." *Shimko v. Guenther*, 505 F.3d 987, 993 (9th Cir. 2007) (quoting *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007)) (alteration omitted); *see Bahra v. County of San Bernardino*, No. EDCV 16-1756-JGB-(SPx), 2022 WL 6653533, at *2 (C.D. Cal. Sept. 7, 2022) (new trial appropriate under any of these circumstances "even when the verdict is supported by

1  substantial evidence") (citing *United States v. 4.0 Acres of Land*, 175 F.3d 1133,
2  1139 (9th Cir. 1999)). The court "is not limited to the grounds a party asserts … but
3  may sua sponte raise its own concerns" about the verdict. *Experience Hendrix*
4  *L.L.C. v. Hendrixlicensing.com Ltd.*, 762 F.3d 829, 842 (9th Cir. 2014) (citing
5  F.R.C.P. 59(d)).

6  When "the conduct complained of prevented the losing party from fully and
7  fairly presenting the [case]," *De Saracho v. Custom Food Mach., Inc.*, 206 F.3d 874,
8  880 (9th Cir. 2000)[1], "[t]he district court must grant … a new trial," *Claiborne v.*
9  *Blauser*, 934 F.3d 885, 894 (9th Cir. 2019); *see Molski*, 481 F.3d at 729 (motion
10  should be granted if "trial was not fair to the party moving") (citing *Montgomery*
11  *Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940)). "[T]he district court can weigh
12  the evidence, make credibility determinations, and grant a new trial for any reason
13  necessary to prevent a miscarriage of justice." *Experience Hendrix*, 762 F.3d at 841.
14  The Court has broad discretion to order a new trial. *See Allied Chem. Corp. v.*
15  *Daiflon, Inc.*, 449 U.S. 33, 36 (1980). Accordingly, appellate courts grant
16  "considerable deference to the district court's new trial decision and will not
17  overturn [it] absent an abuse of discretion, meaning 'only when the district court
18  reaches a result that is illogical, implausible, or without support in the inferences
19  that may be drawn from the record.'" *Experience Hendrix*, 762 F.3d at 842 (quoting
20  *Kode v. Carlson*, 596 F.3d 608, 612 (9th Cir. 2010)); *see Dees v. County of San*
21  *Diego*, 960 F.3d 1145, 1151 (9th Cir. 2020).

22
23
24
25
26

---

27  [1] Although *De Saracho* involved a Rule 60(b)(3) motion, "[t]he test to be applied"
under Rule 59 is "borrowed from cases interpreting Rule 60(b)(3)." *Jones v.*
28  *Aero/Chem Corp.*, 921 F.2d 875, 878 (9th Cir. 1990).

## III.    ARGUMENT

### A. The Verdict Is Against the Clear Weight of the Evidence

Under Rule 59, "the district court has 'the duty to weigh the evidence as the court saw it, and to set aside the verdict of the jury, even though supported by substantial evidence, where, in the court's conscientious opinion, the verdict is contrary to the clear weight of the evidence." *Molski*, 481 F.3d at 729 (quoting *Murphy v. City of Long Beach,* 914 F.2d 183, 187 (9th Cir. 1990)) (alterations adopted). Unlike with a motion for judgment, the Court "is not required to view the trial evidence in the light most favorable to the verdict." *Experience Hendrix*, 762 F.3d at 842; *see Bahra*, 2022 WL 6653533, at *2. "Instead, the district court can weigh the evidence and assess the credibility of the witnesses." *Experience Hendrix*, 762 F.3d at 842; *see White v. Pence*, 961 F.2d 776, 780 (8th Cir. 1992) (trial court may "rely on its own reading of the evidence"). Although a new trial is not justified "merely because [the Court] might have come to a different result," *Roy v. Volkswagen of Am., Inc.*, 896 F.2d 1174, 1176 (9th Cir. 1990), one should be granted if "the judge on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Landes Constr. Co. v. Royal Bank of Can.*, 833 F.2d 1365, 1371 (9th Cir. 1987). Courts have substantial latitude to find a verdict contrary to the weight of evidence, and such decisions are "virtually unassailable" on appeal. *Hung Lam v. City of San Jose*, 869 F.3d 1077, 1084 (9th Cir. 2017); *see Moist Cold Refrigerator Co. v. Lou Johnson Co.*, 249 F.2d 246, 256-57 (9th Cir. 1957).

Under Plaintiffs' Battery and Negligence claims, the jury was instructed that Plaintiffs must prove, *inter alia*, "[t]hat Michael Martinez's uses of deadly force

were not necessary to defend human life." [Dkt. 175 at 26, 29.][2] It was further
instructed that "Martinez's use of deadly force was necessary to defend human life
only if a reasonable deputy … would have believed, based on the totality of the
circumstances" known to Martinez "at the time of the shooting, that deadly force
was necessary to defend against an imminent threat of death or serious bodily injury
to Michael Martinez or any other person." [*Id.*] The instructions explained:

> A threat of death or serious bodily injury is "imminent" if, based on
> the totality of the circumstances, a reasonable deputy in the same
> situation would believe that a person has the *present ability,
> opportunity, and apparent intent* to *immediately* cause death or serious
> bodily injury to the deputy or to another person. An imminent harm is
> not merely a fear of future harm, no matter how great the fear and no
> matter how great the likelihood of the harm, but is one that, from
> appearances, must be *instantly* confronted and addressed.

