# Exhibit 1

1                    **UNITED STATES DISTRICT COURT**

2           **CENTRAL DISTRICT OF CALIFORNIA - EASTERN DIVISION**

3            **HONORABLE SUNSHINE S. SYKES, U.S. DISTRICT JUDGE**

4

5   **ROSA NUÑEZ, et al.,**                    )
                                               )
6                         **Plaintiffs,**      )
                                               )
7        **v.**                                )        **Case No.**
                                               )  **ED CV 22-1934 SSS (SPx)**
8   **COUNTY OF SAN BERNARDINO, et al.,**      )
                                               )
9                         **Defendants.**      )
    _____)

10

11        **REPORTER'S PARTIAL TRANSCRIPT OF TRIAL PROCEEDINGS**
               **DIRECT EXAMINATION OF MICHAEL MARTINEZ**
12                  **TUESDAY, APRIL 22, 2025**
                            **9:11 AM**
13                  **RIVERSIDE, CALIFORNIA**

14

15

16

17

18

19

20

21

22   _____

23        **MYRA L. PONCE, CSR NO. 11544, CRR, RPR, RMR, RDR**
                  FEDERAL OFFICIAL COURT REPORTER
24                350 WEST 1ST STREET, ROOM 4455
                  LOS ANGELES, CALIFORNIA  90012
25                      (213) 894-2305

1   warning?

2        A.   That's correct.

3        Q.   Were you also trained that deadly force should only

4   be used when there are no other reasonable options?

09:23AM  5        A.   Yes, sir.

6        Q.   And were you trained with respect to deadly force,

7   you have to justify each shot?

8        A.   Yes, sir.

9        Q.   Now, in addition to your firearm on your duty belt,

09:23AM 10   did you have pepper spray?

11        A.   Yes, sir.

12        Q.   Did you have a Taser?

13        A.   Yes, sir.

14        Q.   And did you have a police baton?

09:23AM 15        A.   Yes, sir.

16        Q.   I want to ask you a little bit about the information

17   you had and didn't have before you got to the scene of this

18   incident.  So now I want to talk about the day of the incident.

19   Are you with me?

09:24AM 20        A.   Yes, sir.

21        Q.   At some point you heard a call regarding some family

22   disturbance?

23        A.   That's correct.

24        Q.   And you heard that over your police radio?

09:24AM 25        A.   Yes, sir.

1    Q.    And is that the uniform you were wearing at the time

2  of the shooting incident?

3    A.    Yes, sir.

4    Q.    Are you right-handed?

09:28AM  5    A.    I am, sir.

6    Q.    And do you keep your holster and your duty weapon on

7  your right side?

8    A.    Yes, sir.

9    Q.    Something appears to be yellow on your left side.

09:28AM  10  Would that be your Taser?

11    A.    Yes, sir.

12    Q.    Showing you Exhibit 14, page 11.  That's also a

13  photo of you that was taken -- I think on the day of the

14  incident, afterwards?

09:28AM  15    A.    Yes, sir.

16    Q.    And showing you Exhibit 14, page 12.  Does that

17  appear to be your firearm, the .45 caliber weapon that you shot

18  Mr. Nuñez with?

19    A.    That doesn't appear that it is -- I know by the

09:28AM  20  serial number.

21    Q.    That is it?

22    A.    Yes, sir.

23    Q.    Okay.  So I want to get back to the information that

24  you had regarding the call.  I'm assuming it generally came

09:29AM  25  over the police radio initially?

UNITED STATES DISTRICT COURT

1          A.    Yes, sir.

2          Q.    And you had some information that there was some

3    altercation between brothers?

4          A.    Yes, sir.

09:29AM  5    Q.    At some point you learned that the contention was

6    one brother pushed the other brother?

7          A.    Yes, sir.

8          Q.    And you had some information that someone might be

9    possibly under the influence?

09:29AM  10   A.    Yes, sir.

11         Q.    And this would be before you got to the scene;

12   correct?

13         A.    That's correct.

14         Q.    And you may have had some information that someone

09:30AM  15   might not have slept for a few days or words to that effect?

16         A.    Yes, sir.

17         Q.    And I think you had information that there was a

18   possible gun or guns in the home?

19         A.    Yes, sir.

09:30AM  20   Q.    And at some point you learned, prior to the

21   shooting, that the guns were -- or gun was actually registered

22   to Rosa Nuñez, the mother; is that right?

23         A.    I don't recall having that information myself prior

24   to.

09:30AM  25   Q.    At any point -- well, let me just ask you this.  You

**UNITED STATES DISTRICT COURT**

```
 1   residence?
 2        A.    No.
 3        Q.    At some point did you hear someone in the residence
 4   appear to be possibly talking to themselves?
 5        A.    Yes, sir.
 6        Q.    Do you now believe that is Anthony Nuñez, the person
 7   that you thought might have been talking to themselves?
 8        A.    Yes, sir.
 9        Q.    Did you try the door at some point to see if it was
10   locked?
11        A.    No, sir.
12        Q.    At some point did you seek the brother, Andrew's
13   assistance in having him open the door from the inside?
14        A.    Yes.  I initially made contact with him.
15        Q.    Okay.  And where did you contact him at?
16        A.    On the north side of the residence.  There's a
17   bedroom upon entering the driveway.
18        Q.    Was he cooperative with you?
19        A.    Yes, sir.
20        Q.    Did he appear to be injured in any way?
21        A.    I saw him through the screen.  I couldn't really
22   tell.
23        Q.    Well, let me ask you this.  Did you have any
24   specific information from any source that anyone was actually
25   injured in that house?
```

09:36AM (line 5)
09:36AM (line 10)
09:36AM (line 15)
09:37AM (line 20)
09:37AM (line 25)

|       |    |                                                            |
|-------|----|------------------------------------------------------------|
| 1     | A. | No, sir.                                                   |
| 2     | Q. | I'm assuming if you thought someone was injured, you       |
| 3     |    | would have called medical attention for them?              |
| 4     | A. | Yes, sir.                                                  |
| 5     | Q. | Did you have any information that Anthony -- and I'm        |
| 6     |    | talking about the time that you were there up to the shooting. |
| 7     |    | Did you have any information that Anthony Nuñez had a criminal |
| 8     |    | history?                                                   |
| 9     | A. | No, sir.                                                   |
| 10    | Q. | Any information that he had ever physically injured        |
| 11    |    | someone in his entire life?                                |
| 12    | A. | No, sir.                                                   |
| 13    | Q. | At some point was the front door open?                     |
| 14    | A. | Yes.                                                       |
| 15    |    | MR. GALIPO:  And I'd like to put up, if we can,            |
| 16    |    | Exhibit 1, page 4.                                         |
| 17    | Q. | (BY MR. GALIPO:)  Does that appear to be the area of       |
| 18    |    | the front door of the residence?                          |
| 19    | A. | That's correct, sir.                                      |
| 20    | Q. | And when the door was open, were you standing there        |
| 21    |    | with Deputy Campos?                                        |
| 22    | A. | Standing where, sir?                                       |
| 23    | Q. | Outside the door.                                          |
| 24    | A. | Yes, sir.                                                  |
| 25    | Q. | And at some point do you see Anthony Nuñez?                |

**UNITED STATES DISTRICT COURT**

1     A.    Yes, sir.

2     Q.    And when you first saw him, where was he in relation

3 to the open door we're looking at?

