Exhibit 5

1    UNITED STATES DISTRICT COURT

2    CENTRAL DISTRICT OF CALIFORNIA - EASTERN DIVISION

3    HONORABLE SUNSHINE S. SYKES, U.S. DISTRICT JUDGE

4

5    ROSA NUÑEZ, et al.,                    )
                                            )
6                        Plaintiffs,        )
                                            )
7       v.                                  )          Case No.
                                            )  ED CV 22-1934 SSS (SPx)
8    COUNTY OF SAN BERNARDINO, et al.,      )
                                            )
9                        Defendants.        )
     _____   )

10

11       REPORTER'S PARTIAL TRANSCRIPT OF TRIAL PROCEEDINGS
             DIRECT EXAMINATION OF JEREMY DEBERG
12              WEDNESDAY, APRIL 23, 2025
                      9:32 AM
13              RIVERSIDE, CALIFORNIA

14

15

16

17

18

19

20

21

22    _____

23      MYRA L. PONCE, CSR NO. 11544, CRR, RPR, RMR, RDR
            FEDERAL OFFICIAL COURT REPORTER
24          350 WEST 1ST STREET, ROOM 4455
            LOS ANGELES, CALIFORNIA  90012
25                  (213) 894-2305


                    UNITED STATES DISTRICT COURT

A.    Yes.  It's the red vehicle on the right side of the

photograph.

Q.    Okay.  So when Mr. Nuñez exited the house, you would

have been behind the red vehicle?

09:41AM    A.    Yes.

Q.    And do you have a recollection of where any of the

other deputies were positioned at that time when Mr. Nuñez

exited the house?

A.    Deputy Campos and Deputy Martinez were in front of

09:41AM    the red sedan near the front door -- or front porch area of the

residence.  Above the roof of the red sedan, you can see the

white security screen door where the front door is.  And I

believe Deputy Cervantes was to my right, which would have been

north of the front door.

09:42AM    Q.    Okay.  And at some point when Anthony Nuñez came

out, did he stay in the front area for a short period of time?

A.    Yes.

Q.    And during that time that he stayed in the front

area before moving to the dirt, which we'll talk about in a

09:42AM    moment, did some of the officers tactically reposition, if you

know, behind the vehicles?

A.    Yes.  Deputy Martinez and Deputy Campos both backed

away from the front door as Mr. Nuñez exited the front door.

Q.    Okay.  And then at some point did Mr. Nuñez go from

09:43AM    the front of the house in a -- towards the -- a dirt area?

| | |
|---|---|
| 1 | A.    Yes.  He walked to the south of the front door to |
| 2 | that dirt area to the left side of the gray sedan in the |
| 3 | photograph. |
| 4 | Q.    Okay.  Before he walked to the dirt area, did you |
| 09:43AM  5 | see him trying to charge at or attack any deputies, before he |
| 6 | walked to the dirt area? |
| 7 | A.    I don't recall. |
| 8 | Q.    I'd like to show you Exhibit 1, page 10. |
| 9 | Does this image show a portion of the dirt area |
| 09:44AM 10 | where he had walked to? |
| 11 | A.    Yes. |
| 12 | Q.    And can you describe -- and you may be able to |
| 13 | actually mark on this.  But can you describe where he was |
| 14 | approximately in the dirt area when you first deployed your |
| 09:44AM 15 | 40 millimeter round? |
| 16 | A.    It's hard to specify because this is the opposite |
| 17 | viewing of where I was.  Best estimate would have been in the |
| 18 | dirt area on the left side of the screen and the lower portion |
| 19 | in both the sun and the shade of the tree. |
| 09:44AM 20 | Q.    Okay.  And at some point you saw him with a chain; |
| 21 | is that correct? |
| 22 | A.    Yes.  He was holding a chain in his right hand upon |
| 23 | exiting the residence. |
| 24 | Q.    And you at some point gave a statement or interview |
| 09:45AM 25 | regarding this matter? |

1      A.    Again, it's hard to say exactly where he was in this

2    photograph because the perception is the exact opposite.  But

3    it does have a general view, yes.

4      Q.    Okay.  We'll talk about this photograph and then

09:50AM   5    I'll see later if I can get one from the other angle, if that

6    helps you.

7          But the -- and you described both in your statement

8    and in your deposition what was going on at the time you fired

9    your 40 millimeter rounds.  Is that fair?

09:50AM  10      A.    Yes.

