# Exhibit 7

```
 1                  UNITED STATES DISTRICT COURT

 2         CENTRAL DISTRICT OF CALIFORNIA - EASTERN DIVISION

 3         HONORABLE SUNSHINE S. SYKES, U.S. DISTRICT JUDGE

 4

 5   ROSA NUÑEZ, et al.,                )
                                        )
 6                   Plaintiffs,        )
                                        )
 7       v.                             )     Case No.
                                        )  ED CV 22-1934 SSS (SPx)
 8   COUNTY OF SAN BERNARDINO, et al.,  )
                                        )
 9                   Defendants.        )
     _____)
10

11          REPORTER'S PARTIAL TRANSCRIPT OF TRIAL PROCEEDINGS
                DIRECT EXAMINATION OF JONATHAN CAMPOS
12                   WEDNESDAY, APRIL 23, 2025
                            11:23 AM
13                    RIVERSIDE, CALIFORNIA

14

15

16

17

18

19

20

21

22   _____

23       MYRA L. PONCE, CSR NO. 11544, CRR, RPR, RMR, RDR
                  FEDERAL OFFICIAL COURT REPORTER
24               350 WEST 1ST STREET, ROOM 4455
                  LOS ANGELES, CALIFORNIA  90012
25                       (213) 894-2305
```

|  |  |  |
|---|---|---|
| | 1 | A. Yes. |
| | 2 | Q. And there was some conversation at times between you |
| | 3 | and Mr. Nuñez about, if he puts down his chain, you'll put down |
| | 4 | your Taser, stuff like that? |
| 11:28AM | 5 | A. Yes. |
| | 6 | Q. And a few times, at least, he set the chain down by |
| | 7 | his foot or wrapped it around his leg. Is that fair? |
| | 8 | A. Yes. |
| | 9 | Q. And during the hour or hour and a half that you were |
| 11:28AM | 10 | there with Mr. Nuñez, did he ever try to attack you during that |
| | 11 | time? |
| | 12 | A. Not exactly, no. |
| | 13 | Q. You never deployed your Taser or any force during |
| | 14 | that time, did you? |
| 11:29AM | 15 | A. No, I did not. |
| | 16 | Q. And at some point, he comes out of the house? |
| | 17 | A. Yes. |
| | 18 | Q. And was that the goal, in part, to get him to come |
| | 19 | out of the house? |
| 11:29AM | 20 | A. Essentially, yes. |
| | 21 | Q. Was there a tactical plan in place, if and when he |
| | 22 | came out, exactly what the deputies were going to do? |
| | 23 | A. I mean, in my mind I was hoping that less lethal |
| | 24 | options would have been utilized then and he would drop the |
| 11:29AM | 25 | chain. |

**UNITED STATES DISTRICT COURT**

|   |   |
|---|---|
| 1 | Q. Okay. So at least you were thinking in your mind if |
| 2 | he comes out, then people would start firing less lethal at |
| 3 | him? |
| 4 | A. Correct. |
| 5 | Q. And -- but you're saying there was no discussion as |
| 6 | to who would do what. It was just what you were thinking at |
| 7 | the time? |
| 8 | A. Correct. But at the same time, I knew that Special |
| 9 | Enforcement Division was en route as well. So I figured they |
| 10 | would take over as well. |
| 11 | Q. Okay. You understood they were just a few minutes |
| 12 | away? |
| 13 | A. Correct. |
| 14 | Q. ==And so when Anthony came out, did he at some point== |
| 15 | ==run to this dirt area on the side of the yard?== |
| 16 | ==A. Yes.== |
| 17 | Q. And were you present when there was some attempts at |
| 18 | less lethal before your attempt to Taser? |
| 19 | A. Yes. |
| 20 | Q. And what do you recall in that regard? Who |
| 21 | attempted less lethal before your Taser? |
| 22 | A. So Deputy Cervantes initially was going to utilize |
| 23 | her bean bag first. And she announced, "Bean bag, bean bag, |
| 24 | bean bag." But she had a malfunction. |
| 25 | So at that point, Deputy Deberg stepped up and |

