Exhibit 9

```
 1              UNITED STATES DISTRICT COURT

 2        CENTRAL DISTRICT OF CALIFORNIA - EASTERN DIVISION

 3         HONORABLE SUNSHINE S. SYKES, U.S. DISTRICT JUDGE

 4

 5   ROSA NUÑEZ, et al.,              )
                                      )
 6                    Plaintiffs,     )
                                      )
 7        v.                          )        Case No.
                                      )  ED CV 22-1934 SSS (SPx)
 8   COUNTY OF SAN BERNARDINO, et al.,)
                                      )
 9                    Defendants.     )
     _____)

10

11       REPORTER'S PARTIAL TRANSCRIPT OF TRIAL PROCEEDINGS
                         MORNING SESSION
12                  MONDAY, APRIL 28, 2025
                           8:41 AM
13                   RIVERSIDE, CALIFORNIA

14

15

16

17

18

19

20

21

22   _____

23       MYRA L. PONCE, CSR NO. 11544, CRR, RPR, RMR, RDR
                 FEDERAL OFFICIAL COURT REPORTER
24                350 WEST 1ST STREET, ROOM 4455
                  LOS ANGELES, CALIFORNIA  90012
25                      (213) 894-2305
```

UNITED STATES DISTRICT COURT

5

```
 1              MONDAY, APRIL 28, 2025; 8:41 AM

 2                  RIVERSIDE, CALIFORNIA

 3                        -oOo-

 4            (The following is a partial transcript

 5             of the day's trial proceedings:)

 6            (Out of the presence of the jury:)

 7            THE COURTROOM DEPUTY:  Calling Case Number

 8  ED CR 22-1934, Rosa Nuñez, et al., versus County of

 9  San Bernardino, et al.

10            If I can have counsel state their name for the

11  record.

12            MR. GALIPO:  Yes.  Good morning, Your Honor.

13  Dale Galipo with Benjamin Levine from my office on behalf of

14  plaintiffs.

15            MR. CARRILLO:  Michael Carrillo.  Good morning,

16  Your Honor.  And Dominique Boubion on behalf of my office.

17            THE COURT:  Good morning.

18            MR. WESIERSKI:  Good morning, Your Honor.

19  Chris Wesierski and Abe Salen on behalf of the defendants.

20            THE COURT:  Okay.  I think there is something you

21  all wanted to discuss before the jurors come out this morning?

22            MR. GALIPO:  Yes.  Thank you, Your Honor.

23            And on a side note, we were able to agree on a

24  Bane Act instruction, so we're hoping that's helpful to the

25  Court.  And we submitted that.
```

UNITED STATES DISTRICT COURT

1        But it's my understanding the defense is calling two

2   witnesses today, Sergeant Corey LaFever and then their police

3   practice expert, Ed Flosi.

4        With respect to Sergeant LaFever, the plaintiffs

08:42AM   5   have two concerns.  One is that they're going to attempt to

6   elicit information unknown by Deputy Martinez through

7   Sergeant LaFever because Sergeant LaFever had subsequent

8   conversations with Andrew, with his wife, with -- getting a

9   search warrant, SWAT, all kind of stuff.

08:42AM   10       And we're going to be objecting to that because, for

11  example, Deputy Martinez said he was aware of a push, he wasn't

12  aware of any choke or anything like that.

13       I think they want Sergeant LaFever to say he had

14  subsequent conversations and his impression was it was more of

08:43AM   15  a choke and there was an assault with a deadly weapon that took

16  place, in his opinion, things of that nature.  That's one area.

17       The second area is similar to what we talked about

18  with some of the other officers.  But because he's a sergeant,

19  we even have a heightened concern that they're going to want

08:43AM   20  him to say, as the sergeant, as the supervisor observing

21  everything that went down, in his opinion, it was pursuant to

22  training, pursuant to policy.  The implication is it was

23  appropriate, justified.  And he's -- like the others, he's not

24  listed as a non-retained expert.

08:43AM   25       So we think those opinions are inappropriate.  Those

UNITED STATES DISTRICT COURT

1          And, number two, I don't -- I don't plan to ask him,

2    you know, what they did -- if what they did was okay under the

3    law.  What I plan to ask him is did they follow what they had

4    been trained to do as the watch commander out there at the

08:45AM    5    scene and what was done in regards to less-lethal weapons, what

6    was done in regards to lethal weapons, and was that, in his

7    mind, what should have been done at the scene.

8          And so I think as the watch commander, he was the

9    person on scene in charge of calling in the individuals who

08:45AM   10    were all called in -- and I think he's allowed to talk about

11    that, I believe -- and why he called them in.  For example, he

12    called in SWAT, he called in CHP, he called in fire.  You know,

13    as the person in charge, he's the one that set up the command

14    post.  He's the one that called in the people that needed to be

08:46AM   15    called in and -- based on his assessment of the situation.

16          So he also viewed what happened as a witness, so

17    he'll talk about what happened, what he saw and what he heard.

18          THE COURT:  Okay.  Well, I think what you're saying

19    is a little bit different than what counsel is saying as far as

08:46AM   20    if there's any objection as to what he did.  I don't think

21    there's any objection as to that.

22          Correct?

23          MR. WESIERSKI:  Correct.

24          THE COURT:  Well, let me -- I'm talking to

08:46AM   25    plaintiffs' counsel.

```
 1              MR. WESIERSKI:  I'm sorry.

 2              MR. GALIPO:  Generally not, unless he wants to use

 3  as an explanation of what he did information that was unknown

 4  by Deputy Martinez, which is the subject of Motion in Limine

 5  Number 1, which the Court granted.  And clearly, the sergeant

 6  is not a defendant in this case.  The jury instructions, the

 7  verdict form do not in any way address what he did, whether he

 8  acted appropriately or not.

 9              And I believe --

10              THE COURT:  But the thing that makes it difficult is

11  I -- I don't know exactly -- because I don't know -- well, I

12  don't recall what Deputy Martinez said in his direct about what

13  he knew or didn't know.  So then it puts me in a situation

14  where I'm trying to guess, Did -- did Deputy Martinez know

15  that, you know, five men were coming in -- and women on SWAT?

16  I don't know.  Maybe he just knew SWAT was coming in but not

17  the details of -- of everything that the sergeant could speak

18  to.

19              MR. GALIPO:  I understand.  I'm not saying that all

20  of that's out.  What I am concerned about is Deputy Martinez

21  was asked very specifically by both counsel the information he

22  had -- his information, there was a push.  No injuries.

23              What Sergeant LaFever wants to say is, upon further

24  investigation, he believes there was a choking and an assault

25  with a deadly weapon.  That's what the proffer is that they
```

08:46AM (line 5)
08:47AM (line 10)
08:47AM (line 15)
08:47AM (line 20)
08:48AM (line 25)

1    want to have him use.  And based on that, he was having

2    conversations with SED, which is the SWAT equivalent, seeking a

3    search warrant, talking to a person in charge of the gang unit

4    and all this stuff that Martinez had no information about.  So

08:48AM   5    that's one area of concern.

6            I'm not suggesting he can't say generally what he

7    did.  But if they're using that as a vehicle to get information

8    in the record that was unknown -- and I'm not so concerned

9    about whether three people were coming or five people were

08:48AM   10   coming.  I'm more concerned about alleging this was a choking

11   and an assault with a deadly weapon.

12           And my other point is, which I've said, I think,

13   several times now, they should not be permitted to use him as

14   an expert witness.  They have their expert witness later this

08:49AM   15   morning, Ed Flosi.  Each side has a police practice expert.

16           They want him to say, as the sergeant, everything

17   that was done was consistent with training and policy with the

18   implication that it was appropriate, lawful, and justified.

19   And that, from our view, is inappropriate because they never

08:49AM   20   listed him as a non-retained expert, nor did we ever explore

21   any of those opinions in deposition or discovery because we

22   never anticipated he would be giving those opinions.

23           THE COURT:  Uh-huh.  Okay.

24           MR. WESIERSKI:  Your Honor, just real quick, the

08:49AM   25   other defendant in this case is the County.  So a lot of what

UNITED STATES DISTRICT COURT

1 his experts said on the stand went against the County.  The

2 only way to rebut what was said is through this expert --

3 through this expert -- through this sergeant who's going to

4 come on who was on scene as the watch commander, number one.

08:50AM  5         And he didn't investigate later.  He talked to

6 Andrew Nuñez and the wife at the scene before the incident took

7 place, before the shooting -- the lethal force enforcement took

8 place.  He talked to them at the bedroom, as he'll discuss, and

9 talked with Andrew about what happened because he was trying to

08:50AM  10 establish whether or not they had grounds for a crime that had

11 been committed.  Through the discussion that he had with

12 Andrew, he determined that, yes, there was an assault and

13 battery.  And, therefore, he needed to call in the individuals

14 that he called in.  That's one.

08:50AM  15         THE COURT:  Well, the jury is not being asked to

16 find anything against the County in the verdict form.  So how

17 does the County come in?

18         MR. WESIERSKI:  Well, the County is a defendant.

19         THE COURT:  Well, the County -- but there's

08:50AM  20 nothing -- the County is only a defendant insofar as, I believe

21 you all have stipulated to, that Deputy Martinez was acting

22 under the color of law.

23         MR. WESIERSKI:  That's correct.  But the --

24         THE COURT:  So the County is not on the verdict

08:51AM  25 form.  There's no *Monell*.  And I would understand if there was

UNITED STATES DISTRICT COURT

1    *Monell* still left and you all had to kind of prove that the --

2    the County was acting within their policy.  Then I could see,

3    well, yeah, then maybe the sergeant would be able to come in

4    and testify that the County was, in fact, acting within --

08:51AM    5    within the policy and following the policy and procedures and

6    all of that.

7            But I don't see how it's relevant if the County

8    is -- is not a defendant that the jury actually has to make any

9    determination on.

08:51AM    10            MR. WESIERSKI:  Well, you're correct, that the

11    *Monell* claim is gone.  But their expert made allegations

12    against the County in the sense that he said tactics weren't

13    deployed that should have been deployed.  They had no tactical

14    plan, for example, is what his testimony was.  He also

08:51AM    15    indicated that at the scene they should have done things

16    completely different than what they did.  This watch commander

17    is going to explain why he did what he did at the scene, which

18    goes directly to counter what the expert said in regards to his

19    theory as to what should have happened instead of what did

08:52AM    20    happen.

