# Exhibit 13

1        UNITED STATES DISTRICT COURT

2     CENTRAL DISTRICT OF CALIFORNIA - EASTERN DIVISION

3       HONORABLE SUNSHINE S. SYKES, U.S. DISTRICT JUDGE

4

5  ROSA NUÑEZ, et al.,                    )
                                          )
6                    Plaintiffs,          )
                                          )
7      v.                                 )         Case No.
                                          )  ED CV 22-1934 SSS (SPx)
8  COUNTY OF SAN BERNARDINO, et al.,      )
                                          )
9                    Defendants.          )
   _____)

10

11     REPORTER'S PARTIAL TRANSCRIPT OF TRIAL PROCEEDINGS
                 TESTIMONY OF SCOTT DEFOE
12            WEDNESDAY, APRIL 23, 2025
                      1:39 PM
13             RIVERSIDE, CALIFORNIA

14

15

16

17

18

19

20

21

22  _____

23    MYRA L. PONCE, CSR NO. 11544, CRR, RPR, RMR, RDR
              FEDERAL OFFICIAL COURT REPORTER
24            350 WEST 1ST STREET, ROOM 4455
              LOS ANGELES, CALIFORNIA  90012
25                   (213) 894-2305

```
 1    be and/or experiencing a mental crisis.

 2         Q.    Okay.  Is there a saying in police training that

 3    cover plus distance equals time?

 4         A.    Yes.

 5         Q.    What does that mean, essentially?

 6         A.    Well, if I -- from a distance, if I'm really close

 7    to this woman here, it really limits what my options are

 8    because we're so close.  But if I'm 25 feet back, once again, I

 9    can give commands.  If she's not responsive to my commands, I

10    then can use other less-than-lethal force options from further

11    out.  She decides to charge at me, I can utilize a bean bag

12    shotgun or a long-range impact device, such as the

13    40 millimeter.  I can use the Taser if she's charging at me.

14    She gets close, between 15 feet, I could use OC spray outdoors,

15    no cross contamination issues, to stop if she's a threat.

16              When I'm up close like this and if she has

17    something, maybe a chain, it limits what I can do and it puts

18    me in a poor tactical position.  So I don't want to stand next

19    to someone with a chain.  I want to stand back and use an

20    outdoor voice and let her know by de-escalating what I want her

21    to do.  If she complies, great.  If she doesn't, whatever her

22    level of resistance is, I'm going to apply a tactic or use of

23    force based on her response.

24         Q.    Okay.  And then I -- was it important to you -- you

25    mentioned that you noted that Anthony Nuñez did not charge or
```

02:00PM (line 5)
02:00PM (line 10)
02:01PM (line 15)
02:01PM (line 20)
02:01PM (line 25)

|          |    |                                                        |
|----------|----|--------------------------------------------------------|
|          | 1  | A.    No.                                              |
|          | 2  | Q.    I want to ask you now about the principles that  |
|          | 3  | apply to the use of deadly force, what the training is, what |
|          | 4  | the POST standards are.                                |
| 02:12PM  | 5  | First of all, deadly force, I take it, is the          |
|          | 6  | highest level of force an officer can use?             |
|          | 7  | A.    That's correct.                                  |
|          | 8  | Q.    And is the expectation on training, if you shoot |
|          | 9  | someone in their upper body, it's likely to cause death or |
| 02:12PM  | 10 | great bodily injury?                                   |
|          | 11 | A.    Correct.                                         |
|          | 12 | Q.    Is reverence for human life associated with the  |
|          | 13 | training on deadly force?                              |
|          | 14 | A.    It's associated with Learning Domain Number 20 from |
| 02:12PM  | 15 | POST.                                                  |
|          | 16 | Q.    And how does that relate -- can you explain to the |
|          | 17 | jury on the concept of when you should or shouldn't use deadly |
|          | 18 | force?                                                 |
|          | 19 | A.    Only when there's an imminent threat of great bodily |
| 02:12PM  | 20 | injury or death for you or someone else.               |
|          | 21 | Q.    LAPD had an acronym IDOL, I-D-O-L?               |
|          | 22 | A.    Correct.                                         |
|          | 23 | Q.    What did it stand for?                           |
|          | 24 | A.    Immediate defense of life.                       |
| 02:13PM  | 25 | Q.    Is that essentially when an officer under the    |

1    circumstances, such as we have in this case, can use deadly

2    force, when there is an immediate threat to life?

