Exhibit 15

1            UNITED STATES DISTRICT COURT

2        CENTRAL DISTRICT OF CALIFORNIA - EASTERN DIVISION

3          HONORABLE SUNSHINE S. SYKES, U.S. DISTRICT JUDGE

4

5    ROSA NUÑEZ, et al.,                    )
                                            )
6                      Plaintiffs,          )
                                            )
7        v.                                 )          Case No.
                                            )   ED CV 22-1934 SSS (SPx)
8    COUNTY OF SAN BERNARDINO, et al.,      )
                                            )
9                      Defendants.          )
     _____   )

10

11        REPORTER'S PARTIAL TRANSCRIPT OF TRIAL PROCEEDINGS
             DIRECT EXAMINATION OF SCOTT LUZI, M.D.
12                  THURSDAY, APRIL 24, 2025
                         11:35 AM
13                  RIVERSIDE, CALIFORNIA

14

15

16

17

18

19

20

21

22    _____

23       MYRA L. PONCE, CSR NO. 11544, CRR, RPR, RMR, RDR
              FEDERAL OFFICIAL COURT REPORTER
24            350 WEST 1ST STREET, ROOM 4455
              LOS ANGELES, CALIFORNIA  90012
25                    (213) 894-2305


                    UNITED STATES DISTRICT COURT

```
  1    X-rays of the body?

  2         A.    In this type of autopsy, we would always take X-rays

  3    prior to the -- doing the autopsy.

  4         Q.    Can you explain to the jury, Doctor, what's the

11:41AM  5    reason to do X-rays on someone who's already died?

  6         A.    So in particular, in gunshot wound cases, there may

  7    be projectiles still in the body that we may need to recover

  8    and retain for evidence.  So this -- the X-rays will give us an

  9    idea of where those bullets -- those projectiles are in the

11:41AM 10    body.

 11         Additionally, the X-rays may give us an idea of what

 12    kind of injuries, particularly bony injuries, because X-rays

 13    are best for identifying bony injuries such as fractures.  And

 14    so they can give us an idea of what to expect as -- on that

11:42AM 15    part as well.

 16         Q.    Did you have information as to the age of

 17    Anthony Nuñez?

 18         A.    Yes.

 19         Q.    What was your understanding?

11:42AM 20         A.    He was 42 years old.

 21         Q.    And did you have information or have someone take

 22    measurements as to his height or weight?

 23         A.    Yes.

 24         Q.    Can you tell the jury what his height was, please?

11:42AM 25         A.    So in my notes, I have that he was 71 inches and
```

**UNITED STATES DISTRICT COURT**

1    193 pounds.

2        Q.    And is 71 inches, if I'm doing my math right, 5'11"?

3        A.    Yes.

4        Q.    Clothing.  What clothing, if any, did he come to you

11:42AM  5    with?

6        A.    So, again, I'm going to review my notes, ma'am.

7            THE COURT:  Yes.  That's fine.

8            THE WITNESS:  So he had a pair of shoes, some pants,

9    boxer briefs, a pair of socks, and a red, white, and blue

11:43AM  10   scarf.  It was like a flag, an American flag scarf wrapped

11    around his waist.

12       Q.    (BY MR. GALIPO:)  Was there any evidence of medical

13    intervention?

14       A.    Yes.

11:43AM  15       Q.    And what was that?

16       A.    So there was an oral airway.  So this wasn't -- he

17    wasn't intubated with a tube that goes all the way into the

18    trachea, the air -- your windpipe.  It just -- it just keeps --

19    it's an oral airway to keep the mouth open so oxygen [sic] can

11:43AM  20   breathe, assuming that he's still breathing on his own.

21            Also, there were -- was an intraosseous catheter.

22    So this is a type of catheter that will get fluid into the --

23    into the body.  A lot of times you may have heard of an I.V.

24    catheter.  Well, that's going directly into a vein.  This

11:43AM  25   intraosseous catheter is going directly into bone because it's

the body and move down to -- upper right front of the body and

move down through wounds.  And then -- then we look at the, um,

posterior, the back of the body, and basically move down to the

lower right of the body.

11:46AM

So just because a particular wound was designated A

doesn't mean that it occurred actually before a wound that was

subsequently labeled as B.

