# Exhibit 16

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA - EASTERN DIVISION**

**HONORABLE SUNSHINE S. SYKES, U.S. DISTRICT JUDGE**

```
ROSA NUÑEZ, et al.,              )
                                 )
          Plaintiffs,            )
                                 )
     v.                          )    Case No.
                                 )    ED CV 22-1934 SSS (SPx)
COUNTY OF SAN BERNARDINO, et al.,)
                                 )
          Defendants.            )
_____)
```

**REPORTER'S PARTIAL TRANSCRIPT OF TRIAL PROCEEDINGS**
**DEFENDANTS' CLOSING STATEMENT**
**TUESDAY, APRIL 29, 2025**
**11:13 AM**
**RIVERSIDE, CALIFORNIA**

---

**MYRA L. PONCE, CSR NO. 11544, CRR, RPR, RMR, RDR**
FEDERAL OFFICIAL COURT REPORTER
350 WEST 1ST STREET, ROOM 4455
LOS ANGELES, CALIFORNIA  90012
(213) 894-2305

```
 1   because everything was done right.  So counsel has tried to fit
 2   a square block into a round hole.  He's tried to use, as much
 3   as he can try, evidence to try and say we should be entitled to
 4   not just some money, $35 million.  That's what he's asking you
 5   for with a square peg and a round hole.
 6              There's something missing here.  What's missing?
 7   The person who called this in.  You saw that he called all
 8   these witnesses, but he never called the wife of Andrew, the
 9   one who finally said when -- when Anthony pushed and choked
10   Andrew, it wasn't just a push, pushed him twice and choked him.
11   She finally said, okay, that's it, I'm calling the cops.  But
12   she wasn't here.  She's the one who reported he'd been on
13   drugs, he'd been up for three days, and there's a gun in the
14   house.
15              So everybody was called in, everybody's been here
16   for the family except for her.  Why is that?  Because she would
17   have said very bad things for them and they knew that.  She was
18   fed up with Mr. Nuñez attacking her husband, Anthony attacking
19   Andrew.  She was fed up with that.  Finally, when he choked
20   him, pushed him and choked him, she said that's enough.
21              And you remember, we read to you from the statement
22   when Andrew was on the stand, he was worried about, when she
23   came home, trying to get her in the house.  He was so concerned
24   about getting her in the house that he was worried about that.
25              So she's the person missing, Noelia Benitez.  That's
```

**UNITED STATES DISTRICT COURT**

```
         1   the wife of Andrew.
         2           So a lot of the facts here, to me, are grasping at
         3   straws.  There's really nothing there.  And they're doing their
         4   best, counsel has done his best to try to look through
11:21AM  5   everything to find any little conflict.
         6           But remember, all these deputies have different
         7   perspectives, different views.  So, for example, Campos,
         8   Deputy Campos, he was -- when he had his view of what happened,
         9   he was off in the shade by the tree.  So it's a whole different
11:22AM 10   view than Deputy Cervantes and Deputy Martinez looking down
        11   that pathway or alleyway between the two cars.
        12           The best example of that, the best description of
        13   that was Deputy Cervantes when she said, I was looking eye to
        14   eye to him as he came down that pathway, as he came down that
11:22AM 15   aisle.  And they both said he was advancing.
        16           All the deputies said he was advancing.  The only
        17   one -- and I think counsel was surprised when his own expert
        18   said this.  The only one who said that he somehow stumbled
        19   inadvertently down that path was their expert, DeFoe.  I mean,
11:22AM 20   that was -- that was crazy.  No one said that.  There's no
        21   evidence at all that he just stumbled down that path and wasn't
        22   advancing.  He just stumbled down that way.  And I'll read to
        23   you what he said in trial.  That is absolutely ridiculous for
        24   an expert to go that far.
11:23AM 25           Okay.  So we started the trial with audiotape.  What
```

12

1  and endanger the other people that were inside the house and
2  create maybe a hostage situation.
3        And counsel said, well, he didn't have a gun.  So
4  what?  That's a red herring.  So what he didn't have a gun.
11:28AM  5  You can kill somebody with a lot of things other than a gun.
6        And if you hit somebody in the head with that chain
7  or you hit the carotid artery just right, you hit somebody in
8  the eye and somebody bleeds out, you can kill somebody with
9  that chain.  So the fact he didn't have a gun doesn't mean that
11:28AM 10  the deputies acted inappropriately.
11        And they're not required -- everybody acknowledges
12  this.  They're not required to put themselves in harm's way and
13  get close to them and let themselves get hit in order to try to
14  take him down.  55 times on that tape, 55 times they ask him to
11:28AM 15  put the chain down.  55 times he -- he ignores them.  He does
16  not obey their commands.
17        When he gets outside, he does not obey their
18  commands. Get on the ground.  He never does it.  He never once
19  obeyed their commands.
11:29AM 20        ==And let's not forget, the less-lethal weapons that==
21  ==were used had no effect on this gentleman, none.  He was high==
22  ==on some sort of amphetamine, whatever it was.  The family knew==
23  ==it.  And so the fact that he didn't have a gun, that's a red==
24  herring.
11:29AM 25        What about mental health?  They kept saying, oh, you

