MA EXHIBIT 9

```
 1                    UNITED STATES DISTRICT COURT

 2         CENTRAL DISTRICT OF CALIFORNIA - EASTERN DIVISION

 3          HONORABLE SUNSHINE S. SYKES, U.S. DISTRICT JUDGE

 4

 5   ROSA NUÑEZ, et al.,                  )
                                          )
 6                   Plaintiffs,          )
                                          )
 7        v.                              )    Case No.
                                          )  ED CV 22-1934 SSS (SPx)
 8   COUNTY OF SAN BERNARDINO, et al.,    )
                                          )
 9                   Defendants.          )
     _____)
10

11         REPORTER'S PARTIAL TRANSCRIPT OF TRIAL PROCEEDINGS
                           MORNING SESSION
12                    MONDAY, APRIL 28, 2025
                             8:41 AM
13                    RIVERSIDE, CALIFORNIA

14

15

16

17

18

19

20

21

22   _____

23       MYRA L. PONCE, CSR NO. 11544, CRR, RPR, RMR, RDR
                  FEDERAL OFFICIAL COURT REPORTER
24                350 WEST 1ST STREET, ROOM 4455
                  LOS ANGELES, CALIFORNIA  90012
25                       (213) 894-2305
```

UNITED STATES DISTRICT COURT

08:51AM
*Monell* still left and you all had to kind of prove that the -- the County was acting within their policy. Then I could see, well, yeah, then maybe the sergeant would be able to come in and testify that the County was, in fact, acting within -- within the policy and following the policy and procedures and all of that.

But I don't see how it's relevant if the County is -- is not a defendant that the jury actually has to make any determination on.

08:51AM
MR. WESIERSKI: Well, you're correct, that the *Monell* claim is gone. But their expert made allegations against the County in the sense that he said tactics weren't deployed that should have been deployed. They had no tactical plan, for example, is what his testimony was. He also

08:51AM
indicated that at the scene they should have done things completely different than what they did. This watch commander is going to explain why he did what he did at the scene, which goes directly to counter what the expert said in regards to his theory as to what should have happened instead of what did

08:52AM
happen.

And, you know, the other thing, Your Honor --

THE COURT: I think there's an additional step that plaintiff is concerned about, which I -- I believe that they're saying, yes, he can testify that, you know, as watch commander,

08:52AM
I called out SWAT, I relayed information to the deputies that,

```
              1    A.   Yes.
              2    Q.   And after you spoke with Andrew Nuñez, did you
              3    communicate to the other deputies what generally you had spoken
              4    about?
09:14AM       5    A.   Yes.
              6    Q.   And in regards to speaking with Andrew Nuñez, did
              7    you have a belt recorder at the time that you spoke to him?
              8    A.   Yes.
              9         MR. WESIERSKI:  And I'd like to play -- and I've
09:14AM      10    handed a transcript to counsel -- a portion of that belt
             11    recorder, Your Honor.
             12         MR. GALIPO:  I would object, Your Honor, as hearsay.
             13    Information unknown and unclear from the record as to what, if
             14    anything, was communicated to Deputy Martinez.
09:15AM      15         THE COURT:  Okay.  I actually don't have the
             16    transcripts.  I know we had talked about it but --
             17         MR. WESIERSKI:  I do have a -- I do have a copy,
             18    Your Honor.  May I approach?
             19         THE COURT:  Yes.
09:15AM      20         MR. WESIERSKI:  I'm handing the clerk, Your Honor,
             21    three pages of transcript, which is a small portion of his belt
             22    recorder.
             23         THE COURT:  But this is the -- the precise portion
             24    you're asking to play?
09:15AM      25         MR. WESIERSKI:  Yes, Your Honor.  333-1, I've marked
```

**UNITED STATES DISTRICT COURT**

```
 1   residence -- I think you said you were coming from your command
 2   post back, you heard the 40 millimeter; correct?
 3        A.   Yes.
 4        Q.   And when you saw Anthony Nuñez after you heard the
 5   deployment of the 40 millimeter, did you see that he had slowed
 6   in any way when you could see him at that point?
 7        A.   No.
 8        Q.   And as far as the bean bag, you saw that hit him; is
 9   that right?
10        A.   Yes.
11        Q.   Where did it hit him?
12        A.   In the -- I believe it was in the upper portion of
13   the torso of his body.  And it was while he was at the front of
14   the vehicle.
15        Q.   There has been some testimony by the expert that he
16   was shot in the front -- lethally shot in the front of these
17   vehicles.  Is that what you saw?
18        A.   No.
19        Q.   What did you see?
20        A.   I saw that he was shot by lethal force in between
21   the vehicles.
22        Q.   And at that point when you saw that, you were close
23   enough to see it --
24        A.   Yes.
25        Q.   -- is that right?
```