[*Id.* at 26-27, 29 (emphasis added).] They further provided that deputies "have a
duty to use reasonable tactical repositioning … tactics." [*Id.* at 27, 30.]

      The evidence at trial showed that, after Martinez and Campos spoke to
Anthony at the door for 1-1.5 hours, Anthony came outside and turned right, toward
the southern portion of the yard, where he was shot by deputy Deberg's four 40mm
rounds, before walking northward, toward the front of the grey Charger parked
outside, along the same route he had come. (Ex. 1, 27:19-22, 43:8-44:8, 53:15-55:2;
Ex. 2, 14:11-15:9; Ex. 3, 17:17-18:13, 23:7-15; Ex. 5, 12:24-13:3, 17:15-18:8; Ex. 7,
11:14-16, 13:13-15:2.) It was undisputed that Anthony walked away from the
deputies when he came outside and, before moving north, never approached them or
attempted to attack. (Ex. 1, 32:5-9, 42:16-21, 43:23-44:4, 45:8-15, 50:16-51:12,
51:19-24, 58:15-21; Ex. 3, 18:19-22; Ex. 5, 13:4-7; Ex. 7, 10:9-12.) The key period

---

[2] Defendants have never disputed that Martinez intentionally shot Anthony, that
it constituted deadly force, or that Anthony died. And shooting Anthony was
obviously a substantial factor in causing his death. [*See id.*]

1  for both sides, then, was when Anthony was moving north by the Charger and, in
2  Defendants' version, then turning between the cars toward Martinez.

3      A key aspect of Plaintiffs' case concerned the timing of deputy Cervantes's
4  beanbag round relative to Martinez's gunshots. Martinez's belt recorder captured
5  audio of the incident and showed the beanbag and his first shot overlapped or, at
6  most, were a split-second apart. (Ex. 17 00:47-00:50.) This went undisputed at trial.
7  (Ex. 2, 22:4-8; Ex. 4, 14:2-12; Ex. 5, 26:17-27:21; Ex. 6, 13:12-15; Ex. 7, 15:3-10;
8  Ex. 8, 6:13-18; Ex. 9, 108:8-19; Ex. 13, 41:3-6; Ex. 14, 28:20-23, 29:14-25.)[3]
9  Likewise, the deputies testified that when Cervantes fired her beanbag, Anthony was
10 in front of the Charger, facing north, not moving or turning into the gap. (Ex. 1,
11 59:2-17, 61:21-62:4; Ex. 2, 16:18-24; Ex. 3, 25:22-28:16; Ex. 4, 7:25-8:16; 14:13-
12 15; Ex. 5, 23:5-26:5; Ex. 6, 8:13-21; Ex. 8, 6:5-15, 6:19-7:14; Ex. 9, 98:17-24,
13 100:8-101:11, 117:12-16.) Further, the bulk of testimony showed that, during this
14 time, Martinez was behind the two cars, to Anthony's east (Ex. 1, 55:3-14, 57:2-
15 58:4, 66:3-67:7, 67:25-68:6; Ex. 3, 24:20-26:9, 26:22-27:3; Ex. 4, 9:6-13; Ex. 8,
16 6:13-7:2; Ex. 14, 34:3-8, 37:10-13), such that Anthony was over a full car's length
17 away. Evidence also showed Anthony paused at the front of the Charger before
18 Cervantes fired. (Ex. 3, 25:22-24, 26:10-15.)

19     There was no evidence that the beanbag and Martinez's first gunshot did not
20 essentially overlap. Thus, the evidence strongly indicated it could not have been true
21 that Anthony was already between the cars, "charging" toward Martinez, when
22 Martinez fired, as certain deputies claimed. Although some deputies initially
23 testified there was a pause after the beanbag, before Anthony turned to advance
24 between the cars (Ex. 3, 29:10-30:1; Ex. 9, 102:18-103:6), upon hearing the audio
25
26 _____

27     [3] Indeed, in conferring with counsel regarding a jury note, the Court
   acknowledged the evidence showed the beanbag and gunshot were essentially
28 simultaneous.

1    and acknowledging these shots were near-simultaneous, no deputy revised their

2    testimony to say Anthony was already advancing toward Martinez when Cervantes

3    fired. This discrepancy, together with deputies' testimony that several seconds

4    passed between the beanbag and the gunshot, calls these witnesses' credibility into

5    serious doubt regarding this issue, as that pause never occurred. *See Experience*

6    *Hendrix*, 762 F.3d at 848 (concluding that "a new trial … would be just" where

7    prevailing party's evidence "was minimal and, in the eyes of the district court, not

8    very credible"). Martinez himself testified that, had Anthony been in front of the

9    cars, as he was when Cervantes fired, deadly force would have been inappropriate.

10    (Ex. 2, 16:18-21, 26:7-13.)[4]

11        The unanimity regarding Anthony's position when Cervantes fired and the

12    shots' near-concurrent timing stands in contrast to the divergent testimony regarding

13    Anthony's position when Martinez fired, showing that the truth, far more likely, is

14    Martinez fired when Anthony was in front of the Charger, facing north. Campos

15    corroborated this, testifying that, when Martinez first fired, Anthony was in front of

16    the Charger, moving and facing north; that during Martinez's second shot, Anthony

17    was in front of the space between the cars, still moving and facing north, and had

18    not turned eastward; and, for both, Anthony's right side faced the rear of the

19    vehicles, behind which Martinez and Cervantes stood. (Ex. 7, 15:20-17:20; Ex. 8,

20    6:5-7:2, 7:9-14; *see* Ex. 2, 27:22-25.)[5] Deberg also acknowledged Anthony was at

21    the front of the cars when Martinez fired. (Ex. 5, 35:21-36:4; Ex. 6, 8:13-21.)