4     A.    I would say approximately -- or the middle of that

09:39AM  5 area, for the area -- from my point of view, I didn't see the

6 baby gate or any of that stuff when I initially made contact

7 with him at the front door.  I couldn't see that area.

8     Q.    There appears to be a hallway going from the front

9 door into the home.  Would you agree?

09:39AM  10    A.    In this picture, yes.

11    Q.    Are you saying -- when you say in the middle of the

12 area, do you mean more or less in the middle of the hallway?

13    A.    I'm talking about from the vanity or that armoire to

14 the front door.

09:39AM  15    Q.    Somewhere in between those two points?

16    A.    In the middle, yes, sir.

17    Q.    More or less in the middle?

18    A.    Yes, sir.

19    Q.    Okay.  Now, you and Deputy Campos were talking to

09:40AM  20 Mr. Nuñez for probably over an hour before he came outside.  Is

21 that fair?

22    A.    Yes, sir.

23    Q.    And at some point you see this chain in his hand;

24 correct?

09:40AM  25    A.    Upon opening the door, I saw the chain.

**UNITED STATES DISTRICT COURT**

1     Q.    And your recollection is that the chain looked like

2  it was wrapped a couple of times around his right wrist area?

3     A.    It would be his hand.

4     Q.    His hand.

09:40AM  5     A.    Yes, sir.

6     Q.    And I'm not going to go through the entire

7  conversation.  But would it be fair to say during times, during

8  the conversation with you and Deputy Campos and Anthony, that

9  there were times when Anthony was calm and there were times

09:41AM  10  where he was agitated and upset?

11     A.    Yes.  His emotions were agitated and then sometimes

12  calm.

13     Q.    There were some occasions where he was crying.  Do

14  you recall that?

09:41AM  15     A.    I believe it was two occasions, yes.

16     Q.    There was some occasions where he was praying or

17  wanting you to pray with him.  Do you recall that?

18     A.    Yes, sir.

19     Q.    At some point I think he said something to the

09:41AM  20  effect that he loved you guys.  Do you recall that?

21     A.    Yes, sir.

22     Q.    And at some point he was talking about that he was a

23  king or words to that effect?

24     A.    Yes, sir.

09:41AM  25     Q.    Talking about the President or wanting to become

1    President or words to that effect?

2        A.    Yes, sir.

3        Q.    And he appeared to you to be very paranoid.   Is that

4    fair?

09:42AM  5        A.    Yes, sir.

6        Q.    And you noticed that his emotions were changing a

7    lot from time to time?

8        A.    That's correct, sir.

9        Q.    Now, during this time frame of this -- how much time

09:42AM  10   would you estimate you were talking to him inside the house

11   before he came out?

12       A.    Hour and 30 minutes, hour and 25 minutes.

13       Q.    Now, you wanted him to come out of the house.  That

14   was one of the goals you had?

09:42AM  15       A.    That's correct, sir.

16       Q.    And did he ever come out of the house even partially

17   before the last time he came out?

18       A.    Before the only time he came out?  No.

19       Q.    So he just came out the one time, crossing the

09:42AM  20   threshold of the door that would be the last time?

21       A.    That's correct, sir.

22       Q.    And generally, during this hour or an hour and a

23   half that you were talking to him, where were you and

24   Deputy Campos generally positioned?

09:43AM  25       A.    It's not photographed in this photograph, but we

```
 1    Right now I'm just talking about when he was inside.  Are you
 2    with me?
 3         A.    Yes.  My apologies.  No.  Sorry about that.
 4         Q.    That's okay.
 5               So it's correct that during this hour, hour and a
 6    half that he was 8 to 9 feet from you, he never advanced
 7    towards you, he never charged at you, he never tried to swing
 8    the chain at you, and he never struck you with the chain.  Is
 9    that all correct?
10         A.    That's correct, sir.
11         Q.    He was saying some bizarre things.  Is that a fair
12    statement?
13         A.    Yes, sir.
14         Q.    Even using quite a bit of profanity?
15         A.    That's correct.
16         Q.    Were you trained that if someone is under the
17    influence or having a mental health crisis or saying bizarre
18    things, including threatening things to the officers, it's okay
19    to shoot him?
20               MR. WESIERSKI:  Objection.  Compound.  Overly broad.
21    Calls for speculation.
22               MR. GALIPO:  I could break it down.
23               THE COURT:  If you want to break it down, I'll
24    sustain the objection.
25               MR. GALIPO:  Okay.  I'll break this down.
```

```
 1        Q.     (BY MR. GALIPO:)  Were you trained as an officer

 2   that sometimes people under the influence might be saying

 3   bizarre things?

 4        A.     Yes, sir.

 5        Q.     And that could be alcohol or drugs?

 6        A.     Yes, sir.

 7        Q.     Were you trained that people under the influence can

 8   sometimes use a lot of profanity?

 9        A.     Yes, sir.

10        Q.     Were you trained that people under the influence

11   could say even threatening things to a police officer?

12        A.     Yes, sir.

13        Q.     And were you trained as a police officer that, if

14   someone appears to be under the influence and is using a lot of

15   profanity and saying threatening things, that it's okay to

16   shoot him just for that?

17        A.     No, sir.

18        Q.     Is that something that police officers deal with

19   quite a bit?

20        A.     Yes, sir.

21        Q.     And you do have training as a police officer to deal

22   with someone who might be experiencing a mental health crisis.

23   Is that fair?

24        A.     Limited but yes.

25        Q.     Well, there's a whole chapter in the police academy
```

09:47AM

09:47AM

09:47AM

09:48AM

09:48AM

**UNITED STATES DISTRICT COURT**

1    about that, isn't there?

2        A.    Yes, sir.

3        Q.    Some of the descriptors you gave about Anthony

4    during this hour, hour and a half, we've talked about some of

09:48AM  5    it -- right? -- about the crying and the praying?