11      Q.    Would you agree that after your third round -- and

12    if I'm understanding you, you believe your first three rounds

13    struck him; is that correct?

14      A.    I believe all four struck him.

09:51AM  15      Q.    Would you agree that after your third round,

16    Mr. Nuñez began walking back to the house?

17      A.    Between firing the third round and the fourth round,

18    he walked west through the front yard.

19      Q.    Towards the house?

09:51AM  20      A.    In the direction of the house, yes.

21      Q.    You recall -- you did give a deposition in this

22    matter; correct?

23      A.    Yes.

24      Q.    You recall in your deposition saying that, after he

09:51AM  25    was struck with the third round, he began walking back to the

1    house?  If you need to see it, I can show it to you.

2        A.    Yes, I don't remember exactly what I said in the

3    deposition, like, the exact words.

4        Q.    Okay.  But is that generally correct, that he was

09:51AM  5    walking back towards the house after the third round?

6        A.    Well, the house is to the west and he was walking

7    west.  I don't know if he was walking to the house or just in a

8    westerly direction.

9        Q.    But was he walking in that direction?

09:52AM  10       A.    Yes.

11       Q.    Okay.  And then -- we're going to try to put up

12   Exhibit 1, page 6, which may show the perspective that you had

13   and see if that helps you.

14            MR. GALIPO:  No objection.  We would move to admit

09:52AM  15   if it's not in already.

16            THE COURT:  It's in.

17            MR. GALIPO:  Oh, it's already in.  Okay.  Thank you.

18            THE COURT:  Yes.

19       Q.    (BY MR. GALIPO:)  Was that more your perspective?

09:52AM  20       A.    Better than the last one but not exactly.  I was on

21   the opposite side of the gray sedan.

22       Q.    Right.

23            You were to the rear of the vehicle; correct?

24       A.    Yes.

09:52AM  25       Q.    But in any event, after the third round, he begins

1   of time?

2        A.    Yes.

3        Q.    You think you heard it during that time frame?

4        A.    Potentially.  I don't remember exactly when.

10:01AM  5        Q.    And then at some point, did you hear, after your

6   four 40 millimeter rounds, what sounded like a bean bag round?

7        A.    Yes.

8        Q.    And do you recall being asked in your deposition

9   where Anthony was when you heard the bean bag round in relation

10:01AM  10  to the cars?

11       A.    Yes.

12       Q.    And that's covered, I think, on page 75 of your

13  deposition, the page you have in front of you now?

14       A.    It appears so.

10:01AM  15       Q.    And, in fact, I think you were asked whether or not

16  he was in between -- in that space in between the two cars --

17  maybe we can put back up Exhibit 1, page 51, please -- when you

18  heard the bean bag go off.  And your testimony was you believe

19  the bean bag went off before he got to that space between the

10:02AM  20  two vehicles.  Correct?

21       A.    Yes.

22       Q.    So you believe he would have been somewhere in front

23  of the gray vehicle when you heard the bean bag round go off;

24  is that correct?

10:02AM  25       A.    Yes, in that area.

| | | |
|---|---|---|
| 1 | Q. | Okay. And are you familiar with the sound of the |
| 2 | bean bag round versus, for example, a firearm? |
| 3 | A. | Well, it is classified as a firearm. |
| 4 | Q. | The bean bag is classified as a firearm also? |
| 5 | A. | Yes. It has a primer, gunpowder charge, and shoots |
| 6 | a projectile. |

10:03AM

1    Q.    Okay.  And are you familiar with the sound of the
2    bean bag round versus, for example, a firearm?
3         A.    Well, it is classified as a firearm.
4    Q.    The bean bag is classified as a firearm also?
5    A.    Yes.  It has a primer, gunpowder charge, and shoots
6    a projectile.
7    Q.    And are they different sounds, from your experience,
8    the bean bag round versus -- like a handgun, for example?
9    A.    Yes.  It has different sounds.
10   Q.    I'm going to show you Exhibit 1, page 17.
11        MR. GALIPO:  By agreement, Your Honor.
12        THE COURT:  I think that -- that's been admitted.
13        MR. GALIPO:  Oh, it has?  Thank you.  I'm sorry.
14   Q.    (BY MR. GALIPO:)  We'll get that up and -- can you
15   see in this image a portion of the front of both of the
16   vehicles?
17   A.    Yes.
18   Q.    And can you kind -- can you kind of see the -- where
19   the space between the two vehicles would be from this angle?
20   A.    I don't understand what you're asking.
21   Q.    It probably wasn't a very good question.
22        There were some separation between the vehicles;
23   correct?
24   A.    Yes.  You could walk between them.
25   Q.    Right.