**UNITED STATES DISTRICT COURT**

|        |    |    |                                                                      |
|--------|----|----|----------------------------------------------------------------------|
|        | 1  | A. | Yes.                                                                 |
|        | 2  | Q. | You indicated he might have taken one step towards                   |
|        | 3  |    | you.  Do you recall that?                                            |
|        | 4  | A. | Yes.                                                                 |
| 11:32AM| 5  | Q. | And it looked to you like one of the prongs may have                 |
|        | 6  |    | hit him in the leg area?                                             |
|        | 7  | A. | That's correct.                                                      |
|        | 8  | Q. | But you were unsure about the other prong?                           |
|        | 9  | A. | Yes.                                                                 |
| 11:32AM| 10 | Q. | Based on your perspective, it did not look like both                 |
|        | 11 |    | prongs got -- penetrated the skin.  Is that fair?                    |
|        | 12 | A. | That's correct.                                                      |
|        | 13 | Q. | So he at some point is -- is, after you Tased him or                 |
|        | 14 |    | during that time, moving back towards the front of the house,        |
| 11:32AM| 15 |    | towards the front of those cars.  Do you recall that?                |
|        | 16 | A. | Yes.                                                                 |
|        | 17 | Q. | And you probably recall that two cars being in                       |
|        | 18 |    | the -- in the -- in the area in front of the house?                  |
|        | 19 | A. | Yes.                                                                 |
| 11:32AM| 20 | Q. | I'd like to show you Exhibit 1, page 51, which we've                 |
|        | 21 |    | seen, just to make sure we're all on the same page, so to            |
|        | 22 |    | speak.                                                               |
|        | 23 |    | Are you able to see that on your screen?                             |
|        | 24 | A. | Yes.                                                                 |
| 11:33AM| 25 | Q. | Those are the two cars that you recall?                              |

**UNITED STATES DISTRICT COURT**

1  A.   Yes.
2  Q.   And it looks like one of them -- was it a red Honda
3  and the other a gray Charger?
4  A.   That's correct.
5       MR. GALIPO:  So I'd like to show -- I think this is
6  in evidence, Your Honor, Exhibit 1, page 17.
7       THE COURT:  Yes.
8       MR. GALIPO:  If we could put that up, please.
9  Q.   (BY MR. GALIPO:)  Okay.  Do you recall generally the
10 directions -- which way was north, south, east, and west?
11 A.   Yes.
12 Q.   Can you draw an arrow on -- and I think if you touch
13 your screen, it will actually work where you can make it an
14 arrow -- which way is north?
15 A.   (Indicating.)
16 Q.   Did you make an arrow on the screen?
17 A.   Yes.  I don't know if you can see it.
18 Q.   I'm having trouble seeing it but maybe --
19      THE COURTROOM DEPUTY:  You can change the color.
20 Q.   (BY MR. GALIPO:)  Oh.  Oh.  It's at the top.  No
21 wonder.  I'm looking at the bottom.  No wonder I can't see it.
22      Okay.  And can you do me a favor and just in -- in
23 the area in front of the gray Charger, can you make another
24 arrow there which way is north, so at the bottom of the picture
25 as well?

**UNITED STATES DISTRICT COURT**

```
 1      A.      (Indicating.)
 2      Q.      Okay.  Thank you.
 3              Now, you recall in your statement describing that
 4   the bean bag round and the lethal rounds were almost
 5   simultaneous.  Do you remember describing that in your
 6   statement?
 7      A.      I believe so.
 8      Q.      Have you heard the audio recently of the bean bag
 9   round and the shots?
10      A.      Not recently, no, but I recall the audio.
11      Q.      Okay.  We're going to try to play it for you real
12   quick, just the -- the last portion, if we can.  And you tell
13   me -- oh, let's not do it yet because I want to keep that arrow
14   up.  My fault.
15              We'll play it in a second.
16      A.      Okay.
17      Q.      So your deposition testimony -- have you had a
18   chance to review that as well?
19      A.      Yes.
20      Q.      Would you agree that at the time of
21   Deputy Martinez's first shot, Anthony was located in the area
22   of the front bumper of the Dodge Charger?
23      A.      That sounds about right, yes.
24      Q.      Would you agree that, at the time of the first shot
25   from Deputy Martinez, Anthony was moving north and also facing
```