21            And, you know, the other thing, Your Honor --

22            THE COURT:  I think there's an additional step that

23    plaintiff is concerned about, which I -- I believe that they're

24    saying, yes, he can testify that, you know, as watch commander,

08:52AM    25    I called out SWAT, I relayed information to the deputies that,

**UNITED STATES DISTRICT COURT**

```
 1                THE COURT:  Okay.  Good morning.

 2                MR. WESIERSKI:  Good morning, Your Honor.

 3                THE COURT:  Good morning, ladies and gentlemen.

 4   We're ready to get started this morning.  I hope you all had a

 5   nice weekend and ready to go.

 6                So on behalf of defendant, you can call your next

 7   witness.

 8                MR. WESIERSKI:  Thank you, Your Honor.

 9                THE COURT:  Or your first witness.  Go ahead.

10                MR. WESIERSKI:  Thank you.  We call Sergeant

11   Corey LaFever.

12                THE COURT:  Okay.

13                THE COURTROOM DEPUTY:  Good morning.

14                THE WITNESS:  Good morning.

15                THE COURTROOM DEPUTY:  I'll go ahead and have you

16   take the stand, and I'll have you raise your right hand.

17                Do you solemnly swear that the testimony you shall

18   give in the cause now before this Court shall be the truth, the

19   whole truth, and nothing but the truth, so help you God?

20                THE WITNESS:  Yes.

21                THE COURTROOM DEPUTY:  Thank you, sir.

22                If I can have you take a seat.  Please adjust the

23   microphone so that you can speak clearly into it.  And then if

24   I can have you state your first and last name and spell it for

25   the record.
```

09:07AM (line 5)
09:07AM (line 10)
09:08AM (line 15)
09:08AM (line 20)
09:08AM (line 25)

UNITED STATES DISTRICT COURT

```
 1   please?

 2        A.   San Bernardino County Sheriff's Department.

 3        Q.   How long have you worked for the San Bernardino

 4   Sheriff's Department?

 5        A.   Approximately 22 years.

 6        Q.   And can you tell us, do you have a college degree?

 7        A.   Yes.

 8        Q.   What is your degree in, please?

 9        A.   A criminal justice management degree.

10        Q.   And where did you obtain that degree from?

11        A.   Union Institute & University.

12        Q.   And before that, when you first went to

13   San Bernardino, did you go to the academy?

14        A.   I did.

15        Q.   What is the name of that academy?

16        A.   It's the Frank Bland Regional Training -- Regional

17   Training Center.

18        Q.   And did you go through at that time the normal

19   training that everyone goes through?

20        A.   Yes.

21        Q.   Thereafter, can you give us your history, your work

22   history, please?

23        A.   Yes.  I worked at the West Valley Detention Center

24   for a short time and then went to Barstow Station, worked in

25   the jail at the Barstow Station and then eventually went to
```

09:09AM (line 5)
09:09AM (line 10)
09:09AM (line 15)
09:09AM (line 20)
09:10AM (line 25)

1    patrol, worked patrol in Barstow, and the -- and then went to

2    Baker as a resident deputy in Baker, California, then

3    transferred down to Apple Valley and was a patrol deputy in

4    Apple Valley until I went to the training division and worked

09:10AM  5    as a range officer and tactical defense instructor.

6         Q.    Can I stop you just for a second there?

7         A.    Yes.

8         Q.    Tell us what that means in a little more detail,

9    range --

09:10AM  10         A.    I was a range instructor at our range, teaching

11    people firearms, and also defensive tactics, teaching how to

12    perform, you know, any tactical situations where we would

13    actually need to use force or less force needed to accomplish

14    the task at hand, whether it be arrest or detain somebody for

09:11AM  15    furtherance of investigation.

16         Q.    How long did you do that job?

17         A.    I was there for three years.

18         Q.    All right.  And go on, please.  Thank you.

19         A.    From there, I worked at our -- I went to our

09:11AM  20    Criminal Intelligence Division where I promoted to a detective.

21    I worked as a detective in the Criminal Intelligence Division

22    as well as a task force officer with the Joint Terrorism Task

23    Force with the FBI.

24         Q.    How long did you do that job?

09:11AM  25         A.    Four years.

1    I promoted to sergeant from there and went to the

2    city of Victorville and worked as a patrol watch commander in

3    the city of Victorville for just over two years.  And then I

4    was transferred to Hesperia as a patrol sergeant in the city of

09:11AM  5    Victorville -- I mean, sorry -- in the city of Hesperia.  And

6    after that, I went to the coroner's division, I worked at the

7    coroner's division for approximately a year and a half, and now

8    I'm back at Hesperia.

9    Q.    And when were you promoted to sergeant?  What year?

09:12AM  10   A.    '19 -- 2019.

11   Q.    And how long did you work in the coroner's division?

12   A.    I worked at the coroner's division for approximately

13   a year and a half as the -- as an administrative sergeant.

14   Q.    Okay.  And what does that mean?  What did you do?

09:12AM  15   A.    General scheduling.  Um, I tracked and scheduled

16   training for the deputy coroner investigators as well as was

17   part of the interview and hiring process for deputy coroner

18   investigators, autopsy assistants, and other administrative

19   duties, such as tracking contracts and different programs that

09:12AM  20   we worked through the County to support the community in

21   outreach.

22   Q.    Did you work hand in hand with the coroner at that

23   time for those number of years?

24   A.    Yes.

09:13AM  25   Q.    All right.  Tell me, being employed as a deputy and

UNITED STATES DISTRICT COURT

1    a detective, how many calls apparently -- approximately have

2    you gone to that involved armed suspects, please?

3        A.    Approximately 800.

4        Q.    And of those 800, how many of those 800 were you

09:13AM  5    personally involved with the armed suspect?

6        A.    Approximately 50, maybe 75, somewhere in there.

7        Q.    Okay.  And how about contact with individuals who

8    were under the influence of narcotics?  How many of those calls

9    have you made through the years?

09:13AM  10       A.    Probably over a thousand.

11       Q.    And how many times, if at all, have you been a

12   commander on scene before this incident?

13       A.    Probably approximately 20 to 30.

14       Q.    Were you the commander on scene for the -- this

09:13AM  15   incident with Mr. Nuñez?

16       A.    Yes, at the time.

17       Q.    What does that mean?

18       A.    My -- my duties are to supervise and make sure that

19   we're doing things in accordance to policy and procedures as

09:14AM  20   well as making sure people -- proper people are notified,

21   additional support and resources are requested, and come up

22   with plans to help resolve a situation.

23       Q.    And on the day of the incident, when you were the

24   commander on scene, did you get a chance to speak with

09:14AM  25   Andrew Nuñez?

**UNITED STATES DISTRICT COURT**

1    A.   Yes.

2    Q.   And after you spoke with Andrew Nuñez, did you

3 communicate to the other deputies what generally you had spoken

4 about?

09:14AM  5    A.   Yes.

6    Q.   And in regards to speaking with Andrew Nuñez, did

7 you have a belt recorder at the time that you spoke to him?

8    A.   Yes.

9         MR. WESIERSKI:  And I'd like to play -- and I've

09:14AM  10 handed a transcript to counsel -- a portion of that belt

11 recorder, Your Honor.

12         MR. GALIPO:  I would object, Your Honor, as hearsay.

13 Information unknown and unclear from the record as to what, if

14 anything, was communicated to Deputy Martinez.

09:15AM  15         THE COURT:  Okay.  I actually don't have the

16 transcripts.  I know we had talked about it but --

17         MR. WESIERSKI:  I do have a -- I do have a copy,

18 Your Honor.  May I approach?

19         THE COURT:  Yes.

09:15AM  20         MR. WESIERSKI:  I'm handing the clerk, Your Honor,

21 three pages of transcript, which is a small portion of his belt

22 recorder.

23         THE COURT:  But this is the -- the precise portion

24 you're asking to play?

09:15AM  25         MR. WESIERSKI:  Yes, Your Honor.  333-1, I've marked

1    it, and 333-2 would be the last page.

2                    THE COURT:  Okay.

3                        (Exhibit Nos. 333-1 and 333-2

4                         for identification.)

09:16AM    5                    THE COURT:  Why don't you all come sidebar just for

6    a second?

7                        (At sidebar:)

8                    THE COURT:  I guess we should have talked about this

9    before because I didn't -- I didn't read them.

09:17AM    10                    MR. WESIERSKI:  I apologize.  I did give a copy to

11    counsel.

12                    THE COURT:  Okay.  So have you read them all?  And

13    the objections are the same for everything?

14                    MR. GALIPO:  Well, so my general objection, first of

09:17AM    15    all, is it's hearsay because this is a conversation with

16    Andrew.  My second objection is that none of this information

17    was communicated to Deputy Martinez.  He did not have any of

18    this information.  And, therefore, it would be irrelevant and

19    403 to admit it and in violation of the order on Motion

09:17AM    20    in Limine Number 1.

21                    If counsel is saying that this was communicated over

22    the police radio, then we can simply play those portions of the

23    radio dispatch.  Even though Martinez says he didn't hear that,

24    at least we know that was what was communicated over the police

09:18AM    25    radio because that's the only source of information Martinez

UNITED STATES DISTRICT COURT

1    had.  He wasn't present for this conversation.  This sergeant

2    never told Deputy Martinez what this conversation included.

3            So the general concern that I have is they're

4    getting in inadmissible hearsay of information unknown that was

09:18AM  5    not communicated.  So by him simply saying he communicated some

6    of this information to other officers does not mean it was

7    communicated to Deputy Martinez.

8            And if the only source of possible communication

9    with Martinez was his police radio, they should be playing

09:18AM  10    those portions of the radio dispatch, not separate conversation

11    that Deputy Martinez didn't hear.

12            MR. WESIERSKI:  Your Honor, Chris Wesierski.

13            I do believe that he communicated it to

14    Deputy Martinez.  And he had separate side conversations with

09:19AM  15    multiple individuals, including Deputy Zane, Deputy Campos,

16    Detective Schroeder, his lieutenant, which is part of this tape

17    which I'm not going to play which is after the fact.

18            But my understanding is he did communicate that,

19    that Deputy Martinez had this knowledge about the -- the

09:19AM  20    incident being more than just a push.

21            THE COURT:  So how do you get over hearsay?

22            MR. WESIERSKI:  Well, it is hearsay, but it goes to

23    what was known at the time of the incident for Deputy Martinez

24    and the other deputies, not just Deputy Martinez, as to whether

09:19AM  25    or not they were justified, if you would, in firing their

1    less-lethal weapons, aside from the fact that he was swinging a

2    chain, the fact that the --

3            THE COURT:  Well, I would agree with you if Martinez

4    was involved in this conversation because the whole purpose of

09:20AM    5    hearsay is to kind of address the reliability of it.  So if

6    he's not involved in this conversation, then it's pure hearsay.

7    And it doesn't matter --

8            MR. WESIERSKI:  Well -- I'm sorry.  Go ahead.

9            THE COURT:  -- about the totality of the

09:20AM    10    circumstances as it relates to Martinez who wasn't involved in

11    the conversation.

12            MR. WESIERSKI:  Right.  But one of the jury

13    instructions specifically addresses totality of the

14    circumstances -- as the Court knows, one of the *Graham* factors.

09:20AM    15            So the totality of the circumstances is that it was

16    more than just a push.  And, in fact, Andrew Nuñez testified

17    about this on the stand.  He called it a push in this area

18    (indicating) rather than in the neck area.  What he told this

19    sergeant was different, told him it was a choking.

09:20AM    20            THE COURT:  Which could have come in through Andrew,

21    this -- I mean, if this -- if you wanted to bring this in

22    through Andrew when he was on the stand, then I think it would

23    be a different situation.  But Andrew's not on the stand.  It

24    is hearsay.