3        A.    Immediate or imminent threat, they're both almost

4    synonymous.  That a reasonable officer would believe, based on

02:13PM    5    the totality of the circumstances, that the subject's actions

6    are likely to cause great bodily injury or death.

7        Q.    Okay.  And if there is not an imminent or immediate

8    threat of death or serious bodily injury, is the training that

9    an officer should not use deadly force?

02:13PM    10        A.    Correct.  Because the subject's resistance has not

11    risen to life-threatening.

12        Q.    Well, let me ask you about that.  Does POST -- I

13    take it -- you mentioned Learning Domain 20.  Is that like a

14    chapter in POST?

02:13PM    15        A.    A POST -- all -- all officers, LAPD, San Bernardino

16    County, Huntington Beach, wherever it may be, go through a POST

17    certified academy.  POST is Peace Officers Standards and

18    Training.  They're housed out of Sacramento.  They're

19    responsible for the licensing, training, and certification,

02:14PM    20    both -- from the academy level, all the way through your

21    career.  And you get certificates based on benchmarks that you

22    reach in your career.

23            The training is based on 43 learning domains.  Those

24    range from use of force, which is Number 20, people with

02:14PM    25    disabilities, Number 37, might be vehicle operations for

1    pursuit driving.  We're all taught the same training in a POST

2    certified academy.  And then throughout our career, we're

3    taught perishable skills -- use of force obviously being one of

4    the most important.  That's done through the curriculum

02:14PM    5    quarterly, semi-annually, and annually through most

6    departments.

7         Q.    Does the language from POST Learning Domain 20

8    define "imminent threat of death or serious bodily injury" as

9    someone having the present ability, opportunity, and apparent

02:15PM    10   intent to immediately cause death or serious bodily injury?

11        A.    Correct.

12        Q.    So you need all three of those?

13        A.    You do.

14        Q.    How about the fear of future harm?  What does it say

02:15PM    15   about that?

16        A.    It's -- fear has to be reasonably objective based on

17   the totality of the circumstances.  And that fear has to be

18   correlated to actions that are occurring at that time.

19   Something that may occur at a later time does not factor in

02:15PM    20   when I can use lethal force.  It's only at that time that you

21   present an imminent threat of great bodily injury or death to

22   me or someone else is when I can deploy lethal force.

23        Q.    How about the concept of subjective fear, whether --

24   what if an officer says, "I was in fear of my life.  I wanted

02:15PM    25   to go home to my family," is that the end of the analysis?

1     A.     No.  It states specifically that subjective fear is

2 insufficient.  The fear has to be reasonably objective based on

3 the totality of the circumstances.

4     Q.     Are officers trained, essentially, that deadly force

02:16PM  5 should only be used if you not only have this immediate threat

6 of death or serious bodily injury but, also, if there are no

7 other reasonable options?

8     A.     Correct.

9     Q.     Did you look in this case to see under the facts

02:16PM 10 given by different officers whether there was an immediate

11 threat of death or serious bodily injury?  Is that one of the

12 things you looked at?

13     A.     I did.

14     Q.     Did you also look at whether there were other

02:16PM 15 reasonable options?

16     A.     Yes.

17     Q.     How about warning?  What does the training say

18 regarding giving a verbal warning before using deadly force?

19     A.     Warning when feasible and a reasonable opportunity

02:16PM 20 to comply.  A warning is not a command, which is get on the

21 ground, don't move.  Those are comments.

22         Get on the ground or I'm going to tase you is a

23 warning because I'm giving you something to do and I'm telling

24 you what I need you to do and that I need to give you a

02:17PM 25 reasonable opportunity to comply.  I want you to get on the

1    ground, I've got to give you the time to get on the ground.   I

2    can't just use force preceding that.

3         Q.    Weapons in hand.   Let's say someone has a gun in

4    their hand, for example.   Is that fact -- based on the

02:17PM   5    training, that fact alone enough to use deadly force?