Q.    And so there's an expression I've heard sometimes

that the body is in an anatomical position.  Is that sometimes

11:47AM  used in your profession?

A.    Yes.  That anatomical position is something that we

use for reference when we talk about the pathway of a wound,

going front to back, right to left, upward or downward.

So the anatomic position would be an individual

11:47AM  standing on their feet with their arms down at their sides and

their hands, their palms facing forward.  So that is the

general anatomic position.

When I refer in my report to the direction, it will

be in reference to that position.

11:47AM  Q.    So in general, starting with Gunshot Wound A in your

report, that would be the -- the one that was highest up on the

body or closest to the top of the head?

A.    Yes.

Q.    And then the next one, B, as we'll get to in a

11:48AM  moment, would be the next one going down from head to toe?

```
 1          A.    Yes.

 2          Q.    All right.  Let's first talk about Gunshot Wound A.

 3                Can you please tell the jury, Doctor, where that

 4    gunshot wound was located on Mr. Nuñez's body?

11:48AM  5          A.    So that was on the back of his right arm.  So behind

 6    on the back part of his right arm.

 7          Q.    And that was an entrance wound?

 8          A.    Yes.

 9          Q.    And after entering the back of the right arm, where

11:48AM 10    did that bullet go?

11          A.    So it went through the muscle of his arm.  It did

12    not hit the bone in his arm, his humerus.  And it came out --

13    we call that part the axilla.  That's the scientific word for

14    your armpit.  So it came out that part of his arm around his

11:48AM 15    armpit.

16          Q.    So that bullet had an entry and exit in the right

17    arm?

18          A.    Yes.

19          Q.    And with the body in an anatomical position, did

11:49AM 20    that bullet travel -- which direction?

21          A.    So I'm going to refer to my notes, ma'am.

22                THE COURT:  Go ahead.  Yes.

23                THE WITNESS:  So it was directed back to front,

24    right to left, and upward.

11:49AM 25          Q.    (BY MR. GALIPO:)  Okay.  And after exiting the right
```

1    arm, where did that bullet go next?

2        A.    So that looked -- appears to have reentered the body

3    on the medial portion or the chest side of the armpit.

4        Q.    Okay.  So do I -- do I have it correct that it would

11:49AM  5    have entered the outside of the right arm, exited the inside of

6    the right arm, and then reentered the body in the chest?

7        A.    In general, yes.  It was from the back of the right

8    arm.  But, yes, it went to the inside of the right arm and then

9    entered through the chest.

11:50AM  10        Q.    And did -- the shot, I think you already indicated,

11    Doctor, had a right-to-left trajectory?

12        A.    Yes.

13        Q.    And once it entered the -- or reentered the chest,

14    where did the bullet go?  What did it go through?

11:50AM  15        A.    So it went through the -- the right lung, the root

16    of the aorta, and the pulmonary artery.  So those are the

17    largest vessels -- those are vessels coming out of the heart.

18    The aorta supplies blood to the body, whereas the pulmonary

19    artery supplies blood to the lungs so it can get oxygen.  So

11:50AM  20    you have two large arteries having been injured there.  And

21    then it went into the left side of the chest.

22        Q.    So that bullet also traveled right to left --

23        A.    Yes.

24        Q.    -- once it entered the chest?

11:50AM  25        A.    Yes.

1    you give me a hypothetical.

2          Q.    Of course.

3                And is this something you've been asked and called

4    upon to do in courts before?

11:53AM    5          A.    Yes.

6          Q.    And something you have done on numerous occasions?

7          A.    Yes.

8          Q.    Something you feel comfortable doing depending on

9    the facts and the hypothetical, if it's complete or not?

11:53AM    10          A.    Yes.

11          Q.    Okay.  So I'm going to try my hypothetical again and

12    let me know if it makes sense.

13                The -- I'm just talking now about the gunshot wound

14    to the right arm that entered, exited, and reentered the chest.

11:54AM    15    Are you with me?

16          A.    Yes.

17          Q.    First of all, to get the entry wound on the outside

18    of the right arm, would the outside of the right arm have to be

19    exposed to the muzzle of the gun and the bullet?

11:54AM    20          A.    Yes.