**UNITED STATES DISTRICT COURT**

1  know, there's something maybe mentally off with him.  Well, all
2  the deputies testified they thought he was high on drugs.
3  They're not required to call in anybody from mental health
4  until it's safe to do so.  It was never safe.  He would never
5  ever let them make that area safe.  All he had to do was come
6  out and talk to them.
7            When they first got there, they just wanted to find
8  out what was going on.  What happened?  Why?  Why are you in
9  this dispute with your brother?  Why did you push him and try
10 to choke him?
11           And remember, Andrew said, well, he didn't really
12 choke me around the neck, despite that's what he told
13 Sergeant LaFever.  He said, well, he really choked me -- or he
14 really pushed me here.  It wasn't really a choking.  I just
15 don't think that's correct.
16           Involuntary travel.  That means their expert made
17 this outlandish statement that he involuntarily just happened
18 to go between these two cars.  That was a stretch beyond any
19 stretch an expert could go to.  That was ridiculous.
20           The trajectory.  Okay.  I asked, I think, two
21 questions of the coroner.  I said, well, if -- if he was
22 advancing this way (indicating) -- and I have my right arm
23 up -- and if the bullets aren't the way Mr. -- counsel
24 described it -- in fact, no one knows how those bullets
25 entered.  They don't know the order.  Counsel would have you

1  pet store.  And Anthony Nuñez knew that.  He knew it was a
2  chain that he could use as a weapon.  So, therefore, he did.
3           Here's some key facts.  Anthony Nuñez was on drugs
4  and up for days.  There was a gun in the house and he had a
5  chain.  So that's what the deputies knew.
6           And by the way, why was the gun taken from the house
7  the night before?  They tried to say it was because they had a
8  gun stolen a couple of months before, but that -- I think the
9  gun was moved because the mother knew what was happening with
10 her son, that he was acting totally drugged up.
11          ==Anthony Nuñez pushed and choked plaintiff==
12 ==Andrew Nuñez.  So there was a battery that occurred.==  The
13 police then started to get a search warrant and they started to
14 get a *Ramey* warrant or an arrest warrant for him because of
15 that so there was a crime that had been committed.
16          Residents had to be evacuated through the windows.
17 In fact, you heard how on the right and on the left the
18 residents in the house had to be evacuated.  And they made it
19 sound like they were forced to evacuate.  They could have
20 stayed in there.  They never said they wanted to stay in there.
21 ==Why would they want to stay in there with somebody who's high==
22 ==on drugs, pounding on doors, kicking on doors, up all night,==
23 ==three nights in a row, up all day and night.==
24          So not just them but the other residents in the
25 neighborhood are evacuated and, for their own safety, either

**UNITED STATES DISTRICT COURT**

11:37AM

1  gone over this before.  The one witness they had aside from the
2  deputies is the neighbor.  And she has said she's in this car
3  that I've circled.  She's acknowledged there was this car here
4  that blocked her view, showed yesterday with the fence, that
5  there's this fence here that blocks her view.  This tree here
6  that I'm circling blocks her view, kind of looks like a cactus
7  tree.  The next tree blocks her view.
8          And what I didn't show you, there's no way she sees
9  anything in the front of the house because the house blocks her

11:38AM

10 view.  She cannot see what happens.  She has no idea about the
11 shooting.  And, moreover, she testifies that when the shots
12 rang out, she shut her eyes.  And she had her windows rolled
13 up.
14         And then, even more importantly, she acknowledges

11:38AM

15 that she doesn't say that she saw anything for a year.
16 Counsel's saying, oh, gosh, they didn't talk to these deputies
17 for a month.  She didn't talk to anybody for a year.  And then
18 she, while she's on the stand with you, is crying because she
19 relates to Mrs. Nuñez, for whatever reason.  I don't know if

11:38AM

20 she had a situation in the past.  I asked her, and she said no.
21         But she doesn't say anything about seeing the
22 incident for a year.  And she doesn't -- I don't think she
23 could really see the incident at all.  She might have seen him
24 when he ran out on the dirt, but she couldn't hear anything.

11:39AM

25 She didn't hear him say anything.  She didn't hear the deputy

say anything either.

So here are some key facts. The decedent pushed and choked Andrew Nuñez; we talked about that. The family was evacuated from the residence; we talked about that. This is really important. The person who had to use lethal force, Michael Martinez, called for less lethal to be brought. He is the one who asked for less lethal, and that came from the sergeant.

He said, Can we bring up less lethal, the bean bag? He didn't want to shoot this person. No one did. They didn't go out there with the idea, well, let's shoot this person. Nobody wanted to do that.