**UNITED STATES DISTRICT COURT**

|  |  |  |
|---|---|---|
| | 1 | A. Yes. |
| | 2 | Q. And that obviously takes into account everyone's |
| | 3 | safety? |
| | 4 | A. Correct. |
| 11:06AM | 5 | Q. Including the safety of the individual, in this case |
| | 6 | Anthony? |
| | 7 | A. Certainly. |
| | 8 | Q. And the hope is to take someone into custody with no |
| | 9 | force, if possible? |
| 11:07AM | 10 | A. Absolutely. |
| | 11 | Q. And the minimal amount of force, if you can? |
| | 12 | A. Yes. |
| | 13 | Q. And then I think your belt recorder -- when did you |
| | 14 | turn it on, approximately, in the chronology of the events? |
| 11:07AM | 15 | A. Probably upon my arrival to the scene. And -- and |
| | 16 | it -- as far as I know, it recorded most of the time. I might |
| | 17 | have paused it here and there, but that doesn't normally |
| | 18 | happen. |
| | 19 | Q. To the best of your knowledge, it was running |
| 11:07AM | 20 | continuously? |
| | 21 | A. Yes. |
| | 22 | Q. Now, I know you said you reviewed it prior to giving |
| | 23 | your interview on April 20th? |
| | 24 | A. Yes. |
| 11:08AM | 25 | Q. Have you reviewed it at any time since then? |

**UNITED STATES DISTRICT COURT**

```
 1    Q.   Do you understand the topic I'm -- I want to talk to
 2   you about?
 3    A.   Sure.
 4    Q.   So, first of all, did you have -- hear anything
 5   regarding any attempt to use the bean bag shotgun initially?
 6    A.   Not that I'm aware of.
 7    Q.   Did you hear anything as you were starting to walk
 8   that sounded like a bean bag shotgun being deployed?
 9    A.   It sounded to me like the 40 millimeter.
10    Q.   What you heard, you believe, was the 40?
11    A.   Correct.
12    Q.   And did they have slightly different sounds, based
13   in your experience, the bean bag shotgun versus the
14   40 millimeter?
15    A.   Yes.
16    Q.   And it sounds like you could hear the 40 millimeter,
17   you're saying, but you could not actually see Anthony at the
18   time he was struck.  Is that a fair statement?
19    A.   Yes.
20    Q.   And do you know on your belt recorder that you
21   listened to sometime in the last week, whether you can hear the
22   40 millimeter sounds on your belt recorder?
23    A.   I don't recall hearing it on my belt recorder.
24    Q.   Do you think it was because you were too far away at
25   the time?
```

**UNITED STATES DISTRICT COURT**

|  |  |
|---|---|
| 1 | A.    I believe I might have paused it when I was at the |
| 2 | command post.  So I don't know that it was recording when I |
| 3 | went back up to the instant location. |
| 4 | Q.    Okay.  So how about a Taser?  Did you hear any Taser |
| 5 | being deployed as you were walking? |
| 6 | A.    I don't recall hearing the Taser being deployed.  I |
| 7 | just recall hearing that the Taser was deployed.  Whether it |
| 8 | was a broadcast or if I overheard while walking up towards the |
| 9 | location them say "Taser, Taser," I don't recall that.  I just |
| 10 | recall hearing it was -- it was deployed. |
| 11 | Q.    Heard over the radio dispatch or -- |
| 12 | A.    I don't recall whether it was over the radio or if I |
| 13 | overheard -- I could hear it in the distance.  I don't recall |
| 14 | that, though, which one. |
| 15 | Q.    Did you see it actually being deployed? |
| 16 | A.    No.  I don't believe so. |
| 17 | Q.    So would it be correct to say as you were walking |
| 18 | there from the command post 200 yards away, after hearing |
| 19 | Anthony was outside with the chain, you yourself didn't |
| 20 | actually see any less lethal strike him? |
| 21 | A.    I saw the bean bag round strike him. |
| 22 | Q.    And where did you say he was at that time?  I think |
| 23 | you said in front of the gray car. |
| 24 | A.    Correct. |
| 25 | Q.    I'm going to get back to that in a moment. |