22    Martinez testified Anthony was 20 feet away when he fired and acknowledged that,

23    with his gun already drawn and pointed, he could pull the trigger much faster than

24

25        [4] As explained *infra*, these details render LaFever's perjurious testimony

26    especially prejudicial.

27        [5] This testimony is consistent with Campos's testimony regarding Cervantes's

28    beanbag (Ex. 8, 6:10-18, 7:11-14), as it shows Anthony had not or barely moved
    between the beanbag and the first gunshot.

Anthony could have covered 20 feet and swung the chain. (Ex. 1, 70:23-71:2, 77:9-11, 86:17-25, 87:9-88:8.) Campos further testified that, before Martinez's third shot, Anthony's arm was extended downward, and Anthony was "collapsing towards the ground." (Ex. 7, 17:25-18:16.)[6]

That Anthony had not turned, and faced north, when Martinez opened fire is further corroborated by other key objective evidence, the autopsy. It showed that two of the gunshots caused injuries with right-to-left trajectories, and the other had partial right-to-left and downward trajectories, consistent with Anthony facing north for the first shots and turning while stumbling or falling forward by the third. (Ex. 15, 14:20-16:25, 19:11-20:20, 21:7-23:3, 23:19-28:11, 36:8-27:25, 41:6-20, 48:1-24, 49:14-50:3, 50:20-23; Ex. 1, 71:16-18.)[7] Likewise, blood between the cars, where Anthony's body landed, coupled with evidence that he was 5'11" and took multiple steps between the cars *after* being shot, shows he must have been in front of the cars when Martinez opened fire. (Ex. 19; Ex. 20; Ex. 1, 80:14-81:9, 82:8-84:14; Ex. 2, 15:10-21; Ex. 7, 18:8-11; Ex. 3, 32:3-7; Ex. 9, 118:3-14; Ex. 13, 42:17-43:2, 88:14-24; Ex. 15, 10:21-11:3.)

Taken together, the objective evidence and the only testimony consistent therewith—showing Anthony was in front of the Charger, facing north, and not moving toward Martinez when Martinez fired—is wholly inconsistent with the jury's determination that Plaintiffs failed to show Anthony posed no immediate

---

[6] The foregoing testimony is undoubtedly why counsel sought to undermine Campos in closing using information not in evidence. *See infra* Section III.C.1.

[7] Although defense counsel questioned Dr. Luzi regarding whether this evidence could be consistent with Anthony facing somewhat toward Martinez for the first shot, then turning left before the other shots, and argued the same in closing, this is hardly helpful to Defendants. Not only is this inconsistent with the other evidence—no deputy testified Anthony turned left after the first shot and then had his right side exposed—it would also show that Martinez continued firing despite Anthony no longer facing him, and thus not posing an immediate threat.

threat of death or serious injury when Martinez fired, a determination it necessarily made in reaching its verdict. Plaintiffs' expert distilled this point. (Ex. 13, 30:16-43:23.) Again, to conclude Anthony posed an immediate threat, the jury had to find he "ha[d] the present ability, opportunity, and apparent intent" to "immediately cause" death or serious injury—not merely to likely cause it soon—such that Martinez had no option but to "instantly" use deadly force. [Dkt. 175 at 26-27, 29.]

Given the evidence, the verdict was plainly contrary to this instruction. *See Experience Hendrix*, 762 F.3d at 846 (affirming grant of new trial where verdict was "against the clear weight of the evidence and the product of … disregard of the Court's instructions"); *Mejia v. Cook County*, 650 F.3d 631, 633 (7th Cir. 2011) ("In passing on a motion for a new trial, the district court has the power to get a general sense of the weight of the evidence, assessing … the comparative strength of the facts put forth at trial.") (collecting cases); *cf. Smith v. Union Oil Co.*, 241 Cal.App.2d 338, 350-51 (1966). The clear weight of the evidence showed Martinez shot Anthony from 20 feet away, a portion of the Charger between them, when Anthony was not facing him. It also showed that, although Anthony held a chain, the usable portion was six feet, and Anthony was not swinging it when Martinez fired or immediately before. (Ex. 1, 70:23-71:2, 84:18-20, 91:10-14; Ex. 2, 25:25-26:6; Ex. 11, 14:7-13, 16:4-10; Ex. 12, 7:21-25.) Given the distance, these obstacles, and Anthony's orientation, it was unreasonable for the jury to conclude Anthony had the "present ability [and] opportunity … to immediately" kill or seriously injure Martinez when Martinez fired. *See Sagicor Life Ins. Co. v. Jang*, EDCV 19-2028-JGB-KK, 2022 WL 17328237, at *4 (C.D. Cal. Oct. 27, 2022) (granting motion where evidence clearly satisfied element jury found was unmet); *Hilborn v. Metro. Grp. Prop. & Cas. Ins. Co.*, 306 F.R.D. 651, 654-55 (D. Idaho 2015); *cf. Lennox v. City of Sacramento*, 2024 WL 3845378, at *15, 30-31 (E.D. Cal. Aug. 16, 2024); *Mehling v. Schield*, 253 Cal.App.2d 55, 60-61 (1967).