6        A.    Yes, sir.

7        Q.    At times, it appeared he had a blank look on his

8    face.  Do you recall that?

9        A.    Yes, sir.

09:49AM 10        Q.    Multiple times he was apologetic to you and

11    Deputy Campos.  Do you recall that?

12        A.    Yes, sir.

13        Q.    And you even, in your deposition, thought --

14    testified that you thought he was possibly exhibiting signs of

09:49AM 15    mental illness.  Do you recall that?  Do you recall saying that

16    in your deposition?

17              MR. WESIERSKI:  Objection.  Improper question.

18    Calls for --

19              THE COURT:  Overruled.

09:49AM 20              MR. WESIERSKI:  Calls for speculation.

21              THE COURT:  Overruled.

22              You can answer, if you recall.

23              THE WITNESS:  Can you repeat it one more time, sir?

24        Q.    (BY MR. GALIPO:)  Do you recall saying in your

09:49AM 25    deposition that you thought Anthony might be possibly

**UNITED STATES DISTRICT COURT**

1    exhibiting signs of mental illness?

2        A.    I believe I could have said it was a possibility,

3    yes.

4        Q.    And do you recall in your deposition stating that he

09:49AM  5    was exhibiting symptoms consistent with a mental health crisis?

6        A.    Specifically with a mental health crisis?  No.

7        Q.    Did you take into consideration during your

8    encounter with Anthony that he might be experiencing or

9    suffering from a mental health crisis?

09:50AM  10       A.    Possibly, yes.

11       Q.    Now, there were other officers arriving during this

12   time frame; correct?

13       A.    Yes, sir.

14       Q.    And you became aware of other officers arriving?

09:51AM  15       A.    Yes, sir.

16       Q.    For example, Officer -- or Deputy Cervantes arrived

17   at some point?

18       A.    Yes, sir.

19       Q.    Deputy Deberg?

09:51AM  20       A.    Yes, sir.

21       Q.    The sergeant arrived at some point?

22       A.    Yes, sir.

23       Q.    And would that be Corey -- LaFever is it pronounced?

24       A.    That's correct, sir.

09:51AM  25       Q.    He even spoke to Anthony for a short period;

```
 1    confusing.  As we're looking in this picture between the two

 2    cars towards the house, would that direction be west?

 3          A.    That's correct, sir.

 4          Q.    West?

 5          A.    Yes, sir.

 6          Q.    So I'm thinking of a map.  So to the right would be

 7    north and to the left would be south?

 8          A.    That's correct.

 9          Q.    So when Anthony first comes out of the house and

10    you're standing in between the two cars and you're -- would you

11    be facing west or turned towards the house?

12          A.    I'd be facing west.  We moved east, away from the

13    house.

14          Q.    Right.  But you're facing west?

15          A.    Correct, sir.

16          Q.    And when Anthony came out of the house, did he try

17    to attack you?

18          A.    No, he just had the chain up near his shoulder area.

19          Q.    Did he run at you in between these two cars and try

20    to strike you with the chain?

21          A.    No, he did not.

22          Q.    And if you know, where were the other deputies at

23    that time in relation to the cars?

24          A.    At that time, I don't recall where everybody else

25    was positioned.
```

**UNITED STATES DISTRICT COURT**

1      Q.    Did you have anything in your hand at that point?

2      A.    No, sir.

3      Q.    Now, if we could look at -- again, at Exhibit 1,

4    page 51, please.

10:03AM  5          Do you recall in your statement indicating that you

6    had your Taser out when Anthony came out of the house?

7      A.    I don't recall that.

8      Q.    In any event, you would have been positioned in

9    between these two vehicles initially, facing in the direction

10:03AM  10    of the house when he first came out?

11      A.    Yes, sir.

12      Q.    And I think you've already told us he did not come

13    in your direction.  He actually went to the left as we look at

14    this image; is that correct?

10:04AM  15      A.    Yes, sir.

16      Q.    And he ended up going to a dirt area.  Is that also

17    correct?

18      A.    Yes, sir.

19      Q.    I'd like to show Exhibit 1, page 10, please.

10:04AM  20          Okay.  So do you see the dirt area in this

21    photograph?

22      A.    Yes, sir.

23      Q.    And Anthony went from the area of the front door,

24    across the front of these vehicles or at least in -- across the

10:05AM  25    front of the gray Charger, into this dirt area; is that

UNITED STATES DISTRICT COURT

1    correct?

2         A.    Yes, sir.

3         Q.    And in doing so, he was moving away from the

4    officers.  Would you agree?

10:05AM    5         A.    Yes, sir.

6         Q.    And at some point, he ended up, more or less,

7    stationary in this dirt area?

8         A.    Yes, sir.

9         Q.    And at some point you moved to the back of the

10:05AM   10    vehicle -- or vehicles?

11         A.    At some point when, sir?

12         Q.    Well, did you reposition while Anthony was in this

13    dirt area?

14         A.    Yes.  All the deputies repositioned to that area.

10:05AM   15         Q.    And where did the deputies reposition to?  Behind

16    the cars?

17         A.    No, sir.

18         Q.    Where did they reposition to?

19         A.    The -- the grass area.

10:06AM   20         Q.    How far from the cars, approximately?

21         A.    Depends on which deputy we're speaking of, sir.

22         Q.    Okay.  Let's break it down.  How about Cervantes?

23    How far from the car was she, if you know?

24         A.    Yeah.  I don't really recall how far from the

10:06AM   25    vehicle -- the gray vehicle she was from.

UNITED STATES DISTRICT COURT

1      Q.   Do you recall Deberg?

2      A.   I know he was on the other side of her, but I don't

3  recall the distance.

4      Q.   What would be the approximate distance between the

10:06AM  5  deputies and Anthony when Anthony was in this dirt area?

6      A.   I believe approximately 20, 20 to 30 feet.

7      Q.   20 to 30 feet.

8      And how long would you estimate Anthony was in this

9  dirt area approximately 25 to 30 feet away from the deputies?

10:07AM  10      A.   I believe no more than five minutes.

11      Q.   And during this one to five minutes that Anthony was

12  in this dirt area, 20 to 30 feet from the deputies, did Anthony

13  ever try to charge at and attack any of the deputies while he

14  was standing in the dirt area?

10:07AM  15      A.   No, sir.

16      Q.   Now, at some point did you notice there was a

17  neighbor who had come outside in the adjacent property?

18      A.   Yes, sir.

19      Q.   Now, you told us there was no tactical plan as to

10:08AM  20  what to do once Anthony came outside.  But at some point when

21  Anthony was standing in the dirt area, did you hear someone

22  yell "less lethal, less lethal" or words to that effect?