UNITED STATES DISTRICT COURT

1           And so we could just see from this angle maybe where

2      the beginning of that space would start?

3           A.      Yes.

4           Q.      Okay.  But just so we're clear, when you heard the

10:04AM  5      bean bag round go off, you're saying that Mr. Nuñez was still

6      in front of the gray vehicle.  He wasn't to that space yet.  Is

7      that fair?

8           A.      Correct.  He had not entered the space between the

9      two vehicles yet.

10:04AM  10          Q.      Okay.  Could you tell whether the bean bag round

11     struck Mr. Nuñez?

12          A.      I don't know if it did or not.

13          Q.      Where were you positioned relative to the vehicles

14     when you heard the bean bag round go off?

10:05AM  15          A.      I was northeast of the vehicles.  After I deployed

16     the fourth 40 millimeter round, I was out of 40 millimeter

17     rounds.  So I was actually walking back towards

18     Sergeant LaFever's patrol car to get additional 40 millimeter

19     rounds.

10:05AM  20          Q.      But it sounds like you at least heard the bean bag

21     round; correct?

22          A.      Yes.

23          Q.      And you at least at that point were aware, as you

24     testified in your deposition, that Mr. Nuñez was not yet in

10:05AM  25     that space but in front of the gray car?

**UNITED STATES DISTRICT COURT**

```
 1        A.    Yes.  He was moving north towards that space between
 2   the vehicles.
 3        Q.    Okay.  And was he crossing across the front of the
 4   gray car that we see here?
 5        A.    Yes, in that area.
 6        Q.    Okay.  At some point did you hear gunshots?
 7        A.    Yes.
 8        Q.    How many shots did you hear?
 9        A.    I believe it was three.
10        Q.    So if we added the bean bag round and the three
11   shots from the firearm, from the handgun, that would be four
12   shots you heard all together?
13        A.    Yes.  That's how many it would add up to.
14        Q.    And in your mind, you were able to distinguish the
15   bean bag round from the other rounds?
16        A.    Yes.
17        Q.    Do you have an estimate as to how much time passed
18   from you hearing the bean bag round fired by Deputy Cervantes
19   when Mr. Nuñez was in front of the gray car and then hearing
20   the start of the lethal rounds?
21        A.    I don't have an exact time estimate, but it was very
22   close together.
23        Q.    When you say "very close together," are you saying
24   it was nearly simultaneous?
25        A.    I'd say a little bit longer than nearly
```

10:06AM
10:06AM
10:07AM
10:07AM
10:08AM

1    simultaneous, but it was not a significant amount of time.

2        Q.    Can you turn to page 78 of your deposition, please?

3    I want to draw your attention to question -- to lines 16

4    through 22 on that page.

10:08AM    5        Do you recall being asked whether it was more or

6    less simultaneous, the bean bag round and the shots from the

7    handgun?  Do you recall now being asked that question on

8    lines 16 through 19?

9        A.    Yes, I do now.

10:09AM    10        Q.    Okay.  Do you recall what your answer was?

11        A.    I stated I could not distinguish between the

12    gunshots.

13        Q.    Right.

14        You could not distinguish the difference between the

10:09AM    15    bean bag shotgun round being fired and Deputy Martinez's duty

16    weapon fired -- being fired.  Do you recall that response?

17        A.    After reading it, yes.

18        Q.    And one of the reasons you couldn't distinguish it

19    is because they were essentially happening at the same time.

10:09AM    20    Is that fair?

21        A.    According to my statement, yes.

22        Q.    I'd like to show you a few other photographs.

23        MR. GALIPO:  I have a group of photos by agreement,

24    Your Honor.  Is it okay -- there's about five or six of them --

10:10AM    25    if I give you all the numbers?

**UNITED STATES DISTRICT COURT**

          1    everyone was out of the house, at least to your knowledge, the

          2    family members?

          3         A.    They were on the house?

          4         Q.    No.  Out of the house.

10:19AM   5         A.    I'm sorry.  I misheard you.

          6               Um, I believe at the time the information was there

          7    was no one else in the house.

          8         Q.    And --

          9               THE COURT:  Are you done with this exhibit?

10:19AM  10               MR. GALIPO:  Oh, yes.  Let's take it down.  I

         11    apologize.