11:35AM (lines 5, 10, 15, 20)
11:36AM (line 25)

UNITED STATES DISTRICT COURT

```
 1  north?
 2       A.   Yes.
 3       Q.   And do you recall testifying to that in your
 4  deposition?
 5       A.   Yes.
 6       Q.   And you made the arrow which way facing north was on
 7  this exhibit; is that correct?
 8       A.   Yes.
 9       Q.   And you would agree -- and I think you stated this
10  in your deposition -- that at the time of the first shot,
11  Anthony had not turned in between the vehicles yet.  Is that
12  also correct?
13       A.   That sounds right, yes.
14       Q.   Do you recall testifying to that in your deposition?
15       A.   Yes.
16       Q.   And your perception was the first two shots were
17  kind of back to back with a slight pause before the third one?
18       A.   Correct.
19       Q.   And at the time of the second shot, your
20  recollection is that Anthony was also still facing north;
21  correct?
22       A.   Yes.
23       Q.   And by the time of the second shot, he was in
24  between -- more in between the space between the two vehicles
25  but still facing north in the direction you have drawn the
```

1  arrow?
2       A.    Yes.
3       Q.    So -- and your understanding was the --
4  Deputy Martinez would have been somewhere more to the rear of
5  the vehicles.  Is that fair?
6       A.    The rear of the Honda Civic?
7       Q.    Either one of the cars.
8       A.    Correct.  Yes.
9       Q.    So would it be correct to say, as Anthony was facing
10 in the direction of the arrow north for the first two shots,
11 Anthony's right side would have been to the rear of the
12 vehicles?
13      A.    I'm sorry.  Could you repeat the question?
14      Q.    Sure.
15            Would it be correct that, if Anthony was facing
16 north in the direction you have of the arrow, his right side
17 would have been more to the rear of the vehicles?
18      A.    Yes.  His right side would face that direction.
19      Q.    Correct.
20      A.    Yes.
21      Q.    And so are you aware, from any information in this
22 case you're aware of that two of the shots hit Anthony on the
23 right side and traveled right to left across his body?
24      A.    I was not aware of that.
25      Q.    Okay.  And after the second shot occurred, it's your

|   |   |   |
|---|---|---|
| | 1 | recollection that Anthony's right arm was coming down and he |
| | 2 | started collapsing towards the ground.  Is that your |
| | 3 | recollection? |
| | 4 | A.    Yes. |
| 11:40AM | 5 | Q.    And then that's about the time you heard the third |
| | 6 | shot? |
| | 7 | A.    Yes. |
| | 8 | Q.    And then at some point Anthony went down or took a |
| | 9 | step or two forward and he fell in between the two cars, I |
| 11:40AM | 10 | think, on his back? |
| | 11 | A.    I believe he fell on his torso. |
| | 12 | Q.    Okay.  And you -- at the time -- and just so we're |
| | 13 | clear on this point, at the time of the -- the third shot, your |
| | 14 | testimony and recollection is that Anthony's arm was extended |
| 11:41AM | 15 | downward; is that correct? |
| | 16 | A.    Yes. |
| | 17 | Q.    And you did your best to help Anthony afterwards by |
| | 18 | checking for injuries and trying to stop his bleeding? |
| | 19 | A.    Yes. |
| 11:41AM | 20 | Q.    And you at least noticed two gunshot wounds.  Is |
| | 21 | that fair? |
| | 22 | A.    From what I -- yes.  From what I recall, yes. |
| | 23 | Q.    One to his arm and maybe one on his -- one to his |
| | 24 | right arm and one on his right rib cage? |
| 11:41AM | 25 | A.    The one on his lower abdomen, I believe, is the one |

**UNITED STATES DISTRICT COURT**

# CERTIFICATE OF OFFICIAL REPORTER

COUNTY OF LOS ANGELES   )
                        )
STATE OF CALIFORNIA     )

      I, MYRA L. PONCE, FEDERAL OFFICIAL REALTIME COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

      DATED THIS 25TH DAY OF MAY, 2025.


      /S/ MYRA L. PONCE
_____
MYRA L. PONCE, CSR NO. 11544, CRR, RDR
FEDERAL OFFICIAL COURT REPORTER