09:21AM    25            You can ask him those questions, about what

**UNITED STATES DISTRICT COURT**

1  information he provided to Deputy Martinez.  That gets the same

2  information in without hearsay.  But I agree, if -- unless you

3  have a basis that that's not hearsay, which I haven't heard

4  yet, then I don't think it can come in.

09:21AM  5          MR. WESIERSKI:  I think it would be one of the

6  exceptions.  And it would be what Deputy Martinez knew as well

7  as other deputies in regards to whether their actions were

8  appropriate on that day.  And I think part of what they knew

9  was that this individual was more than just a pusher, that he

09:22AM  10  was a pusher and a choker and, aside from what they all knew,

11  which is that he had the chain and the drugs and all that.

12          And also, in this statement, Andrew Nuñez talks

13  about the fact that he'd gone on a bender and that he was

14  clearly on drugs for a number of days, which is something we

09:22AM  15  already have in the record from dispatch, from his wife,

16  Andrew's wife talking about that.

17          MR. GALIPO:  Well, that's a 911 call that the

18  officer didn't hear.  So --

19          THE COURT:  Well, it's -- it's hearsay.  So I --

09:22AM  20          MR. GALIPO:  Yes.

21          THE COURT:  I don't see any way around the hearsay,

22  unless Martinez was involved in the conversation.

23          MR. GALIPO:  And the only last point I'd like to

24  make is that Martinez clearly said he didn't have any of this

09:22AM  25  information.  The only information he had was the push.  He had

1    no other information.  And, also, the totality of the

2    circumstances known to the officer is the issue.

3            THE COURT:  I'm going to sustain the objection as

4    hearsay as far as this -- it coming in this way.  I mean,

09:23AM    5    certainly you can ask him what information he gave to Martinez.

6    I mean, that's -- that's not hearsay.

7            MR. WESIERSKI:  The -- the second part that I want

8    to play, Your Honor, is his discussion directly with

9    Anthony Nuñez.

09:23AM    10            THE COURT:  Whose discussion?

11            MR. WESIERSKI:  Sergeant LaFever.

12            THE COURT:  Is he the "male deputy" in this -- is

13    this --

14            MR. WESIERSKI:  It would be the shorter one,

09:23AM    15    Your Honor, 333-2.

16            THE COURT:  So the male -- okay.  So who's this

17    "male deputy"?  Someone else?

18            MR. WESIERSKI:  That's somebody else.  That's not

19    Martinez.

09:23AM    20            THE COURT:  Okay.

21            MR. WESIERSKI:  And then -- yeah, I got it right

22    here.

23            So just his conversations that took place with the

24    decedent, which I think clearly come in because the decedent

09:23AM    25    has now passed away, unfortunately.  So his discussions with

1    the decedent in trying to de-escalate the situation, "he" being

2    Sergeant LaFever.

3                    THE COURT:  And the relevance of that is?

4                    MR. WESIERSKI:  Just that he also, in addition to

09:24AM  5    Deputy Campos and Deputy Martinez, tried to de-escalate the

6    situation, which I think is one of our defenses, that he too

7    tried to step up and tried to say what he could to try to

8    de-escalate.

9                    THE COURT:  Okay.  Go ahead.

09:24AM  10                    MR. GALIPO:  Well, I think the Court's inquiry says

11    a lot because the issue is what Martinez did.  The issue in

12    this case is whether the use of deadly force was appropriate or

13    not.  It's not whether LaFever did anything right or wrong.

14    He's not a named defendant.  And he's nowhere in consideration

09:24AM  15    in the jury instructions or the verdict form.

16                    THE COURT:  And I don't -- I agree.  So I'm not

17    going to -- I don't know -- I don't know what the relevance is

18    of it because then you would bring in -- if someone else had

19    tried to talk him down, then you'll bring that testimony in and

09:25AM  20    then the next person, you'll bring that testimony in.  And

21    that's not --

22                    MR. WESIERSKI:  I'm not going to do that,

23    Your Honor.  The only one I would bring in is Sergeant LaFever

24    because it matters, again, to respond to what their expert says

09:25AM  25    as to the improper acts that were done at the scene, that they

UNITED STATES DISTRICT COURT

1    did not -- they could have de-escalated more, they could have

2    retreated, they could have -- whatever they could have done.

3           He is the person in charge of seeing what they're

4    doing and making sure what they're doing, those other deputies,

09:25AM  5    is appropriate.

6           And I think his discussions with the individual also

7    go to whether or not he could see if the person was on drugs or

8    not.  And that also goes to -- which Deputy Martinez and Campos

9    and all the other ones have testified to already, that he was

09:26AM  10    on drugs at the time of the incident.  This --

11           THE COURT:  Did -- did LaFever tell Martinez

12    anything about him being on drugs?  Like, Oh, hey, you know,

13    Martinez, I think this guy's on drugs.  You should do X, Y, Z

14    or --

09:26AM  15           MR. WESIERSKI:  I don't know if he did.  I don't

16    think he did.

17           THE COURT:  That may be relevant.  If that happened,

18    I would agree with you.  Or if LaFever took whatever

19    information he saw and then gave it to Martinez and now

09:26AM  20    Mr. Martinez knows -- you know, not only does he suspect it but

21    now the sergeant is telling him.  So I think I would agree in

22    that respect.  But if whatever he's doing right here wasn't

23    ever known to Martinez, then it's not relevant.

24           MR. WESIERSKI:  Okay.

09:26AM  25           THE COURT:  Okay.

1      Q.    What did you do?

2      A.    We had deputies stop traffic coming from Sultana

3    and -- and then farther north -- I'm sorry -- farther south.

4    And I'm trying to remember the street that we -- that we closed

09:46AM  5    off on the south side.

6      Q.    So did you close off the streets at either end of

7    this block?

8      A.    Yes.

9      Q.    And aside from stopping traffic, did you try to

09:46AM  10   evacuate neighbors on that whole block?  Or how far did you go

11   down?

12     A.    Yeah.  We tried to get neighbors from the block off,

13   just to prevent any additional -- you know, it's for their

14   safety, to keep them either in the house or get them out and

09:47AM  15   then, also, to prevent anyone from coming out and distracting

16   deputies and causing further issues out on the scene.

17     Q.    Okay.  So walk us through.  You get to the scene and

18   then what happens after what you've already talked about?

19     A.    So I get on scene.  And as we get people evacuated,

09:47AM  20   I request our Special Enforcement team -- Division to come out

21   to assist.  I asked for a search warrant as well as an arrest

22   warrant to be obtained -- an arrest warrant for Anthony Nuñez

23   and search warrant for the residence to actually get Anthony

24   out of the residence.

09:47AM  25     Q.    Okay.  And then as you approached the scene, you do

```
 1   all that, do you go back at some point to your command post?

 2        A.    Yes.

 3        Q.    And do you -- how far is that, approximately, from

 4   where this house is?

 5        A.    Approximately is 100 to 200 yards to the north.

 6        Q.    Okay.  And at some point do you then go back to the

 7   home?

 8        A.    Yes.  I went back to the home when Mr. Anthony Nuñez

 9   exited the residence and deputies advised that he had made

10   statements that he wanted us to kill him and that he wasn't

11   going to give up without us -- without a fight, in essence.

12        Q.    So when you went back to the home, how long was it

13   you were at your command post until you went back to the front

14   of the home?

15        A.    Probably -- I'll say 15 minutes or so.

16        Q.    Okay.  And then what happened?

17        A.    As I walked back towards the residence, like I said,

18   Mr. Anthony Nuñez had exited the residence, refusing to listen

19   to deputies as he swung a chain over his head and was

20   attempting to hit deputies with the chain.

21        Q.    Okay.  And where did he come out and go to?  If you

22   can show us on the map with the drawing, that would be great.

23        A.    He came out from the front of the -- (indicating)

24   the door and then came out to the southeast.

25        Q.    Okay.  And were you able to see him outside with
```

09:48AM (line 5)
09:48AM (line 10)
09:48AM (line 15)
09:49AM (line 20)
09:49AM (line 25)

**UNITED STATES DISTRICT COURT**

1  that chain?

2       A.    As I approached, I could see him from a distance,

3  but I didn't see -- I didn't see everything that was happening

4  at the time.  I was relying on the deputies advising over -- to

09:49AM 5  dispatch over the radio as well as my distant view.

6       Q.    And at some point did you speed up and go faster

7  toward the residence?

8       A.    Yes.  Um, as -- as I was approaching, the --

9  Deputy Deberg advised that the less-lethal option of

09:50AM 10  40 millimeter was ineffective and it had been deployed.  I

11  could hear the -- the deployment of that less lethal.  And I

12  picked up my pace and began running towards the residence.

13       Q.    Okay.  And what did you see as you approached where

14  you could see more clearly?

09:50AM 15       A.    As I approached the residence, I could see him

16  swinging that chain at deputies still as deputies were giving

17  him commands to drop it and --

18       Q.    Let me stop you for a second.

19            In what way was he swinging the chain?

09:50AM 20       A.    He was swinging it over his head like a lasso and

21  towards the deputies.

22       Q.    Did he ever swing the chain or use the chain like a

23  whip?

24       A.    Yes.  That didn't happen until after I believe the

09:50AM 25  Taser was deployed and -- that I could see.  And then as he was

1    approaching Deputy Martinez, then the less-lethal bean bag

2    option was used by Deputy Cervantes and then he continued to

3    whip it in an upward and downward motion towards

4    Deputy Martinez.

09:51AM    5    Q.    All right.  And show us where he was, "he" being

6    Mr. Anthony Nuñez, where he was at the time that the lethal

7    force encounter occurred.

8    A.    I believe he was right in here (indicating), in

9    between the cars.

09:51AM    10    Q.    All right.  And where were you at that time?

11    A.    By the time that the -- the shots were fired by

12    Deputy Martinez, I was at the back right corner of that red

13    vehicle.

14    Q.    Why didn't you deploy your weapon?

09:51AM    15    A.    Um, by the time that I got on scene and I drew my

16    firearm towards Mr. Nuñez, I didn't have a clear shot at the

17    time with Deputy Martinez backing in between those -- those

18    vehicles and me having -- and the vehicle in between me and

19    Mr. Nuñez.

09:51AM    20    Q.    So was -- at the time this happened, how would you

21    describe the movement of Anthony Nuñez?

22    A.    I would describe it as a brisk walk, moving fairly

23    quickly but not running.

24    Q.    And did the shots ring out at the front of the

09:52AM    25    vehicles or in between the vehicles, to your memory?

| | | |
|---|---|---|
| 1 | A. | It was in between the vehicles. |

Q.   And Deputy Martinez was, in a sense, backing up a
little bit.  Is that what you saw?

A.   Yes.

09:52AM   Q.   And how about Deputy Cervantes?  Where was she?

A.   I believe Deputy Cervantes was on the -- the left
side of the vehicle, kind of over in this area (indicating),
and moving back towards the back of the vehicle.

Q.   All right.  At the time that Deputy Martinez shot
09:52AM   with lethal force against Anthony Nuñez, did Anthony Nuñez
continue to advance even after the first shot?