6         A.    No.

7         Q.    How about a knife?

8         A.    No.

9         Q.    How about a dog leash chain?

02:17PM  10         A.    No.

11         Q.    Now, the POST learning domain has categories of

12    suspects' behavior and tells you what type of force you can

13    use?

14         A.    It does.

02:17PM  15         Q.    Can you explain that to the jury, please?

16         A.    First is compliance.   I ask this woman to stand over

17    here and she complies and stands over there, no force needed.

18              Second level is passive noncompliance.   Maybe she's

19    protesting for whatever her cause is, sitting in the middle of

02:17PM  20    the street and I ask her to move and she won't move but she's

21    not offering any form of physical resistance.   I can pick her

22    up and move her out of the street if I need to do that, if I'm

23    going to take her into custody or clear the roadway.

24              The third is active resistance.   I come up to her, I

02:18PM  25    pull her over in her car, she gets out and she runs.   Or I come

1    up to her and I ask to take her into custody and she braces

2    against this board, that's bracing.  So tensing, bracing or

3    running away is considered active resistance by POST.  And then

4    there are certain force options I can use within the active

02:18PM    5    resistance realm that would be reasonable.

6                    The next level is assaultive behavior.  Doesn't mean

7    I need to get punched or kicked from this woman.  But if she

8    puts her hands up and wants to fight me, pre-assaultive

9    behavior, I can then use other force options to either -- if I

02:18PM    10    reasonably believe she's going to assault me or, in fact, she

11    is assaulting me.

12                    And the last is life-threatening.  That's when

13    there's an imminent threat of great bodily injury or death.

14    Her actions rose to the level where I reasonably believe that

02:18PM    15    my life or someone else's life is in danger.  And only at that

16    time can I use lethal force to stop what would be a deadly

17    threat.

18         Q.    So resistive behavior would not be enough?

19         A.    Correct.

02:19PM    20         Q.    And assaultive behavior even would not be enough?

21         A.    Correct.

22         Q.    So going back now to the time frame that he's in

23    front of the car.  I'm going to give you a few different

24    hypotheticals based on testimony that -- that I believe the

02:19PM    25    jury has heard.

**UNITED STATES DISTRICT COURT**

|  |  |  |
|---|---|---|
| 1 |  | Let's assume that Officer Martinez, from his |

1          Let's assume that Officer Martinez, from his

2 perspective, at the time that the shots are fired, he's towards

3 the back of the car and Mr. Nuñez is towards the front of the

4 car.

02:19PM  5          Are you with me so far?

6     A.    Yes.

7     Q.    And further assume that Officer Martinez estimates

8 the distance between himself and Mr. Nuñez at the time of the

9 first shot to be 20 feet.

02:19PM  10          Are you still with me?

11     A.    Yes.

12     Q.    And further assume that, according to

13 Officer Martinez, at the time of the first shot and even within

14 five seconds of the first shot, he did not observe Mr. Nuñez

02:20PM  15 swinging the chain.

16          Are you still with me?

17     A.    Yes.

18     Q.    And additionally, assume that Officer Martinez has

19 the Taser on him, has room to tactically reposition, either

02:20PM  20 move to the side or back up, and just prior to him shooting, he

21 hears Deputy Cervantes who's to his left say "less lethal."

22          Are you with me in my hypothetical?

23     A.    I am.

24     Q.    Under those facts -- that's Officer Martinez's

02:20PM  25 hypothetical, I'll call it -- would it be appropriate to -- and

**UNITED STATES DISTRICT COURT**

1    further assume he gave no warning that he was going to shoot.

2    Would it be appropriate to use deadly force?

3                MR. WESIERSKI:  Excuse me.  Objection.  Misstates

4    the evidence.  Incomplete hypothetical.

02:21PM  5                THE COURT:  Okay.  I'll overrule the objection.

6                You can answer.

7                THE WITNESS:  It would be inappropriate to use

8    lethal force.

9          Q.    (BY MR. GALIPO:)  Can you explain to the jury why?

02:21PM 10          A.    There's no immediate threat of great bodily injury

11   or death.  Based on the testimony, he doesn't have the chain up

12   in a threatening manner.  He's not swinging the chain.  At that

13   point, he's in an area.