21          Q.    And then for it to travel through the arm in --

22    right to left and enter the chest right to left going across

23    the body, is that, in your mind, consistent with the shooter

24    and the decedent being on the same ground plane and the shooter

11:54AM    25    and the decedent's right side being to the shooter at the time

20

1    that shot was sustained, explaining the right-to-left

2    trajectory?

3        A.    So as far as the -- being on the same ground, I

4    don't know what -- are you -- did you say that they were the

11:55AM  5    same size?

6        Q.    Same ground plane.  In other words, they were

7    both -- one wasn't up high and the other down low.  They were

8    on the basic same ground plane.

9        A.    Okay.  So, I mean, yes, that is consistent -- the

11:55AM  10   wound path I documented is consistent with that hypothetical

11   that you presented.

12       Q.    Okay.  Let me give you another hypothetical.  Let's

13   assume that the decedent was directly facing the shooter so the

14   decedent's chest was directly towards the shooter.  Are you

11:55AM  15   with me?

16       A.    Yes.

17       Q.    Assuming that hypothetical, would you expect to get

18   the right-to-left trajectory we have across the body, right to

19   left, as we see in Gunshot Wound A?

11:55AM  20       A.    No.

21       Q.    And I take it the reason that shot was fatal, in

22   part, is because it went through vital organs, as you've

23   described?

24            MR. WESIERSKI:  Objection.  Asked and answered.

11:56AM  25            MR. GALIPO:  I'll re-ask it in a different way.

**UNITED STATES DISTRICT COURT**

1           THE COURT:  Go ahead.

2           MR. GALIPO:  I'll re-ask it.

3       Q.    (BY MR. GALIPO:)  Have you fully explained why that

4    shot was fatal, or are there other factors as well?

5       A.    That is a full explanation of the injuries

6    sustained.

7       Q.    Okay.  Let's talk about Gunshot Wound B as indicated

8    in your report.  Does that relate to the re-entry or something

9    else?

10      A.    B is likely a reentry of Gunshot Wound A.

11      Q.    So you have already explained Gunshot Wound B in

12   your report that, in essence, in your opinion, more likely than

13   not, is the reentry in the chest from the shot that went in and

14   out of the arm?

15      A.    Yes.

16      Q.    Let's go to, please, then, to Gunshot Wound C.  Can

17   you tell the jury where that entered the body?

18      A.    That was on the -- we call it the lateral -- excuse

19   me -- lateral right torso.  So the side of his torso, side of

20   his -- around the chest.  It entered and injured the right

21   lung -- excuse me.  Make sure I'm looking at my notes right.

22   Yes, the right lung, went through the diaphragm to injure the

23   liver.  And it went through a lumbar vertebrae, and then it

24   went back into the left side of the diaphragm.  And that's

25   where we recovered a bullet from.

1          Q.     And I think you've already done this.  But is it

2    possible, Dr. Luzi, to point again to the -- even stand up, if

3    the judge would permit, and point to where on your body that

4    entry wound is?

11:57AM  5          THE COURT:  Do you need to stand?

6          THE WITNESS:  I'm short enough, I think I need to.

7          THE COURT:  Go ahead.  You can stand up.

8          THE WITNESS:  On the side -- lateral right torso,

9    about here (indicating).

11:58AM  10         Q.     (BY MR. GALIPO:)  Okay.  Thank you for that.

11                And what was the trajectory of that bullet in the

12   body?

13         A.     Excuse me.  I'm looking at my notes.

14                Wound path was directed right to left.

11:58AM  15         Q.     And did it pass through the body essentially right

16   to left?

17         A.     Yes.

18         Q.     And so my hypothetical that I -- I gave you with the

19   right side of the decedent to the shooter at the time that shot

11:58AM  20   was sustained, would that also be consistent with Gunshot

21   Wound C because of the entry point on the right side and the

22   right-to-left trajectory across the body?

23         A.     Yes.

24         Q.     And then if I was to ask you the same hypo I did

11:58AM  25   before is that Gunshot Wound C consistent with the decedent

1    facing towards -- directly towards the shooter, what would your

2    answer be?

3         A.    No.

4         Q.    Was that wound fatal or potentially fatal, in your

11:59AM  5    opinion?

6         A.    Potentially fatal.  Again, it hit the right lung,

7    which was hit in the other wound as well, and hit the liver,

8    which was a very vascular organ, meaning that it -- it contains

9    a lot of blood.  So there's potential -- excuse me -- for

11:59AM  10   losing a lot of blood from the liver.