All the deputies testified that Michael Martinez had no other choice. He was in fear for his life and the other deputies' lives.

Michael Martinez, who has every incentive to say that he was running, says he was walking with a purpose. The other deputies -- Deberg says that he's running. LaFever says that he's walking briskly.

So they use different words. They have different perceptions. Remember, this all happens within seconds, the actual shooting. So we can't look at it in hindsight now. We've all had a chance to break it down, listen to the audio many times. They didn't have that opportunity. They had to do what was being done at the time using what a reasonable police

**UNITED STATES DISTRICT COURT**

|          |    |                                                                        |
|----------|----|------------------------------------------------------------------------|
|          |  1 | the way through, completely.                                           |
|          |  2 | Deputy Michael Martinez shot Anthony Nuñez after                       |
|          |  3 | over an hour and a half of de-escalation attempts and after            |
|          |  4 | Anthony Nuñez charged the deputies.                                    |
| 11:44AM  |  5 | Remember, it wasn't just Michael Martinez, it was                      |
|          |  6 | Ms. -- Deputy Cervantes who was right next to them.  And there         |
|          |  7 | were other deputies in that area.  Plus, he'd already attempted        |
|          |  8 | in the yard to go towards the street and then gone back, but           |
|          |  9 | there were neighbors still not completely out of their homes.          |
| 11:44AM  | 10 | They weren't completely evacuated.                                     |
|          | 11 | Jeremy Deberg shot Anthony Nuñez with four                             |
|          | 12 | less-lethal sponge-tip projectiles, otherwise sometimes called         |
|          | 13 | rubber bullets.  You saw the markings on him.  It didn't have          |
|          | 14 | effect -- not one effect on him.  And you hear him call on the         |
| 11:44AM  | 15 | tape 40/40, 40/40.                                                     |
|          | 16 | And I would submit to you the shots that counsel                       |
|          | 17 | wants you to think are the shots that sergeant here is walking         |
|          | 18 | up, that he's not really there, those are the 40/40 shots.             |
|          | 19 | Deputy Cervantes shot with a bean bag projectile.                      |
| 11:45AM  | 20 | The first one didn't work.  For whatever reason, it jammed.            |
|          | 21 | Second one did work, hit him in the right shoulder.  Counsel           |
|          | 22 | showed you the bruise from that.  So the third one is                  |
|          | 23 | Deputy Campos deploys his Taser.  No effect.  And, again, only         |
|          | 24 | one of the prongs went into him.  But he was quite a ways away         |
| 11:45AM  | 25 | from Anthony Nuñez when he shot the Taser.                             |

|         |    |                                                                   |
|---------|----|-------------------------------------------------------------------|
|         | 1  | concern when he's saying, I'm gonna kill you, you know, I'm       |
|         | 2  | gonna make you kill me.  That's a heightened concern when those   |
|         | 3  | nonlethal or less-lethal weapons don't work at all and they've    |
|         | 4  | tried everything they can and he's still advancing and coming     |
| 11:52AM | 5  | at them with his arm cocked and with the chain up.  At that       |
|         | 6  | point, Deputy Martinez has to protect himself and                 |
|         | 7  | Deputy Cervantes.                                                 |
|         | 8  |            No injury, counsel said.  There wasn't an injury on    |
|         | 9  | anybody.  There doesn't have to be an injury.  If Andrew Nuñez    |
| 11:52AM | 10 | was pushed and choked, a crime was committed, an assault and a    |
|         | 11 | battery.  And that's all that they needed in order to try to      |
|         | 12 | bring him out to try to talk to him, possibly arrest him or       |
|         | 13 | not.                                                              |
|         | 14 |            Oh.  This is another red herring, and this has been    |
| 11:53AM | 15 | repeatedly one of the themes.                                     |
|         | 16 |            Deputy Martinez should have waited after the bean      |
|         | 17 | bag was deployed to see if it worked.  Well, nothing had worked   |
|         | 18 | before.  And after the bean bag, he kept advancing.  Is he        |
|         | 19 | supposed to wait and just get hit with the chain?  No, he's not   |
| 11:53AM | 20 | required to do that.  He doesn't have to wait to see if the       |
|         | 21 | bean bag works and expose himself to danger, possible death.      |
|         | 22 | He doesn't have to do that.                                       |
|         | 23 |            And this -- this call with the mother, that was just   |
|         | 24 | to pull at your heartstrings.  I mean, let's be blunt.  What      |
| 11:54AM | 25 | was the point of that?                                            |

**CERTIFICATE OF OFFICIAL REPORTER**

COUNTY OF LOS ANGELES   )
                        )
STATE OF CALIFORNIA     )

      I, MYRA L. PONCE, FEDERAL OFFICIAL REALTIME COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

      DATED THIS 12TH DAY OF MAY, 2025.

/S/ MYRA L. PONCE
_____
MYRA L. PONCE, CSR NO. 11544, CRR, RDR
FEDERAL OFFICIAL COURT REPORTER