**UNITED STATES DISTRICT COURT**

|  |  |
|---|---|
| 1 | A. And I think I heard me call Mike's name earlier on. |
| 2 | Sorry, I didn't -- |
| 3 | Q. That's okay. I'm going to keep playing. You tell |
| 4 | me if you hear anything else. |
| 5 | A. Okay. Uh-huh. |
| 6 | (Audiotape played, not reported.) |
| 7 | THE WITNESS: I asked for fire -- I'm trying to |
| 8 | distinguish voices. Obviously, there's a lot of different |
| 9 | voices going on there. But I believe I asked for fire in the |
| 10 | distance and then gloves possibly. |
| 11 | MR. GALIPO: Okay. Please continue. |
| 12 | (Audiotape played, not reported.) |
| 13 | THE WITNESS: Offering the tourniquet there. |
| 14 | Q. (BY MR. GALIPO:) All right. Thank you. |
| 15 | (Audiotape played, not reported.) |
| 16 | THE WITNESS: That's me. That's me. |
| 17 | Q. (BY MR. GALIPO:) Okay. Did you hear yourself say |
| 18 | anything else during that time frame? |
| 19 | A. Yes. Letting dispatch know that the subject was not |
| 20 | responsive and asking for fire to -- to get in. |
| 21 | Q. Okay. Now, I next want to play a clip from your |
| 22 | belt recorder. And I think your belt recording is 333. |
| 23 | MR. GALIPO: So we made a -- we just want to play a |
| 24 | short clip that we'd like to mark, Your Honor, as 333-A, if |
| 25 | that's okay with the Court. |

**UNITED STATES DISTRICT COURT**

```
                then we'll deal with it, if it's going to be admitted at a
                later time.
                        MR. WESIERSKI:  Okay.
```

### REDIRECT EXAMINATION

BY MR. WESIERSKI:

Q.  I think counsel's trying to imply that you weren't there at the scene.  When you're at the scene of a shooting, is that something you ever forget?

A.  No.

Q.  Were you there at the time the lethal force encounter occurred?

A.  Yes.

Q.  And I think you initially said on my direct that you had paused or stopped your recording.  And then when Mr. Galipo asked you -- it might have got confusing.  Did you at some point stop your recording or pause it?

A.  Yes.

Q.  When did you do that?

A.  Probably throughout the event, but certainly I would have when I was back at the command post.

Q.  All right.  When you came from the command post to the scene of this incident, at that point were you recording that part of your walk?

A.  It would depend but possibly not.

Q.  Okay.  And when you came to the scene of the

```
 1   shooting, at that point, if you had pushed "PAUSE" on your
 2   recording and then after the shooting occurred pushed "PAUSE"
 3   again, would it unpause and then continue on as if it had been
 4   recording the whole time?
 5        A.    Yes.  It would look like it had been recording the
 6   whole time with -- it doesn't start a new file when it's
 7   pressed "PAUSE" -- when "PAUSE" is pressed.
 8        Q.    And at the time that this incident occurred, when
 9   the Taser was used and when the less lethal bean bag was used,
10   you saw the bean bag being used and deployed?
11        A.    Yes.
12        Q.    And you saw where it hit -- or did you see where it
13   hit Mr. Nuñez?
14        A.    Yes.  I believe so.
15        Q.    You said where?  Where did it --
16        A.    I believe it hit his upper torso.
17        Q.    And do you know which side?
18        A.    I believe it was his right side.
19        Q.    If -- and we've seen plenty of photos and I can put
20   one up if you need it.  If Mr. Martinez -- excuse me.  If
21   Mr. Nuñez had wanted to proceed back into the house, was there
22   enough room for him to do that between the car and the house?
23              Let me do it a different way.  Let me introduce the
24   video, if we could.  And I'll stop the video, which I think is
25   341.
```

**UNITED STATES DISTRICT COURT**

**CERTIFICATE OF OFFICIAL REPORTER**

COUNTY OF LOS ANGELES  )
                       )
STATE OF CALIFORNIA    )

      I, MYRA L. PONCE, FEDERAL OFFICIAL REALTIME COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

      DATED THIS 13TH DAY OF MAY, 2025.

      /S/ MYRA L. PONCE
_____
MYRA L. PONCE, CSR NO. 11544, CRR, RDR
FEDERAL OFFICIAL COURT REPORTER