The evidence also showed that when Martinez fired, Anthony lacked the "apparent intent … to immediately" kill or injure him; although Anthony had made threats, those were before less-lethal weapons were fired, causing him to scream in pain and tell the deputies, "Jesus, get away!" (Ex. 17, 00:29-00:47; Ex. 1, 70:16-22; Ex. 13, 83:17-25.) Additionally, Luz Ramos testified that she observed the encounter until the shots and that Anthony never swung the chain overhead or charged deputies. (Ex. 11, 14:7-13, 16:1-10; Ex. 12, 7:5-8, 7:21-25)[8]; *see Morris v. W. Hayden Estates First Addition Homeowners Assoc., Inc.*, 104 F.4th 1128, 1152-54 (9th Cir. 2024) (affirming new trial based on verdict against clear weight of evidence, where testimony of prevailing party's principal witness "was not credible," losing party's witnesses "were 'convincing and credible,'" and "few pieces of evidence in the record" supported verdict); *Cervantes v. County of Los Angeles*, CV12-09889-DDP-MRW, 2015 WL 5163031, at *1-3 (C.D. Cal. Sept. 3, 2015).

The jury also apparently disregarded Martinez's "duty to use reasonable tactical repositioning," contrary to the instructions. Martinez admitted he had room to maneuver backward or around the rear of the vehicles, providing additional distance and cover (Ex. 1, 55:25-56:13, 79:4-80:13; Ex. 2, 27:22-28:6), but he did neither. Plaintiffs' expert explained the many alternatives to deadly force Martinez had, including how Martinez could and should have repositioned. (Ex. 13, 22:2-23, 38:8-39:22, 89:6-21.)

Together, these details show that all requirements for a Plaintiffs' verdict under the Battery and Negligence instructions were plainly satisfied. The verdict was thus against the clear weight of the evidence. Although perhaps somewhat less

---

[8] Although counsel attempted to challenge her credibility (Ex. 16, 18:1-19:1), she testified she had no prior relationship with the Nuñezes (Ex. 11, 7:18-8:5, 8:24-9:2), such that she had no reason to lie or exaggerate. (*See* Ex. 11, 12:12-24.) The Court may judge her credibility for itself. *Experience Hendrix*, 762 F.3d at 841.

clear-cut given their multi-factor presentation, the Fourth Amendment instructions
support the same conclusion. Given the foregoing evidence, the only factors that did
not clearly favor Plaintiffs, of thirteen, were whether Anthony "resist[ed] arrest" and
"[t]he nature of the circumstances" to Martinez was responding. [Dkt. 175 at 24-25.]
Anthony did not pose an immediate threat of death or serious injury (bearing on
factors 2, 4-5, and 7-11); Martinez knew of no serious crime Anthony had
committed (factors 1 and 8); Anthony's injuries were severe (factor 6), Martinez
failed to issue any warning (factor 11) (Ex. 1, 71:3-6); and significant evidence
indicated Anthony "was emotionally disturbed" (factor 12) (Ex. 1, 28:6-29:8, 32:11-
13, 33:21-35:10; Ex. 5, 33:15-34:3; Ex. 6, 13:16-24; Ex. 8, 5:17-23). These details
likewise show that, in using deadly force, Martinez "reckless[ly] disregard[ed]"
Anthony's "right to be free from excessive force," violating the Bane Act. [Dkt. 175
at 34.]

### B. The Verdict Is Based on False and Perjurious Evidence

Where a new trial is sought based on conduct that "prevented the losing party
from fully and fairly presenting the case," the movant "need not establish that the
result in the case would be altered." *Landeros v. Schafer*, 2024 WL 1693356, at *1
(9th Cir. Apr. 19, 2024) (quoting *De Saracho*, 206 F.3d at 880; *Jones v. Aero/Chem
Corp.*, 921 F.2d 875, 879 (9th Cir. 1990)). In criminal cases, a district court has *no
discretion* to deny a new trial when "a conviction [has been] obtained by the
knowing use of perjured testimony"; the verdict "*must be set aside* if there is any
reasonable likelihood that the false testimony could have affected the judgment of
the jury." *Hayes v. Brown*, 399 F.3d 972, 984 (9th Cir. 2005) (en banc) (emphasis
added) (quoting *United States v. Bagley*, 473 U.S. 667, 678 (1985)).

Although courts have discretion regarding whether to grant a new trial in civil
cases, knowing use of false evidence warrants close scrutiny. As the *en banc* Ninth
Circuit explained, when a verdict "is obtained through perjurious or deceptive
means, the entire foundation of our system of justice is weakened." *Id.* at 988; *see*

1    *United States v. Simpson*, 2021 WL 1986026, at *5 (N.D. Cal. May 18, 2021

2    ("[P]erjured testimony is an affront to not only those devoted to the administration

3    of justice, but also to anyone with confidence in the justice system. When that

4    testimony comes from a peace officer, it is particularly damaging to the public's

5    faith in law enforcement and the courts.") (citations omitted). If "[d]eliberate

6    deception of a judge and jury is 'inconsistent with the rudimentary demands of

7    justice'" in criminal cases, *Hayes*, 399 F.3d at 978 (quoting *Mooney v. Holohan*, 294

8    U.S. 103, 112 (1935)); *accord Giglio v. United States*, 405 U.S. 150, 153 (1972), so

9    is it in civil cases. *Cf. Hardwick v. County of Orange*, 844 F.3d 1112, 1119-20 (9th

10   Cir. 2017) ("[G]overnment perjury and the knowing use of false evidence are

11   absolutely and obviously irreconcilable with … Due Process in our courts.").