23      A.   Yes, sir.

24      Q.   What did you hear?

10:08AM  25      A.   "Less lethal, less lethal."

1         Is that more of a close-up of the launcher?

2    A.    Yes, sir.

3    Q.    Now, if you know, what type of projectile does this

4    launcher shoot?

10:14AM  5    A.    More like a rubber bullet.

6    Q.    Kind of like a rubber bullet?

7    A.    Yes, sir.

8    Q.    And showing you Exhibit 14, page 7.  That's --

9    that's another photo of the -- of the launcher?

10:15AM  10   A.    Yes, sir.

11         MR. GALIPO:  And then if we could put up Exhibit 1,

12   page 10, please, I think previously admitted, Your Honor.

13         THE COURT:  Yes.

14   Q.    (BY MR. GALIPO:)  So I want to get back to this dirt

10:15AM  15   area that Anthony ran to.

16         So correct me if I'm wrong so far.  During the hour

17   or hour and a half that you were talking to Anthony and he was

18   approximately 8 to 9 feet away from you, holding this chain, he

19   did not charge you or try to strike you with a chain at all

10:15AM  20   during that time frame; is that correct?

21   A.    That's correct, sir.

22   Q.    And then when he ran out of the house, finally came

23   out of the house and you were initially positioned in between

24   the two cars, he did not run at you and try to strike you with

10:16AM  25   a chain at that point; is that correct?

1          A.    That's correct, sir.

2          Q.    Instead of running towards the deputies who were by

3    the cars, Anthony ran away from the deputies into this dirt

4    area; is that also correct?

10:16AM  5          A.    Yes, sir.

6          Q.    And according to you, he's in this dirt area for one

7    to five minutes?

8          A.    Correct, sir.

9          Q.    And during the time he's in this dirt area for one

10:16AM  10   to five minutes, you're saying he was not charging at you or

11   the deputies at that time.   Is that also correct?

12         A.    That's correct.

13         Q.    And so while he's in this dirt area, approximately

14   20 to 30 feet away is your estimate, you hear at some point

10:16AM  15   "less lethal, less lethal" being yelled out.  You don't hear

16   any bean bag rounds at that point, but you eventually hear

17   40 millimeter rounds coming from Deputy Deberg?

18         A.    That's correct.

19         Q.    And when Anthony went from the house south into the

10:17AM  20   dirt, he walked there; correct?

21         A.    I'd say more walking with a purpose.

22         Q.    Well, whether it was with a purpose or not, would

23   you agree it was walking?

24         A.    Yes.

10:17AM  25         Q.    And you heard these 40 millimeter rounds going off;

1    A.    Yes, sir.

2    Q.    So your impression was, when Anthony was in this

3  dirt area, that Deberg fired approximately four 40 millimeter

4  rounds, but Cervantes with the bean bag shotgun had not got off

10:19AM  5  any rounds.  Was that your impression?

6    A.    Yes, sir.

7    Q.    And did you learn at some point that she had a

8  malfunction initially?

9    A.    Yes, sir.

10:19AM  10    Q.    And that the information of her having a malfunction

11  initially, did you learn that or have that impression at the

12  time or is that something you learned later?

13    A.    I don't recall if it was at the time or something

14  I -- I learned later, sir.

10:19AM  15    Q.    Now, at some point after or during Deberg firing his

16  40 millimeter rounds at Anthony and at least two of them

17  striking him, from your impression, did you see Anthony start

18  to walk back towards the front of the house?

19    A.    You're saying right after the shots were fired?  I'm

10:20AM  20  sorry, sir, once again.

21    Q.    Okay.  I'll try to say it.

22    At some point after Deberg fired the 40 millimeter

23  rounds and at least two of them, from your observations,

24  appeared to strike Anthony, did you see Anthony start walking

10:20AM  25  back towards the front of the house?

1    A.    At some point after, yes.

2    Q.    And showing you again -- oh.  We have it up.

3          So he would have walked from this dirt area back

4    towards the front of the house; is that correct?

10:21AM  5    A.    Yes, sir.

6    Q.    And as he was walking back to the front of the

7    house, was he more or less taking the same path that he took

8    when he walked from the front of the house to the dirt area?

9    A.    Yes, sir.

10:21AM  10   Q.    And in walking towards the front of the house, would

11   you agree that his walk was a direction in such a way that he

12   ended up walking in front of the gray Charger?

13   A.    Yes, sir.

14   Q.    Now, your impression was -- as you saw the angle

10:22AM  15   that Anthony was walking was that he was walking back towards

16   the front door; correct?

17   A.    My impression was he was walking back to the front

18   door?  I didn't know where he was going, sir.

19   Q.    No.  But that was the direction he was walking.  Is

10:22AM  20   that fair?

21   A.    Yes, sir.

22   Q.    And I think you said you did review your deposition

23   in preparation for the trial?

24   A.    Yes, sir.

10:23AM  25   Q.    And would you agree that he walked in the same

1    direction back towards the front door?

2         A.    Yes, sir.

3         Q.    Now, when Anthony was walking back towards the front

4    door, where were the officers, if you know?

10:23AM    5         A.    I know Deputy Cervantes was to my left.  I didn't

6    really know where everybody else transitioned to as he was

7    walking back to the front door area of the residence.

8         Q.    Well, at some point, you observed officers behind

9    the vehicles, didn't you?

10:23AM    10         A.    Yes.  But as far as positioning, I didn't know where

11    everybody was at, sir.

12         Q.    Well, you and Cervantes were behind the vehicles;

13    true?

14         A.    Yes, sir.

10:24AM    15         Q.    And was it your impression that Deberg and Campos

16    would -- were somewhere to your left?

17         A.    That's correct, sir.

18              MR. GALIPO:  May I have one moment, Your Honor?

19              THE COURT:  Yes.

10:24AM    20              MR. GALIPO:  I have to make sure to find the right

21    photograph.

22                   (Pause in the proceedings.)

23              MR. GALIPO:  Okay.  Can we show Exhibit 1, page 51,

24    again, please?

10:25AM    25         Q.    (BY MR. GALIPO:)  By the way, you have training on

1    something called "tactical repositioning"; correct?

2         A.    Yes, sir.

3         Q.    And you also have training on something called

4    "cover" -- "cover"?

10:25AM  5         A.    Yes, sir.

6         Q.    And cover is some form of protection, generally?

7         A.    Yes, sir.

8         Q.    And one of the things you're trained that could

9    provide cover or some form of protection is a vehicle?

10:25AM  10        A.    Yes, sir.

11        Q.    And tactical repositioning, in essence, is moving to

12   a spot that's potentially safer or better for the officer?