         12               THE COURT:  Go ahead.

         13               MR. GALIPO:  Thank you, Your Honor.

         14               THE COURT:  Uh-huh.

10:19AM  15         Q.    (BY MR. GALIPO:)  And you heard, I think, parts of

         16    the conversation that Anthony was having with the deputies

         17    while he was in the house?

         18         A.    Yes, I heard parts of it.

         19         Q.    And did you hear at some point some reference to

10:20AM  20    devils or something like that?

         21         A.    I believe Mr. Nuñez specified something about devils

         22    at some point during the conversation.

         23         Q.    And at least in your mind -- and I think you were

         24    asked this at deposition -- you thought that that could be

10:20AM  25    possibly someone experiencing a mental health crisis or someone

 1    being under the influence of drugs or maybe both.  Is that

 2    fair?

 3        A.    Yes.

 4            MR. GALIPO:  May I have a moment to look at my

 5    notes, Your Honor?

 6            THE COURT:  Yes.  Go ahead.

 7        Q.    (BY MR. GALIPO:)  You also took photos of the scene

 8    after the incident; is that also correct?

 9        A.    Yes.

10        Q.    Now, your -- the interview that you gave -- I

11    believe there's an exhibit book to your right, that black

12    notebook.  And if you can find Exhibit 6-B, as in boy.  Turn to

13    that and see if that appears to be your -- a transcription of

14    the interview that you gave about a month after the incident.

15            (Exhibit No. 6-B for identification.)

16            THE WITNESS:  Yes.  The cover page says 6-A, and

17    then it's stamped 6-B at the beginning of the -- what appears

18    to be a transcript.

19        Q.    (BY MR. GALIPO:)  Okay.  And did you -- have you

20    reviewed this transcript in the last few weeks just to refresh

21    your recollection about this incident?

22        A.    Yes.

23        Q.    Okay.  Do you recall in this statement, you

24    indicating that Anthony was at the front of the vehicles when

25    the shots were fired?  Do you recall saying that in your

1    statement?

2         A.    I believe I said he was between the vehicles, near

3    the fronts of the vehicles.

4         Q.    Can you turn to page 71, please?

10:22AM    5         A.    This is -- so it will say 6-B, page 71 of 82?  Is

6    that what I'm looking at?

7         Q.    Yeah.  Hold on.  I want to give you the right

8    information.

9              Yeah, it should be -- it should be -- 6-B should be

10:23AM   10    a transcription.  And there's -- there's page numbers on the

11    actual transcription.  I want you to look at those.

12         A.    Okay.

13         Q.    So page 71 of the actual transcription.  If you can

14    turn to that page, please.

10:23AM   15              And do you see there's line numbers on the left-hand

16    side?

17         A.    Yes.

18         Q.    And starting on line 19 -- is page 1 of the

19    detectives or investigators asking you questions?

10:23AM   20         A.    Yes.  He's one of the homicide detectives.

21         Q.    And you were asked, "From the time the suspect

22    arrived to the front of those vehicles, between them, and the

23    time that the shots are fired, how much time transpired?"

24              Do you see that question?

10:23AM   25         A.    Yes.

1          Q.      And your response was, "I believe he was at the

2    front of the vehicles when the shots were fired."

3                  Do you see that?

4          A.      Yes.

10:24AM   5          Q.      And I think you already told us that the --

6    Mr. Nuñez was at the front of the gray vehicle when the bean

7    bag round was fired.  Is that correct?

8          A.      Yes.

9                  MR. GALIPO:  Thank you.  That's all I have,

10:24AM  10    Your Honor.

11                  THE COURT:  Okay.  Thank you.

12                      (Direct Examination of Jeremy Deberg

13                       concluded at 10:24 AM.)

14                              *  *  *  *  *

15                      (Proceedings continued.)

16

17

18

19

20

21

22

23

24

25

**CERTIFICATE OF OFFICIAL REPORTER**

COUNTY OF LOS ANGELES   )
                        )
STATE OF CALIFORNIA     )

I, MYRA L. PONCE, FEDERAL OFFICIAL REALTIME COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

DATED THIS 25TH DAY OF MAY, 2025.

/S/ MYRA L. PONCE
_____
MYRA L. PONCE, CSR NO. 11544, CRR, RDR
FEDERAL OFFICIAL COURT REPORTER