A.   That I remember, yes.  It was a quick -- a quick
response, but he was still moving through the first -- first
one or two shots.

09:53AM   Q.   All right.  How many shots did you hear that rang
out?

A.   I believe there was three or four.

Q.   Okay.  And at the time that the incident occurred,
do you believe that at that point Anthony Nuñez was using the
09:53AM   chain as a weapon against Deputy Martinez?

A.   Yes.

Q.   Was it your understanding based on what you had seen
and what you had heard, that the 40/40 had already been used?

A.   Yes.

09:53AM   Q.   Was it your understanding that the bean bag had

UNITED STATES DISTRICT COURT

1    already been used?

2        A.    Yes.

3        Q.    And did you see him have -- have any change in the

4    way he was briskly walking following either one of those?

09:53AM   5        A.    No.

6        Q.    And how about the Taser?  Was it your understanding

7    that a Taser had also been used?

8        A.    Yes.

9        Q.    The -- we've talked about the spray.  Was there any

09:53AM   10   other less-lethal weapon, such as the baton or a shield, that

11   you believe could have been used in place and in stead of the

12   lethal force that was used?

13       A.    No.

14       Q.    And why is that?

09:54AM   15       A.    The baton would have put us in a higher risk.  We

16   would have to have been closer to Mr. Nuñez.  And the shield is

17   to prevent gunfire.  And it's -- it's -- it's heavy.  It's

18   something that we don't always bring out with us because it's a

19   burden in the moments of quick reaction.

09:54AM   20            If we were making a tactical plan to make an entry,

21   that might be an option.  But in this situation, it was not

22   something that we would normally use.

23       Q.    And after Mr. Nuñez was shot with the bullets, what

24   happened next?

09:54AM   25       A.    We asked for fire to respond to perform medical

1      A.    I don't -- I don't recall if Andrew was part of that

2    discussion.  I don't believe so.  But we did discuss it with

3    the deputies on scene, whether it was just Deputy Campos as

4    well as other detectives, and that was the plan, was to not go

10:00AM  5    in because it would force Mr. Nuñez farther into the residence.

6      Q.    Okay.  And you were afraid to expose the other

7    residents to -- to further danger by doing that; is that right?

8      A.    Yes.  Yes.  And you know what?  At the beginning, we

9    knew about the firearm being in there.  But there's also

10:00AM  10    other -- other items in a residence that could also be used

11    against people as weapons -- knives in the kitchen, which

12    obviously if he would have went -- if he went to the left, it

13    would have been a concern for the firearm and any other items

14    down in there.  But to the right, we knew there was a kitchen

10:01AM  15    and there's also, we know, based on information in kitchens,

16    there's knives and other items that could be used as weapons.

17    So we didn't want to force him either way.

18      Q.    And that box that says K-I-T, KIT, is that the

19    kitchen?

10:01AM  20      A.    Yes.

21      Q.    When you came back to the scene --

22            MR. WESIERSKI:  We can take that down.  Thank you.

23      Q.    (BY MR. WESIERSKI:)  When you came back to the scene

24    as you approached just before the lethal force encounter, did

10:01AM  25    you have a clear view of Deputy Martinez and -- of

1    Anthony Nuñez before that lethal force encounter?

2         A.    Yes.

3         Q.    Is it your understanding that Deputy Campos and

4    Deputy Martinez spent over one hour and a half in trying to

10:02AM    5    cajole Mr. Nuñez out of the home?

6         A.    It was definitely over an hour.

7         Q.    Did you believe on what you saw and what you heard

8    at the scene that they had established some rapport with him at

9    the time this happened, before the lethal force encounter?

10:02AM    10        A.    Yes.

11        Q.    So we talked a little bit about getting the

12   residents out of the home.  Did you develop a tactical plan for

13   getting the residents out from both sides of that home?  We

14   talked about that already.

10:02AM    15        A.    Yes.

16        Q.    We didn't talk about the gate.  Was there some gate

17   that was used where two of the individuals had to cut the lock

18   on the gate?

19        A.    Yes.  Deputy -- Deputy Zane and Detective Schroeder,

10:03AM    20   when they went to go get the two family members on the south

21   side of the residence out, they had to cut a lock that was

22   securing the gate to go around the back and -- and then back to

23   the front to get the two residents out.

24        Q.    And you were in the process, you said, of ordering a

10:03AM    25   *Ramey* warrant and a search warrant.  What's a *Ramey* warrant

```
 1    decisions.
 2         Q.    Did anybody in the family advise you that he had any
 3    kind of mental issue?
 4         A.    No.
 5         Q.    Okay.  Did you see the bean bag round strike
 6    Mr. Nuñez?
 7         A.    Yes.
 8         Q.    And I don't know -- I think you didn't see the
 9    40 millimeter strike him; is that right?
10         A.    Correct.
11         Q.    But to your knowledge, as you approached, did you
12    see him slow at all after you heard the 40 millimeter strike?
13         A.    No.
14         Q.    So as far as what you knew at the time when
15    Deputy Martinez fired, the less lethal, whatever had been
16    deployed -- the 40 millimeter, the bean bag, and the Taser --
17    none of those had had any effect on him.  Is that your
18    understanding?
19              MR. GALIPO:  I'm going to object as lacks foundation
20    as phrased.
21              THE COURT:  I'll sustain.  If you want to separate
22    it out because I'm unclear --
23              MR. WESIERSKI:  Sure.
24              THE COURT:  -- as well.
25         Q.    (BY MR. WESIERSKI:)  As you approached that
```

10:08AM (line 5)
10:09AM (line 10)
10:09AM (line 15)
10:09AM (line 20)
10:09AM (line 25)

1  residence -- I think you said you were coming from your command

2  post back, you heard the 40 millimeter; correct?

3      A.    Yes.

4      Q.    And when you saw Anthony Nuñez after you heard the

10:09AM  5  deployment of the 40 millimeter, did you see that he had slowed

6  in any way when you could see him at that point?

7      A.    No.

8      Q.    And as far as the bean bag, you saw that hit him; is

9  that right?

10:10AM  10      A.    Yes.

11      Q.    Where did it hit him?

12      A.    In the -- I believe it was in the upper portion of

13  the torso of his body.  And it was while he was at the front of

14  the vehicle.

10:10AM  15      Q.    There has been some testimony by the expert that he

16  was shot in the front -- lethally shot in the front of these

17  vehicles.  Is that what you saw?

18      A.    No.

19      Q.    What did you see?

10:10AM  20      A.    I saw that he was shot by lethal force in between

21  the vehicles.

22      Q.    And at that point when you saw that, you were close

23  enough to see it --

24      A.    Yes.

10:10AM  25      Q.    -- is that right?

**UNITED STATES DISTRICT COURT**

1            And so the -- the 40 millimeter didn't slow him as

2    far as what you saw.  The bean bags -- did that slow him at

3    all?  Did he slow?

4        A.    No.

10:10AM  5        Q.    And you described it as a brisk walk.  Faster than a

6    regular walk, is that a fair assumption?

7        A.    Yes.

8        Q.    And would you describe it as him charging

9    Deputy Martinez at the time that he was shot?

10:11AM  10            MR. GALIPO:  I'm going to object as leading.

11            THE COURT:  Sustained.

12        Q.    (BY MR. WESIERSKI:)  How would you describe it when

13    he was -- when Anthony Nuñez was coming toward Deputy Martinez,

14    how would you describe that?

10:11AM  15        A.    I would describe it as someone that wanted to hurt

16    or attack an individual, and that was Deputy Martinez.

17        Q.    Okay.  So the Taser, did you see the Tasers hit him

18    or not?

19        A.    I don't believe I did.

10:11AM  20        Q.    All right.  And as far as you knew, did the Taser

21    slow him down, if it did hit him?

22        A.    No.

23        Q.    The backdrop -- that's the term we've heard

24    before -- that was there when Deputy Martinez fired, what was

10:11AM  25    the backdrop?

|    | |
|----|----|
| 1 | A.    The residence or the stucco wall of the residence. |
| 2 | Q.    So -- and why is that important? |
| 3 | A.    Well, because we want to make sure that any rounds |
| 4 | that are -- any firearms that are shot, the trajectory of those |
| 10:12AM  5 | firearms, we want to make sure that they're going into a safe |
| 6 | location or a location that doesn't put anyone else at risk or |
| 7 | at harm. |
| 8 | Q.    So at the time that this incident occurred, was |
| 9 | Deputy Martinez the designated person with the lethal force |
| 10:12AM  10 | encounter at that point in time if the other ones had less |
| 11 | lethal in their hands? |
| 12 | MR. GALIPO:  Objection.  Calls for speculation and |
| 13 | lacks foundation, unless he did the designation. |
| 14 | THE COURT:  I'll sustain. |
| 10:12AM  15 | Q.    (BY MR. WESIERSKI:)  All right.  Was there anybody |
| 16 | else who had weapons drawn other than Deputy Martinez? |
| 17 | A.    Yes.  I had my -- my handgun drawn at the time of |
| 18 | getting on scene there as well. |
| 19 | Q.    How did you have your handgun at that point? |
| 10:12AM  20 | A.    Pointed towards Mr. Nuñez. |
| 21 | Q.    Okay.  And did you determine, as you said, that you |
| 22 | didn't have a clear shot because of the car? |
| 23 | A.    The car and Deputy Martinez moving as well. |
| 24 | Q.    So there would have been some crossfire there |
| 10:13AM  25 | possibly? |

1      A.    Yes.

2      Q.    Anybody else besides you that had their pistol drawn

3  and Deputy Martinez?

4      A.    Not that I remember.

10:13AM  5      Q.    Now, after Deputy Martinez fired his shots, did you

6  then approach Anthony Nuñez at that point?

7      A.    Yes, myself and Deputy Campos.

8      Q.    And what did you do at that point?

9      A.    I gave my tourniquet to Deputy Campos to apply.  We

10:13AM  10  believed that he was shot in the arm.  Deputy Campos did an

11  assessment and determined that the tourniquet wouldn't be

12  effective to helping because there was no shot in the arm in a

13  location where you could get a tourniquet on.

14      Q.    As the -- Anthony Nuñez was there on the ground,

10:13AM  15  what did you do to try to assist Anthony Nuñez?

16      A.    I -- I -- I had then gone to go clear the residence,

17  but we were working on getting a trauma kit out of the vehicle,

18  which has additional bandages and different things, to then

19  apply.  So we were in the process of getting some of those

10:14AM  20  other supplies over there.

21      Q.    Did you direct some of the other deputies to do

22  that, to try to get that trauma kit?

23      A.    Yes.

24      Q.    And who was that, if you recall?

10:14AM  25      A.    Deputy Deberg.

           1    placed in front of the road to prevent additional people to

           2    come.

           3         Q.     You have familiarity with the less-lethal weapons

           4    that were used that day before the lethal weapon was used;

10:21AM    5    correct?