14               In addition to that, less lethal was just deployed,

02:21PM 15   which means Deputy Cervantes was able to figure out how that

16   bean bag shotgun worked and fired a round at that -- from that

17   point, which means you want to use less-than-lethal force and,

18   once again, to see if the force works.

19               And with that Remington 870 shotgun, if the first

02:21PM 20   round is not effective, you have four additional rounds within

21   that weapon system to continue to fire, which gives you another

22   opportunity to continue using that in the event that the first

23   round is ineffective in putting Mr. Nuñez onto the ground.

24               The fact -- once again, officers are trained -- the

02:22PM 25   reason why Deputy Cervantes, based on her training, said "less

1   lethal" is she's letting the other officers know that she

2   reasonably believes at that time it's a less-than-lethal force

3   option she's going to deploy.  She didn't -- did not transition

4   to her firearm.  She deployed a less-than-lethal force option

02:22PM   5   because the force did not rise where there's an imminent threat

6   of great bodily injury at the time in which she deployed the

7   bean bag shotgun.

8        Q.    How about if, given those -- that hypothetical but

9   Officer -- or Deputy Martinez says, "Well, I was afraid he was

02:22PM   10   charging at me and I thought he could kill me and I was afraid

11   for my life," does that change your opinion?

12        A.    No.

13        Q.    Why not?

14        A.    For one, the question of Deputy Martinez standing

02:23PM   15   where he was is a poor tactical decision.  Simply move back,

16   move adjacent to the cars there, create some cover.  Because

17   from the distance of 20 feet, at that point he doesn't really

18   have anything he can use on his person from 20 feet that would

19   be effective.

02:23PM   20        Pull back, create some distance.  He knows, once

21   again -- hopefully that was conveyed, and I was critical of the

22   plan -- that both Deputy Deberg has a 40 millimeter.  He knows

23   that Deputy Cervantes has a Remington 870 bean bag shotgun.

24   There's no reason for him to stand there.  Tactically retreat.

02:23PM   25   Pull back, create some time and distance, and let the person

UNITED STATES DISTRICT COURT

1    who has the weapon system, that being Deputy Cervantes, use it

2    and then hopefully to take Mr. Nuñez into custody.

3         Q.    Looking at Exhibit 1, page 51, do you believe -- if

4    Deputy Martinez was standing towards the rear of either one of

02:24PM  5    those vehicles and let's say -- I think he testified he was a

6    foot or two from the red car, was there room to tactically

7    reposition?

8         A.    Clearly back up.  You can move lateral to the

9    passenger's side of the red car or the driver's side of the

02:24PM  10   Dodge and use that as a cover or barrier between him and Mr. --

11   Mr. Nuñez at that time, but preferably just back away.

12              He's got a chain wrapped in his hand.  At that

13   point, he's testified -- that being Deputy Martinez -- that

14   he's not swinging the chain at him, advancing him while

02:24PM  15   swinging the chain.  So just back up and allow those with

16   less-than-lethal force options to deal with the

17   less-than-lethal force situation.

18        Q.    And under the -- the concept that you talked about,

19   no other reasonable options, is this tactical repositioning one

02:24PM  20   of the considerations for other reasonable options?

21        A.    Yes, tactical repositioning or tactical retreat.

22   They're both synonymous.

23        Q.    And giving the less lethal a chance to see if it

24   works?

02:25PM  25        A.    Clearly, yes.

         1          Q.      Now, given Officer Martinez -- the hypo I gave you,

         2   did it play into your assessment as an expert that, during the

         3   time Anthony was in the house, he didn't try to attack the

         4   officers, he ran away from them when he came out and, when he

02:25PM  5   ran back towards the front of the vehicle, again he didn't run

         6   towards the officers?

         7          A.      Correct.  He was running in a northerly direction

         8   from that point across the vehicles, not towards the officers.

         9          Q.      Now, I want to go back to -- I want you to assume

02:25PM  10  that Deputy Cervantes -- from her viewpoint, she fired her bean

         11  bag round after saying "less lethal" when Anthony was in front

         12  of the car and had not started advancing yet.