11            I didn't see that there was injury -- excuse me --

12   that there was blood in his abdomen like I did see the blood in

13   the chest.  So it appears that he did not bleed much from his

14   liver.

11:59AM  15        Q.    So most of the bleeding was associated with the shot

16   that you believe went through the right arm and into the right

17   chest?

18        A.    Yes.

19        Q.    And then is there a Gunshot Wound D in your report?

12:00PM  20        A.    Yes.

21        Q.    And where -- what part of the body was that to?

22        A.    So this was on the lower right abdomen.  And this

23   really just hit soft tissues and didn't hit any vital

24   structures.

12:00PM  25        Q.    Okay.  And what was the general -- where did that

1    bullet go through the body?  I hear you're saying it's mostly

2    soft tissue?

3         A.    Yes.  So it hit the abdominal wall, appears to have

4    traced through the abdominal wall.  And we recovered a bullet

12:00PM  5    from the soft tissues, the muscles, the subcutaneous tissues

6    around the left side of his hip.

7         Q.    And what was the trajectory of that bullet in the

8    body?

9         A.    So that was front to back, right to left, and

12:00PM  10    downward.

11         Q.    Okay.  Would that shot, the Gunshot Wound D, Doctor,

12    be consistent with the decedent facing towards the shooter at

13    the time of that shot?

14         A.    It's not as perfect as -- I'm -- "perfect" is not

12:01PM  15    the right word to use.  But it's not as classic as those other

16    two wounds we've been talking where the -- the decedent was

17    roughly perpendicular to the muzzle.  There was -- at some

18    angle, he may have had some -- been in front of the decedent to

19    some degree.

12:01PM  20         Q.    Okay.  So let me give you a -- a hypothetical

21    involving three shots.  And you let me know if this is

22    consistent with the medical evidence from autopsy.

23              For the first two shots in my hypothetical, the

24    decedent's right side is to the shooter.  In other words, his

12:01PM  25    body, as I think you just used the word, is perpendicular to

1    the shooter.

2        A.    Yes.

3        Q.    Are you with me so far in the hypothetical?

4        A.    Yes.  I want to emphasize, in general, I --

12:02PM  5    perfectly perpendicular, I can't say, but in general, yes.

6        Q.    I'm not saying perfectly but in general.  Is that

7    what you understand?

8        A.    Yes.

9        Q.    And then after those two shots were sustained, in my

12:02PM 10    hypothetical, the decedent starts to turn somewhat in the

11    direction of the shooter.  Would that hyp- -- and sustained the

12    third shot to the stomach.  Are you with me in my hypothetical?

13        A.    Yes.

14        Q.    So the first two shots, one goes through the arm and

12:02PM 15    the chest, the other one hits the right side and goes across

16    the body right to left.  And then he turns towards the shooter.

17    And the third shot strikes him in the stomach.

18            Do you understand my hypothetical so far?

19        A.    Yes.

12:02PM 20            MR. WESIERSKI:  I'm sorry.

21            MR. GALIPO:  If I could just finish it, and then you

22    can object.

23            MR. WESIERSKI:  Sure.

24        Q.    (BY MR. GALIPO:)  And would that scenario, in those

12:03PM 25    three shots I just gave you in my hypothetical, be consistent

1    with the entry points and trajectory of the bullets as you

2    indicated in your autopsy report?

3                    MR. WESIERSKI:  Objection.  Misstates the evidence.

4    No foundation as to the order of shots as the witness

12:03PM    5    indicated.  Calls for speculation.  And an incomplete

6    hypothetical.

7                    THE COURT:  Well, I'm going to overrule the

8    objection to the extent that the answer doesn't pertain to any

9    type of order.

12:03PM    10                   So if you're able to answer it without getting into

11    some sort of testimony about order.

12                   THE WITNESS:  Yes, ma'am.

13                   Yes.

14        Q.      (BY MR. GALIPO:)  And why would my hypothetical at

12:03PM    15    least be consistent with the first two shots hitting him on the

16    right side when he's generally perpendicular to the shooter

17    with his right side to the shooter and the last shot hitting

18    him in the stomach as he's starting to turn in the direction of

19    the shooter?