12       Defendants' first witness was Sergeant Corey LaFever. Under oath, LaFever

13   testified that, although he was at a command post 200 yards away, he began heading

14   toward the house upon hearing via radio that Anthony came outside. (Ex. 9, 16:10-

15   20, 45:25-46:15, 88:25-90:11, 96:7-22.) He testified that, while approaching, he

16   heard Deberg announcing via radio that Deberg had begun firing four 40mm rounds,

17   and LaFever heard these shots. (Ex. 9, 46:25-47:12, 60:25-3, 73:15-24, 97:7-19.) He

18   testified he approached the driveway as Cervantes fired a beanbag round and saw it

19   strike Anthony in front of the Charger. (Ex. 9, 60:5-7, 61:8-14, 98:17-99:4, 100:8-

20   102:11.) He testified he drew his gun and pointed it at Anthony for 30 seconds, and

21   observed Anthony pause before proceeding between the cars, toward Martinez,

22   whipping the chain, attempting to attack Martinez. (Ex. 9, 48:5-23, 55:23-56:2,

23   61:15-25, 62:12-16, 63:15-20, 76:8-78:12, 104:12-20, 119:5-13.) He testified

24   Martinez then fired from between the vehicles, and LaFever did not fire only

25   because he lacked a clear shot from where he stood, at the corner of the red Honda.

26   (Ex. 9, 48:10-49:4, 63:15-64:1, 101:16-102:3.)

27       This testimony is demonstrably false. LaFever's belt recording was activated

28   throughout the incident and shows that, when Martinez fired, LaFever was far away

such that the gunshots are barely audible in the background. At that time, LaFever is heard speaking with another officer and, crucially, continued this conversation *before* arriving at the house. (Ex. 18, 00:16-00:31.) None of the preceding 40mm shots are audible. (Ex. 18, 00:00-00:09; Ex. 9, 97:20-23.) Then, after LaFever's conversation ends, no voices are heard for several seconds, and additional time passes before any of the extensive post-shooting discussion clearly audible on Martinez's belt audio can be heard on LaFever's. (Ex. 18, 00:20-00:41.)

This differs dramatically from Martinez's audio, which is cacophonous until the shooting and immediately after. Martinez's clearly captured Deberg loudly announcing and firing each of four 40mm rounds, then Cervantes yelling, "Less lethal!" before firing her beanbag a split-second before Martinez shot, with deputies issuing commands and Anthony yelling (including in pain and "Jesus, get away!") throughout. (Ex. 17, 00:29-00:50.) Martinez's audio captured additional loud commands after the gunshots. (Ex. 17, 00:49-00:59.)

Despite LaFever's testimony that he was feet away for the beanbag and gunshots, none of the foregoing is audible on his recording except the faint gunshots in the distance.[9] It is inconceivable that, if LaFever was feet away with his gun drawn when Martinez fired, he would have been concurrently engaged in a separate in-person conversation that continued thereafter. LaFever also claimed *5-20* seconds passed between Cervantes's beanbag and Martinez's shots, showing he was not present. (Ex. 9, 102:18-103:6.) And no other deputy testified he was present during the shots. (*See* Ex. 1, 57:14-22); *Experience Hendrix*, 762 F.3d at 846 (holding "the

---

[9] The pertinent sections of audio can be compared via LaFever's reference to a "tourniquet" approximately 52 seconds after Martinez's third shot on Martinez's recording (Ex. 17, 00:49-1:43) and at 01:07 on LaFever's. (Ex. 18.) On LaFever's, approximately 52 seconds before, LaFever states, "Yes, there's a fi- there's a gun in the back corner ….," (Ex. 18, 00:16-00:21) during which the gunshots can be heard in the background, clearly at a great distance. On Martinez's, they are loud and clear. (Ex. 17, 00:48-00:50.)

district judge, who heard the evidence presented at trial," did not abuse discretion in granting new trial based in part on determination that official testifying for prevailing party was not credible).

That LaFever's testimony is not simply false, but also perjurious, is evident from his testimony that he repeatedly reviewed his audio before trial, and thus could not have believed he was present for the shooting. (Ex. 9, 92:13-93:7.) His perjury—and counsel's elicitation thereof—is also evident from LaFever's shifting and contradictory testimony regarding whether he ever paused his recorder. First, he testified he believed he activated it "upon [his] arrival"; that, although he "might have paused it here and there, [] that doesn't normally happen"; and that, "to the best of [his] knowledge, it was running continuously." (Ex. 9, 92:13-20.) When asked whether it captured the 40mm rounds, he then testified he actually "might have paused it … at the command post" and was unsure whether it was on when returning to the house. (Ex. 9, 97:20-98:3.) Later, after conferring with counsel during lunch, new testimony: He *did* pause the recorder, "[p]robably throughout the event, but certainly … back at the command post," and it "possibly [was] not" recording when returned to the house. (Ex. 9, 136:13-24, 143:23-144:1)[10]; *see Cleveland Demo. Co., Inc. v. Azcon Scrap Corp.*, 827 F.2d 984, 986 (4th Cir. 1987) (explaining, under heightened Rule 60(b) standard, that "involvement of an attorney, as an officer of the court, in a scheme to suborn perjury" constitutes "fraud on the court" and that, "if [a witness] deliberately lied and [counsel] participated," the "verdict … should be set aside") (citations omitted); *Hunter v. Thomas*, 173 F.2d

---

[10] Counsel's post-lunch invocation of the attorney-client privilege over LaFever followed LaFever's earlier testimony that he was not represented by counsel. (Ex. 9, 82:12-17.) Despite never being a defendant, LaFever testified he attended multiple meetings regarding the case, including with counsel, for an hour, two days prior. (*Id.* 81:24-82:20.)