13        A.    Yes, sir.

14        Q.    And so when you moved behind the vehicles, would you

10:25AM  15   consider that tactical repositioning?

16        A.    At that point, I wouldn't really consider it

17   tactical repositioning.  We were just following him back

18   towards the direction towards the house.

19        Q.    Well, I think you said -- correct me if I'm wrong --

10:26AM  20   at some point you were in front of the Charger.

21        A.    "In front" meaning the left side of the Charger,

22   sir, on the other photograph.

23        Q.    Well, help me out because I'm thinking of the front

24   bumper area, the rear, the driver's side, the passenger's side.

10:26AM  25   Can you tell us a little more descriptively where you were?

**UNITED STATES DISTRICT COURT**

         1       A.    Would you --

         2       Q.    When he was in the dirt area and these

         3    40 millimeters are striking him, where were you in relation to

         4    the Charger at that time?

10:26AM  5       A.    The left side of the rear bumper.

         6       Q.    Okay.  So towards the rear bumper of the car on the

         7    driver's side.  When you say the left side, you're meaning the

         8    driver's side?

         9       A.    Yes, sir.

10:27AM 10       Q.    So we could see the two, I guess, taillights of the

        11    car that look to be reddish in color.  You would have been near

        12    the one on the left in the back?

        13       A.    On that side, yes.

        14       Q.    Okay.  And then when he started walking in front of

10:27AM 15    the Charger, you observed him do that; correct?

        16       A.    Yes, sir.

        17       Q.    Did you kind of move to your right, kind of tracking

        18    him?

        19       A.    That's correct, sir.

10:27AM 20       Q.    And at that time, did you know -- did you have a

        21    sense of where any of the other officers were?

        22       A.    I knew they were all to my left.  Specifically, I

        23    believe Cervantes was directly to my left.  As far as the

        24    positioning of the other deputies, I do not.

10:28AM 25       Q.    Okay.  So when you say Cervantes was directly to

                          UNITED STATES DISTRICT COURT

1    your left, you mean close to you but on your left side?

2        A.    Yes, sir.

3        Q.    And then obviously you would have been to her right?

4        A.    Correct, sir.

10:28AM    5        Q.    And by the way, somewhere in the sequence, after the

6    40 millimeters, did you see someone try to tase Anthony?

7        A.    Yes, sir.

8        Q.    Would that be Deputy Campos?

9        A.    Yes, sir.

10:28AM    10        Q.    Could you tell whether both of the prongs or darts

11    struck Anthony or not?

12        A.    No, sir.

13        Q.    You couldn't tell?

14        A.    No, sir.

10:28AM    15        Q.    At any time before Anthony got to the front of the

16    Dodge Charger, at any time before he got to the front, did you

17    see him try to attack any deputies?

18        A.    No, sir.

19        Q.    And at that point, you had been with him for about

10:29AM    20    an hour and a half?

21        A.    That's correct, sir.

22        Q.    We've been in session almost an hour and a half this

23    morning.  That's about the time you -- you were with him prior

24    to him getting to the front of the Dodge Charger; is that

10:29AM    25    right?

**UNITED STATES DISTRICT COURT**

1      A.      Yes, sir.

2      Q.      Now, did you hear Deputy Cervantes, who was right to

3  your left, say "less lethal" when Anthony was at the front of

4  the Charger?

10:30AM   5      A.      Yes, sir.

6      Q.      And we've already talked about this.  But when an

7  officer says "less lethal," that tells your fellow -- the

8  fellow officers that someone's going to try less lethal?

9      A.      Yes, sir.

10:30AM  10      Q.      And part of the training is, if less lethal is going

11  to be used, give it a chance to see if it can work before

12  having to resort to deadly force.  Is that fair?

13      A.      Yes, sir.

14      Q.      And this is, so that we're clear on the time frame,

10:30AM  15  when Anthony is in -- walking in the front of the gray Charger;

16  correct?

17      A.      Yes.

18          MR. GALIPO:  May I have one moment, Your Honor?

19          THE COURT:  Yes.  Go ahead.

10:31AM  20          MR. GALIPO:  Can we -- Exhibit 1, page 17, by

21  agreement.

22          THE COURT:  Yes.  Go ahead.  That will be admitted.

23          MR. GALIPO:  Thank you, Your Honor.

24      Q.      (BY MR. GALIPO:)  Okay.  We can see the front of the

10:31AM  25  gray Charger in this exhibit; correct?

**UNITED STATES DISTRICT COURT**

1        A.    Correct, sir.

2        Q.    And I think you then said something about he swung

3    the chain at -- at the vehicle?

4        A.    Yes, sir.

10:34AM  5        Q.    Which vehicle?

6        A.    The gray vehicle.

7        Q.    Do you recall testifying in deposition you didn't

8    know which vehicle it was?

9        A.    I do not recall that.

10:34AM  10       Q.    And did you hear something that made you believe he

11   struck it that we can hear on your belt recorder?

12       A.    I don't know if it's on my belt recorder.  I just

13   observed him swinging the chain.

14       Q.    Did you ever see any damage anywhere to this gray

10:34AM  15   Charger from being struck with a chain?

16       A.    I did not check after the incident, sir.

17       Q.    Have you ever seen a picture showing any damage to

18   the gray Charger that would be consistent with being -- in your

19   mind, with being struck by a chain?

10:34AM  20       A.    I have not, sir.

21       Q.    So you hear Cervantes say "less lethal," which gave

22   you the understanding, from your training, she was going to

23   fire the bean bag shotgun round and then you heard her fire it.

24   Am I correct?

10:35AM  25       A.    Yes, sir.  Yes, sir.

62

```
 1        Q.     When she fired her bean bag shotgun round, you are

 2   telling us that Anthony was in front of this gray car by the

 3   front bumper but more on the passenger side of the front?

 4        A.     Yes.  Almost in between both vehicles, sir.

 5        Q.     And at that -- up to that point in time, from
10:35AM
 6   leaving the dirt area to the bean bag shotgun round, you

 7   described Anthony as walking; correct?

 8        A.     With a purpose, yes.

 9        Q.     Well, I'm not sure about the purpose thing, but
10:35AM
10   he -- would you agree he was walking?

11        A.     Yes, sir.

12               MR. GALIPO:  If we could show Exhibit 1, page 51,

13   again, please.

14               Do you want me to go to a quarter of or what's best?
10:36AM
15               THE COURT:  If you're going to move on to a

16   different kind of subject, we can stop now.  If you want to --

17   if you want to finish with this photograph, we can as well.

18   Usually I'll take a break around 10:40.

19               MR. GALIPO:  Okay.  I can go to 10:40, if that's
10:36AM
20   okay.

21               THE COURT:  Now is fine as well.  So it's up to you.

22               MR. GALIPO:  Okay.  I don't mind asking a few more

23   questions, if that's okay.

24               THE COURT:  Okay.  Go ahead.
10:36AM
25        Q.     (BY MR. GALIPO:)  You told us when Anthony was in
```

**UNITED STATES DISTRICT COURT**

1          Okay.  Whenever you're ready.

2          MR. GALIPO:  Okay.  Thank you.

3      Q.    (BY MR. GALIPO:)  Do you recall at some point having

4   your deposition taken in this matter?