           6         A.     Yes.

           7         Q.     And, in fact, did you teach that at the academy?

           8         A.     I -- I taught some of those -- those devices, yes.

           9         Q.     Is it your understanding that normally if somebody's

10:21AM   10    hit with a 40/40 round or the rubber bullets, that would

          11    usually cause an individual to react in some way by falling,

          12    hunch over, something like that?

          13         A.     Yes.

          14         Q.     And is it your understanding on this day that those

10:21AM   15    rubber bullets didn't have that effect at all?

          16              MR. GALIPO:  I'll object as lacks foundation.

          17              THE COURT:  Sustained.

          18              MR. WESIERSKI:  Well, we can talk about it a little

          19    more, Your Honor.

10:21AM   20         Q.     (BY MR. WESIERSKI:)  Did you, in fact, have, as part

          21    of your training as a person that was in charge of training at

          22    the academy, the use of nonlethal weapons such as the 40/40?

          23    Did you specifically use that 40/40 or teach it?

          24         A.     I did not teach the 40 millimeter, but we had

10:22AM   25    instruction on that after I left the academy.

1    hit and they didn't have any effect on him.

2         So what I'm getting at now is his background, as he

3    explained, that he gets in training as to what normally happens

4    to someone when they're hit by these 40/40.

10:23AM    5         THE COURT:  But your question was -- was asked as if

6    he saw them hit and immediately after the hit it had no

7    response.  He had no reaction.  And I think that that's where

8    it lacks foundation.

9         MR. WESIERSKI:  Okay.  I'll clear that up.  I

10:23AM   10    thought he did say he did, but I'll clear that up.

11         THE COURT:  Okay.

12              (In the presence of the jury:)

13         THE COURT:  Go ahead.  Whenever you're ready.

14         MR. WESIERSKI:  Thank you, Your Honor.

10:24AM   15    Q.    (BY MR. WESIERSKI:)  So at the time of the incident,

16    you didn't see the 40/40 bullets hit Mr. Nuñez; is that -- is

17    that true?

18    A.    Yes.

19    Q.    Did you see Mr. Nuñez, though, as you approached

10:24AM   20    right after you heard the 40/40 being deployed?

21    A.    Yes.

22    Q.    And did you see him at that point in time slow at

23    all?

24    A.    Not that I know of.

10:24AM   25    Q.    And in your training, what did you learn in regards

1    to these 40/40 bullets would normally happen if somebody was

2    struck by these bullets?

3        A.    There's normally some type of compliance that takes

4    place due to the pain that's -- that they feel, and they

10:25AM  5    generally will begin to cooperate or listen to commands that

6    are given.

7        Q.    Did that concern you, when none of those less-lethal

8    weapons worked at all with Mr. Nuñez?

9              MR. GALIPO:  I'm going to object as lacks foundation

10:25AM 10    and it's irrelevant.

11             THE COURT:  Sustained.

12        Q.    (BY MR. WESIERSKI)  As the tactical commander on

13    the scene and in charge of these deputies and their lives and

14    their safety, did it concern you about them and about the

10:25AM 15    neighbors when you saw that the less-lethal weapons had no

16    effect?

17             MR. GALIPO:  Again, object.  Assumes facts not in

18    evidence.  Lacks foundation.  It's irrelevant.

19             THE COURT:  Sustained.

10:25AM 20        Q.    (BY MR. WESIERSKI)  When you saw -- strike that.

21             So is it your understanding -- and correct me if I'm

22    wrong -- that none of the less-lethal weapons had worked that

23    day?

24             MR. GALIPO:  I'm going to object.  It's leading and

10:25AM 25    lacks foundation.

1              MR. WESIERSKI:  Well, it's just background,

2   Your Honor.

3              THE COURT:  Overruled.

4              You can answer.

10:26AM   5              THE WITNESS:  Yes.  None of them worked that day.

6         Q.    (BY MR. WESIERSKI:)  And -- and did that give you a

7   heightened concern beyond the fact that he had a chain that he

8   was using as a weapon?

9              MR. GALIPO:  Again, I'm going to object as leading,

10:26AM  10   Your Honor.

11             THE COURT:  Sustained.

12        Q.    (BY MR. WESIERSKI:)  Was there -- did you have a

13   different concern than you had when you knew he already had the

14   chain?

10:26AM  15        A.    Yes.

16        Q.    And why was that?

17        A.    Because those less lethal options weren't working.

18   And normally, when they're deployed, they induce pain

19   compliance, which allow -- or then -- then people listen and

10:26AM  20   follow instructions and do what they're asked normally.

21        Q.    So I started to talk about -- or we did talk about

22   the baton, the shield.  Were there any other less-lethal

23   weapons available to you or any of the other deputies other

24   than the Taser, other than the 40/40, and other than the bean

10:27AM  25   bag launcher that day?

```
 1            A.    No.  Not at that time.

 2            Q.    Is there any doubt in your mind that Mr. Nuñez was

 3     walking briskly, I think -- is that what you said?

 4                  MR. GALIPO:  Objection.  Leading and cumulative.

 5                  MR. WESIERSKI:  I hadn't finished, Your Honor, but I

 6     can finish.

 7                  THE COURT:  Go ahead.

 8            Q.    (BY MR. WESIERSKI:)  Was there any doubt in your

 9     mind that Mr. Nuñez was walking briskly toward Deputy Martinez

10     just before the lethal force encounter occurred?

11                  MR. GALIPO:  Objection.  Leading and cumulative.

12                  THE COURT:  Overruled.

13                  You can answer.

14                  THE WITNESS:  Yes.

15            Q.    (BY MR. WESIERSKI:)  Yes, there was a doubt?

16            A.    Oh, I'm sorry.  No, there was no doubt.  Yes, he was

17     doing that.

18            Q.    Okay.  And is it your testimony that, as he

19     approached Deputy Martinez, between the cars, he was also using

20     the chain in some fashion?

21                  MR. GALIPO:  Objection.  Leading.

22                  THE COURT:  Sustained.

23            Q.    (BY MR. WESIERSKI:)  As -- as Anthony Nuñez

24     approached Deputy Martinez, was he using the chain in some

25     fashion?
```

10:27AM (line 5)
10:27AM (line 10)
10:27AM (line 15)
10:28AM (line 20)
10:28AM (line 25)

1    A.    Yes.

2    Q.    What was he doing?

3    A.    He was whipping it up in a -- in an up-and-down

4    motion at that point.

10:28AM    5    Q.    And could you --

6    MR. WESIERSKI:  Is it all right if he gestures from

7    the stand as to what that was, Your Honor?

8    THE COURT:  Yes.  Go ahead.

9    THE WITNESS:  In an up-and-down motion like this,

10:28AM    10    like a whip.

11    Q.    (BY MR. WESIERSKI:)  And at some point did he have

12    his arm above his body, kind of like what I'm doing here

13    (indicating)?

14    MR. GALIPO:  Objection.  Leading.

10:28AM    15    THE COURT:  Sustained.

16    Q.    (BY MR. WESIERSKI:)  At some point was his arm above

17    his body?

18    A.    Yes.

19    Q.    And was that when he was in between the cars that

10:28AM    20    you saw that?

21    A.    Yes.

22    Q.    When Mr. Nuñez was whipping the chain as you

23    described in an up-and-down motion in between the cars and just

24    before he was shot, do you believe that Deputy Martinez was in

10:29AM    25    danger of serious injury or death at that time?

UNITED STATES DISTRICT COURT

| | |
|---|---|
| 1 | MR. GALIPO:  Your Honor, again, I'm going to object |
| 2 | as leading and irrelevant as to his belief. |
| 3 | THE COURT:  Sustained. |
| 4 | Q.    (BY MR. WESIERSKI)  Well, if -- put it this way, if |
| 10:29AM  5 | you had been in Deputy Martinez's spot, would you have used |
| 6 | lethal weapon as well? |
| 7 | MR. GALIPO:  Objection.  Irrelevant. |
| 8 | THE COURT:  Sustained. |
| 9 | Q.    (BY MR. WESIERSKI)  As a witness that saw the |
| 10:29AM  10 | incident take place, were you concerned that Deputy Martinez |
| 11 | was in danger of either serious maiming or death? |
| 12 | A.    Yes. |
| 13 | Q.    And you talked about clearing the residence.  What |
| 14 | did you mean by that? |
| 10:30AM  15 | A.    Make sure there was no additional people in the |
| 16 | residence and no other dangers to us or any of the -- if there |
| 17 | was any -- possibly any other residents inside the home. |
| 18 | Q.    And what was found? |
| 19 | A.    That it was empty and no one else was inside. |
| 10:30AM  20 | Q.    What was your call sign that day? |
| 21 | A.    19 Sam 8, or S8. |
| 22 | Q.    We talked earlier with some of the other deputies, |
| 23 | that they were connected by an earpiece with each other on |
| 24 | radio; is that true? |
| 10:30AM  25 | A.    Yes. |

1    to advance even after he was shot?

2         A.    Yes.

3         Q.    And do you know how far?  Your best estimate.

4         A.    A foot or two.

10:32AM  5    Q.    Okay.  Even after he was shot with a third bullet,

6    did he -- did he still have the chain in his hand?

7         A.    I don't recall if it was in his hand still or just

8    next to his hand.

9         Q.    Okay.  Do you believe, based on what you saw and

10:32AM  10   what you heard that day, whether or not Deputy Martinez

11   overreacted?

12             MR. GALIPO:  Objection, Your Honor.  Calls for

13   expert testimony.

14             THE COURT:  Sustained.

10:32AM  15             MR. GALIPO:  It's irrelevant as to his belief.

16             THE COURT:  Sustained.

17        Q.    (BY MR. WESIERSKI:)  Did you and your team on that

18   day do everything possible to try to bring this to a peaceful

19   resolution?

10:33AM  20        A.    I believe so.

21             MR. WESIERSKI:  No further questions.  Thank you

22   very much, sir.

23             THE COURT:  Okay.  We'll go ahead and take our break

24   at this moment.

10:33AM  25             Ladies and gentlemen of the jury, I'll remind you,

 1    please do not discuss the case, form any opinions, begin any

 2    type of deliberations.  We'll try to get back here in about 10

 3    to 15 minutes.  Okay?

 4              THE COURTROOM DEPUTY:  All rise for the jury.

10:33AM  5         (Out of the presence of the jury:)

 6              THE COURT:  You can step down.

 7              Okay.  We'll be back in about 10, 15.

 8              MR. GALIPO:  Thank you, Your Honor.

 9              MR. WESIERSKI:  Thank you, Your Honor.

10:33AM 10         (Break taken.)

11              (In the presence of the jury:)

12              THE COURT:  Thank you.  You all can be seated.

13              Okay.  On behalf of plaintiff?

14              MR. GALIPO:  Yes.  Thank you, Your Honor.

10:51AM 15                     **CROSS-EXAMINATION**

16    BY MR. GALIPO:

17         Q.    Good morning, Sergeant LaFever.

18         A.    Good morning.

19         Q.    Do you still work for the County of San Bernardino?

10:51AM 20         A.    Yes.

21         Q.    And you're aware that the County of San Bernardino

22    was a defendant in this case?

23         A.    Yes.

24         Q.    Did you talk to anyone about this case last Friday?

10:51AM 25         A.    I don't believe so.