         13          Are you with me?

         14          A.      Yes.

02:26PM  15          Q.      At that moment, if he had not started advancing and

         16  was in front of the car, would lethal force be appropriate?

         17          A.      No.

         18          Q.      Why not?

         19          A.      There's no imminent threat of great bodily injury or

02:26PM  20  death.

         21          Q.      Well, is there a difference in the training between

         22  a potential threat and an imminent threat of death or serious

         23  bodily injury?

         24          A.      It has to be an imminent threat of serious bodily or

02:26PM  25  great bodily injury or death.

1          Q.    Isn't a potential threat enough?

2          A.    No.

3          Q.    So when you listen to the audio of the timing of the

4    bean bag shot to the gunshots, what was your impression when

02:26PM    5    you listened to it as to the timing?

6          A.    Simultaneous.

7          Q.    And so if Deputy Cervantes testified that Anthony

8    was in front of the car and had not started advancing yet at

9    the time she fired her less lethal, what did that tell you

02:26PM    10    about what was happening when Deputy Martinez fired his lethal

11    shots?

12          A.    Can you repeat that?

13          Q.    Sure.

14                If Deputy Cervantes said that he had not started

02:27PM    15    advancing and was in front of the car when she fired her less

16    lethal, what information did it give you about what Anthony was

17    doing at the time Martinez fired his lethal shots?

18          A.    He was doing exactly what she said he was doing, he

19    wasn't advancing, he was in a northerly position.  And it

02:27PM    20    coincided -- once again, not offering medical opinions -- that

21    the Remington 870 round struck him in the right shoulder, which

22    puts him in a northerly direction along the front of the cars.

23          Q.    And so with respect to the northerly direction, if

24    he was faced in a northerly direction, his right side would be

02:27PM    25    to the vehicle and to the opening between the vehicles; is that

1  right?

2       A.    Correct.  Not his torso, his right side, right

3  shoulder area.

4       Q.    And did you review Deputy Campos's deposition?

02:27PM  5       A.    Yes.

6       Q.    And did you review when Deputy Campos said for the

7  first two shots, Anthony was facing north with his right side

8  to the deputies who were in the back of the car?

9       A.    Yes.

02:28PM  10      Q.    Assuming it happened like that, would the use of

11  deadly force be appropriate?

12      A.    No.

13      Q.    Now, is it your understanding that, by the time of

14  the third shot, Anthony had turned in the direction between the

02:28PM  15  two cars and there was a third shot to his abdomen area?

16      A.    Yes.  I'm familiar with that.

17      Q.    Okay.  And in reading the testimony and the

18  statements, did you see where multiple officers had Anthony

19  taking a few steps forward after his third shot before falling

02:28PM  20  forward to the ground?

21      A.    Correct.

22      Q.    Did you also note, in reviewing Officer -- or

23  Deputy Martinez's deposition, that he indicated that this

24  advancing that he's talking about was a couple of feet?

02:29PM  25      A.    Yes.

```
 1          Q.    And maybe one step?

 2          A.    Yes.

 3          Q.    In your opinion, from 20 feet away where the car is

 4    cover, is that enough to -- to shoot and kill someone?

 5          A.    No.

 6          Q.    Why not?

 7          A.    It's not an imminent threat of great bodily injury

 8    or death from that distance.

 9                MR. GALIPO:  May I have a moment to look at my

10    notes, Your Honor?

11                THE COURT:  Yes.  Go ahead.

12                     (Pause in the proceedings.)

13          Q.    (BY MR. GALIPO:)  Do sometimes -- and I know you

14    reviewed a lot of officer-involved shooting cases, Mr. DeFoe.

15    But have you seen cases where, in your view, the officer

16    overreacted by using deadly force?

17          A.    Yes.

18          Q.    And in those cases where the officers overreacted,

19    is the training that that is excessive force?

20          A.    It is.

21          Q.    Do you feel -- do you have an opinion in this case

22    as to whether, at a minimum, Deputy Martinez overreacted?

23          A.    I think it was a complete overreaction.

24          Q.    The gun issue that's been brought up a few times --

25    possible gun in the house, learning the gun wasn't in the
```

02:29PM  (line 5)
02:29PM  (line 10)
02:29PM  (line 15)
02:30PM  (line 20)
02:30PM  (line 25)

1    evidence, that Deputy Martinez assessed whether the less-lethal

2    bean bag round was going to have an impact?