12:04PM    20                   MR. WESIERSKI:  Objection.  I'm sorry.

21        Q.      (BY MR. GALIPO:)  Why is that consistent?

22                   MR. WESIERSKI:  Objection.  Misstates the evidence.

23    Incomplete hypothetical.  No foundation based on what the

24    witness said.

12:04PM    25                   THE COURT:  Okay.  Overruled.

1                You can answer.

2                THE WITNESS:  So, yes, with the hypothetical you're

3    presenting, it's possible.  It's also -- there are other

4    possibilities as well.

12:04PM    5        Q.    (BY MR. GALIPO:)  Right.

6                But what I'm asking you is why is my hypothetical

7    consistent with the medical evidence?  Is it because of the

8    right-to-left trajectory of the first two shots and the

9    slightly different trajectory for the abdomen shot or is it

12:04PM   10    something else?

11                MR. WESIERSKI:  Objection.  Leading.

12                THE COURT:  Sustained.

13        Q.    (BY MR. GALIPO:)  Why is it consistent, Doctor?  Why

14    is the trajectory evidence consistent with my hypothetical I

12:05PM   15    gave?

16        A.    All three of those wounds have some component of a

17    right-to-left trajectory.

18        Q.    Right.  But the trajectory of the first two is --

19    it's almost perpendicular, as you describe; correct?

12:05PM   20                MR. WESIERSKI:  Objection.  Leading.

21                THE COURT:  Sustained.

22        Q.    (BY MR. GALIPO:)  Is the trajectory of the first two

23    somewhat different than the third one?

24        A.    Yes.

12:05PM   25        Q.    How so?

```
 1      A.    So -- and when we say "first two," we're actually
 2  talking about Wounds B and C.  Okay?  So B and C are both going
 3  right to left.  And wound -- and, actually -- B actually has
 4  some component of back to front because, remember, it's coming
 5  from his arm and entering into his chest.  So there's a
 6  component of back to front and right to left.
 7          C has a component of right to left; whereas, D
 8  has -- front to back.  Okay?  Front to back.  So there was some
 9  kind of turning going on.  Front to back, right to left, and
10  downward.  So there is a little bit of a deviation downward as
11  well.
12          THE COURT:  And --
13          MR. GALIPO:  And I think we're going to go to lunch.
14  Can I ask one more question, then we can take our lunch break?
15  Or you want me to wait?
16          THE COURT:  No.  You can go ahead.
17      Q.    (BY MR. GALIPO:)  Okay.  But for gunshot wounds --
18  the two that entered the chest, the A that's associated with B,
19  do you believe that's from one shot most likely?
20      A.    Yes.
21      Q.    And then the C, both of them going right to left
22  across the body, you -- if I'm understanding what you're
23  saying, the right side -- so if you were the shooter, for
24  example, sitting at -- where you're sitting and I'm standing
25  with my right side to you as I am now -- generally
```

12:05PM  (line 5)
12:06PM  (line 10)
12:06PM  (line 15)
12:06PM  (line 20)
12:06PM  (line 25)

1      screen with your finger and it may show.

2              A.    (Indicating.)

3              Q.    Okay.  And that, I think, was referenced as Gunshot

4      Wound A previously?

01:48PM    5              A.    Yes.

6              Q.    Now, it might be hard to tell, but is the decedent

7      chest down, laying down in this photograph?

8              A.    Yes.  In this photograph, he's lying on his belly.

9      We are seeing his back.

01:48PM   10              Q.    Okay.  We're seeing his back here.

11                    And Gunshot Wound C that you indicated, can we see

12      that on this -- in this image?

13              A.    Yes.

14              Q.    Can you circle that, please?

01:49PM   15              A.    (Indicating.)

16              Q.    So technically, was Gunshot Wound C to his -- a

17      portion of his back?

18              A.    Again, it's more -- like I said, the lateral right

19      torso.  But in this picture, it does appear to be somewhat the

01:49PM   20      lateral right back, could also be used as a -- a term.

21              Q.    Okay.  So this photo shows two of the entrance

22      wounds, Entrance Wound A to the arm that you circled and

23      Entrance Wound C to the back that you circled?

24              A.    Yes.

01:50PM   25                    MR. GALIPO:  Okay.  Your Honor, I've conferred with

1        Q.      (BY MR. GALIPO:)  So I think you -- did all of --

2   what was the trajectory in terms of left to right or right to

3   left for all of the wounds?