810, 812-13 (10th Cir. 1949) (affirming new trial under Rule 59 based on perjured testimony).

Attempting to reconcile LaFever's testimony with LaFever's recording, counsel elicited an apparently fabricated explanation that LaFever maintained a single recording despite purportedly pausing and unpausing his device. (Ex. 9, 136:25-137:7.) And counsel supported LaFever's perjury, asking whether LaFever would "lie in any way about what happened out there that day," which LaFever denied, and argued in closing that the gunshots faintly audible on LaFever's recording were in fact Deberg's 40mm rounds. (Ex. 9, 141:18-22; Ex. 16, 22:11-18)[11]; *see Gibson v. Total Car Franchising Corp.*, 223 F.R.D. 265, 282 (M.D.N.C. 2004) (under heightened Rule 60(b) standard, whether verdict should be set aside "often turn[s] on whether the improper actions are those of parties alone, or if the attorneys … are involved") (quoting *Demjanjuk v. Petrovsky*, 10 F.3d 338, 352 (6th Cir. 1993)).

LaFever's perjured testimony was material because it supported Defendants' preferred narrative: That immediately before Martinez fired, Anthony was already between the cars, near and quickly approaching Martinez while swinging the chain (Ex. 9, 47:22-50:5; 76:23-77:21), fiercely disputed details. It prejudiced Plaintiffs by falsely presenting a narrative suggesting Anthony posed an imminent threat when Martinez fired. The prejudice was heightened because LaFever is no ordinary

---

[11] This claim is implausible because on Martinez's recording, the 40mm rounds, clearly audible, were spaced apart further than the gunshots, after which no shots followed. And it contradicted LaFever's testimony that he did not recall pausing or unpausing the recorder while heading to the house or once there. (Ex. 9, 114:21-115:7.) It is inconceivable that LaFever would have heard the 40mm rounds, then paused his recorder. Nevertheless, counsel's claim bolstered the prejudicial impact of LaFever's perjury via the imprimatur of the County's counsel and by purporting to shore up LaFever's testimony. It also was premeditated, given that closings occurred on a separate day. *See Hardwick*, 844 F.3d at 1119-20.

deputy, rather, a sergeant—presented as a commanding officer with experience over and above the other deputies, even a quasi-expert. (Ex. 9, 18:3-21:22, 71:3-13, 77:22-78:12, 80:9-20; *see id.* 8:1-15, 10:12-11:4, 12:10-20, 28:22-29:5); *cf. Briscoe v. LaHue*, 460 U.S. 325, 342 (1983) (acknowledging that "perjured testimony by police officers is likely to be more damaging to constitutional rights" than by other witnesses because police carry "special credibility in the eyes of jurors"). Defendants also utilized LaFever's false testimony and experience to suggest that the less-lethal weapons had no effect whatsoever, justifying Martinez's use of deadly force. (Ex. 9, 73:15-75:20.) LaFever was one of only two defense witnesses, called by the County and represented by its counsel, elevating the import of his perjured testimony for Defendants' case. *See Traylor v. Pickering*, 324 F.2d 655, 658 (5th Cir. 1963) (new trial may be granted where "a witness willfully testified falsely to a material fact, especially where the perjured testimony was induced by the opposite party or … was that of the opposite party"); *Landeros*, 2024 WL 1693356, at *1-2 (reversing denial of new trial where defense counsel elicited false testimony from coroner, presented as key witness, "prevent[ing] plaintiffs from fully and fairly presenting their case"); *cf. United States v. Houston*, 648 F.3d 806, 814 (9th Cir. 2011) (condemning criminal "conviction obtained using knowingly perjured testimony," in part because government lawyers knew of falsity yet "fail[ed] to correct" it); *Hayes*, 399 F.3d at 978 (government lawyer who "solicit[s] false evidence" or "allows false evidence to go uncorrected when it appears" violates due process) (cleaned up, citation omitted).

        In addition to denying Plaintiffs a fair trial, perjury, when committed by public officials, threatens the legitimacy of the justice system, real and perceived. *See Hardwick*, 844 F.3d at 1119 ("Perjury is a crime under both federal and California state law, as is the knowing submission of false evidence to a court. Both crimes make no distinction between criminal and civil proceedings.") (citations omitted). Where law enforcement leaders feel privileged to falsely testify under oath

to protect colleagues from liability, the right to a fair trial is undermined, with few remedies practically available. *See Briscoe*, 460 U.S. at 342. LaFever's perjury, and elicitation thereof by the County of San Bernardino's counsel, should particularly concern the Court where the County's deputies, officials, and counsel will testify or argue in the presiding judge's courtroom for years to come. *See* 28 U.S.C. § 84(c)(1). LaFever's perjury, with Martinez—his subordinate—watching, should be revealing of his Department's culture, and it is unknown, given his apparent comfort with giving false testimony, how many times he has done so before, in civil and criminal matters. (*See* Ex. 10, 5:20-23.) It is the opposite of what we expect from law enforcement, and allowing it to go unremedied risks signaling to other officers and their counsel that perjury is a risk worth taking—or no risk at all.