11:03AM  5      A.    Yes, sir.

6      Q.    And at the time, did you realize you were under

7   oath?

8      A.    Yes, sir.

9      Q.    And did you understand that your testimony in a

11:03AM  10   deposition could potentially be read by a judge or a jury at a

11   later time?

12      A.    Yes, sir.

13      Q.    So you understood it was obviously important to tell

14   the truth and give accurate testimony?

11:03AM  15      A.    Yes, sir.

16      Q.    And do you recall at some point during your

17   deposition asking -- you being asked where you were positioned

18   when you fired your first shot?

19      A.    Yes, sir.

11:03AM  20      Q.    And I think we talked about it a little bit.  But do

21   you recall --

22          MR. GALIPO:  And if we could put up Exhibit 1,

23   page 51, again, please.

24      Q.    (BY MR. GALIPO:)  Do you recall describing that you

11:04AM  25   were 1 to 2 feet east of the vehicles and then you also

```
 1    referenced 5 feet north of one of the vehicles?  Do you recall
 2    that?
 3         A.    Yes, sir.
 4         Q.    And when you say east of the vehicles, just so we're
 5    clear on the directions, that would be farther behind the car;
 6    is that right?
 7         A.    Yes, sir.
 8         Q.    And to the north, as we looked at this photo, would
 9    be to the right?
10         A.    That's correct, sir.
11         Q.    And do you also recall being asked in your
12    deposition to give estimates as to how far Anthony Nuñez was
13    from you when you fired your first shot?
14         A.    Yes, sir.
15         Q.    And can you turn to page 64 of your deposition,
16    please?
17              THE COURT:  And I'm going to pause you just for a
18    second just to let the jury know what a deposition is.
19              So a deposition is the testimony of a person taken
20    before trial.  At a deposition, the person is sworn to tell the
21    truth and is questioned by the attorneys.  So you must consider
22    the deposition testimony as -- in the same way that you would
23    consider testimony given here in court.  Okay?
24              So go ahead.
25         Q.    (BY MR. GALIPO:)  Do you recall in your deposition
```

11:04AM (line 5)
11:04AM (line 10)
11:05AM (line 15)
11:05AM (line 20)
11:06AM (line 25)

1  giving estimates that Anthony was approximately 20 feet from

2  you when you fired the first shot?

3      A.    Yes, sir.

4      Q.    And you were 1 or 2 feet behind the vehicles;

5  correct?

6      A.    Yes, sir.

7      Q.    And do you have an estimate as to the length of the

8  Charger, how long it is?  About 16, 17 feet?

9      A.    I don't have an estimate, sir.

10             MR. GALIPO:  And if we could look back -- this is a

11  new exhibit, I believe, Your Honor, 1 -- Exhibit 1, page 14.

12             THE COURT:  Any objection?

13             Has that been admitted?

14             MR. GALIPO:  I don't believe it's been admitted yet.

15             MR. WESIERSKI:  No problem, Your Honor.

16             THE COURT:  Are you seeking for it to be admitted?

17             MR. GALIPO:  Yes.  Thank you.

18             THE COURT:  That will be admitted.

19                 (Exhibit No. 1-14 for identification

20                  and received into evidence.)

21      Q.    (BY MR. GALIPO:)  This image shows the front of the

22  house; is that correct?

23      A.    That's correct, sir.

24      Q.    It also shows a portion of the Dodge Charger,

25  including the front?

1    that time?

2        A.    No, sir.

3        Q.    And I believe there was a fence, was there not, that

4    separated his yard from the next yard?

11:09AM  5        A.    That's correct, sir.

6        Q.    And I think you've already told us, but you didn't

7    see any -- any gun on him at any time; is that correct?

8        A.    That's correct, sir.

9            MR. GALIPO:  So if we could look at -- and this is

11:09AM  10   also a new one, I believe, Exhibit 1, page 39.

11           MR. WESIERSKI:  No problem, Your Honor.

12           THE COURT:  That will be admitted.

13       Q.    (BY MR. GALIPO:)  This shows the front of the Dodge

14   Charger; correct?

11:10AM  15       A.    Yes, sir.

16       Q.    In the ten seconds before you fired your shots, did

17   you hear Anthony saying anything?

18       A.    I believe there was words said.  I just don't recall

19   exactly what he had said.

11:11AM  20       Q.    Do you recall him saying at some point, "Jesus, get

21   away"?

22       A.    I do recall that, yes.

23       Q.    Would you agree that at the time you fired your

24   first shot from approximately 20 feet away from Anthony, that

11:11AM  25   Anthony was not swinging the chain at the time you fired the

1  first shot?  Would you agree with that?

2      A.    Yes, sir.

3      Q.    And I think you already told us this, but you did

4  not give him any verbal warning you were going to shoot; is

11:11AM 5  that correct?

6      A.    That's correct, sir.

7      Q.    When he was initially walking across the front of

8  the Charger, if the -- if the podium here is the front of the

9  Charger, when he was walking, his right side would have been to

11:12AM 10  the front of the Charger; is that correct?

11      A.    Yes.

12      Q.    And when he was walking across the front of the

13  Charger, would his right side have been to -- towards you and

14  Deputy Cervantes at that time?

11:12AM 15      A.    While walking in front of the Charger?  Yes.

16      Q.    Are you aware from reviewing materials in this case

17  that he has shots, Anthony, to his right side?  Are you aware

18  of that?

19      A.    I believe I recall they were to the right side.

11:13AM 20      Q.    Now, regarding this less-lethal shot that you say

21  you heard Deputy Cervantes fire before you fired your lethal

22  shots, how much time would you estimate passed from hearing her

23  less-lethal shot and then you firing your first shot?

24      A.    Two to three seconds.

11:14AM 25      Q.    And you didn't say anything in that time period?

1          A.    Yes, sir.

2          Q.    And then you -- you would say, "I would say a

3    compact car length."  Do you see that answer?

4          A.    Yes, sir.

11:24AM 5          Q.    And then you were asked, "What's your best estimate

6    as to that distance?"