1      Q.    How about last Saturday?

2      A.    Saturday?  I believe I talked to the -- the

3    attorney.

4      Q.    I don't want to know what you talked about, but how

10:52AM    5    long was that meeting?

6      A.    About -- about an hour.

7      Q.    Did you talk to anyone on Sunday regarding this

8    case?

9      A.    I don't believe so.

10:52AM    10      Q.    How about today before you testified?

11      A.    Yes.

12      Q.    Who did you talk to today before you testified about

13    the case?

14      A.    My attorney -- or the attorney, sorry.  The

10:52AM    15    San Bernardino County Sheriff's Department attorney.

16      Q.    Do you consider him to be your attorney?

17      A.    No.

18      Q.    Prior to last Friday, how many meetings in total

19    have you attended regarding this case?

10:53AM    20      A.    Approximately four or five.

21      Q.    You gave an interview after the date of the

22    shooting; is that correct?

23      A.    Yes.

24      Q.    And you have reviewed at least a summary of that

10:53AM    25    interview?

1          Q.    And I think you used the words that -- your

2     impression was he was not capable of making rational decisions.

3     Is that what you said?

4          A.    Yes.

11:00AM  5          Q.    And given that, whatever the cause of that was,

6     would you agree as a law enforcement officer he needed help?

7          A.    Certainly.

8          Q.    You mentioned that at some point you requested a

9     helicopter?

11:01AM 10          A.    Yes.

11          Q.    When did you do that in the chronology,

12     approximately?  Was it at the beginning or halfway through --

13          A.    Oh, it was probably halfway through it was

14     requested.

11:01AM 15          Q.    And at some point, did you become aware the

16     helicopter responded to your request?

17          A.    I was advised over the radio that they were

18     en route, so yes.

19          Q.    Have you ever looked at some video taken by the

11:01AM 20     helicopter immediately after the shooting?

21          A.    Yes.  I believe I did.

22          Q.    Did you ever ask whether the helicopter caught the

23     actual shooting, just seconds before?

24          A.    I did not.

11:01AM 25          Q.    So the command post, if I'm understanding you

1    correctly, you were spending some time there, approximately

2    15 minutes or so at some point?

3         A.    Yes.

4         Q.    And I think you said that was up to 200 yards away

11:02AM  5    from where the yard was?

6         A.    Yes.

7         Q.    And I know they had the NFL draft recently, but 200

8    yards would be two football fields?

9         A.    Yes.

11:02AM  10        Q.    And when you were at the command post, who else was

11   there with you?

12        A.    Other sergeants -- at least one other sergeant.

13   There was -- I believe my lieutenant had shown up.  And I

14   believe the Special Enforcement Division commander had arrived

11:03AM  15   just -- right before the shooting took place -- or before

16   Anthony came out of the residence.  And I believe fire was --

17   was there and -- I don't know if anyone else.

18        Q.    Who was your lieutenant?

19        A.    My lieutenant was Lieutenant Doug Hubbard.

11:03AM  20        Q.    Okay.  He arrived at some point?

21        A.    Yes.

22        Q.    You had some conversations with him at the command

23   post?

24        A.    Yes.

11:03AM  25        Q.    And did you say the commander of SED had arrived?

1       A.    Yes.

2       Q.    And is SED kind of the County's equivalent to SWAT?

3       A.    Yes, sir.

4       Q.    And who was that person?

11:03AM 5       A.    It is Captain -- it was Kevin -- Captain

6    Kevin Ferber.

7       Q.    And you're saying that you had some conversations

8    with him as well?

9       A.    I don't know that I had any conversations with him

11:04AM 10   prior to Anthony coming outside.  I think he was getting there

11   right as I -- right as Anthony came out.

12      Q.    Do you know if there was any request made for a K9

13   to respond?

14      A.    Yes.  I believe Captain Ferber requested the K9.  I

11:04AM 15   don't -- I believe it might have been on his way to the scene,

16   but I don't know that for sure.

17      Q.    And does the County have a special unit that deals

18   with mental health crises that can sometimes respond?

19      A.    We do have a Crisis Intervention Team, and those are

11:04AM 20   deputies that are trained and deployed as deputy sheriffs on

21   a -- just regular patrol deputies that -- that have that

22   training.

23      Q.    Do you know what the name of that team is?  Is it

24   just exactly what you said, the Crisis Intervention Team?

11:05AM 25      A.    Well, the Crisis Intervention Team is multiple, you

```
 1        A.    Yes.

 2        Q.    And that obviously takes into account everyone's

 3   safety?

 4        A.    Correct.

 5        Q.    Including the safety of the individual, in this case

 6   Anthony?

 7        A.    Certainly.

 8        Q.    And the hope is to take someone into custody with no

 9   force, if possible?

10        A.    Absolutely.

11        Q.    And the minimal amount of force, if you can?

12        A.    Yes.

13        Q.    And then I think your belt recorder -- when did you

14   turn it on, approximately, in the chronology of the events?

15        A.    Probably upon my arrival to the scene.  And -- and

16   it -- as far as I know, it recorded most of the time.  I might

17   have paused it here and there, but that doesn't normally

18   happen.

19        Q.    To the best of your knowledge, it was running

20   continuously?

21        A.    Yes.

22        Q.    Now, I know you said you reviewed it prior to giving

23   your interview on April 20th?

24        A.    Yes.

25        Q.    Have you reviewed it at any time since then?
```

11:06AM (line 5)
11:07AM (line 10)
11:07AM (line 15)
11:07AM (line 20)
11:08AM (line 25)

```
 1          A.    Yes.

 2          Q.    When was the last time you reviewed it?

 3          A.    I'll say within the week.  I don't recall the date

 4     but within the week.

 5          Q.    That's okay.

 6                Within the last week or so?

 7          A.    Yes.

 8          Q.    So -- and then you were asked how many different law

 9     enforcement officers arrived.  And I think -- did you say SED

10     had 10 to 20 officers themselves, or did I mishear you?

11          A.    No.  They would normally come with 10 to 20.  I

12     don't think all of them were there by the time the -- Anthony

13     came outside.

14          Q.    And other than the SED, what would be your estimate

15     again of the other deputies or officers there?

16          A.    Approximately 20 to 25 of -- of everyone there.

17          Q.    Everyone combined.

18          A.    Yes.

19          Q.    So 20 or 25 officers were in the area, either at the

20     house or near the command post?

21          A.    Yes.

22          Q.    So I take it the goal was to get him to come

23     outside?

24          A.    Yes, without the chain.

25          Q.    Without the chain?
```

11:08AM (line 5)
11:08AM (line 10)
11:08AM (line 15)
11:09AM (line 20)
11:09AM (line 25)

**UNITED STATES DISTRICT COURT**

```
 1        A.    Yes.

 2        Q.    And were you at the command post at that point?

 3        A.    Yes.

 4        Q.    Which would be couple of football fields away,

 5  approximately?

 6        A.    Yes.

 7        Q.    Do you recall if you were talking to anyone when you

 8  heard the dispatch that Anthony had come outside with the

 9  chain?

10        A.    I certainly was talking to somebody.  But who, I'm

11  not exactly sure.

12        Q.    Talking to someone at the command post?

13        A.    Yes.  I wasn't just standing around, I can say that.

14        Q.    Okay.  I'm not saying you were.

15        A.    No, I know.  I just want to make that clear.  I

16  don't know who it was but --

17        Q.    All right.  You were at the command post talking to

18  someone and then you heard information over the radio that

19  Anthony had come outside?

20        A.    Yes.

21        Q.    And then you started walking in that direction?

22        A.    Correct.

23        Q.    Now, I want to ask you a little bit about the less

24  lethal that you heard or didn't hear as you were walking.

25        A.    Okay.
```

1    Q.    Do you understand the topic I'm -- I want to talk to

2    you about?

3    A.    Sure.

4    Q.    So, first of all, did you have -- hear anything

11:13AM 5    regarding any attempt to use the bean bag shotgun initially?

6    A.    Not that I'm aware of.

7    Q.    Did you hear anything as you were starting to walk

8    that sounded like a bean bag shotgun being deployed?

9    A.    It sounded to me like the 40 millimeter.

11:13AM 10    Q.    What you heard, you believe, was the 40?

11    A.    Correct.

12    Q.    And did they have slightly different sounds, based

13    in your experience, the bean bag shotgun versus the

14    40 millimeter?

11:13AM 15    A.    Yes.

16    Q.    And it sounds like you could hear the 40 millimeter,

17    you're saying, but you could not actually see Anthony at the

18    time he was struck.  Is that a fair statement?

19    A.    Yes.

11:14AM 20    Q.    And do you know on your belt recorder that you

21    listened to sometime in the last week, whether you can hear the

22    40 millimeter sounds on your belt recorder?

23    A.    I don't recall hearing it on my belt recorder.

24    Q.    Do you think it was because you were too far away at

11:14AM 25    the time?

1    A.    I believe I might have paused it when I was at the

2   command post.  So I don't know that it was recording when I

3   went back up to the instant location.

4    Q.    Okay.  So how about a Taser?  Did you hear any Taser

11:15AM  5   being deployed as you were walking?

6    A.    I don't recall hearing the Taser being deployed.  I

7   just recall hearing that the Taser was deployed.  Whether it

8   was a broadcast or if I overheard while walking up towards the

9   location them say "Taser, Taser," I don't recall that.  I just

11:15AM  10   recall hearing it was -- it was deployed.

11    Q.    Heard over the radio dispatch or --

12    A.    I don't recall whether it was over the radio or if I

13   overheard -- I could hear it in the distance.  I don't recall

14   that, though, which one.

11:15AM  15    Q.    Did you see it actually being deployed?

16    A.    No.  I don't believe so.

17    Q.    So would it be correct to say as you were walking

18   there from the command post 200 yards away, after hearing

19   Anthony was outside with the chain, you yourself didn't

11:16AM  20   actually see any less lethal strike him?

21    A.    I saw the bean bag round strike him.

22    Q.    And where did you say he was at that time?  I think

23   you said in front of the gray car.

24    A.    Correct.

11:16AM  25    Q.    I'm going to get back to that in a moment.

1          Was that the first -- was that the first less lethal

2     round you saw strike him, the bean bag round when he was in

3     front of the gray car?

4          A.    Yes.  I believe so.

11:16AM 5          Q.    And did you have an understanding as to who fired

6     that round?

7          A.    Yes.

8          Q.    Who was that?

9          A.    I believe that was Deputy Cervantes.

11:16AM 10          Q.    At any time after the date of this incident, as the

11     supervisor of these officers, did you have a debriefing meeting

12     to go over with them what went well, maybe what could have been

13     done differently or better?

14          A.    I don't -- I don't believe we did.  Um, yeah, I

11:17AM 15     don't believe we did on that one.

16          Q.    You are aware that Deputies Martinez, Campos,

17     Cervantes, and Deberg all gave interviews, as you did, in

18     April?

19          A.    Yes.

11:17AM 20          Q.    And you're also aware that they all gave

21     depositions?