3        A.    He did not.

4        Q.    Why do you say that?

03:35PM    5        A.    Because he fired -- fired simultaneously.

6        Q.    And counsel kept giving you hypotheticals with this

7    chain raised above the ear and charging.  Do you recall those

8    hypotheticals?

9        A.    I do.

03:35PM    10        Q.    And then he said something to the effect, Are you

11    saying that you think there's evidence to -- to support he

12    wasn't charging at Deputy Martinez?  Do you remember that

13    question?

14        A.    Yes.

03:35PM    15        Q.    And so I want to talk to you a little bit about

16    that.

17            And by the way, before he got to the front of the

18    car, counsel asked you, Is there any evidence that the

19    40 millimeter rounds were having any effect on him?  Do you

03:35PM    20    recall that?

21        A.    Yes.

22        Q.    Did you hear him in the audio say "ah" twice?

23        A.    Yes.

24        Q.    Did you hear him say "Jesus, get away"?

03:35PM    25        A.    Yes.

1      Q.    How so?

2      A.    Because there's evidence where the rounds struck

3  based on his position in front of the car.

4      Q.    So if he's facing north, as Campos states he was,

03:41PM  5  when he was shot, the first two shots, and the officers are to

6  the east, how would that be evidence that he was charging?

7      A.    It wouldn't be.

8      Q.    And did you note when even Deberg said in his

9  deposition -- or statement he was in front of the vehicle when

03:41PM  10  he got shot?

11      A.    I believe so, yes.

12      Q.    And the officers are in the back of the vehicle?

13      A.    They are.

14      Q.    Now, you also said that there was evidence, after

03:41PM  15  the first two shots, he turned in the direction between the two

16  cars, took -- took a step forward, got shot, and then took one

17  or two steps forward after he was shot and fell down; correct?

18      A.    Yes.

19      Q.    And is that your understanding how he ended up in

03:41PM  20  the position he did?

21      A.    Yes.

22      Q.    So was that some of the evidence you considered in

23  this case in looking at whether he was charging or not?

24      A.    Yes, sir.

03:42PM  25      Q.    Based on everything you reviewed, Mr. DeFoe, in this

1    case, including the statements and testimony of the officers,

2    do you think there was an imminent or immediate threat of death

3    or serious bodily injury posed at the time the shots started?

4         A.    To no -- not to Deputy Martinez or any of the

03:42PM  5    officers at the scene.

6         Q.    Do you have an opinion as to whether there were

7    other reasonable options other than shooting and killing

8    Mr. Nuñez?

9         A.    Yes.

03:42PM  10        Q.    What were some of those options?

11        A.    Taser deployments, OC spray, additional bean bag

12   shotgun rounds; if available, 40 millimeter rounds

13   Deputy Deberg had.

14        Q.    And how about tactical repositioning?

03:43PM  15        A.    Yes.

16        Q.    And, finally, it's been said that there was no

17   opportunity for Deputy Martinez to give a verbal warning that

18   he was going to use deadly force.  Do you agree with that?

19        A.    I disagree with that.

03:43PM  20        Q.    Why?

21        A.    Because there was an opportunity.

22             MR. GALIPO:  Thank you.

23             That's all I have, Your Honor.

24             THE COURT:  On behalf of defendants, go ahead.

03:43PM  25             MR. WESIERSKI:  Thank you, Your Honor.

1                    **CERTIFICATE OF OFFICIAL REPORTER**

2

3    COUNTY OF LOS ANGELES    )
                              )
4    STATE OF CALIFORNIA      )

5

6              I, MYRA L. PONCE, FEDERAL OFFICIAL REALTIME COURT

7    REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE

8    CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT

9    TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING

10   IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY

11   REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT

12   THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE

13   REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

14

15

16

17              DATED THIS 26TH DAY OF APRIL, 2025.

18

19

20              /S/ MYRA L. PONCE
                _____
21              MYRA L. PONCE, CSR NO. 11544, CRR, RDR
                FEDERAL OFFICIAL COURT REPORTER
22

23

24

25