4        A.      Well, are you talking about the gunshot wounds or --

02:00PM   5      Q.      The gunshot wounds.  I'm sorry.

6                MR. WESIERSKI:  Excuse me.  I think we covered that

7   this morning.  Asked and answered.

8                MR. GALIPO:  It's prefatory to my hypothetical I was

9   trying to make before lunch.

02:00PM  10                THE COURT:  I'll overrule the objection.

11                THE WITNESS:  So I guess I'm going to go through all

12  four wounds.

13                First wound, remember, is the -- of the right

14  shoulder.  That one is going back to front, right to left, and

02:00PM  15  I believe downward -- no.  Excuse me.  Upward.

16                Then there's the one to the right side of the chest

17  that was under his armpit.  And that one is going back to front

18  and right to left.

19                Then there's one to the right side of the chest,

02:01PM  20  remember, that -- the wound looked like it could be on the

21  back.  I said the lateral right torso.  And that one was right

22  to left.

23                And then there was the one of the abdomen which was

24  front to back, right to left, and downward.

02:01PM  25      Q.      (BY MR. GALIPO:)  Okay.  Thank you.

1          So did you determine the manner of death -- the --

2    strike that -- the cause of death in this case?

3          A.    Yes.

4          Q.    And what was your determination of the cause of

02:01PM    5    death?

6          A.    It was multiple gunshot wounds.

7          Q.    Did you determine the manner of death?

8          A.    Yes.

9          Q.    What was your determination?

02:01PM   10          A.    Homicide.

11          Q.    Now -- and for medical terms, that's essentially

12    death at the hands of another?

13          A.    Yes.

14          Q.    So lastly, getting back to the hypothetical, the

02:02PM   15    shot through the arm and through the chest, the A and B shots,

16    I guess you'll call them, would those be consistent with the

17    right side of the decedent to the shooter?

18          A.    Yes.

19          Q.    And the Shot C that went right to left as you

02:02PM   20    described, would that be consistent with the right side of the

21    decedent to the shooter?

22          A.    Yes.

23          Q.    And then, finally, the D shot to the stomach, would

24    that be consistent with the right side of the decedent to the

02:02PM   25    shooter but the decedent starting to turn some angle towards

**UNITED STATES DISTRICT COURT**

1    the shooter?

2        A.    Yes.  Some -- some part of the front of his body was

3    facing the muzzle of a weapon.

4        Q.    And after sustaining these types of gunshots, I take

02:03PM    5    it death is not instantaneous?

6        A.    No.

7        Q.    It takes some time?

8        A.    Yes.

9        Q.    And why does it take time?  Is that partly what you

02:03PM    10    were explaining before about the internal bleeding?

11        A.    Yes.

12        Q.    And so after someone sustained these gunshots, would

13    they potentially be able to take a few steps, two or three

14    steps?

02:03PM    15        A.    It is possible.  After -- even if blood doesn't get

16    to the head, the brain has a reserve of a couple of seconds of

17    oxygen.  So they -- there is still enough oxygen for some

18    purposeful movement, but -- I can't get specific for how long

19    it is, but there is a potential for that.

02:04PM    20        Q.    And lastly, Dr. Luzi, with respect to Wounds A, B,

21    and C, would those be, in your opinion, consistent with the

22    decedent directly facing the shooter?

23        A.    No.

24        MR. GALIPO:  Thank you.  That's all I have,

02:04PM    25    Your Honor.

1           **CERTIFICATE OF OFFICIAL REPORTER**

2

3 COUNTY OF LOS ANGELES   )
                             )
4 STATE OF CALIFORNIA     )

5

6         I, MYRA L. PONCE, FEDERAL OFFICIAL REALTIME COURT

7 REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE

8 CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT

9 TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING

10 IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY

11 REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT

12 THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE

13 REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

14

15

16

17         DATED THIS 25TH DAY OF MAY, 2025.

18

19

20              /S/ MYRA L. PONCE

21             MYRA L. PONCE, CSR NO. 11544, CRR, RDR
              FEDERAL OFFICIAL COURT REPORTER
22

23

24

25

**UNITED STATES DISTRICT COURT**