### C. Allowing the Verdict to Stand Would Work a Miscarriage of Justice

#### 1. Counsel Referenced Details Not in Evidence to Undermine Plaintiffs' Case and Improperly Influence the Jury

"A new trial may [] be warranted when counsel, in closing argument, argues the existence of material facts that are false or without basis in the record." *Clapper v. Am. Realty Investors, Inc.*, 95 F.4th 309, 313 (5th Cir. 2024) (citations omitted). "[C]ounsel should not introduce extraneous matters before a jury …, and, where there is a reasonable probability that the verdict of a jury has been influenced by such conduct, it should be set aside." *City of Cleveland v. Peter Kiewit Sons' Co.*, 624 F.2d 749, 754 (6th Cir. 1980) (citation omitted). Here, improper statements during Defendants' closing unfairly prejudiced Plaintiffs and denied a fair trial. *See Molski*, 481 F.3d at 729; *De Saracho*, 206 F.3d at 880; *Hesselbein v. Beckham*, 168 F.Supp.3d 1252, 1265 (E.D. Cal. 2016) (introduction of inadmissible evidence more likely prejudicial where weak evidence supports verdict); *see also Clapper*, 95 F.4th at 314 ("closing argument … often leaves an especially powerful impression on the jury"). In seeking to legitimize Martinez's deadly force, counsel referenced significant details not in evidence to undermine Plaintiffs' case and inflame the jury.

_Campos's Location:_ Most prejudicial was counsel's statement that Campos
was "off in the shade by the tree" at the time of Martinez's shots, such that Campos
had "a whole different view than Deputy Cervantes and Deputy Martinez looking
down that pathway or alleyway between the two cars." (Ex. 16, 8:6-11.) Unlike
other deputies, Campos's testimony regarding Anthony's position when Martinez
fired was highly favorable for Plaintiffs, bearing directly on the central issue of
whether Anthony posed an immediate threat. Campos testified that, when Martinez
first fired, Anthony was in front of the Charger,[12] moving and facing north; that
during the second shot, Anthony was in front of the space between the cars, still
moving and facing north, and had not turned to face deputies; and for both,
Anthony's right side faced the rear of the vehicles, behind which Martinez and
Cervantes stood. (Ex. 7, 15:20-17:20; Ex. 8, 6:5-7:2, 7:9-14.) He further testified
that, before Martinez's third shot, Anthony started collapsing to the ground, his arm
extended downward. (Ex. 7, 17:25-18:16.)

The clear intent of counsel's comment, and its presumed effect, was to
discredit Campos and his testimony. Its prejudicial impact was especially
consequential because Campos's testimony was most consistent with the objective
evidence; contrary to other deputies' testimony that Anthony faced Martinez during
all of the shots, the autopsy showed that injuries Anthony sustained from two
gunshots had right-to-left trajectories, and the other had a partial right-to-left and
partial downward trajectory, consistent with Anthony facing north for the first two
shots, and beginning to turn right while stumbling or falling forward for the third.

However, _neither Campos nor anyone else testified to Campos's location
when Martinez fired_, and counsel never asked. The only references to "shade" from

---

[12] Campos also testified that Cervantes's beanbag was "almost simultaneous"
with Martinez's first shot and that, at the time of the beanbag, Anthony was "in front
of the Charger more on the driver's side." (Ex. 8, 6:10-18, 7:11-14.)

1    trees during the entire trial were to shady areas in the southeast portion of the yard

2    (from large trees across the fence), where Anthony allegedly stood when Deberg

3    began firing 40mm rounds. (*See* Ex. 21.) Thus, the jury would have been left with

4    the mistaken impression that Campos was far away, rendering his testimony

5    untrustworthy. This is especially consequential because the jury was clearly

6    preoccupied with the deputies' positioning when Martinez fired, including when

7    deadlocked. [*See* Dkt. 182-183.] It specifically asked to know how Martinez,

8    Cervantes, and Campos testified regarding their positioning when Martinez fired—

9    the same deputies referenced in counsel's comments; significantly, counsel did not

10    reference Deberg or LaFever, whose testimony the jury did not inquire about. *See*

11    *Peter Kiewit*, 624 F.2d at 756 ("In determining whether 'there is a reasonable

12    probability that the verdict of a jury has been influenced' by improper [comments],

13    warranting that the verdict be set aside, a court must examine … their possible

14    relevancy to the real issues before the jury, … the strength of the case (e.g. whether

15    it is a close case), and the verdict itself.").

16        *Anthony's Earlier Conduct:* Counsel also improperly referenced details

17    regarding events before deputies' arrival that were not in evidence and were

18    excluded by the Court. Among these was the claim that Anthony, in addition to

19    having pushed his brother Andrew, also "choked" Andrew. (Ex. 16, 7:7-10, 7:19-20,

20    13:7-10, 15:11-12, 19:2-3, 27:9-11.) Andrew had denied Anthony choked him but,

21    more importantly, Martinez testified that all he knew regarding contact between the

22    brothers was the push. (Ex. 1, 25:12-26:12; Ex. 2, 6:6-25; Ex. 16, 13:11-14.)

23    Because this information was unknown to Martinez, counsel's reference to it in

24    closing argument contravened the Court's order *in limine*. [Dkt. 137.] The issue was

25    also raised in sidebar during the final day of testimony, during which Plaintiffs'

26    counsel noted the Court's order and reaffirmed that details unknown to Martinez

27    could not be introduced. (Ex. 9, 5:20-6:16, 8:18-10:11, 22:9-29:25.)