7                And you say, "15 to 20 feet"?

8          A.    Yes, sir.

9          Q.    And you already told us that your estimate at the

11:24AM 10   time of the first shot was approximately 20 feet; correct?

11         A.    Yes, sir.

12         Q.    And you say how long after -- and then the question

13   is, "How long after he turned towards you did you fire the

14   first shot?"

11:24AM 15               And you say, "I believe it was right after he

16   cleared the vehicle and began to walk towards me."

17               Do you see that?

18         A.    Yes, sir.

19         Q.    In fact, on the next page, page 61, starting on

11:25AM 20   line 8, do you recall being asked how much distance he covered

21   from him turning towards you and you shooting?

22               MR. WESIERSKI:  Well, I'm going to object.  That's

23   not what the question was.

24               MR. GALIPO:  I'll withdraw the question and ask a

11:25AM 25   new question.

1      Q.     So your impression was the first two shots struck

2   him; correct?

3      A.     Yes, sir.

4      Q.     In fact, you may have even taken a step back before

11:27AM  5   you fired; true?

6      A.     Yes, sir.

7      Q.     And you -- you weighed less at the time.  Is that

8   fair?

9      A.     Yes, sir.

11:27AM  10      Q.     Maybe a little more agile at the time than you are

11   now?  When I say "agile," able to move.

12      A.     I'm still pretty agile, sir.

13      Q.     Okay.  I wouldn't doubt that.

14             In fact, as a shortstop, don't you sometimes -- if

11:27AM  15   there's a pop ball or something, you have to move very quickly

16   backwards, for example, to get to it and left and right, things

17   like that, as a shortstop?

18      A.     Yes, sir.

19      Q.     And would you agree that, at least in terms of the

11:28AM  20   position of the cars, there was space to move backwards for

21   you?

22      A.     Yes, sir.

23      Q.     In other words, there was nothing blocking you from

24   moving backwards; true?

11:28AM  25      A.     True, sir.

1    Q.    And you also had space to move to your right at

2   least for sure; correct?

3    A.    Yes, sir.

4    Q.    In fact, to your right was the red car; correct?

11:28AM  5    A.    That's correct, sir.

6    Q.    And in terms of tactical repositioning and cover, if

7   you move to your right, you would have potentially created more

8   distance and cover between you and Anthony; true?

9    A.    Yes, sir.

11:28AM  10    Q.    And part of the training is to tactically reposition

11   and create distance when you can rather than using deadly

12   force; true?

13    A.    Yes, sir.

14    Q.    Now, your recollection is, after your first shot, he

11:29AM  15   moved a couple of feet; correct?

16    A.    Yes, sir.

17    Q.    And then after your second shot, you believed he

18   moved a couple more feet?

19    A.    Yes, sir.

11:30AM  20    Q.    And then after your third shot, you believed that he

21   took a step or two towards you after your third shot; correct?

22    A.    Yes, sir.

23    Q.    And then if you could look at page 16 of your

24   deposition, which I think you have in front of you.

11:30AM  25    A.    I'm there, sir.

UNITED STATES DISTRICT COURT

1      Q.    You see lines 9 and 12 where you reference, "I think

2   after the third shot, he maybe took a couple of steps and then

3   went to the ground"?

4      A.    Yes, sir.

11:31AM  5      Q.    And these couple of steps you're talking about would

6   have been steps going somewhat in between the cars?

7      A.    Are you specifying to a direction, sir?

8      Q.    Yeah.  The direction, I guess, would be east; right?

9      A.    Yes, sir.

11:31AM  10      Q.    Yes.  You're saying --

11            MR. GALIPO:  If we could put up Exhibit 1-39.

12            I think that's already admitted, Your Honor.

13   Exhibit 1, page 39?

14            THE COURT:  Yes.

11:31AM  15            MR. GALIPO:  Okay.

16      Q.    (BY MR. GALIPO:)  Can you see that on your screen?

17      A.    Yes, sir.

18      Q.    So just to make sure I have your chronology correct,

19   he's in front of this gray Charger, more on the passenger side,

11:32AM  20   when Cervantes fires her less-lethal round.  I have that

21   correct?

22      A.    Sir, I don't know if I would say if he was clear of

23   the vehicle or more so to the passenger side.  I --

24      Q.    Well, that's okay.

11:32AM  25            Somewhere in the front closer to the passenger side

UNITED STATES DISTRICT COURT

1    but not necessarily clear of the vehicle yet.  Is that fair?

2         A.    That's what I was trying to say, sir.  I don't know

3    if he was completely clear of the vehicle when she shot or if

4    he was still a little bit in front of the vehicle.

11:32AM    5         Q.    Okay.  That's fine.  But somewhere in the area in

6    front of the car?

7         A.    Yes, sir.

8         Q.    Okay.  And then you fired your first shot.  And

9    you're saying after that, he -- he -- you're saying he turned

11:32AM    10   and moved a couple of feet towards you; correct?  Maybe took a

11   step.

12        A.    Yes, sir.

13        Q.    And then you fired a shot, and you're saying he

14   might have moved another foot or two?

11:33AM    15        A.    Yes, sir.

16        Q.    And then you fired a second shot and then a third

17   shot?

18        A.    Yes, sir.

19        Q.    And after your third shot, you're saying he took a

11:33AM    20   couple of more steps in between the cars after your third shot;

21   correct?

22        A.    Yes, sir.

23        Q.    And then you're saying, if I understand you

24   correctly, he fell forward?

11:33AM    25        A.    I don't recall if he had fell to his side, fell

1    forward.  But he did fall in the direction of east, yes,

2    forward.

3          Q.    His head was more towards the -- where we see this

4    blood in this photograph, his feet were more towards the house;

11:33AM   5    correct?

6          A.    That's correct, sir.

7          Q.    Okay.  So you would agree that there was some

8    movement he made after your third shot, a couple of steps, as

9    you indicated in your deposition, moving east between the cars?

11:34AM   10          A.    Yes, sir.

11          Q.    And you would also agree he fell forward -- whether

12    he landed on his side, back, or -- or chest, you might not be

13    sure, but he fell forward?

14          A.    Yes, sir.

11:34AM   15          Q.    You believe, at least in your deposition, that he

16    fell on his stomach?

17          A.    Yeah, I believe the stomach or side.  I don't recall

18    exactly.

19          Q.    Yeah.  You see page 16, the same page we're on,

11:34AM   20    lines 15 through 16 where you say you thought he was facing

21    belly first?

22          A.    Yes, sir.

23          Q.    Okay.  In any event, what I'm getting at is, where

24    we see the blood in this picture, that's the area he ended up

11:34AM   25    in; correct?