22          A.    Yes.

23          Q.    Are you aware that none of them have you at the cars

24     at the time of the shooting?

11:17AM 25          MR. WESIERSKI:  Objection.  Misstates the evidence.

 1    Misstates the depositions.

 2         Q.    (BY MR. GALIPO)   Do you know one way or the other,

 3    sir, whether any of them have stated in any interview or

 4    deposition that you were there at the time of the shooting at

11:17AM  5    the red car?

 6              MR. WESIERSKI:  Also, no foundation.

 7              THE COURT:  Sustained.

 8         Q.    (BY MR. GALIPO)   I'd like to show Exhibit 1,

 9    page 39, if we could, please.

11:18AM 10              THE COURT:  That's been admitted.

11              MR. GALIPO:  Thank you, Your Honor.

12         Q.    (BY MR. GALIPO)   Are you able to see that on your

13    screen?

14         A.    Yes.

11:18AM 15         Q.    Is this the gray car you were referring to?

16         A.    Yes.

17         Q.    We could also see a portion of the red car?

18         A.    Correct.

19         Q.    And you indicated, I think, both on direct

11:18AM 20    examination and just again that you did see the moment when the

21    bean bag round was fired by Deputy Cervantes; is that correct?

22         A.    Yes.

23         Q.    And you saw that strike Mr. Nuñez?

24         A.    Yes.

11:19AM 25         Q.    And you indicated, I think, twice now that Mr. Nuñez

1    was in front of this gray car when it struck him; is that

2    correct?

3          A.    Yes.

4          Q.    And was he more on the driver's side?  More in the

11:19AM  5    middle?  Where would you say he was when he was struck by the

6    bean bag round?

7          A.    If I remember correctly, he was towards the front

8    driver's side of the vehicle.

9          Q.    Okay.  And did you hear that -- a sound associated

11:19AM  10   with that?

11         A.    Yes.

12                MR. GALIPO:  I'd like to -- I believe Exhibit 1,

13   page 52, is in evidence, Your Honor?

14                THE COURT:  Let me just check.

11:20AM  15               Yes.

16                MR. GALIPO:  Okay.  Can we show that, please?

17   Exhibit 1, page 52.

18         Q.    (BY MR. GALIPO:)  Are you able to see that on your

19   screen?

11:20AM  20        A.    Yes.

21         Q.    And you could see -- we see the rear portions of

22   both the gray car and the red car?

23         A.    Yes.

24         Q.    Can you maybe make an X where you were when you saw

11:20AM  25   Mr. Nuñez being struck by the bean bag round when he was in

UNITED STATES DISTRICT COURT

1    front of the gray car in the front driver's side?

2         A.    I believe I was back here (indicating), roughly.

3         Q.    Behind the red car?

4         A.    Correct.

11:21AM  5    Q.    And you said you could tell that it struck him?

6         A.    Yes.

7         Q.    What did you see that made you believe it struck

8    him?

9         A.    I believe I saw the projectile hit Mr. Nuñez.

11:21AM 10    Q.    Did it kind of bounce off of him in some fashion?

11        A.    Yes.

12        Q.    So to your knowledge at the time, would that have

13   been the first bean bag round that was fired and struck him?

14        A.    Yes.  I believe so.

11:21AM 15    Q.    And up to that point in time, you actually hadn't

16   seen any less lethal actually strike him.  Is that fair?

17        A.    Correct.

18        Q.    And then how much time would you estimate passed

19   from him being in the front of the car -- of the gray car near

11:22AM 20   the driver's side when he was hit by the bean bag round and the

21   time of the first lethal shot?

22        A.    Within seconds.

23        Q.    Okay.  Seconds could be anywhere from 1 to 59.

24   Since you say you were there, can you give us as to how many

11:22AM 25   seconds?

```
 1        A.    Five to 20.

 2        Q.    Five to 20 seconds.

 3              In between him being struck by the bean bag round in

 4   front of the car and the first lethal shot, that would be your

 5   estimate?

 6        A.    Yes.

 7        Q.    In fact, your -- from your perspective, you -- and I

 8   think you said this either in your statement or deposition --

 9   you believe he was momentarily stopped at the time he was

10   struck by the bean bag round; is that correct?

11        A.    I don't recall saying one way or the other, to be

12   honest.

13        Q.    And did you hear anybody say anything before --

14   immediately before the bean bag round was deployed by

15   Deputy Cervantes?

16        A.    I know there was commands being made to drop the

17   chain.  And I also believe -- I'm pretty confident that right

18   before or during the less lethal round, bean bag round was

19   shot, there was the command or preparatory command of "Bean

20   bag, bean bag, bean bag."

21        Q.    Okay.  And that would have been said by

22   Deputy Cervantes?

23        A.    Yes.

24        Q.    And the purpose of that, in part, is to let other

25   officers know that someone's deploying the bean bag?
```

11:22AM (line 5)
11:22AM (line 10)
11:23AM (line 15)
11:23AM (line 20)
11:23AM (line 25)

**UNITED STATES DISTRICT COURT**

1    A.    Correct.

2    Q.    And part of the training on that is that the officer

3    shooting the bean bag wants other officers to know it's a bean

4    bag round, not a deadly round?

11:24AM    5    A.    Correct.

6    Q.    And one of the parts of that training is to avoid

7    contagious fire?

8    A.    Correct.

9    Q.    You don't want a situation where an officer hears a

11:24AM    10    sound go off and they start shooting.  Is that fair?

11    A.    Yes.

12    Q.    Now, in the approximate five to 20 seconds in

13    between the bean bag round and the lethal rounds starting,

14    where did you go to?  Or where were you positioned at the time

11:24AM    15    of the lethal rounds?

16    A.    I was positioned right near the same area, possibly

17    over to the right a little bit where the new X is.

18    Q.    So you would have been in that position, it sounds

19    like, somewhere between five to 20 seconds?

11:24AM    20    A.    Yes.

21    Q.    Did you say anything to anyone to alert your fellow

22    officers you were there?

23    A.    I don't recall.

24    Q.    Did you give any of your fellow officers any

11:25AM    25    directive as to what to do or not do at that point?

**UNITED STATES DISTRICT COURT**

```
 1          A.    Not that I recall.
 2          Q.    And then after the shots were fired, at some point
 3   you said something about a tourniquet?
 4          A.    Yes.
11:25AM  5          Q.    Were you giving any commands or any directives after
 6   the shots were fired?
 7          A.    No.  The deputies were doing their job, starting to
 8   perform medical -- you know, perform help, medical procedures,
 9   if you will, try to get him the assistance he needed.  And
11:26AM 10   we -- I did, I guess, say we needed to get the residence
11   cleared to make sure no one else was in there as well, as the
12   assistance was being already given to Mr. Nuñez.
13          Q.    All right.  So what I'm going to do now is play a --
14   a clip.
11:26AM 15          MR. GALIPO:  I believe it's already in evidence,
16   Your Honor, Exhibit 4A, which is a clip right before the
17   shooting and at the time of the shooting and shortly
18   thereafter.
19          THE COURT:  Yes.  That's already admitted.
11:26AM 20          MR. GALIPO:  Thank you.
21          Q.    (BY MR. GALIPO:)  And so just so you know what we're
22   doing now, Sergeant -- sorry.
23          MR. GALIPO:  Are you -- you're good, Mr. Levine?
24   I'm sorry.
11:27AM 25          Q.    (BY MR. GALIPO:)  Just so we're -- this is from
```

1    Q.    Okay.  And -- well, actually, is a .45 caliber

2  considered a small caliber handgun?

3    A.    I would say -- I think -- I think that gets into --

4  I would say yes.

11:31AM  5    Q.    Okay.  Anyways, it's your understanding that

6  Deputy Martinez had a .45?

7    A.    Yes.

8    Q.    So you're saying, in listening to this, as we all

9  listen together, you can hear the bean bag round and then a

11:31AM  10  couple of handgun rounds almost immediately thereafter?

11    A.    Yes.

12    Q.    So I guess what I'm trying to understand, when you

13  testified to this jury that there were five to 20 seconds

14  between the bean bag round and the lethal rounds, do you still

11:31AM  15  think that's accurate?

16    A.    No.

17    Q.    Would you agree, sir, that the bean bag round and

18  the lethal rounds are almost simultaneous?

19    A.    It sounds to be, yes.

11:31AM  20    Q.    Now, I want to keep playing.  And you tell me if and

21  when you hear your voice saying something.

22              (Audiotape played, not reported.)

23              THE WITNESS:  Some of that is, I believe, me talking

24  about clearing the house.

11:32AM  25    Q.    (BY MR. GALIPO)  Okay.

1    A.    And I think I heard me call Mike's name earlier on.

2    Sorry, I didn't --

3    Q.    That's okay.  I'm going to keep playing.  You tell

4    me if you hear anything else.

11:32AM    5    A.    Okay.  Uh-huh.

6              (Audiotape played, not reported.)

7              THE WITNESS:  I asked for fire -- I'm trying to

8    distinguish voices.  Obviously, there's a lot of different

9    voices going on there.  But I believe I asked for fire in the

11:33AM    10   distance and then gloves possibly.

11             MR. GALIPO:  Okay.  Please continue.

12             (Audiotape played, not reported.)

13             THE WITNESS:  Offering the tourniquet there.

14   Q.    (BY MR. GALIPO:)  All right.  Thank you.

11:33AM    15             (Audiotape played, not reported.)

16             THE WITNESS:  That's me.  That's me.

17   Q.    (BY MR. GALIPO:)  Okay.  Did you hear yourself say

18   anything else during that time frame?

19   A.    Yes.  Letting dispatch know that the subject was not

11:34AM    20   responsive and asking for fire to -- to get in.

21   Q.    Okay.  Now, I next want to play a clip from your

22   belt recorder.  And I think your belt recording is 333.

23             MR. GALIPO:  So we made a -- we just want to play a

24   short clip that we'd like to mark, Your Honor, as 333-A, if

11:34AM    25   that's okay with the Court.

UNITED STATES DISTRICT COURT

```
 1    not long.  At this point, 10 to 15.

 2              THE COURT:  Okay.  So we can have -- I don't know

 3    if --

 4              MR. GALIPO:  Or if you want, I can do everything

 5    else and then do that right after lunch, if you want to.

 6              THE COURT:  I think that's probably better.

 7              MR. GALIPO:  Okay.  I'll do that.  I'll do that.

 8    I'll get back to it.

 9              THE COURT:  Okay.

10              MR. GALIPO:  Thanks.

11              MR. WESIERSKI:  Your Honor, should I start my cross,

12    then, without that portion of it?

13              MR. GALIPO:  No, I'm just going to keep going.  I'm

14    going till lunch.

15              THE COURT:  And if he ends early, we'll just end

16    early for lunch and I'll tell the jury we're only taking an

17    hour.

18              MR. GALIPO:  That's fine.

19              MR. WESIERSKI:  Okay.

20                  (In the presence of the jury:)

21         Q.   (BY MR. GALIPO:)  With respect to your belt

22    recording that you listened to about -- in the last week, do

23    you hear a portion of it, when you listened to it, when you're

24    talking about the tourniquet?

25         A.   I don't recall.
```

1    Q.    You don't recall turning it on or off as you were

2    walking from the command post to the scene --

3    A.    I don't.

4    Q.    -- do you?

11:41AM  5    And you don't recall turning it on or off when you

6    got to the front yard, do you?