28

Counsel similarly alleged that before deputies arrival, Anthony had been
"pounding on doors" at home (Ex. 16, 15:21-23), about which Plaintiffs have not
located any trial testimony. Because no evidence was presented that Martinez knew
about this, it too violated the Court's order.

Together, these details served to improperly heighten the purported danger
Anthony posed toward deputies in the jury's eyes—as well as improperly establish
that Anthony may have committed a significant crime before deputies arrived,
bearing factors relevant to Plaintiffs' Fourth Amendment claim [*see* Dkt. 175 at 24-
25]—unfairly prejudicing Plaintiffs.

*Amphetamines:* Counsel also asserted in closing that Anthony was "high on
some sort of amphetamine" and that "[t]he family knew it." (Ex. 16, 12:20-23.)
Although Martinez, like other deputies, believed Anthony may have been under the
influence, based on Anthony's speech and demeanor, and because dispatch relayed
that the 911 caller believed he was (Ex. 1, 19:23-20:16; Ex. 2, 9:3-7), no evidence
regarding any specific drug or drug class—or even confirming Anthony was
actually on drugs—was ever introduced. Because every deputy lacked such
information, the Court granted Plaintiffs' motion *in limine* on this subject, and
counsel's statement violated that order. [Dkt. 93, 137.] Likewise, although Andrew
may have testified he believed Anthony was on drugs, no family member ever
testified they were aware Anthony was on an "amphetamine," contrary to counsel's
claim. Like the above-addressed regarding alleged conduct before deputies arrived,
counsel's "amphetamine" comment advanced an improper basis for the jurors to
believe Anthony was unstable and thus posed an increased threat. And, as the Court
recognized at oral argument on the motion, drug evidence can serve to wrongly
imply that an individual's life is worth less, and thus this comment further
improperly prejudiced Plaintiffs.

Each of these comments in closing based on details not in evidence denied
Plaintiffs a fair trial. *See Levitant v. City of N.Y. Human Res. Admin.*, 914 F.Supp.2d

281, 311-312 (E.D.N.Y. 2012) (ordering new trial where counsel referenced details not in evidence and that court had excluded); *Molski*, 481 F.3d at 729; *De Saracho*, 206 F.3d at 880.

2.  Cumulatively, All the Foregoing Issues Warrant a New Trial

The impact of trial errors must be considered cumulatively. *Jerden v. Amstutz*, 430 F.3d 1231, 1240 (9th Cir. 2005); *see Gonzales v. City of San Jose*, 901 F.2d 758, 762 (9th Cir. 1990); *Gordon Mailloux Enters., Inc. v. Firemen's Ins. Co. of Newark*, 366 F.2d 740, 742 (9th Cir. 1966) ("[A]lthough the errors requiring reversal, if considered separately, were perhaps harmless, their cumulative effect was prejudicial."); *Beck v. Haik*, 377 F.3d 624, 645 (6th Cir. 2004).

Although the issues detailed in each foregoing section of this motion individually "prevented [Plaintiffs] from fully and fairly presenting the[ir] case," *De Saracho*, 206 F.3d at 880, their cumulative impact was far greater, necessitating a new trial. *Molski*, 481 F.3d at 729. All objective evidence showed Anthony was not an immediate threat of death or serious injury when Martinez fired, such that the verdict was against the clear weight of the evidence. Sergeant LaFever's perjured testimony, and counsel's endorsement thereof, lent improper and unfair support for Defendants' preferred story. And counsel's comments regarding details not in evidence unfairly prejudiced Plaintiffs, particularly by discrediting the deputy who contradicted Defendants' narrative. Together, these denied Plaintiffs a fair trial, particularly significant in a case that was, despite these issues, close and uncertain— in which the jury was "evenly split" more than a day into deliberations occurring over three days. *See Stamps v. United States*, 406 F.2d 925, 929 (9th Cir. 1969) (given alleged perjury, "in view of the closeness of the issue ..., hinging on the credibility of the agent, and in view of the inquiry by the jury, we think a new trial should have been granted").

Under these circumstances, a new trial is "necessary to prevent a miscarriage of justice." *Experience Hendrix*, 762 F.3d at 841. The Court should exercise its

broad discretion to provide this relief, *see Allied Chem.*, 449 U.S. at 36; *Dees*, 960 F.3d at 1151, which would undeniably be "[]logical" and abundantly "support[ed] [by] inferences that may be drawn from the record," as detailed herein. *Experience Hendrix*, 762 F.3d at 842.

## IV.   CONCLUSION

For the foregoing reasons, the Court should order a new trial on all issues— without perjured testimony or introduction of information not in evidence.

DATED:  June 9, 2025            LAW OFFICES OF DALE K. GALIPO

By */s/ Benjamin S. Levine*
    Dale K. Galipo
    Benjamin S. Levine
    Attorneys for Plaintiffs

**CERTIFICATION OF COMPLIANCE WITH WORD LIMIT (L.R. 11-6.2)**

The undersigned, counsel of record for Plaintiffs, certifies that this brief contains **7,000** words, which complies with the word limit of L.R. 11-6.1.

DATED:  June 9, 2025                    LAW OFFICES OF DALE K. GALIPO


By */s/ Benjamin S. Levine*
   Dale K. Galipo
   Benjamin S. Levine
   Attorneys for Plaintiffs