1      A.    Yeah.  I don't know if it was at the front of the

2    blood or the back of that blood.  I'm not sure, sir.

3      Q.    Right.

4            But you told us that he was at the front of the car,

11:35AM  5    maybe went a couple of feet, you shot him, he took a few steps,

6    and then, after the third shot, he took another couple steps

7    and then fell forward; correct?

8      A.    Yes, sir.

9      Q.    So if we just back that up from him falling and he's

11:35AM  10    almost 6 feet tall and we back that up and then go back a step

11    or two before he took the two steps and fell forward, at the

12    time of the third shot, he wasn't where we see the blood in

13    here, he was farther back; correct?

14      A.    I'm not sure, sir.

11:35AM  15      Q.    And how much time do you think it took between your

16    first shot and last shot?

17      A.    Three to five seconds.

18      Q.    And you're saying he was not swinging the chain

19    during any of the shots.  Do I have that correct?

11:36AM  20      A.    That's correct, sir.

21      Q.    You observed blood afterwards?

22      A.    Yes, sir.

23      Q.    Deputy Campos was attempting to provide some help in

24    terms of a tourniquet?

11:36AM  25      A.    Yes, sir.

**UNITED STATES DISTRICT COURT**

1    in a life-threatening situation; correct?

2        A.    Yes, sir.

3        Q.    And I think you've already told us this, when there

4    are no other reasonable options?

11:38AM    5        A.    Yes, sir.

6        Q.    And obviously, seeing a weapon in someone's hand,

7    that fact alone is not sufficient to use deadly force.  Would

8    you agree?

9        A.    Yes, sir.

11:38AM    10        Q.    Even if you tell the person to drop the weapon and

11    they don't, you would agree those facts alone are not enough to

12    use deadly force?

13        A.    Yes, sir.

14        Q.    Do you have any experience that a man with a chain

11:39AM    15    from 20 feet away could immediately cause death?

16        A.    No, sir.

17        Q.    Would you agree to cause harm or potentially cause

18    harm with a chain, you'd have to swing it?

19        A.    I would disagree with that, sir.

11:39AM    20        Q.    Are you saying you can throw it?

21        A.    I'm saying you could choke somebody with it.

22        Q.    Would you agree that you'd have to be in proximity

23    to them in order to harm someone with a chain, whether you're

24    swinging it or choking them or whatever you might be doing?

11:39AM    25        A.    Yes, sir.

```
 1           Q.    And I take it there were other officers besides you

 2    in that yard; correct?

 3           A.    Yes, sir.

 4           Q.    And they all had firearms, to your knowledge?

 5           A.    Yes, sir.

 6           Q.    And to your knowledge, you're the only one who fired

 7    a lethal -- lethal round?

 8           A.    That's correct, sir.

 9           Q.    Would you agree that your understanding from the

10    training is a person can pull a trigger on a gun a lot faster

11    than a person could swing a chain?

12           A.    I would have to say it depends on the circumstances,

13    sir.

14           Q.    Well, can you turn to page 71 of your deposition,

15    please?

16           A.    Okay, sir.

17           Q.    Do you see the question on lines 22 and 23, "Is it

18    fair to say that a person can pull trigger -- the trigger a lot

19    faster than a person could swing a chain?"  Do you see that

20    question?

21           A.    Yes, sir.

22           Q.    And do you recall what your response was at the top

23    of page 72?

24           A.    Before I turn the page, I do not, sir.

25           Q.    Well, turn the page now.
```

11:40AM

11:40AM

11:40AM

11:41AM

11:41AM

**UNITED STATES DISTRICT COURT**

1           Okay.  How about now?  Does it refresh your

2   recollection that you said, "Yes, sir"?

3           A.    Yes, sir.

4           Q.    And it's kind of common sense, isn't it, that a --

11:41AM  5   you've got your gun out, I mean, all you got to do is press the

6   trigger.  It's faster to do that than for someone to cover

7   20 feet and swing a chain at you; true?

8           A.    Yes, sir.

9           Q.    Did you have training at the academy with respect to

11:42AM  10  controlling your fears so you won't overreact by unnecessarily

11  killing someone?

12          A.    I believe the -- that's what the academy entails,

13  situations like that, yes.

14          Q.    Right.  Because part of your training is it's

11:42AM  15  natural sometimes that you're going to be scared or afraid;

16  right?

17          A.    Yes, sir.

18          Q.    The key is to kind of stay focused and don't -- to

19  control it so it's not to the point where you're shooting

11:42AM  20  someone unnecessarily.  Is that fair?

21          A.    Yes, sir.

22          Q.    And with regards to tactical repositioning -- I

23  think we've already talked about this -- that your training is

24  to tactically reposition when you can?

11:43AM  25          A.    When feasible, yes, sir.

**UNITED STATES DISTRICT COURT**

```
     1    wrapped around his hand a couple of times?

     2          A.    That's correct, sir.

     3          Q.    How much was left in the chain?  Was it 5 feet?

     4    6 feet?  Do you have any estimate?

11:47AM    5          A.    I do not, sir.

     6                MR. GALIPO:  May I consult with my colleagues for

     7    one second?

     8                THE COURT:  Yes.  Go ahead.

     9                (Off-the-record discussion among counsel.)

11:48AM   10          Q.    (BY MR. GALIPO:)  Do you recall in your deposition

    11    indicating that, with the chain wrapped around his hand, it was

    12    more like 6 feet left?  Does that sound right?  I can show you

    13    page 125 if you need it.

    14          A.    No.  I believe that sounds correct.

11:48AM   15                MR. GALIPO:  Okay.  Thank you.  That's all I have at

    16    this time, Your Honor.

    17                THE COURT:  Okay.  Thank you.

    18                (Direct Examination of Michael Martinez

    19                 concluded at 11:48 AM.)

    20                      *  *  *  *  *

    21                (Proceedings continued.)

    22

    23

    24

    25
```

92

1                    **CERTIFICATE OF OFFICIAL REPORTER**

2

3    COUNTY OF LOS ANGELES   )
                              )
4    STATE OF CALIFORNIA      )

5

6           I, MYRA L. PONCE, FEDERAL OFFICIAL REALTIME COURT

7    REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE

8    CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT

9    TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING

10   IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY

11   REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT

12   THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE

13   REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

14

15

16

17              DATED THIS 26TH DAY OF APRIL, 2025.

18

19

20              /S/ MYRA L. PONCE
                _____
21              MYRA L. PONCE, CSR NO. 11544, CRR, RDR
                FEDERAL OFFICIAL COURT REPORTER
22

23

24

25

**UNITED STATES DISTRICT COURT**