7    A.    I don't.

8    Q.    You did -- did you hear your voice, when we listened

9    to Deputy Martinez's body-worn camera, reference the

11:41AM  10   tourniquet?

11   A.    The audio recording?

12   Q.    Yes.

13   A.    I'm sorry.  Yes.

14   Q.    Okay.  You just don't know whether you can hear that

11:41AM  15   on your own body-worn camera or not -- I mean, not body-worn

16   camera, belt recorder?  I'm sorry.

17   A.    Correct.  I don't remember if I had that portion on

18   there or not.

19   Q.    Okay.  Would it be at least correct to say that,

11:42AM  20   when you listened to your body-worn camera -- I mean, strike

21   that.  I keep saying.  Belt recorder.  I apologize.  When you

22   listened to your belt recorder within the last week, you did

23   not hear on your recording that Deputy Cervantes says, "Bean

24   bag, bean bag," or "Less lethal"?

11:42AM  25   A.    I don't recall if that was on there or not.

```
 1        Q.    And --

 2        A.    -- and assess the situation.  Sorry.

 3        Q.    That's okay.

 4              It sounds like your recollection is they got there

 5    fairly shortly after the shooting, civil liabilities?

 6        A.    Yes.

 7        Q.    Now, do you have any information from any source

 8    about the trajectory of the gunshots in Mr. Nuñez's body?  And

 9    you can just answer "yes" or "no" to that.

10        A.    No.

11        Q.    Can we look at Exhibit 1, page 39 again, please?

12              When Mr. Nuñez was at the front of the gray car more

13    on the driver's side when the bean bag round was deployed,

14    which way was he facing?  Was his right side to the front of

15    the Charger?

16        A.    I believe so.

17        Q.    And I think you said you believe you heard three or

18    four shots; is that right?

19        A.    Yes.

20        Q.    And would you agree it sounds like the shots are in

21    fairly rapid succession?

22        A.    Yes.

23        Q.    And I think you indicated in response to counsel's

24    question that you saw Mr. Nuñez taking some steps forward after

25    the shots; is that right?
```

11:44AM  (line 5)
11:44AM  (line 10)
11:45AM  (line 15)
11:46AM  (line 20)
11:46AM  (line 25)

 1          A.    No.  I believe I said he was -- he was still moving

 2   forward.  I don't know that I said he made steps forward.

 3          Q.    Okay.  And then you're saying he fell forward?

 4          A.    He was moving forward at the time.

11:46AM  5          Q.    Did you see him fall to the ground at some point?

 6          A.    Yes.

 7          Q.    How did he end up on the ground?

 8          A.    I don't recall if he was on his stomach or his back.

 9   I don't recall that.

11:46AM  10          Q.    Do you recall which way his head and feet were?

11          A.    Yes.

12          Q.    Which way were they?

13          A.    His head was towards the -- the street and his feet

14   were back towards the house, from what I recall.

11:47AM  15          Q.    And can we look at --

16                MR. GALIPO:  I think Exhibit 1, page 30 is in.

17                THE COURT:  I -- I don't have that listed.

18                MR. GALIPO:  Oh.  I thought it was shown by counsel.

19                No objection, Your Honor.  I'd move to admit.

11:47AM  20                THE COURT:  That will be admitted.

21                   (Exhibit No. 1-30 for identification

22                    and received into evidence.)

23          Q.    (BY MR. GALIPO:)  Are you able to see this on your

24   screen?

11:47AM  25          A.    Yes.

| | | |
|---|---|---|
| | 1 | Q.    And is it your recollection, when Mr. Nuñez ended up |
| | 2 | on the ground initially, he was in the vicinity of this blood |
| | 3 | spot that we see by the red car? |
| | 4 | A.    Yes. |
| 11:47AM | 5 | Q.    And you indicated, I think, you had your gun pointed |
| | 6 | at Mr. Nuñez? |
| | 7 | A.    Yes. |
| | 8 | Q.    How long was your gun pointed at him before he went |
| | 9 | to the ground? |
| 11:48AM | 10 | A.    I don't recall.  Seconds.  Maybe, you know, half a |
| | 11 | minute. |
| | 12 | Q.    Half a minute, meaning 30 seconds? |
| | 13 | A.    Yes. |
| | 14 | Q.    And is it correct that you never fired? |
| 11:48AM | 15 | A.    Correct.  Yes. |
| | 16 | MR. GALIPO:  Other than that other issue, |
| | 17 | Your Honor, I think we could take a break and maybe address |
| | 18 | that right after lunch. |
| | 19 | THE COURT:  Okay.  Thank you. |
| 11:49AM | 20 | Ladies and gentlemen, we're going to take a little |
| | 21 | bit of an earlier lunch.  However, in order for us to finish |
| | 22 | today with testimony, we're going to take an hour lunch.  So |
| | 23 | we'll -- I'll have you all come back here to start at |
| | 24 | 1:00 o'clock. |
| 11:49AM | 25 | Please -- I'll remind you, please do not discuss the |

1  then we'll deal with it, if it's going to be admitted at a

2  later time.

3          MR. WESIERSKI:  Okay.

4                    **REDIRECT EXAMINATION**

01:24PM 5  BY MR. WESIERSKI:

6      Q.    I think counsel's trying to imply that you weren't

7  there at the scene.  When you're at the scene of a shooting, is

8  that something you ever forget?

9      A.    No.

01:24PM 10     Q.    Were you there at the time the lethal force

11  encounter occurred?

12     A.    Yes.

13     Q.    And I think you initially said on my direct that you

14  had paused or stopped your recording.  And then when Mr. Galipo

01:24PM 15  asked you -- it might have got confusing.  Did you at some

16  point stop your recording or pause it?

17     A.    Yes.

18     Q.    When did you do that?

19     A.    Probably throughout the event, but certainly I would

01:25PM 20  have when I was back at the command post.

21     Q.    All right.  When you came from the command post to

22  the scene of this incident, at that point were you recording

23  that part of your walk?

24     A.    It would depend but possibly not.

01:25PM 25     Q.    Okay.  And when you came to the scene of the

1  shooting, at that point, if you had pushed "PAUSE" on your

2  recording and then after the shooting occurred pushed "PAUSE"

3  again, would it unpause and then continue on as if it had been

4  recording the whole time?

01:25PM  5      A.    Yes.  It would look like it had been recording the

6  whole time with -- it doesn't start a new file when it's

7  pressed "PAUSE" -- when "PAUSE" is pressed.

8      Q.    And at the time that this incident occurred, when

9  the Taser was used and when the less lethal bean bag was used,

01:25PM  10  you saw the bean bag being used and deployed?

11      A.    Yes.

12      Q.    And you saw where it hit -- or did you see where it

13  hit Mr. Nuñez?

14      A.    Yes.  I believe so.

01:26PM  15      Q.    You said where?  Where did it --

16      A.    I believe it hit his upper torso.

17      Q.    And do you know which side?

18      A.    I believe it was his right side.

19      Q.    If -- and we've seen plenty of photos and I can put

01:26PM  20  one up if you need it.  If Mr. Martinez -- excuse me.  If

21  Mr. Nuñez had wanted to proceed back into the house, was there

22  enough room for him to do that between the car and the house?

23          Let me do it a different way.  Let me introduce the

24  video, if we could.  And I'll stop the video, which I think is

01:26PM  25  341.

**UNITED STATES DISTRICT COURT**

```
 1          A.    Mr. -- oh, "Mr. Nuñez," Andrew or --

 2          Q.    Andrew Nuñez.  Thank you.

 3          A.    No.  Yes, there was a screen in between us.

 4          Q.    All right.  And when you talked to Mr. Andrew Nuñez,

 5    I think you said you might have talked to him again at the car

 6    when you drew that diagram?

 7          A.    Yes.

 8          Q.    Were you examining him at that point for any

 9    injuries?

10          A.    Yes.  Just by talking to him.

11          Q.    All right.  Did you see anything at that point?

12          A.    No.

13          Q.    You were asked about meetings that you might have

14    had with either -- any of the other deputies or -- or anybody

15    else.  Did you change in any way what your recall is of the

16    event because of any of these meetings?

17          A.    No.

18          Q.    Did you -- did you agree to lie in any way about

19    what happened out there that day?

20          A.    No.

21          Q.    Would you do that?

22          A.    No.

23          Q.    Did you, because of these meetings, change in any

24    way what you had specifically told people about what happened?

25          A.    No.
```

**UNITED STATES DISTRICT COURT**

```
          1    that you had developed in trying to make sure that people were

          2    out of the house?

          3        A.    Yes.

          4        Q.    Did you mention in that interview the tactical plan

01:32PM   5    that you had explored about whether to enter the house or not?

          6        A.    Yes.

          7        Q.    Did you mention in the interview that you had called

          8    in the various people that you talked about here today -- the

          9    negotiator, the SWAT, and all the other individuals?

01:33PM  10        A.    Yes.

         11        Q.    And did you change what you said in the interview at

         12    any point because somebody had suggested that you do so?

         13        A.    No.

         14        Q.    Did you change what you said here in court at some

01:33PM  15    point in any way because somebody had suggested that you do so?

         16        A.    No.

         17            MR. WESIERSKI:  Thank you, sir.  Thank you for

         18    coming today.

         19            THE COURT:  Thank you.

01:33PM  20            On behalf of plaintiff?

         21                      RECROSS-EXAMINATION

         22    BY MR. GALIPO:

         23        Q.    Did you meet with anyone over lunch regarding the

         24    case?

01:33PM  25            MR. WESIERSKI:  I'm going to object.
```

1      Attorney-client.

2                  MR. GALIPO:  I'll withdraw the question.

3                  THE COURT:  Okay.  Withdrawn.

4                  Is that it?

01:33PM  5          MR. GALIPO:  Yes, Your Honor.

6                  THE COURT:  Anything further?

7                  MR. WESIERSKI:  No, Your Honor.

8                  THE COURT:  Okay, sir.  You can step down.

9                  THE WITNESS:  Thank you.

01:34PM 10         Do you want this to stay here?

11                 THE COURT:  Yes.  It can stay there.

12                   (Testimony of Corey LaFever

13                    concluded at 1:34 PM.)

14                         *  *  *  *  *

15                   (Proceedings continued.)

16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

**CERTIFICATE OF OFFICIAL REPORTER**

COUNTY OF LOS ANGELES   )
                        )
STATE OF CALIFORNIA     )


          I, MYRA L. PONCE, FEDERAL OFFICIAL REALTIME COURT

REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE

CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT

TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING

IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY

REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT

THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE

REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.




          DATED THIS 13TH DAY OF MAY, 2025.




          /S/ MYRA L. PONCE
          _____
          MYRA L. PONCE, CSR NO. 11544, CRR, RDR
          FEDERAL OFFICIAL COURT REPORTER